## UNITED STATES DISTRICT COURT
## DISTRICT OF SOUTH CAROLINA

| | |
|---|---|
| Robert L. Norman, Individually and on Behalf of All Others Similarly Situated, )<br>)<br>) | CIVIL ACTION NO.   3:17-2616-MBS |
| ) | <u>CLASS ACTION</u> |
| Plaintiff, )<br>) | |
| vs. ) | **<u>COMPLAINT FOR VIOLATION OF</u>** |
| ) | **<u>THE FEDERAL SECURITIES LAWS</u>** |
| SCANA CORPORATION, KEVIN B. )<br>MARSH, JIMMY E. ADDISON and )<br>STEPHEN A. BYRNE, )<br>) | |
| ) | <u>JURY TRIAL DEMANDED</u> |
| Defendants. )<br>) | |

Plaintiff Robert L. Norman ("Plaintiff"), by and through the undersigned attorneys, alleges the following upon Plaintiff's knowledge with respect to Plaintiff, and upon information and belief as to all other matters, based on, *inter alia*, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of the Defendants' public documents and press releases, SCANA Corporation's ("SCANA" or the "Company") public filings with the United States Securities and Exchange Commission ("SEC"), wire and media reports published regarding SCANA, securities analysts' reports and advisories about the Company, transcripts of SCANA investor conference calls, legislative committee hearings, and other information obtained on the Internet.  Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## I.    <u>NATURE OF THE ACTION</u>

1.      This is a securities class action pursuant to §§ 10(b), and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder on behalf of behalf of all persons or entities who purchased or otherwise acquired the common stock of SCANA, between January 19, 2016 and September 22, 2017, inclusive (the "Class Period").

2.      SCANA is an energy-based holding company whose principal subsidiary, South Carolina Electric & Gas Company ("SCE&G"), is a regulated public utility engaged in the generation, transmission, distribution and sale of electricity primarily in South Carolina.

3.      During the Class Period, Defendants artificially drove up the price of SCANA's stock by issuing false and misleading statements to investors, and omitting material information, concerning the progress, cost, and completion schedule of the multi-billion dollar nuclear construction project at V.C. Summer Nuclear Station (the "Nuclear Project") in Fairfield County, South Carolina.  Defendants, including Kevin B. Marsh ("Marsh"), SCANA's Chief Executive Officer ("CEO"), repeatedly mislead investors through various press events, press releases, investor conference calls, meetings with public officials, and filings with the SEC and other regulatory agencies, about the true status of the Nuclear Project.  Indeed, rather than disclose to the market that the Nuclear Project was facing serious design, construction, and cost headwinds, as described in a secret, 130-page report issued by Bechtel Corporation ("Bechtel") on February 5, 2016 (the "Bechtel Report"), Defendants doubled down on their strategy of deception and misdirection by issuing SCANA produced promotional videos, press releases, and other public statements that created a fundamentally false and misleading impression to investors that the project was running smoothly within a reasonable budget and on schedule.  Yet, as only recently disclosed to investors, for much of the Nuclear Project's history, a formal construction schedule was never in place and costs were spiraling out of control.

4.      In addition to material misstatements and omissions about the status and progress of the Nuclear Project, Defendants also issued false and misleading statements and omitted material information, concerning the financial health of its lead contractor for the project, Westinghouse Electric Company ("Westinghouse").  For example, long before Westinghouse

sought bankruptcy protection on March 29, 2017, Defendants harbored grave concerns about Westinghouse's financial viability to continue the construction of the project. This too was never disclosed to investors and was otherwise masked by Defendants' deliberate misinformation campaign to create the false impression to investors and other stakeholders that the project had reached significant milestones and was moving forward as planned.

5.    As a result of Defendants' wrongful acts and omissions, SCANA shares traded at artificially inflated prices during the Class Period, and Plaintiff and other Class members suffered significant losses and damages. Accordingly, Plaintiff hereby brings claims against SCANA and certain of the Company's senior executives that exercised control over the Company during the Class Period. Plaintiff's claims arise under Sections 10(b) and 20(a) of the Exchange Act and Rule 10b-5 promulgated thereunder.

## II.    JURISDICTION AND VENUE

6.    The claims asserted arise under §§ 10(b) and 20(a) of the Exchange Act and Rule 10b-5 promulgated thereunder. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and 1337, and § 27 of the Exchange Act. Venue is proper pursuant to § 27 of the Exchange Act and 28 U.S.C. § 1391(b). SCANA has operations in this District; false statements were made in this District; and acts giving rise to the violations complained of occurred in this District.

7.    In connection with the acts alleged in this Complaint, Defendants directly or indirectly used the means and instrumentalities of interstate commerce, including without limitation the mails, interstate telephone communications, and the facilities of the national securities exchanges.

III.    **PARTIES**

8.      Plaintiff Robert L. Norman, as set forth in the accompanying certification, which is incorporated by reference herein, acquired SCANA common stock at artificially inflated prices during the Class Period and has been damaged thereby.

9.      Defendant SCANA describes itself as an energy-based holding company principally engaged, through subsidiaries, in electric and natural gas utility operations and other energy-related businesses.  SCANA's principal subsidiary, SCE&G is a regulated public utility engaged in the generation, transmission, distribution and sale of electricity primarily in South Carolina.  SCANA is incorporated in South Carolina and maintains its principal executive offices at 220 Operation Way, Cayce, South Carolina 29033-3701.  SCANA's stock is traded on New York Stock Exchange ("NYSE") under the ticker symbol "SCG."

10.     Defendant Kevin B. Marsh ("Marsh") has served as Chairman of the Board and Chief Executive Officer ("CEO") of SCANA since December 2011.  Marsh became president of SCE&G in 2006 and became President and Chief Operating Officer of SCANA in January 2011.  Marsh became Vice President and Chief Financial Officer ("CFO") of SCANA in 1996, and became Senior Vice President of SCANA in 1998.

11.     Defendant Jimmy E. Addison ("Addison") Jimmy E. Addison has served as the CFO and Executive Vice President of SCANA since April 2006 and January 2012, respectively.

12.     Defendant Stephen A. Byrne ("Byrne") has served as Executive Vice President of SCANA since 2009.  Byrne has served as President, Generation and Transmission and Chief Operating Officer of SCE&G since 2011.

13.     Defendants Marsh, Addison and Byrne (collectively, the "Individual Defendants") possessed the power and authority to control the contents of SCANA's SEC filings, press releases, and other market communications.  The Individual Defendants were provided with copies of the

Company's SEC filings and press releases alleged herein to be misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or to cause them to be corrected. Because of their positions with the Company, and their access to material information available to them but not to the public, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to and were being concealed from the public, and that the positive representations being made were then materially false and misleading. The Individual Defendants are liable for the false statements and omissions pleaded herein.

IV.    **SUBSTANTIVE ALLEGATIONS**

14.    The Class Period begins on January 19, 2016. On that date, SCANA issued a press release and video "Highlighting a Year of Progress for V.C. Summer Units 2 and 3." The press release touted the "achievement" of several "milestones" for "V.C. Summer," stated that "[t]he nuclear construction team concluded the year on a high note," and noted that "work continued steadily on the construction site . . . ."

15.    On February 5, 2016, Bechtel delivered the secretly commissioned Bechtel Report to SCANA and SCE&G. In the report, which was never made public until September 4, 2017, Bechtel informed SCANA and SCE&G that Westinghouse lacked a legitimate schedule to build the reactors:

> [T]he V.C. Summer Units 2 & 3 project suffers from various fundamental EPC and major project management issues that must be resolved for project success:
>
> - While the Consortium's engineering, procurement, and construction plans and schedules are integrated, the plans and schedules are not reflective of actual project circumstances.
>
> - The Consortium's project management approach does not provide appropriate visibility and accuracy to the Owners on project progress and performance.
>
> - The Consortium's forecasts for schedule durations, productivity forecasted manpower peaks and percent complete do not have a firm basis.

- There is a lack of a shared vision, goals, and accountability between the Owners and the Consortium.

- The Consortium lacks the project management integration needed for a successful protect outcome.

- The WEC-CB&I relationship is strained, caused to a large extent by commercial issues.

- The overall morale on the project is low.

- The Contract does not appear to be serving the Owners or the Consortium particularly well.

- The issued design is often not constructible resulting in a significant number of changes. The construction planning and constructability review efforts are not far enough out in front of the construction effort to minimize impacts.

- There is significant engineering and licensing workload remaining (currently over 800 engineers) ITAAC closure will be a significant effort.

- Emergent issues potentially requiring NRC approval of LARs remain a significant project concern.

- There is a significant disconnect between construction need dates and procurement delivery dates.

- The amount of stored material onsite is significant, creating the need for an extended storage and maintenance program.

- Construction productivity is poor for various reasons including changes needed to the design sustained overtime, complicated work packages, aging workforce etc.

- The indirect to direct craft ratio is high.

- Field non-manual turnover is high.

- The Owners do not have an appropriate project controls team to assess/validate Consortium reported progress and performance.

- The schedule for the startup test program is in the early stages of development. The BIP turnover rate appears to be overly aggressive.

16.    In March 2016, a month after receiving the Bechtel Report, ***Defendant Marsh stated in a letter to shareholders that "[SCANA] continued to move forward and make substantial progress on initiatives important to our company such as our new nuclear construction project."***

17.    On April 28 2016, SCANA held a conference call with analysts and investors to discuss the Company's first quarter 2016 earnings and operations.  During the conference call, Defendant Byrne answered an analyst's questions regarding SCE&G's progress in constructing the V.C. Summer reactors.  Byrne reassured the analyst that SCE&G's contractors were "doing a tremendous job" and that progress was "better than we expected."

> [**Analyst**]: Okay. And then, I think you mentioned on the nuclear that the current critical path item is the shield building.  And I know that in your report that you filed in February that was mentioned there as well. ***I was just wondering if you could update us on the status of that in terms of the components that are being fabricated, and so forth.***

> [**Defendant Byrne**]: ***Yes. Dan, the shield building is going probably better than we had anticipated.*** Our concern for the shield building really came from the contractor, their concerns, and at the time, that was Chicago Bridge and Iron. Now, Fluor has taken over. But we still retained the CB&I Services crew that is doing that welding. So even though CB&I Power exited the Consortium, the CB&I Services folks who are doing the containment vessel welding and the shield building welding stay. ***They're doing a tremendous job.***

> \*\*\*

> ***So overall, I'd say the shield building's going a little better than we expected.***

18.    On May 1, 2016, Santee Cooper CEO Lonnie Carter sent a private letter to Jose Gutierrez, the interim President and CEO of Westinghouse:  "Unfortunately, our experience with Westinghouse . . . has been set in a trend of continuous deceit and non-transparency."

19.    In June 2016, Defendant Marsh sent a private email to Mamoru Hatazawa, Executive Officer of Toshiba Corporation (the parent company of Westinghouse) as follows:  "We

have no doubt that we have been the victim of financial malfeasance by [Westinghouse] and Toshiba." In another email on June 8, 2016, March informed Mr. Hatazawa that "[w]e continue to be taken aback by what we see as Toshiba's lack of respect" and stating that Toshiba "is not acting honorably."

20.     On or around June 30, 2016, SCANA issued a "V.C. Summer Nuclear Station Units 2 & 3 Quarterly Report" to the South Carolina Office of Regulatory Staff ("ORS"). This report stated that "[w]hile certain aspects of the work present challenges to the completion schedule, overall progress continues . . . . ."

21.     On July 28, 2016, SCANA held a conference call with analysts and investors to discuss the Company's second quarter 2016 earnings and operations. During the conference call, Defendant Byrne answered an analyst's questions regarding the "timeline and schedule on the project and specifically on the milestones" and "ultimately, if and/or when you expect to do -- or hear back from Fluor as to more of an integrated schedule update for the overall project." Byrne reassured the analyst that the reactors' "guaranteed substantial completion dates remained" the same and that he did not "expect anything dramatic to come from" Westinghouse's recent change in subcontractors.

> [**Analyst**]: So I wanted to follow up a little bit on the timeline and schedule on the project and specifically on the milestones, if you could provide a little bit more of an update there; and ultimately, if and/or when you expect to do -- or hear back from Fluor as to more of an integrated schedule update for the overall project.

> [**Defendant Byrne**]: Yes, Julien, this is Steve. ***The guaranteed substantial completion dates remain at August of 2019 for unit 2 and August of 2020 for unit 3. We don't see anything to change those.*** Fluor's review of the schedule is really something that should conclude somewhere in the third quarter and they will be giving that to Westinghouse. And remember that on the project now, we're dealing just with Westinghouse; Fluor is a subcontractor to Westinghouse. I don't expect anything necessarily to change from that review, save for perhaps the number of hours it might take and shifts that they would have to put on, that kind of thing. So the goal of that schedule review was to hold the dates constant and see what it would

take to accomplish those dates. ***So I don't expect anything dramatic to come from that.***

22.    On October 7, 2016, SCE&G "[p]ublished" a video on YouTube of Defendant Marsh speaking to reporters on September 21, 2016, at the "V.C. Summer Media Day 2016."  In the video, Defendant Marsh stated:  ***"Well they say well if you could do it again, would you make the same decision?  And absolutely I would make the same decision.  I feel as strongly today, probably even stronger today, than I did back in 2008 that this is the solution for us for a clean energy future." Marsh further stated that "with projects of this nature, you're gonna have some challenges . . . but we've been able to meet those challenges, make adjustments to the contract, and continue progress on the project."***  Marsh reiterated:

> ***We're excited about where we are, we've had challenges, we've been able to work through those challenges***, because you're not gonna go through a project that's gonna be ten or twelve years without issues come up.  I would offer if you've ever built a house, whether it took twelve months or eighteen months, you had a couple issues, you had a couple of change orders along the way, and the likelihood is that didn't reduce the cost of your house as you went through that process.

23.    On October 27, 2016, SCANA held a conference call with analysts and investors to discuss the Company's third quarter 2016 earnings and operations.  During the conference call, Defendant Byrne answered an analyst's questions regarding whether Westinghouse's subcontractor to build the nuclear reactors was "maybe having some troubles in terms of staffing up for the evening shift . . . ."  Byrne reassured the analyst that the reactors' "guaranteed substantial completion dates remained" the same and that he did not "expect anything dramatic to come from" Westinghouse's recent change in subcontractors.  Byrne reassured the analyst that Westinghouse's subcontractor was "doing a good job"; that "we're very happy with what [the subcontractor] is doing for us"; and that the subcontractor has "been very successful recently":

[**Analyst**]: Okay. And then I think in your last update report, there was also some discussion about Fluor maybe having some troubles in terms of staffing up for the evening shift or whatever. I wondered if you could update us on that.

[**Defendant Byrne**]: Yes, Fluor, when they first came in, identified the need to increase staffing and wanted to staff a full back-shift or night-shift because we'd been operating with a skeleton crew night-shift or back-shift up to that point. Initially, they had some difficulty in hiring, but I'd say that they recently have rectified that. . . . ***So they're doing a good job.*** They're trying some innovative things, implementing multilingual workforces, those kinds of things. ***So we're very happy with what Fluor is doing for us. So they've been very successful recently.***

24.    Also on October 27, 2016, SCANA issue a video on YouTube titled "SCE&G Welcomes News Media to Nuclear Construction Site" featuring "members of the V.C. Summer leadership team."  In the video, Defendant Byrne spoke to reporters on September 21, 2016, at the "V.C. Summer Media Day 2016."  Byrne "gave the journalists an overview of the massive construction site before they boarded a bus to see it for themselves."  Holding a microphone, Byrne stated:  "The pace of this project is quickening.  Though we have run into some issues and roadblocks in the past, most of those issues and roadblocks are behind us."

25.    On February 14, 2017, Toshiba announced that it would delay the release of its quarterly earnings report due to concerns around the company's accounting controls, specifically as they related to its U.S. nuclear subsidiary Westinghouse, which Toshiba estimated would require it to take a $6.3 billion write-down related to SCANA's nuclear project.  Toshiba's chairman, Shigenori Shiga, announced his resignation to take responsibility for the massive write-down.

26.    Also on February 14, 2017, SCANA issued a quarterly report to the ORS that included "a revised completion schedule" for the two Nuclear Project reactors "of April 2020 and December 2020" – later than the previous completion dates of August 2019 and August 2020.

27.     Upon these and other revelations, SCANA's stock price fell approximately 6.25%, or $4.38 per share, from a closing price of $70.03 on February 13, 2017, to a closing price of $65.65 on February 17, 2017, on unusually heavy trading volume.

28.     Despite these announcements which revealed some – but not the full extent – of the troubles affecting SCANA, Westinghouse, Toshiba, and the Nuclear Project, Defendants continued to make false and misleading statements to the market.

29.     On February 16, 2017, SCANA held a conference call with analysts and investors to discuss the Company's first quarter 2017 earnings and operations. During the conference call, Defendant Marsh stated that "we still anticipate completing our two new nuclear units" and that "we are making substantial progress on these new plants":

> We continue to monitor Toshiba's financial situation and their proposed recovery plans. Although ideally Toshiba would be without these stresses, *we still anticipate completing our two new nuclear units*, which will enable us to provide our customers with safe, reliable energy for decades to come. . . . *As you can see from Steve's update, we are making substantial progress on these new plants and remain focused on continued progress toward their completion. Again we will continue to monitor this situation closely and will alert you if we are made aware of any changes.*

30.     During the same call, Defendant Byrne reassured analysts that SCANA would still reach its "2020 deadline" because "efficiency factors have increased significantly," things were "going much, much more smoothly," and that "we're getting to that point very rapidly where the unique nuclear aspects and unique aspects of this new regulatory framework are getting behind us." Specifically, Byrne stated as follows:

> [**Defendant Byrne**]: . . . When you say the second unit, you talking about the second new unit or are you talking about Unit 2, which is the first new unit?
>
> [**Analyst**]: Sorry. Yes, the second new unit and the –
>
> [**Defendant Byrne**]: Second new unit.
>
> [**Analyst**]: -- 2020 deadline.

[**Defendant Byrne**]: Yes. *So what we've seen so far is that the efficiency factors have increased significantly . . . and it's going much, much more smoothly. So I have a reasonable confidence in the efficiency gains for the second new unit.*

\*\*\*

[**Analyst**]: And also, I think in an earlier question you were talking about the various critical paths, activities that you have coming up here over the first half of this year and going forward. How close are you guys to getting to the point where the construction project is, like now becomes a more traditional construction project in the nuclear in and of itself is no longer like the defining factor in terms of getting from here to there?

[**Defendant Byrne**]: *Yes. I think we're actually pretty close to that. . . . I think we're getting to that point very rapidly where the unique nuclear aspects and unique aspects of this new regulatory framework are getting behind us.*

31.     Between February 28 and March 2, 2017, SCANA attended the 2017 UBS & Morgan Stanley Utilities Conferences, at which the Company published a "2017 UBS & Morgan Stanley Utilities Conferences Presentation" for investors and industry analysts.  This presentation included the following slide, which graphically showed that SCANA's "Current Position" on the "Manufacturing Schedule" for the V.C. Summer reactors was nearly complete:



32.    On March 29, 2017, Westinghouse filed to reorganize its business under the protection of Chapter 11 of the U.S. Bankruptcy Code.

33.    On April 12, 2017, Defendants March, Addison, and Byrne gave an "Ex Parte Briefing" to the PSC concerning Westinghouse's March 29 bankruptcy filing.  During the briefing, Defendant Byrne stated that "[s]ince the bankruptcy, Westinghouse has been generally cooperative and responsive to our requests for information"; that "we expect this cooperation to continue"; and that "work continues on-site without substantial disruption."

34.    During the briefing to the PSC, Defendants presented another slide to the PSC showing that the "Manufacturing Completion Schedule" for the V.C. Summer reactors was nearing completion:



35.    On July 31, 2017, SCANA publicly announced that it would abandon construction of the nuclear project because of delays and cost overruns.

36.    On August 2, 2017, *The Post and Courier* published an article titled "S.C. lawmakers want SCANA stockholders to eat costs of two failed nuclear reactors."  The article stated:

> A bipartisan group of legislators met in the Statehouse on Wednesday to condemn utility regulators, the executives of SCANA and the board of the state-operated utility Santee Cooper, which partnered on the V.C. Summer expansion projects more than a decade ago.
>
> Many of the lawmakers went a step further, claiming they will investigate how to stop the executives and investors of SCANA — the parent company of [SCE&G] — from charging customers between $2 billion to nearly $5 billion in costs over the next 60 years for the wasted concrete, steel and labor pumped into the unfinished reactors.

37.     On August 4, 2017, South Carolina Attorney General Alan Wilson announced that he was opening an investigation and state Senate leaders called for a special legislative session to investigate SCANA's abandonment of the Nuclear Project.

38.     In response to these announcements, SCANA's stock price fell approximately 5%, or $3.36 per share, to close at $63.79 per share on August 4, 2017, after several days of unusually heavy trading volume.

39.     On August 10, 2017, *The Post and Courier* published a "Top Story" article entitled "CEO: SCANA may not return to scuttled nuclear project — even if a new partner emerges."  The article reported on Defendant Marsh's comments to state lawmakers that "he wasn't sure he would want to take the project back up after it fell years behind schedule and its costs soared billions of dollars over budget."

40.     On this news, SCANA's stock price fell approximately 2.1%, or $1.32 per share, to close at $60.69 per share on August 11, 2017.

41.     The same day, *Seeking Alpha* published an article commenting on Defendant Marsh's announcement.  The article stated that "[a]bandonment of nuclear plant under construction is a dramatic and unexpected move that is meeting political uproar."  The article further stated that "[SCANA] had made no indication that they were considering abandonment. Even the Regulators were taken by surprise. In fact, the Chairman of the Public Service Commission of South Carolina was quoted as asking senior management at an ex parte briefing "are the three of you aware that this Commission was blindsided yesterday by this news?"

42.     On August 31, 2017, *The Post and Courier* published an article titled "Secretive report on South Carolina nuclear reactor construction never given to state utility regulators."  The article stated:

SCANA Corp. may have misled state utility regulators about the existence of a secretive report that detailed construction failures at two troubled nuclear reactors at the V.C. Summer station in Fairfield County, months before the $9 billion energy project was abandoned.

The director of the state Office of Regulatory Staff told *The Post and Courier* on Thursday that SCANA officials repeatedly told state agency employees they didn't have a copy of a report that was produced by Bechtel Corp., an engineering and project management company that observed the nuclear construction near Jenkinsville in past years.

"They have continued to ask for it," said Dukes Scott, the regulatory staff director. "As we asked for it, they never said, 'Yes, here it is.'"

Those state regulators were surprised last week when SCANA and Santee Cooper officials admitted under oath in a Senate hearing the document did exist, and they were again denied access to it by SCANA, who is now claiming it as legally privileged information.

Eric Boomhower, a communications director for SCANA, said the reason the company is treating the document as privileged information is because the investor-owned utility and Santee Cooper hired Bechtel in anticipation of suing Westinghouse, the designer of the reactors and the primary contractor at V.C. Summer.

"SCANA prefers to respect the legislative review process by not commenting on its actions in response to the report at this time," Boomhower added.

Santee Cooper, which isn't overseen by state utility regulators, didn't respond to questions sent from the newspaper this week about the report.

Lawmakers on two special legislative committees in the S.C. House and Senate have requested the document. It reportedly points out problems with the reactors' construction and offered recommendations of how to correct the nuclear build-out that was abandoned at the end of July.

The exact findings of the report are not known but lawmakers hope the previously undisclosed document will shed some light into why electric customers are paying for two unfinished nuclear reactors that are only 30 percent complete and lacked a legitimate construction schedule.

Roughly 5,000 workers were fired at V.C. Summer when investor-owned SCANA and state-run Santee Cooper pulled the plug on the decade-long construction effort that was supposed to usher in a new age of nuclear power in the United States.

But to this point, nobody outside the two partnering utilities has seen the report. Gov. Henry McMaster, who oversees the 11-member board of Santee Cooper, knew nothing of it before last week. Later Thursday, McMaster sent a letter to

Santee Cooper Chairman Leighton Lord asking for a copy of the report immediately.

Members of the state's regulatory staff heard about the report, compiled by Bechtel, the country's largest construction and civil engineering company, through conversations with workers at the V.C. Summer site in past years. But when the utility watchdog agency inquired about the document, Scott said his staff was told by SCANA officials that the utility didn't have a physical copy of any report.

SCANA employees informed state regulators that Bechtel had only orally communicated with them about the San Francisco-based company's work at V.C. Summer, Scott said.

Much is still unknown about Bechtel's work, including who paid for the report, what date Bechtel started its analysis, when it was completed, who it was delivered to and what problems it pointed out.

The report was initiated after Santee Cooper, the minority owner of the now-canceled reactors, pushed to have a third-party company analyze the construction effort, according to Lord.

By that point, the project had already seen one temporary construction schedule after another fail and the total cost for the two reactors increase dramatically.

Lord didn't go into detail about what findings or recommendations were contained in the report, but he told The Post and Courier it led Santee Cooper's board to issue a call for an independent construction monitor at the V.C. Summer site.

SCANA, which was primarily in charge of building and starting the reactors, rejected the call to hire a third-party construction monitor, according to Santee Cooper's chairman.

SCANA's failure to provide the state's utility regulators with the report has raised questions from state lawmakers leading the special committees.

"Some things just aren't quite adding up," said Rep. Russell Ott, a St. Matthews Democrat who co-chairs the House committee. "If a report surfaces, then we are going to have a situation where we will have to find out who is telling the truth."

SCANA and Santee Cooper have yet to hand over the report to senators and representatives investigating the nuclear plant debacle. But the committees have threatened to subpoena the document if the utilities don't comply. The Senate asked for the utilities to hand over the document by Sept. 7.

"We understand the Senate committee has indicated they plan to issue a subpoena for production of this document," the House committee wrote in their letter to the utilities. "We would hope to avoid that process but are willing and able to issue our own subpoena if forced to."

*The Post and Courier* has requested the report through the state's Freedom of Information Act.

McMaster, who has been pushing for a sale of Santee Cooper since the reactors were cancelled last month, said he's asked the state-run utility to produce whatever documents lawmakers need to investigate the reactors' failure.

"We've asked Santee Cooper to be forthcoming with information," McMaster said. "There are some things by law or agreement they can do, some things they can't, but our intention is to get every piece of information that would be of any interest at all to these people, these companies who are interested in purchasing some or all of Santee Cooper or entering into any other kind of agreement."

43.      On September 22, 2017, South Carolina Attorney General Alan Wilson requested that the State Law Enforcement Division ("SLED") launch a criminal investigation related to the Nuclear Project.

44.      On this news, SCANA's stock price fell approximately 3.43 %, or $1.96 per share, to close at $55.22 per share on September 22, 2017.

## V.    SCIENTER ALLEGATIONS

45.      As alleged herein, Defendants knew that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated in or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws.  As set forth elsewhere herein in detail, Defendants, by virtue of their receipt of information reflecting the true facts regarding SCANA, their control over, and receipt or modification of SCANA's allegedly materially misleading statements, and their associations with the Company which made them privy to confidential proprietary information concerning SCANA, participated in the fraudulent scheme alleged herein.

## VI.    PRESUMPTION OF RELIANCE

46.    Plaintiff will rely upon the presumption of reliance established by the fraud-on-the-market doctrine.  At all relevant times, the market for SCANA common stock was an efficient market that promptly digested current information with respect to the Company from all publicly-available sources and reflected such information in the prices of the Company's securities.

47.    Specifically, the market for SCANA's publicly traded common stock was an efficient market for the following reasons, among others:

(i)    SCANA common stock met the requirements for listing and was listed and actively traded under the ticker symbol "SCG" on the NYSE, a highly efficient and liquid market;

(ii)    As a regulated issuer, SCANA filed periodic public reports with the SEC;

(iii)    SCANA regularly communicated with investors via established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

(iv)    SCANA was followed by numerous securities analysts employed by major brokerage firms throughout the Class Period who wrote reports that were distributed to the sales force and certain customers of their respective brokerage firms.  Each of these reports was publicly available and entered the public marketplace.

48.    Based upon the foregoing, Plaintiff and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

## VII.    LOSS CAUSATION/ECONOMIC LOSS

49.    During the Class Period, Defendants made false and misleading statements and engaged in a deceptive course of conduct that artificially inflated the prices of SCANA common stock and operated as a fraud or deceit on Plaintiff and the Class by misrepresenting the Company's financial condition, growth, revenues, and/or ability to execute its business plan, among other things.  Later, when Defendants' prior misrepresentations and fraudulent omissions began to become apparent to the market, the price of the Company's common stock plunged.  As a result of their purchases of SCANA common stock during the Class Period, Plaintiff and other members of the Class suffered damages under the federal securities laws.

## VIII.    NO SAFE HARBOR

50.    The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements described in this Complaint. Many of the specific statements described herein were not identified as "forward- looking" when made.  To the extent that there were any forward-looking statements, there was no meaningful cautionary language identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.  Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements described herein, Defendants are liable for those false forward-looking statements because at the time each was made, the particular speaker knew that the particular forward-looking statement was false, and/or that the forward-looking statement was authorized and/or approved by an executive officer of SCANA who knew that those statements were false when made.

## IX.    CLASS ACTION ALLEGATIONS

51.    Plaintiff brings this action as a class action pursuant to Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure on behalf of all persons or entities who purchased or otherwise

acquired SCANA common stock between January 19, 2016 and September 22, 2017, inclusive (the "Class"), and who were damaged thereby.  Excluded from the Class are Defendants, other officers and directors of SCANA at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns, and any entity in which Defendants have or had a controlling interest.

52.     The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, SCANA common stock was actively traded on the NYSE.  While the exact number of Class members is unknown to Plaintiff at this time and can be ascertained only through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class.  Record owners and other members of the Class may be identified from records maintained by SCANA or its transfer agent, and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

53.     The disposition of the claims in a class action will provide substantial benefits to the parties and the Court.  As of February 20, 2017, SCANA had 142,916,917 shares of stock outstanding, which were owned publicly by at least hundreds of persons and entities.

54.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

- whether the federal securities laws were violated by Defendants' acts as alleged herein;

- whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business, operations and management of SCANA;

- whether the Individual Defendants caused SCANA to issue false and misleading financial statements during the Class Period;

- whether Defendants acted knowingly or recklessly in issuing false and misleading financial statements;

- whether the prices of SCANA common stock during the Class Period was artificially inflated because of the Defendants' conduct complained of herein; and

- whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

55.     Plaintiff's claims are typical of the claims of the other members of the Class, as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of the federal law that is complained of herein.

56.     Plaintiff will adequately protect the interests of the Class and has retained competent counsel experienced in class action securities litigation.  Plaintiff has no interests which conflict with those of the Class.

57.     A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

<u>**COUNT ONE**</u>
**For Violation of § 10(b) of the Exchange Act**
**and Rule 10b-5 Against All Defendants**

58.     Plaintiff incorporates by reference each and every preceding paragraph as though fully set forth herein.

59.     Plaintiff asserts this Count pursuant to § 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder against Defendants SCANA, Marsh, Addison and Byrne.

60.     During the Class Period, Defendants disseminated or approved the false statements set forth above, which they knew or deliberately disregarded were false and misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

61.     Defendants violated § 10(b) of the 1934 Act and Rule 10b-5 in that they:

      a.     employed devices, schemes, and artifices to defraud;

      b.     made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

      c.     engaged in acts, practices, and a course of business that operated as a fraud or deceit upon Plaintiff and others similarly situated in connection with their purchases of SCANA common stock during the Class Period.

62.     By virtue of their positions at SCANA, Defendants had actual knowledge of the materially false and misleading statements and material omissions alleged herein, and intended thereby to deceive Plaintiff and the other members of the Class, or, in the alternative, Defendants acted with reckless disregard for the truth in that they failed or refused to ascertain and disclose such facts as would reveal the materially false and misleading nature of the statements made, although such facts were readily available to Defendants.  Said acts and omissions of Defendants were committed willfully or with reckless disregard for the truth.  In addition, each Defendant knew or recklessly disregarded that material facts were being misrepresented or omitted as described above.

63.     Information showing that Defendants acted knowingly or with reckless disregard for the truth is peculiarly within Defendants' knowledge and control.  As the senior executive managers and/or directors of SCANA, the Individual Defendants had knowledge of the details of SCANA's internal affairs.

64.     The Individual Defendants are liable both directly and indirectly for the wrongs complained of herein.  Because of their positions of control and authority, the Individual Defendants were able to and did, directly or indirectly, control the content of the statements of

SCANA. As officers and/or directors of a publicly-held company, the Individual Defendants had a duty to disseminate timely, accurate, and truthful information with respect to SCANA's businesses, operations, future financial condition, and future prospects. As a result of the dissemination of the aforementioned false and misleading reports, releases, and public statements, the market price of SCANA securities was artificially inflated throughout the Class Period. In ignorance of the adverse facts concerning SCANA's business and financial condition which were concealed by Defendants, Plaintiff and the other members of the Class purchased or otherwise acquired SCANA securities at artificially inflated prices and relied upon the price of the securities, the integrity of the market for the securities, and/or upon statements disseminated by Defendants, and were damaged thereby.

65.    Plaintiff and the other members of the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for SCANA common stock. Plaintiff and the other members of the Class would not have purchased SCANA common stock at the prices they paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by Defendants' misleading statements.

<u>**COUNT TWO**</u>
**For Violation of §20(a) of the Exchange Act**
**Against the Individual Defendants**

66.    Plaintiff incorporates by reference each and every preceding paragraph as though fully set forth herein.

67.    Plaintiff asserts this Count pursuant to Section 20(a) of the Exchange Act against the Individual Defendants.

68.    The Individual Defendants, by virtue of their executive leadership positions in SCANA, had the power and authority to cause SCANA to engage in the wrongful conduct complained of herein, and to control the contents of SCANA's annual and quarterly reports and

press releases.  They were provided with copies of the Company's reports and press releases alleged herein to be misleading prior to or shortly after their issuance, and had the ability and opportunity to prevent their issuance or cause them to be corrected.

69.      As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to SCANA's financial condition and results of operations, and to correct promptly any public statements issued by SCANA which had become materially false or misleading.

70.      Because of their positions of control and authority as senior executive officers, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which SCANA disseminated in the marketplace during the Class Period concerning SCANA's results of operations.  Each of the Individual Defendants exercised control over the general operations of SCANA, and possessed the power to control the specific activities which comprise the primary violations about which Plaintiff and the other members of the Class complain.  The Individual Defendants therefore, were "controlling persons" of SCANA within the meaning of Section 20(a) of the Exchange Act.  In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of SCANA securities.

71.      SCANA violated Section 10(b) and Rule 10b-5 by its acts and omissions as alleged in the Complaint, and as a direct and proximate result of those violations, Plaintiff and the other members of the Class suffered damages in connection with their purchases of the Company's common stock during the Class Period.

72.      By reason of their control of SCANA, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for SCANA's violations of Section 10(b) and Rule 10b-5, to the same extent as SCANA.

## X.    **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays for judgment as follows:

A.    Declaring this action to be a proper class action pursuant to Fed. R. Civ. P. 23;

B.    Awarding Plaintiff and the other members of the Class damages, including interest;

C.    Awarding Plaintiff reasonable costs and attorneys' fees; and

D.    Awarding Plaintiff such other or further relief as the Court may deem just and proper.

## XI.    **JURY DEMAND**

Plaintiff, on behalf of the Class, hereby demands a trial by jury.

Dated: September 27, 2017                           Respectfully submitted,

*/s/ Joshua C. Littlejohn*

Marlon E. Kimpson (Fed. Bar No. 7487)
William S. Norton (Fed. Bar No. 11343)
Joshua C. Littlejohn (Fed. Bar No. 10426)
**MOTLEY RICE LLC**
28 Bridgeside Boulevard
Mt. Pleasant, South Carolina 29464
843- 216-9000 Telephone
843-216-9450 Facsimile
mkimpson@motleyrice.com
wnorton@motleyrice.com
jlittlejohn@motleyrice.com

David P. Abel (D.S.C. Bar No. 11395)
**U.S. Market Advisors Law Group PLLC**
5335 Wisconsin Ave. NW, Ste. 440
Washington, DC  20015
202-274-0237 Telephone
202-686-2877 Facsimile
dabel@usmarketlaw.com

***Counsel for Plaintiff Robert L. Norman***

26