# UNITED STATES DISTRICT COURT
## DISTRICT OF SOUTH CAROLINA
### (COLUMBIA DIVISION)

| | |
|---|---|
| *In re SCANA Corporation Securities Litigation* | Civil Action No. 3:17-CV-2616-MBS<br><br>CLASS ACTION<br><br>**CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**<br><br>JURY TRIAL DEMANDED |
| WEST VIRGINIA INVESTMENT MANAGEMENT BOARD, STICHTING BLUE SKY GLOBAL EQUITY ACTIVE LOW VOLATILITY FUND, and STICHTING BLUE SKY ACTIVE LARGE CAP EQUITY USA FUND, on Behalf of Themselves and All Others Similarly Situated,<br><br>        Plaintiffs,<br><br>v.<br><br>SCANA CORPORATION, KEVIN B. MARSH, JIMMY E. ADDISON, STEPHEN A. BYRNE, HAROLD C. STOWE, D. MAYBANK HAGOOD, and JAMES W. ROQUEMORE,<br><br>        Defendants. | |

## TABLE OF CONTENTS

I.      INTRODUCTION ...................................................................................................2

II.     JURISDICTION AND VENUE...........................................................................13

III.    THE PARTIES .....................................................................................................14

        A.      Lead Plaintiffs...........................................................................................14

        B.      Defendants .................................................................................................15

                1.      SCANA...........................................................................................15

                2.      The Officer Defendants ..................................................................15

                3.      The Director Defendants.................................................................16

        C.      Relevant Non-Parties ................................................................................18

IV.     FACTUAL BACKGROUND AND SUBSTANTIVE ALLEGATIONS OF FRAUD ....19

        A.      Background On SCANA And Its Nuclear Business...................................19

                1.      The 2005 Energy Policy Act Created Billions Of Dollars Of Tax
                        Credits Available For Nuclear Construction Completed By January
                        2021 ................................................................................................21

                2.      The BLRA Allowed SCANA To Charge Increased Energy Rates To
                        Recover "Prudent" Nuclear Project Construction Costs .........................22

        B.      SCANA Petitions To Build Two New Nuclear Reactors At The V.C. Summer
                Site ............................................................................................................24

        C.      SCANA Sought A Two-Year Extension To The Nuclear Project But Assured
                The Public That All Major Issues Have Been Resolved.......................................28

        D.      Defendants Knew No Later Than October 2015 Of Numerous Problems And
                Risks With The Nuclear Project Leading To Delays Well Past 2020 .................33

                1.      SCANA Retained Bechtel To Assess The Nuclear Project.....................33

                2.      The Bechtel Assessment and First Bechtel Report ..................................38

                3.      Defendants Attempted To Alter Bechtel's Report ..................................44

4.  The Sanitized Second Bechtel Report ......................................................46

E.  Defendants Reaffirmed Nuclear Project Completion By 2020, Despite Bechtel's And Santee Cooper's Warnings That The Date Was Unachievable .....48

F.  Defendants Continued To Conceal The Bechtel Reports.....................................52

1.  Defendants Prevented Disclosure Of The Bechtel Reports ......................52

2.  Defendants Conceal The Existence Of The Bechtel Report From SCANA's Public Watchdog ......................................................54

G.  Defendants Did Nothing To Fix Some Of The Nuclear Project's Greatest Deficiencies, Dooming The Nuclear Project ......................................................56

1.  In Early 2016, Defendants Reject Recommendations To Increase Oversight Of The Nuclear Project......................................................56

2.  In Mid-To-Late 2016, The Nuclear Project Schedule Slips Further Behind And Progress Fails To Improve ..................................................62

3.  Former Employees And Internal Progress Reports Confirm That Defendants Knew the Nuclear Project Would Not Be Completed In 2020 ......................................................69

H.  Defendants Misled Investors About The Nuclear Project Throughout 2016........77

I.  Defendants Were Aware That Election Of The Fixed Price Option Did Not Remove The Risk Of Future Cost Increases And, In Fact, Threatened The Viability Of The Nuclear Project ......................................................82

J.  The Director Defendants Were Active Participants In SCANA's Fraud.............88

V.  Partial Disclosures, Further Misleading Statements, And The Gradual Emergence Of The Full Impact Of The Fraud ......................................................90

A.  The Financial Meltdown Of Toshiba And Westinghouse Called The Nuclear Project Into Question ......................................................90

B.  SCANA Abandoned The Nuclear Project, Claiming It Was The "Prudent" Decision......................................................100

C.  Public Investigations Threaten To Strip SCANA Of Billions Of Dollars Of BLRA Funds, And Reveal That Defendants Were Aware Of – And Actively Concealed –The Fatal Risks Facing The Nuclear Project.................................107

VI.  Post-Class Period Events ......................................................126

A.  SCANA's Board Revoked Marsh's And Byrne's Golden Parachutes ...............126

B.     SCANA Announced A Proposed Merger, Which Faces Strong Opposition ......126

C.     Moody's Downgraded SCANA's Credit Ratings to "Speculative 'Junk' Grade" .............................................................................................................129

D.     SCANA Whistleblower Confirms Defendants Intentionally Concealed Their Gross Mismanagement Of The Nuclear Project "To Prop[] Up Earnings To Be Able To Make Their Bonuses" ..........................................................................130

VII.     DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS .......................................................................................................132

A.     False And Misleading Statements And Omissions Concerning SCANA's Ability To Complete The Nuclear Project By The End Of 2020 ......................133

B.     False And Misleading Statements And Omissions Concerning Defendants' Commitment To Transparency ..........................................................................145

C.     False And Misleading Statements And Omissions Concerning SCANA's Oversight of the Nuclear Project ......................................................................149

D.     False And Misleading Statements Concerning Progress At The Nuclear Project ...............................................................................................................157

E.     False And Misleading Statements Concerning The Impact Of A Westinghouse Or Toshiba Bankruptcy On The Nuclear Project's Continued Viability ............161

F.     Defendants Failed To Disclose "Known Trends or Uncertainties" That Would "Have A Material . . . Unfavorable Impact On . . . Revenues Or Income From Continuing Operations" In Violation Of Item 303 ............................................169

VIII.     LOSS CAUSATION ...................................................................................................171

IX.     THE INAPPLICABILITY OF THE STATUTORY SAFE HARBOR ........................176

X.     THE PRESUMPTION OF RELIANCE ....................................................................177

XI.     CLASS ACTION ALLEGATIONS ............................................................................178

XII.     CAUSES OF ACTION ...............................................................................................180

XIII.     PRAYER FOR RELIEF .............................................................................................184

XIV.     JURY TRIAL DEMAND ...........................................................................................184

Lead Plaintiffs the West Virginia Investment Management Board ("West Virginia IMB") and Stichting Blue Sky Global Equity Active Low Volatility Fund and Stichting Blue Sky Active Large Cap Equity USA Fund (related funds collectively referred to herein as "Blue Sky"), (collectively, the "Lead Plaintiffs"),[1] individually and on behalf of a class of similarly situated persons and entities, by their undersigned attorneys, allege the following against SCANA Corporation ("SCANA" or the "Company") and the Individual Defendants (defined below), upon personal knowledge as to themselves and their own acts, and upon information and belief as to all other matters.

Lead Plaintiffs bring this federal securities class action on behalf of themselves and a class consisting of all persons and entities who purchased, or otherwise acquired, the publicly traded securities of the Company from October 27, 2015 through December 20, 2017, inclusive (the "Class Period"), and who were damaged thereby, subject to certain exclusions addressed in paragraph 439 below (the "Class"). The Defendants in this action are: SCANA; Kevin B. Marsh, SCANA's former Chief Executive Officer ("CEO") and Chairman of SCANA's Board of Directors; Jimmy E. Addison, SCANA's current CEO and former Chief Financial Officer ("CFO") and Executive Vice President; Stephen A. Byrne, SCANA's former Executive Vice President; Harold C. Stowe, the Lead Director on SCANA's Board during the Class Period until on or about April 27, 2016; D. Maybank Hagood, a director on SCANA's Board during the Class

---

[1] Pursuant to the Private Securities Litigation Reform Act of 1995 (the "PSLRA," *see* 15 U.S.C. Code 78u-4(a)(3)(B)(i)) and Federal Rule of Civil Procedure 42(a), on January 23, 2018, this Court consolidated certain related actions (*Norman v. SCANA Corporation et al*, No. 3:17-CV-2616-MBS; *Evans v. SCANA Corporation et al*, No. 3:17-cv-02683-MBS; *Fox v. SCANA Corporation et al*, No. 3:17-cv-03063-MBS, and *West Palm Beach Firefighters' Pension Fund v. SCANA Corporation et al*, No. 3:17-cv-03141-MBS) into this lead Action, to be captioned "*In re SCANA Corporation Securities Litigation*" and maintained under File No. 3:17-cv-02616-MBS. ECF No. 49. It further appointed West Virginia IMB and Blue Sky as Lead Plaintiffs, and closed "[a]ll other cases related to this matter." *Id.*

Period, including as its Lead Director since on or about April 27, 2016, as well as a member of the Board's Nuclear Oversight Committee; and James W. Roquemore, a director on SCANA's Board and the Chairman of its Nuclear Oversight Committee during the Class Period.  Lead Plaintiffs' and the Class's claims arise under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act") and Rule l0b-5 promulgated thereunder.

Lead Plaintiffs' allegations concerning matters other than themselves and their own acts is based upon the investigation conducted by and through counsel, which included, among other things, the review and analysis of: (i) transcripts, press releases, news articles, and other public statements issued by or concerning SCANA and the Individual Defendants; (ii) research reports issued by financial analysts concerning the Company; (iii) reports and other documents filed publicly by SCANA with the U.S. Securities and Exchange Commission ("SEC"); (iv) SCANA's corporate website; (v) interviews with former employees of companies who worked on the Nuclear Project (defined below); (vi) transcripts of hearings before SCANA's regulators and select committees of the South Carolina Senate and House of Representatives; (vii) documents produced to Lead Plaintiffs through Freedom of Information Act ("FOIA") requests; (viii) press reports; and (ix) other publicly available information. Lead Plaintiffs believe that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

I.    **INTRODUCTION**

1.    This securities fraud class action arises from one of the most egregious public scandals in recent South Carolina history – SCANA's failed construction and ultimate abandonment of two nuclear reactors located at the V.C. Summer nuclear generating station in Fairfield County, South Carolina.   The well-publicized debacle surrounding the V.C. Summer

reactors has caused enormous losses to SCANA investors, resulted in a number of high profile resignations, and precipitated multiple civil lawsuits and criminal investigations.

2.      While the full depth of the wrongdoing underlying the scandal continues to be revealed in an almost-daily fashion, it is already clear that the Defendants named herein – SCANA and certain of its directors and officers – intentionally or recklessly made material misrepresentations and omissions to the public in violation of the federal securities laws.   Lead Plaintiffs bring this action to recover on behalf of themselves and all persons and entities who purchased the publicly traded securities of SCANA during the Class Period and were damaged by Defendants' misrepresentations and omissions.

3.      SCANA is a publicly-traded mid-sized electric and gas utility company whose principal subsidiary is South Carolina Electric and Gas Company ("SCE&G").   SCE&G is a regulated utility that generates, transmits and sells energy to approximately 700,000 electricity customers and 350,000 natural gas customers in South Carolina.   Throughout the Class Period, the V.C. Summer site was jointly owned by SCE&G and the South Carolina Public Service Authority, which is a state-owned utility commonly referred to as "Santee Cooper."

4.      In May 2008, SCE&G and Santee Cooper reached agreement as joint owners to build two new 1,117-megawatt AP1000 nuclear reactors at the V.C. Summer site (the "Nuclear Project").   The ownership interest was split with SCE&G taking a 55% ownership stake and Santee Cooper the remaining 45% share.   These two nuclear reactors would be the first new nuclear power plants to be built in the Unites States since the 1980s.

5.      The construction of these reactors was of immense significance to SCANA and its investors.   As a mid-sized energy company, SCANA was unable to directly finance the huge costs of the project – initially pegged at $9.8 billion – and instead relied on a 2005 federal law

called the Energy Policy Act and a 2007 South Carolina law called the Base Load Review Act ("BLRA") to help defray costs. The Energy Policy Act created nuclear production tax credits to incentivize the construction of new nuclear facilities. As Defendants repeatedly told investors throughout the Class Period, if the reactors were completed by January 1, 2021, SCANA and Santee Cooper would qualify under the Energy Policy Act for nuclear tax credits worth approximately $2.2 billion ($1.4 billion to SCANA).

6.      The BLRA was also integral to SCANA's ability to pay for the construction of the new reactors. Passed in 2007, the BLRA permitted utility companies to apply to the South Carolina Public Service Commission ("PSC"), a seven-person elected governmental board that regulates utility rates, for permission to raise rates for the purpose of offsetting the construction costs of new nuclear reactors. The BLRA required SCANA to submit detailed information regarding the construction schedule, the capital costs, and completion projections in order to justify any rate increases. The BLRA also provided that SCANA could be held liable for any costs that were incurred "imprudently."

7.      In 2008, SCANA selected Westinghouse Electric Company ("Westinghouse") as its lead contractor for the new reactors and petitioned the PSC for permission to raise customer rates under the BLRA throughout the anticipated construction period. In order to reassure the PSC and investors regarding the reasonableness of the costs of the project, Defendants stated that they would assign a "dedicated group of SCE&G personnel that will monitor each aspect of the construction process on a day-today basis" and would report "progress, issues and variances to an executive steering committee that includes [Defendant Marsh] as SCE&G's president … and to the SCANA board of directors."

8.      Construction on the new nuclear reactors began in March 2013 following approval from the federal Nuclear Regulatory Commission ("NRC"), and SCANA initially projected that the first reactor would be on-line and generating power in 2016, and the second by 2019.  The Nuclear Project, however, was immediately beset by cost overruns and delays.  As early as September 2013 Defendants were calling for emergency (non-public) meetings with Westinghouse and noting in internal emails that "missed deadlines put potentially **unrecoverable stress on the milestone schedule** approved by the SC Public Service Commission."[2]

9.      Despite these known troubles, SCANA did little to remedy the situation and instead continued to petition the PSC for additional rate increases and schedule extensions.  All told, SCANA has successfully petitioned the PSC for nine rate hikes under the BLRA, which collectively added nearly $37 million per month or $500 million per year to customer's electricity bills.  These increases have resulted in South Carolina families paying the highest power bills in the South and the third highest in the Country (behind only Connecticut and Hawaii).

10.      By March 2015, the construction problems had become so acute that SCANA petitioned the PSC for a 27-month extension of the construction schedules that adjusted the project completion date to June 2020, and increased costs by nearly $700 million.  In public statements surrounding the new petition, Defendants repeatedly assured the public that they would "**fulfill our commitment to transparency**" regarding the Nuclear Project and additionally assured investors that SCANA was "performing its role as project owner in a

---

[2] All emphases are added unless otherwise indicated.  The statements made by Defendants that are bolded and italicized are generally the statements alleged to be false and misleading.  All other emphasis is in bold.

manner that is reasonable, prudent, cost-effective and responsible," with Defendant Marsh stating that "my senior management team and I are **directly involved** in the management and oversight of the project and in interacting with Westinghouse."

11.    In a September 10, 2015 order, the PSC approved SCANA's request for $698 million in additional costs and revised substantial completion dates to June 2019 for the first reactor and June 2020 for the second.  This approval was granted in reliance on, among other things, testimony provided to the PSC by Defendant Byrne, who stated that the revised "construction schedule … represents a **reasonable and prudent schedule** for completing the construction of the Units."   The PSC particularly noted that Defendants had assured them that "**many of the initial risks and challenges of new nuclear construction have been overcome**."

12.    Unbeknownst to the PSC or the public, however, construction continued to be plagued by a host of problems that made even the revised schedule totally unrealistic.  Indeed, in early 2015 Santee Cooper had pressured SCANA to hire Bechtel Corporation ("Bechtel") to conduct an analysis of the nuclear project.  Bechtel is one of the world's most respected engineering, construction and project management companies.

13.    On or about October 22, 2015, Bechtel presented its initial findings to Defendants Marsh and Byrne, as well as other senior members of SCANA and Santee Cooper management.  Lead Plaintiffs recently obtained a previously undisclosed email from Bechtel executives to Santee Cooper outlining the topics to be covered in the October 2015 meeting.  The October 2015 email reviewed by Lead Plaintiffs makes clear that Bechtel told the Defendants at (and likely even before) the October 22, 2015 meeting that "the commercial operation dates **will be extended**" for the nuclear reactors such that:

- Unit 2: **18-26 months beyond** the current June 2019 operation date.

- Unit 3: **24-32 months beyond** the current June 2020 commercial operation date.

The email also states that SCANA's "forecasts for schedule durations, productivity, forecasted manpower peaks, and percent complete **are unrealistic**," and "the current hands-off approach taken by the Owners towards management of the [contractors] **does not allow for real-time, appropriate cost and schedule mitigation**."

14.     Despite these alarming findings from Bechtel, SCANA made a significant announcement about the Nuclear Project on October 27, 2015 that was directly contrary to Bechtel's conclusions. In a Form 8-K filed with the Securities and Exchange Commission ("SEC") on October 27, 2015, SCANA announced an amendment to its existing contract governing construction of the nuclear units, and noted that as part of the amendment SCANA had revised "the Guaranteed Substantial Completion Dates" for the reactors by just two months "to August 31, 2019 and 2020, respectively." On November 6, 2015, in SCANA's Form 10-Q for the third quarter of 2015, Defendants also assured investors that "both New Units are expected to be operational [by the end of 2020] and to qualify for the nuclear production tax credits," worth $2.2 billion and critical to the financial feasibility of the project.

15.     Bechtel provided Defendants with its formal assessment report on November 9, 2015 (the "First Bechtel Report"). The First Bechtel Report repeated the information conveyed in the October 2015 meeting, was highly critical of SCANA's management of the Nuclear Project and provided an unambiguous conclusion: "the current schedule is at risk" because "installation rates, productivity, and staffing levels all point to project completion later than the current forecast." Notably, Bechtel concluded that the current schedule would be delayed up to **three years**, with the second reactor likely not coming on-line until June 2023, and June 2022 at the earliest—long after the critical deadline for the federal tax credits. Moreover, Bechtel advised

that the Nuclear Project's monthly construction progress rate—which was averaging only **0.5%** at the time—had to increase dramatically, by **500%,** to **3%**.

16.     Rather than disclose the First Bechtel Report or honestly deal with its devastating conclusions, Defendants engaged in an aggressive and immediate cover-up.  In a November 19, 2015 public briefing before the PSC, while Defendant Addison vowed to "***disclose to investors all the details of anything that we think is critical that you know***," Defendant Marsh confirmed that the plants had to be on-line by 2020 to qualify for nuclear tax credits and "***the first plant is certainly more than a year ahead of that; the second plant is a little bit less than six months ahead of that***."  On an October 29, 2015 conference call with investors, Defendants were asked directly by an analyst regarding the risks of the construction project, and responded "***our only risk*** would be changes in law or change orders that might be associated with the project."

17.     In stark contrast to these (and other) sunny public proclamations, behind the scenes Defendants were scrambling to conceal the findings of the First Bechtel Report.  In a series of contentious negotiations and weeks of "wrangling," SCANA (through its outside counsel) pressured Bechtel to whitewash and sanitize its original report.

18.     Another previously undisclosed document obtained by Lead Plaintiffs, typewritten notes of a February 4, 2016 telephone call between an executive at Santee Cooper and a Bechtel Principal Vice President, confirm that SCANA (again through outside counsel) requested "the schedule and other information be removed" from the First Bechtel Report, and that Defendant Byrne personally informed Bechtel that "his feelings are hurt" because "Bechtel was too rough" on SCANA's management and project oversight efforts.

19.     According to the notes of this call, a Bechtel executive agreed to extract the damaging information about the three-year delay to the Nuclear Project schedule and place that

information "into a stand-alone report and submit 2 reports to [SCANA's outside counsel] …
**knowing [that [SCANA's] outside counsel] will discard the schedule report."**

20.     The very next day, February 5, 2016, Bechtel delivered to SCANA the "Second
Bechtel Report," which was closely guarded and made available to only a handful of SCANA
and Santee Cooper insiders – with each copy being numbered and identifying the intended
recipient on the cover.  While Bechtel had performed no new work or assessments since issuing
the First Bechtel Report, the Second Bechtel Report omitted the references to the construction
schedule being "at risk."  Nonetheless, the Second Bechtel Report still contained many of the
First Bechtel Report's adverse findings about the feasibility of the V.C. Summer Nuclear
Project.[3]  Defendants concealed from the public the existence of the Second Bechtel Report.

21.     In or around February 2016, and in direct response to the Bechtel Reports, Santee
Cooper prepared a memorandum and action plan (the "Bechtel Report Action Plan") stating that
SCANA was concerned over releasing the Second Bechtel Report because it could expose
SCANA's directors and officers to liability in a "shareholder suit" because "**[n]ow that SCE&G
is specifically aware of problems in [the] report, failure to act may result in O&D [Officers'
and Directors'] liability.**"  According to the Bechtel Report Action Plan – which was recently
made available to Lead Plaintiffs – SCANA was acutely aware that it had made material
misrepresentations to the public and investors regarding the feasibility of the Nuclear Project.
This document also makes clear that SCANA was pressuring Santee Cooper to "**avoid
disclosure**" of the Second Bechtel Report, and that Santee Cooper caved to that pressure.

---

[3] As detailed below, in September 2017 Defendant Marsh testified to the South Carolina Senate
that the Second Bechtel Report was "**not news**" because **"the majority of those issues, we had
identified**."

22.     As detailed below, throughout 2016, SCANA continued to receive numerous additional dire warnings regarding the feasibility of the Nuclear Project.  These included direct warnings that went to SCANA's Board of Directors, including the Director Defendants, noting that "**schedule adherence [was] unrealistic**" and the project management failures "**do not support construction need dates**."  Moreover, on July 13, 2016, Defendants Byrne and Marsh received an email from Santee Cooper explicitly noting that the ongoing, massive shortfalls in construction progress made it **impossible** for the project to meet the 2020 completion date – stating "this rate of progress will **never meet the current completion schedule**."

23.     Former employees of Westinghouse, the lead contractor on the Nuclear Project, have confirmed to Lead Counsel that Defendants received monthly reports throughout the Class Period that should have alerted them to the reality that the project was hopelessly behind the publicly-stated schedule and would not be completed by 2020.  For example, Westinghouse's former Director of Licensing for the Nuclear Project stated that Monthly Progress Reports throughout the Class Period made it **"obvious that we were not going to complete this on schedule**."  Another Westinghouse former employee, the Project Director and Consortium Vice President for the entire Nuclear Project, who reported updates to Defendants Marsh and Byrne in monthly and quarterly meetings, confirmed that Westinghouse's Monthly Progress Reports were sent directly to Marsh and Byrne.  In fact, the Director of Licensing noted that a SCANA employee made the observation during multiple Monthly Project Review Meetings that construction rates meant "**completion by 2026 or something!**"  Further, the former Project Director stated that the Nuclear Project was **"doomed from the beginning"** and **"D.O.A."**

24.     Westinghouse's Monthly Progress Reports and other internal documents recently made available to Lead Plaintiffs show that the Nuclear Project's monthly progress rate never

- 10 -

improved significantly from the 0.5% rate observed by Bechtel in 2015. Indeed, it remained, on average, **only 0.7%** in 2016 and 2017—far below the 3% rate that Bechtel stated was necessary to get the project back on schedule. This huge, persisting shortfall in SCANA's own key progress metric thus directly contradicted Defendants' repeated, public assurances of "*substantial progress*" on the project throughout the Class Period.

25.    Despite knowing no later than October 2015 that the Nuclear Project was not realistically going to be completed by 2020, Defendants continued to mislead investors and the public at large. In a corporate video, produced and published by SCANA on YouTube on January 15, 2016, Defendant Marsh stated: "I have just as much faith today in building [the project] as I did in 2008, and [the project] positions us well for the long term." On July 1, 2016, Defendant Byrne publicly stated to the PSC that the 2019 and 2020 completion dates were reasonable and that "SC&EG has carefully reviewed and evaluated all information that is available related to the project and schedule and finds it to be reasonable." At the same hearing, Defendant Addison stated that "*the current schedules reflect the best information available about the anticipated costs and construction timetables for completing the project*." Defendant Marsh stated "*I can affirmatively testify, as I have testified in prior proceedings, that SCE&G is performing its role as project owner in a reasonable, prudent, and cost-effective manner*."

26.    A September 23, 2016 article in The Post and Courier quoted Marsh as stating "we've been straightforward and honest about the challenges we've had on this project as we've presented those to the commission." Another video prepared by SCANA and published on YouTube around the same time quoted Defendant Byrne as stating "though we have run into some issues, roadblocks in the past, most of those issues, roadblocks are behind us."

27.    These statements and many others detailed below were materially false and misleading given Bechtel's damning findings and other internal information regarding the crippling, ongoing construction and management problems at the Nuclear Project, which Defendants continued to conceal.  On July 31, 2017, SCANA issued a press release announcing that it was abandoning the Nuclear Project.  It soon became clear that the abandonment was not the result of new developments but rather the manifestation of issues that Defendants had known about – but deliberately concealed – for many years.

28.    The fall-out from SCANA's abandonment of the Nuclear Project has been severe and is continuing.  In August 2017, special committees of the South Carolina General Assembly began conducting public hearings regarding the decision to abandon the Nuclear Project.  In September 2017, SCANA was served with a subpoena from the United States Attorney's Office for the District of South Carolina, and South Carolina's Attorney General's Office and Speaker of the House of Representatives requested that the South Carolina Law Enforcement Division conduct a criminal investigation into the handling of the Nuclear Project by SCANA.  On October 17, 2017, SCANA announced that the SEC had subpoenaed SCANA for documents, and on October 31, 2017, Defendants Marsh and Byrne resigned from their positions.  In November 2017, when news of the First Bechtel Report was revealed, South Carolina Representative Russell Ott stated about the Defendants' actions: "**This is a cover up. This is deception at its core. The bottom line is they lied to everyone and they did it intentionally.**"

29.    Indeed, in March 2018, the press published a voicemail left in early 2016 by a SCANA whistleblower, its former Vice President of Finance for Nuclear Construction who regularly interacted with the Officer Defendants, to a Santee Cooper employee working on the Nuclear Project, that corroborated Representative Ott's allegations.    Specifically, the

whistleblower warned Santee Cooper that SCANA executives, including Defendants Marsh, Byrne and Addison, were "**mismanaging that project**" and that Santee Cooper should not "**sign anything with that management team.**"    The whistleblower also called Marsh a "liar," asserting that he, Byrne, and Addison **"have broken every friggin' law you can break"** and **"[t]hey're doing it because they want to make money and they're propping up earnings to be able to make their bonuses."**

30.    The truth finally emerged regarding the fraud at SCANA in a series of partial disclosures beginning in late 2016 and continuing until the end of the Class Period.    In total, from the first partial disclosure of the fraud until the end of the Class Period, SCANA's stock price declined from a class period high of $76.12 per share in July 2016 to $37.39 per share, a decline of more than **50%.**  This drop caused a loss of approximately $2.77 billion in market capitalization, causing substantial losses to investors.

## II.    JURISDICTION AND VENUE

31.    This Complaint asserts claims under Sections 10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§ 78j(b) and 78t(a), and the rules and regulations promulgated thereunder, including SEC Rule 10b-5, 17 C.F.R. § 240.10b-5.

32.    This Court has jurisdiction over the subject matter of this action under Section 27 of the Exchange Act, 15 U.S.C. § 78aa and 28 U.S.C. §§ 1331 and 1337.

33.    Venue is proper in this District under Section 27 of the Exchange Act, 15 U.S.C. § 78aa, and 28 U.S.C. § 1391(b), (c), and (d). Many of the acts and omissions that constitute the alleged violations of law, including the dissemination to the public of untrue statements of material facts, occurred in this District.

34.    In connection with the acts alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including the United

States mail, interstate telephone communications, and the facilities of national securities exchanges.

## III.    THE PARTIES

### A.    Lead Plaintiffs

35.    West Virginia Investment Management Board ("West Virginia IMB") is a public body corporate created to serve as the principal long-term investment management organization for the State of West Virginia, as codified in the West Virginia Investment Management Act, W. Va. Code §§ 12-6-1 – 12-6-17.  The West Virginia IMB manages over $17 billion in assets.  It is responsible for and serves as the fiduciary for the investments of all of the State's defined benefit retirement plans, including pension plans for school personnel, public employees, judges, state police and other law enforcement officers, as well as for certain local government pension plans. It also invests other long-term assets held by the State, such as certain government agency insurance and endowment funds.  As set forth in its amended certification attached hereto as Exhibit A, the West Virginia IMB purchased SCANA securities during the Class Period and was damaged as a result of Defendants' wrongdoing as alleged in this Complaint.  On January 23, 2018, this Court appointed West Virginia IMB as a Lead Plaintiff for this litigation.

36.    Lead Plaintiff Stichting Blue Sky Global Equity Active Low Volatility Fund and Stichting Blue Sky Active Large Cap Equity USA Fund (as defined above, collectively, "Blue Sky") are investment funds administered by Blue Sky Group.  Founded in 1999, Blue Sky Group is a pension administrator based in the Netherlands that manages approximately $19 billion in assets on behalf of approximately 103,000 participants.  As set forth in its amended certification attached hereto as Exhibit B, Blue Sky purchased SCANA common stock during the Class Period and was damaged as a result of Defendants' wrongdoing as alleged in this Complaint.  On January 23, 2018, this Court appointed Blue Sky as a Lead Plaintiff for this litigation.

B.     **Defendants**

1.     **SCANA**

37.     Defendant SCANA Corporation ("SCANA" or "the Company") is an energy-based holding company engaged, through subsidiaries, in electric and natural gas utility operations and other energy-related businesses.  SCANA's principal subsidiary, South Carolina Electric & Gas ("SCE&G") is a regulated public utility engaged in the generation, transmission, distribution and sale of electricity primarily in South Carolina.  SCANA is incorporated in South Carolina and maintains its principal executive offices at 220 Operation Way, Cayce, South Carolina 29033-3701.  SCANA's stock is traded on New York Stock Exchange ("NYSE") under the ticker symbol "SCG."   For purposes of this Complaint, references to SCANA refer to SCANA, SCE&G, or both companies, unless otherwise noted.

2.     **The Officer Defendants**

38.     Defendant Kevin B. Marsh ("Marsh") joined SCANA in 1984.  Marsh became Vice President and Chief Financial Officer ("CFO") of SCANA in 1996, President of SCE&G in 2006, and President and Chief Operating Officer ("COO") of SCANA in January 2011.  In December 2011, Marsh became Chairman of the SCANA Board of Directors and Chief Executive Officer ("CEO") of SCANA.  On October 31, 2017, SCANA announced that Marsh was retiring as CEO, effective January 1, 2018.  On December 21, 2017, SCANA announced that Marsh would resign as a director, effective December 31, 2017.

39.     Defendant Jimmy E. Addison ("Addison") served as SCANA's CFO since April 2006 and its Executive Vice President since January 2012.  On October 31, 2017, SCANA announced that Addison would become SCANA's CEO and relinquish his role as CFO, effective January 1, 2018.

- 15 -

40.     Defendant Stephen A. Byrne ("Byrne") joined SCANA in 1995. In 2009, Byrne became an Executive Vice President of SCANA, and in 2011, he became President, Generation and Transmission, and COO of SCE&G.  On October 31, 2017, SCANA announced that Byrne was retiring from all of his positions, effective January 1, 2018.

41.     Defendants Marsh, Addison, and Byrne (collectively, the "Officer Defendants"), because of their positions with the Company, possessed the power and authority to control the contents of SCANA's SEC filings, press releases, public communications with its regulators, and other market communications.  The Officer Defendants were provided with copies of the Company's reports and press releases alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions and access to material non-public information available to them, the Officer Defendants knew that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public, and that certain positive representations that were being made were therefore materially false and/or misleading.

### 3.    The Director Defendants

42.     Harold C. Stowe ("Stowe") served as a director of SCANA since 1999 until his retirement from the Board on or about April 27, 2016.  Stowe served as SCANA's Lead Director at all relevant times until on or about April 27, 2016.  Stowe signed SCANA's 2015 Form 10-K, which contained false and misleading statements concerning the Nuclear Project as alleged herein.

43.     Defendant D. Maybank Hagood ("Hagood") has served as a director of SCANA since 1999.  On or about April 27, 2016, he became SCANA's Lead Director and a member of SCANA's Nuclear Oversight Committee of the Board.  During the Class Period, Defendant Hagood also was a member of the Board's Nominating and Governance Committee.  He also

became a member of the Board's Executive Committee in 2016 and served as Chairman of the Audit Committee in 2015 and part of 2016. In January 2018, Hagood became the Chairman of SCANA's Board. Hagood signed SCANA's 2015 and 2016 Forms 10-K, which contained false and misleading statements concerning the Nuclear Project as alleged herein.

44. Defendant James W. Roquemore ("Roquemore") has served as a director of the Company since 2007. During the Class Period, Roquemore was the Chairman of the Nuclear Oversight Committee and Compensation Committees of the Board. In 2015, he also became a member of the Board's Executive Committee. Roquemore signed SCANA's 2015 and 2016 Forms 10-K, which contained false and misleading statements concerning the Nuclear Project as alleged herein.

45. According to SCANA's Proxy Statements issued during the Class Period:

The Nuclear Oversight Committee consists entirely of independent directors. The Committee meets at least quarterly **to monitor, discuss, and evaluate our nuclear operations, which include regulatory matters, operating results, training and other related topics. The Committee periodically tours the V.C. Summer Nuclear Station and its training facilities**.

The Committee also reviews with the Institute of Nuclear Power Operations, on a periodic basis, its appraisal of our nuclear operations. **Additionally, the Committee routinely presents an independent report to the Board on the status of our nuclear operations. . . .**

46. The Nuclear Oversight Committee met four times annually during 2015 and 2016.

47. According to SCANA's "Governance Principles," all SCANA Board members were required to "review[], oversee[] and approve[] fundamental financial and business strategies and major corporate actions" and to "review[] and assess[][ identified significant risks facing SCANA and the alternatives for their mitigation.

48.    As Lead Directors during the Class Period, Defendants Stowe and Roquemore also had the following obligations:

> The Lead Director presides at all Board meetings at which the Chairman was not present, including executive sessions of the independent directors held at each regularly scheduled Board meeting, and is also authorized to call meetings of the Independent Directors when necessary or appropriate. The Lead Director will **maintain an active, ongoing, positive and collaborative relationship with the Chairman and the CEO** and keep an open line of communication providing for the dissemination of information to the Board. The Lead Director also collaborates with the Chairman regarding schedules and agendas for the Board meetings and provides feedback from the Board to the Chairman following each executive session of the Independent Directors.

49.    Defendants Stowe, Hagood, and Roquemore are collectively referred to herein as the "Director Defendants."

50.    The Officer Defendants and Director Defendants are collectively referred to herein as the "Individual Defendants."

51.    SCANA and the Individual Defendants together are collectively referred to herein as the "Defendants."

**C.    Relevant Non-Parties**

52.    Santee Cooper is a state-owned public power and water utility that provides electricity to more than two million South Carolina customers.

53.    Toshiba Corporation ("Toshiba"), a Japanese multinational conglomerate, is the parent company of Westinghouse Electric Company LLC ("Westinghouse" or "WEC"), an American nuclear power company that was the chief contractor for the Nuclear Project.  In May 2008, Westinghouse and Stone & Webster, Inc., a subsidiary of The Shaw Group Inc. ("The Shaw Group"), entered into an Engineering, Procurement, and Construction contract with SCANA and Santee Cooper for the design and construction of the nuclear electric-generating

- 18 -

units at the site of the V.C. Summer Nuclear Station (the "EPC Contract"). Chicago Bridge & Iron, Inc. ("CB&I"), a provider of technology and infrastructure for the energy industry, acquired the Stone & Webster nuclear construction business as part of its $3 billion acquisition of The Shaw Group in 2012. In October 2015, Westinghouse agreed to purchase nuclear contractor CB&I Stone & Webster, Inc. ("Stone & Webster") from CB&I for $229 million in an effort to help contain the costs of the Nuclear Project by taking over the construction function.

54.    The various parties to the EPC Contract who were the contractors on the Nuclear Project retained by SCANA and Santee Cooper are sometimes herein referred to, collectively, as the "Consortium." Because of the acquisitions described above, the identities of the members of the Consortium changed over the course of the Class Period.

## IV.    FACTUAL BACKGROUND AND SUBSTANTIVE ALLEGATIONS OF FRAUD

### A.    Background On SCANA And Its Nuclear Business

55.    SCANA is a mid-sized electric and gas utility company headquartered in Cayce, South Carolina. SCANA engages predominantly in (a) the generation and sale of electricity to wholesale and retail customers in South Carolina and (b) the purchase, sale and transportation of natural gas to wholesale and retail customers in South Carolina, North Carolina and Georgia.

56.    As noted above, SCANA's principal subsidiary is SCE&G, which operates as a regulated utility. SCE&G generates, transmits, distributes, and sells to approximately 700,000 electricity customers and approximately 350,000 natural gas customers in South Carolina. Its electric service territory extends into 24 counties and its natural gas service territory encompasses all or part of 35 counties in South Carolina. In total, more than 3.4 million people live in the counties serviced by SCE&G.

57.    SCE&G is the operator and two-thirds joint owner of the Virgil C. Summer nuclear generating station in Fairfield County, South Carolina (the "V.C. Summer Site"), which has been in operation since 1984.  Santee Cooper, a state-owned electric and water utility in South Carolina, owns the remaining one-third share.  Summer Station Unit 1, a 966-megawatt nuclear plant, is located at the V.C. Summer Site.  SCE&G and Santee Cooper split the operating costs and energy output of the plant in their respective proportions.

58.    In December 2005, SCE&G and Santee Cooper notified the U.S. Nuclear Regulatory Commission ("NRC")—the federal agency that regulates nuclear energy in the U.S. and oversees reactor licensing, safety, security, and radioactive material—that they intended to apply for a combined license for building two new reactors in South Carolina.  On February 10, 2006, SCE&G and Santee Cooper selected the V.C. Summer Site for potential new nuclear construction and announced plans to build nuclear reactors using a new advanced light water reactor, the "AP1000," designed by Westinghouse, which offers nuclear products and services to utilities, including the design of nuclear power plants.  The companies' goal was to build the reactors in time to meet the growth in "base load" electricity demand anticipated by the mid-2010s.  "Base load" on an electric grid is the minimum level of demand over a period of time.

59.    In May 2008, SCE&G and Santee Cooper (together, the "Owners") entered into an agreement as joint owners to build two new 1,117-megawatt AP1000 nuclear reactors at the V.C. Summer Site (the "Nuclear Project").  SCE&G took a 55% stake in the Nuclear Project while Santee Cooper took the remaining 45% stake.  Similar to their arrangement with Unit 1, the Owners agreed to share operating costs and generation output of the two additional units.  These nuclear reactors would be among the first new nuclear plants to be built in the U.S. since the 1980s.

60.     Building two new nuclear reactors at the V.C. Summer Site was a massive undertaking, estimated at the time to cost a total of $9.8 billion.  SCANA's 55% share of that total cost was $5.4 billion.  SCANA was a relatively small energy company, with a market capitalization of $3.9 billion, while its competitors Duke Energy and Southern Company had market capitalizations of $19 billion and $25 billion, respectively.  Thus, the two new nuclear units SCANA wanted to build were expected to cost more than double SCANA's market capitalization at the time.  Accordingly, the success of the Nuclear Project was critically important to SCANA's future.  As one Wachovia analyst put it on September 12, 2008, "**[m]anagement readily admits that it is 'betting the family farm' on the project**. . . ."

61.     Two pieces of legislation, passed in 2005 and 2007, respectively, made the construction of the Nuclear Project financially feasible for SCANA.

### 1.     The 2005 Energy Policy Act Created Billions Of Dollars Of Tax Credits Available For Nuclear Construction Completed By January 2021

62.     In order to help fund the construction of some of the nation's first new nuclear units licensed since the Three Mile Island accident in 1979, the U.S. Congress passed the Energy Policy Act of 2005 (the "Energy Policy Act").  The Energy Policy Act created a large nuclear production tax credit (the "Nuclear Tax Credits") to incentivize the installation of new nuclear energy facilities in the U.S.  26 U.S.C. §45J.  The Nuclear Tax Credits were available to any "advanced nuclear facility" where the nuclear reactor design was approved by the NRC after 1993 and **the plant went into service before January 1, 2021**.  26 U.S.C. §45J(d)(1)(b) and (d)(2).  Thus, if the nuclear power plant was not in service by the end of 2020, its owner would not receive the Nuclear Tax Credits.

63.     SCANA stood to qualify for approximately $1.4 billion in Nuclear Tax Credits.  Under the Energy Policy Act, the federal Nuclear Tax Credit was 1.8 cents for every kilowatt

hour ("kWh") generated.  26 U.S.C. §45J(a).  The Internal Revenue Service would allocate up to $750 million per year between the various nuclear power plants that qualified for the credit, proportional to their energy output.  A tax-paying corporation with a qualified facility, like SCANA, could claim up to $125 million in Nuclear Tax Credits annually per 1,000 megawatts of power that it had been allocated.

64.     As Defendants repeatedly told investors before and throughout the Class Period, if the Nuclear Project was completed by the January 1, 2021 deadline, SCANA and Santee Cooper would qualify for Nuclear Tax Credits worth up to approximately **$2.2 billion.**  According to SCANA's 2012 Form 10-K, its 55% share of the Nuclear Tax Credits for the Nuclear Project could total as much as **$1.4 billion**, an amount that, at the time, equaled roughly one-third of the projected costs to SCANA.  Accordingly, the Nuclear Project's eligibility for these $2.2 billion Nuclear Tax Credits was critical to SCANA's ability to finance the project in a cost-effective manner and make the project financially viable.

### 2.     The BLRA Allowed SCANA To Charge Increased Energy Rates To Recover "Prudent" Nuclear Project Construction Costs

65.     In 2007, the South Carolina legislature passed the Base Load Review Act, S.C. Code § 58-33-210 et seq. (2007), (the "BLRA").  The BLRA was designed to allow utility companies to recoup "prudently incurred" capital and operating costs for a base load generating power plant during its construction, rather than waiting until it was built.  As Defendant Marsh stated in a May 27, 2008 press release: "The Base Load Review Act allows for annual adjustments to rates during construction of the units as a means of recovering financing costs associated with the project."  Prior to the BLRA's passage, South Carolina required utilities to complete construction before charging ratepayers for the costs associated with that construction.

66.     Utility rates in South Carolina are regulated by the South Carolina Public Service Commission (the "PSC"), a seven-person, publicly-elected executive board of the South Carolina state government.   In a November 21, 2017 legal filing before the PSC, South Carolina's Attorney General explained that, "as applied to SCE&G ratepayers, [the BLRA] requires a utility and its investors to be paid 'up front' by customers in order to finance the construction of exorbitantly expensive nuclear power plants."   Similarly, a December 10, 2017 article in *The Post and Courier* titled "Power Failure: How utilities across the U.S. changed the rules to make big bets with your money" explained that the BLRA "shift[ed] risks of construction projects from power companies to their customers. . . .   It was like paying a grocer as it builds its store — with the hope that groceries might be a little cheaper when it opens."

67.     Under the BLRA, SCANA could submit a "base load review application" to the PSC to seek its approval to charge customers an increased electric rate to offset construction costs for the Nuclear Project. S.C. Code § 58-33-230 (2007).   A utility's base load review application must contain, among other things, the construction schedule, the capital costs and schedule for incurring them, the selection of principal contractors and suppliers, the proposed rate design used in formulating revised rates, and the revised rates that the utility intends to put in place after the issuance of a base load review order.  S.C. Code § 58-33-250 (2007).

68.     The BLRA contained some backstops against imprudently incurred costs, and thus put SCANA at risk of being forced to bear them. Specifically, Section 55-33-275(E) of the Base Load Review Act states:

> In cases where a party proves by a preponderance of the evidence that there has been a material and adverse deviation from the approved schedules, estimates, and projections set forth in Section 58-33-270(B)(1) and 58-33-270(B)(2), as adjusted by the inflation indices set forth in Section 58-33-270(B)(5), the commission may disallow the additional capital costs that result from the deviation,

but only **to the extent that the failure by the utility to anticipate or avoid the deviation, or to minimize the resulting expense, was imprudent considering the information available at the time that the utility could have acted to avoid the deviation or minimize its effect.**

69.     Further, while the BLRA allows a utility to recover costs from ratepayers even for abandoned nuclear construction projects, such recovery is not allowed "to the extent that the failure by the utility to anticipate or avoid the allegedly imprudent costs, or to minimize the magnitude of the costs, was imprudent considering the information available at the time that the utility could have acted to avoid or minimize the costs."   Thus, SCANA's management and Board were on notice from the outset that the Company's ability to recover costs from South Carolina ratepayers was limited by the BLRA's prudency requirement.

**B.      SCANA Petitions To Build Two New Nuclear Reactors At The V.C. Summer Site**

70.     By April 2007, SCANA was publicly touting a massive planned expansion of the V.C. Summer Station. For example, Defendant Addison described SCANA's initial plan in the Company's first quarter 2007 earnings conference call on April 27, 2007, stating that "along with our partner, Santee Cooper, we currently expect to file a joint application with the nuclear regular regulatory commission later this year, for a combined construction and operating license which will cover two units . . . ."

71.     After the passage of the BLRA, SCANA immediately began finalizing its plans to use a consortium of contractors to help design and build the two new nuclear power plants at the V.C. Summer Site.   On March 31, 2008, SCANA submitted a combined construction and operating license application to the NRC for the two new nuclear units it was planning, triggering a multi-year review process.

72.    In May 2008, SCE&G and Santee Cooper—as 55% and 45% owners of the project, respectively—signed the EPC Contract with WEC and Stone & Webster to build two Westinghouse AP1000 Nuclear reactors at the V.C. Summer Site. On May 30, 2008, SCANA submitted to the PSC a "Combined Application For Certificate of Environmental Compatibility, Public Convenience and Necessity and For a Base Load Review Order to the PSC" (the "Combined Application").  The Combined Application submitted under the BLRA documented the need for new electric generation in South Carolina and purportedly provided information necessary to allow state regulators to determine the prudency of the Company's plans to construct the two new nuclear units to meet that need.  The Combined Application was signed by Defendant Kevin Marsh, who was then the President of SCE&G and who would later become SCANA's CEO.

73.    Per the Combined Application, SCANA had selected Westinghouse as the chief contractor under the EPC Contract on the Nuclear Project, in part due to its purported "experience and proven track record as a designer and manufacturer of nuclear systems and components. "As noted above, Stone & Webster was a subsidiary of The Shaw Group, which was selected as another contractor on the Nuclear Project, in part, because it was seen as "a leader in construction and engineering of nuclear power plants and other major energy facilities worldwide."   In general, Westinghouse was responsible for engineering and procurement of all nuclear steam supply system items, while Stone & Webster was responsible for the balance of the plant (including the supporting components and auxiliary systems of a nuclear power plant) and the nuclear reactor modules.

74.    The Combined Application also detailed SCANA's request for a **36% increase** in its customers' electric rates under the BLRA during the Nuclear Project's construction over the next 12 years.

75.    As part of its analysis of the Combined Application, the PSC began holding public hearings to consider SCANA's request.  During a September 16, 2008 hearing before the PSC, Defendants Marsh and Byrne testified about the close oversight that SCANA would exercise over the Nuclear Project's construction.  For example, Defendant Marsh testified that:

> As Mr. Byrne will testify, SCE&G is assembling a team of engineering and construction personnel, with accounting and administrative support, to monitor all aspects of the construction process and to ensure that the EPC contract is administered as intended. . . . In all, we estimate more than 50 people will be assigned to this task.  At the center of this structure will be a **dedicated group of SCE&G personnel that will monitor each aspect of the construction process on a day-to-day basis and will report progress, issues and variances to an executive steering committee that includes me as SCE&G's president, and a senior executive from Santee Cooper and to the SCANA board of directors**.  **This project will be monitored on a sustained and continuous basis by all levels of the reporting chain** . . . .

76.    Further, Defendants Marsh and Byrne publicly highlighted the oversight team SCANA purportedly intended to establish, as well as their own plans to directly and extensively monitor the Nuclear Project.  Byrne described how SCANA would put in place a 50-person oversight team "to monitor each aspect of construction, to sit in on the construction meetings Westinghouse/Stone & Webster will conduct with its personnel and subcontractors, to participate in inspection and testing and acceptance protocols, and to review and monitor closely issues of cost, budget compliance and milestone progress."  This team then would also provide monthly progress reports to Defendant Byrne and to the Executive Steering Committee for the Nuclear

Project, which included Defendant Marsh, and would also meet in-person with the Executive Steering Committee to provide quarterly status updates.

77.    On March 2, 2009, the PSC issued a comprehensive written order, No. 2009-104(A), which officially approved the Combined Application and the revised rate schedule. Under the terms of the order, SCE&G could begin charging increased rates, as long as it (a) remained on track to complete the new units for the approved costs, or (b) obtained the PSC's approval for a change in those costs.  As approved in this order, **the construction schedule anticipated that Unit 2 would be completed by April 1, 2016 and the project as a whole would be completed by January 1, 2019, for a total capital costs for the Units to be paid by SCANA of $4.5 billion in 2007 dollars.  With forecasted escalation, this equaled an estimated costs for the Nuclear Project of $6.3 billion in future dollars.**

78.    Two months later, in May 2009, SCE&G filed its initial rate adjustment request for an overall 1.1% increase in its electric rates, equivalent to an annual revenue increase of $22,533,000, to help finance its Nuclear Project costs.  This increase was on top of the 36% increase listed in the initial Combined Application.

79.    In March 2012, the NRC finally approved SCANA's plan, which had been filed in 2008, to build the two new nuclear reactors at the V.C. Summer Site.

80.    On May 15, 2012, SCANA filed a petition with the PSC seeking an order approving an updated construction and capital cost schedules for the Nuclear Project.  SCANA's updated construction schedule reflected a delay for the completion of Unit 2 until March 15, 2017, and an acceleration of Unit 3 completion to May 15, 2018.  The PSC approved the petition on November 15, 2012.

81.    In total, SCANA has successfully petitioned the PSC for **nine rate hikes** under the BLRA.  As the South Carolina press has recently reported (in a December 10, 2017 *The Post and Courier* article titled "Power Failure: How utilities across the U.S. changed the rules to make big bets with your money"), "[f]or roughly 717,000 SCE&G customers, those rate increases come to 18 cents for every dollar on their monthly bills. **It adds up to about $37 million every month, or nearly $500 million a year**."   In fact, as of January 13, 2018, "[t]he **average SCE&G residential customer has spent $1,406.83 on V.C. Summer** since March 29, 2009, according to the S.C. Office of Regulatory Staff."[4]

82.    Indeed, as a result of the BLRA, South Carolina residents now pay some of the highest electricity bills in the country.  In an August 3, 2017 article titled "Here are answers to some common questions about SC's abandoned nuclear project" *The State* reported the following analysis, showing that South Carolina customers' electricity bills have increased substantially since 2007, representing "the third highest jump in the country:"

> **South Carolina families pay the highest power bills in the South, and the third highest in the country**, trailing only Connecticut and Hawaii, according to the most recent data available.  In 2015, S.C. households paid an average of $144 a month for electricity.  That was up from $111.20 a month in 2007, the year that a law — the Base Load Review Act — passed the S.C. Legislature . . . **The Palmetto State's $38.84 increase in monthly power bills since 2007 was the third highest jump in the country**, trailing only Kansas and West Virginia.

C.    **SCANA Sought A Two-Year Extension To The Nuclear Project But Assured The Public That All Major Issues Have Been Resolved**

83.    During the early stages of the Nuclear Project, SCANA touted the state-of-the-art construction techniques being used, including Westinghouse's "modular" design, in which large components of the reactors would be fabricated off-site and then delivered to the V.C. Summer

---

[4] Colin Demarest, *Dominion Energy: Base Load Review Act key in SCANA purchase*, Aiken Standard, January 13, 2018.

Site for integration into the site. For instance, Defendant Marsh stated during a June 5, 2012 conference call:

> **The concept of using modular build sounds sexy, and it is**. You get civil engineers that just start drooling over this stuff. But at the end, it's not just about the technology. It's how you use modular fabrication to really change the game. Because I would contend to you in nuclear build, and especially what we're seeing in Finland and what we're seeing in France, the big difference in the United States in this technology is it leverages the fact that fabrication— it's all about fabrication in the United States. It's not about actual construction.
>
> As a matter fact, the rule is if you can fab it, fab it, don't build it in a hole, because it is a two-fer. It's a two-fer, relative to regulatory certainty; it's a two-fer relative to costs; it's a two-fer relative to being able to actually manage the product.
>
> So [we are] able to **de-risk the project by fundamentally changing the game in construction**.

84.    Construction on the Nuclear Project finally began on Unit 2 in March 2013, and on Unit 3 in November 2013.  Just months into Unit 2 construction, however, flaws in this "modular" construction system became apparent to the Officer Defendants.

85.    Specifically, throughout 2013 and 2014, Defendant Marsh and his counterpart at Santee Cooper, Lonnie Carter, secretly complained to each other, and to Westinghouse and CB&I, that the Nuclear Project was "in danger" because of submodule shipment delays and design failures.  For example, an August 23, 2013 letter from Carter to Marsh detailed Westinghouse and CB&I's "submodule delivery issues," which "has been **a major source of concern and risk for this project for a long time**" and which "plac[ed] the project schedule in jeopardy once again."  In particular, Carter wrote that CB&I and Westinghouse "do not function well as a team to resolve critical project issues" and that, in Santee Cooper's view, "the Consortium's inability to fulfill their contractual commitments in a timely manner **places the project's future in danger**."  Carter noted that, "based on [their prior] discussion," Marsh

- 29 -

"shares [Carter's] concern" about this "critical issue for the project and our companies," and asked Marsh to help "develop a plan forward" and "insist that the Consortium provid[e] a realistic plan . . . to fabricate and deliver the submodules in a timely manner to complete the project on schedule."

86.     In response, Defendant Marsh requested a meeting with Westinghouse and CB&I. In a September 5, 2013 email to the Westinghouse and CB&I Nuclear Project heads, that was also sent to Carter and Defendants Byrne and Addison, Marsh stated that they needed to meet "to discuss the status of our nuclear project" because SCANA and Santee Cooper "continue to have serious concerns about the consortium's ability to deliver modules from the Lake Charles facility" after three years "of unsuccessful attempts to resolve its manufacturing problem." Marsh emphasized that "missed deadlines put potentially **unrecoverable stress on the milestone schedule** approved by the SC Public Service Commission,' which, at that time, called for Nuclear Project completion by May 2018.

87.     The 2013 communications and meetings did little, if anything, to fix the serious problems causing "unrecoverable stress" on the schedule.  Not only did the delays and missed deadlines continue unabated, but the submodules that were delivered to the Nuclear Project site suffered from numerous design and construction flaws.  A May 6, 2014 letter from both Marsh and Carter to the leaders of Westinghouse and CB&I detailed the history of the contractors' "**poor performance**" on delivery and design, "and their combined effect on the expected completion date and cost of the project."  In particular, the letter described how the submodules that had been delivered were flawed and "required documentation processing and repairs" that were still not corrected by May 2014.  Marsh and Carter identified numerous failures, each of which "tested our resolve," and informed the Consortium that "**[a]s a result of these events, our**

**frustration continues to mount**" because "**[y]ou have made promise after promise, but fulfilled few of them.**"  They also noted that these "**unexcused delays will cause our project costs to increase greatly.**"

88.     SCANA and Santee Cooper were unable to get the Nuclear Project on track to meet its existing milestone schedule.  As a result, on March 12, 2015, SCANA sought PSC approval of an updated construction schedule that delayed the substantial completion dates for Units 2 and 3 by 27 months and 25 months, respectively. This proposed schedule revised the guaranteed substantial completion date of Unit 2 to June 2019, and the total project completion to June 2020.  SCANA also sought approval for increased capital costs of $698 million, bringing its share of the total costs up to $6.8 billion.  In a press release announcing SCANA's March 12, 2015 petition, Defendant Marsh stated that while "we are not pleased with the delays in the construction schedule for our new nuclear plants," "**[s]ubstantial progress has been made towards the completion of the units.**"  Marsh also confirmed SCANA's supposed commitment to keep the PSC and the public fully aware of changes to the schedule and costs of the Nuclear Project: "Our commitment to the Public Service Commission of South Carolina in 2008 was to keep them informed regarding changes in the construction schedule and related cost of the project.  Today's filing and our subsequent appearances before the Commission will allow us to fulfill our **commitment to transparency**."

89.     In support of SCANA's March 2015 petition, the Officer Defendants provided open testimony before the PSC in May 2015 that assured the public they were actively and prudently overseeing the Nuclear Project.  For example, Defendant Marsh testified: "SCE&G is performing its role as project owner in a manner that is **reasonable, prudent, cost-effective and responsible**" and "**[m]y senior management team and I are directly involved in the**

management and oversight of the project and in interacting with WEC/CB&I and its senior leadership team. We are dealing with the issues with WEC/CB&I aggressively and at the highest levels."

90.    On September 10, 2015, the PSC approved SCANA's request for $698 million in additional costs, and approved revised substantial completion dates for Unit 2 until June 19, 2019 and Unit 3 until June 16, 2020.  Based on the information presented to it by SCANA – including the testimony of Defendant Byrne that "**the construction schedule presented here represents a reasonable and prudent schedule for completing the construction of the Units**" – the PSC concluded that "the modified construction schedule and capital cost schedule presented in the Company's Petition were not the result of imprudence" under the terms of the BLRA.  Indeed, the PSC accepted SCANA's representation that "[t]he cause of the delay in the project to date has been [the] delay in the production of submodules for the Units."

91.    The PSC also emphasized that an important factor in its approval was the fact that the requested completion dates ensured that the Company would receive the expected billions of dollars of Nuclear Tax Credits:  "**[t]imely completion of the Units is particularly important given the narrow gap between the current substantial completion date for Unit 3 and the date by which power must be generated by that Unit to earn the full $2.2 billion in special Federal Production Tax Credits**, net of tax, that are potentially available for the Units."

92.    The PSC further commented on SCANA's role in the delayed completion dates, concluding that, based on the information presented to the PSC, "the delay in the project schedule to date results from delay in the submodule production," and that "there is no basis on this record to conclude that the project delays reflected in the updated construction schedule are the result of imprudence by SCE&G."  The PSC also credited Defendant Byrne's testimony that,

while additional delays could occur in the future, "construction of the Units has proceeded to a point where **many of the initial risks and challenges of new nuclear construction have been overcome**." The PSC found that the proposed schedule "is a reasonable and prudent plan for completing construction of the Units given the information available at this time."

### D.    Defendants Knew No Later Than October 2015 Of Numerous Problems And Risks With The Nuclear Project Leading To Delays Well Past 2020

#### 1.    SCANA Retained Bechtel To Assess The Nuclear Project

93.    Unknown to the PSC at the time of its September 10, 2015 order, however, Defendants' early 2015 statements that the primary cause for delay at the Nuclear Project was the Consortium's "delay in the production of submodules for the Units" and that "many of the initial risks and challenges of new nuclear construction have been overcome" were not accurate. According to an internal Santee Cooper document dated November 28, 2016 that recounted the history of the Bechtel relationship (the "SC Nuclear Timeline"), Santee Cooper began pressing SCANA executives "to engage outside assistance with management" of the Nuclear Project by the end of 2014 due to the need for "[i]ncreased project management expertise in large scale EPC construction" at the Nuclear Project.

94.    On February 10, 2015, Bechtel Corporation ("Bechtel"), one of the world's most respected engineering, construction, and project management companies, submitted an "Assessment Proposal" to SCANA and Santee Cooper. According to the proposal, Bechtel would provide an "assessment [] to assist the owners of the V.C. Summer Nuclear Generating Stations Units 2 & 3 in better understanding the current status and potential challenges of the project as a first step in helping to ensure the project is on the most cost-effective trajectory to completion." Bechtel made clear in its Assessment Proposal that its work would not be used in the context of current or anticipated litigation: "this team will not evaluate the ownership of past

impacts or validity of pending or future claims." No immediate action was taken on Bechtel's proposal.

95.     By April 2015, weeks after SCANA's March 2015 petition to delay the completion date of the Nuclear Project to June 2020, internal communications between SCANA and Santee Cooper revealed that a completion date in 2020 was unlikely, and that the project was significantly over budget. On April 6, 2015, Santee Cooper's Senior Vice President for Nuclear Energy, Michael Crosby ("Crosby"), emailed Defendant Byrne and SCANA's Jeff Archie a series of charts "that were discussed in the Executive Steering Committee meeting" with SCANA, which Defendant Marsh attended as a committee member, on March 6, 2015. In this email, made available to Lead Plaintiffs through a FOIA request, Crosby noted that for one chart depicting the "total target cost impact of the Consortium's poor management of productivity and labor ratios," "**a total cost curve" using an "average of the actual numbers recorded on the project**" over the last five months "is not shown on the graph because **it would be off the chart**." He further discussed that even in the positive scenarios represented in this chart "**still result in cumulative target costs that are significantly over budget**." Thus, Defendants knew as early as April 2015 that the total costs for the Nuclear Project would substantially exceed the public cost estimates, even if they were able to improve construction productivity.

96.     The April 6, 2015 email to Byrne also attached another chart titled "Percent Complete – Direct Craft Work," which depicted the Nuclear Project's progress based on skilled labor hours:



97.    This chart showed the dramatic disparity between the Nuclear Project's "**actual** progress to date" (represented by the blue dotted line) versus the progress "**required** to achieve [the] Jun[e] 2019/Jun[e] 2020 SCDs [substantial completion dates" for Units 2 and 3 (represented by the green dotted line).  Specifically, the chart revealed that construction of the Nuclear Project was roughly 16% complete by January 2015, and had progressed only 8% in the prior 24 months – a rate of **0.33% progress completed per month**.  According to the chart, Unit 2 would not even reach **35%** completion by its July 2019 purported completion date if progress continued at the same pace.  This chart demonstrated clearly that in order to complete the remaining 86% of construction over the remaining 42 months left in the schedule for Unit 2, the

rate of construction progress would have to increase to at least 2% per month – six times the current rate – and it would have to improve immediately.

98.     According to the SC Nuclear Timeline, Defendant Marsh and other SCANA and Santee Cooper executives met with the nuclear team from Bechtel the next day – April 7, 2015 – to discuss their Assessment Proposal, and decided to proceed with the engagement.

99.     On May 11, 2015 and May 27, 2015, Defendant Byrne exchanged emails with Michael Crosby, Byrne's counterpart at Santee Cooper, copies of which were provided to Lead Plaintiffs through FOIA requests. Crosby wrote that Santee Cooper was eager to retain Bechtel, and noted that "Lonnie [Carter] is extremely (motivated) and ready to move forward on this . . . and would like to see us get documents to Bechtel as soon as possible so that Bechtel can begin . . . ." Crosby also suggested to Byrne that "[m]aybe with the blessing of our legal teams . . . **we could (NDA) wrap Bechtel into an Owner's engineer role ?? [sic] that would allow Bechtel to start reviewing documents**. Please stew on this a bit . . . and let's get back together soon on what we can do to get the program jump started . . . I'm feeling some real heat on this one."

100.     About two weeks later, on May 27, 2015, Byrne sent Crosby and others at Santee Cooper an email with the subject line "Bechtel NDA." Defendant Byrne relayed that he "had a conversation with Kevin Marsh this afternoon relative to the NDA for Bechtel **to do the third party assessment or act as Owner's Engineer** and he had no problem with Bechtel reviewing what you have now." He did not want to engage Bechtel yet, because he wanted to "**discuss with the consortium CEOs first**."

101.     These May 2015 emails between Santee Cooper and SCANA show that both companies envisioned Bechtel's role as providing a "third party assessment or act[ing] as Owner's Engineer,"—*i.e.* a qualified engineering expert to assess the project. They agreed to

Bechtel signing an NDA, a non-disclosure agreement, so that Bechtel could more quickly gain access to confidential documents related to the Nuclear Project for purposes of beginning the assessment urged by Santee Cooper.

102.    Internal Santee Cooper documents produced in response to FOIA requests reveal that on June 1, 2015, Bechtel executed a Proprietary Data Agreement – and NDA – with SCE&G that allowed Bechtel access to confidential "information in oral, written or physical form" related to the "AP1000 Nuclear Power Plant(s) and related facilities." Notably, Westinghouse and Stone & Webster were "expressly recognized as third party beneficiary(ies) to this Agreement" such that the Proprietary Data Agreement was enforceable by Westinghouse.

103.    A June 1, 2015 email between executives from Santee Cooper, Bechtel and SCANA (including Defendant Byrne), produced in response to FOIA requests, reveals that, for the first time, "the possibility that Bechtel might be retained by" outside counsel was discussed. A Bechtel executive responded that "we are flexible and we are willing to be retained by your outside counsel if you believe that would be preferable."

104.    While Bechtel was amenable to being formally retained by SCANA's outside counsel, Bechtel clearly conveyed that its work was not privileged as it was shared with – and even conducted on behalf of – the Consortium. On June 1, 2015, Bechtel executed the Proprietary Data Agreement, to which Westinghouse was a beneficiary with rights of enforcement. Moreover, as evidenced in a string of emails between counsel for Westinghouse, CB&I, SCANA and Santee Cooper on July 28, 2015 and July 30, 2015, which were produced in response to FOIA requests, Westinghouse and CB&I were active participants in providing edits to and then approving the language of the agreement retaining Bechtel and setting out the terms of Bechtel's assessment (the "Bechtel Agreement").

105.    According to the SC Nuclear Timeline, sometime between April and August 2015, SCANA's Board of Directors, which at this time included Marsh and the Director Defendants (Roquemore, Hagood, and Stowe), approved the proposal and the Bechtel Agreement, and authorized Bechtel to prepare a Nuclear Project assessment.   Bechtel's assessment commenced on August 10, 2015.

106.    Specifically, SCANA and Santee Cooper commissioned Bechtel to write a report that would contain an "evaluation of the current status and forecasted completion plan through the design, supply chain, and construction aspects" of the Nuclear Project.   Composed of 14 members, the senior members of the Bechtel "Assessment Team" were well-equipped to evaluate the Nuclear Project.   Together, they had over 500 years relevant experience, 300 of which was dedicated to Engineering, Procurement & Construction nuclear experience and oversight of more than 85 projects similar in kind to the V.C. Summer Nuclear Project.

## 2.    The Bechtel Assessment and First Bechtel Report

107.    Bechtel's assessment was comprehensive.   Over the course of three months, the Bechtel team (i) reviewed over 350 Nuclear Project documents; (ii) attended 70 meetings with personnel from Westinghouse, CB&I, SCANA and Santee Cooper; (iii) conducted 25 interviews with personnel from Westinghouse, CB&I, SCANA and Santee Cooper; (iv) completed 24 site walkdowns and real time observations; and (v) attended 7 presentations on various subjects. Among the high-level SCANA executives interviewed by Bechtel were Defendant Byrne; Ron Jones, SCANA's Project Director for the Nuclear Project and Vice President of New Nuclear Operations; Alan Torres, SCANA's General Manager of Nuclear Plant Construction; Jeff Archie, SCANA's Chief Nuclear Officer and Senior Vice President; and Carlette Walker, SCANA's Vice President of Nuclear Financial Administration who reported directly to Defendant Addison.    Bechtel also interviewed leaders of the Nuclear Project from the

Consortium, including but not limited to Westinghouse's Nuclear Project Manager ("Former Employee 1," discussed below) and Director of Licensing ("Former Employee 2," discussed below).

108.    Bechtel provided regular updates to Defendant Marsh throughout its assessment. According to an internal Santee Cooper document, Craig Albert, the President of Bechtel Nuclear, Security & Environmental, personally held weekly update calls with Defendant Marsh and Santee Cooper CEO Carter between August 10 and October 16, 2015. In addition, Defendants were presented with Weekly Reports documenting the work completed by Bechtel each week, and the work planned for the next week. Defendant Marsh has since confirmed in 2017 testimony before the South Carolina House of Representatives that the information provided to him in Bechtel's weekly reports and phone calls included the negative information that "led to the ultimate conclusions [Bechtel] came to in the report."

109.    The Bechtel team determined there were "**significant issues**" facing the Nuclear Project that threatened its "successful completion." On October 16, 2015, the Bechtel team met in person with Defendant Marsh to discuss the final results of their assessment. Six days later, Bechtel's presented its "project assessment, findings, and high-level recommendations" to SCANA's and Santee Cooper's executive management in SCANA's Cayce, South Carolina headquarters on October 22, 2015 (the "Bechtel Assessment"). Defendants Marsh and Byrne have since admitted in public testimony in 2017 that they attended this presentation.

110.    Internal Santee Cooper documents confirm that the October 22, 2015 Bechtel Assessment provided Defendants with the key findings and recommendations regarding the Nuclear Project that were then documented in a November 9, 2015 report, discussed below. Specifically, on October 13, 2015, Bechtel emailed Crosby, Santee Cooper's Senior Vice

President, its "Preliminary Assessment" which would "**form the basis of our presentation to the execs**" of SCANA and Santee Cooper, noting that Bechtel's recommendations "are still in development but **will [also] be part of the exec review**." This email, produced to Lead Plaintiffs through FOIA requests, indicated that the "Scope of the Assessment" was focused on "evaluat[ing] the status of the project **to assess the Consortium's ability to complete the project on the forecasted schedule.**" Crosby forwarded this email to Carter on October 14, 2015, explaining that after the "CEO meeting" with Defendant Marsh and Carter is "nailed down," likely for "the 22nd or 23rd" of October, Bechtel would "schedule a sit-down meeting with [Defendant] Byrne" and Crosby, "and also a separate meeting with [SCANA's] Jeff Archie's staff" before the Bechtel Assessment meeting with the CEOs. Thus, although Crosby noted that "SCE&G has not seen this [Preliminary Assessment] yet," the email clearly indicated that it would be discussed with SCANA even before the October 22 Bechtel Assessment meeting.

111. In his October 14 email forwarding Bechtel's preliminary assessment to Carter, Crosby noted that although he did "not see any real surprises … **the Bechtel projection on commercial operation dates is sobering**." It was sobering because Bechtel's "preliminary assessment of the project schedule [was] that the **commercial operation dates will be extended**." Specifically, Bechtel stated in its email that Unit 2 would not be in operation until "**18-26 months beyond the current June 2019 commercial operation date**" and Unit 3 would not be completed until "**24-32 months beyond the current June 2020 commercial operation date**."

112. In this email, Bechtel also identified other problems with the Nuclear Project's project management, controls, construction, engineering and licensing, and procurement that

- 40 -

were later detailed in Bechtel's formal report.  In particular, Bechtel found that "[t]he Consortium's forecasts for schedule durations, productivity, forecasted manhour peaks, and percent complete **are unrealistic**" and "**[t]he Owners do not have an appropriate project controls team to assess/validate Consortium reported progress and performance**."  Further, the Nuclear Project suffered from a "lack of accountability," and "[t]he current hands-off approach taken by the Owners towards management of the Consortium does not allow for real-time, appropriate cost and schedule mitigation."  With regard to engineering, Bechtel found that "**the issued design is often not constructible** (currently averaging over 600 changes per month)."

113.    Bechtel's observations and recommendations presented on October 22, 2015 were then detailed in a 130-page Project Assessment Report, dated November 9, 2015 (the "First Bechtel Report") that was made public only at the end of the Class Period, as discussed further below. Defendant Addison confirmed in September 2017 public testimony that Bechtel detailed "the basics" of its forthcoming report during the October 22, 2015 Bechtel Assessment presentation.

114.    Bechtel organized the First Bechtel Report into five specific areas of assessment: (i) Project Management; (ii) Engineering and Licensing; (iii) Procurement; (iv) Construction and Project Controls, including an "Analysis of the Project Construction Schedule;" and (v) the Startup plans for the nuclear units once completed.  While the cover of the First Bechtel Report notes that it is "Strictly Confidential," there is no mention of the Report being created in anticipation of litigation, being directed by attorneys, or otherwise being subject to attorney-client privilege.  Indeed, the Weekly Reports attached to the First Bechtel Report indicate that Bechtel's team spoke openly with employees of SCANA, Santee Cooper, Westinghouse, and

CB&I, and had in-person meetings with Defendants Marsh and Byrne, without the attendance, participation, or input of any legal counsel.

115.    Bechtel's assessment of the Nuclear Project was highly critical of SCANA's management of the project, and provided an unambiguous conclusion: "**the current schedule is at risk**" because "**[t]he to-go scope quantities, installation rates, productivity, and staffing levels all point to project completion later than the current forecast**."   In sum, Bechtel concluded that the schedule that was approved by the PSC just weeks before, on September 10, 2015 – with completion dates of June 2019 and June 2020, respectively – was impossible to achieve.   Bechtel concluded that the current approved schedule would be delayed up to three years, and included the following timeline in the First Bechtel Report:

| Impacts on Commercial Operation Dates | | |
|---|---|---|
| | Unit 2 | Unit 3 |
| Current COD | June 2019 | June 2020 |
| Adjustment | 18 to 26 months | 24 to 36 months |
| New COD | Dec 2020 to Aug 2021 | June 2022 to June 2023 |

116.    Bechtel provided an objective performance metric that had to be met in order for the Nuclear Project to succeed, and for it to have even a chance of being completed by the end of 2020.   The First Bechtel Report detailed how SCANA's projected schedule relied on the Nuclear Project reaching a rate of 3% monthly construction progress, but the Nuclear Project reached only 0.5% construction progress per month, on average, and was only 21% complete to date. This showed that only 5% of the Nuclear Project had been completed between January 2015 and October 2015, at a rate of only 0.5% progress.   Nothing had changed between the April 6, 2015 email to Byrne, which showed the severe shortfall in the project's actual versus target progress rates, and the October 22, 2015 Bechtel Assessment.   SCANA still had to somehow improve performance from 0.5% to 3%, and it would have to happen immediately in order to have a hope

of completing the Nuclear Project by the end of 2020. Such improvement would be impossible without addressing and correcting the numerous significant deficiencies in project management, engineering, licensing, procurement and construction identified by Bechtel.

117. The First Bechtel Report provided an Executive Summary summarizing numerous reasons why the Nuclear Project's recently approved schedule was "at risk," and contained well over 80 separate "Observations" and "Recommendations" to address these recognized deficiencies. In addition to the specific conclusions on the timing of the schedule, Bechtel concluded that:

- "While the Consortium's engineering, procurement, and construction (EPC) plans and schedules are integrated, **the plans and schedules are not reflective of actual project circumstances.**"

- "The Consortium **lacks the project management integration needed for a successful project**."

- "There is a **lack of shared vision, goals, and accountability** between the Owners and the Consortium."

- **"The Contract does not appear to be serving the Owners or the Consortium particularly well**."

- "The **detailed engineering design is not yet completed** which will subsequently **affect the performance of procurement and construction**."

- "The **issued design is often not constructible** resulting in a significant number of changes and causing delays."

- **"The oversight approach taken by the Owners does not allow for real-time, appropriate cost and schedule mitigation**."

- "The relationship between the Consortium partners . . . is **strained**, caused to a large extent by commercial issues."

- "The recently announced acquisition of CB&I and WEC and the hiring of another construction contractor" **could "caus[e] further delays in mitigating the resulting project impacts"** because "the issues at V.C. Summer rest with both engineering, procurement, and construction".

118.    The First Bechtel Report also identified additional deficiencies related specifically to SCANA's management of the Nuclear Project including, but not limited to, the following observations:

- "As the Owners, SCE&G and Santee Cooper have the responsibility to manage their portion of the prime contract and ensure that the Consortium contractors are fulfilling their contractual observations."  Yet, Bechtel observed that "[t]here is **a lack of accountability**" in various SCANA departments, and [t]he approach [to project management] taken by [SCANA and Santee Cooper] **does not allow for real-time, appropriate cost and schedule mitigation.**"

- "The Owners' [SCANA and Santee Cooper] organization **lacks the appropriate personnel to provide the proper level of review and oversight required to drive the project to successful completion**."

- "The Owners' oversight organization does **not have a proper Project Controls staff**."

- "The Consortium **does not appear to be commercially motivated to meet Owner goals**."

- "[T]he V.C. Summer Units 2 & 3 project suffers from various **fundamental EPC and major project management issues that must be resolved for project success**."

### 3.    Defendants Attempted To Alter Bechtel's Report

119.    Rather than accept Bechtel's observations and recommendation and work on improvements to make the Nuclear Project a success, SCANA immediately took steps to silence Bechtel and conceal the Bechtel Assessment and First Bechtel Report.

120.    According to the SC Nuclear Timeline, immediately following the October 22 presentation, "SCANA management expresse[d] hesitation" and instructed its legal counsel to push back against Bechtel's conclusions.  SCANA's decision to "route[] [the] assessment through [its] legal department" following this scathing assessment was highly suspicious.  There is no mention of privilege or any legal purpose for Bechtel's work in any of the Weekly Updates appended to the First Bechtel Report, nor anywhere on the face of the report itself.  However, once SCANA received a copy of the First Bechtel Report, management instructed SCANA's

legal counsel to sanitize the report.  As discussed above, Bechtel had commenced work on the assessment, and had signed a Proprietary Data Agreement before SCANA even raised the idea of routing Bechtel's retainer through SCANA's outside counsel.  Moreover, Bechtel had expressly informed Defendant Marsh in a July 13, 2015 email that Bechtel's assessment did not include any "claims consultancy."  In other words, Bechtel's work was not to be used as a litigation tool, but was to be a fair assessment of "the work, the consortium, and SS [SCANA/Sante Cooper] oversight."

121.    As described in the SC Nuclear Timeline, negotiations between Bechtel and SCANA's counsel were contentious, and prompted weeks of "wrangling" over SCANA's attorneys' attempts to "reject[] initial report, redactions, timeline removal, [and] critique of project management."

122.    Defendant Byrne actively participated in efforts to whitewash the Bechtel Report. An internal Santee Cooper document made available to Lead Plaintiffs in response to FOIA requests details notes of a February 4, 2016 telephone call between a Santee Cooper employee and Ty Troutman, a Bechtel Principal Vice President who is listed as an "Assessment Reviewer" in the First Bechtel Report. These notes confirm that SCANA, through its outside counsel, requested that "the schedule and other information be removed."  The notes reveal that in mid-December, Troutman called Defendant Byrne to discuss the First Bechtel Report and the requested redactions.  Troutman concluded from this call that Defendant Byrne had either read the First Bechtel Report or gotten a full download from outside counsel because "Byrne knew a lot about the content of the report."  Byrne communicated to Troutman that "his feelings are hurt" and that "Bechtel was too rough on SCE&Gs 'EPC management skills.'"  One month later, SCANA's outside counsel notified Bechtel that the "schedule piece must be removed and words

- 45 -

negative on SCE&Gs 'EPC management skills' must be softened." According to these February 4, 2016 notes, Troutman agreed to separate Bechtel's conclusions about the schedule and completion dates "into a stand-alone report" and "submit 2 reports to George [Wenick, SCANA's outside counsel] . . . **knowing George will discard the schedule report**."

### 4.      The Sanitized Second Bechtel Report

123.    A day after the call with Troutman, on about February 5, 2016, Bechtel delivered a second Project Assessment Report (the "Second Bechtel Report") (together with the First Bechtel Report, the "Bechtel Reports"). The Second Bechtel Report was closely guarded and made available to only a handful of people, including the Officer Defendants. Each copy was numbered and the intended recipient identified on the cover. No new assessment work had been performed by Bechtel since the First Bechtel Report, and no additional information had been added to the document, but some of the most damaging conclusions concerning the schedule were stripped from the report. The cover of the Second Bechtel Report noted, as did the First Bechtel Report, that it was "Strictly Confidential," but again there was no mention of the Report being created in anticipation of litigation or otherwise being subject to attorney-client privilege.

124.    Conspicuously missing from the Final Bechtel Report were the following key conclusions regarding the schedule for the Nuclear Project:

- "Based on Bechtel's assessment, **the current schedule is at risk**;"

- Bechtel's **new completion dates for Units 2 and 3 in 2021 and 2023**, respectively; and

- Bechtel's view that **the October 27, 2015 EPC Amendment would likely "caus[e] further delays" to the schedule**.

125.    In addition, twenty pages, including an entire section, titled "**Analysis of the Project Construction Schedule**" and supporting charts, all of which explained in detail Bechtel's methodology, bases, assumptions and results of its analysis of the revised completion

schedule, were erased from the Second Bechtel Report.  In sum, the Second Bechtel Report entirely excluded Bechtel's fundamental conclusion that the Nuclear Project would not be completed in 2020 and, even in a good scenario, the Nuclear Project would not be completed until 2022, two years past the deadline promised to investors.  According to the notes from the phone call between a Santee Cooper executive and Bechtel's Ty Troutman, discussed above, Bechtel produced another report on February 5, 2016 with this missing information – a report that, according to the Santee Cooper notes of a February 4, 2015 call with Bechtel's Troutman, SCANA may have discarded.

126.    Despite these glaring removals made at SCANA's direction, the Second Bechtel Report still listed many of the same problems identified in the First Bechtel Report.   These problems would have communicated to any observer that the Nuclear Project was failing, and could not possibly be completed by the end of 2020.  As *The Post and Courier* later reported, the Second Bechtel Report made clear that "SCANA and Santee Cooper knew the effort to construct two nuclear reactors was failing more than a year before the ambitious energy project was scrapped [in July 2017]."

127.    Both the First and Second Bechtel Reports stated that the recently-revised schedule approved by the PSC In September 2015 "has slipped significantly" and "continues to slip," and identified "**Major Issues Affecting Schedule and Performance**," including:

- "A large percentage of the personnel on the project" have been "working too many hours for an extended period," which is proven to "reduc[e] productivity" and "negatively affect[] morale, decision making, and safety;"

- "Significant Non-Manual Turnover" of "greater than 17%, which is high for a typical nuclear plant" and is likely attributable to the Nuclear Project's "safety, cost, and schedule concerns" that were "compounded with the frustrations of design change" at the Units;

- A poor management process that minimized, rather than maximized, actual craftsmen time at the workface;

- 47 -

- "A large part of the schedule slip is related to late design changes, slow resolution of interference issues, and the time it takes to resolve construction errors and quality problems. . . . As long as there are late design changes occurring and there is not expeditious resolution of issues that arise, there will continue to be significant schedule slippages;" and

- The modular design strategies employed at the Units, "while a great concept, have proven to be an impediment to the construction and are more complicated to fabricate."

128.    The most important "**key schedule challenge**" identified by Bechtel in both the First and Second Bechtel Reports remained the Units' dismal progress percentages – a key indicator of whether the Nuclear Project could meet its schedule.  Without achieving the target level of 3% progress per month, Defendants had no hope of competing the Nuclear Project in the next five years.  Indeed, as Bechtel noted again, "**[i]n order for the plant to complete on schedule, monthly construction progress must increase to close to 3%.**"

129.    SCANA and Santee Cooper paid Bechtel $1 million for its assessment. Defendant Addison later admitted in a September 15, 2017 hearing that SCANA paid its share of this $1 million from the account used to fund the Nuclear Project.  As South Carolina State Representative Bill Sandifer noted, this effectively meant that the South Carolina ratepayers funded the Bechtel Reports, yet their existence, their conclusions and the critical underlying facts they discussed, were hidden from ratepayers, investors, and regulators until the Nuclear Project collapsed in mid-2017.

    E.    **Defendants Reaffirmed Nuclear Project Completion By 2020, Despite Bechtel's And Santee Cooper's Warnings That The Date Was Unachievable**

130.    Bechtel's stark conclusions were not a surprise to Defendants.  Indeed, Defendant Marsh admitted under oath in 2017 testimony that Bechtel's conclusions were "not news" because Defendants already knew "the majority" of the things contained within the Bechtel Report before October 2015.  Moreover, Defendant Byrne similarly testified in 2017 that "the

issues that were raised by Bechtel had largely been raised by our folks before the Bechtel report."

131.    Nevertheless, on October 27, 2015, in a press release issued in a Form 8-K after trading hours, SCANA announced that it had renegotiated the terms of the EPC Contract with the Consortium and, as part of those terms, agreed that the Nuclear Project would be completed by August 2020 (the "EPC Amendment").    SCANA publicly described the terms of the EPC Amendment as follows:

- A two-month extension of "*the guaranteed substantial completion dates of Units 2 and 3, "to August 31, 2019 and 2020*, respectively;"

- Westinghouse will acquire from CB&I its Stone & Webster subsidiary;

- Westinghouse will engage an entirely new company – Fluor – as a subcontractor to manage construction;

- An increase in the total gross construction cost to *$7.1 billion,* a $300 million increase from the $6.8 billion approved by the PSC in September;

- A fixed-price option of *$7.6 billion*, which SCANA had until November 1, 2016 to exercise; and

- The settlement of "all outstanding disputes" between SCANA, Westinghouse and CB&I, in exchange for, among other things:

  - SCANA's waiver and cancellation of CB&I's guaranty with respect to the Nuclear Project, leaving Westinghouse and its parent, Toshiba, as the sole entities guaranteeing the Project's completion;

  - Establishment of a dispute resolution board process to resolve any future commercial claims and disputes, and a provision that would "eliminate the requirement or ability to bring suit before substantial completion of the Project."

132.    Analysts viewed the EPC Amendment as a positive development.  For example, in response to the announcement, Macquarie Research upgraded the Company to "Outperform" from "Neutral" on October 28, 2015, stating that "**[w]e see the deal as a big win for SCG's investors and ratepayers**."

- 49 -

133.    On October 29, 2015, the Officer Defendants answered questions about the EPC Amendment during the Company's quarterly earnings conference call.  Analysts questioned the strength of the Nuclear Project in light of the EPC Amendment.  During the call, an analyst from Mizuho Securities inquired about the remaining risks related to the Nuclear Project, and asked whether SCANA was "happy with the quality" of the construction such that there would no "ah ha" moment expected in "a worst case basis-type question."

134.    Defendant Addison responded: "*We don't anticipate any ah ha moments*."  Addison justified this response by explaining SCANA's direct oversight of the Nuclear Project: "We have our own quality group, our own quality inspectors, and we send our folks not just at the site but we will send them to facilities that are manufacturing components, whether it be CB&I or somebody else, and we send them whether it is domestically or internationally, our QA QC inspectors have a lot of stamps on their passports. *We will be able to assure Fluor of the quality of the construction so far*."

135.    Analysts reacted positively to SCANA's explanation of the EPC Amendment.  On October 30, 2015, Wells Fargo reiterated its Outperform rating, increased its valuation range upwards, and wrote that "we continue to believe SCE&G is managing the nuclear project prudently, that support remains high in the state and that constructive regulatory treatment will enable SCG to achieve a 6+% EPS [earnings per share] CAGR [compound annual growth rate]."  Wells Fargo also noted that the "revised EPC contract seemingly **de-risks the project**."  The market reacted favorably on October 29, 2015, with shares rising approximately 3.39% to close at $59.22 per share on October 30, 2015, on heavy trading volume.

136.    Each of the Officer Defendants appeared before the PSC in a public *ex parte* briefing to explain the terms of the EPC Amendment on November 19, 2015 (the "November 19

PSC Briefing"), ten days after they received the First Bechtel Report. Defendants falsely stated that there were no known impediments to completing the two Units by the end of 2020, as required to secure the relied-upon Nuclear Tax Credits. For example, Defendant Marsh acknowledged the two-month extension to the guaranteed completion dates, and noted that SCANA would complete construction "*in time to finish the units for the production tax credit*" at the end of 2020. Marsh further emphasized SCANA's supposed "certainty" in meeting the 2019 and 2020 guaranteed substantial completion dates:

> We wanted to focus Westinghouse very keenly on meeting the deadlines for the production tax credits. As you know, those tax credits expire at the end of 2020. We have to have our plants on line at the end of 2020 to qualify for those. *The first plant is certainly more than a year ahead of that; the second plant is a little bit less than six months ahead of that, . . . so we wanted to make sure we kept [Westinghouse] focused on trying to reach those goals so we could secure those benefits for customers that amount to about $2.3 billion on a pretax basis*.

137. Defendant Addison, in fact, emphasized to the PSC SCANA's commitment to complete transparency when it came to the risks facing the Nuclear Project. Specifically, during the November 19PSC Briefing, Defendant Addison discussed certain provisions of the amended EPC Contract, and highlighted one provision that was "very important to SCANA" because it allowed SCANA to "*disclose to investors all the details of anything that we think is critical that you know*" without first getting approval for that disclosure from Westinghouse. Addison emphasized that any potential barrier to full transparency had been lifted, noting that "*we can share with you anything that we think is important that you see, as well as the investors, those that buy our bonds or those that buy our stock to provide funds to build the plants*."

**F.**     **Defendants Continued To Conceal The Bechtel Reports**

**1.**     **Defendants Prevented Disclosure Of The Bechtel Reports**

138.     Defendants' decision to make public statements on October 27, 2015 and thereafter that were directly contrary to Bechtel's observations and conclusions was part of a deliberate attempt to cover-up and conceal the Bechtel Reports and their underlying facts.  This is evident from a document titled the "Bechtel Report Action Plan," which was authored by Santee Cooper in February 2016, as later confirmed by Santee Cooper's General Counsel in a letter to South Carolina Governor McMaster on September 27, 2017.

139.     The Bechtel Report Action Plan, which was recently made available to Lead Plaintiffs through a FOIA request, is a one-page memo written in the wake of the Second Bechtel Report.  The Bechtel Report Action Plan is divided into three sections: (i) "SCE&G Concerns;" (ii) "Santee Cooper Proposal for Use of Report;" and (iii) "Santee Cooper Action Steps."

140.     The Bechtel Report Action Plan reveals that SCANA was acutely aware of how Defendants' public statements since October 2015 differed materially from Bechtel's undisclosed Assessment and Reports.  In the section of the Plan titled "SCE&G Concerns," Santee Cooper wrote: "**What mitigation effort is required to defend potential shareholder suit -- Now that SCE&G is specifically aware of problems in [the] report, failure to act may result in O&D [Officers' and Directors'] liability**."  The Bechtel Report Action Plan further described how SCANA and Santee Cooper colluded to ensure that any "disclosures" made to prospective buyers of each company's corporate debt – the primary source of funds used for the Nuclear Project – were "similar," given that they both knew the Nuclear Project was seriously troubled and they were  concerned  about how "**to defend [a] potential shareholder suit**."

141.    The Bechtel Report Action Plan also makes clear that SCANA pressured Santee Cooper to conceal the Bechtel Report, and that Santee Cooper agreed to this proposal as long as SCANA would take certain steps in response to the Bechtel Report:

SANTEE COOPER PROPOSAL FOR USE OF REPORT

1. We will continue to co-operate, within the law, **with SCE&G's efforts to avoid disclosure** on the condition that SCE&G will use the document as a template for project administration changes to be jointly decided, but must include:

   (a) The hiring of an EPC nuclear construction-experienced owners' engineer with authority to manage the project, Bechtel is not excluded from consideration;

   (b) An internal SCE&G project management change that will increase managerial staff and be led by a nuclear construction-experienced individual who is a direct report to Kevin Marsh whose sole responsibility is managing this construction project;

   (c) The Bechtel Report will be reviewed jointly by SCE&G and Santee Cooper leadership, section by section, together with Bechtel analysts, to determine specifically what administrative and operations changes will be made going forward with the project, effective immediately; and

   (d) Each change will include an objective metric to determine compliance and success.

142.    As described in detail below, while Santee Cooper upheld its side of the bargain and colluded with SCANA to "avoid disclosure" of Bechtel's work and conclusions, SCANA - the majority owner and controlling operator of the Nuclear Project – never implemented any of Santee Cooper's demands concerning the hiring of an "owners' engineer with authority to manage the project" or "a nuclear construction-experienced individual who is a direct report to Kevin Marsh whose sole responsibility is managing this construction project."

143.    Later in 2016, Santee Cooper revisited the potential disclosure of the Bechtel Report, but was prevented by SCANA from doing so once again. In a November 28, 2016 email

from Santee Cooper CEO Carter to Defendant Marsh, Carter asked to discuss the "[r]elease of the Bechtel Report to the Cooperatives," Santee Cooper's largest customers who purchase 70% of Santee Cooper's electricity, and who paid more than $422 million to Santee Cooper to finance the reactors since workers broke ground on the project. Carter noted that the Cooperatives had learned of the existence of a report by Bechtel and "demand[] a copy of the report." Carter noted that while SCANA had so far instructed Santee Cooper not to release the Second Bechtel Report, "[n]ot releasing the information will likely bring formal requests that will be an untenable position for both companies."

### 2. Defendants Conceal The Existence Of The Bechtel Report From SCANA's Public Watchdog

144. Defendants also actively withheld information about Bechtel's conclusions and the Bechtel Reports from South Carolina's Office of Regulatory Staff (the "ORS"), SCANA's public utility watchdog that reported to the PSC with respect to the Nuclear Project. According to its website, "[t]he ORS represents the public interest with regard to investor-owned utility applications to build new nuclear transmission and generation facilities in South Carolina. In accordance with the Base Load Review Act, the ORS provides ongoing monitoring of a project's schedule and budget during construction." For all relevant times, the ORS monitored the Nuclear Project, received quarterly updates from SCANA on progress at the Nuclear Project, and provided public testimony and advice to the PSC in connection with SCANA's requested rate relief, schedule changes, and other petitions.

145. The first "SCE&G CONCERN" identified in the February 2016 Bechtel Action Report Plan revealed that SCANA was aware that the ORS had caught wind of Bechtel's secret assessment of the Nuclear Project:

    1. **What disclosures to make to ORS** – Marion Cherry [a Santee Cooper executive working on-site at the Nuclear

> Project] is aware of internal SCE&G emails and verbal communications revealing that ORS is aware that a project assessment was being done, and recent inquiries have [come] from ORS to SCE&G checking on status of assessment report.

146.    In fact, the ORS inquiries into Bechtel's work – and SCANA's active resistance to providing the ORS with the requested information – dated back to October 2015. This was revealed on September 18, 2017, when Allyn Powell, the ORS Manager for Nuclear Programs, who managed ORS's review of the Nuclear Project, testified before the South Carolina Senate V.C. Summer Nuclear Project Review Committee.  In her testimony, Ms. Powell stated that members of the ORS had observed Bechtel personnel at the Nuclear Project site and first asked about the nature of Bechtel's work on October 27, 2015.  Curious as to Bechtel's role, the ORS added an agenda item to its October monthly meeting with SCANA to "[d]iscuss the Bechtel Assessment and the top ten issues noted thus far."  According to Ms. Powell's September 2017 testimony, the ORS received no response to that agenda item, and followed up in person with various SCANA personnel to no avail in October, November, and December 2015, and again in January 2016.  These inquiries were ignored – the ORS received no response from SCANA about the nature of Bechtel's work.

147.    Unable to secure a response from SCANA informally, on March 4, 2016, the ORS issued a "First Continuing Request for Records and Information" to SCANA, seeking a response, under oath, to the question "Has SCE&G decided to retain the services of a Project Consultant as allowed in the Agreement?"  On March 24, 2016, SCANA's Assistant General Counsel privately responded to the ORS that SCANA had retained the services of two project consultants for consultation, neither of which were Bechtel.  And, on June 24, 2016, SCANA supplemented those responses to clarify that one consultant's services cost just $5,000 and that SCANA had elected not to retain the second consultant referred to in March.  Critically, Defendants did not

mention SCANA's retention of Bechtel, nor the $1 million of ratepayer-generated funds used to pay Bechtel for its work in 2015 and 2016.

148.    In response to Ms. Powell's testimony on September 18, 2017, Defendant Marsh justified withholding the Bechtel Report from the ORS on the grounds that the report was protected from release under the attorney-client privilege.  As discussed below, by this time, SCANA's privilege defense had already been decisively overruled as having no credibility by South Carolina Governor McMaster.    South Carolina Senator Luke Rankin summarized Defendants' bad faith in concealing the Bechtel Report from the ORS during the September 18, 2017 Senate Hearing as follows:

> [T]he representation today is that ORS affirmatively, actively sought information from your organization that you decided, by legal maneuver or otherwise, not to produce . . .
>
> I'm real curious that you now want to involve ORS, and, We're buddy-buddies, we're pals, yet perhaps, not you, but the public is beating on ORS for not doing its job, beating up on the General Assembly for not doing its job, when **SCANA has purposely and willfully not produced a document that is highly critical of your project, of which you're the majority partner . . . That does not speak of good faith**.

G.    **Defendants Did Nothing To Fix Some Of The Nuclear Project's Greatest Deficiencies, Dooming The Nuclear Project**

149.    Bechtel and Santee Cooper made numerous recommendations in an effort to get the Nuclear Project on track in a manner that would allow it to reach completion.  Following Bechtel's assessment, Santee Cooper repeatedly sought SCANA's cooperation in implementing them. SCANA ignored these recommendations.

1.    **In Early 2016, Defendants Reject Recommendations To Increase Oversight Of The Nuclear Project**

150.    Santee Cooper set out specific steps that it believed SCANA should take in response to the Second Bechtel Report in exchange for Santee Cooper's agreement to hide the

Bechtel Reports from investors, regulators and ratepayers.  As set forth in the Bechtel Report Action Plan, Santee Cooper attempted to force SCANA to (i) hire an independent "nuclear construction-experienced owners' engineer with authority to manage the project;" (ii) hire an additional "nuclear construction-experienced individual" to be employed by SCANA "who is a direct report to Kevin Marsh [and] whose sole responsibility is managing this construction project;" (iii) review the Second Bechtel Report with Bechtel analysts "to determine specifically what administrative and operations changes will be made going forward with the project, effective immediately;" and (iv) create "objective metric[s] to determine compliance and success."

151.     One month after receipt of the Second Bechtel Report, on March 4, 2016, Santee Cooper sent Defendant Marsh a five-page memo titled "Santee Cooper Recommendations" setting forth some of these purported conditions.  Santee Cooper wrote that "**[o]ver the past seven years, the Consortium's inability to coordinate itself and complete the engineering, procurement, and construction work necessary to deliver this project on a schedule has come at a high cost to the Owners**."  Santee Cooper quantified its own cost as "approximately $35 million" for each month of delay.  SCANA's costs were greater in light of its majority interest in the Nuclear Project.  Santee Cooper stated, in no uncertain terms, that **"[n]ew project management and leadership are needed to overcome these challenges**," which have "**significant impact upon the Owners**."

152.     Santee Cooper impressed upon SCANA the need to act quickly:  "Considering the Consortium's record, nearly three years of delays, and the risk associated with not receiving the production tax credits, it **is incumbent upon the Owners to employ increased and magnified oversight** to ensure that WEC and Fluor will properly coordinate efforts to resolve the

challenges facing the Project." This document confirms that Defendants clearly knew at this time of an existing, substantial "risk" that SCANA would "not receiv[e] the production tax credits" worth $1.4 billion to the Company given the major schedule delays and continuing failures on the Nuclear Project identified by Bechtel. Yet, Defendants continued to publicly misrepresent this risk, falsely reassuring investors that the Nuclear Project's schedule was still on track to qualify for these massive Nuclear Tax Credits. For example, it SCANA's 2015 Form 10-K, issued on February 26, 2016—only about a week before this Santee Cooper memorandum—Defendants reiterated that "*[b]ased on the guaranteed substantial completion dates provided above [i.e. by the end of 2020], both New Units are expected to be operational and to qualify for the nuclear production tax credits*."

153.    In its March 4, 2016 memorandum, Santee Cooper further echoed the "objective metric," also set forth by Bechtel – *i.e.* the monthly progress percentage – that had to be met for the Nuclear Project to succeed and have a hope of being completed by the end of 2020:

> **In 2015**, only 3.7% direct craft progress (**0.31% per month**) was earned toward completion of the combined units. The year closed with overall direct craft construction at 18.7% complete. With 81% of the work to go, **the monthly construction progress must increase to around 2.5% if contract dates are to be achieved. Failure to realize a significant and sustained increase on this metric over the next six months will invariably result in more project delay.**

154.    In order to achieve this increased productivity, among other things, Santee Cooper ultimately recommended that SCANA improve the "professional oversight of the EPC [Contract]" by choosing one of the two options described in the Bechtel Report Action Plan: (i) hire "a career professional with extensive experience in complex, new-build generation projects" who would  report directly to Defendant Marsh and answer to Santee Cooper's CEO Carter; or

(ii) retain an independent "qualified EPC firm, including executive leadership and support personnel" to provide the needed oversight services.

155.    Santee Cooper drafted another memo dated March 3, 2016, produced to Lead Plaintiffs through a FOIA request, which was sent to Santee Cooper's Board of Directors in preparation for a March 21, 2016 joint meeting of the two companies' Boards of Directors, titled "V.C. Summer – United 2 & 3 – Concerns with Consortium and EPC Management."  Given that such materials were shared with Santee Cooper's Board in advance of the joint Board meeting on March 21, 2016, it is likely that they were also shared with SCANA's Board, including the Director Defendants. According to Santee Cooper, **"[t]he SCE&G oversight staff lacks the experience, and in some cases, the support of upper management, to hold the Consortium accountable for the work sold under the EPC [Contract]**."  This four-page memo sets forth, without specific attribution to Bechtel, echoes  Bechtel's opinion that (i) "SCE&G needs to on-board professional EPC management support for the V.C. Summer Project;" (ii) the changing members of the Consortium's inability to "fully complete[] and integrate[] the engineering, procurement and construction plans and schedules **necessary to deliver the Project**;" (iii) evidence that **Westinghouse "is not properly funding Fluor** to allow the addition of needed contractor employees;" (iv) a **lack of transparency** on the part of the Consortium; (v) the fact that Westinghouse's "**design engineering has been a significant impediment** to the Project from the outset;" and (vi) Westinghouse's **design "is often not constructible** requiring change modifications, impedes performance, and a source of numerous delays."

156.    Santee Cooper specifically highlighted the urgent need for SCANA's oversight of the Nuclear Project's "planning, scheduling and execution." Santee Cooper determined that "**schedule adherence [was] unrealistic**" because the "[p]lans and schedules contain

unreasonable assumptions and do not reflect actual project circumstances." Santee Cooper also stated that the "**project completion dates [were] artificially constrained**," "[c]ritical path material deliveries . . . **do not support construction need dates**," and "[m]issed milestones push-out and are rarely recovered."

157.    Shortly after receiving the Santee Cooper Recommendations, Marsh met with Santee Cooper to discuss their concerns in advance of the joint meeting of the two companies' Boards of Directors on March 21, 2016. According to a March 14, 2016 email from Carter to Santee Cooper's Board of Directors, produced to Lead Plaintiffs through a FOIA request, Carter and other Santee Cooper executives "met with Kevin Marsh and his team on Monday, March 7, [2016] to discuss" the Santee Cooper Recommendations, which were attached to the email as preparatory "materials for our Executive Section with the SCANA Board members on March 21, 2016." Again, it is likely that such materials, including the Santee Cooper Recommendations, that were shared with Santee Cooper's Board in preparation for the joint Board meeting, were similarly sent to SCANA's Board in advance of the meeting, particularly given their oversight responsibilities with respect to the Nuclear Project. Carter relayed details of their meeting to his Board of Directors in the email, stating that "[w]e had a long and frank discussion regarding item 5 [concerning getting additional oversight] and the need for management changes to the Project." However, "Kevin [Marsh] noted that he supported changes in the management of the Project **but seemed to not want to go as far as we recommend**." According to Carter, Marsh agreed to "think about the issue and be ready to discuss on March 11, when he, **Harold Stowe (SCANA's Lead Director)**, Leighton [Lord, Santee Cooper's Chairman of the Board] and I met."

158.    According to Carter's March 14, 2016 email, on March 11, 2016, Lonnie Carter and Santee Cooper's Chairman of the Board met with Defendants Marsh and Stowe to discuss

Santee Cooper's concerns and recommendations before the joint Board Meeting between the two companies.  During this high-level meeting, Santee Cooper "emphasized the need to address item 5 and **associated Project management changes**."  In particular, Carter "stressed the need for talent in the area of very large construction projects" who would "report to Kevin [Marsh] and I frequently."

159.    The November 2016 Santee Cooper Nuclear Timeline corroborates that on March 11, 2016 a CEO meeting took place in Columbia, S.C. where "Marsh, **Harold Stowe**, Carter, Leighton Lord – meet to discuss Santee Cooper's formal recommendations and expectations of SCANA for the planned Mar 21 Joint Board meeting."  Accordingly, Defendant Stowe, as SCANA's Lead Director at the time, was actively involved in Marsh's discussions with Santee Cooper about the Santee Cooper Recommendations, including to add an independent, qualified EPC professional or firm to improve the poor management of the Nuclear Project, which derived from the Bechtel Reports.

160.    Ultimately, SCANA and Defendants Marsh and Byrne, however, rejected many of Bechtel's and Santee Cooper's recommendations.  SCANA refused to hire either "an executive EPC professional" or "a qualified EPC firm."  According to the November 2016 SC Nuclear Timeline – and several other internal Santee Cooper documents – Defendants Marsh and Byrne pushed back against Bechtel's and Santee Cooper's recommendations.  On March 18, 2016, Defendant Marsh **rejected hiring either an "owner's engineer" EPC firm or a dedicated SCANA EPC professional to report to him**.  Marsh's resistance was a recurring source of tension between SCANA and Santee Cooper.

161.    For example, according to internal documents recently made available to Lead Plaintiffs through a FOIA request, the Boards of Directors of SCANA, including Defendants

- 61 -

Marsh and the Director Defendants (Roquemore, Hagood, and Stowe), and Santee Cooper held a joint Board Meeting on March 21, 2016 where they "**discussed Bechtel Report, Santee Cooper March 3 formal recommendations** and SCANAs [sic] plan forward to address issues."   At this meeting, nearly six months after Bechtel completed its disastrous assessment, Defendant Marsh finally "committed that SCANA and Santee Cooper would work to identify actionable Bechtel recommendations, SCANA would add EPC experts to its team, and that SCANA would charter a V.C. Summer Construction Oversight Review Board to help SCANA with project execution." However, SCANA still did not agree to retain the independent EPC professional or firm, as recommended by Bechtel and Santee Cooper.

162.    After the joint Board meeting, on March 23, 2016. Lonnie Carter sent Defendant Marsh a letter regarding the meeting, carbon copying Defendant Stowe.  Carter noted that the slide presentation at the March 21 joint Board meeting "was informative and fully consistent with information provided to us by Michael Crosby and our nuclear team."  Carter also stated that the "[t]he discussion between our Boards was **frank**," indicating that the Nuclear Project's troubles were "open[ly]" discussed at the March 21, 2016 joint Board meeting.  This letter further confirms that Defendants Roquemore, Hagood, and Stowe, in their capacity as SCANA directors, were fully apprised of the Nuclear Project's crippling problems, and their dire impact of the project's schedule and costs, at the March 21, 2016 and other joint Board meetings in 2016, as discussed below.

## 2.    In Mid-To-Late 2016, The Nuclear Project Schedule Slips Further Behind And Progress Fails To Improve

163.    Marsh's March 21, 2016 commitment to effect change in the management of the Nuclear Project was illusory.  According to the November 28, 2016 SC Nuclear Timeline, SCANA failed to even convene a Construction Oversight Review Board ("CORB") until July

2016, and this step was only taken after several months of inactivity and another joint meeting of the SCANA and Santee Cooper Boards, on June 20, 2016, where the issue of the CORB was raised once again. As SCANA's directors, Defendants Marsh, Roquemore, Hagood, and Stowe, attended this June 20, 2016 joint meeting of the two companies' Boards.

164.    Indeed, in June 2016, despite SCANA's prior refusal, Santee Cooper continued to urge SCANA to retain an external, independent EPC management firm to help address the continuing problems with the Nuclear Project, finding SCANA's proposed CORB insufficient. For example, as revealed in an email produced to Lead Plaintiffs through a FOIA request, on June 2, 2016, Santee Cooper's Senior Vice President for Nuclear Energy, Michael Crosby, emailed SCANA's Jeff Archie, copying Defendants Marsh and Byrne and Lonnie Carter, among others, commenting on, *inter alia*, on "SCANA's Project Assessment Report," which Santee Cooper had received at a "May 19 meeting with Kevin [Marsh,] Steve [Byrne] and [Archie,]," among others. In that June 2, 2016 email, Crosby wrote that "we have reviewed and appreciate the SCE&G commentary relative to **the engineering challenges that continue to impede progress on the [Project]**– namely design debt, **design constructability**, change paper, complex work packages, and emergent issue management." Crosby stressed that there still was no significant improvement in the Nuclear Project's progress to date: "Unfortunately, five months after WEC has had complete control of the Project, **there is little evidence that (WEC) is taking the steps necessary to resolve these challenges and relieve pressure on the substantial completion dates**. Each meeting I attend we continue to report out and discuss **the same basic issues as progress on the critical path continues to slip**." Accordingly, he reiterated that Santee Cooper "**remain[ed] steadfast** that at this juncture of the project, we could only benefit **by adding outside EPC resources [***i.e.*** the EPC management firm] to guide and**

**assist with this effort on these challenges**." He further explained this was necessary for Santee Cooper and SCANA, "[a]s Owners, ... to ensure [] that we are doing all we can do to analyze project challenges … and hold WEC accountable for executing the project on the contract schedule."

165.    Similarly, on July 13, 2016, Carter wrote an email to Defendant Marsh, which was forwarded to Defendant Byrne later that same day. In this email, Carter described how monthly construction progress had not improved at all since October 2015, continuing at the same dismal **0.5%** monthly progress rate observed by Bechtel, which was only **one sixth** of the necessary 3% monthly rate. He explicitly recognized that this ongoing, massive shortfall in progress made it **impossible** for the Nuclear Project to meet the 2020 completion date that Defendants were still publicly touting at this time and thus to qualify for the $2.2 billion of Nuclear Tax Credits, contrary to their public representations. Carter also laid out Santee Cooper's frustrations with both Westinghouse's continued poor performance and SCANA's role in allowing Westinghouse's poor performance to continue unchecked:

> What has particularly frustrated Santee Cooper from the date of the 2015 Amendment [October 27, 2015] is WEC's failure to seize an opportunity and significantly ramp up construction progress at the site. . . . **Through the last 6 months, while the Owners have paid $600 million dollars, construction progress has only been an aggregate of 3% [i.e., 0.5% per month]**. Moreover, for the June billing period, had the Owners accepted WEC's milestones and payment schedule, which contained twenty-seven milestones and requested payment of $156 million for the month, only four of the twenty-seven were completed, which would entitle WEC to payment of just $23.1 million. **This rate of progress will never meet the current completion schedule, impacting production tax credits, the availability of cheaper energy for our customers, and bringing the costs of construction to conclusion**.
>
> The DRB [Dispute Resolution Board] time crunch in which we find ourselves is unfortunate, but respectfully, was avoidable. **The Santee Cooper team has been requesting since the first of this**

> **year that we immediately engage an independent analysis of the project's progress and needs going forward in order to better inform the Owner's position in the construction milestone debate**. Our first suggestion as to a particular vendor was not satisfactory to the SCE&G team. We continued to persist in our request through various delays we did not understand, the actual engagement with another vendor was not finalized until much later, and now we are in time constraints.

166.    The CORB was finally assembled in July 2016. After "initial site visits" in July and August 2016, the CORB provided an "executive debrief" on August 16, 2016, and circulated a draft report on September 16, 2016, **nearly a full year after the Bechtel Assessment** (the "First CORB Report"). It was clear from the face of the First CORB Report that the CORB's role was advisory only, and that it was a far cry from the dedicated EPC professional employee or firm recommended by Santee Cooper and Bechtel. For example, the First CORB Report made clear that its purpose was "to offer insights and suggestions to enhance the execution of the V.C. Summer Unit 2 and Unit 3 Construction Project." Further, while "responses will be reviewed by the CORB during future visits" scheduled quarterly, the CORB was explicit that "[o]bservations **do not necessitate responses by project management**," *i.e.*, SCANA.

167.    While the First CORB Report lacked any enforcement power or accountability from management, the CORB came to many of the same conclusions as Bechtel and Santee Cooper nearly one year earlier. Among other observations, the CORB highlighted the significant risks and impediments to completing the Nuclear Project on time. For example, the CORB noted that "the Unit 2 & Unit 3 **project schedules include significant risks to achieve substantial completion**" and "**project schedule uncertainty is impacting the efficient assignment of oversight resources**." The CORB also noted that the schedule being used by SCANA did not even include "all work to complete the project that should be in the schedule," meaning that additional time would have to be added to account for the work identified by the CORB,

3:17-cv-02616-MBS    Date Filed 03/30/18    Entry Number 72    Page 70 of 190

including "subcontractor tasks," "engineering punch-lists," "test progress," and "licensing inspections, tests, analyses, and acceptance criteria."

168.    Moreover, the CORB concluded that **"[t]he current schedule for Unit 2 has slipped 5 months in a 6-month period**."  This meant that the Nuclear Project was not progressing at all, and, for every month that passed, the Nuclear Project schedule lost an additional month.  By August 2016, according to the CORB Report, even SCANA's own internal schedule, which was still unachievable based on Bechtel's contradictory findings, had moved Unit 2's completion date from August 2019 into **2020**, a fact never disclosed to the public.  Indeed, at this time Defendants were publicly insisting that Unit 2 would be completed by August 31, 2019, contrary to SCANA's own internal conclusions.  For example, on a July 28, 2016, earnings call, Defendant Byrne stressed that "*[t]he guaranteed [substantial] completion dates remain at August of 2019 for Unit 2 and August 2020 for Unit 3. We don't see anything to change those*."  SCANA's August 5, 2016 Form 10-Q similarly reiterated these completion dates.

169.    In its First CORB Report, the CORB also highlighted many of the design and engineering problems identified by Bechtel.  Based on its observations, the CORB warned that "[w]ithout improved metrics, it will be difficult to ensure the Project is and remains on track** and to determine when recovery actions need to be identified."  The CORB also echoed Bechtel's concerns about the constructability of the Nuclear Project designs, writing that **"[t]here is a growing backlog of constructability issues that are not getting the attention needed** to not impact constructability."

170.    The CORB did not return to the Nuclear Project site between August and November 2016.  Instead, it "debrief[ed]" SCANA executives on November 22, 2016, and

- 66 -

issued a general draft six-page Report in December 2016, a copy of which was produced to Lead Plaintiffs through a FOIA request. While perfunctory, the December CORB report "noted that oversight is insufficient for some project activities, including: the Project Execution Strategy, prioritization of project tasks, schedule performance, contract administration, and performance monitoring." The CORB highlighted a number of other continuing deficiencies concerning the schedule and Nuclear Project management and oversight, and identified four recommendations that were all virtually identical to recommendations made by Bechtel in October and November 2015 (and again in February 2016), and by Santee Cooper in March 2016 – all of which SCANA had failed – or refused – to implement.

171.    On November 28, 2016, after months of frustration and inactivity, Santee Cooper CEO Carter wrote Defendant Marsh an email in advance of a November 30, 2016 meeting of their "teams" to prepare for a December 5, 2016 third joint meeting of the two companies' Boards of Directors, including Defendants Roquemore, Hagood, and Stowe. In this email, Carter attached the SC Nuclear Timeline and identified three "primary items" that Marsh, Carter, and their respective teams needed to discuss before the joint Board meeting. One of these items was "[i]ncreased project management expertise in large scale EPC construction." Carter noted that "[w]e need to be prepared to discuss with our board, after two years of requests and an affirmative commitment from you on more than one occasion," why there has not been an increase in "project management expertise" in response to the Bechtel Report. Carter stated that SCANA's formation of the CORB, discussed above, was entirely unsatisfactory and ineffective, and "I am concerned that we learn critical information too late from an outside team that comes in quarterly for a few days, [information] which should have been brought to our attention by our teams."

172.    In particular, at the end of the SC Nuclear Timeline attached to this November 28, 2016 email, Santee Cooper stated that "**SCANA's project management team . . . does not have the comprehensive skills and depth of experience necessary in engineering, scheduling, project controls and construction to manage a new build project laced with complexities**." Given these SCANA project management shortcomings, Santee Cooper again reiterated the need to add independent, qualified EPC managers to oversee the Nuclear Project:

> The Project would be greatly benefitted by infusing the current project management team with a framework of qualified EPC managers charged with working collaboratively with the Owner and Consortium to identify areas for improvement, suggest proven solutions, and to provide an independent perspective on actual progress – the effort aimed at increasing the accountability of the Consortium and the success of the Project.

173.    Thus, more than one year after the Bechtel Assessment, Santee Cooper was pleading with SCANA for the same minimal amount of increased oversight.  But their pleas went unaddressed yet again.

174.    The Nuclear Project continued to fall woefully behind schedule as SCANA refused to fix its ineffective oversight.   An internal February 13, 2017 Santee Cooper memorandum sent by CEO Carter to the Santee Cooper Board, and produced to Lead Plaintiffs through a FOIA request, revealed that the **work productivity factor remained at an abysmal 0.7% per month at the end of 2016, and that only 30.9% of the project had been completed to date**.  This document confirms that between October 2015 and February 2017, just over 10% of the Nuclear Project was completed.

175.    Carter further stated in the February 13, 2017 memorandum that SCANA's CORB had finally made recommendations in late 2016.  At that time, the CORB concluded "that **more Owner management was needed** in three specific areas of the Project (infrastructure, execution, and schedule quality)."  But no action had been taken in the intervening three months.

As Carter noted, the CORB's November 2016 conclusions and recommendations were no different than the recommendations made sixteen months earlier by Bechtel: **"[CORB's report] is consistent with Santee Cooper's position all along [and] the Bechtel report delivered in October of 2015.**"

176.    Ultimately, Bechtel and Santee Cooper proved to be completely accurate in their predictions.  As Lonnie Carter documented in an internal June 14, 2017 email to Santee Cooper executives and directors, SCANA and Santee Cooper determined that there would "**be an additional cost of over $4.5B and schedule delays in excess of 3 years**" to complete the Nuclear Project.

### 3.    Former Employees And Internal Progress Reports Confirm That Defendants Knew the Nuclear Project Would Not Be Completed In 2020

177.    As discussed above, in October 2015, Bechtel objectively concluded, and communicated to Defendants, that it was a mathematical impossibility for the Nuclear Project to reach completion by even the end of 2020 without increasing monthly construction progress from **0.5% to 3%**.  Defendants have conceded that this objective metric was known to them in advance of the Bechtel Assessment.  Indeed, Defendant Marsh testified in 2017 that the Bechtel observations were "not news" and emails, such as the April 2015 email to Defendant Byrne, discussed above, showed the dramatic improvement necessary to complete the Nuclear Project in 2020.  The monthly construction progress figures were communicated to Defendants (at a minimum) on a monthly basis, at least, and at no point during the entire Class Period did that progress rate improve in any demonstrable way.

178.    Between October 2015 and July 2017, the Nuclear Project's monthly construction progress rate remained somewhere between 0.5% and 1%.  This was confirmed throughout the Class Period by numerous sources, including former employees of Westinghouse and numerous

internal SCANA, Santee Cooper and Westinghouse documents.    Westinghouse's former Project Director and Consortium Vice President for the entire Nuclear Project between May 2015 and August 2017[5] ("Former Employee 1" or "FE 1") signed off on monthly reports that informed Defendants that progress rates were not improving.    FE1, who had over thirty-five years' experience in the industry, was brought on to the Nuclear Project in May 2015 to get the project on track.    FE1 reported Nuclear Project updates to Defendants Marsh and Byrne, both in person during monthly and quarterly meetings, and through Westinghouse's written Monthly Progress Reports, which, according to FE 1, were sent directly to Defendants Marsh and Byrne.

179.    Based on Lead Plaintiffs' review of these documents, these reports all communicated the consistent delays and poor progress that doomed the Nuclear Project.    More specifically, these meetings and Monthly Progress Reports showed that the monthly progress rate was not improving.

180.    Upon arrival in May 2015, FE 1 performed a three-to- four-week assessment of the Project.    FE 1's assessment identified several fundamental deficiencies that contributed to missed milestones and cost overruns.    For example, FE 1 stated that the contracts negotiated by and between SCANA, Santee Cooper and their partners had already led to billions of dollars of waste between 2009 and 2015.    According to FE 1, this waste was the result of poorly structured contracts with the contractors and subcontractors.    FE 1 added that there was no cost control and no fiscal accountability before FE 1 joined the Nuclear Project.

181.    FE 1 also noted that in May 2015 there were 33,000 handwritten work packages that needed to be executed.    FE 1 stated that work packages were the specifications that instructed construction personnel how to execute the work in the field.    According to FE 1, there

---

[5] FE 1 explained that while work on the Nuclear Project ended in August 2017, FE 1 was employed by Westinghouse until October 2017.

was no electronic work management platform to manage these work packages, which forced the contractors to write them **by hand**. The lack of such a platform, which FE 1 described as "absolutely ludicrous," thus led to disorganization and inefficiencies that contributed to the schedule delays and cost overruns on the Nuclear Project.

182.  FE 1 explained that the primary reason that significant improvement in the monthly progress rate was unachievable was the lack of adequate project management by SCANA. FE 1 elaborated that SCANA was not equipped to manage a project of this magnitude and failed to put in the fundamental "processes" or "architecture" in place—including with respect to procurement, engineering, and manpower—to oversee the contractors' construction of such a complex project. While FE 1 tried to mitigate the delays caused by these management and related problems, there were always design and fabrication issues, which further stunted progress. These statements by FE 1 thus corroborate Bechtel's findings, echoed in Santee Cooper documents and SCANA's CORB reports (as discussed in Section IV, [*supra*]), that one of the undisclosed, fundamental problems causing the Nuclear Project's schedule delays was SCANA's inadequate project management.

183.  FE 1 signed off on Monthly Progress Reports, which were issued on Westinghouse letterhead and delivered to more than twenty SCANA executives responsible for the Nuclear Project, including Defendants Marsh and Byrne and SCANA senior executives Ron Jones and Jeff Archie, in addition to dozens of other Westinghouse and CB&I, and then Fluor, executives and employees.

184.  Based on Lead Plaintiffs' review of these documents, these Monthly Progress Reports, which generally totaled over 100 pages each, contained a chart listing "Project Milestones" and "Project BLRA Milestones," along with an identification of how many days

delinquent each milestone was.  The Monthly Progress Report also contained an "Executive Summary Dashboard," which indicated, among other things, the percentage of construction progress achieved each month.  These Monthly Progress Reports were discussed at Monthly Project Review Meetings held on the third Thursday of each month, and attended by Defendant Byrne and a handful of other SCANA executives.  FE 1 confirmed that Defendant Byrne, Jeff Archie, Ron Jones, and Alan Torres regularly attended these meetings on behalf of SCANA.

185.    According to FE 1, the Nuclear Project averaged just **0.8% progress per month** during the Class Period.  FE 1 further noted that the Nuclear Project never achieved even a single month with 3% progress, and that an expectation of that amount was fantastical.  According to FE 1, who has 35 years of experience in the nuclear industry, the best monthly progress rate **ever** achieved was approximately 2.6% or 2.7%  A 3% monthly progress rate "would have been an all-time bar raiser."  FE 1 further stated that not only would 3% have been unprecedented, such a rate was extremely difficult to achieve given the number of continuing problems with project management, procurement, engineering, and staffing at the time.

186.    Westinghouse's former Director of Licensing for the Nuclear Project, who worked on the Nuclear Project from May 2012 through July 2017, confirmed the abysmal progress rates reported to SCANA ("FE 2").  FE 2, who was responsible for all licensing activities related to the construction of the two Units, received the Monthly Progress Reports and attended the Monthly Project Review Meetings. FE 2 specified that FE 1 reported Westinghouse's progress rate to SCANA every month, through the reports and at meetings.  FE 2 stated: "**It was obvious that we were not going to complete this on schedule, and [on]-**

**budget, based on unit hours burned and unit hours earned.**"[6]  In fact, FE 2 noted that a SCANA employee extrapolated from the monthly progress rates and made the observation during multiple Monthly Project Review Meetings – which were attended by Defendant Byrne – that those rates meant "**completion by 2026 or something!**"  As discussed further herein, internal documents support the SCANA employee's conclusion that the Nuclear Project's extremely low monthly progress rates meant that its construction would not be completed until approximately 2026—six years later than the completion date that Defendants publicly represented during the Class Period (late 2020) and the January 1, 2021 deadline to qualify for the critical Nuclear Tax Credits.

187.    Lead Plaintiffs have received excerpts from Westinghouse's Monthly Progress Reports for December 2016 through June 2017 through FOIA requests issued during the course of their investigation.  Each of these Monthly Progress Reports, each signed and delivered by FE 1, confirm that the monthly progress rate was nowhere near 3%:

- "Construction of Unit 2 / Unit 3 Standard Plant and Site Specific continues **with 0.6% earned progress in December [2016]**."

- "Construction of Unit 2 / Unit 3 Standard Plant and Site Specific continues **with 0.8% earned progress in Januar**y **[2017].**"

- Construction of Unit 2 / Unit 3 Standard Plant and Site Specific continues **with 0.8% earned progress in February [2017].**"

---

[6] FE 2 explained that unit rates is a measure of man hours used while estimating how long it would take to complete a specific task.  The EPC Contract required that Westinghouse predict how much time, in man hours, it would take to accomplish certain tasks before undertaking those tasks.  Thus, for example, if Westinghouse predicted it would take 100 hours to build a wall and it ended up taking 300 hours, then Westinghouse would have "earned" 100 hours of work under the EPC Contract but it had "burned" 200 hours—meaning that it was behind schedule and over-budget on that specific task.

- "Construction of Unit 2 / Unit 3 Standard Plant and Site Specific continues **with 0.6% earned progress in March [2017]**."

- "Construction of Unit 2 / Unit 3 Standard Plant and Site Specific continues **with 0.7% earned progress in April [2017]**."

- "Construction of Unit 2 / Unit 3 Standard Plant and Site Specific continues **with 0.6% earned progress in May [2017]**."

- Construction of Unit 2 / Unit 3 Standard Plant and Site Specific continues **with 0.8% earned progress in June [2017].**"

188.    Based on these Monthly Progress Reports, the Nuclear Project delivered an average monthly progress rate of just 0.7% during these seven (7) months, barely 0.2% better than the average rate observed by Bechtel in October 2015.

189.    Internal Santee Cooper documents confirm that the Nuclear Project was not achieving anywhere close to the targeted 3% monthly progress after the First Bechtel Report in late 2015.  For example, a chart included in a Santee Cooper Construction Update – Executive Summary, dated December 5, 2016, produced to Lead Plaintiffs through a FOIA request, showed the monthly progress between January 2016 and October 2016 ranged **between 0.3% and 0.7%**:



190.    According to the accounts of FE 1, who personally signed off on these Monthly Progress Reports, and FE 2, who received these Monthly Progress Reports and attended monthly meetings where progress was discussed, such rates (below 1%) were generally consistent with the monthly rates achieved during the Class Period.

191.    Each of the Monthly Progress Reports also warned that "[t]he Unit 2 and Unit 3 project schedules include significant risks to achieve the current substantial completions."  Thus, the Defendants knew throughout the Class Period that the Nuclear Project would not be completed by the end of 2020.  Given the fact that the progress rates did not materially improve at all between October 2015 and May 2017, even Bechtel's completion date in 2023 was not achievable.

192.    Indeed, the Santee Cooper document above (Santee Cooper Construction Update - Executive Summary, dated December 5, 2016) corroborated the SCANA employee's statements in the Monthly Project Review Meetings, as reported by FE 2, that, based on these extremely low monthly progress rates, the Nuclear Project **would not be completed until 2026** – six years after the completion dates publicly touted by Defendants during the Class Period, and three years after even Bechtel's 2023 completion date.  As shown in this Santee Cooper chart, the Nuclear Project never achieved a monthly progress rate greater than 0.7% in 2016. It also showed that in January 2016, the total construction progress to date was only 19.2%.  Therefore, assuming SCANA maintained its best monthly progress rate in 2016 and the average rate in 2017, as discussed in Section IV above, (0.7%) for the remainder of the Nuclear Project, a mathematical calculation shows that it would take approximately another 9.6 years to complete the remaining 80.8% of the project-i.e. **late 2025**. The documents, therefore, support the SCANA employee's statements in

the Monthly Project Review Meetings that, based on the poor monthly progress rates, the Nuclear Project would not be done until approximately 2026.

193.    Not only did Defendants Marsh and Byrne receive the Monthly Progress Reports and Byrne attende and participate in the Monthly Project Review Meetings, but Defendants Byrne and Marsh attended quarterly "President's Meetings," where FE 1 made regular presentations on the Nuclear Project. Defendant Marsh ran the President's Meetings, which were attended by Defendant Byrne and Ron Jones from SCANA, along with 10-12 other people, including Santee Cooper CEO Lonnie Carter and other top-level executives from Santee Cooper, and Westinghouse. FE 1 also confirmed that Defendant Addison attended at least one President's Meeting, possibly in December 2015.    President's Meetings were held either at the Nuclear Project site or at a hangar at the airport in Columbia, South Carolina, for the convenience of the Westinghouse executives flying in to attend or, at least once, at SCANA's headquarters in Cayce, South Carolina.  According to FE 1, "[t]he President's Meeting was a very big deal," during which the schedule progress was discussed, along with staffing, engineering, and procurement.

194.    FE 1 also said that at these President's Meetings, the executives typically discussed a quarterly top ten list of action items and reviewed a computer-aided drawing that visually depicted the construction.  FE 1 elaborated that the computer-aided drawing showed target dates for the completion of certain components of the construction.  According to FE 1, if these deadlines were not going to be met, then the executives attending these President's Meetings would be so told at the meetings.  Thus, FE 1 confirmed that at these President's Meetings, "[a]ll of the dirty laundry was laid out on the table all of the time," reiterating that Westinghouse personnel always told SCANA and Santee Cooper the truth about the problems

- 76 -

facing the Nuclear Project at these meetings. FE 1 added that the Nuclear Project was "**doomed from the beginning**" or "**D.O.A.**," meaning dead on arrival, because SCANA failed to put in place the project management architecture necessary to execute a project of this magnitude.

H.    **Defendants Misled Investors About The Nuclear Project Throughout 2016**

195.    Defendants continued to make falsely positive statements about the supposed substantial progress at the site throughout 2016. For example, in SCANA's January 15, 2016 YouTube video titled "SCE&G Release Video Highlighting a Year of Progress for V.C. Summer Units 2 and 3," Defendant Marsh stated that "*I have just as much faith today in building new nuclear [i.e., the Nuclear Project] as I did in 2008. And [the Nuclear Project] positions us well for the long term*." Likewise, on March 29, 2016, Defendants filed a Proxy Statement with the SEC, which included a letter from Defendant Marsh to the shareholders, wherein he stated that "[*d]uring a very challenging 2015, we continued to move forward and make substantial progress on initiatives important to our company such as our new nuclear construction project* and our recent initiative to offer renewable energy to our customers."

196.    These "progress" statements were highly misleading because, as noted above, Defendants knew, but concealed from investors, Bechtel's findings that in 2015 the Project had averaged only a 0.5% monthly progress rate – far short of the 3% rate required to get the project back on track. Further, at this time in 2016, the Nuclear Project's monthly progress rate still had not improved, continuing to range between **0.3% and 0.7% in January 2016 and October 2016**, per Santee Cooper documents. Defendants, including Marsh, knew of these dismal progress rates based on the Monthly Progress Reports regularly sent to them by Westinghouse and related discussions of the project's status at the Monthly Project Review Meetings and Presidents' Meetings, as discussed above.

197.    The findings of the Bechtel Report also rendered Defendants' statements about SCANA's expected receipt of Nuclear Tax Credits false and misleading.  Importantly, Bechtel's conclusion that the completion of the Nuclear Project would be delayed until mid-2022, at the earliest, meant that the SCANA's would be ineligible to receive the $1.4 billion portion of the $2.2 billion tax credits set to expire on January 1, 2021.  The receipt of these tax credits was crucial for the project to be financially feasible for SCANA.  Nonetheless, Defendants continued to represent in their SEC filings and elsewhere, including the SEC Form 10-K for 2015, filed on February 26, 2016 and signed by Defendants Marsh, Addison and the Director Defendants, and the SEC Form 10-Q for the quarter ending March 31, 2016, filed on May 6, 2016 and signed by Defendants Marsh and Addison, that "*[b]ased on the guaranteed substantial completion dates provided above [August 2019 and 2020], both New Units are expected to be operational and to qualify for the nuclear production tax credits* . . . ."

198.    SCANA's failure to disclose the Bechtel Reports and the negative findings therein similarly rendered Defendants statements in their testimony to the PSC false and misleading.  For example, during a public *ex parte* proceeding before the PSC on July 1, 2016 in support of the fixed price option and the extension of the schedule to August 2020, in response to the question about whether the 2019 and 2020 substantial completion dates were reasonable, Defendant Byrne falsely affirmed that they were, including as follows:

> *Yes.* The substantial completion dates and the construction schedules . . . are based on extensive construction data that Westinghouse has provided to SCE&G. That data includes a construction schedule which identifies and sequences the tens of thousands of specific construction activities that must be accomplished to complete the project. *SCE&G's construction experts have reviewed this schedule and found that its scope and sequencing is logical and appropriate*. . . . Consistent with its responsibilities as Owner, *SCE&G has carefully reviewed and*

- 78 -

> *evaluated all information that is available related to the project*
> *and schedule and finds it to be reasonable*.

199.    At the same hearing, Defendant Addison similarly assured, *inter alia,* that "*[t]he*

*current schedules reflect the best information available about the anticipated costs and*

*construction timetables for completing the project*," even though he knew about, but failed to

disclose, the critical information provided in the Bechtel Reports, and other contemporaneous

internal documents as discussed above, showing that the Nuclear Project was years behind

schedule and thus substantially over budget.

200.    Likewise, at the outset of Defendant Marsh's July 1, 2016 testimony, he

affirmatively claimed that SCANA's management of the Nuclear Project has been "reasonable,

prudent, and cost-effective."  Specifically, Defendant Marsh testified:

> All Company witnesses testify in support of the reasonableness
> and prudency of the updated construction schedule and the related
> schedule of capital costs it represents. From my knowledge of the
> project and my perspective as SCE&G's Chief Executive Officer**, I**
> ***can affirmatively testify, as I have testified in prior proceedings,***
> ***that SCE&G is performing its role as project owner in a***
> ***reasonable, prudent, and cost-effective manner.*** The other
> witnesses are providing similar testimony about the project from
> their particular areas of expertise.

201.    At the same PSC hearing, Marsh further minimized the risks facing the Nuclear

Project, asserting, *inter alia*, that based on his "direct[] . . . management and oversight of the

project," "*the challenges we are facing are consistent with the risk we identified in our filings*

*in 2008*," and that "[t]he *project team has overcome many of the first-of-a-kind challenges*

*presented by this project.*"  However, as the Bechtel Reports and subsequent SCANA and Santee

Cooper documents discussed above revealed, the problems and risks facing the Nuclear Project

at this time were far greater that at the Nuclear Project's outset in 2008 and the "challenges"

nowhere near resolved by this time in July 2016.

202.     Shortly after their PSC testimony, on July 28, 2016, Defendants held an earnings call with analysts to discuss the financial results for Q2 FY 2016.  On this call, Defendant Byrne again falsely assured that, notwithstanding the contradictory findings of the Bechtel Report, "*[t]he guaranteed [substantial] completion dates remain at August of 2019 for Unit 2 and August 2020 for Unit 3. We don't see anything to change those*."     Analysts responded favorably to Defendants' strong statements concerning the Nuclear Project's adherence to the schedule first announced on October 27, 2015. On July 29, 2016, a UBS Research analyst report emphasized that "[m]anagement remained resilient today on its project schedule, **emphasizing . . . that the project schedule remained intact** with Fluor rapidly ramping up on hiring in an effort to scale productivity to meet targets."  That same day, a Macquarie analyst report espoused a "reasonably positive view on SCANA" and was similarly comforted by Defendants' misstatements concerning the costs and completion dates.  Specifically, Macquarie stated:

> Though it doesn't feel great that SCG and Westinghouse might be unable to agree to the timing and amounts of payments, **importantly, the total estimated project costs and the guaranteed substantial completion dates are not being debated**. We instead merely see it as a timing issue, unlikely to materially impact [earnings estimates] on which the stock is valued.

203.     Further, in a September 23, 2016 *The Post and Courier* news article titled, "Electric Bill 'Look at Whole Picture,' SCANA Chief Says of Nuclear Project Costs," Defendant Marsh urged investors to consider "*the complete picture*" or "*the whole picture*"—*i.e.* the $1.4 billion in Nuclear Tax Credits that SCANA stood to recover—rather than focus solely on the rising costs of the Nuclear Project. In particular, Marsh stated:

> *"While people talk about the cost increases, you have to look at the whole picture," said Kevin Marsh*, chairman and CEO of SCE&G parent SCANA Corp.

- 80 -

> *When those* finance savings and *tax credits are factored against the cost overruns, Marsh said, the utility is* "*close to where we said we would be*" *in terms of V.C. Summer's overall costs*.

At the same time, he hypocritically continued to conceal the "complete picture" known internally at SCANA, notably damning findings of the Bechtel Report that the project's schedule would be delayed until years after the January 1, 2021 deadline to qualify for those Nuclear Tax Credits.

204.    In addition, the same September 23, 2016 *The Post and Courier*, quoted Marsh as falsely assuring that "*[w]e've been straightforward and honest about the challenges we've had on this project as we've presented those to the commission*."   However, such a claim of complete transparency with the PSC and the public were blatantly false given Defendants' continued, deliberate concealment of the Bechtel Reports throughout the Class Period.

205.    Moreover, on October 7, 2016—almost a year after receiving the Bechtel Report—SCANA published a September 21, 2016 video on its YouTube channel titled, "V.C. Summer Media Day 2016 - Steve Byrne" ("Media Day 2016 – Byrne Video").   In the video, Defendant Byrne falsely claimed that any prior problems with Nuclear Project had been resolved:  "**The pace of this project is *quickening*. *Though we have run into some issues, roadblocks in the past, most of those issues, roadblocks are behind us*."  Byrne also assured in a PowerPoint presentation that "[w]e have the right team in place and *are making tremendous progress toward completion*."   Finally, in a video titled "V.C. Summer Media Day 2016 - Kevin Marsh," Defendant Marsh similarly highlighted the purported "*great progress*" SCANA had made to that point, stressing that "*we've been able to meet [prior project] challenges*."   Marsh stated that he was asked about the Nuclear Project, "if you could do it again, would you make the same decision?"   Marsh responded:  "And absolutely I would make the same decision . . . . . . We're excited about where we are, we've had challenges, we've been able to work through those challenges . . . ." But, as discussed in Section IV *supra*, other internal SCANA and Santee

- 81 -

Cooper documents and former Westinghouse employees confirm that the problems identified in the Bechtel Report continued, and in fact, worsened by this time in 2016, contrary to Defendants' statements.[7]

**I.     Defendants Were Aware That Election Of The Fixed Price Option Did Not Remove The Risk Of Future Cost Increases And, In Fact, Threatened The Viability Of The Nuclear Project**

206.    As discussed above, on May 26, 2016, SCANA petitioned the PSC seeking approval to update the capital cost schedule and construction milestone schedule for the Nuclear Project. SCANA informed the PSC that it had "notified Westinghouse that it will elect the Fixed Price Option" under the EPC Amendment, subject to Santee Cooper's concurrence and PSC approval. The petition reflected an increase in total project costs of approximately $852 million over the cost approved by the PSC in September 2015, of which approximately $505 million was directly attributable to the fixed price option. The project's estimated gross construction cost was estimated to be approximately $7.7 billion. In the Company's May 26, 2016 press release, Defendant Marsh stated that "[c]onstruction of the two new nuclear units continues to progress," and that "the Fixed Price Option provides substantial value to our customers, investors, and the Company by limiting the risk of future cost increases."

207.    The market reacted favorably to SCANA's decision to elect the fixed price option. For example, on June 5, 2016, a Wells Fargo analyst report reiterated its outlook on SCANA as offering investors an "attractive risk/reward proposition." The Wells Fargo analyst report noted that SCANA "**expressed confidence in the target substantial completion dates of August 2019 (Unit 2) and August 2020 (Unit 3)**." Furthermore, regarding the BLRA's requirement that SCANA must act prudently to recover costs, Defendants' statements left Wells

_____

[7] Additional false and misleading statements are set forth below in Section VII, and in the attached Appendix.

Fargo to "believe SCG will be able to demonstrate the rationale, customer benefits, etc. of the FPO [Fixed Price Option]"—*i.e.* that it has acted **prudently** in managing the Nuclear Project. Specifically, the report stated as follows:

> **Prudency** - Importantly, the ORS stressed that their diligence efforts will be consistent with what is prescribed under the state's 2007 Base Load Review Act (BLRA). Specifically, **the BLRA allows SCG to recover higher costs** unless the ORS (or other parties) **can show that the company acted imprudently**. Thus, the burden of proof for disallowance of costs is on the intervenors, not the utility. The imprudence test does not extend to the actions/performance of other members of the Engineering, Procurement & Construction consortium (i.e. Westinghouse, CBI, etc.). **Ultimately, we believe SCG will be able to demonstrate the rationale, customer benefits, etc. of the FPO.**

208.    On June 3, 2016, Santee Cooper's Board of Directors allowed SCANA to formally elect the fixed price option on both companies' behalf.  On July 1, 2016, SCANA executed the fixed price option, subject to PSC approval.  In a Directive, dated November 9, 2016, the PSC approved the revised schedule, costs and election of the fixed price option, and found that "the evidence of record justifies a finding that the changes are not the result of imprudence on the part of" SCANA.

209.    The election of fixed price option created the expectation that Westinghouse would be willing and able to pay for any costs that exceeded the $7.7 billion fixed price.  In reality, SCANA and the Individual Defendants knew by the time they elected the fixed price option that (i) costs would vastly exceed the $7.7 billion fixed price, and (ii) Westinghouse and its parent Toshiba would be unable to fund those excess costs.

210.    Westinghouse and Toshiba's financial condition – and the likelihood that the fixed price option could force one or both of them into bankruptcy – had been a constant topic of discussion and concern between SCANA and Santee Cooper since prior to SCANA's election of the fixed price option.  Santee Cooper's Carter sent Defendant Marsh document titled "Nuclear

Timeline – Project Bankruptcy Counsel" on November 28, 2016 (the "Santee Cooper Bankruptcy Timeline"). The Santee Cooper Bankruptcy Timeline detailed how, by March 2016, Santee Cooper and SCANA were not only aware of financial hardships facing Westinghouse and its parent, Toshiba, but were weighing the likelihood that Westinghouse would declare bankruptcy rather than pay the true costs of the Nuclear Project in excess of the fixed price. These concerns were never disclosed to the public when SCANA elected the fixed price in May 2016.

211.  On March 21, 2016, Santee Cooper first requested that SCANA retain bankruptcy counsel to consider a potential Westinghouse or Toshiba bankruptcy during a joint meeting of the companies' Boards of Directors, attended by Defendants Marsh, Roquemore, Hagood, and Stowe, "as a proactive measure given Toshiba's and potentially WEC's financial condition." Although SCANA was tasked with securing bankruptcy counsel at this meeting, SCANA never did so, despite constant reminders and requests by Santee Cooper between March 2016 and November 2016.

212.  On June 7, 2016 – less than two weeks after SCANA filed a petition with the PSC announcing its intention to elect the fixed price option – Michael Crosby, Santee Cooper's Senior Vice President for Nuclear Energy, sent Defendant Byrne a proposed agenda for a joint Board meeting on June 20, 2016. In that agenda, listed under the discussion of the "Fixed Price Option" was "Potential Bankruptcy – outside legal opinion and plan to address."

213.  Defendant Marsh pushed back against discussing the potential bankruptcy with the companies' Boards in a June 16, 2016 email to Carter. Carter responded to Marsh that same day, emphasizing that "the possibility of [a Westinghouse or Toshiba] bankruptcy cannot be entirely divorced from our joint board discussions on Monday." He continued, "For example,

Item No. 2 on your agenda relating to the fixed price option obviously shifts risk away from the Owners and to Toshiba/Westinghouse, making their credit worthiness all the more important. Similarly, with respect to Item No. 3, getting the milestone payment schedule right will make it less likely that Westinghouse view as desirable a strategic Chapter 11 bankruptcy to rid itself of uneconomical executive contract."

214.    The impact of a Toshiba or Westinghouse bankruptcy was ultimately discussed at the June 20, 2016 joint meeting of the SCANA and Santee Cooper Boards of Directors, which included Defendants Roquemore, Hagood, and Stowe.  Carter wrote in an October 25, 2016 letter to Defendant Marsh that "[d]uring the June 20 joint meeting, members of both our Boards expressed concern about the financial difficulties being faced by Toshiba Corporation and Westinghouse Electric Company and how those problems could possibly impact the timely and successful completion of the project." Thus, in addition to the Officer Defendants, the Director Defendants also knew about and "expressed concern" about the likelihood and potential impact of a Toshiba and a Westinghouse bankruptcy on the continued viability of the Nuclear Project in June 2016.  Carter also confirmed, once again, that "[o]ne action item that SCANA agreed to take on was securing Project Bankruptcy Counsel who would help us think through Toshiba/Westinghouse insolvency scenarios so that we might begin planning now on how to mitigate the impact of such an unfortunate possibility."

215.    Finally, on October 24, 2016, Santee Cooper's CEO, Lonnie Carter, and General Counsel, J. Michael Baxley, traveled to New York and interviewed potential bankruptcy counsel. The next day, on October 25, 2016, Carter wrote to Marsh demanding that the financial conditions of Toshiba and Westinghouse be presented to the Boards of both companies:

> [I]n a June 16, 2016 email to me, you expressed the very same concerns describing "the potential bankruptcy of Toshiba or

Westinghouse [as] critical" but expressing the "prefer[ence] to have some detailed discussions and debate within our project teams before making a formal presentation to either of our Boards." **The time for that formal presentation to the Board has arrived**.

216.    After no response from Marsh, on October 28, 2016, Santee Cooper sent an email to Marsh and SCANA's legal team informing SCANA that Santee Cooper had stepped in and retained a respected team of bankruptcy counsel for the nuclear construction project.   The November 28, 2016 Santee Cooper Bankruptcy Timeline indicated that, as of November 28, Santee Cooper had received no reply from anyone at SCANA.

217.    In his November 28, 2016 letter to Marsh, Carter emphasized that "Bankruptcy expertise would significantly inform our team as we negotiate with WEC going forward.   Our separate, collective and independent analysis suggests that the fixed price option offered by WEC is likely significantly less than the cost WEC will incur to complete the Project.   This is the very reason that we selected the fixed price.   **Regrettably, we must anticipate WEC having financial difficulty completing the Project, particularly in a timely manner**."   Carter further noted that Santee Cooper had been forced to retain bankruptcy counsel **"[a]fter no action [was taken by SCANA] on our repeated requests on this topic**."

218.    SCANA's refusal to engage bankruptcy counsel and actively plan on ways to manage a potential Westinghouse bankruptcy was highly reckless, given the fact that SCANA and the Individual Defendants knew that the Nuclear Project would take years beyond 2020 to complete, and billions of dollars more than the $7.7 billion anticipated in the fixed price option. Rather than take steps to mitigate, or prevent, a potential Westinghouse bankruptcy, SCANA began looking for a way out.   According to a document recently filed with the SEC by the company seeking to acquire SCANA in the wake of the Nuclear Project fiasco, SCANA sought to sell itself in "a potential strategic transaction" in December 2016.   However, these initial steps

toward a merger or other "strategic transaction" were put on hold following a late December 2016 announcement by Toshiba that, as discussed below, disclosed to the public for the first time the severity of the risks and issues facing the Nuclear Project.

219.    Defendants' internal concern about the likelihood and impact of a potential Westinghouse and/or Toshiba bankruptcy stands in stark contrast to their public statements.  For example, on a February 18, 2016 earnings call, Defendants Addison and Byrne discussed the supposed financial protections to SCANA built into the EPC Contract, including the Fixed Price Option, and claim that SCANA could complete the Nuclear Project on its own, if necessary, thus falsely minimizing the risk of such a potential bankruptcy's impact.  In particular, Byrne assured that "*if there were to be a cessation of operations by the contractor [Westinghouse], that we could finish the plant on our own*."

220.    Similarly, on an April 28, 2016 earnings call, in response to analysts' questions, Defendant Byrne again downplayed the negative impact of a potential bankruptcy by Toshiba, and thus likely Westinghouse, on the Nuclear Project's continued viability.  Specifically, Byrne explained that "[i]f we elect the [F]ixed [P]rice [O]ption, there's an added cost that comes with taking [the risk of cost overruns] away,"  and then reassured that in the event of a potential Westinghouse bankruptcy, "*we would look to finish the plant on our own*."

221.    Byrne's statements that SCANA could "finish the plant on [its] own" lacked any foundation. Byrne knew that Bechtel, the CORB, and numerous monthly reports – all of which were sent to him – demonstrated that the Nuclear Project was plagued with fundamental issues that SCANA lacked the expertise to overcome.  In addition, Byrne knew that the monthly progress reports showed that construction remained slow and the schedule was actually slipping further behind each month.

J.    **The Director Defendants Were Active Participants In SCANA's Fraud**

222.    Director Defendants Hagood, Roquemore, and Stowe signed SCANA's Form 10-K for 2015 and Director Defendants Hagood and Roquemore signed SCANA's Form 10-K for 2016 (filed on February 26, 2016 and February 24, 2017, respectively), which contained multiple misstatements and omissions regarding the Nuclear Project's schedule, costs, eligibility for the Nuclear Tax Credits, and SCANA's purportedly prudent and adequate oversight of the project. Like the Officer Defendants, these Director Defendants also knew of or recklessly disregarded the falsity of their statements. According to SCANA's Governance Principles, as directors, the Director Defendants were required to "review[], oversee[] and approve[] fundamental financial and business strategies and major corporate actions" and to "review[] and assess[] identified significant risks facing SCANA and the alternatives for their mitigation." Given these Governing Principles, and their added roles as members of the Nuclear Oversight Committee (Hagood and Roquefort) and as "Lead Directors" of SCANA (Stowe and Hagood), the Director Defendants were aware of Bechtel's conclusions, as well as SCANA's imprudence and inadequate oversight over the Nuclear Project and the crippling problems, schedule delays and cost overruns that resulted therefrom.

223.    Indeed, they actively monitored the status of the Nuclear Project, including its schedule, costs, construction progress and related issues. For example, as noted above, at the September 16, 2008 hearing before the PSC regarding SCANA's Combined Application for the Nuclear Project, Defendant Marsh testified that SCANA's 50-person oversight team would report on the project's progress and issues not only directly to Marsh but also to the Board of Directors:

> At the center of this structure will be a dedicated group of SCE&G personnel that will monitor each aspect of the construction process on a day-to-day basis and **will report progress, issues and variances** to an

executive steering committee that includes me as SCE&G's president, and a senior executive from Santee Cooper and **to the SCANA board of directors**. This project will be monitored on a sustained and continuous basis by **all levels of the reporting chain** . . . .

224.    In fact, as detailed above, as members of SCANA's Board of Directors, Defendants Roquemore, Hagood, and Stowe attended at least four Joint Meetings of SCANA's and Santee Cooper's Boards during the Class Period—on March 21, 2016, June 20, 2016, December 5, 2016, and February 14, 2017—where they were fully apprised of the key issues facing the Nuclear Project and expressed their concerns about these matters. In particular, the SCANA Board approved the engagement of Bechtel to prepare a Nuclear Project assessment on August 10, 2015; discussed the Bechtel Report and the Santee Cooper Recommendations regarding the Nuclear Project with the Santee Cooper Board during the March 21, 2016 joint Board meeting; and considered Toshiba's and Westinghouse's distressed financial condition and potential bankruptcy as early as the June 20, 2016 joint Board meeting.

225.    Moreover, as members of the Nuclear Oversight Committee, Hagood and Roquemore met quarterly to monitor, discuss, and evaluate SCANA's nuclear operations, including regulatory matters, operating results, training and other related topics. Likewise, as members of this committee, they regularly toured the V.C. Summer Site and routinely presented an independent report to the Board on the status of SCANA's nuclear operation. Therefore, they would have been well aware of the severe problems, schedule delays, and cost overruns plaguing the Nuclear Project.

226.    Finally, Defendant Stowe, as Lead Director, was actively involved in the March 2016 discussions, including at a March 11, 2016 meeting with Marsh and Santee Cooper regarding the Santee Cooper Recommendations for the Nuclear Project, including notably "[p]roject management changes" such as the need to hire an independent, qualified EPC firm or

professional.  Therefore, Stowe too was keenly aware of the dire problems facing the Nuclear Project during the Class Period.

## V.  Partial Disclosures, Further Misleading Statements, And The Gradual Emergence Of The Full Impact Of The Fraud

227.  Beginning on December 27, 2016 through the end of the Class Period in December 2017, the true facts concerning the Nuclear Project, specifically the fact that (i) the Nuclear Project would not be completed by the end of 2020, or, at all; (ii) the true costs of the Nuclear Project were astronomically higher than projected; (iii) Defendants knew of and actively misrepresented these clear risks; (iv) Defendants refusal to correct the clear deficiencies identified by Bechtel and SCANA's own partner ensured the failure of the Nuclear Project; and (v) Defendants knew that election of the fixed price option agreed to in the EPC Amendment would likely lead to Westinghouse's bankruptcy.

### A.    The Financial Meltdown Of Toshiba And Westinghouse Called The Nuclear Project Into Question

228.  On December 26, 2016, a non-trading day, and just six weeks after the PSC approved SCANA's revised schedule and a fixed price of $7.7 billion, Westinghouse's parent Toshiba announced an estimated impairment of "several billion US dollars" in connection with Westinghouse's nuclear construction and integrated services business.  Articles published in *BloombergTechnology* and *The Wall Street Journal* connected Toshiba's anticipated write-down directly to the Nuclear Project and SCANA's recent schedule revision and cost increases, attributing Toshiba's financial distress to "cost overruns and missed deadlines on nuclear reactor projects," including the Nuclear Project.  *The Wall Street Journal* reported that Toshiba had "discovered unexpected inefficiencies in the labor force . . . that along with other factors were driving up costs," and revealed that Toshiba's "disclosure suggests that the situation is worse than was previously understood."  The article quoted a SCANA spokesperson as saying only that

- 90 -

SCANA was "still evaluating the finances of its reactor projects and [would] have more to report soon."

229.    In response to this news, SCANA's shares declined by $1.51 per share, or 2.03%, to close at $72.92 per share on December 28, 2016.

230.    On February 14, 2017, Toshiba quantified its impairment and reported that it would take a $6.3 billion write-down related to its U.S. nuclear program – a figure reported by *The New York Times* to be "near the top of analysts' estimates." Toshiba also announced that it might sell all or part of its stake in Westinghouse, calling into question the viability of the Nuclear Project. The timeline and the costs of the Nuclear Project, affirmed just three months earlier, were now seriously in doubt. In an article published on *Benzinga* that day, Mizuho Securities analyst James Von Riesemann opined that "Scana's construction consortium with [] Westinghouse may not be economically viable any longer, leaving the construction of two new nuclear units to fall into Scana's lap." Von Riesemann further noted that Scana might not have the funds needed to see the project through to completion.

231.    The market reacted swiftly to Toshiba's announcement, with SCANA shares declining $3.17 per share, or 4.53%, to close at $66.86 per share on February 14, 2017 on high trading volume.

232.    SCANA immediately acted to assuage investors' concerns. In a press release issued after trading hours on February 14, 2017, SCANA communicated to investors that both Westinghouse and Toshiba provided SCANA with assurances that they were "committed to completing the two new Westinghouse AP 1000 nuclear units." While SCANA disclosed that Westinghouse had provided revised completion dates for the new units, the Company assured

investors that "*[t]he completion dates provided in the new schedule . . . would enable both units to qualify, under current law, for the federal production tax credits*."

233.     SCANA's February 14, 2017 statement concerning the ability to qualify for the federal Nuclear Tax Credits was false and misleading.  Defendants knew since the beginning of the Class Period the Nuclear Project could not have any hope of qualifying for the Nuclear Tax Credits unless the construction progress level rose immediately to 3% per month.  As Defendants had been informed since the start of the Class Period, the Nuclear Project never came close to 3% monthly progress and, in fact, never topped a 1% monthly progress rate.

234.     Influenced by the fact that SCANA reaffirmed both Westinghouse's commitment to the Nuclear Project and completion of the Project in 2020, analysts and the media expressed optimism in the wake of Toshiba's announcement.  For example, in a February 14, 2017 report, Wells Fargo noted that "[w]hile Toshiba's financial woes create a degree of uncertainty and are concerning, we continue to remain of the opinion that SC's Baseload Review Act (BLRA) provides SCG with substantial protections in the event Toshiba is ultimately unable to honor the $7.8B Fixed Price Option contract due to solvency issues."  Wells Fargo also commented that even "[i]n the event of additional cost overruns, the BLRA places the burden of proof on opposing parties, such as the Office of Ratepayer Staff, to show that such cost overruns are due to SCG's negligence (a high and challenging threshold to prove)."

235.     Similarly, *The State* reported on February 15, 2017, that although "Toshiba's announcement initially raised concerns about the future of SCE&G's plants[, **t]hose concerns were alleviated some by Westinghouse's commitment**."  *The State* also explained that **"[f]or shareholders, the key issue is that SCANA completes the project and produces the earnings growth that management is projecting**."

236.     Defendants also attempted to reassure investors in the wake of the Toshiba announcement on SCANA's quarterly conference call, held before the close of trading on February 16, 2017.  Marsh reiterated the Company's earlier statements that Westinghouse and Toshiba remained committed to the project.  He also stated that "we continue to look for ways to mitigate project risk for our customers and shareholders.  If for any reason, Westinghouse exits the project, we will evaluate the facts and circumstances at that time to determine the most prudent action for our Company and customers."  In response to an analyst's question about what the "worst case scenario on the nuclear side might look like," Marsh explained that, among other things, SCANA could serve as the general contractor for the new reactors or enter into a new EPC contract, or SCANA could consider the abandonment provisions under the BLRA, noting "[t]hat's not something that's high on our list."

237.     Defendant Byrne similarly reassured investors on this call that Toshiba's financial difficulties would not derail the completion of the Nuclear Project, stating that "[a]lthough ideally Toshiba would be without these stresses, *we still anticipate completing our two new nuclear units.*"

238.     Several analysts asked specifically about the BLRA abandonment provision and, specifically, whether SCANA could retain and secure BLRA funds in the event of abandonment. In response to a question about whether Marsh "f[elt] confident that given this type of situation that's happened, [the BLRA abandonment clause] would still be valid," Marsh sidestepped the question, again reiterating that Westinghouse and Toshiba had committed to finishing the project.  Another analyst asked whether, "[i]f . . . the budget and the cost overruns are really driven by . . . more ordinary course scheduling issues . . . and also the fact that Toshiba may not be able to meet its financial obligations, is that under the abandonment provision?  Is that a cause

for being able to get recovery for the money spent to date?"  Marsh explained that "[t]here was not an effort to make a listing of the types of items that would qualify," but that "generally prudency is the rule that the Commission banks on at the end of the day."

239.    Analysts credited SCANA's responses.  Wells Fargo issued a report on February 16, 2017, stating that "we think the current valuation arguably overstates the risk, particularly considering the protections afforded SCG under the Baseload Review Act."  On March 3, 2017, a UBS Research analyst report upgraded its rating on SCANA to "Buy" because "**SCG management appears quite confident** regarding contract completion and **won't see material delays** or more importantly, need contract reassignment."

240.    Nonetheless, the next trading day, SCANA's shares slid $1.67 to close at $65.65, a drop of 2.5%.

241.    In March 2017, news began to leak out indicating that Westinghouse would soon file for bankruptcy. On March 22, 2017, Morgan Stanley issued an analyst report titled "Implications of Potential Westinghouse Bankruptcy Filing" (the "March Morgan Stanley Report").  The March Morgan Stanley Report called into question many of SCANA's representations concerning the Nuclear Project.  Morgan Stanley concluded that "further cost overruns and delays will emerge" at the Nuclear Project and that the expected cost for the V.C. Summer project would be **$12.6 billion – 108%** above the original construction cost estimate of $6.05 billion, and $5.2 billion greater than the latest cost estimate filed just weeks earlier.

242.    Morgan Stanley also reported that there were no silver linings for SCANA that could result from Westinghouse's bankruptcy, predicting three possible negative scenarios: (1) nuclear contracts, such as the EPC Amendment and its fixed price option, could be modified by a bankruptcy filing to the detriment of shareholders; (2) SCANA could become embroiled in

3:17-cv-02616-MBS    Date Filed 03/30/18    Entry Number 72    Page 99 of 190

protracted litigation regarding liability for cost overruns on the Nuclear Project; or (3) Toshiba might lack the assets necessary to satisfy SCANA's claims. Finally, Morgan Stanley noted that, should SCANA choose to abandon the Nuclear Project as a response to a Westinghouse bankruptcy, its "earnings could be at risk" if the PSC can show that SCANA "should have anticipated or avoided costs considering information available at the time."

243.    The Morgan Stanley analyst report was widely covered in the press. Later that same day, after the close of trading hours, a *Reuters* article entitled "Exclusive: Westinghouse's clients gear up for bankruptcy fight – sources" reported that Westinghouse had secured bankruptcy counsel and SCANA had hired restructuring advisers in response, suggesting that a bankruptcy was imminent.

244.    In response to the Morgan Stanley Report and the *Reuters* article, SCANA's shares declined for two consecutive trading days, falling $0.53 or 0.78% on March 22, 2017 to close at $67.74, and another $1.03, or 1.52%, on March 23, 2017, to close at $66.71.

245.    Just days later, as expected, Westinghouse filed for Chapter 11 bankruptcy protection in the Southern District of New York. SCANA issued a press release and filed an 8-K that same day. In its press release, SCANA explained that:

> SCANA and Santee Cooper have been working with WEC in anticipation of the bankruptcy filing to reach an agreement, subject to bankruptcy court approval, that allows for work on the project to continue toward completion of the units. This agreement, which will be filed today with the court as part of WEC's bankruptcy filings, allows for a transition and evaluation period during which SCANA and Santee Cooper will assess information provided by WEC and determine the most prudent path forward for the project.

The press release quoted Defendant Marsh as stating that "[t]he agreement with Westinghouse allows progress to continue to be made on-site while we evaluate the most prudent path to take going forward."

- 95 -

246.    During a conference call held on March 29, 2017, SCANA executives sought to dispel concerns about the impact of the Westinghouse bankruptcy on the Nuclear Project by focusing on SCANA's "prudent" decision making and oversight.  Marsh explained that SCANA was evaluating its options in light of the bankruptcy, and "if continuing the construction is not determined to be the most prudent path forward . . . we will look to exercise the abandonment clause" under the BLRA.  In response to analysts' concern over SCANA's ability to recover costs in the event of abandonment, Defendant Marsh responded that "it's pretty clear that [if] it is deemed it's not prudent to continue the project, *that the prudently incurred cost to date can be recovered through the abandonment clause.  I don't expect that to be changed*."

247.    SCANA also claimed that the cost estimates that would arise out of its review of Westinghouse's cost estimates was likely to be more reliable than previous estimates, which had been revised several times, because of access to new information that SCANA had not received previously.  For example, Byrne explained that "[t]here's a lot of things that [Westinghouse] would consider business-sensitive and proprietary. . . . Since we got into this bankruptcy issue, they have become much, much more open."  Similarly, Marsh explained that "[w]e're going to have access to information we have not seen heretofore.  And having access to that information . . . will help inform our evaluation."  At no point did Defendants explain that they knew the Nuclear Project would not be completed by the end of 2020 since at least October 2015, or that they had considered retaining bankruptcy counsel more than a year earlier in recognition of Westinghouse's likely bankruptcy.

248.    Marsh downplayed the adverse impact of the Westinghouse bankruptcy and the possibility of SCANA abandoning the Nuclear Project, reassuring investors that "*[a]t this time, we expect that the resources available from Westinghouse and Toshiba, including its parental*

*guarantee, are adequate to compensate us for the Westinghouse estimate of additional costs*." Moreover, on this same call, Marsh again represented to investors that "*[we]'ve been transparanet on this project since day 1, and we're not going to change that*." This statement was demonstrably false given Defendants' repeated concealment of the Bechtel Reports' adverse findings and related, substantial problems with the Nuclear Project throughout the Class Period.

249.    On March 29, 2017, the *Associated Press State & Local* reported that SCANA and Santee Cooper were "committed to finishing the project despite the bankruptcy of builder Westinghouse Electric Co." The same day, the *Charlotte Business Journal* reported that Marsh had made comments playing down the likelihood of abandonment, stating that there was a "pretty high hurdle" to abandoning the project. And *The State* also reported on March 29 that Marsh had stated that SCANA's "commitment is still to try to finish these plants. That would be my preferred option. The least preferred option, I think realistically, is abandonment."

250.    In response to these statements, on March 30, 2017, Gabelli & Company published a report explaining that SCANA's agreement with Westinghouse "gives [SCANA] access to critical information and resources that it had not been previously provided necessary to plan for the future of the project," and that SCANA expected that resources available from Westinghouse and Toshiba would cover any cost overruns and that SCANA's investment was "largely protected" under the BLRA. Wells Fargo stated that SCANA had "kept regulators and other key parties in the loop" about the risks of a Westinghouse bankruptcy.

251.    After Westinghouse announced its bankruptcy, Defendants continued to assure investors that Westinghouse's parent company Toshiba would honor the fixed price agreement. For example, during an April 27, 2017 earnings call, Byrne stated that SCANA was looking for up to an additional 60 days to finish its assessment, but that, based on the cost overrun estimates

Westinghouse had provided, SCANA believed that the incremental cost increase would be "*captured*" by the Toshiba parental guarantee.

252.    Analysts reacted positively to SCANA's assurances. For example, Gabelli & Company stated that:

> We believe the project moves forward to completion as $4.634 billion has been invested and SCG needs the capacity. In a worst case scenario, *we believe SCG's nuclear development investment is protected under SC's Baseload Review Act (BLRA)*, which provides for recovery even under the scenario of abandonment. In order for SCE&G investment to be imprudent, opposing parties would need to prove negligence on SCE&G.

253.    Similarly, on April 28, 2017, analysts from UBS published a report reiterating SCANA's statement that it expected the Toshiba parental guarantee to cover Westinghouse's cost estimate, as well as SCANA's message to the Commission on April 13, 2017 that "it [would] look to Westinghouse and Toshiba if required for the incremental costs associated with the project."  UBS further explained that "we anticipate Toshiba will prove capable of paying off the obligations . . . . This adds to our relative comfort on an eventual payment."  UBS further explained that "[o]ur downside case is now focused on the risk of eventually receiving <u>no</u> ROE recovery on project costs spend thus far.  This would appear a downside case principally tied to immediate project abandonment as well as a punitive commission decision as well."

254.    On July 27, 2017, after the close of trading, SCANA and Santee Cooper announced an agreement with Toshiba whereby Toshiba would honor its $2.168 billion ($1.192 billion to SCANA; $0.976 billion to Santee Cooper) parental guarantee for bankrupt subsidiary Westinghouse's liabilities associated with the Nuclear Project. Under the agreement, Toshiba agreed to a series of installment payments from October 2017 through September 2022 whether one or two nuclear units were completed or the project was abandoned.

255.    This potentially positive news was tempered, however, by SCANA and Santee Cooper's joint statement that they expected that the cost of completing the Nuclear Project would "materially exceed" prior estimates by Westinghouse, and would not be covered by "the anticipated guaranty settlement payments from Toshiba," the reactors would not be complete in time to receive the planned tax credits, and there were "significant challenges" to even completing just one unit.  As reported by *The State* on the same day as the joint statement, "[d]espite Toshiba's guarantee, questions continued to surface about whether the company could make good on the money."  The article quoted Santee Cooper CEO Carter, who spoke to Santee Cooper's board that day, "Quite frankly, Toshiba's financial condition is a concern, no matter whether we accept this settlement today or not" because Toshiba could fail to make all of its payments through 2022.  *The State* also reported that both SCANA and Santee Cooper disclosed that the Nuclear Project "**also likely won't be completed by 2021, the current deadline for SCE&G to gain production tax credits for completing the reactors**."  The companies faced an August 10 deadline to decide whether they would complete the Nuclear Units, which were now "$2.5 billion to $3.5 billion over budget and several years behind schedule. Construction work is about one-third complete."  *The State* noted that "the news release issued jointly by the utilities . . . raised questions about their commitment to building two reactors."

256.    Analysts reacted strongly to the news.  For example, Guggenheim issued a report on July 28, 2017, downgrading SCANA from a "Buy" to a "Sell," and writing:

> **It's extremely rare for us to make such a rating change, especially on a regulated utility**, and especially during market hours, and especially during such a heavy earnings day, but with the news coming out this morning, we believe SCG should be under substantially more pressure for some time.  At this point, **it is becoming more evident to us that the situation around VC Summer is materially deteriorated and a situation that is constructive for shareholders is becoming less evident**.

257.    In response to the news on July 27, 2017, SCANA shares fell on Friday, July 28, 2017 by $4.53 per share, or 6.63%, to close at $61.29, on heavy trading volume.

258.    Some analysts saw a bright lining in SCANA's ability to rely on the rate protections afforded to SCANA under the BLRA.  For example, a July 28, 2017 Gabelli & Company report explained that "SCG's nuclear development investment is protected under [the BLRA], which provides for recovery even under the scenario of abandonment." Wells Fargo also issued a report on July 28, 2017, and wrote that "we viewed the language in the press release as strongly suggesting that the companies are leaning toward project abandonment," and "[i]n the event of complete abandonment of the new nuclear project, **we believe relative downside is limited given . . . the protections afforded SCG under the BLRA**".

**B.    SCANA Abandoned The Nuclear Project, Claiming It Was The "Prudent" Decision**

259.    On Monday, July 31, 2017, SCANA issued a press release announcing that it would abandon the Nuclear Project and "promptly file a petition with the [PSC] seeking approval of its abandonment plan."  SCANA explained that its considerations included the "additional costs" to complete the two new units and "uncertainty regarding the availability of production tax credits for the project," and explained that, after considering all the factors, it "concluded that it would not be in the best interest of its customers and other stakeholders to continue construction."  SCANA further explained that it had concluded, based on its analysis following Westinghouse's bankruptcy, that "completion of both Units would be prohibitively expensive" and that the "Units could not be brought online until after" January 1, 2021, which would prevent SCANA from qualifying for production tax credits.  In light of these and other factors, SCANA "concluded that the only remaining prudent course of action [was] to abandon the construction . . . under the terms of the [BLRA]."  On a conference call held by SCANA the same day, Marsh

explained that the "Westinghouse bankruptcy removed the benefits and protection of the fixed price option," which caused "SCANA and our project co-owner, Santee Cooper, to reevaluate the entire new nuclear project from all perspectives."

260.    In light of the cancellation of the fixed price contract, abandonment meant that SCANA would not need to spend more money on the Nuclear Project, and could recoup abandonment costs from ratepayers under the BLRA.    However, unknown to investors, Defendants' public justifications for abandonment consisted largely of facts that Defendants had known from the first day of the Class Period, including, among other things, that (i) the Nuclear Project could not be completed for many years; (ii) "additional costs" to complete the Project would be needed because of the additional years needed to complete the Project; (iii) "uncertainty regarding the availability of production tax credits for the project;" and (iv) the likelihood that Westinghouse would declare bankruptcy rather than pay the skyrocketing costs in excess of the fixed price option.    Marsh indicated that SCANA would soon "file a petition to seek recovery of the project costs under the abandonment provisions of the Baseload Review Act."    Defendant Addison spoke about the BLRA, explaining that SCANA's supposed prudence – the test that SCANA had to meet to seek the protections of the BLRA – had been affirmed by the PSC as of June 2016, and would seek a determination that the "decision to abandon is prudent" and that "the cost incurred after June of 2016 are prudent."

261.    In a conference call held on July 31, 2017, Defendants fielded numerous questions about what could happen should the PSC reject SCANA's abandonment proposal. Defendants affirmed that their actions met the test for prudency, and placed the blame for the Nuclear Project's demise on "*the failure of Westinghouse to deliver on its fixed price contract*."

262.    On July 31, 2017, Guggenheim published a report stating "[w]e already noted SCG was tilting toward the abandonment route; what was really introduced this afternoon was share buy-backs, which management expects will allow SCG to maintain a 4-6% growth trajectory." Guggenheim further explained:

> At the end of the day, management described a relatively constructive path forward for recovery of (and return on) capital associated with V.C. Summer nuclear construction, premised upon SC's BLRA, which we acknowledge set the most constructive regulatory/policy back-drop in support of nuclear construction that we've seen, although as the abandonment plan has yet to be filed with regulators (SCG plans to update regulators tomorrow), we look forward to reactions from regulators and policy-makers whom management acknowledged were disappointed with the decision to abandon construction.  .  .  .  **[W]e recognize the solid regulatory/legislative framework for cost recovery provided by the BLRA**.

263.    The next day, on August 1, 2017, SCANA, represented by Defendants Marsh, Byrne and Addison, went before the PSC to petition for rate increases to cover costs beginning on June 30, 2016 and through abandonment that were not reflected in then-current rates. Before the PSC, Defendants made numerous false and misleading statements concerning their prior knowledge of the risks facing the Nuclear Project. For example, Defendant Marsh described how their decision to abandon the Nuclear Project was driven by the findings of SCANA's "evaluation team," who concluded that construction of Unit 2 would only be substantially complete by December 31, 2022, and of Unit 3 by March 31, 2024. These completion dates were no surprise to Defendants, though, as Bechtel had provided remarkably similar dates nearly two years earlier.

264.    Defendant Byrne testified that Defendants "*thought – in October [2015], when we negotiated our fixed price option, that we had largely resolved the issues with costs*," and that Toshiba's December 2016 announcement of its financial troubles was "*the first time that*

*they indicated that Toshiba had a huge financial liability issue on finishing the cost of the project*." However, each of the Individual Defendant knew that SCANA and Santee Cooper had identified Toshiba's financial condition as a serious concern in early 2016, and Santee Cooper had pressed SCANA to retain bankruptcy counsel in advance of its election of the fixed price option.

265.    At the hearing, the PSC Commissioners berated the Company and Defendants. Chairman Whitfield stated that "**it's a grim day**," and asked SCANA executives whether they were "aware that **this Commission was blindsided yesterday by the news**."   Commissioner Elam noted that "[o]ver the course of this project, **we've seen completion dates that seem to slip exponentially** – for lack of a better word. And when we were talking about increase of costs, they seemed to slip from . . . a couple hundred million more than we thought it would be. . . [to] billions." Elam then asked "**why it seemed to get worse as we went along**."  In response, Byrne pointed the finger squarely at Westinghouse, including for its poor management of the supply chain, and also at design issues – all of which Defendants had been well aware of for years, but hadn't disclosed to the market.  Indeed, contrary to Bechtel's findings, Byrne claimed t that "*[t]he construction work at the site has been progressing well*."   At no point did Defendants take responsibility for their own, completely disastrous oversight of the Nuclear Project – criticisms they had learned about in October 2015, and then promptly and repeatedly ignored.

266.    The following day, the prudence of SCANA's oversight over the Nuclear Project was called into serious question, as was SCANA's ability to walk away from the Nuclear Project and pin the costs of the failed Nuclear Reactors on South Carolina's ratepayers.  During trading hours on August 2, 2017, news broke that a group of nearly thirty South Carolina lawmakers had

formed the "South Carolina Energy Caucus" "to push for reforms that will . . . protect ratepayers." In an August 2, 2017 press release announcing the formation of the group, Representative James Smith stated that "[t]here should be safeguards in place for accountability and ratepayers should have total protection from paying for the failures of a few. . . . **Those who dropped the ball here should be held accountable**." In an article published on the afternoon of August 2, 2017 entitled "S.C. lawmakers want SCANA stockholders to eat costs of two failed nuclear reactors," *The Post and Courier* reported that the goal of the South Carolina Energy Caucus was to force "**the shareholders of SCANA Corp. to eat any remaining costs tied to the high-profile cancellation of two multi-billion nuclear reactors in Fairfield County**."

> A bipartisan group of legislators met in the Statehouse on Wednesday to condemn utility regulators, the executives of SCANA and the board of the state-operated utility Santee Cooper, which partnered on the V.C. Summer expansion projects more than a decade ago.
>
> Many of the lawmakers went a step further, claiming they will investigate how to stop the executives and investors of SCANA — the parent company of South Carolina Electric & Gas — from charging customers between $2 billion to nearly $5 billion in costs over the next 60 years for the wasted concrete, steel and labor pumped into the unfinished reactors.
>
> The company's investors have seen a more than 10 percent profit on nearly $2 billion that has been collected from electric customers since 2008.
>
> "**The bottom line, folks, is that it will cost additional money for us to get out of this problem, but the money should not come from the pockets of South Carolinians**," Rep. Russell Ott, D-St. Matthews, said.
>
> "**Whatever has to be paid for going forward should be paid for out of the pockets of these utilities that ultimately got us into this mess**," he added.
>
> The lawmakers said they plan to investigate the past year — before the bankruptcy announcement by Westinghouse, the lead contractor on the project — to determine if the decisions of the

investor-owned utility were improper considering the circumstance
at the time.

The elected officials said they expect "glaring examples" of
improper management practices to arise, which is one of the only
ways the company can be forced to cover the costs.

267.    On the following day, August 3, 2017, SCANA announced its results for the
second quarter of 2017, and later that day, just before the close of trading, hosted an earnings
conference call.  The focus of the conference call was not, however, on the Company's financial
results, but rather, on the Company's decision to abandon the Nuclear Project and the public
response to that announcement, including the creation of the South Carolina Energy Caucus.

268.    Defendants continued to falsely paint themselves as the victim of Westinghouse's
financial meltdown, and nothing more.  For example, in response to a question from a
Morningstar analyst as to whether they were "confident that the BLRA will be upheld,"
Defendant Byrne responded:

It's clear that the law provides for it. We are following the
procedures outlined in the law, which will require us to make sure
we didn't do anything imprudent to put ourselves in this situation.
***And we validated everything we had done on the project but the
fixed price option that was approved in 2016, that validated
everything we had done on the project is prudent at that point***. It
was shortly thereafter that we learned of the news of the Toshiba
financial distress, followed by the Westinghouse bankruptcy in
March of 2017. So clearly from our perspective, we had an active
project. ***It was moving forward, we were making progress and
looking forward to hitting the targets but when Westinghouse
withdrew from the project by declaring bankruptcy, that put us in
a situation we had to do the analysis. So we believe we have -- we
were prudent to the point we learned of the financial distress and
bankruptcy of Westinghouse***.

269.    The impact of the newly-formed South Carolina Energy Caucus was also a topic
of discussion.  A Morgan Stanley analyst asked whether Defendants had talked to the legislators
who formed the South Carolina Energy Caucus.  Defendant Marsh responded that they had not,

but that SCANA would soon do that.  Defendant Marsh then stated that "*[o]ur process at the commission is very open*. . . . And I can understand their disappointment. I can understand their anger because the state wanted these 2 reactors. At the same time, *we just didn't feel like it was prudent to proceed with something that was too expensive for them in the long run and not cost-effective based on what we know today*."  Marsh did not mention the fact that Defendants had concealed material information from the PSC for nearly two years, and just as the damaging information was "not news" to Defendants in October 2015, it certainly was not new information just revealed to Defendants in July 2017.

270.    On August 4, 2017, additional pressure was placed on SCANA's abandonment petition, which again called into question SCANA's management of the Nuclear Project.  On that day, South Carolina Attorney General Alan Wilson announced that his office was initiating an investigation of SCANA "to ensure that all laws were complied with and all applicable procedures were followed. . . . **The public needs to know any recourse the people have to protect those who were harmed by these actions**."  Wilson also urged legislators to "delay any rate increase while [the Attorney General's] investigation is ongoing."  That same day, *The Post and Courier* reported on Wilson's decision, noting that "Wilson's pending investigation **could cause more worry among SCANA investors, who questioned the executives earlier this week after state lawmakers called for the shareholders to eat the remaining cost of the reactors**."  It also reported that legislators were planning to closely investigate SCANA's abandonment request and had encouraged SCANA to walk back its request to recoup costs from ratepayers.

271.    That same day, *The State* also reported on the Attorney General's investigation and legislators' calls for a special session to temporarily block rate increases.  It explained that

Senate Majority Leader Shane Massey and Minority Leader Nikki Setzler "want the General Assembly to return to pass a resolution that would prevent the [PSC] from approving further rate hikes until . . . next January," and quoted Setzler as saying that "**[t]here has got to be some responsibility taken for what's occurred here.  It's not the ratepayers' responsibility**."

272.    In response to, among other things, the (i) August 2, 2017 news of Defendants' ill-received testimony before the PSC and the resulting convocation of the South Carolina Energy Caucus; (ii) the August 3, 2017 conference call; and (iii) August 4, 2017 announcement of the Attorney General's investigation – each of which called into serious doubt SCANA's prudent oversight and abandonment of the Nuclear Project, SCANA's common stock declined precipitously.   On August 3, 2017, SCANA's shares fell $1.81, or nearly 3%, to close at $65.34, and fell another $1.55 on August 4, 2017, or 2.4%, to close at $63.79.

> ### C.    Public Investigations Threaten To Strip SCANA Of Billions Of Dollars Of BLRA Funds, And Reveal That Defendants Were Aware Of – And Actively Concealed –The Fatal Risks Facing The Nuclear Project

273.    The news continued to worsen for SCANA throughout August and September, as civil and criminal investigations and lawsuits were launched, and numerous internal documents evidencing SCANA's and the Officer Defendants' longstanding knowledge of the true risks of the Nuclear Project were reported in response to the production of internal Santee Cooper documents.

274.    On August 9, 2017, after the market closed, *The State* reported that the ORS "took legal action . . . against SCE&G's plan to charge customers for a nuclear expansion project the utility said had become too expensive to finish."   Specifically, the ORS moved to dismiss SCANA's abandonment petition, reasoning, in the words of regulatory director Dukes Scott, that it would be "very difficult to challenge successfully the costs or rates" if SCANA's plan was not dismissed. *The State* also noted in its article that stopping SCANA's plan from moving forward

"would give state officials time to study the fallout" arising from SCANA's abandonment decision.    That same day, James Lucas, the Speaker of South Carolina's House of Representatives, filed a petition seeking to intervene in the PSC proceeding to support the ORS's motion to dismiss.

275.    On August 10, 2017, *The Post and Courier* published an article entitled "CEO: SCANA may not return to scuttled nuclear project — even if a new partner emerges."  The article reported on the ORS motion to dismiss, noting that legislators had "urged SCE&G to pull its request" to charge ratepayers for the failed project, and quoted one as saying to Marsh, "[t]here's a lot of public trust and public money at stake here, and I think it would be the right thing for you guys to do.  I fear that if you don't . . . you may force the General Assembly to be more rash than we may otherwise would want [sic] to be."

276.    In response to the ORS motion and *The Post and Courier* article and other news, SCANA's shares closed on August 10, 2017 at $62.01, a drop of nearly $0.70, or just over 1%, and dropped again on August 11, 2017, to close at $60.69, a drop of over 2%.

277.    On August 15, 2017, in response to pressures from legislators and amid public outcry, SCANA announced that it would withdraw its abandonment petition before the PSC to seek rate increases under the BLRA.  In the press release, Marsh defended SCANA's actions, reassured investors that the Company had acted prudently, and once again, blamed the Nuclear Project's failures solely on Westinghouse and Santee Cooper:

> While ceasing construction was always our least desired option, ***based on the impact of the bankruptcy of Westinghouse on our fixed price construction contract***, the results of our evaluation of the cost and time to complete the project, and Santee Cooper's decision to suspend construction, ***abandonment was the prudent decision***.

278.     On August 22, 2017, Defendants Byrne and Addison, as well as Santee Cooper CEO Carter and Board Chair Leighton Lord, were summoned to testify before the newly-convened South Carolina Senate V.C. Summer Nuclear Project Review Committee.  Chairman Lord revealed, for the first time, that, following concerns over the Nuclear Project raised in 2014, SCANA and Santee Cooper "eventually engaged a firm named – known as Bechtel in order to do [an] independent study and to try to help us better understand the problems that we were facing and better deal with those problems."   Defendant Byrne confirmed the existence of a Bechtel report during the August 22, 2017 hearing, but immediately stated that he could not provide any testimony about the contents of the Report because it was "requested by counsel in preparation for potential litigation."  At the close of testimony, the Senate Committee said it would subpoena Bechtel's report.

279.     Internal documents recently made available to Lead Plaintiffs through FOIA requests reveal that Defendants' assertion of privilege over Bechtel's work based on the representation that Bechtel's retention was "requested by counsel in preparation for potential litigation" was bogus from the start.  As described in the internal June 1, 2015 email exchange involving Defendant Byrne and Bechtel, SCANA and Santee Cooper executives, Bechtel's assessment was already underway when Defendants brought in outside counsel because there was "an advantage in doing so."  That "advantage" turned out to be SCANA's belief that the Company could bury Bechtel's conclusions to the extent they differed from SCANA's public representations concerning the status of the Nuclear Project and its completion by the end of 2020.   Indeed, on multiple occasions Bechtel made it clear that the scope of the assessment excluded advising SCANA regarding potential claims against the Consortium.  In its official assessment proposal, dated February 10, 2015, Bechtel stated "[f]or clarity, this team will not

evaluate the ownership of past impacts or validity of pending or future claims."  Bechtel re-emphasized in a  July 13, 2015 email to Defendant Marsh and Santee Cooper CEO Carter that Bechtel's assessment of the Nuclear Project was "[n]ot claims consultancy," but was limited to "the work, the consortium, and SS [SCANA/Santee Cooper] oversight."  (Emphasis in original.)

280.    On Thursday, August 31, 2017, *The State* published an article "SCE&G has a report critical of nuke project, but won't hand it over, SC agency says."  In this article it was revealed that after SCANA "told the Office of Regulatory Staff at least eight months ago that the company did not have a report by the Bechtel Corp.," SCANA now says "it won't give the report to the ORS because the document is considered private information shared between an attorney and a client."  The article quoted South Carolina Representative James Smith, who said the power company's conflicting stories "**appear[] to be evidence of an effort to mislead**."  Smith added that SCANA "need[s] to be forthcoming with all that information.  **We've asked for this report.  Where is it?**"  Later that day, *The State* reported that South Carolina Governor Henry McMaster, in a letter to Santee Cooper Chairman Lord, demanded that Santee Cooper "immediately" provide a report by Bechtel.  *The State* reported that Chairman Lord wanted to provide the report, but was seeking legal advice as to whether Santee Cooper could produce the report over SCANA's objection.

281.    After refusing a request by Santee Cooper that the Governor allow for delay to allow for "a judicial determination . . . with respect to release of the Bechtel Report," the Governor again demanded the report on Saturday, September 2, 2017.  On September 4, 2017, Santee Cooper presented Governor McMaster's office a single hard copy of the Second Bechtel Report, and requested that the Governor keep the report confidential.  Governor McMaster, an attorney who served eight years as South Carolina's Attorney General and four years as the

United States Attorney for South Carolina, was well equipped to ascertain whether the Second Bechtel Report was a privileged communication. Governor McMaster's office stated on September 4: "Gov. McMaster has reviewed the document and believes **there is no basis for their 'assertion of privilege' or confidentiality**. Therefore, in the legitimate interest of the ratepayers, he has directed this information to be released to the public immediately."

282.    According to an article in *The State* on September 4, 2017, "lawmakers fumed after reviewing the report:"

> "I couldn't believe it when I first learned the utilities weren't going to release the report. Now I know why," said state Rep. Nathan Ballentine, a Richland Republican who is on a House committee investigating the project's failure. "**No part of this construction and planning appears 'prudent,' and as such, I think a strong case can be made that ratepayers and taxpayers shouldn't be stuck with the bill for what is now basically a hole in the ground**."

> State Rep. James Smith said the Bechtel report confirms to him that problems were not isolated to Westinghouse. SCE&G and Santee Cooper also share the blame, the Richland Democrat said.

> "It's what I suspected: that **the bankruptcy of Westinghouse had little to nothing to do with the project's failure**," Smith said. "**The reality is that it was built to fail. ... It was never going to produce any power**."

283.    A rash of news stories were published on September 6, 2017 and September 7, 2017, reporting on the fallout of the release of the Second Bechtel Report and the release of a number of internal documents and communications that revealed new information concerning SCANA's and the Officer Defendants' longstanding knowledge of the risks facing the Nuclear Project, and Westinghouse and Toshiba's ability to pay for the Nuclear Project once the fixed price option was elected.

284.    *The State* reported on September 7, 2017 that: "For parts of three years, the Santee Cooper power company urged partner SCE&G to address growing problems with the utilities'

failing nuclear expansion project — but SCE&G was either slow to respond or failed to comply with the requests, records show." The article went on to reveal, for the first time, the November 28, 2016 email from Santee Cooper CEO Carter to Defendant Marsh, discussed at length above. The article also quoted from a June 18, 2016 email from Santee Cooper that "questions why SCANA wanted to continue studying problems with the nuclear project when action was needed" following the receipt of the $1 million Bechtel report.

285.    Also on September 7, 2017, *The Post and Courier* published an article entitled "Emails: Toshiba, Westinghouse accused of deceit, malfeasance in run-up to South Carolina nuclear plant failure," which reported on "newly obtained internal emails [that] reveal that Kevin Marsh, SCANA Corp.'s chief executive officer, earlier this year accused Toshiba Corp. of 'financial malfeasance' in the failed V.C. Summer nuclear project." The article quoted a Santee Cooper spokesperson, who said that transparency issues with Westinghouse "came up again and again" as the utilities "tried to figure out whether to complete or scrap the nuclear project." The newly-obtained emails and letters also:

> [S]uggest that SCANA and Santee Cooper **quietly prepared more than a year ago for the possibility that Westinghouse and Toshiba might fall into bankruptcy and bring the nuclear project down in the process**.
>
> In an October letter to Marsh, Lonnie Carter, Santee Cooper's chief executive officer, noted that SCANA had agreed in June 2016 to hire bankruptcy lawyers "**to help us think through Toshiba/Westinghouse insolvency scenarios**."
>
> But SCANA's public portrayal of the project was much different. During a hearing before state utility regulators that October, Bob Guild, an attorney for the Sierra Club, specifically asked SCANA officials about the possibility of Westinghouse's insolvency. **SCANA officials shrugged off the question**.

286.    As a result of these articles revealing a host of newly-obtained documents that revealed Defendants' years' long discussion of the potentially fatal risks facing completion of the Nuclear Project, SCANA's shares declined significantly on September 7 and September 8, 2017.

287.    Following the forced release of the Second Bechtel Report, Defendants downplayed its importance. On September 15, 2017, Defendant Marsh was questioned by a Committee of the South Carolina House of Representative. During that questioning, South Carolina Representative Peter McCoy rejected Defendant Marsh's attempt to justify SCANA's "active push to keep [Bechtel's assessment] quiet" as "unbelievable," and noted that he viewed the Santee Cooper-authored Bechtel Report Action Plan (which has been produced to the House Committee by this time) as indicating that SCANA and Santee Cooper "got together" and "decided we're not turning this over at any cost."

288.    Three days later, in the September 18, 2017 Senate Hearing, Defendant Marsh claimed that "**the Bechtel Report was not news**." He stated that **"[t]he majority of those issues, we had identified**. We had put teams together to address those. Some of those issues had already been addressed." Yet, as discussed below, SCANA actively refused to or failed to address Bechtel's most fundamental concerns.

289.    During the Hearing, Senate Chairman Shane Massey pointed out a major flaw in Defendants' decision to withhold the Report and conceal its conclusions based simply on an assertion of privilege. Chairman Massey confirmed that, through the October 27, 2015 EPC Amendment, SCANA and Santee Cooper had **resolved all outstanding litigation and disputes** with Westinghouse and CB&I. Moreover, the EPC Amendment prevented the entities from bringing any litigation against each other for the life of the Nuclear Project. As Chairman Massey noted, given that the Second Bechtel Report (the only report known to exist as of

September 2017) was dated February 5, 2016, it could not have been issued in anticipation of litigation because "**that 2015 contract by its terms resolved every dispute that you had between – with the consortium**" and no disputes had arisen "between October 27, 2015 and February 2016 that would have led to litigation after the completion of the project."

290.    Only the Second Bechtel Report was produced in September 2017.  Information contained in the Second Bechtel Report, and the fact that the dates in the February 5, 2016 Second Bechtel Report stopped in October 2015, led to the belief that there was another Bechtel report that had not been turned over.  On September 18, 2017, South Carolina Senator Luke Rankin questioned Defendant Marsh:

> SENATOR RANKIN:  Mr. Marsh, apparently, and we heard, perhaps, again, the narrative world, maybe unreported, whispered, but **there's great belief that there are two reports**, and, in fact, there's some indication that there is a report issued on October the 15th, perhaps by Bechtel, perhaps by somebody else. If -- one, **is there another report that this committee does not have**, dated in October of 2015?

> MR. MARSH: We had a presentation. I believe it was on October 22nd, if I remember the date correctly, a preliminary presentation by Bechtel. I don't recall a report being issued because that was preliminary information. The report I have from Bechtel is the one I believe you've been provided. *I'm not aware of a second report*.

291.    Marsh's response was, of course, not true.  Marsh was acutely aware of the existence of the First Bechtel Report.  Indeed, he had been reminded directly of its existence when, on November 28, 2016, Santee Cooper CEO Carter emailed him the SC Nuclear Timeline that identified, in no uncertain terms, their receipt of the First Bechtel Report and efforts to sanitize its contents.

292.    On September 21, 2017, SCANA issued a press release announcing that the Company had been served with a subpoena issued by the U.S. Attorney's Office for the District of South Carolina related to the Nuclear Project.  SCANA provided no further information

concerning the substance of the subpoena, but indicated that it would cooperate with the investigation. Later that morning, sources reported in *The State* that a criminal "federal grand jury in South Carolina is looking at SCANA's actions concerning the company's failed nuclear construction project."

293. News reports later that day revealed broad public support for the federal investigation, and the belief that the U.S. Attorney could possibly "**get to the bottom of what went wrong," "shine more light on what led to the project's failure**" and reveal evidence of securities fraud by "examin[ing] **whether SCANA misled investors, including its stockholders**, about the outlook for the nuclear project in federal securities filings:"

> Some said news of the probe Thursday validated the efforts of S.C. Senate and House committees investigating the project's failure, which will cost S.C. power customers billions of dollars.
>
> Others complained SCANA executives had been evasive in legislative hearings into the $9 billion debacle. "**The absolute arrogance of the leadership of that company and their response to their own conduct is outrageous**," state Rep. James Smith, D-Richland, said Thursday.
>
> One lawmaker, a former prosecutor, predicted federal investigators **will look closely at what the shareholder-owned SCANA told its investors about the outlook for the two reactors it was building**.
>
> *****
>
> Speaker Jay Lucas, R-Darlington, said testimony during two House hearings on the project indicates "**the collapse of the V.C. Summer nuclear project was much more careless and fraudulent than initially believed**."

294. On the following day, September 22, 2017, *The State* reported that four SCANA insiders sold a cumulative $3.4 million in stock in the period from February 2016 through May 2017—after SCANA's receipt of the Bechtel Report and before its public disclosure. Wells

Fargo issued a "Flash Comment" on September 22, 2017, in the wake of news concerning the

U.S. Attorney subpoena and convening of a federal grand jury, and noted that:

> **Unfortunately, the news flow is not likely to get any better anytime soon** as early next week, per The State, the South Carolina Attorney General's (AG's) office is expected to opine on the constitutionality of the Base Load Review Act (BLRA) as well as the ability of the SC General Assembly to change the law. The BLRA affords SCG substantial legal protections in the event of project abandonment including recovery of and a return on the remaining balance. **We think it is likely that the AG will seek to attack the legality of the BLRA in one form or fashion**.

295.    In light of these revelations of, among other things, the federal subpoenas, the

grand jury investigation, insider trading, and the likely actions of the South Carolina Attorney

General, on September 22, 2017, SCANA's stock plummeted $1.96 per share, or 3.43%, to close

at $55.22 on heavy volume.

296.    On September 25, 2017, *The State* reported that South Carolina House leaders had

asked the South Carolina Law Enforcement Division ("SLED") to investigate SCANA for

possible criminal fraud based on the Nuclear Project.  Significantly, in a letter to SLED, the

legislative panel that had been conducting the hearings on the matter wrote: "it has become our

belief that the proximate cause of **the V.C. Summer collapse is a direct result of

misrepresentation by SCANA and SCE&G.  We also believe that criminal fraud through

the concealment of material information is also a plausible cause for the project's

disastrous collapse**."    The next day, on September 26, 2017, SLED opened a criminal

investigation.

297.    The bad news continued to accumulate. On September 26, 2017, as reported in

*The Post and Courier* that same day, "the South Carolina AG issued an opinion, concluding that

elements of the BLRA were 'constitutionally suspect.'"  This opinion, as Wells Fargo noted in a

September 27, 2017 analyst report, "present[ed] [a] potential legal avenue to pursue a challenge"

to the BLRA. Later that same day, and in response to the AG's filing, the ORS filed a request with the PSC to (1) prevent SCANA from continuing to collect financing costs related to the Nuclear project in current rates and (2) asked the PSC to force SCANA to refund ratepayers for past BLRA-related costs collected in rates in the event the BLRA is ultimately deemed to be unconstitutional and/or the General Assembly revokes the BLRA.

298.    Then, again on September 27, 2017, *The State* published an article entitled "How much worse was the First Bechtel nuclear report?"  In the article, *The State* reported on the existence of the First Bechtel Report for the first time:

> A timeline that Santee Cooper CEO Lonnie Carter sent to SCANA CEO Kevin Marsh complaining about delays includes this Nov. 12, 2015, entry: "Bechtel Assessment Report — Issued to George Wenick— Weeks go by with Wenick/Bechtel wrangling over Wenick's rejection of initial report, redactions, timeline removal, critique of project management."
>
> That's **one of the most disturbing details so far in an ever-growing pile of the disturbing details about the colossal failure of SCANA and Santee Cooper to stop years of bleeding that eventually killed the two unfinished nuclear reactors**.
>
> What that suggests is that **the damning report that has upended the whole conversation about that project was originally much worse**. What it suggests is that the version of the report that we've seen pulled some of its punches.

299.    In the wake of the revelations about the AG opinion, the ORS ratepayer action, and the news of the existence of the First Bechtel Report, SCANA's shares fell $4.35 on September 27, 2017, a drop of 7.8%, to close at $51.22.

300.    Two days later, on September 29, 2017, a further raft of bad news related to the Nuclear Project collapse came out for the Company.  Credit rating agencies Fitch and Standard & Poor's both downgraded SCANA's credit ratings and placed SCANA on negative "watch" lists, indicating that further downgrades might be in store.  As Fitch explained:

> Fitch is concerned with the sharp deterioration in the legislative and regulatory environment in South Carolina. There is a significant risk that SCE&G may have to cease collection of revenues related to the new nuclear units, as petitioned by the Office of the Regulatory Staff (ORS) to the SC Public Service Commission (PSC) until the legal issues regarding the BLRA are resolved. Fitch could consider additional negative rating actions if the BLRA were to be found unconstitutional and material refunds required. The Rating Watch Negative primarily reflects the risk that adverse regulatory orders could lead to restricted liquidity, constrained capital access and incremental debt issuance . . . .

Similarly, Standard & Poor's explained that it had lowered SCANA's rating "due to adverse regulatory developments in South Carolina that have weakened the consolidated business risk profile," and that "[w]e could downgrade the ratings further if the SCPSC orders large rate refunds or credits, or if the South Carolina legislature retroactively changes the law that underpins our expectation of substantial recovery of the nuclear plant investment." Standard & Poor's further explained:

> The CreditWatch with negative implications on SCANA and its subsidiaries reflects our view that the political atmosphere in South Carolina following the company's decision to abandon [V.C.] Summer construction has worsened and could result in regulatory and legislative decisions that harm both the business and financial risk of SCANA. We could lower the ratings on SCANA and its subsidiaries if Summer-related rates are rescinded. We could further lower ratings if legal challenges to a rate decrease are unsuccessful, if the SCPSC orders cash refunds or rate credits for Summer-related costs, if the BLRA is repealed or changed by the legislature, or if the BLRA is deemed unconstitutional.

301. The same day, on September 29, 2017, *The Post and Courier* published an article titled "Letter shows S.C. utilities knew Westinghouse's reactor designs would lead to increased costs and schedule delays." This article discussed and attached a link to a "previously undisclosed" May 26, 2014 letter from Defendant Marsh and Lonnie Carter to the leaders at Westinghouse and CB&I concerning engineering problems with the Nuclear Project, discussed

above in Section IV. According to *The Post and Courier*, South Carolina Representative Russell Ott stated that the letter was "'just **more proof, concrete proof, that these guys knew the project was in bad shape**.'"  The article also explained that S.C. Attorney General Wilson had petitioned to intervene in the PSC case determining whether SCANA could continue to charge its customers in connection with the Nuclear Project, citing his "sworn duty to '**seek to protect the rights'" of ratepayers**.

302.    On this news, SCANA's shares fell $2.50 on September 29, 2017, or nearly 5%, to close at $48.49 on extremely heavy trading.

303.    On October 17, 2017, SCANA disclosed that it had been subpoenaed by the SEC in connection with the abandoned Nuclear Project.  Just two days later, on October 19, 2017, Governor McMaster sent a letter to Marsh requesting that SCANA "immediately cease collecting approximately $37 million per month from ratepayers for its abandoned nuclear project."  The Governor's letter further requested that SCANA use the Toshiba settlement to repay ratepayers rather than fund the costs of the Nuclear Project:

> **I also urge SCANA to use the Toshiba settlement funds to begin refunding to ratepayers money collected for the construction of the nuclear reactors in Fairfield County**.  I believe this is the right thing to do under these circumstances.  It is unreasonable and oppressive for SCANA to require its customers to bear the burden of actions and decisions in which customers played no part and over which they had no control.  Moreover, as SCANA seeks to stabilize its future in the face of investigations and ratepayer lawsuits, it would be unwise to spend years litigating the constitutionality of the Base Load Review Act**.**

304.    That same day, *The State* revealed that SCANA executives had substantial golden parachutes in place that could reward them handsomely in the event of a sale of the Company, and further that Defendant Marsh and the rest of the executive team had received nearly $3 million in performance-related bonuses for their work on the Nuclear Project—including nearly $432,000 paid in 2016, after they had received the Bechtel Report.

- 119 -

305.     When these facts came to light, they revealed further regulatory and legal risk for the Company, and, in response, SCANA's stock closed at $48.65, a drop of $0.48, or 0.98%, on heavy trading.

306.     On October 26, 2017, SCANA announced its third-quarter 2017 earnings. Earnings declined to $34 million, driven in large part by a $210 million impairment taken on grounds that "the public, political and regulatory response to the abandonment decision has been extremely contentious," with the result that cost recovery under the BLRA had been threatened. SCANA also reiterated its 2017 GAAP-adjusted weather-normalized earnings guidance, but stated that "we are unable to provide long-term earnings guidance" on account of uncertainties surrounding "treatment of the abandoned new nuclear project."

307.     During a conference call held later in the afternoon on October 26, 2017, analysts peppered the Officer Defendants with questions concerning recent and expected regulatory developments.  Marsh explained that the Company was pursuing settlement with the regulators, but that "[t]his is a very different situation, given the attention that's been given to it." Nonetheless, SCANA executives cast ongoing negotiations and the Company's prospects for reaching a settlement optimistically, with Marsh noting that "I look at it as a positive that we're having discussions, and that process is hopefully going to continue to increase," while Defendant Addison stated that the negotiations were "very professional." Marsh also minimized the risks associated with the ORS action seeking to suspend SCANA's rate collections as based on a South Carolina Attorney General opinion that "has no weight at this point, in our opinion, which is why we challenged the filing with the Office of Regulatory Staff at the commission."  Marsh also stated, "**We believe what we have done and invested under law was appropriate and**

under the law to the extent we reach a settlement, or otherwise would be recoverable under the terms and conditions of the law."

308.    Analysts had mixed reactions to the conference call.  Analysts from Guggenheim, for example, reported on October 26, 2017 that they were buoyed by management's representations concerning the possibility of a settlement, calling it "a sight for sore eyes" and hoping that "'Professional' conversations could lead to bigger and better things" while "flagging a deteriorating political backdrop for a utility that will be carrying around a lot of regulatory/policy baggage for the foreseeable future."  By contrast, on October 27, 2017, analysts from Morgan Stanley lowered its price target on the grounds that analysts were "growing increasingly concerned" about negative scenarios playing out for the company in light of (i) the Governor's letter; (ii) the ORS action to force SCANA to stop charging ratepayers for the project until the legislature could review the BLRA; (iii) the South Carolina AG's opinion, (iv) comments from legislators, and, critically, (v) media reports that SCANA management was aware of significant issues with the project "**at the same time that management was allegedly not fully disclosing such issues to key constituents**."

309.    Investors reacted strongly to SCANA's results, conference call statements, and the Morgan Stanley report on October 27, when SCANA's shares dropped by $1.33, or 2.78%, on heavy trading volume.

310.    On October 28, 2017, news outlets reported that SCANA's Board of Directors had "ousted" Defendants Marsh and Byrne, while SCANA denied these reports.  It soon became clear that these reports had merit when, on October 31, 2017, *The Post and Courier* reported that South Carolina House Speaker Jay Lucas "called for SCANA Chief Executive Officer Kevin Marsh to resign" during a special House Committee meeting on October 30, 2017.  According to

*The Post and Courier*, Speaker Lucas' demand was precipitated by SCANA's October 28 offer "to oust [Marsh] in exchange for concessions over the canceled $9 billion nuclear plant expansion." *The Post and Courier* reported that state lawmakers had rejected this inartful attempt to use Marsh's position as a bartering chip for concessions. Speaker Lucas then demanded Marsh's resignation, without any concessions:

> SCANA's mismanagement of the V.C. Summer nuclear facility has proven that the company cannot be trusted to promote or protect its consumers' interests . . . On behalf of the South Carolina ratepayer, **I believe SCANA CEO Kevin Marsh should resign immediately. This measure should have occurred long before now and without pressure from elected officials**.

311.   Just days after issuing strong denials of their departures, on October 31, 2017, SCANA announced that, effective January 1, 2018, its top executives, Defendants Marsh and Byrne, would be the first SCANA executives to depart as a result of the collapse of the Nuclear Project. It was reported later that Defendants Marsh and Byrne could receive up to $40 million in total severance compensation. In the wake of Defendant Marsh's departure, it was announced that Defendant Addison would step into the role of CEO. This news was met with some resistance. For example, on October 31, 2017 *The State* reported that an adviser to the Friends of the Earth environmental group "questioned why Addison had been retained and promoted to chief executive office" because "Addison is one of the ringleaders of the project,'' and "rewarding him is very unsettling."

312.   Also on October 31, 2017, *The Post and Courier* reported that the House committee "examining the nuclear project fiasco called for legislation Monday that would block SCE&G nuclear-related charges to ratepayers." The article noted that such action "could further hurt the utility's share price that already has lost nearly 25 percent of its value since the project was canceled in July."

313.    In response to the news of Marsh's and Byrnes' departures and the Committee's proposed legislation limiting rate changes, on October 31, 2017, SCANA stock plummeted by $2.77, or 6.03%, on extremely heavy volume, to close at $45.93 per share.

314.    In late November 2017, the First Bechtel Report – the existence of which was already known to the public through news reports dating back to late September 2017 – was released.  Public condemnation followed as it became clear that Defendants actively concealed and manipulated Bechtel's findings regarding the viability of the Nuclear Project just weeks earlier.  For example, on November 22, 2017, *The Post and Courier* published an article in which it emphasized: "Newly disclosed documents show **critical information was scrubbed two years ago from a report about the V.C. Summer nuclear project — insight that would have alerted investors and regulators about some of the project's problems long before they came to light**."  The article noted that after receiving the First Bechtel Report, Defendants "**didn't share Bechtel's findings then with investors, state leaders or utility regulators. Instead, they touted their progress and asked regulators for hundreds of millions of dollars to expand the project's budget**." The article also quoted Representative Russel Ott, who stated that Defendants' actions constituted a "cover up" that was "deception at its core":

> "If they would have brought this forward, they knew their investors would have gone crazy," said Rep. Russell Ott, a Democrat from St. Matthews who helped lead a special House committee that investigated the nuclear project. "**This is a cover up. This is deception at its core. The bottom line is they lied to everyone and they did it intentionally**."

315.    Representative Bill Sandifer echoed these sentiments during the September 15, 2017 House Committee Hearing:

> One of the focuses of our inquiry is to determine who knew what and when. **To that end the Bechtel report tells us an awful lot about what SCE&G knew dating back to 2015 and I have a number of questions to ask about why that information was**

- 123 -

**not made available to the appropriate regulatory authorities**. I believe that if we along with the PSC and the ORS all had access to the information from the Bechtel report describing the true extent of the problems back in 2015, we all would have been pushing to make changes to correct the problem just as we're coming together now to try to correct the problem and move forward responsibly. Along the same lines, I believe **the concealment of that report led the PSC to approve schedules and cost changes that they otherwise would not have approved**.

The results of the Bechtel report are highly concerning and I'll put it very clearly, the results seem to indicate that **the executive leadership of SCE&G intentionally misled the PCS, the ORS, the General Assembly, the SCE&G shareholders and investors and the ratepayers and the public at large as to the true extent of the delays, mismanagement, cost overruns at VC Summer and intentionally engaged in an effort to conceal that information at the same time**, all the while returning a hefty return to their shareholders and receiving millions in compensation and bonuses.

316.    *The Post and Courier* also cited to Santee Cooper's internal records, which showed that SCANA "wanted Bechtel to ax criticisms about the utilities' oversight" and "to remove any mention of the reactors being finished after 2020, the deadline needed to receive the federal tax credits."  The article noted that, in the end, "**more than 30 pages that analyzed the project's construction schedule disappeared from the audit,**" "include[ing] **Bechtel's estimated completion dates**."  The article quoted Jeff Nelson, the Chief Counsel for the ORS, as stating: "There was information that was withheld from us and the Public Service Commission." Indeed, the article noted that "[a]fter receiving Bechtel's findings in the fall of 2015, SCANA continued to assure the state's seven member utility commission that the reactors would be finished before December 2020. . . The Public Service Commission, in turn, increased SCANA's nuclear budget by more than $800 million and approved a fixed-price agreement." Representative Ott was further quoted: "**I think it's clear evidence that the executives of**

**SCANA knew beyond a shadow of the doubt that the project was in peril**," and "**[e]verything they were working for and working toward had come off the tracks**."

317.    On December 20, 2017, after the close of trading, the PSC issued a press release announcing that it had denied SCANA's motion to dismiss the ORS request for immediate relief for ratepayers, and ordered that a hearing be set.  The press release further provided that the PSC had ordered the ORS to "perform a thorough inspection and audit . . . to determine the reasonableness of SCE&G's retail electric rates."   It also explained that the PSC had consolidated the ORS request with proceedings initiated by Friends of the Earth and the Sierra Club, which included requests for review of SCANA's previous prudency determinations.  That same day, *The Post and Courier* reported on the PSC's decision, noting that, "[b]y combining that action with another proposal, the utility commission will also consider whether SCANA should refund customers for the roughly $1.8 billion it has collected to finance its share of the nuclear project since 2009."  The article further explained that Commissioner Elam had "ordered the Office of Regulatory Staff — the state's utility watchdog agency — to determine whether SCANA's bankruptcy warnings were accurate or whether the utility could absorb the lost revenue."

318.    The following day, Morgan Stanley issued an analyst report discussing the PSC's ruling.  Among other things, the report explained that the PSC had permitted the two regulatory dockets to move forward, characterizing the Friends of the Earth and Sierra Club's proceeding as seeking to "re-examine past prudency decisions to charge customers for nuclear construction financing costs (and possibly refund past collections)."  Morgan Stanley further explained that the petitioner success in either or both dockets would dramatically reduce SCANA's value:

> By our estimates, if the company were to receive no nuclear cost
> recovery (in addition to a lower 8% ROE at the core utilities) the

stock would be worth $30/share, and if SCG were to also refund all revenue collected thus far the stock would be worth $18/share.

319.    On the news, SCANA's stock dropped precipitously on December 21, 2017, falling $3.93, or 9.51%, on extremely heavy trading volume, to close at $37.39.

## VI.    Post-Class Period Events

### A.    SCANA's Board Revoked Marsh's And Byrne's Golden Parachutes

320.    Defendants Marsh and Byrne officially stepped down on January 1, 2018.  Four days later, on January 5, 2018, SCANA announced that its Board voted to strip Marsh and Byrne of their "golden parachute" severance packages.  According to an article reporting the Board action in *The Post and Courier* on January 6, 2018, "[t]hose packages could have amounted to benefits worth tens of millions of dollars" for Marsh and Byrne.

321.    Similarly, Dominion's Form S-4 filed on February 14, 2018 regarding the Merger provides that Marsh and Byrne "are not eligible for any severance as a result of the merger. . . . and are not eligible for any pension/non-qualified deferred compensation benefit as a result of the merger." Marsh and Byrne are also no longer eligible for the change-in-control payments, also potentially worth millions of dollars, that would have been triggered upon the closing of Dominion's purchase of SCANA.

### B.    SCANA Announced A Proposed Merger, Which Faces Strong Opposition

322.    On January 3, 2018, the morning of which SCANA's stock was trading at $48 per share, Dominion Energy, Inc. ("Dominion") announced that it would buy SCANA for $7.9 billion in a stock-for-stock deal (the "Merger").  Under the terms of the Merger, SCANA's investors would receive 0.669 shares of Dominion for each share of SCANA that they owned, valuing the stock at about $55.35 per share.  Dominion promised $1,000 payments and 5% rate cuts to the "average residential electric customer," who had been overcharged by SCANA to

fund the Nuclear Project.  As part of the Merger, Dominion would also acquire $6.7 billion of SCANA's debt and write off more than $1.7 billion in capital and assets related to the Nuclear Project.

323.    According to the January 4, 2018 press release filed by SCANA and Dominion announcing the Merger, the transaction requires the approval of SCANA's shareholders, the U.S. Federal Trade Commission, the U.S. Department of Justice under the Hart-Scott-Rodino Act, the Nuclear Regulatory Commission, the Federal Energy Regulatory Commission, and the public service commissions of South Carolina, North Carolina, and Georgia.  The CEO of Dominion, Thomas Farrell, stated on January 29, 2018 that he was "optimistic" that the Merger would obtain all necessary regulatory, legislative, and shareholder approvals in order to complete the transaction before the end of the year.  Almost immediately, lawsuits arose attempting to block the Merger.    On March 15, 2018, however, Dominion's Vice President of Corporate Communications, Chet Wade, stated, "We have been very clear, we said if someone else comes in and offers something better, [SCANA] should take it."

324.    The Merger was also threatened by proposed legislation that would block SCANA -- and any company that acquired SCANA – from charging customers inflated electricity rates to pay for the abandoned Nuclear Project.  On January 31, 2018, the South Carolina House voted by a margin of 119 to 1 to approve House Bill 4375, which would block SCANA from continuing to charge customers approximately $37 million per month—$27 per household—for the abandoned Nuclear Project.  Bill 4375 would also empower the PSC to nullify several of the rate increases that SCANA obtained to help fund the Nuclear Project.

325.    Speaker of the South Carolina House Jay Lucas spoke about the bill during debate, stating that the purpose of Bill 4375 was to ensure that "**fraud, concealment, omission, misrepresentation, non-disclosure of a material fact by a utility should never be rewarded**."

326.    On February 1, 2018, the House bill was introduced in the Senate and referred to the Senate Committee on the Judiciary.  On February 20, 2018, the Committee on the Judiciary referred the bill to a subcommittee where, as of the date of this filing, it is currently pending.

327.    While the South Carolina Senate and Governor McMaster have expressed enthusiasm for Bill 4375, upon the House's vote on the bill, Dominion issued a statement arguing that the bill would compromise the Merger.  Dominion stated that the bill, if it passed, would "put a standalone SCE&G in a precarious financial position."  Dominion claimed that the law "could offer temporary relief for SCE&G customers, [it] . . . unfortunately could threaten the permanent solution offered by Dominion."  Dominion claimed that the "significant financial consequences" of the bill "would not allow us to provide $12 billion of relief to SCE&G's customers."

328.    On February 14, 2018, as the South Carolina Senate was taking up House Bill 4375, the Senate introduced an amendment to a separate resolution—Senate Bill 954—to establish a deadline of December 21, 2018, and no earlier, for the PSC to issue its final order on SCANA's abandonment petition and to allow the merger of SCANA and Dominion to proceed. Because Dominion has threatened to abandon its acquisition of SCANA in light of House Bill 4375, and SCANA has warned that the bill would throw it into financial distress, the Senate has stated that it needs additional time to consider the consequences of House Bill 4375 and the Merger.  The amendment passed unanimously the following day, and the Senate sent the bill back to the House for re-reading; the House approved the bill and referred it to the House

Judiciary Committee, which approved the bill, and sent it back to the House for another reading, which the House approved again. On February 20, 2018, SCANA and Dominion wrote jointly to the Honorable Jocelyn G. Boyd, the Chief Clerk/Administrator of the PSC, to express their support for the amendment. On March 7 and 8, 2018, the House voted again to approve the bill and return it to the Senate. On March 28, 2018, the Senate adopted the amendment.

C.    **Moody's Downgraded SCANA's Credit Ratings to "Speculative 'Junk' Grade"**

329.    On February 5, 2018, Moody's Investors Service ("Moody's") downgraded its ratings of SCANA and SCE&G and continued its review of a potential further downgrade that began on November 1, 2017. Moody's stated in its announcement of the downgrade, "The review was originally initiated as a result of escalating political and regulatory contentiousness following the organization's decision to cease construction of the V.C. Summer new nuclear units 2 and 3." Moody's downgrade followed upon the South Carolina House's passage of Bill 4375, described above, which would repeal the rates that SCE&G is collecting under the BLRA for the abandoned Nuclear Project and impose "experimental" rates in their place. Moody's stated that "[t]he proposed immediate reduction in revenue would have a materially negative impact on SCE&G and SCANA's cash flow credit metrics." Recognizing that Bill 4375 has not yet become South Carolina law, but noting that (as of February 5, 2018) it had the full support of Governor McMaster and at least some of the Senate, Moody's stated that the downgrade was driven by "a political and regulatory environment that has become exceedingly contentious and uncertain," and a understanding that the state legislature has reacted negatively to "recent credit neutral proposals by SCANA and by SCANA and Dominion Energy, Inc. in conjunction with their proposed merger, that would better balance the cost of nuclear abandonment." As such,

Moody's stated, SCANA will likely be forced to "absorb a greater portion of these costs, which would likely materially weaken their financial position."

330. On February 6, 2018, SCANA confirmed that, "[w]ith the downgrade by Moody's, all of SCANA's current credit ratings . . . are now below investment grade, which is commonly referred to as 'speculative "junk" grade.'"

### D. SCANA Whistleblower Confirms Defendants Intentionally Concealed Their Gross Mismanagement Of The Nuclear Project "To Prop[] Up Earnings To Be Able To Make Their Bonuses"

331. On March 29, 2018, *The Post and Courier* published an article titled "Top SCANA accountant accused executives of mismanaging S.C. nuclear plant to prop up earnings." The article revealed that SCANA's former Vice President of Finance for Nuclear Construction, Carlette Walker, had left a voicemail with Santee Cooper's Marion Cherry, one of Santee Cooper's three on-site employees at the Nuclear Project, sometime between January and May 2016—just months after Bechtel provided its assessment and recommendations to the two companies—imploring him to get Santee Cooper to stop paying SCANA any more money for the Nuclear Project.[8]  In particular, Walker told Cherry that Defendants "have broken every friggin' law you can break" and "**[t]hey're doing it because they want to make money and they're propping up earnings to be able to make their bonuses**."

332. As a high-level SCANA executive, Walker regularly interacted with the Officer Defendants and was in a position to know about the Nuclear Project and the inner workings at SCANA.  Walker joined SCE&G's internal audit department in 1983 and later worked as an assistant controller, for SCE&G's Electric Generation division and then for all of SCE&G.  In 2002, Walker's responsibilities as Assistant Controller were increased to include all SCANA-

---

[8] *The Post and Courier* posted Walker's voicemail on its website, and it can be accessed at the following link: https://www.postandcourier.com/business/top-scana-accountant-accused-executives-of-mismanaging-s-c-nuclear/article_743584d4-3295-11e8-8465-47a2cc905671.html.

regulated subsidiaries. In 2006, she was promoted to Corporate Compliance and Ethics and Audit Officer and in 2009, she was promoted to Vice President for Nuclear Finance Administration. At some point thereafter, Walker assumed the role of Vice President of Finance for Nuclear Construction. According to *The Post and Courier*, "[f]or years, Walker headed SCANA's project finance team, overseeing the multi-million dollar payments the company made to its contractors. She was in close contact with SCANA's top echelon, internal emails show." Walker reported to Defendant Addison during the Class Period until she left the Company in 2016.

333. In the voicemail to Santee Cooper, Walker referred to what SCANA's management was telling Santee Cooper as "bullshit." Walker continued, noting that Defendants were "continu[ing] to mismanage" the Nuclear Project and were lying to Santee Cooper for their own financial gain:

> I just wanted to let you know that I know the truth now. And I don't want you and Santee [Cooper] to get screwed anymore by the executives of SCE&G and SCANA. **Kevin Marsh is not the guy that everybody thinks he is. He is a liar**. **And he is just like Steve [Byrne] and Jeff [Archie] and Jimmy [Addison] and Marty, so they're all of the same cloth.** They all think they're the smartest guys in the room. But **they're all on the friggin' take.** Nobody knows this but I went to a lawyer yesterday and **they have broken every friggin' law that you can break.**
>
> . . .
>
> **Michael [Crosby] and Lonnie [Carter] and you [Marion Cherry] need to push back and don't let them continue to mismanage that project**. Just don't let them. Don't sign anything. Refuse to pay. Don't pay SCANA. Push back and just say, "No, we're not going to do it." Because **they are mismanaging that project** and it's at y'all's expense. **They're doing it because they want to make money and they're propping up earnings to be able to make their bonuses.** And it's going to be at your expense. So if y'all haven't signed that agreement on the purchase price, call whoever you need to call and tell them, "**Don't sign anything with that management team**."

334.    According to the article, Walker "voluntarily retired from SCANA after more than three decades with the company" in May 2016.  She did so, even though she received pay raises each year, eventually earning more than $565,000 in 2015.

335.    Walker's statements regarding the Officer Defendants' financial motives are corroborated by other public information regarding their executive bonuses.  For example, according to *The State*'s August 9, 2017 article titled "Top SCANA executives were paid millions in bonuses for roles in failed nuclear project," SCANA's top five executives, including the Officer Defendants, received $3.3 million in performance-based pay in 2016.  Nearly half of that $3.3 million went to Defendant Marsh as part of his $6.1 million total compensation in 2016. From 2007 to 2017, SCANA paid out almost 21.4 million in annual performance-based compensation.

## VII.    DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS

336.    Defendants SCANA, Marsh, Byrne, and Addison made materially false and misleading statements and omissions during the Class Period concerning, among other things: (i) the Nuclear Project schedule and completion dates; (ii) the costs of the Nuclear Project; (iii) the receipt of $1.4 billion of Nuclear Tax Credits to be awarded as long as the Nuclear Project was completed by January 1, 2021;   (iv) the progress of the Nuclear Project construction; (v) SCANA's oversight of the Nuclear Project; (vi) the viability of the Nuclear Project once SCANA elected the Fixed Price Option and the related likelihood and impact on the project of a potential Toshiba and/or Westinghouse bankruptcy; (vii) Defendants' affirmative commitment to disclose all material information related to the Nuclear Project; (viii) and Defendants' failure to disclose "known trends and uncertainties" pursuant to Item 303 or Regulation S-K.

337.     Including and in addition to the materially false and misleading statements and omissions set forth above, Defendants made the following materially false and misleading statements and omissions during the Class Period with knowledge or reckless disregard for their falsity at the time they were made. Indeed, as explained above, during the Class Period, Defendants SCANA, Marsh, Byrne and Addison knew that (i) the Nuclear Project would not be completed in 2020; (ii) the costs of the Nuclear Project would be, at least, $935 million to $1.45 billion greater than represented; (iii) SCANA would be ineligible to receive the $1.4 billion in Nuclear Tax Credits; (iv) the Nuclear Project was not progressing toward a 2020 completion date because the monthly progress rates never came close to the needed rate of 2.5% to 3% per month; (v) SCANA's oversight was completely inadequate to "bring the project to completion;" (vi) SCANA's May 2016 election of the fixed price option would likely force Toshiba and/or Westinghouse into bankruptcy, dooming the Nuclear Project; and (vii) Defendants' affirmative commitment to heightened transparency at the start of the Class Period was patently false as Defendants buried the Bechtel Assessment and Report, as well as the monthly progress reports and other internal documents that revealed the fraud.

A.     **False And Misleading Statements And Omissions Concerning SCANA's Ability To Complete The Nuclear Project By The End Of 2020**

338.     From October 27, 2015, November 9, 2016, Defendants repeatedly represented that the Guaranteed Substantial Completion Dates ("GSCDs") for Nuclear Project Unit 2 and Unit 3 were August 31, 2019 and August 31, 2020, respectively.  During the same period, SCANA announced that the total gross construction cost to SCANA of the Nuclear Project would be $7.113 billion [$5.5 billion in 2007 dollars].  These costs were raised and purportedly capped at $7.6 billion once the PSC approved SCANA's May 26, 2016 petition to elect the Fixed Price Option provided for in the EPC Amendment on November 9, 2016.  Completion of the

Nuclear Project by the GSCDs of August 2019 and 2020, respectively, were directly related to the costs of completion because, among other things, each month of delay increased the costs of the Nuclear Project significantly – approximately $42.5 million per month based on Santee Cooper's calculation. Completion of the Nuclear Project by the end of 2020 was also material to investors because the 2005 Energy Policy Act allowed SCANA to claim $1.4 billion in Nuclear Tax Credits only if the Nuclear Project went into service before January 1, 2021.

339.    On October 27, 2015, after the close of trading, SCANA filed a Form 8-K with the SEC attaching a press release titled "SCE&G Announces an Amendment to the Engineering, Procurement, and Construction Agreement for AP1000 Plants at VC Summer Station" (the "October 27, 2015 8-K"). The October 27, 2015 8-K and attached press release announced that the October 27, 2015 EPC Amendment "*revises the Guaranteed Substantial Completion Dates (GSCDs) for Units 2 and 3 to August 31, 2019 and 2020*, *respectively*."[9] The October 27, 2015 8-K also stated that "the total [Nuclear] Project costs for SCE&G will increase by approximately $286 million over the $6.827 billion [$5.2 billion in 2007 dollars]," which had just been approved on September 10, 2015. The Press Release continued that, as a result, "the *total gross construction cost of the [Nuclear] Project [was raised to] approximately $7.113 billion [$5.5 billion in 2007 dollars]*."[10] Moreover, the October 27, 2015 8-K announced SCE&G's "exclusive and irrevocable option to, at any time prior to November 1, 2016, further amend the EPC Agreement" and exercise a "fixed price option [that] would result in SCE&G's total Project costs to increase by approximately $774 million over the $6.827 billion" approved by the PSC in

---

[9] The statements made by Defendants that are bolded and italicized are the statements alleged to be false and misleading. All other emphasis is in bold.

[10] Unless otherwise specified, all cost information reflects SCE&G's 55% share of the project's cost.

September 2015.  If exercised, this fixed price option "**would bring the total gross construction cost of the Project to approximately $7.601 billion**" for SCANA.

340.     Defendant Marsh touted the EPC Amendment in the October 27, 2015 8-K, and was quoted as stating how he and the other Defendants were "excited about the changes in . . . the amendment to the EPC contract for the new nuclear plants and **see these changes as very positive**," including the inclusion of additional incentives to ensure completion by the end of 2020 in the form of "liquidated damages that are linked to timely completion of the nuclear plants and qualification for federal production tax credits."  Defendant Marsh concluded that "**[w]e believe these changes provide better protection against future cost increases for our customers and the company**."

341.     Defendants also made misrepresentations about SCANA's ability to qualify for $1.4 billion of Nuclear Tax Credits based on their representation that the Nuclear Project would be in operation months before the Energy Policy Act tax credit provision expired on January 1, 2021.  For example, in the Company's November 6, 2015 Form 10-Q for the third quarter of 2015, signed and certified as accurate pursuant to the Sarbanes-Oxley Act of 2002 ("SOX")[11] by Defendants Marsh and Addison (the "November 6, 2015 10-Q"), the Company stated that "[b]ased on the guaranteed substantial completion dates provided above, **both New Units are expected to be operational and to qualify for the nuclear production tax credits**; however, **further delays in the schedule** or changes in tax law **could impact such conclusions.**"  Defendant Marsh also discussed the availability of the Nuclear Tax Credits based on the

---

[11] For example, Marsh's and Addison's SOX certifications stated: "Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report."  The SOX certifications accompanying the Company's other SEC filings during the Class Period contained substantially similar language.

completion of both Units in 2020 during his testimony during a November 19, 2015 *ex parte* briefing before the PSC "regarding recent activity concerning the new nuclear units at V.C. Summer Nuclear Station" (the "November 2015 PSC Briefing"):

> We wanted to focus Westinghouse very keenly on meeting the deadlines for the production tax credits. As you know, ***those tax credits expire at the end of 2020. We have to have our plants on line at the end of 2020 to qualify for those. The first plant is certainly more than a year ahead of that; the second plant is a little bit less than six months ahead of that***, so we wanted to make sure we kept them focused on trying to reach those goals so we could secure those benefits for customers that amount to about $2.3 billion on a pretax basis.
>
> ****
>
> So, on line one, the ***guaranteed substantial completion dates***, those have moved from June of [20]19 and June of 2020 for Units 2 and 3—under the "EPC" and the "Fixed-Price Option" those have both ***moved to August of [20]19 and August of 2020. A couple of months' move there, but still we believe in time to finish the units for the production tax credit qualification.***

342.    Statements repeating the (i) August 31, 2019 and August 31, 2020 GSCDs, (ii) total gross construction costs of $7.113 billion (without the election and approval of the fixed price option), and $7.601 billion (with election and approval of the fixed price option); and (iii) eligibility of SCANA to receive the $1.4 billion of Nuclear Tax Credits, were substantially repeated by Defendants between October 2015 and November 2016, in the following statements, as detailed in the attached Appendix:

- SCANA's Forms 10-Q, each of which was signed and certified as accurate pursuant to SOX by Defendants Marsh and Addison, specifically the November 8, 2015 10-Q; the Form 10-Q for the first quarter of 2016 (the "May 6, 2016 10-Q); the Form 10-Q for the second quarter of 2016 (the "August 5, 2016 10-Q"); and the Form 10-Q for the third quarter of 2016 (the "November 4, 2016 10-Q");

- SCANA's February 26, 2016 Form 10-K for the fourth quarter and full year 2015 that was signed and certified as accurate pursuant to SOX

by Defendants Marsh and Addison, and was also signed by the Director Defendants (the "2015 Form 10-K");

- SCANA's quarterly earnings conference calls, including: (i) an October 29, 2015 third quarter 2015 earnings conference call with analysts (the "October 29, 2015 Call"); a February 18, 2016 fourth quarter and full year 2015 earnings call with analysts (the "February 18, 2016 Call"); (iii) an April 28, 2016 first quarter 2016 earnings conference call with analysts (the "April 28, 2016 Call"); and (iv) a July 28, 2016 second quarter earnings call with analysts (the "July 28, 2016 Call");

- Testimony by Defendants Marsh and Byrne during the November 2015 PSC Briefing;

- SCANA's March 2, 2016 Investor Presentation at the "2016 UBS & Morgan Stanley Utilities Conference" (the "March 2, 2016 UBS/MS Conference");

- SCANA press releases including: (i) a May 26, 2016 press release titled "South Carolina Electric & Gas Company Elects Fixed Price Option and Requests Update to Construction and Capital Cost Schedules for New Nuclear Units" (the "May 26, 2016 Press Release"), attached to a Form 8-K filed that day (the "May 26, 2016 8-K"); (ii) a June 8, 2016 Form 8-K (the "June 8, 2016 Form 8-K"); (iii) a September 1, 2016 press release titled, "SCE&G Announces Settlement Agreement Related to Election of Fixed Price Option and Petition to Update Construction and Capital Cost Schedules for New Nuclear Units" (the "September 1, 2016 Press Release"), attached to a Form 8-K filed that day (the "September 1, 2016 8-K"); (iv) a November 9, 2016 press release titled, "Public Service Commission of South Carolina Approves Settlement Agreement Concerning South Carolina Electric & Gas Company's Petition to Update Construction and Capital Cost Schedules and to Elect the Fixed Price Option for New Nuclear Units" (the "November 9, 2016 Press Release").

- Direct Testimony by Defendants Byrne, Marsh and Addison, which was submitted to the PSC in support of SCE&G's request to approve the August 31, 2019 and August 31, 2020 GSCDs and to approve SCE&G's election of the EPC Amendment's fixed price option, which increased SCANA's total project costs to $7.674 billion (the "July 1, 2016 PSC Testimony").

- An October 7, 2016 publication on SCANA's YouTube site of a Media Day 2016 - Byrne Video, during which Defendant Byrne stated, "*[w]e have established significant cost certainty*," citing the Fixed

Price Option negotiated as a condition of allowing Westinghouse to acquire CB&I.

343.    Defendants downplayed the risk that the Nuclear Project would not be completed by the end of 2020.  For example, following opening statements during the October 29, 2015 Call, an analyst from Mizuho Securities asked Defendants about the risks facing the Nuclear Project after the EPC Amendment:  "[W]hat sort of risk would you say that you still retain and the risk that the construction consortium retains?"  In response, Defendant Addison did not include completing the Nuclear Project by the end of 2020 as a retained risk, responding that "*our risk profile is certainly reduced from where it was before we signed the amendment*," and adding that "*our only risk*" would be "*changes in law or change orders that might be associated with the project*."

344.    Eight months later, Defendant Addison highlighted that the August 2019 and August 2020 GSCDs and stated costs of construction were firm and "*not speculative*." In his Direct Testimony submitted to the PSC on July 1, 2016, Defendant Addison affirmatively stated: "*[t]he current schedules reflect the best information available about the anticipated costs and construction timetables for completing the project. The anticipated capital costs presented here are not speculative*."  Addison continued, "[a]s Mr. Byrne testifies, *they are based on a careful review of construction plans and the expected costs of the tasks required to complete them. No speculative or un-itemized costs are included in this cost schedule. It is appropriate that this cost schedule be approved under the BLRA as the updated schedule for the project*."

345.    Likewise, Defendant Byrne stated in his July 1, 2016 PSC Testimony that "*SCE&G's construction experts have reviewed this schedule and found that its scope and sequencing is logical and appropriate*. . . . Consistent with its responsibilities as Owner, *SCE&G has carefully reviewed and evaluated all information that is available related to the*

*project and schedule and finds it to be reasonable.*"  Defendant Byrne then listed several changes made in the EPC Amendment, and stated: "*All these factors support the conclusion that the construction schedule . . . is [a] reasonable and prudent schedule for completing the Units*."  Byrne testified that "*[i]t is my considered opinion that [the construction schedule] represents a reasonable and prudent schedule for completing the project as envisioned by the BLRA*," and that the costs for the Nuclear Project "*are prudent in every respect*."

346.    Later that month, during the July 28, 2016 Call, Defendant Byrne reiterated the August 2019 and 2020 completion dates, and emphasized that "*[w]e don't see anything to change those*."

347.    On February 14, 2017, Toshiba announced that it would take a $6.3 billion write-down related to its U.S. nuclear problem and that it may sell Westinghouse, calling into question the continued viability of the Nuclear Project.  That same day, SCANA issued a press release titled, "SCANA Receives Reaffirmation from Westinghouse Regarding Completion of VC Summer New Nuclear Project," reassuring investors that Toshiba indicated that it was committed to completing the Nuclear Project (the "February 14, 2017 Press Release").  The February 14, 2017 Press Release announced that "[i]n addition to [Toshiba's] reaffirmation, [Westinghouse] provided SCE&G *with revised in-service dates of April 2020 and December 2020 for Units 2 and 3, respectively*," compared to the then-current August 2019 and August 2020 dates—representing a delay of eight months for Unit 2 and four months for Unit 3, respectively.  Nevertheless, these proposed, revised completion dates were still within the January 1, 2021 deadline to qualify for the $1.4 billion in Nuclear Tax Credits.

348.    The February 14, 2017 Press Release thus attempted to minimize the impact of this new schedule delay, assuring that the "*completion dates provided in the new schedule* are

within the 18 month contingency period provided under the construction provisions of the [BLRA] . . . and *would enable both units to qualify, under current law, for the federal production tax credits.*"

349.    Defendants repeated the April 2020 and December 2020 GSCDs several times in February 2017.  For example, on February 16, 2017, during the February 16, 2017 Earnings Call, when confronted by an analyst that it was "conceivable that unit [Unit 3] wouldn't qualify for PTCs," Defendant Byrne similarly downplayed this "possibility" as follows:

>    That possibility exists. There are a couple things that are yet undefined or untested relative to qualification production tax credits. One is, what is the definition of in service. *Because certainly we'll be making some power from those units prior to declaring it in service. So if making power qualifies, then we'll be ahead of those dates.* That just gives us a little bit more room, probably on the order of two months

350.    On February 24, 2017, SCANA issued its Form 10-K for the for the fourth quarter and full year 2016 that was signed and certified as accurate pursuant to SOX by Defendants Marsh and Addison, and was also signed by Defendants Hagood and Roquemore (the "2016 Form 10-K").  The 2016 Form 10-K reiterated the existing guaranteed substantial completion dates at that time, as well as the new completion dates that Westinghouse had proposed to SCE&G:  "*The approved construction schedule designates contractual guaranteed substantial completion dates of August 31, 2019 and August 31, 2020 for Units 2 and 3, respectively, although recent communications from WEC indicate substantial completion dates of April 2020 and December 2020 for Units 2 and 3, respectively.*" SCANA also assured investors that the Company was still in line to receive the Nuclear Tax Credits, stating:

>    *Based on* current tax law and *the contractual guaranteed substantial completion dates (and the recently revised forecasted dates of completion) provided above, both New Units would be operational and would qualify for the nuclear production tax*

*credits*; however, any ***further delays in the schedule*** or changes in tax law **<u>could</u> adversely impact these conclusions**.

351.    Again, on May 5, 2017 in SCANA's Form 10-Q for the first quarter of 2017, which was signed by Defendants Marsh and Addison (the "May 5, 2017 10-Q"), SCANA stated that in February 2017, "WEC [Westinghouse] provided further revised estimated ***substantial completion dates of April 2020 and December 2020***." Defendants reassured investors that "***achievement of such dates would also allow the output of both units to qualify, under current law, for federal production tax credits.***"

352.    Each of the false statements above, and the speaker of each false statement, is identified and listed chronologically in the attached Appendix.

353.    The misstatements and omissions set forth above concerning the guaranteed substantial completion date of August 2019 for Unit 2 and August 2020 for Unit 3 (later revised to April 2020 and December 2020), the costs of completing the Nuclear Project, and the availability of the Nuclear Tax Credits for completion by the end of 2020, were materially false and misleading because they were directly contrary to (i) the conclusions drawn by Bechtel and presented to Defendants in the days preceding the October 2015 Press Release; (ii) internal documents that demonstrated that the completion dates and costs were unachievable; and (iii) accounts of former Westinghouse employees, who provided direct reports to the Officer Defendants on the construction of the Nuclear Project.

354.    Bechtel, following an intensive three-month on-site assessment of the Nuclear Project, for which it was paid $1 million, determined that, based on numerous objective factors, including the construction progress made to date (21%), the historical rate of monthly construction progress (0.5%), "[t]he to-go scope quantities, installation rates, productivity, and staffing levels," deficiencies related to Consortium project management, SCANA's poor

oversight of the Nuclear Project, and incomplete engineering designs that, when applied, were "often not constructible," the Nuclear Project **could not be completed before June 2022, at the earliest – a deadline that could extend to June 2023**. Bechtel informed Defendants that completion by the end of 2020 could only occur if SCANA could increase the Consortium's monthly construction progress by 500%, from 0.5% to 3%, an impossible improvement given the other crippling issues facing the Nuclear Project. Bechtel's assessment was unequivocal – any realistic projected completion dates by the end of 2020 were not achievable, and could certainly not be guaranteed.  As a result, Defendants also knew that SCANA would not qualify for the Nuclear Tax Credits, which were available to new nuclear construction that was completed by January 1, 2021.

355.    Defendants' knowledge of the falsity of these representations from the first day of the Class Period is clear.  Defendant Marsh received weekly updates from Bechtel between August 10, 2015 and October 16, 2015.  On October 16, 2015, Marsh received a one-on-one report of Bechtel's Assessment.  Marsh and Defendant Byrne both attended the Bechtel Assessment at SCANA's headquarters on October 22, 2015, where they were told that the Nuclear Project **would not be completed until 2022, at the earliest**, and that **"[t]he Consortium's forecasts for schedule durations, productivity, forecasted manpower peaks and percent complete" are unrealistic** and that SCANA and Santee Cooper "**do not have an appropriate project controls team to assess/validate Consortium reported progress and performance**."  Moreover, SCANA, including Defendant Byrne specifically, spent months trying to get Bechtel to change its conclusions concerning SCANA's inability to complete the Nuclear Project by the end of 2020.  Moreover, these dates were also unachievable because of SCANA's continuing poor oversight of the Nuclear Project, as demonstrated by Bechtel's

findings and subsequent internal documents showing their repeated failure to implement Bechtel's and Santee Cooper's recommendations.

356.    In subsequent public testimony following disclosure of the existence of the Final Bechtel Report (but not the First Bechtel Report), Defendant Marsh admitted that Bechtel's scathing assessment of the Nuclear Project was "not news" to Defendants in October 2015. Indeed, information contained in an April 6, 2015 email, which was sent to Defendant Byrne by Santee Cooper's Senior Vice President for Nuclear Energy, shows that Defendants knew much earlier than October 2015 that completion of the Nuclear Project by the end of 2020 was simply not possible.  This April 6, 2015 email contained a chart demonstrating that the Nuclear Project would not even be 50% complete by the end of 2020 without an extraordinary, immediate and unprecedented improvement in monthly construction progress – none of which had happened by October 2015.  Given Bechtel's later detailed breakdown of the many, crippling challenges facing the Nuclear Project, Defendants could have had no reasonable expectation by October 27, 2015 or thereafter that the Nuclear Project could be completed by the end of 2020.

357.    Former Westinghouse employees with direct knowledge of the Nuclear Project's progress, who reported on this progress directly to Defendants Marsh and Byrne, corroborate that completion by the end of 2020 was fantastical.  FE 1, the former Nuclear Project Director for Westinghouse during the Class Period, stated that a significant increase in the monthly progress rate was unachievable due to the lack of adequate project management by SCANA, which was unequipped to manage the Nuclear Project and failed to put in the fundamental "architecture" in place to oversee the construction.  FE 1 also confirmed that Westinghouse distributed Monthly Progress Reports to Defendants Marsh and Byrne that demonstrated monthly construction progress that averaged 0.8% throughout the Class Period, and never came close to approaching

the needed rate of 3% progress per month.  FE 1 added that an expectation of 3% monthly progress was fantastical, and "would have been an all-time bar raiser" given that that rate of progress had never been achieved in any nuclear construction in FE 1's 35 years of experience.

358.    Monthly Progress Reports made available to Lead Plaintiffs for the months of December 2016 through June 2017 show unequivocally that monthly construction progress rates averaged only 0.7% more than one full year after the Bechtel Assessment.

359.    FE 2, the former Westinghouse Director of Licensing for the Nuclear Project, also stated that Westinghouse provided the monthly progress rates to SCANA, including Defendant Byrne, every month, and stated: "It was obvious that we were not going to complete this on schedule, and [on-]budget."   FE 2 also described how a SCANA employee who attended multiple Monthly Project Review Meetings with FE 2 and Defendant Byrne, acknowledged that the actual monthly progress rates meant "completion by **2026** or something!"

360.    The fact that the Nuclear Project would not be completed on – or anywhere near – schedule meant that Defendants' statements that the amendment "***will bring the total gross construction cost of the [Nuclear] Project to approximately $7.113 billion***" without fixed pricing, and $7.601 billion with fixed pricing, were objectively false and misleading when made.  Costs to SCANA increased with every month of delay.  This was demonstrated in a memo sent to Defendant Marsh on March 4, 2016.  In that Santee Cooper March 3 Recommendations Memo, Santee Cooper calculated that each month of delay cost Santee Cooper – with a 45% ownership interest in the Nuclear Project – $35 million per month. That would equal **approximately $42.5 million per month** for SCANA to account for SCANA's 55% ownership interest in the Nuclear Project. Assuming that Bechtel's lower estimate of Nuclear Project completion in June 2022 were correct, this delay translates into **minimum additional costs of**

**$935 million for SCANA for a 22-month delay, and total additional costs of $1.45 billion for a 34-month delay to June 2023**.

361.     To the extent any of Defendants' statements above were opinions, they were false and misleading because they lacked a reasonable basis and omitted the above material facts—notably, Bechtel's negative findings regarding the schedule delays and numerous, crippling problems with the Nuclear Project—which did not fairly align with Defendants' positive statements regarding the project's schedule, costs, Nuclear Tax Credits eligibility, and risks.

## B.    False And Misleading Statements And Omissions Concerning Defendants' Commitment To Transparency

362.     Each of the Officer Defendants appeared before the PSC on November 19, 2015 to describe to the Commissioners the genesis and terms of the EPC Amendment.  Among one of the new provisions in the EPC Amendment was a clause that freed SCANA of any obligation it previously had to clear public statements concerning the Nuclear Project with Westinghouse. Defendant Addison described this provision during the November 19 PSC Briefing as enhancing Defendants' "***ability to disclose to our regulators and our investors all the details of anything that we think is critical that you know***:"

> One of the provisions in the agreement — one very late night we were going through things that were very important to us, we said, "***We really need the ability to disclose to our regulators and our investors all the details of anything that we think is critical that you know***," and they [Westinghouse] acquiesced to that right off the bat.  So there's a provision in that agreement, Item No. 26, that says ***we can share with you anything that we think is important that you see, as well as the investors, those that buy our bonds or those that buy stock to provide the funds to build the plants***.

363.     Item No. 26 to the EPC Amendment, which was attached as an exhibit to the November 6, 2015 10-Q, provided that:

> While the Parties acknowledge the existence of various confidentiality agreements between themselves, ***they also***

- 145 -

> *recognize that certain disclosures must be made to satisfy various securities laws and for regulatory purposes. Each Party is free to make such disclosures as it deems prudent*, but the disclosing Party must provide a copy of any intended written disclosure to the other Parties before such disclosure is made.

364.    Item No. 26 to the EPC Amendment and Defendant Addison's November 19PSC Briefing statements emphasized to the public that SCANA and the Officer Defendants had removed any contractual impediments to full disclosure, and were free to – and committed to – disclose any information that was "critical" or "important" to investors about the Nuclear Project.

365.    Defendants reaffirmed this commitment to disclose "critical information" during the Class Period.  For example, Defendant Marsh, in a September 23, 2016 article published in *The Post and Courier* titled, "Electric Bill 'Look at Whole Picture,' SCANA Chief Says of Nuclear Project Costs," asserted that *"[w]e've been straightforward and honest about the* challenges *we've had on this project as we've presented those to the commission*, and we'll do everything we can to limit the cost of that fixed price."

366.    Later, once the market began to understand through various partial disclosures that the Nuclear Project was in serious jeopardy, Defendant Marsh tried to assure investors that SCANA had been and would continue to be "open" and "transparent."  For example, during the March 29, 2017 Call, Marsh represented that *"[w]e've been transparent on this project since day 1, and we're not going to change that.*"

367.    Months later, after SCANA had announced its abandonment of the Nuclear Project, Defendant Marsh spoke during the August 3, 2017 earnings call (the "August 3, 2017 Call") about SCANA's commitment to openness with the PSC, stating "*[o]ur process at the commission is very open*."  Marsh reiterated this description on September 18, 2017 during testimony before the South Carolina Senate, when he stated that, despite the recent revelation of

- 146 -

the existence of the February 2016 Final Bechtel Report, SCANA had "*discussed openly the challenges that we had*."

368.     The misstatements and omissions above concerning Defendants' purported commitment to transparency and disclosure of all "critical" and "important" information concerning the Nuclear Project were false and misleading because Defendants, from the very first day of the Class Period, concealed highly "critical" and "important" information from SCANA's investors and regulators.  SCANA retained and paid $1 million for the Bechtel Assessment and Reports, and Bechtel – one of the leading construction and engineering companies worldwide – made numerous negative observations and recommendations, using objective facts.  Bechtel informed Defendants days before the start of the Class Period that SCANA's GSCDs were untethered to reality and that, in fact, the completion of the Nuclear Project would be delayed up to three years.  This information related to Defendants that, as a result of this multi-year delay, costs for completing the Nuclear Project would skyrocket and SCANA would not be eligible for the $1.4 billion of Nuclear Tax Credits.

369.     Defendants actively concealed this information, and instead provided investors with patently false information as to the Nuclear Project's completion dates, costs and eligibility for Nuclear Tax Credits.  Moreover, Bechtel, Santee Cooper, and later the CORB identified that many of the fundamental issues and deficiencies at the Nuclear Project site were due, at least in part, to SCANA's own failure to oversee and manage the Nuclear Project.  Therefore, Defendant Addison's forthright statement in November 2016 that SCANA would provide the PSC and investors with all "critical" and "important" information was proven false by the fact that SCANA actively concealed – to investors, the PSC and the ORS – Bechtel's conclusions, and the

existence of the Bechtel Assessment and Reports, throughout the Class Period until SCANA's partner Santee Cooper was forced to disclose the Final Bechtel Report on September 4, 2017.

370.    Defendant Marsh's September 23, 2016 statement that **"[w]e've been straightforward and honest about the challenges we've had on this project as we've presented those to the commission**," was likewise false and misleading.  By September 2016, Defendants were actively concealing even greater risks and fatal threats to the Nuclear Project.  The clear deficiencies identified by Bechtel had only worsened by September 2016, and, by this date, SCANA had secretly rejected Santee Cooper's attempts to proactively address the oversight and engineering and design deficiencies identified by Bechtel.  Meanwhile, Monthly Progress Reports received by Defendants Marsh and Byrne revealed that progress on the Nuclear Project construction – which had to improve 500% to a rate of 3% monthly progress – had not improved at all over the last year, averaging between 0.7% and 0.8% construction progress per month.

371.    Marsh's March 29, 2017, August 3, 2017 and September 18, 2017 statements were all false and misleading for the same reasons:  neither Marsh nor the other Defendants had been "transparent" or "open" with the PSC or investors since the start of the Class Period. Indeed, on September 18, 2017, while the Final Bechtel Report had finally been disclosed – against SCANA's will – Marsh continued to lie about the existence of the earlier First Bechtel Report.  In response to a direct question from a PSC Commissioner about the existence of an earlier Bechtel report, Marsh replied: "*I'm not aware of a second report*."

372.    To the extent any of Defendants' statements above were opinions, they were false and misleading because they lacked a reasonable basis and omitted the above material facts— notably, Defendants repeated, deliberate concealment of Bechtel's negative findings regarding

the schedule delays and numerous, crippling problems with the Nuclear Project – which did not

fairly align with Defendants' assurances of their transparency with the public.

C.     **False And Misleading Statements And Omissions Concerning SCANA's Oversight of the Nuclear Project**

373.     At the start of the Class Period, both analysts and PSC commissioners questioned

the quality of the work performed to date on the Nuclear Project, in light of the fact that CB&I –

the lead contractor – was departing the project just one month after the PSC approved a 27-

month extension of the schedule and nearly $700 million of additional costs. Defendants assured

investors, based on SCANA's oversight of and presence at the Nuclear Project, that the quality

of the Nuclear Project construction was good and was not going to cause problems or create risks

down the road.

374.     For example, during the October 29, 2015 Call, Defendant Addison, in response

to an analyst question about whether Fluor and Westinghouse had "looked at the quality [of the]

work that has been done by CB&I," responded:

> But Westinghouse has had an opportunity to assess quality as have
> our folks, and so *we don't just rely on the quality from the vendor*,
> in this case CB&I. *We have our own quality group, our own
> quality inspectors*, and we send our folks not just at the site but we
> will send them to facilities that are manufacturing components,
> whether it be CB&I or somebody else, and we send them whether
> it is domestically or internationally, our QA QC inspectors have a
> lot of stamps on their passports. *We will be able to assure Fluor of
> the quality of the construction so far*.

375.     The same analyst followed up and asked: "So you're happy with the quality, so

there's going to be no ah ha moment, is what you are saying?" Defendant Addison responded in

the affirmative: "*We don't anticipate any ah ha moments*."

376.     Defendant Byrne also misrepresented SCANA's control over the quality of the

Nuclear Project construction during the November 19PSC Briefing, responding to a question

about whether he had "any concern about having a fixed-price option, about the quality of the project at the end," in the negative, stating "*even with the delays, we don't have an issue with quality.*"

377.    Defendant Addison's statements that the quality of the work as of October 27, 2015 was good and that SCANA did not "*anticipate any ah ha moments*" with respect to the quality of the work done by its contractors on the Nuclear Project, and Defendant Byrne's November 19 statement that "*we don't have an issue with quality*" were false and misleading because they were inconsistent with and failed to disclose the substantial design and construction problems identified in the Bechtel Assessment and First Bechtel Report.    Moreover, these statements falsely communicated to the public that SCANA's oversight and project management of the Nuclear Project was sufficient to make conclusions regarding the quality of the construction and the risks going forward.

378.    Defendants' statements concerning their ability to attest to the quality of the work performed on the Nuclear Project were similarly false and misleading.    The Officer Defendants received Bechtel's Assessment on October 22, 2015, (and Defendant Marsh also received Bechtel's Assessment in a one-on-one meeting on October 16, 2015).    According to an October 14, 2015 email that contained conclusions that would "form the basis of [Bechtel's] presentation to the execs," Bechtel's October 16 and October 22 presentations informed Defendants that their oversight of the Nuclear Project was insufficient to vouch for "*the quality of the construction so far*."    In particular, Bechtel informed Defendants that SCANA was not in a position to vouch for the "the quality of the construction" because "[t]he Owners **do not have an appropriate project controls team to assess/validate Consortium reported progress and performance**," and the "**hands-off approach** taken by the Owners towards management of the Consortium **does not**

allow for real-time, appropriate cost and schedule mitigation." Bechtel noted that this poor oversight was an issue because, among other things, "the issued design is often not constructible (currently averaging over 600 changes per month)" and "[t]he construction planning and constructability review efforts are not far enough out in front of the construction effort to minimize impacts." Defendants also knew, or were reckless in not knowing, that quality could not be assured because, among other reasons, the Consortium's project management "does not provide appropriate visibility and accuracy on project progress and performance" and that "[t]he Consortium's lack of project management integration (e.g., resolution of constructability issues) is a significant reason for the current construction installation issues and project schedule delays."

379.    By the November 19 PSC Briefing, when Defendant Byrne stated "*we don't have an issue with quality,*" Defendants had received, in addition to the Bechtel Assessment, the First Bechtel Report. The 130-page First Bechtel Report provided an even greater breakdown of the quality issues facing the Nuclear Project, and SCANA's inability to oversee. According to Bechtel, SCANA's poor oversight contributed to the delays to the Nuclear Project. In addition to the above conclusions, the First Bechtel Report stated: "A large part of the schedule slip is related to late design changes, slow resolution of interference issues, and the time it takes to resolve construction errors and quality problems. . . . As long as there are late design changes occurring and there is not expeditious resolution of issues that arise, there will continue to be significant schedule slippages." Bechtel concluded that "[t]he oversight approach taken by the Owners does not allow for real-time, appropriate cost and schedule mitigation," "[t]here is a lack of accountability" in various SCANA departments, and SCANA "lacks the appropriate personnel to provide the proper level of review and oversight required to drive the project to

successful completion." Further, the First Bechtel Report concluded that when "an engineering analysis of a construction or quality problem is needed, it appear[ed] that either there [were] **not enough engineering resources to address the issue, or the issue [was] not addressed with the urgency needed to keep schedule and cost impacts to a minimum**." Bechtel specifically recommended to Defendants that one of the areas of focus "should be on **resolution of issues (i.e., engineering, procurement, and quality) impacting the construction activities**."

380. Following Defendants' statements concerning their oversight as it related to the EPC Amendment, Defendants misrepresented SCANA's purportedly "prudent" (*i.e.*, not reckless) oversight of the Nuclear Project in their filings with the SEC. For example, SCANA represented in the November 6, 2015 10-Q, which was signed by Defendants Marsh and Addison, that:

> Under the BLRA, the SCPSC has approved, among other things, a milestone schedule and a capital costs estimates schedule for the New Units. This approval constitutes a final and binding determination that the New Units are used and useful for utility purposes, and *that the capital costs associated with the New Units are prudent utility costs and expenses and are properly included in rates so long as the New Units are constructed or are being constructed within the parameters of the approved milestone schedule, including specified schedule contingencies, and the approved capital costs estimates schedule*.

381. The above statement was repeated in SCANA's subsequent quarterly and annual filings with the SEC, specifically, in the (i) 2015 Form 10-K, signed by Defendants Marsh, Addison, and the Director Defendants, (ii) 2016 Form 10-K, signed by Defendants Marsh, Addison, Hagood and Roquefort (iii) March 29, 2016 Proxy Statement filed with the SEC, containing a "Chairman's Letter and 2015 Highlights" by Defendant Marsh; and (iii) the following Forms 10-Q, all signed by Defendants Marsh and Addison: May 6, 2016 10-Q; August 5, 2016 10-Q; November 4, 2016 10-Q; May 5, 2017 10-Q; and August 4, 2017 10-Q.

382.    Following SCE&G's May 26, 2016 PSC petition seeking approval of the schedule and costs set forth in the EPC Amendment, as well as the Company's election of the fixed price option, the Officer Defendants provided written Direct Testimony to the PSC on July 1, 2016.  In that testimony, Defendants Marsh and Byrne made direct statements attesting to their knowledge of and "prudent" oversight of the Nuclear Project.  For example, Defendant Marsh stated that "***I can affirmatively testify, as I have testified in prior proceedings, that SCE&G is performing its role as project owner in a reasonable, prudent, and cost-effective manner***."  Defendant Marsh also minimized the risks facing the Nuclear Project and assured investors that, based on his "direct[] . . . management and oversight of the project," many of the construction issues were now largely behind SCANA:

> My senior management team and I are directly involved in the management and oversight of the project and in interacting with Westinghouse and Fluor and their senior leadership teams. ***We are dealing with the issues aggressively and at the highest levels. The challenges we are facing are consistent with the risk we identified in our filings in 2008.*** The important point is that these challenges do not in any way outweigh the long-term benefits of adding this new nuclear capacity to our system.
> …
> We are now nine years into a thirteen year construction project. ***The project team has overcome many of the first-of-a-kind challenges presented by this project***.

383.    Defendant Byrne answered the following question in his Direct Testimony in the affirmative:   "Are the updates requested in this proceeding [are] reasonable and prudent?," Defendant Byrne responded that "[t]he ***updates presented in this proceeding are reasonable and prudent,***" and are "***adjustments that I know to represent reasonable and prudent changes in the cost and construction schedules for the Units***."    Byrne explained that, "***[b]ased on my knowledge of the project, and in my professional opinion, the adjustments are in no way the***

*result of any lack of responsible and prudent management of the project by the Company or of imprudence by the Company in any respect*."

384.   On the February 16, 2017 Earnings Call, analysts questioned Defendants regarding the possibility that SCANA might abandon the Nuclear Project in the event of a Toshiba and/or Westinghouse bankruptcy, including whether SCANA would then be able to recover its cost overruns on the project under the BLRA's provisions.  For instance, one analyst asked whether, "if the issues with the budget and the cost overruns are really driven by . . . more ordinary course scheduling issues . . . and also the fact that Toshiba may not be able to meet its financial obligations, is that under the abandonment provision?  Is that a cause for being able to get recovery for the money spent to date?"  In response, Marsh explained that "[t]here was not an effort to make a listing of the types of items that would qualify [under the abandonment provision]," but that "*generally prudency is the rule that the Commission banks on at the end of the day.*"  He thus implied that SCANA would be able to recover its additional costs on the Nuclear Project under the BLRA because the Company had acted prudently in managing it.

385.   During the March 29, 2017 Conference Call, after Westinghouse had filed for bankruptcy, Defendants sought to further dispel concerns about the impact of the Westinghouse bankruptcy on the Nuclear Project by focusing on SCANA's purportedly "prudent" oversight. Marsh explained that SCANA was evaluating its options in light of the bankruptcy, and "if continuing the construction is not determined to be the most prudent path forward . . . we will look to exercise the abandonment clause" under the BLRA.  In response to analysts' concern over SCANA's ability to recover costs in the event of abandonment, Defendant Marsh stated that "*it's pretty clear that if it is deemed it's not prudent to continue the project, that the prudently*

*incurred cost to date can be recovered through the abandonment clause. I don't expect that to be changed.*"

386.    Similarly, on September 18, 2017, during the SC Senate Committee Hearing, Defendant Marsh once again touted that all prior decisions during construction were prudent: "[T]he costs that were the basis for the increases in the revised rates while we were building the project were based on dollars that *were prudently spent as the project was being constructed*." He continued: "*So it's my opinion that those rate increases were prudent at the time they were put into place*."

387.    During this hearing, Marsh further assured that SCANA had made "prudent decisions" throughout the course of the Nuclear Project: "We knew and told the Commission back in 2008 when we had it approved that we anticipated there would be challenges on a megaproject of this size, and we did our best to address those, *making prudent decisions along the way*."

388.    As late as October 26, 2017, during the October 26, 2017 earnings for the third quarter of 2017 (the "October 26, 2017 Call"), after the Nuclear Project was abandoned and several investigations into the Officer Defendants' actions had commenced, Defendant Addison still asserted that SCANA had been prudent in its management of the Nuclear Project from the start: "As we have said in various legislative hearings, *we believe our actions related to the nuclear project have been prudent* and were in the best interest of our customers."

389.    The misstatements and omissions set forth above regarding Defendants' purportedly prudent oversight of the Nuclear Project were false and misleading. Defendants' statements made in 2016 and 2017, such as Marsh's July 1, 2016 statement that the "*SCE&G is performing its role as project owner in a reasonable, prudent, and cost-effective manner*" and

Byrne's July 1, 2016 statements that the EPC Amendment's revised schedule and costs were "*adjustments that I know to represent reasonable and prudent changes in the cost and construction schedules for the Units*" that "*are in no way the result of any lack of responsible and prudent management of the project by the Company or of imprudence by the Company in any respect*" were false and misleading for the reasons stated above.

390.    Defendants further knew, or were reckless in not knowing that SCANA's oversight of the Nuclear Project was not "responsible" or "prudent."   As alleged above, following the Final Bechtel Report, Santee Cooper created a Bechtel Report Action Plan and sent Defendant Marsh on March 4, 2016 the Santee Cooper Recommendations.  Santee Cooper urged SCANA to take the "opportunity to make significant correction to the course of the nuclear construction Project" and hire "**[n]ew project management and leadership . . .  to overcome these challenges**" that have "significant impact upon the Owners."   Another Santee Cooper memo, also dated March 3, 2016, also stated that "[**t]he SCE&G oversight staff lacks the experience, and in some cases, the support of upper management, to hold the Consortium accountable** for the work sold under the EPC [Contract]." Defendants rejected both Bechtel's and Santee Cooper's recommendations, which were discussed at a March 21, 2016 joint meeting of the two companies' officers and Boards of Directors.   Moreover, even after SCANA's toothless CORB finally convened and issued draft reports in September and December 2016, which were presented to the Officer Defendants, these CORB reports informed Defendants, once again, that SCANA's "**oversight is insufficient** for some project activities, including:  the Project Execution Strategy, prioritization of project tasks, schedule performance, contract administration, and performance monitoring."

391.    To the extent any of Defendants' statements above were opinions, they were false and misleading because they lacked a reasonable basis and omitted the above material facts—notably, Bechtel's negative findings regarding the lack of adequate SCANA project management over the Nuclear Project, which contributed to the project's substantial schedule delays and numerous, crippling problems—which did not fairly align with Defendants' positive statements regarding their supposedly "prudent" oversight of the Nuclear Project.

### D.    False And Misleading Statements Concerning Progress At The Nuclear Project

392.    On January 15, 2016, in a video titled "Year of Progress" that was published on SCANA's YouTube channel, SCANA's public affairs spokeswoman discussed SCANA's purported "progress with V.C. Summer Units 2 and 3 over the past year," stating, for example, that "*significant progress has taken place on the V.C. Summer Nuclear construction site*." Defendant Marsh then touted the progress and success of the Nuclear Project: "*I have just as much faith today in building new nuclear [i.e., the Nuclear Project] as I did in 2008. And [the Nuclear Project] positions us well for the long term.*"

393.    In SCANA's March 29, 2016 Proxy Statement, Defendant Marsh again told investors that "[d]uring a very challenging 2015, *we continued to move forward and make substantial progress on initiatives important to our company such as our new nuclear construction project* and our recent initiative to offer renewable energy to our customers."

394.    On the April 28, 2016 Earnings Call, Defendant Byrne discussed with analysts the continued viability of the Nuclear Project in the event that Westinghouse was no longer solvent and was no longer part of the Nuclear Project.  Byrne stated that, should Westinghouse leave the Project, SCANA itself could act as the general contractor, "which we would be more

comfortable doing now than when we originally signed up for the project *since we've made so much progress*."

395.    One month later, in the May 26, 2016 Press Release announcing SCE&G's petition seeking approval to update the capital cost and the construction milestone schedule for the Nuclear Project, Defendant Marsh represented that "*[c]onstruction of the two new nuclear units continues to progress.*"

396.    On October 7, 2016, SCE&G's YouTube channel, scegnews, published two videos, originally recorded on September 21, 2016, where SCANA gave local, regional, and national media outlets an update on the construction progress of the Nuclear Project's Units 2 and 3.  In the Media Day 2016 - Byrne Video, Defendant Byrne began by assuring the public that "*[t]he pace of this project is quickening*.  [Though] we have run into some issues and roadblocks in the past, *most of those issues and roadblocks are behind us.*"  Byrne further stated in a PowerPoint presentation that "[w]e have the right team in place *and are making tremendous progress toward completion*" and that "*a lot of progress is taking place.*"  Similarly, in the same video, Defendant Marsh assured the public that SCANA has been making "*great progress*" at the Nuclear Project.  Later, in the Media Day 2016 - Marsh , Marsh again reassured investors that progress had continued at the project, as SCANA had addressed prior challenges:

> In projects of this nature, you're going to have some challenges and issues.  We've had challenges and issues; some of those have been on the cost side, the cost of the whole project for Santee [Cooper] and SCE&G is going from 11.4 billion to 13.8 billion or about a 21% increase because of adjustments we had to make in the price, some of it driven by regulations, some of it driven by engineering challenges from our providers, some of it delivered by late delivery of parts that weren't on time at the time we needed them, *but we've been able to meet those challenges, make adjustments to the contract and continue progress on the project.*

397.    On the October 27, 2016 Earnings Call, Defendant Byrne similarly reiterated to investors "*the significant progress that has been made so far on the project*."  Again, on February 16, 2017, during the fourth quarter and year-end 2016 Earnings Call Defendant Byrne further assured investors that "*we've made significant progress in just under 14 months*." During that same February 16, 2017 Call, Defendant Marsh similarly assured investors of continued "substantial progress" on the Nuclear Project: "As you can see from [Byrne's] update, *we are making substantial progress on these new plants and remain focused on continued progress toward their completion*."

398.    Even after abandoning the Nuclear Project, Defendants publicly insisted that they had made substantial progress throughout the Class Period.  For example, at the August 1, 2017 PSC Briefing, Defendant Byrne assured that before the abandonment decision, "*[t]he construction work at the site has been progressing well*."  Likewise, at the August 3, 2017 Earnings Call, Defendant Marsh stated that before the announcement of Westinghouse's bankruptcy in March 2017, the Nuclear Project "was moving forward, *we were making progress* and looking forward to hitting the targets."

399.    The misstatements and omissions set forth above regarding the Nuclear Project's purportedly positive "progress" were materially false and misleading.  From the first day of the Class Period, each of the Individual Defendants secretly knew that the Nuclear Project's historical rate of monthly construction progress, which peaked at about 0.5% per month in 2015, had to immediately improve by 500% – to 3% monthly progress – for there to be any possibility of completing the Nuclear Project in 2020.  At no point did Defendants have a plan as to how to achieve this monthly progress rate.  Indeed, as FE 1 stated, a rate of 3% monthly construction progress was unprecedented and fantastical.  Given the numerous significant management,

oversight, engineering, and design issues plaguing the Nuclear Project by the start of the Class Period, Defendants knew, or were reckless in not knowing, that any reported "progress" in terms of the Nuclear Project being completed by the end of 2020 was illusory unless SCANA was able to reach progress levels near 3% per month.

400.    As discussed above, the March 3, 2015 Santee Cooper Recommendations memo, sent to Defendant Marsh on March 4, 2016, highlighted that "[i]n 2015, only 3.7% direct craft progress (**0.31%** per month) was earned toward completion of the combined units.  The year closed with overall direct craft construction at 18.7% complete.  With 81% of the work to go, the monthly **construction progress must increase to around 2.5% if contract dates are to be achieved**."  Santee Cooper warned that "[f]**ailure to realize a significant and sustained increase on this metric over the next six months will invariably result in more project delay**."  Santee Cooper's warning was derived from Bechtel's Assessment and First Bechtel Report, which informed Defendants in October and November 2015 that, to have any hope of a 2020 completion date, the monthly progress rate would have to improve 500% -- from 0.5% to 3% -- immediately. In reality, as discussed above in Section IV, internal Monthly Progress Reports and other internal documents, as well as statements from FE 1 and FE 2, confirm that in 2016 and 2017 monthly construction progress at the Nuclear Project averaged, approximately 0.8%.

401.    To the extent any of Defendants' statements above were opinions, they were false and misleading because they lacked a reasonable basis and omitted the above material facts— notably, Bechtel's negative findings and the internal documents showing the poor construction progress at the Nuclear Project, including the 0.5% monthly progress rate in 2015 that needed to dramatically increase to 3% for the project to get back on track, but instead continued to hover in

the 0.7-0.8% range (or less) throughout 2016 and 2017. Such facts did not fairly align with Defendants' positive statements regarding the project's supposedly substantial, continuing progress.

E.    **False And Misleading Statements Concerning The Impact Of A Westinghouse Or Toshiba Bankruptcy On The Nuclear Project's Continued Viability**

402.    Defendants knew from the start of the Class Period that the costs of a years-delayed Nuclear Project would incur an additional $1 billion of costs, at least. As a result, election of the fixed price option – which capped SCANA's costs and put the onus of all cost overruns on Westinghouse and Toshiba – would put considerable financial strain on Westinghouse and Toshiba. As discussed above, as SCANA and Santee Cooper were deciding on whether to elect the fixed price option, Santee Cooper pressured SCANA to hire bankruptcy counsel to advise the companies on a potential bankruptcy of Toshiba or Westinghouse so that the companies could make an informed decision. SCANA refused. Beginning in 2016, the Officer Defendants downplayed the impact that a Toshiba or Westinghouse bankruptcy would have on the Nuclear Project, and assured the market that SCANA would simply "finish the plain on [its] own" should the Consortium partners cease operations.

403.    For example, on the February 18, 2016 Earnings Call, analysts asked Defendants about the potential impact of Toshiba's reported financial difficulties on the Nuclear Project and SCANA. In response, Defendant Byrne downplayed the likelihood and impact of a bankruptcy by Toshiba, and Westinghouse, assuring investors that "we do have in the contract some provisions to escrow intellectual properties, *such that if there were to be a cessation of operations by the contractor, that we could finish the plant on our own*." Then, on the April 28, 2016 Earnings Call, Defendant Byrne again minimized the negative impact of a potential bankruptcy by Toshiba or Westinghouse on the Nuclear Project's continued viability.

Specifically, Byrne reassured investors that, in the event of a potential Westinghouse bankruptcy, SCANA could finish the project on its own: "*So, the important part, to me, is that I have the information that I need to be able to finish the plant on my own . . .*"

404.    SCANA and Santee Cooper elected to exercise the fixed price option in mid-2016, and it was approved by the PSC in late 2016, just one month before Toshiba announced an estimated impairment of billions of dollars connected to Nuclear Project at the end of December. In a February 12, 2017 article in *The Post and Courier*, in response to inquiries regarding the impact that the potential bankruptcy of Toshiba would have on the continued viability of the Nuclear Project, Defendant Byrne again reassured investors that "*we do have some contingency plans in place to complete the plant on our own should something like that happen.*"  He further explained: "We would then act as the general contractor, and we're escrowing the proprietary information . . . we would need in order to do that now. . . . From that perspective *we think we can complete the plants on our own.*"

405.    A few days later, the February 14, 2017 Press Release further reassured investors that SCANA and Santee Cooper "have received information from [Westinghouse] officials that indicates *[Westinghouse] and its parent guarantor, Toshiba Corporation (Toshiba), are committed to completing the two new Westinghouse AP1000 nuclear units*."

406.    On February 16, 2017, during the fourth quarter Earnings Call, Defendant Marsh again told investors that Toshiba's financial difficulties would not derail the completion of the Nuclear Project: "We continue to monitor Toshiba's financial situation and their proposed recovery plans. Although ideally Toshiba would be without these stresses, *we still anticipate completing our two new nuclear units* which will enable us to provide our customers with safe, reliable energy for decades to come."  Moreover, later on the same call, Defendant Marsh

similarly reassured that SCANA would complete the Nuclear Project without Westinghouse, if
necessary.  For instance, he explained that "If for any reason, Westinghouse exits the project:

> **Under this scenario, we could evaluate options of serving as the
> general contractor, entering into a new EPC contract for the
> remainder of the construction, or entering into a procurement
> and construction contract and supply the engineering support
> ourselves or through a third-party engineering firm.** As of the
> end of 2016, all major equipment has been procured, received on
> site, or is in fabrication.

407.    During the same fourth quarter Earnings Call, in response to an analyst question
about a "worst-case scenario on the nuclear side," Defendant Marsh stated that SCANA would
"consider all" of the options to continue construction, downplaying the possibility that SCANA
would abandon the Nuclear Project:

> So we would certainly consider all of those [options], look at the
> last case option, **the abandonment [provisions] under the BLRA.
> That's not something high on our list.**
>
> We would certainly like to finish these projects, they are critical to
> us over the long term and meeting customers['] needs and the
> growth we expect to see in the State of South Carolina over the
> long term. . . . **So we're sticking with our strategy[,] and these
> plants are critical to do that.**

408.    Several analysts asked specifically about the BLRA abandonment provision,
including whether SCANA could recover BLRA funds in the event of abandonment.  For
example, in response to a question about whether Marsh "f[elt] confident that given this type of
situation that's happened, [the BLRA abandonment clause] would still be valid," Marsh
sidestepped the question, reiterating that "**Westinghouse and Toshiba have reaffirmed their
commitment to finish the project**."

409.    On March 29, 2017, during the March 2017 Conference Call, Defendant Marsh
again downplayed the possibility of SCANA abandoning the Nuclear Project, reassuring
investors that "**[a]t this time, we expect that the resources available from Westinghouse and

*Toshiba, including its parental guarantee, are adequate to compensate us for the Westinghouse estimate of additional costs*."

410.    On April 27, 2017, during the Q1 FY 2017 Earnings Call, Defendant Byrne continued to minimize the impact of Westinghouse's bankruptcy and reassure investors that SCANA would complete the Nuclear Project despite any cost overruns because Toshiba would honor the fixed price option and pay for any additional costs above the fixed price amount. Specifically, Byrne stated that "*[Westinghouse's] estimate to us of what it would cost to complete above what our current fixed price contract amount is would be within the amount that is the parental guarantee from Toshiba.*"

411.    The misstatements and omissions set forth above regarding the continued viability of the Nuclear Project, and SCANA's ability to complete the project on its own should Westinghouse or Toshiba cease operations and withdraw from the fixed price option, were materially false and misleading.

412.    As discussed above, in Section IV(I), while the Officer Defendants were downplaying the possibility of a Toshiba or Westinghouse bankruptcy to investors, Defendants knew by the time they elected the fixed price option that (i) costs would vastly exceed the $7.7 billion fixed price; (ii) the financially-challenged Westinghouse and its parent Toshiba would be unable to fund those excess costs; and (iii) those cost overruns would likely cause Westinghouse and/or Toshiba to file for bankruptcy protection.  Santee Cooper CEO Carter wrote Defendant Marsh on June 16, 2016, before Santee Cooper agreed to exercise the fixed price option, and stated that "**the possibility of [a Westinghouse or Toshiba] bankruptcy cannot be entirely divorced from our joint board discussions on Monday**" because "**the fixed price option**

**obviously shifts risk away from the Owners and to Toshiba/Westinghouse, making their credit worthiness all the more important**."

413.     Defendants' attempt to deflect questions about the impact of a bankruptcy by stating that SCANA would "*complete the plants on our own*" was both false and misleading because SCANA had no financial capability or expertise to undertake the project management and construction of the Nuclear Project. Defendants knew from the first day of the Class Period that the Nuclear Project would not be completed by the end of 2020 and, as a result, not only would the costs of construction increase by at least $1 billion, but SCANA would not be eligible for the long-touted $1.4 billion in Nuclear Tax Credits.  Not only did SCANA lack the financial capability to undertake the Nuclear Project construction on its own, but, as Bechtel made clear to Defendants,  SCANA was incapable of **overseeing** the Nuclear Project contractors, let along undertaking the primary project management duties and oversight of over 6,000 Nuclear Project employees.

414.     As SCANA had long predicted, election of the fixed price option hastened Westinghouse's declaration of bankruptcy and cessation of work on the Nuclear Project.  Rather than "*complete the plants on our own*," SCANA – knowing that the Nuclear Project would take many years to complete, and cost billions of dollars above the $7.6 billion fixed price option cap – quickly abandoned the Nuclear Project entirely.

415.     On July 31, 2017, Defendants issued the July 31, 2017 Abandonment Press Release that misled investors into believing Westinghouse's bankruptcy was the primary reason SCANA chose to abandon the Nuclear Project, and continued to conceal Bechtel's earlier negative findings.  Specifically, the press release quoted Defendant Marsh as follows: "We arrived at this very difficult but necessary decision following months of evaluating the project

from all perspectives to determine the most prudent path forward. ***Many factors outside our control have changed since inception of this project. Chief among them, the bankruptcy of our primary construction contractor, Westinghouse . . . .***" Similarly, that same day during the July 31, 2017 Abandonment Conference Call, Defendant Marsh affirmed that SCANA's actions met the test for prudency, and placed the blame for the Nuclear Project's demise on "***the failure of Westinghouse to deliver on its fixed price contract.***" Furthermore, Marsh explained that the "***Westinghouse bankruptcy removed the benefits and protection of the [F]ixed [P]rice [O]ption,***" which caused "SCANA and our project co-owner, Santee Cooper, to reevaluate the entire new nuclear project from all perspectives."

416.    On August 1, 2017, during the August 2017 PSC Briefing, Defendant Byrne testified that Defendants "***thought – in October [2015], when we negotiated our [F]ixed [P]rice [O]ption, that we had largely resolved the issues with costs,***" and that Toshiba's December 2016 announcement of its financial troubles was "the first time that they indicated that Toshiba had a huge financial liability issue on finishing the cost of our project." On August 3, 2017, during the Q2 FY 2017 Earnings Call, Defendant Marsh continued to assure investors that construction had been going well, that SCANA had acted prudently throughout the project's course, and that SCANA had no prior knowledge of any substantial problems that could jeopardize its viability before Toshiba's and Westinghouse's financial problems. For example, with respect to any prior knowledge of Toshiba's and Westinghouse's financial difficulties, Defendant Marsh stated that "***[i]t was shortly [after the 2016 approval of the Fixed Price Option on November 9, 2016] that we learned of the news of the Toshiba financial distress, followed by the Westinghouse bankruptcy in March of 2017.***"

417.    On September 15, 2017, during the September 2017 House Utility Ratepayer Protection Committee Hearing, Defendant Marsh testified to the committee that Defendants abandoned the Nuclear Project only because of Westinghouse's bankruptcy:

> Westinghouse filed for bankruptcy on March 29, 2017, and told SCE&G that they would not honor our fixed price contract. Immediately upon learning that - and we had hints that that was coming based on our discussions with them and with Toshiba – we'd already put a team in place to begin the transition and evaluation period to determine the most prudent path forward for the project. We honestly didn't know the answer to that question when we started. ***We wanted to complete the project.  We had parental guarantees that Westinghouse had told us were sufficient to cover what they believed the additional cost would be, and if that had been the case, we might still be building today.*** But we had to evaluate that and we had to make our own determination. We had access to information to do that evaluation that we had never had access to before because of the fixed price arrangement and the EPC contract that was in place that was originally signed in 2008.  We evaluated completing both units. We evaluated completing one unit, one with delaying construction on the second; the other one with abandoning the second unit, and then we looked at abandoning both units.

418.    During the September 15, 2017 House Utility Ratepayer Protection Committee Hearing, Defendants once again passed the blame onto Westinghouse, stating in SCANA's PowerPoint presentation: "***I believe we would be building these plants if Westinghouse had not declared bankruptcy.***"  In addition to this PowerPoint slide, Defendant Marsh expressed this same point during his testimony: "***If Westinghouse hadn't declared bankruptcy and lived up to its commitments and Santee Cooper were still in the project, yes, I do think we'd be moving and I think we would have completed the project.***"  Similarly, Defendant Byrne reiterated: "I think, as Mr. Marsh has said, you know, we're sorry that we're here ***but if we were not in a position where Westinghouse is in bankruptcy and rejected the contract, we would still be building these plants and I believe we would be building both plants with our partner, Santee Cooper.***"

419.    On September 18, 2017, during the September 2017 SC Senate Committee Hearing, Defendant Marsh again blamed Westinghouse for the Nuclear Project's collapse.  For instance, he stated that "*if Westinghouse had lived up to its fixed-price contract and the obligations they signed with us, we would still be building these projects, I believe.*"

420.    The September 28, 2017 Press Release—issued that day—again passed all blame onto Westinghouse for Defendants' own failures.  Specifically, it quoted Defendant Marsh as follows: "*The primary reason the project was cancelled is Westinghouse filed for bankruptcy and informed us that they would not honor the Fixed Price Contract under the provisions of federal bankruptcy laws.*"

421.    The misstatements and omissions set forth above blaming SCANA's abandonment of the Nuclear Project solely on Westinghouse's bankruptcy were false and misleading. Defendants had prepared for and anticipated Westinghouse bankruptcy since March 2016, well over a year before the contractor declared bankruptcy.  Indeed, Defendants knew that SCANA's election of the fixed price option would hasten the bankruptcy filing because of the delays and cost overruns, of which Defendants were fully aware, as discussed above.

422.    To the extent any of Defendants' statements above were opinions, they were false and misleading because they lacked a reasonable basis and omitted the above material facts— notably, Bechtel's negative findings regarding the substantial schedule delays that would inevitably drive up the costs and render the project financially unfeasible and their own internal concerns about the impact of a potential Toshiba and Westinghouse bankruptcy.  Such facts did not fairly align with Defendants' reassuring statements about the continued viability of the project.

F.     **Defendants Failed To Disclose "Known Trends or Uncertainties" That Would "Have A Material . . . Unfavorable Impact On . . . Revenues Or Income From Continuing Operations" In Violation Of Item 303**

423.     The November 6, 2015 10-Q, the 2015 Form 10-K, the May 6, 2016 10-Q, the August 5, 2016 10-Q, the November 4, 2016 10-Q, the 2016 Form 10-K, and the May 5, 2017 10-Q were all materially false and misleading because they failed to disclose the information required by Item 303 of the SEC's Regulation S-K ("Item 303").  Item 303 requires the disclosure of known trends or uncertainties that will affect future revenue, specifically: "known trends or uncertainties that have had or that the registrant reasonably expects will have a material…unfavorable impact on…revenues or income from continuing operations."

424.     Accordingly, as the SEC has repeatedly emphasized, the "specific provisions in Item 303 [set forth above] require disclosure of forward-looking information." Indeed, the SEC has stated that Item 303 is "intended to give the investor an opportunity to look at the company through the eyes of management by providing both a short and long-term analysis of the business of the company…with **particular emphasis on the registrant's prospects for the future**." *See* Management's Discussion and Analysis of Financial Condition and Results of Operation, Securities Act Release No. 6835, 1989 WL 1092885, at *3 (May 18, 1989). Thus, "material forward-looking information regarding known material trends and uncertainties is required to be disclosed as part of the required discussion of those matters and the analysis of their effects." *See* Commission Guidance Regarding Management's Discussion and Analysis of Financial Condition and Results of Operation, Securities Act Release No. 8350, 2003 WL 22996757, at *11 (December 19, 2003).

425.     Disclosure of known trends and forward-looking information concerning the registrant's revenue are required by Item 303 "where a trend, demand, commitment, event or uncertainty is both [i] presently known to management and [ii] reasonably likely to have material

effects on the registrant's financial condition or results of operations." *See* Management's Discussion and Analysis of Financial Condition and Results of Operation, Securities Act Release No. 6835, 1989 WL 1092885, at *4 (May 18, 1989).

426.    As set forth in detail above, both of these conditions were satisfied here.  First, Defendants knew that Bechtel demonstrated with objective evidence adverse trends or uncertainties regarding the Nuclear Project, including that it (i) would not be completed by 2020 given that, while monthly progress rates needed to improve immediately to 3% per month, they averaged between 0.5% and 1% for the entire Class Period, (ii) would not qualify for $1.4 billion in Nuclear Tax Credits, and (iii) would cost, as a result of delays alone, between $935 million and $1.45 billion more than represented by Defendants.  Moreover, Bechtel informed Defendants that this "growing trend" was directly caused, at least in part, by SCANA's poor management and oversight of the Nuclear Project.  The facts set forth above establish that this trend and uncertainty was "reasonably likely to have material effects on [SCANA's] financial condition or results of operations."

427.    Second, as a direct result of this trend, SCANA's future solvency would be dramatically impacted once the concealed trend was revealed publicly as SCANA was forced to abandon construction of the Nuclear Project, and lose any capacity to recover the billions of dollars of projected revenue from the operation of the two new Nuclear Project Units.

428.    Accordingly, pursuant to Item 303, the Individual Defendants were required to disclose: (i) the existence of known trends or uncertainties within the Company regarding the Nuclear Project, namely that SCANA was not going to be able to complete construction of the Nuclear Project Units by the end of 2020; was not going to be eligible to receive $1.4 billion in

Nuclear Tax Credits; and the fact that (ii) the failure to complete the Nuclear Project Units by the end of 2020 would have a "material…unfavorable impact on…revenues."

## VIII.    LOSS CAUSATION

429.    Defendants' wrongful conduct, as alleged herein, directly and proximately caused Plaintiffs and the Class to suffer substantial losses. During the Class Period, Plaintiffs and the Class purchased SCANA securities at artificially inflated prices and were damaged thereby when the price of SCANA securities declined when the truth was revealed. The price of SCANA securities significantly declined (causing investors to suffer losses) when the Defendants' misrepresentations, and/or the information alleged herein to have been concealed from the market, and/or the effects thereof, were revealed, and/or the risks that had been fraudulently concealed by the Defendants materialized.

430.    Specifically, Defendants' materially false and misleading statements misrepresented, *inter alia*, the status of the Nuclear Project (including the schedule for its completion, total costs, SCANA's ability to qualify for the crucial Nuclear Tax Credit, and the progress of construction), Defendants' purported commitment to honesty and transparency about the project, the prudency of SCANA's management of the project,  the likelihood and impact or a potential Toshiba and/Westinghouse bankruptcy, and the ongoing viability of the project. When those statements were corrected and the risks concealed by them materialized, investors suffered losses as the price of SCANA securities declined.  Because of the disclosure of the truth of the Defendants' fraud, SCANA's common stock price declined over **50%**, from a high closing price of 76.12 per share on July 6, 2016, to a closing price of $37.39 per share on December 21, 2017.

431.    The disclosures that corrected the market prices of SCANA securities and/or revealed a previously concealed, materialized risk to reduce the artificial inflation caused by the

Defendants' materially false and misleading statements and omissions are detailed below and summarized in the following chart.  *See also* Section V, *supra* (discussing each alleged corrective disclosures and/or materialization of the risk event in greater depth).   Specifically, the chart identifies each corrective disclosure and/or materialization of the risk event, the price declines in SCANA common stock resulting from the event, and, for purposes of comparison, the percentage change in the S&P 500 Index on each event date:

| Date[12] | Corrective Event | Closing Stock Price | Common Stock Price Change | S&P 500 Price Change |
|---|---|---|---|---|
| 12/27/2016 (12/28/2016) | Toshiba announced estimated impairment of billions of dollars connected to Nuclear Project. | $72.92 | -2.03% | -0.82% |
| 2/14/2017 | Toshiba announced $6.3 billion writedown related to nuclear program and reported that it may have to sell its stake in Westinghouse. | $66.86 | -4.53% | 0.43% |
| 2/16/2017 | SCANA holds conference call and discusses Toshiba announcement and possible impact on SCANA and Nuclear Project. | $67.32 | -0.22% | -0.08% |
| 3/22/2017 | Morgan Stanley issues report predicting "further cost overruns and delays" at the Nuclear Project, and estimating that total costs would be 108% above the original cost estimate, and $5.2 billion greater than most recent cost estimate. | $67.74 | -0.78% | 0.19% |
| 3/22/2017 (3/23/2017) | News coverage of Morgan Stanley report and publication of *Reuters* article reporting that Westinghouse had secured bankruptcy counsel and indicating that bankruptcy announcement was imminent. | $66.71 | -1.52% | -0.10% |

---

[12] Date of stock price drop indicated in parentheses.

| Date[12] | Corrective Event | Closing Stock Price | Common Stock Price Change | S&P 500 Price Change |
|---|---|---|---|---|
| 7/27/2017 (7/28/2017) | SCANA and Santee Cooper announce that (i) Toshiba agreement to honor its $2.168 billion parental guarantee will not be sufficient as the costs of the two Units will "materially exceed" prior estimates, and (ii) the Nuclear Project will not be completed by 2021, "the current deadline for SCE&G to gain production tax credits for completing the reactors." | $61.29 | -6.63% | -0.13% |
| 8/2/2017 (8/3/2017) | 8/2/2017: Following news covering testimony by Defendants Marsh, Byrne and Addison before the PSC, which stated that it was "a grim day" and that the "Commision was blindsided," SC lawmakers form South Carolina Energy Caucus in response to SCANA's decision to abandon the Nuclear Project, with a goal to force "the shareholders of SCANA Corp. to eat any remaining costs tied to the high-profile cancellation of two multi-billion nuclear reactors." | $65.34 | -2.70% | -0.20% |
| 8/4/2017 | SC Attorney General announced initiation of investigation into SCANA "to ensure that all laws were complied with and all applicable procedures were followed," and news that legislators were planning on closely investigating SCANA's abandonment petition. | $63.79 | -2.37% | 0.19% |
| 8/9/2017 (8/10/2017) | It is reported that the ORS moved to dismiss SCANA's abandonment petition, and the Speaker of SC's House of Representatives intervened to join that motion. | $62.01 | -1.10% | -1.41% |
| 8/10/2017 (8/11/2017) | *Post and Courier* article reported that Marsh told lawmakers that he would not want to take on the Nuclear Project now "after it fell years behind schedule" and soared "billions of dollars over budget." Article also reported lawmaker statements that | $60.69 | -2.13% | 0.13% |

| Date[12] | Corrective Event | Closing Stock Price | Common Stock Price Change | S&P 500 Price Change |
|---|---|---|---|---|
| | unless SCANA pulled its request to charge ratepayers for the failed project, "you may force the General Assembly to be more rash than we would otherwise want to be." | | | |
| 9/7/2017 | Articles report on the fallout from the release of the Final Bechtel Report and the release of internal documents and communications that revealed new information about SCANA executives' knowledge of the significant risks facing the Nuclear Project at least by February 2016, as well as knowledge of a significant risk of bankruptcy facing Toshiba and Westinghouse and the adverse impact on the viability of the Nuclear Project from early in 2016. | $59.58 | -0.75% | 0.01% |
| 9/21/2017 (9/22/2017) | SCANA announces that it had been served with a subpoena from the US Attorney; followed by news of a federal grand jury being convened to look into SCANA's role in the failed Nuclear Project. Lawmakers make public comments that the US Attorney could uncover securities fraud violations. On September 22, 2017, an article is published detailing the insider trading of certain SCANA executives. | $55.22 | -3.43% | 0.07% |
| 9/26/2017 (9/27/2017) | SC AG issues opinion that BLRA was "constitutionally suspect," calling into question its enforceability. ORS then filed a request with the PSC to block SCANA from charging ratepayers going forward, and force SCANA to refund ratepayers for prior charges. On 9/27/2017, *The State* reported on the existence of an earlier Bechtel Report, suggesting that the initial report was "originally much worse." | $51.22 | -7.83% | 0.41% |

| Date[12] | Corrective Event | Closing Stock Price | Common Stock Price Change | S&P 500 Price Change |
|---|---|---|---|---|
| 9/29/2017 | Credit rating agencies Fitch and Standard & Poor's both downgrade SCANA's credit ratings and place SCANA on negative "watch" lists, indicating that further downgrades might be in store. | $48.49 | -4.90% | 0.37% |
| 10/19/2017 | Gov. McMaster asks SCANA to stop charging customers for Nuclear Project, and to use the $2 billion from Toshiba to repay those customers rather than fund the Nuclear Project. | $48.65 | -0.98% | 0.04% |
| 10/26/17 & 10/27/2017 | Earnings declined to $34 million, driven in large part by a $210 million impairment taken on grounds that "the public, political and regulatory response to the abandonment decision has been extremely contentious." | $46.50 | -2.78% | 0.81% |
| 10/31/2017 | Defendants Marsh and Byrne resign, after news of their ouster. | $43.14 | -6.03% | 0.10% |
| 12/20/2017 (12/21/2017) | The PSC denies request to dismiss rate relief suit; Morgan Stanley report on 12/21 writes that petitioner success in any of the pending cases before PSC would dramatically reduce SCANA value. | $37.39 | -9.51% | 0.20% |

432.    The timing and magnitude of the price declines in SCANA's common stock negate any inference that the losses suffered by Lead Plaintiffs and the other Class members were caused by changed market conditions, macroeconomic or industry factors or Company-specific facts unrelated to Defendants' fraudulent conduct.  Indeed, analyst commentary after each corrective disclosure and/or materialization of the risk event attributed the large negative reaction in the stock specifically to the alleged disclosures.  See Section V, *supra*.

- 175 -

433.    Accordingly, as a result of their purchases of SCANA's publicly traded SCANA securities, during the Class Period, Plaintiffs and other members of the Class suffered economic loss and damages.

## IX.    **THE INAPPLICABILITY OF THE STATUTORY SAFE HARBOR**

434.    The statutory safe harbor applicable to forward-looking statements under certain circumstances does not apply to any of the false or misleading statements pleaded in this Complaint. The statements complained of herein were historical statements or statements of current facts and conditions at the time the statements were made.  For example, many of the statements relate to the current or historical status of the Nuclear Project, including that the project is progressing well or that prior challenges have been resolved.  To the extent that any of these statements might be construed to touch on future intent, they are mixed statements of present facts and future intent and are not entitled to safe harbor protection with respect to the part of the statement that refers to the present.  Further, to the extent that any of the false or misleading statements alleged herein can be construed as forward-looking, the statements were not accompanied by any meaningful cautionary language identifying important facts that could cause actual results to differ materially from those in the statements.

435.    Alternatively, to the extent the statutory safe harbor otherwise would apply to any forward-looking statements pleaded herein, the Individual Defendants are liable for those false and misleading forward-looking statements because at the time each of those statements was made, the speakers knew the statement was false or misleading, or the statement was authorized or approved by an executive officer of SCANA who knew that the statement was materially false or misleading when made.

## X.     **THE PRESUMPTION OF RELIANCE**

436.     Lead Plaintiffs are entitled to a presumption of reliance under *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), because the claims asserted herein against Defendants are predicated upon omission of material fact that there was a duty to disclose.

437.     Lead Plaintiffs are also entitled to a presumption of reliance on Defendants' material misrepresentations and omissions pursuant to the fraud-on-the-market doctrine because, during the Class Period:

> (a)     SCANA's common stock was actively traded in an efficient market on the New York Stock Exchange, a highly efficient and liquid market;
>
> (b)     SCANA's common stock traded at high weekly volumes;
>
> (c)     As a regulated issuer, SCANA filed periodic public reports with the SEC;
>
> (d)     SCANA was eligible to file registration statements with the SEC on Form S-3;
>
> (e)     SCANA regularly communicated with public investors by means of established market communication mechanisms, including through regular dissemination of press releases on the major news wire services and through other wide-ranging public disclosures, such as communications with the financial press, securities analysts and other similar reporting services;
>
> (f)     The market reacted promptly to public information disseminated by SCANA;
>
> (g)     SCANA securities were covered by numerous securities analysts employed by major brokerage firms who wrote reports that were distributed to the sales force and certain customers of their respective firms. Each of these reports was publicly available and entered the public marketplace;
>
> (h)     The material misrepresentations and omissions alleged herein would tend to induce a reasonable investor to misjudge the value of SCANA securities; and
>
> (i)     Without knowledge of the misrepresented or omitted material facts alleged herein, Lead Plaintiff and other members of the Class purchased or

acquired SCANA securities between the time Defendants misrepresented or failed to disclose material facts and the time the true facts were disclosed.

438.     Accordingly, Lead Plaintiffs and other members of the Class relied, and are entitled to have relied, upon the integrity of the market prices for SCANA's securities, and are entitled to a presumption of reliance on Defendants' materially false and misleading statements and omissions during the Class Period.

## XI.     CLASS ACTION ALLEGATIONS

439.     Lead Plaintiffs bring this action as a class action pursuant to Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure on behalf of all persons or entities who purchased or otherwise acquired SCANA publicly traded securities from October 27, 2015 through December 20, 2017, inclusive, and who were damaged thereby. Excluded from the Class are: Defendants; members of the immediate family of any Defendant who is an individual; the officers and directors of SCANA during the Class Period; any firm, trust, corporation, or other entity in which any Defendant has or had a controlling interest; the Company's employee retirement and benefit plan(s) and their participants or beneficiaries, to the extent they made purchases through such plan(s); and the legal representatives, affiliates, heirs, successors-in-interest, or assigns of any such excluded person or entity.

440.     The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, SCANA common stock was actively traded on the NYSE. While the exact number of Class members is unknown to Lead Plaintiffs at this time and can be ascertained only through appropriate discovery, Lead Plaintiffs believes that there are hundreds or thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by SCANA or its transfer agent, and may be

notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

441.    The disposition of the claims in a class action will provide substantial benefits to the parties and the Court. As of October 31, 2017, SCANA had 142,616,254 shares of stock outstanding, which were owned publicly by at least hundreds of persons and entities.

442.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

- Whether the federal securities laws were violated by Defendants' acts as alleged herein;

- Whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business, operations, and management of SCANA;

- Whether the Individual Defendants caused SCANA to issue false and misleading financial statements during the Class Period;

- Whether Defendants acted knowingly or recklessly in issuing false and misleading financial statements;

- Whether the prices of SCANA securities during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and

- Whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

443.    Lead Plaintiffs' claims are typical of the claims of the other members of the Class, as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of the federal law that is complained of herein.

444.    Lead Plaintiffs will adequately protect the interests of the Class and have retained competent counsel experienced in class action securities litigation. Plaintiffs have no interests which conflict with those of the Class.

445.     A class action is superior to other available method for the fair and efficient adjudication of this controversy.

## XII.     CAUSES OF ACTION

### COUNT ONE
### For Violation Of Section 10(b) Of The Exchange Act
### And Rule 10b-5 (Against All Defendants)

446.     Lead Plaintiffs incorporate by reference each and every preceding paragraph as though fully set forth herein.

447.     Lead Plaintiffs assert this Count pursuant to § 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder against Defendant SCANA, the Officer Defendants (Marsh, Addison, and Byrne), and the Director Defendants (Hagood, Roquemore and Stowe).

448.     During the Class Period, Defendants disseminated or approved the false statements set forth above, which they knew or deliberately disregarded were false and misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

449.     Defendants violated 10(b) of the Exchange Act and Rule 10b-5 in that they

(i)     Employed devices, schemes, and artifices to defraud;

(ii)     Made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

(iii)     Engaged in acts, practices, and a course of business that operated as a fraud or deceit upon Plaintiffs and others similarly situated in connection with their purchases of SCANA securities during the class period.

450.    By virtue of their positions at SCANA, as senior executives and/or directors on the Company's Board (including as members of the Board's Nuclear Oversight Committee, as alleged above), Defendants had actual knowledge of the materially false and misleading statements and material omissions alleged herein, and intended thereby to deceive Plaintiff and the other members of the Class, or, in the alternative, Defendants acted with reckless disregard for the truth in that they failed or refused to ascertain and disclose such facts as would reveal the materially false and misleading nature of the statements made, although such facts were readily available to Defendants. Said acts and omissions of Defendants were committed willfully or with reckless disregard for the truth.  In addition, each Defendant knew or recklessly disregarded that material facts were being misrepresented or omitted as described above.

451.    Information showing that Defendants acted knowingly or with reckless disregard for the truth is peculiarly within Defendants' knowledge and control. As the senior executive managers and/or directors of SCANA, the Individual Defendants had knowledge of the details of SCANA's internal affairs. The Individual Defendants are liable both directly and indirectly for the wrongs complained of herein. Because of their positions of control and authority, the Individual Defendants were able to and did, directly or indirectly, control the content of the statements of SCANA.  As officers and/or directors of a publicly-held company, the Individual Defendants had a duty to disseminate timely, accurate, and truthful information with respect to SCANA's businesses, operations, future financial condition, and future prospects. As a result of the dissemination of the aforementioned false and misleading reports, releases, and public statements, the market price of SCANA securities was artificially inflated throughout the Class Period. In ignorance of the adverse facts concerning SCANA's business and financial condition which were concealed by Defendants, Plaintiff and the other members of the Class purchased or

otherwise acquired SCANA securities at artificially inflated prices and relied upon the price of the securities, the integrity of the market for the securities, and/or upon statements disseminated by Defendants, and were damaged thereby.

452.    Lead Plaintiffs and the other members of the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for SCANA securities. Plaintiff and the other members of the Class would not have purchased SCANA securities at the prices they paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by Defendants' misleading statements.

## COUNT TWO
### For Violation Of Section 20(a) Of The Exchange Act
### (Against The Individual Defendants)

453.    Lead Plaintiffs incorporate by reference each and every preceding paragraph as though fully set forth herein.

454.    Lead Plaintiffs assert this Count pursuant to Section 20(a) of the Exchange Act against the Individual Defendants.

455.    The Officer Defendants, by virtue of their executive leadership positions in SCANA, had the power and authority to cause SCANA to engage in the wrongful conduct complained of herein, and to control the contents of SCANA's annual and quarterly reports, press releases and other public statements. They were provided with copies of the Company's reports, press releases and other public statements alleged herein to be misleading prior to or shortly after their issuance, and had the ability or opportunity to prevent their issuance or cause them to be corrected.

456.    The Director Defendants, by virtue of their positions as directors of SCANA, also had the power and authority to cause SCANA to engage in the wrongful conduct complained of herein, and to control the contents of SCANA's annual and quarterly reports and press releases.

Specifically, Defendants Stowe, Roquemore and Hagood, by virtue of their positions as directors of SCANA; Roquemore's and Hagood's membership on the Nuclear Oversight Committee; and Stowe's and Hagood's position as Lead Director, had the power and authority to cause SCANA to engage in the wrongful conduct complained of herein, and to control the contents of SCANA's annual and quarterly reports and press releases. The Director Defendants signed the 2015 and/or 2016 Forms 10-K alleged herein to be misleading prior, and had the ability or opportunity to prevent their issuance or cause them to be corrected.

457.     As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to SCANA's financial condition and results of operations, and to correct promptly any public statements issued by SCANA which had become materially false or misleading.

458.     Because of their positions of control and authority as senior executive officers, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which SCANA disseminated in the marketplace during the Class Period concerning SCANA's results of operations. Each of the Individual Defendants exercised control over the general operations of SCANA, and possessed the power to control the specific activities which comprise the primary violations about which Plaintiffs and other members of the Class complain. The Individual Defendants therefore, were "controlling persons" of SCANA within the meaning of Section 20(a) of the Exchange Act.  In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of SCANA securities.

459.     SCANA violated Section 10(b) and Rule 10b-5 by its acts and omissions as alleged in the Complaint, and as a direct and proximate result of those violations, Plaintiff and

the other members of the Class suffered damages in connection with their purchases of the Company's securities during the Class Period.

460.   By reason of their control of SCANA, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for SCANA's violations of Section 10(b) and Rule 10b-5, to the same extent as SCANA.

## XIII.   PRAYER FOR RELIEF

WHEREFORE, Lead Plaintiffs pray for judgment as follows:

A.   Declaring that this action is a proper class action and certifying Lead Plaintiffs as class representative under Rule 23 of the Federal Rules of Civil Procedure;

B.   Awarding compensatory damages in favor of Lead Plaintiffs and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C.   Awarding Lead Plaintiffs and the other members of the Class their reasonable costs and expenses incurred in this action, including attorneys' fees and expert fees; and

D.   Awarding such other and further relief as the Court may deem just and proper.

## XIV.   JURY TRIAL DEMAND

Lead Plaintiffs hereby demand a trial by jury.

DATED: March 30, 2018

*/s/ Marlon E. Kimpson*
Marlon E. Kimpson (D.S.C. Bar No. 7487)
William S. Norton (D.S.C. Bar No. 11343)
Joshua C. Littlejohn (D.S.C. Bar No. 10426)
**MOTLEY RICE LLC**
28 Bridgeside Blvd.
Mt. Pleasant, South Carolina 29464
Telephone: (843) 216-9000
Facsimile: (843) 216-9450
mkimpson@motleyrice.com
bnorton@motleyrice.com
jlittlejohn@motleyrice.com

*Liaison Counsel for Lead Plaintiff West Virginia IMB and Blue Sky*

John C. Browne *(admitted pro hac vice)*
Jeroen Van Kwawegan *(admitted pro hac vice)*
Lauren Ormsbee *(admitted pro hac vice)*
Michael M. Mathai *(admitted pro hac vice)*
Kate W. Aufses *(admitted pro hac vice)*
**BERNSTEIN LITOWITZ BERGER**
    **& GROSSMANN LLP**
1251 Avenue of the Americas
New York, New York 10020
Telephone: (212) 554-1400
Facsimile: (212) 554-1444
johnb@blbglaw.com
jeroen@blbglaw.com
lauren@blbglaw.com
michael.mathai@blbglaw.com
kate.aufses@blbglaw.com

*Co-Lead Counsel for Lead Plaintiff West*
*Virginia IMB and Blue Sky and Proposed*
*Lead Counsel for the Class*

James W. Johnson *(admitted pro hac vice)*
Michael H. Rogers *(admitted pro hac vice)*
Irina Vasilchenko *(admitted pro hac vice)*
Claiborne Hane *(admitted pro hac vice)*
James Christie *(admitted pro hac vice)*
**LABATON SUCHAROW LLP**
140 Broadway
New York, New York 10005
Telephone: (212) 907-0700
Facsimile: (212) 818-0477
jjohnson@labaton.com
mrogers@labaton.com
ivasilchenko@labaton.com
chane@labaton.com
jchristie@labaton.com

*Co-Lead Counsel for Lead Plaintiff West*
*Virginia IMB and Blue Sky and Proposed*
*Lead Counsel for the Class*

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on March 30, 2018, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will send a Notice of Electronic Filing to all counsel of record.

/s/ Marlon E. Kimpson
MARLON E. KIMPSON (D.S.C. Bar No. 7487)