# Exhibit F

ELECTRONICALLY FILED - 2018 May 23 6:24 PM - SCPSC - Docket # 2017-370-E - Page 1 of 94

**THE PUBLIC SERVICE COMMISSION**

**OF SOUTH CAROLINA**

**DOCKET NOS. 2017-207-E, 2017-305-E, AND 2017-370-E**

| | | |
|---|---|---|
| **IN RE:** | Friends of the Earth and Sierra Club, Complainant/Petitioner v. South Carolina Electric & Gas Company, Defendant/Respondent ) ) ) ) ) | |
| **IN RE:** | Request of the South Carolina Office of Regulatory Staff for Rate Relief to SCE&G Rates Pursuant to S.C. Code Ann. § 58-27-920 ) ) ) ) ) | **EXPEDITED REVIEW** <br><br> **MOTION TO COMPEL DISCOVERY RESPONSES AND PRODUCTION BY SCE&G AND DOMINION** |
| **IN RE:** | Joint Application and Petition of South Carolina Electric & Gas Company and Dominion Energy, Incorporated for Review and Approval of a Proposed Business Combination between SCANA Corporation and Dominion Energy, Incorporated, as May Be Required, and for a Prudency Determination Regarding the Abandonment of the V.C. Summer Units 2 & 3 Project and Associated Customer Benefits and Cost Recovery Plans ) ) ) ) ) ) ) ) ) ) ) | |

The South Carolina Office of Regulatory Staff ("ORS") respectfully moves[1] for an

expedited review and decision by the Public Service Commission of South Carolina

("Commission") for an order compelling South Carolina Electric & Gas Company ("SCE&G")

---

[1] See S.C. Code §§ 58-4-55(A)(2), 58-4-55(A), 58-27-160, 58-27-1570, 58-27-1580 & 58-33-277; S.C. Code Ann. Regs. 103-833 & 103-835; Rules 26, 33, 34 & 37, SCRCP.

ELECTRONICALLY FILED - 2018 May 23 6:24 PM - SCPSC - Docket # 2017-370-E - Page 2 of 94

and Dominion Energy, Inc. ("Dominion") (collectively "Joint Applicants"), to respond fully within fifteen (15) days to all outstanding discovery and investigative requests by ORS and to produce all documents responsive to such requests along with a privilege log for any that are withheld. This requested order is necessary to ensure Joint Applicants' compliance with their discovery obligations in this proceeding where the Joint Applicants seek both approval of the proposed merger and the extraordinary relief of charging ratepayers billions of dollars in abandonment costs, notwithstanding the troubling and questionable circumstances that continue to come to light. Any Commission decision in the above-referenced dockets should be premised on ORS receiving full disclosure—not continued concealment—of all material facts so that ORS can make a fully informed recommendation to the Commission. The information contained in this Motion is based on ORS's information and belief based on documents already collected and reviewed by ORS—too many remain hidden.

ORS has served six sets of discovery requests (the "Discovery Requests") on Joint Applicants in accordance with its statutorily provided investigative authority and as permitted under the Commission's Rules and the South Carolina Rules of Civil Procedure. *See supra* note 1. The first set of discovery requests by ORS was served on Joint Applicants on February 7, 2018, and the sixth set was served on April 11, 2018.[2]

As set forth below, Joint Applicants have failed to comply with the law and their disclosure obligations by providing unresponsive, incomplete, and evasive responses to the requests listed below and by not providing responsive documents or a privilege log. *See* Rule 37(a)(3), SCRCP. ORS provided notice of the deficiencies in the responses to Joint Applicants

---

[2] The numbering of the questions within the Discovery Requests indicate which set it is contained in, for example request 2-5 is in the Second Set of Discovery Requests.

ELECTRONICALLY FILED - 2018 May 23 6:24 PM - SCPSC - Docket # 2017-370-E - Page 3 of 94

pursuant to S.C. Code Ann. § 58-4-55 by letter ("Deficiency Letter") dated May 9, 2018, attached as **Exhibit A,** in an attempt to resolve this dispute and to obtain full and complete discovery responses so that ORS may fulfill its statutory duties. Joint Applicants have failed to supplement their responses as needed and requested. Thus, ORS is forced to file this motion and ask the Commission to order Joint Applicants to respond in full to ORS's Discovery Requests within fifteen (15) days of an issuing order. Copies of the Discovery Requests that have not been sufficiently answered are attached as **Exhibit B**, and copies of Joint Applicants' deficient responses are attached as **Exhibit C**. Joint Applicants' May 16, 2018 response letter to the ORS Deficiency Letter ("Deficiency Response") is attached hereto as **Exhibit D.**

## DISCUSSION

### Deficiencies in Joint Applicants' Responses to ORS's Discovery Requests

ORS seeks to meet its statutory responsibilities on the Joint Application and two other pending petitions comprising the consolidated Dockets[3] and to fully inform the Commission of all relevant facts and circumstances for its ultimate decisions on the petitions and application. For the Commission to be in a position to make an informed decision on Joint Applicant's requested relief, it is imperative that Joint Applicants be forthcoming and responsive in a timely manner to allow the full presentation of evidence and issues to the Commission. Continued concealment by SCE&G, for example of the Bechtel Report and its related documents, should not be permitted.

Below are the most significant deficiencies with Joint Applicants' current responses and production to the Discovery Requests.

---

[3] The Docket numbers are 2017-207-E, 2017-305-E, and 2017-370-E.

ELECTRONICALLY FILED - 2018 May 23 6:24 PM - SCPSC - Docket # 2017-370-E - Page 4 of 94

**Request Nos. 2-5, 6-6, 6-7, 6-8 & 6-9: Joint Applicants' Assertion of Privilege Regarding Bechtel Related Materials**

Foremost among the improperly withheld documents are the Bechtel Report ("the Report"), its drafts, alternative reports, working papers, references, responses, and other related documents, including all communications relating to the assessment and Report.  Contrary to the public and outward representations by SCE&G that the Owners of the Project, SCE&G and Santee Cooper ("the Owners"), hired[4] Bechtel Power Corporation ("Bechtel") for legal claims consultancy, there are substantial circumstances and previously secret communications and documents that show the Owners did not hire Bechtel as part of any legal advice that could possibly protect it as privileged or to perform an assessment in anticipation of litigation against Westinghouse, which would be required for protection by the work product doctrine; and no privilege protects these documents from disclosure. *See, e.g., Tobaccoville USA, Inc. v. McMaster*, 387 S.C. 287, 692 S.E.2d 526 (2010).  Moreover, any claim to privilege under the current circumstances is also undermined by the crime-fraud exception to the privilege.[5]

Even if claims of privilege or protection applied to the Bechtel Report and its related documents at the time they were created, those claims have been waived by subsequent actions and disclosures by the Owners.  Specifically, the privilege and protection for any documents related to the Bechtel Report has been waived by the State of South Carolina, by and through the

---

[4] ORS understands that an Atlanta, Georgia attorney, George D. Wenick of the law firm Smith, Currie & Hancock LLP, executed the Professional Services Agreement with Bechtel on behalf of the Owners, which is the basis for SCE&G's assertion of attorney-client privilege with respect to Bechtel's assessment and Report.

[5] Even if SCE&G could argue Bechtel was retained to assist SCE&G's attorney in providing legal advice, because SCE&G failed to disclose Bechtel's assessment and Report to further SCE&G's fraudulent or criminal conduct, no documents or communications between SCE&G and Bechtel are protected by privilege.  South Carolina courts "widely recognize" [the] rule that [the attorney-client] privilege does not extend to communications in furtherance of criminal [,] tortious or fraudulent conduct." *Ross v. Med. Univ. of S.C.*, 317 S.C. 377, 383–84, 453 S.E.2d 880, 884–85 (1994) (citing *State v. Doster*, 276 S.C. 647, 651, 284 S.E.2d 218, 220 (1981) (internal citations omitted)).

ELECTRONICALLY FILED - 2018 May 23 6:24 PM - SCPSC - Docket # 2017-370-E - Page 5 of 94

Governor and his authority and control over Santee Cooper, after concerns focused on the results of Bechtel's assessment and Report. Santee Cooper is minority owner of the now-abandoned new nuclear development construction of V.C. Summer Units 2 and 3 ("the Project") and was the driving force behind the assessment itself and also one of the clients of the attorney, George Wenick, who on the understanding of ORS executed the Professional Service Agreement with Bechtel on behalf of the Owners. SCE&G also waived any privilege when it disclosed the Report, related documents and communication to others in working towards implementing recommendations from the Report at the construction site. This was not unusual or unexpected at the time because, based on the documents and communications revealed herein, the assessment and Report was intended to make improvement in construction of the Project and not for legal advice or claims consultancy.

In addition, at the hearing on the motions before this Commission on December 12, 2017, SCE&G did not object when the draft and final Bechtel Report was filed with the Commission in Docket No. 2017-305-E.[6] The Joint Applicants should not be permitted to evade disclosure of the related documents, which are unquestionably relevant and now known not to be privileged or protected from disclosure. The Bechtel Report and all documents related to it should be produced by SCE&G to ORS so the Commission can fully evaluate the prudency of abandonment costs during and after the Bechtel assessment and Report. Thus, any claim of privilege cannot be made on the Bechtel Report or any related documents.

In order to establish the privilege, Joint Applicants must show the relationship among the parties to the communications and documents was that of attorney and client and that the communications were confidential in nature and for legal advice. *Crawford v. Henderson*, 356

---

[6] ORS obtained the draft and final Report from non-SCE&G sources.

S.C. 389, 395, 589 S.E.2d 204, 207–08 (Ct. App. 2003) (citing *Marshall v. Marshall*, 282 S.C. 534, 538–39, 320 S.E.2d 44, 47 (Ct. App. 1984)). The privilege is strictly construed to protect only confidences disclosed within the relationship." *State v. Owens*, 309 S.C. 402, 407, 424 S.E.2d 473, 477 (1992). Because its application interferes with "the truth seeking mission of the legal process," *United States v. Tedder*, 801 F.2d 1437, 1441 (4th Cir. 1986), however, the attorney-client privilege is disfavored, *In re Allen*, 106 F.3d at 600 (internal citation omitted); and courts must narrowly construe the privilege and recognize it "only to the very limited extent that ... excluding relevant evidence has a public good transcending the normally predominant principle of utilizing all rational means for ascertaining the truth." *Trammel v. United States*, 445 U.S. 40, 50 (1980).

While the privilege has been applied to outside consultants hired by an attorney to assist in the rendition of legal services, retention by the attorney alone is insufficient to bring the consultant within the scope of the attorney-client privilege. *AVX Corp. v. Horry Land Co.*, No. 4:07-CV-3299-TLW-TER, 2010 WL 4884903, at *7 (D.S.C. Nov. 24, 2010) (citing *United States v. Kovel*, 296 F.2d 918, 921 (2d Cir. 1961) ("Nothing in the policy of the privilege suggests that attorneys, simply by placing accountants, scientists or investigators on their payrolls and maintaining them in their offices, should be able to invest all communications by clients to such persons with a privilege the law has not seen fit to extend when the latter are operating under their own steam.")). Rather, "[c]ommunications with the attorney's agent must meet the same confidentiality and legal purpose requirements that are applicable to all other attorney-client communications that are claimed to be privileged." *AVX Corp.*, 2010 WL 4884903, at *8 (quoting Paul R. Rice, Attorney–Client Privilege in the United States § 3.5 (2d Ed. 2010)). Importantly, "[w]hat is vital to the privilege is that the communication be made in confidence for the purpose

ELECTRONICALLY FILED - 2018 May 23 6:24 PM - SCPSC - Docket # 2017-370-E - Page 6 of 94

ELECTRONICALLY FILED - 2018 May 23 6:24 PM - SCPSC - Docket # 2017-370-E - Page 7 of 94

of obtaining legal advice from the lawyer." *AVX Corp.*, 2010 WL 4884903, at \*8 (citing *United States v. Kovel*, 296 F.2d 918, 922 (2d Cir. 1961)).

In *Kovel*, the court held that "the attorney client privilege can attach to reports of third parties made at the request of the attorney of the client where the purpose of the report was to put in usable form information obtained from the client." *Id.* The *Kovel* court "analogized the role of the accountant to that of a translator who puts the client's information into terms that the attorney can use effectively." *Id.*  The court concluded that the attorney-client privilege applied to communications between the client and an accountant retained by the client's attorney where the communication was in furtherance of providing legal advice by the attorney. *Kovel*, 296 F.2d at 921.  The court was careful to note that if the advice given is that of the accountant, rather than the attorney, no privilege exists. *Id.* at 922.  The Court noted that such a distinction was necessary to prevent the unduly expansion of the privilege. *Id.* at 923.

Thus, the law is well-established that communications between a client and an expert consultant for business purposes, as opposed to legal purposes, are not protected. *In re Grand Jury Subpoena Duces Tecum*, 731 F.2d 1032, 1037–38 (2d Cir. 1984); *see also Venture Inv. Properties Grp., Inc. v. Whaley's Mill, L.P.*, No. CV 3:08-3663-JFA, 2009 WL 10678198, at \*1–2 (D.S.C. June 25, 2009) (The attorney-client privilege is "triggered only by a client's request for legal, as contrasted with business, advice.").

For these Dockets, certain documents have been provided to ORS by Santee Cooper. Governor McMaster directed Santee Cooper to make documents provided to law enforcement and other agencies available to ORS.  With the cooperation of Santee Cooper, ORS is mostly making its assessment based on these documents. In contrast, SCE&G has evaded similar disclosures.

ELECTRONICALLY FILED - 2018 May 23 6:24 PM - SCPSC - Docket # 2017-370-E - Page 8 of 94

The origin of the assessment and Report reveal why it cannot be privileged and is not protected from disclosure.  The relevant documents have been compiled and attached as **Exhibit E** and are identified in the exhibit by the Bates numbering at the bottom right of each page.  They show Santee Cooper initially pushed for a third-party assessment, which became the Bechtel Report and its other versions.  Once the idea of the assessment gained traction with SCE&G, the assessment and related reports were run through an "attorney-directed vehicle", not for the Owners and any potential claims they may have had, but at the request and for the protection of Westinghouse – an entity which at that very point in time was in litigation with the owners of Vogtle.[7]  It appears that Westinghouse was sensitive that the Bechtel assessment could be used against it by the Vogtle owners in their separate litigation over a separate nuclear project.  Thus, in return for cooperating with a third-party assessment, Westinghouse's sensitivity caused a "privileged and non-discoverable attorney-directed vehicle" to protect against disclosure. (Document 00171547)

This attorney-directed vehicle to hide the Report was attorney George Wenick signing the Professional Services Agreement with Bechtel on behalf of the Owners instead of the Owners who hired Bechtel.  Based on ORS's review of documents, Santee Cooper was most interested in getting the Project on a better course and indifferent to whether the attorney-directed vehicle was used.  Litigation against Westinghouse individually or the Consortium (which included Westinghouse) was not a path SCE&G or Santee Cooper wanted to pursue.  (*See* Documents 00178517 and 00178518)

---

[7] But for the production of these documents by Santee Cooper neither ORS nor this Commission would know what happened because of the information in Exhibit E.

ELECTRONICALLY FILED - 2018 May 23 6:24 PM - SCPSC - Docket # 2017-370-E - Page 9 of 94

In the earlier-referenced Document 00171547 titled "Message from Santee Cooper CEO," the first three bullet points clarify the Consortium desired protection from disclosure of the Report: The first bullet point said the "assessment is not…and has never been…intended to position the Owners for litigation ..." In the second bullet point, Attorney George Wenick's legal approach to getting the matters related to the purchase order completed between Bechtel and the Consortium was "to protect Consortium from the Southern project."[8]  If that was not clear enough, then bullet number 3 states:

> "We understand the Consortium's sensitivity regarding Southern … and are fine
>
> with developing an Assessment Work Product protected by a privileged and non-
>
> discoverable attorney-directed vehicle."[9]

Further, in the third paragraph of Document 00079115 dated February 5, 2015, a Bechtel employee states that Bechtel's assessment specifically "will not review the attribution of past impacts or validity of any pending or future claims." This assertion is reiterated again in a document dated July 13, 2015 in which the same Bechtel employee states that the assessment is "[n]ot claims consultancy". (Document 00024735)

Bechtel precisely defined the scope of its assessment in a document dated July 9, 2015.[10] (Documents 00073656-73658) On August 24 and 25, 2015, emails show that Santee Cooper and Bechtel carefully approached SCE&G about Bechtel in an effort to secure Bechtel's role moving

---

[8] The "Southern project" is nuclear construction Westinghouse was contracted to provide near Waynesboro, Georgia to a group of Georgia owners with the Southern Company as the majority owner.  The Georgia and South Carolina projects were similar.

[9] Southern, unlike SCANA, did sue Westinghouse and at that very moment–in October 2015–was in the process of settling its claims against Westinghouse.

[10] On July 21-22, 2015, the Commission heard testimony related to SCE&G's request for an order modifying the cost and construction schedules. Based on the evidence presented, the cost schedule was increased $698 million and completion dates for Units 2 and 3 were delayed to June 19, 2019 and June 16, 2020 respectfully. No mention was made of the Bechtel Report or any plan for a comprehensive third-party assessment.

forward as the EPC-defined "Owner's Engineer." (Documents 00079167-00079169) As we now know, once Bechtel was critical of SCE&G's management of the Project and provided Bechtel's assessment of the realistic completion dates, those dates and that assessment of the realistic schedule were scrubbed from the final Report. Any potential SCE&G lawsuit against Westinghouse would seemingly hinge on how Westinghouse had misled SCE&G about the timeline of the project, and yet that is the precise information left out of the final Bechtel Report.

ORS strongly believes that these documents demonstrate Bechtel's assessment and Report was not for any legal purpose or for a potential SCE&G lawsuit against Westinghouse. Thus, the Joint Applicants cannot satisfy their burden of proof on SCE&G's claim of privilege over documents and communications related to the Bechtel Report.

Notwithstanding this clear record, in 2017 testimony before the House Utility Ratepayer Protection Committee and the Senate V.C. Summer Nuclear Project Review Committee hearings, SCANA executives repeatedly stated under oath that the Bechtel Report was prepared in anticipation of litigation against Westinghouse or CB&I. **Exhibits F, G and H.**[11] That testimony does not appear to be true.

ORS respectfully submits there is sufficient evidence in **Exhibit E** to show that the Owners hired Bechtel to complete a third-party assessment of the Project for business purposes and without any intent of litigation against Westinghouse or others in the Consortium building the Project.    Instead, the cloak of confidentiality was designed and attempted to protect

---

[11] Exhibit F link: https://www.scana.com/docs/librariesprovider15/pdfs/presentations-and-transcripts/schouseutilityratepayerprotectioncommittee091517.pdf
Exhibit G video link: https://www.scstatehouse.gov/video/archives.php
Exhibit H link:
https://www.scstatehouse.gov/citizensinterestpage/VCSummerNuclearProjectReviewComm/Transcript%209_18.pdf

ELECTRONICALLY FILED - 2018 May 23 6:24 PM - SCPSC - Docket # 2017-370-E - Page 10 of 94

ELECTRONICALLY FILED - 2018 May 23 6:24 PM - SCPSC - Docket # 2017-370-E - Page 11 of 94

Westinghouse and the Consortium from lawsuits related to the Southern Project and to ensure the Consortium's cooperation with the assessment. Thus, no privilege applies to the Bechtel Report or any related documents and communications that have been identified by a proper privilege or protection.

If desired by the Commission, ORS offers to further brief the law related to this issue and present the law and facts at the earliest opportunity for oral argument before the full Commission.

**Request No. 5-25.**

Joint Applicants have also failed to respond to other requests of great relevance and importance to the Commission's decisions on the Joint Application and other petitions. Request 5-25 asks for the production of all documents provided to the various state and federal agencies and officials conducting criminal and regulatory investigations during the past two years into acts and omissions on the Project by SCE&G and others working on the Project. These agencies and officials include the U.S. Department of Justice, the Federal Bureau of Investigation, the Securities and Exchange Commission, South Carolina Law Enforcement Division, the Office of the Attorney General for the State of South Carolina, and the South Carolina Department of Labor, Licensing and Regulation. The investigations of those agencies and law enforcement officials into potentially illegal acts on the Project, and particularly the information and documents provided in these investigations, is directly related to the Commission's prudency determinations and the Commission's decision on whether to allow SCE&G or its successor to burden ratepayers with the Project's abandonment costs in that any illegal acts and costs incurred would impact this decision. In addition, the existence and timing of investigations and the requests and production of information and documents by SCE&G in those investigations is

directly relevant to the determination on abandonment costs that the Commission is being asked to make and enforce on ratepayers in South Carolina.

Joint Applicants responded to this request by asserting generic, boilerplate objections of overbreadth, undue burden, irrelevance, duplicity, and harassment without specifically identifying why it should not have to simply copy what has already been compiled and produced to these agencies and officials. *See, e.g.*, *Curtis v. Time Warner Ent.–Advance/Newhouse P'ship*, 2013 WL 2099496 (D.S.C. May 14, 2013) ("The parties shall not make nonspecific, boilerplate objections."). While Joint Applicants attempt to argue that documents responsive to this request are too burdensome to produce, these documents have already been collected and, based on information and belief, can be easily reproduced because they have already been compiled and produced at least once.

In response to ORS's Deficiency Letter, SCE&G reiterated that these documents are irrelevant to the matters pending before the Commission and referenced the circuit court's decision[12] on the plaintiff's motion to compel in *Cleckley v. SCE&G*. The Court's decision that documents simply provided to others does not automatically make the documents relevant. The circuit court's decision is inapplicable to the Commission and the requests by ORS. Any evidence of wrongdoing or illegal acts committed by SCE&G goes directly to the determination of prudency, which is the very crux of the matter before the Commission. SCE&G acknowledged in its original discovery response that it would provide "non-privileged documents only to the extent that they are relevant." That response was received March 19, 2018, yet ORS has not received any documents responsive to Request 5.25. Relying on SCE&G's words that these

---

[12] Order submitted May 22, 2018, in *Cleckley v. SCE&G*, 2017-CP-40-04833 (now consolidated with *Lightsey v. SCE&G et al.*, Case No. 2017-CP-25-335).

ELECTRONICALLY FILED - 2018 May 23 6:24 PM - SCPSC - Docket # 2017-370-E - Page 12 of 94

ELECTRONICALLY FILED - 2018 May 23 6:24 PM - SCPSC - Docket # 2017-370-E - Page 13 of 94

documents will be provided has not been fruitful, and thus ORS and the Commission need to order the production within fifteen (15) days of the Commission's order.

Joint Applicants should be ordered to provide duplicate copies in the same format as they have already provided to requests from other state and federal agencies and officials.

**Requests Nos. 4-27, 4-69, 5-26, 6-16, 6-30.**

With regard to Joint Applicants' objection based on privilege and unilaterally withholding documents based on the attorney-client privilege or work product doctrine, Joint Applicants are required to produce a privilege log in order to carry its burden of showing the documents withheld are privileged and allowing a meaningful review of those claims of privilege. *See, e.g., supra, Curtis v. Time Warner.*

Joint Applicants have not provided ORS with a privilege log in response to Requests numbered 4-27, 4-69, 5-26, 6-16, and 6-30. Thus, neither ORS nor the Commission can determine if Joint Applicants' objections and withholding of documents based on assertions of privilege are substantiated. Joint Applicants state in their Deficiency Response that they will provide a privilege log "as soon as practicable." This information is needed immediately so that ORS can thoroughly prepare its case.

**Requests Nos. 3-24, 3-25, and 3-26.**

For these responses, Joint Applicants initially asserted improper generic, boilerplate objections regarding relevancy and refused to provide information or produce any responsive documents. *See, supra, Curtis v. Time Warner.* In their Deficiency Response, Joint Applicants provided slightly more justification for their objection to these requests, namely that the

ELECTRONICALLY FILED - 2018 May 23 6:24 PM - SCPSC - Docket # 2017-370-E - Page 14 of 94

information sought "has no bearing on any issue pending before the PSC." ORS disagrees with the objections.

These requests call for information and the production of documents relevant to claims in this proceeding. For example, Request No. 3-25 asks for information regarding how SCE&G verified that Westinghouse was following S.C. Code § 40-22-270, which requires plans and specifications to be prepared by a licensee or prepared under a licensee's direct supervision and stamped with seals when issued for use as job site record documents at South Carolina construction projects. SCE&G objected to this request stating it was not relevant to the claims and defenses or the subject matter involved in the dockets and provided no specific further explanation. This information is directly relevant to SCE&G's compliance with applicable law in constructing the Project and thus the prudency determination regarding the abandonment costs of the Project. If SCE&G verified compliance, then the Commission should know how it was verified; and if the answer is that SCE&G did not verify compliance with the law, then that is certainly relevant to its claim for the abandonment costs of the Project.

Likewise, in Request No. 3-26, ORS asked Joint Applicants to provide any documents regarding the use of engineers on the Project that were not licensed to work in South Carolina and whether a legal position, opinion, or justification was provided on the issue. Again, SCE&G made a generic, boilerplate objection on relevancy that ignores the obvious consequences of not complying with State law in constructing the Project. Further, the use of unlicensed engineers goes to the issue of prudency. These responses are evasive and incomplete and thus a failure to respond.

Joint Applicants should be required to provide all information and documents responsive to Requests numbered 3-24, 3-25, and 3-26.

ELECTRONICALLY FILED - 2018 May 23 6:24 PM - SCPSC - Docket # 2017-370-E - Page 15 of 94

**Request Nos. 1-22, 1-23, 1-29, 1-44, 1-45, 1-147, 2-3, 2-7, 4-26, 4-27, 4-69, 4-43,[13] 4-44, 4-66, 4-72, 4-73, 4-74, 6-10, 6-11, 6-12, 6-13, 6-25, and 6-31.**

Each of these requests also calls for information and the production of documents relevant to claims in this proceeding. In response, Joint Applicants asserted generic, boilerplate objections regarding confidentiality and refused to provide information or produce responsive documents and/or complete copies of responsive documents. Examples of documents and information sought, but objected to, include the following:

- Request No. 1-22: a copy of SCANA Minutes of the Board of Directors Meeting for each meeting held from January 1, 2015 through December 31, 2017;

- Request No. 1-23: three copies of the internal auditor's Report Summaries for the twelve months ending September 30, 2017;

- Request 2-3: draft and final documents created between September 2015 to March 31, 2016 that reference Flour's 2016 Estimated-to-Complete Assessment;

- Request 2-7: a description of the work done by AECOM, written work product produced or caused to be produced by AECOM, and the amount paid by date to AECOM or the entity that charged for AECOM's work;

- Request No. 4-44: a copy of all bond rating agency reports that address the proposed transaction; and

---

[13] SCE&G is alleging that a contract with a third party prevents disclosure. To the extent a third party has an expectation of nondisclosure, even under the Master Confidentiality Agreement, that third party can raise its objection to the Commission.

ELECTRONICALLY FILED - 2018 May 23 6:24 PM - SCPSC - Docket # 2017-370-E - Page 16 of 94

- Request 4-69: a copy of all analyses performed by or for SCE&G that assessed the monetization and/or the economics of the monetization of the Toshiba payment.

S.C. Code Ann. §58-4-55 requires that ORS is provided access to information upon request and does not require the execution of any confidentiality agreement prior to such access. SCE&G, to the extent it objected to such production and it is related to a contested case, is required to bring its objections to the Commission. In response to some of these requests, SCE&G refused to provide what it deems confidential information unless and until a confidentiality agreement is executed. ORS and SCE&G have operated under a Master Confidentiality Agreement since 2009 for the Project, and no additional protection is needed now that the Project has been abandoned and SCE&G is asking the Commission to impose significant abandonment costs on the ratepayers. In other responses, SCE&G merely states the information is confidential and claims that the information will be made available to ORS only for inspection at SCE&G's headquarters. S.C. Code Ann. §§ 58-27-1570 and 58-4-55 contemplate that the materials can be made available at such place as ORS designates. Again, SCE&G is providing incomplete and evasive responses to avoid an inspection or examination of information that is directly relevant to this case.

Joint Applicants should be ordered to provide full and complete responses and production for these requests.

## CONCLUSION

ORS respectfully requests an order compelling the Joint Applicants to respond in full to all outstanding discovery requests by ORS, including the complete production to the ORS offices of all documents responsive to the requests, with a privilege log and without further objection within fifteen (15) days of the Commission's order.

ELECTRONICALLY FILED - 2018 May 23 6:24 PM - SCPSC - Docket # 2017-370-E - Page 17 of 94

Despite ORS's letter regarding the deficiencies, Joint Applicants have yet to respond in full and provide responsive documents and other records as specifically requested. Thus, this motion is necessary to ensure Joint Applicants' compliance with discovery obligations in seeking approval of the merger and the extraordinary relief of billions in abandonment costs.

With respect to the Joint Applicants' assertion of privilege or protection for the Bechtel Report and related documents and communications, ORS respectfully asserts that the Joint Applicants cannot meet their burden of proof to claim any privilege or protection because these documents were not privileged or protected from creation or purpose and, in any event, all privilege and protection was waived or excepted for these documents.[14]  Therefore, the Commission should order their full and complete disclosure within fifteen (15) days of its order that no privilege or protection applies.

[Signature block on following page]

---

[14] At the Commission's request, ORS offers to further brief this matter, if necessary, and would ask for oral argument before the full Commission.

ELECTRONICALLY FILED - 2018 May 23 6:24 PM - SCPSC - Docket # 2017-370-E - Page 18 of 94

Respectfully submitted,

s/Matthew Richardson
Matthew T. Richardson, Esquire
Wallace K. Lightsey, Esquire
Camden N. Massingill, Esquire
WYCHE, PA
801 Gervais Street, Suite B
Columbia, South Carolina 29201
Phone:  (803) 254-6542
Fax:      (803) 254-6544
Email: mrichardson@wyche.com,
wlightsey@wyche.com,
cmassingill@wyche.com

&

Nanette Edwards, Esquire
Jeffrey M. Nelson, Esquire
Shannon Bowyer Hudson, Esquire
Jenny R. Pittman, Esquire
OFFICE OF THE REGULATORY STAFF
1401 Main Street, Suite 900
Columbia, South Carolina 29201
Phone: (803) 737-0889/0823/0794
Fax:      (803) 737-0801
Email: nedwards@regstaff.sc.gov,
jnelson@regstaff.sc.gov,
shudson@regstaff.sc.gov,
jpittman@regstaff.sc.gov

**Attorneys for the South Carolina Office of Regulatory Staff**

May 23, 2018

EXHIBIT "A"



ELECTRONICALLY FILED - 2018 May 23 6:24 PM - SCPSC - Docket # 2017-370-E - Page 19 of 94

jpittman@regstaff.sc.gov

*Jenny R. Pittman*
*Counsel for ORS*

May 9, 2017

K. Chad Burgess, Esquire
SCANA Corp.
220 Operation Way MC-C222
Cayce, SC 29033-3701

Re:    Discovery Responses
       **Docket Nos. 2017-207-E, 2017-305-E, and 2017-370-E**

Dear Chad:

After reviewing the discovery that South Carolina Electric & Gas Company and Dominion Energy, Incorporated have provided in response to the South Carolina Office of Regulatory Staff Audit Information Requests issued pursuant to S.C. Code Ann. §§ 58-4-50(A)(2), 58-4-55(A), 58-27-160, 58-27-1570, 58-27-1580, and 58-33-277, many responses do not appear to comply in good faith with the above referenced statutory provisions. Numerous responses are nonresponsive; several are merely labeled as confidential without sufficient explanation as to why they are confidential; and a few are marked as attorney-client privileged without including a privilege log detailing the nature of what SCE&G/Dominion alleges is privileged. Based on information and belief, Bechtel Corporation was not hired for claims consultancy, therefore the assertion of attorney-client privilege with respect to Bechtel being hired in preparation of litigation does not appear to apply.

Please see the attachment containing the original requests and the corresponding responses we deem insufficient; we ask that you provide updated responses within seven (7) days. The attached list is subject to supplement as we continue to identify further missing and deficient information.

EXHIBIT "A"

Letter – K. Chad Burgess
May 9, 2018
Page 2 of 2

Per S.C. Code Ann. § 58-4-55(A), if the information provided does not appear to disclose full and accurate information, and if such deficiencies are not cured after reasonable notice, ORS may require the testimony under oath of the officers or other agents having knowledge of the requested information.

Sincerely,

Jenny R. Pittman

Encl.

ELECTRONICALLY FILED - 2018 May 23 6:24 PM - SCPSC - Docket # 2017-370-E - Page 20 of 94

ELECTRONICALLY FILED - 2018 May 23 6:24 PM - SCPSC - Docket # 2017-370-E - Page 21 of 94

EXHIBIT "A"

## ORS List of Deficient Discovery Responses

| Request Number | ORS Request |
|---|---|
| 1-20: Changes to Joint Application | The response is inadequate as no reasons for the changes were provided. Pursuant to § 58-27-1570, please provide the information as requested to the offices of ORS. |
| 1-22: SCANA Board Minutes | Pursuant to § 58-27-1570, please provide the information as requested to the offices of ORS. If asserting confidentiality, please state with specificity why this information is confidential. |
| 1-23: Auditor's Report Summaries | Pursuant to § 58-27-1570, please provide the information as requested to the offices of ORS. If asserting confidentiality, please state with specificity why this information is confidential. |
| 1-29: Construction & Acquisition Budget | Pursuant to § 58-27-1570, please provide the information as requested to the offices of ORS. If asserting confidentiality, please state with specificity why this information is confidential. |
| 1-44: Officer Compensation | Pursuant to § 58-27-1570, please provide the information as requested to the offices of ORS. If asserting confidentiality, please state with specificity why this information is confidential. |
| 1-45: Officer Compensation | Pursuant to § 58-27-1570, please provide the information as requested to the offices of ORS. If asserting confidentiality, please state with specificity why this information is confidential. |
| 1-119: Tax Cuts and Jobs Act 1.5% Bill Credit | The response is inadequate as no calculations or work papers were provided as requested. Pursuant to § 58-27-1570, please provide the information as requested to the offices of ORS. |
| 1-147: Joint Application Exhibit 12 | Pursuant to § 58-27-1570, please provide the information as requested to the offices of ORS. If asserting confidentiality, please state with specificity why this information is confidential. |
| 1-174: Tax Law Reduction Changed from 1.5% | The response is inadequate as no update has been provided. Pursuant to § 58-27-1570, please provide an updated reduction, along with calculations and work papers, to the offices of ORS. |
| 2-3: Fluor's 2016 Est-to-Comp | Pursuant to § 58-27-1570, please provide the information as requested to the offices of ORS. If asserting confidentiality, please state with specificity why this information is confidential. |

EXHIBIT "A"

ELECTRONICALLY FILED - 2018 May 23 6:24 PM - SCPSC - Docket # 2017-370-E - Page 22 of 94

| | |
|---|---|
| 2-5: Bechtel Meeting Notes 10/22/2015 | Please state with specificity why privilege applies and provide a privilege log. |
| 2-7: AECOM Work | Pursuant to § 58-27-1570, please provide the information as requested to the offices of ORS. If asserting confidentiality, please state with specificity why this information is confidential. |
| 3-8: Estimate of CAPEX Projects | The response is inadequate as it failed to address the type and amount of CAPEX projects planned for 2018-2021. Pursuant to § 58-27-1570, please provide the information as requested to the offices of ORS. |
| 3-24: Requirements for Approval by PE | The response is inadequate as there are claims that unlicensed engineers worked at this site, which relates to the issue of imprudence. Pursuant to § 58-27-1570, please provide the information as requested to the offices of ORS. |
| 3-25: § 44-22-270 re: Westinghouse | The response is inadequate as there are claims that unlicensed engineers worked at this site, which relates to the issue of imprudence. Pursuant to § 58-27-1570, please provide the information as requested to the offices of ORS. |
| 3-26: Use of Non-SC Licensed Engineers | The response is inadequate as there are claims that unlicensed engineers worked at this site, which relates to the issue of imprudence. Pursuant to § 58-27-1570, please provide the information as requested to the offices of ORS. |
| 4-25: Studies, Analyses, Presentations made to Dominion Board | Please state with specificity why privilege applies and provide a privilege log. Please state with specificity why this information is confidential and only available at HQ, not in the E-Room. |
| 4-26: Studies, Analyses, Presentations made to SCANA Board | Please state with specificity why privilege applies and provide a privilege log. Please state with specificity why this information is confidential and only available at HQ, not in the E-Room. |
| 4-27: Studies, Analyses, Presentations made to SCE&G Board | Please state with specificity why privilege applies and provide a privilege log. Please state with specificity why this information is confidential and only available at HQ, not in the E-Room. |
| 4-43: Securities Analysts' Reports | Pursuant to § 58-27-1570, please provide the information as requested to the offices of ORS. If asserting confidentiality, please state with specificity why this information is confidential. |
| 4-44: Bond Rating Agency Reports | Pursuant to § 58-27-1570, please provide the information as requested to the offices of ORS. If asserting confidentiality, please state with specificity why this information is confidential. |

EXHIBIT "A"

ELECTRONICALLY FILED - 2018 May 23 6:24 PM - SCPSC - Docket # 2017-370-E - Page 23 of 94

| | |
|---|---|
| 4-66: SCE&G Accounting Entries | Pursuant to § 58-27-1570, please provide the information as requested to the offices of ORS. If asserting confidentiality, please state with specificity why this information is confidential. |
| 4-69: Toshiba Payment Analyses | Please state with specificity why privilege applies and provide a privilege log. Please state with specificity why this information is confidential and only available at HQ, not in the E-Room. |
| 4-72: SCE&G Corporate Financial Model | Pursuant to § 58-27-1570, please provide the information as requested to the offices of ORS. If asserting confidentiality, please state with specificity why this information is confidential. |
| 4-73: SCE&G Corporate Financial Model Used as Base Case to Assess Merger | Pursuant to § 58-27-1570, please provide the information as requested to the offices of ORS. If asserting confidentiality, please state with specificity why this information is confidential. |
| 4-74: SCE&G Corporate Financial Model re: Customer Benefits Plan, No Benefits Plan, Base Request, etc. | Pursuant to § 58-27-1570, please provide the information as requested to the offices of ORS. If asserting confidentiality, please state with specificity why this information is confidential. |
| 4-76: Income Tax Expenses | The response is inadequate as the total income tax expense included in present rates was not provided, only the income tax expenses related to the equity return on BLRA costs were provided. Pursuant to § 58-27-1570, please provide the information as requested to the offices of ORS. |
| 4-82: Dominion's Calculations of Estimated SCE&G Income Tax Expense Savings | The response is inadequate as it refers back to previously addressed incomplete responses. Additionally, no calculations or work papers were provided as requested. Pursuant to § 58-27-1570, please provide the information as requested to the offices of ORS. |
| 4-83: Magnitude for 1.5% Base Rate Reduction for Income Tax Savings | The response is inadequate as it refers back to previously addressed incomplete responses. Additionally, no calculations or work papers were provided as requested. Pursuant to § 58-27-1570, please provide the information as requested to the offices of ORS. |
| 5-25: Documents Provided to DOJ, FBI, SEC, SLED, SC AG, and SC LLR | These documents are relevant as they concern the withholding of information as to the progress of the project, the proposed completion dates, and the motives as to why this information was not disclosed. Pursuant to § 58-27-1570, please provide the information as requested to the offices of ORS. |
| 5-26: Pre-Abandonment Analyses and Case Studies | Please state with specificity why privilege applies and provide a privilege log. |

EXHIBIT "A"

ELECTRONICALLY FILED - 2018 May 23 6:24 PM - SCPSC - Docket # 2017-370-E - Page 24 of 94

| | |
|---|---|
| 6-6: Documents Containing "Bechtel" and "Kevin Marsh" and "Kevin Marsh" and "Project Manager" | Please state with specificity why privilege applies and provide a privilege log. |
| 6-7: Documents re: Removal of Project Completion Dates | Please state with specificity why privilege applies and provide a privilege log. |
| 6-8: Documents re: Hiring George Wenick | Please state with specificity why privilege applies and provide a privilege log. |
| 6-9: Documents re: Release of Bechtel Report | Please state with specificity why privilege applies and provide a privilege log. |
| 6-10: Supplementary Key Executive Severance Benefits Plan | Pursuant to § 58-27-1570, please provide the information as requested to the offices of ORS. If asserting confidentiality, please state with specificity why this information is confidential. |
| 6-11: Employees' Bonus Incentive for 2018 | Pursuant to § 58-27-1570, please provide the information as requested to the offices of ORS. If asserting confidentiality, please state with specificity why this information is confidential. |
| 6-12: Employee Raises | Pursuant to § 58-27-1570, please provide the information as requested to the offices of ORS. If asserting confidentiality, please state with specificity why this information is confidential. |
| 6-13: Employee Monetary Benefits | Pursuant to § 58-27-1570, please provide the information as requested to the offices of ORS. If asserting confidentiality, please state with specificity why this information is confidential. |
| 6-16: WEC/CB&I Emails | Please state with specificity why privilege applies and provide a privilege log. |
| 6-25: 540-MW Combined Cycle Gas Generating Station Purchase Agreement | Pursuant to § 58-27-1570, please provide the information as requested to the offices of ORS. If asserting confidentiality, please state with specificity why this information is confidential. |
| 6-30: Documents re: Carrying Values for Units 2 & 3 | Please state with specificity why privilege applies and provide a privilege log. |
| 6-31: Retail Allocation Factor for Recoverable NND Costs | Pursuant to § 58-27-1570, please provide the information as requested to the offices of ORS. If asserting confidentiality, please state with specificity why this information is confidential. |

ELECTRONICALLY FILED - 2018 May 23 6:24 PM - SCPSC - Docket # 2017-370-E - Page 25 of 94

**EXHIBIT "B"**

**<u>Outstanding ORS Requests</u>**

1-22    Please provide a copy of the SCANA Minutes of the Board of Directors Meetings for each meeting held from January 1, 2015 through December 31, 2017.

1-23    Please provide THREE (3) copies of the internal auditor's Report Summaries for the twelve-months ending September 30, 2017.

1-29    Please provide the proposed construction and acquisition budget by major function (generation, transmission, etc.) for the electric operations of SCE&G for the next ten (10) years. Please include:

   a.    Dollar amount by year;
   b.    Total generating capacity by year;
   c.    Summer Peak Load;
   d.    Summer Reserve Margin;
   e.    Winter Peak Load; and
   f.    Winter Reserve Margin.

1-44    Please provide a comparative analysis of annual compensation of each officer charged to SCE&G for 2014, 2015, 2016, and the twelve-months ending September 30, 2017, including the Officer's name, title, salary (including bonuses, incentive, fringe benefits, etc., separately) and annual percent (%) increase in total compensation received by the officer. Please include total amounts and amounts (including percentage) allocated to SC Retail.

1-45    Please provide the annual compensation for the twelve-months ending September 30, 2017 for each officer charged to SCE&G. Please include actual and, where necessary, budgeted amounts and specify total amounts and amounts (including percentage) allocated to SC Retail. Please include the Officer's name, title and salary (including bonuses, incentive, fringe benefits, etc., separately).

1-147    Please provide all documents and calculations, in working Excel spreadsheets with all formulas intact, supporting all rates and charges in Exhibit 12 to the Joint Application. These supporting documents should be in the same format provided to ORS in previous Revised Rates Proceedings and should include, but not be limited to:

   a.    Application Revenue Proof;
   b.    Test Year Proofs;
   c.    Rate Class Summary; and,
   d.    Revenue Ratios.

2-3    Provide draft and final documents created between September 2015 to March 31, 2016 that reference Flour's 2016 Estimated-to-Complete Assessment.

ELECTRONICALLY FILED - 2018 May 23 6:24 PM - SCPSC - Docket # 2017-370-E - Page 26 of 94

2-5     Provide meeting notes from the October 22, 2015 briefing by Bechtel to the leadership of Santee Cooper and SCANA.

2-7     Describe the work done by AECOM, provide written work product produced or caused to be produced by AECOM, and list by date the amount paid to AECOM or the entity that charged for AECOM's work.

3-24    Please provide the policies, procedures, and documents that set forth the requirements for approval by a Professional Engineer for the V.C. Summer Unit 2 and 3 Projects.

3-25    Please provide information on how SCE&G verified that Westinghouse was following South Carolina Code § 40-22-270 which requires plans and specifications to be prepared by a licensee or prepared under the licensee's direct supervision and stamped with seals when issued for use as job site record documents at construction projects within this State.

3-26    Please provide the any memorandum, documents or opinions regarding the use of non-South Carolina licensed engineers at the V.C. Summer Unit 2 and 3 Project.  If a legal position was not provided by Westinghouse, identify if SCE&G requested a legal position from Westinghouse and the date SCE&G made the request.

4-26    Provide a copy of all studies, analyses, or presentations made to the SCANA Board of Directors in regards to the proposed merger.

4-27    Provide a copy of all studies, analyses, or presentations made to the SCE&G Board of Directors in regards to the proposed merger.

4-43    Provide a copy of all securities analysts reports that address the proposed transaction.

4-44    Provide a copy of all bond rating agency reports that address the proposed transaction.

4-66    Provide the SCE&G accounting entries for the impairment losses recorded in September 2017 and December 2017, including the related income tax effects, along with all calculations, including workpapers and electronic spreadsheets in live format with all formulas intact.  For each of the impairment losses, separate the losses into directs and AFUDC.

4-69    Provide a copy of all analyses performed by or for SCE&G that assessed the monetization and/or the economics of the monetization of the Toshiba payment.

4-72    Provide a copy of the most recent SCE&G corporate financial model in live format, including all data, assumptions, and standard reports.

4-73    Provide a copy of the SCE&G corporate financial model in live format used as a base case to assess the effects of the proposed merger on SCE&G's financial statements.

ELECTRONICALLY FILED - 2018 May 23 6:24 PM - SCPSC - Docket # 2017-370-E - Page 27 of 94

4-74    Provide a copy of the SCE&G corporate financial model scenarios used to assess the customer benefits plan, no benefits plan, base request, and each other ratemaking alternative considered by SCE&G and/or Dominion.

5-25.    Please provide all documents provided to the United States Department of Justice, Federal Bureau of Investigation, Securities and Exchange Commission ("SEC"), South Carolina Law Enforcement Division, Office of the Attorney General for the State of South Carolina, and the South Carolina Department of Labor, Licensing and Regulation during 2017 and 2018 as a result of those entities' investigations into matters arising out of the NND project.  Provide the documents in the same format as provided to the entities.  SEC filings located on its EDGAR database and documents located on the Public Service Commission of South Carolina's website are excluded from this request.

5-26.    This question seeks information related to analyses and case studies prior to the decision to abandon the NND Project.
    I.    Please provide analyses and case studies showing the following scenarios:
        i.    Completing both Units 2 and 3 (referenced in paragraph 82 of the Merger Application). This case was previously made available to ORS in July 2017.
        ii.    Completing Unit 2 and abandoning or delaying Unit 3 (referenced in paragraphs 85-86 of the Merger Application).
        iii.    Completing Unit 2 and abandoning or delaying Unit 3 in the case that Santee Cooper did not pay its 45% share of the construction and operating costs (referenced in paragraph 90 of the Merger Application). If no economic analysis was performed, please explain how SCE&G determined this option would not be feasible or beneficial to customers.
        iv.    Completing both Units 2 and 3, as shown in Appendix 3 of Exhibit JML-2 to Joseph M. Lynch's direct testimony in Docket No. 2016-223-E ("Comparative Economic Analysis of Completing Nuclear Construction or Pursuing a Natural Gas Resource Strategy, July 1, 2016").
        v.    Completing both Units 2 and 3, as shown in Appendix 3 of the Corrected Version of Exhibit JML-1 to Joseph M. Lynch's direct testimony in Docket No. 2015-103-E ("Comparative Economic Analysis of Completing Nuclear Construction or Pursuing a Natural Gas Resource Strategy, May 26, 2015").

6-6.    Provide all documents, including emails, regarding the NND Project from the period April 1 through November 30, 2015 containing the words, "Kevin Marsh" and "Bechtel." Please conduct a search for the same time period for documents containing the words, "Kevin Marsh" and "project manager"

6-7.    Provide all correspondence and documents, including emails, that concern the removal of the projected completion dates in the draft version of the Bechtel report dated Nov. 9, 2015, from the final version published in February 2016.

ELECTRONICALLY FILED - 2018 May 23 6:24 PM - SCPSC - Docket # 2017-370-E - Page 28 of 94

6-8.    Provide all documents, including emails, that discuss the hiring of attorney George Wenick as it relates to the Bechtel corporation and the report it produced.

6-9.    Provide all documentation discussing release of the Bechtel report.

6-10.   The Supplementary Key Executive Severance Benefits Plan included in the December 2017 10K identifies an amount of $110.7 million for certain payments to qualified senior executive officers in connection with a change of control.
   a.    Identify the top five qualified senior executive officers eligible to receive the benefits;
   b.    Identify the amount set aside associated with the above positions;
   c.    Identify whether any amount is associated with employees whose primary responsibility was the new nuclear project.

6-11.   Provide a listing of all employees who received a bonus incentive for the year 2018 by name, title, and the amounts received.

6-12.   Provide a listing of all employees who received a raise in 2018 by name, title, previous salary amount, new salary amount, and percentage increase.

6-13.   Explain what monetary benefits employees may receive linked to stock price. Explain how the benefit is calculated and linked to or indexed to share price. In answering this question, the receipt of shares is not deemed a monetary benefit.
   a.    If monetary benefits are provided to employees that are linked to stock price, list the total amount paid by year for 2016, 2017, and 2018 and the total number of employees who received the benefit.
   b.    For each year of 2016, 2017, and 2018, list the five employees who received the greatest monetary benefit and the amount received.
   c.    State the total cost of monetary benefits SCANA employees will receive using Dominion's share-exchange bid price for SCANA. Please state the SCANA share price used as the basis for the calculation.

6-16.   Provide all correspondence including e-mails between WEC/CB&I and the following SCE&G employees: Kevin Marsh, Steve Byrne, Jeff Archie, Alan Torres, Kyle Young, and Bernie Hydrick, during the time period between July 2014 and April 2015 caused by, related to, or in reference to the WEC/CB&I Revised, Fully Integrated, Construction Schedule that WEC/CB&I provided to SCE&G in the third quarter of 2014.

6-25.   Refer to page 53 of the SCE&G 2017 10-K related to the $180 million impairment loss associated with the Company's "entry into an agreement in the fourth quarter of 2017 to purchase in 2018 an existing 540-MW combined cycle gas generating station." Provide a copy of the purchase agreement.

6-30.   Refer to page 11 of the Attachment to the response to ORS 4-66 related to nuclear fuel impairment loss writeoffs.

ELECTRONICALLY FILED - 2018 May 23 6:24 PM - SCPSC - Docket # 2017-370-E - Page 29 of 94

a.  Provide the documentation that supports a remaining carrying value of $22,740,654 for Unit 2 and $21,043,281 for Unit 3.

b.  Describe the status of the disposition of these nuclear fuel assets and the resolution of the carrying value of the related costs.

6-31.  Refer to the Attachment to the response to ORS 4-71. The Attachment shows various retail allocation factors for the Rate History.

a.  Provide the appropriate retail allocation factor for the recoverable NND costs. Provide all support developed and/or relied on for the calculation of the retail allocation factor.

b.  Describe whether, and if so, how, SCE&G plans to recover the wholesale portion of the recoverable NND costs.

ELECTRONICALLY FILED - 2018 May 23 6:24 PM - SCPSC - Docket # 2017-370-E - Page 30 of 94

EXHIBIT "C"

## DEFICIENT DISCOVERY RESPONSES

**RESPONSE 1-22:**

The documents responsive to this request contain confidential and sensitive information. Therefore, SCE&G will make this information available for review and inspection by ORS Staff at the Company's corporate headquarters. Access may be coordinate by contacting Chad Burgess at 217-8141, during normal
business hours.

**RESPONSE 1-23:**

The audit and consulting letters issued by SCANA's Audit Service Department (ASD) for South Carolina Electric & Gas Company's Electric Division and SCANA Services during the twelve-months ending September 30, 2017, are confidential and will be available for review at SCANA's corporate office upon execution of a confidentiality agreement.

**RESPONSE 1-29:**

The documents responsive to this request contain confidential and sensitive information. Therefore, SCE&G will make this information available for review and inspection by ORS Staff at the Company's corporate headquarters. Access may be coordinate by contacting Chad Burgess at 217-8141, during normal business hours.

**RESPONSE 1-44:**

The documents responsive to this request contain confidential and sensitive information. Therefore, SCE&G will make this information available for review and inspection by ORS Staff at the Company's corporate headquarters. Access may be coordinate by contacting Chad Burgess at 217-8141, during normal business hours.

**RESPONSE 1-45:**

The documents responsive to this request contain confidential and sensitive information. Therefore, SCE&G will make this information available for review and inspection by ORS Staff at the Company's corporate headquarters. Access may be coordinate by contacting Chad Burgess at 217-8141, during normal business hours.

ELECTRONICALLY FILED - 2018 May 23 6:24 PM - SCPSC - Docket # 2017-370-E - Page 31 of 94

EXHIBIT "C"

**RESPONSE 1-147:**

The information responsive to this request contains confidential, customer specific data and will be made available for review by request at the Company's corporate headquarters only after the execution of a confidentiality agreement.

**RESPONSE 2-3:**

The documents responsive to this request contain highly confidential and sensitive information. Due to the highly confidential and sensitive nature of the information contained within these documents, the Company will make this information available for review and inspection at SCE&G's headquarters. You may contact SCE&G's counsel, Chad Burgess, at 217-8141 to schedule a time to view this document.

**RESPONSE 2-5:**

SCE&G objects to Request 2-5 on the basis that the documents responsive to this request are protected by the attorney-client privilege.

**RESPONSE 2-7:**

SCE&G issued a purchase order dated May 18, 2017, to URS Nuclear, LLC ("URS"), a wholly-owned subsidiary of AECOM, to evaluate four scenarios concerning the V.C. Summer nuclear construction project. Those scenarios consisted of (i) defer plant completion; (ii) salvage equipment; (iii) abandon site after salvage; and (iv) brownfield site after salvage.

AECOM's written work product contains highly confidential and sensitive information. Due to the highly·confidential and sensitive nature of the information contained within AECOM's work product, the Company will make AECOM's work product available for review and inspection at SCE&G's headquarters. You may contact SCE&G's counsel, Chad Burgess, at 217.-8141 to schedule a time to view this document.

The entity that charged SCE&G was URS. SCE&G made payment to URS on August 23, 2017. in the amount of $238,772.62 and on September 22, 2017, in the amount of $5,828.25.

**RESPONSE 3-24:**

SCE&G objects to this request to the extent it seeks information that is not relevant to the claims, defenses or subject matter involved in these dockets, or reasonably calculated to lead to the discovery of admissible evidence in this proceeding.

ELECTRONICALLY FILED - 2018 May 23 6:24 PM - SCPSC - Docket # 2017-370-E - Page 32 of 94

EXHIBIT "C"

**RESPONSE 3-25:**

SCE&G objects to this request to the extent that it seeks information that is not relevant to the claims, defenses or the subject matter involved in these dockets, or reasonably calculated to lead to the discovery of admissible evidence in this proceeding.

**RESPONSE 3-26:**

SCE&G objects to this request to the extent that it seeks information that is not relevant to the claims, defenses or the subject matter involved in these dockets, or reasonably calculated to lead to the discovery of admissible evidence in this proceeding.

**RESPONSE 4-26:**

SCE&G objects to Request 4-26 on the basis that certain portions of the documents sought are protected by the attorney-client privilege. With respect to those portions of the documents that are non-privileged, that information is confidential and sensitive information. Due to the confidential and sensitive nature of the information requested, SCE&G will make the information responsive to this request available to ORS for review and inspection at SCE&G's administrative offices after the execution of a confidentiality agreement.

Responsible Person: Chad Burgess (legal matters) and Gina Champion

**RESPONSE 4-27:**

SCE&G objects to Request 4-26 on the basis that certain portions of the documents sought are protected by the attorney-client privilege. With respect to those portions of the documents that are non-privileged, that information is confidential and sensitive information. Due to the confidential and sensitive nature of the information requested, SCE&G will make the information responsive to this request available to ORS for review and inspection at SCE&G's administrative offices after the execution of a confidentiality agreement.

Responsible Persons: Chad Burgess (legal matters) and Gina Champion

**RESPONSE 4-43:**

The information responsive to this request contains confidential and sensitive information. Due to the confidential and sensitive nature of the information requested, SCE&G will make the

ELECTRONICALLY FILED - 2018 May 23 6:24 PM - SCPSC - Docket # 2017-370-E - Page 33 of 94

EXHIBIT "C"

information responsive to this request available to ORS for review and inspection at SCE&G's administrative offices after the execution of a confidentiality agreement.

Responsible persons: Chad Burgess (legal matters) and Addison Potter

**RESPONSE 4-44:**

The information responsive to this request contains confidential and sensitive information. Due to the confidential and sensitive nature of the information requested, SCE&G will make the information responsive to this request available to ORS for review and inspection at SCE&G's administrative offices after the execution of a confidentiality agreement.

Responsible Person: Chad Burgess (legal matters) and Addison Potter

**RESPONSE 4-69:**

SCE&G objects to Request 4-69 on the basis that certain information responsive to this request is protected by the attorney-client privilege. With respect to the remaining information responsive to this request, that information is confidential and sensitive information. Due to the confidential and sensitive nature of the information requested, SCE&G will make the information responsive to this request available to ORS for review and inspection at SCE&G's administrative offices after the execution of a confidentiality agreement.

Responsible Person: Chad Burgess (legal matters) and Christina Putnam

**RESPONSE 4-72:**

The information responsive to this request contains confidential and sensitive information. Due to the confidential and sensitive nature of the information requested, SCE&G will make the information responsive to this request available to ORS for review and inspection at SCE&G's administrative offices after the execution of a confidentiality agreement.

Responsible Person: Christina Putnam

**RESPONSE 4-73:**

The information responsive to this request contains confidential and sensitive information. Due to the confidential and sensitive nature of the information requested, SCE&G will make the information responsive to this request available to ORS for review and inspection at SCE&G's administrative offices after the execution of a confidentiality agreement.

EXHIBIT "C"

ELECTRONICALLY FILED - 2018 May 23 6:24 PM - SCPSC - Docket # 2017-370-E - Page 34 of 94

Responsible Person: Christina Putnam

**RESPONSE 4-74:**

The information responsive to this request contains confidential and sensitive information. Due to the confidential and sensitive nature of the information requested, SCE&G will make the information responsive to this request available to ORS for review and inspection at SCE&G's administrative offices after the execution of a confidentiality agreement.

Responsible Person: Christina Putnam

**RESPONSE 5-25:**

SCE&G objects to Request No. 5-25 on the ground that it is overbroad and unduly burdensome because it seeks information that is neither relevant to the subject matter of this litigation, nor reasonably calculated to lead to the discovery of admissible evidence.

SCE&G further objects to Request No. 5-25 on the ground that it is harassing and unduly burdensome to the extent that it is duplicative of other requests propounded by ORS. Subject to and without waiving these specific objections, SCE&G will conduct a reasonable, good faith effort to search for, identify, and produce, on a schedule to be discussed with ORS's counsel, non-privileged documents only to the extent that they are relevant to the claims set forth in ORS's Request for Rate Relief and otherwise responsive to this request.

Responsible Person: Chad Burgess

**RESPONSE 5-26**

With respect to Request 5-26I(i) through (iii), SCE&G objects this request on the ground that the information responsive to this request is protected by the attorney-client privilege.

As for Request 5-261(iv), please see Exhibit JML-2 at the following link:
https:lldms.psc.sc.gov/Attachments/Matter/5cOba125-a47f-4d57-996e-7 cdc09ba5dSf

For the files responsive to Request 5-2SI(iv), please see folder 5-2SI(iv) on the attached compact disc.

As for Request 5-2SI(v), please see Exhibit JML-1 at the following link:
https:lldms. psc. sc.gov/Attachments/Matter/d5dOOf30-155d-141f-232b1fcS6S39f4aS

ELECTRONICALLY FILED - 2018 May 23 6:24 PM - SCPSC - Docket # 2017-370-E - Page 35 of 94

EXHIBIT "C"

For the files responsive to Request 5-261(v), please see folder 5-261(v) on the attached compact disc.

With respect to Request 5-2SII(i) through (vii), SCE&G is in the process of conducting an extensive collection and review of its own documents and information which it anticipates completing by April 10, 2018. SC&EG states that it will supplement this response by producing responsive, non-privileged, nonwork product documents in its possession.

Responsible persons: Chad Burgess (legal matters) and James Neely

### RESPONSE 6-6:

SCE&G objects to Request 6-6 on the basis that the documents sought are protected by the attorney-client privilege and the attorney work product doctrine. Notwithstanding this objection, SCE&G states that it is currently conducting an extensive review of its own documents in connection with responding to subpoenas served on the company by the Federal Grand Jury and the Securities & Exchange Commission as well as document requests served in pending civil litigation. SCE&G states that it will produce non-privileged, non-work product documents in its possession responsive to this request after this review is complete.

Responsible person: Chad Burgess (legal matters)

### RESPONSE 6-7:

SCE&G objects to Request 6-7 on the basis that the documents sought are protected by the attorney-client privilege and the attorney work product doctrine. Notwithstanding this objection, SCE&G states that it is currently conducting an extensive review of its own documents in connection with responding to subpoenas served on the company by the Federal Grand Jury and the Securities & Exchange Commission as well as document requests served in pending civil litigation. SCE&G states that it will produce non-privileged, non-work product documents in its possession responsive to this request after this review is complete.

Responsible person: Chad Burgess (legal matters)

### RESPONSE 6-8:

SCE&G objects to Request 6-6 on the basis that the documents sought are protected by the attorney-client privilege and the attorney work product doctrine. Notwithstanding this objection, SCE&G states that it is currently conducting an extensive collection of its own documents in connection with responding to subpoenas served on the company by the Federal Grand Jury and

ELECTRONICALLY FILED - 2018 May 23 6:24 PM - SCPSC - Docket # 2017-370-E - Page 36 of 94

EXHIBIT "C"

the Securities & Exchange Commission as well as document requests served in pending civil litigation. SCE&G states that it will produce non-privileged, non-work product documents in its possession responsive to this request after this review is complete.

Responsible person: Chad Burgess (legal matters)

**RESPONSE 6-9:**

SCE&G objects to Request 6-9 on the basis that the documents sought are protected by the attorney-client privilege and the attorney work product doctrine. Notwithstanding this objection, SCE&G states that it is currently conducting an extensive review of its own documents in connection with responding to subpoenas served on the company by the Federal Grand Jury and the Securities & Exchange Commission as well as document requests served in pending civil litigation. SCE&G states that it will produce non-privileged, non-work product documents in its possession responsive to this request after this review is complete.

Responsible person: Chad Burgess (legal matters)

**RESPONSE 6-10:**

The information responsive to this request contains confidential and sensitive information. Due to the confidential and sensitive nature of the information requested, SCE&G will make the information responsive to this request available to ORS for review and inspection at SCE&G's administrative offices after the execution of a confidentiality agreement.

Responsible person: Chad Burgess (legal matters) and Denise Scheible

**RESPONSE 6-11:**

The information responsive to this request contains confidential and sensitive information. Due to the confidential and sensitive nature of the information requested, SCE&G will make the information responsive to this request available to ORS for review and inspection at SCE&G's administrative offices after the execution of a confidentiality agreement.

Responsible person: Chad Burgess (legal matters) and Denis Scheible

**RESPONSE 6-12:**

ELECTRONICALLY FILED - 2018 May 23 6:24 PM - SCPSC - Docket # 2017-370-E - Page 37 of 94

EXHIBIT "C"

The information responsive to this request contains confidential and sensitive information. Due to the confidential and sensitive nature of the information requested, SCE&G will make the information responsive to this request available to ORS for review and inspection at SCE&G's administrative offices after the execution of a confidentiality agreement.

Responsible person: Chad Burgess (legal matters), and Denise Scheible

**RESPONSE 6-13:**

The information responsive to this request contains confidential and sensitive information. Due to the confidential and sensitive nature of the information requested, SCE&G will make the information responsive to this request available to ORS for review and inspection at SCE&G's administrative offices after the execution of a confidentiality agreement.

Responsible person: Chad Burgess (legal matters) and Denise Scheible

**RESPONSE 6-16:**

SCE&G objects to Request 6-16 on the basis that the documents sought are protected by the attorney-client privilege and the attorney work product doctrine. Notwithstanding this objection, SCE&G states that it is currently conducting an extensive review of its own documents in connection with responding to subpoenas served on the company by the Federal Grand Jury and the Securities & Exchange Commission as well as document requests served in pending civil litigation. SCE&G states that it will produce non-privileged, non-work product documents in its possession responsive to this request after this review is complete. For now, however, please see the documents on the enclosed compact disc.

Responsible person: Chad Burgess (legal matters)

**RESPONSE 6-25:**

The information responsive to this request contains confidential and sensitive information. Due to the confidential and sensitive nature of the information requested, SCE&G will make the information responsive to this request available to ORS for review and inspection at SCE&G's administrative offices after the execution of a confidentiality agreement.

Responsible Person: Chad Burgess (legal matters) and Jim Landreth

**RESPONSE 6-30:**

ELECTRONICALLY FILED - 2018 May 23 6:24 PM - SCPSC - Docket # 2017-370-E - Page 38 of 94

EXHIBIT "C"

a. Attached are files providing documentation that supports the fuel carrying value as of December 31, 2017. Working Excel files are also provided. In addition, in the first quarter of 2018, SCE&G recorded a further impairment to the carrying value of the Unit 2 and 3 fuel based on current market prices. Attached is the journal entry to record the incremental impairment in March 2018 along with supporting documentation and working Excel files. Also attached is SCE&G's nuclear fuel impairment assessment memo. Please note that certain portions of the memo contain information that is protected by the attorney-client privilege. SCE&G has redacted the information from the memo that is protected by the attorney-client privilege.

b. The disposition of these nuclear fuel assets has not yet been determined. SCE&G has engaged a third party consultant to perform an analysis of current market conditions, future market forecasts, contract options for use of the fuel, as well as, potential market opportunities to either sell or process the fuel into a form useable in Unit 1. SCE&G has received a preliminary draft of the consultant's report and is currently reviewing its results for accuracy and completeness. A final report is expected in May 2018. The Company will consider the final report findings, along with other factors, in evaluating its options concerning the disposition of the fuel material acquired for Units 2 and 3.

Responsible person: Keith Coffer, Jr. and Michael Shinn

**RESPONSE 6-31:**

a. Appropriate retail allocation factors, as audited by ORS, were provided with response 4-71. A portion of the supporting information for the calculation of the retail allocation factors contains confidential and sensitive information. Due to the confidential and sensitive information requested, SCE&G will make the information responsive to this request available to ORS for review and inspection at SCE&G's administrative offices after execution of a confidentiality agreement. Notwithstanding the foregoing, a redacted version of SCE&G's supporting information is on the enclosed CD entitled "Attachment 6-31 (REDACTED)."

b. SCE&G's existing wholesale contracts for power supply to Orangeburg and Winnsboro include provisions under which the stated rates would have been adjusted when VCS2 and VCS3 would have come on-line. However, the stated rates in these contracts do not break out specifically identifiable cost components (beyond fuel and other variable costs) for recovery, and no adjustments to the stated rates in these contracts are specifically triggered by the abandonment of NND. However, NND abandonment costs may be considered going forward in the implementation of any applicable formula rate calculations. The costs related to NND Transmission, which are not being abandoned, will be included in the FERC Transmission formula rate as those projects are placed into service.

Responsible person: Allen Rooks, Eddie Folsom

ELECTRONICALLY FILED - 2018 May 23 6:24 PM - SCPSC - Docket # 2017-370-E - Page 39 of 94

EXHIBIT "D"



**K. Chad Burgess**
Director & Deputy General Counsel

*chad.burgess@scana.com*

May 16, 2018

<u>**VIA ELECTRONIC MAIL AND**</u>
<u>**U.S. FIRST CLASS MAIL**</u>

Jenny R. Pittman, Esquire
South Carolina Office of Regulatory Staff
1401 Main Street, Suite 900
Columbia, SC 29201
jpittman@regstaff.sc.gov

RE:    Friends of the Earth and Sierra Club, Complainant/Petitioner v.
South Carolina Electric & Gas Company, Defendant/Respondent
Docket No. 2017-207-E

Request of the Office of Regulatory Staff for Rate Relief to South
Carolina Electric & Gas Company's Rates Pursuant to S.C. Code
Ann. § 58-27-920
Docket No. 2017-305-E

Joint Application and Petition of South Carolina Electric & Gas
Company and Dominion Energy, Incorporated for Review and
Approval of a Proposed Business Combination between SCANA
Corporation and Dominion Energy, Incorporated, as May Be
Required, and for a Prudency Determination Regarding the
Abandonment of the V.C. Summer Units 2 & 3 Project and
Associated Customer Benefits and Cost Recovery Plans
Docket No. 2017-370-E

Dear Jenny:

We received your May 9, 2018 letter regarding the responses of South Carolina
Electric & Gas Company ("SCE&G") and Dominion Energy, Inc. ("Dominion Energy").
These responses were entirely consistent with the statutory provisions you cite, and
they follow what has been years-worth of precedent in responding to similar requests.

(Continued. . .)

ELECTRONICALLY FILED - 2018 May 23 6:24 PM - SCPSC - Docket # 2017-370-E - Page 40 of 94

EXHIBIT "D"

Jenny R. Pittman, Esquire
May 16, 2018
Page 2

  With each response, SCE&G and Dominion Energy made a good-faith effort to provide information and address fully the substance of each request. For those requests as to which SCE&G or Dominion Energy objected, we described the basis for the objection and provided more than sufficient information to allow the Office of Regulatory Staff ("ORS") to understand and evaluate the response. While we believe that the responses were appropriate in all respects, we nevertheless appreciate the opportunity to provide more information, through this letter and our upcoming supplemental responses.

  Your letter raises three separate issues of significance: (1) allegedly insufficient or non-responsive responses; (2) concerns over the specificity of privilege objections; and (3) similar concerns regarding assertions of confidentiality. This letter addresses each issue.

### Allegedly Non-Responsive Information

  We have reviewed the various requests as to which you contend responses were insufficient or non-responsive. Without agreeing with your position that the prior responses were inadequate, SCE&G and Dominion Energy are supplementing response 3-8, a copy of which is enclosed with this letter, and, as appropriate, will supplement promptly the response to request 1-20. To clarify the companies' positions with respect to certain requests, SCE&G is supplementing responses 1-22; 4-27; and 4-69; and Dominion Energy is supplementing response 4-25. Copies of these responses are enclosed with this letter.

  With regard to requests 1-119; 1-174; 4-82; and 4-83, which seek the production of information related to the recently enacted federal tax law, SCE&G and Dominion Energy are continuing to evaluate the effects of federal tax reform. Through our responses we informed ORS that our analysis of the new law is on-going and that we will update our responses when this scope of work is completed. As of the date of this letter, this analysis is not yet complete. By way of this letter, SCE&G and Dominion Energy affirm their prior statements that when the analysis is concluded, the companies will supplement promptly its responses as appropriate.

  As to requests 3-24; 3-25; and 3-26, we maintain the position that this information is irrelevant and not a proper area of inquiry by the ORS. That there were allegedly "unlicensed engineers" working at V.C. Summer — assuming that were true — has no bearing on any issue pending before the PSC, now or in the foreseeable future. Particularly considering the complex and much more specific requirements of federal law that determine licensing and qualifications for contractors involved in the Project (and that there is no contention that these requirements were not met), we do not understand the relevance of questions related to specific state licensures.

(Continued. . .)

ELECTRONICALLY FILED - 2018 May 23 6:24 PM - SCPSC - Docket # 2017-370-E - Page 41 of 94

EXHIBIT "D"

Jenny R. Pittman, Esquire
May 16, 2018
Page 3

SCE&G also maintains its position that documents responsive to Request 5-25 are irrelevant. You may be aware that in the ratepayer cases currently pending in state court, the court recently denied a motion to compel that sought substantially the same information. In addition, and much like SCE&G informed the court in response to that motion to compel, SCE&G has and will continue to produce to the ORS material relevant to the claims at issue in proceedings involving the ORS. But documents are not made relevant to the issues pending here merely because they were produced to governmental entities in other proceedings. Thus, SCE&G will not agree to produce to the ORS material simply because that material was produced in other proceedings.

Finally, SCE&G maintains the position that its response to Request 4-76 was appropriate and complete. That request seeks "a calculation of the income tax expense included in SCE&G's present *revised* rates based on the test year used in the 2016 revised rate proceeding." (emphasis added). SCE&G provided that calculation. Your letter contends that the response was deficient in that it did not provide "the total income tax expense included in present rates". But "present rates", as mentioned in your letter, are not the same as "present revised rates", which was the subject of the original request. Revised rate proceedings are associated with new nuclear development, and in response to this Request, SCE&G provided information as to the income tax expense included in those revised rates.

**Privilege Objections**

A number of ORS's requests seek to discover information that is plainly privileged. For example, several requests seek information related to the Bechtel Report. *See* Request Nos. 2-5, 6-6, 6-9. In your letter, you state that "Bechtel Corporation was not hired for claims consultancy, therefore the assertion of attorney-client privilege with respect to Bechtel being hired in preparation of litigation does not appear to apply." This is not correct. Bechtel was retained at the direction of counsel to prepare materials that would assist counsel in rendering legal advice regarding the Project. Thus, information related to the Bechtel Report is, in fact, privileged and protected by the work product doctrine.

Further, to the extent the requests seek information regarding SCE&G's abandonment analysis, SCE&G has asserted privilege claims because that analysis was prepared for and at the direction of outside legal counsel. *See* Request No. 5-26. As such, it is protected by the attorney-client privilege and the work-product doctrine.

These are just two examples of the privileged information that the ORS's requests seek. We are working to create a privilege log that provides more information as to all of these privilege claims. Note that some of the requests seek a significant volume of privileged information, so it will take some time to complete the log, but we will provide it to you as soon as practicable.

(Continued. . .)

EXHIBIT "D"

Jenny R. Pittman, Esquire
May 16, 2018
Page 4
_____

**Confidentiality Designations**

You have also asked for additional information regarding confidentiality designations. We continue to believe that it is appropriate and warranted for the ORS to execute a simple confidentiality agreement that preserves these legitimate interests and facilitates the ORS's request for additional information related to the Project and merger. In the meantime, for many of these documents, SCE&G and Dominion Energy have agreed to make materials available to the ORS at SCE&G's corporate office or the law offices of Nexsen Pruet, LLC pending execution of a confidentiality agreement. These reasonable measures are typical in discovery, as you know, and they do not interfere with the ORS's desire to review relevant material.

In any event, we have categorized below the confidential documents that the ORS requests seek, and we have described in detail the basis for the confidentiality designations as to each category. We are evaluating the documents that fall within each category to confirm our prior confidentiality designations. We will produce any documents that we identify as to which prior confidentiality designation can be withdrawn.

1. **Board Materials**

We have several concerns about producing board minutes and materials presented to the boards regarding the merger of SCANA and Dominion Energy, which, as you know, is still pending. *See* Request No. 1-22, 4-26, and 4-27. Board minutes are among SCANA's and Dominion Energy's most sensitive materials as they reflect detailed discussions about the most essential of the companies' strategic plans. The minutes are not public and their disclosure is limited internally. The same is true for materials presented during board meetings, and the sensitivity of this information is particularly existent for materials related to the pending merger. That merger has not closed, as you know. Disclosure of those materials runs the risk of interfering with the companies' ability to effectively negotiate and finalize the merger and other potential future transactions.

2. **Documents Reflecting Employee Compensation and Benefits**

We are also concerned about producing detailed information about compensation and benefits of SCE&G employees without appropriate confidentiality protection. *See* Request Nos. 1-44, 1-45, 6-10 6-11, 6-12, 6-13. The ORS has requested extensive information about how SCE&G compensates certain employees. Those requests implicate both personal and corporate confidentiality concerns as responsive documents will reveal information that SCE&G employees consider to be sensitive, as well as SCE&G's strategy in compensating these employees. Such information is not publicly disclosed and remains confidential internally.

(Continued. . .)

EXHIBIT "D"

ELECTRONICALLY FILED - 2018 May 23 6:24 PM - SCPSC - Docket # 2017-370-E - Page 43 of 94

Jenny R. Pittman, Esquire
May 16, 2018
Page 5

### 3. Documents Subject to Contractual Confidentiality Obligations

SCE&G has asserted confidentiality in response to three requests based on a preexisting obligation to maintain confidentiality. *See* Request Nos. 4-43, 4-44, 6-25. SCE&G has contractually committed to maintain the confidentiality of the documents responsive to these categories, and its designation allows SCE&G to comply with its contractual obligations.

### 4. Corporate Financial and Accounting Models

The ORS has also made a number of requests for various corporate financial and accounting models. *See* Request Nos. 1-29, 1-147, 2-3, 4-66, 4-72, 4-73, 4-74, 6-31. This is sensitive financial information that SCE&G relies on in making strategic business decisions. Disclosure would reveal non-public data and analysis, and it would impact SCE&G's competitive position.

### 5. Audit Reports and Materials Prepared by Consultants

Lastly, SCE&G is concerned about the disclosure of confidential audit reports and materials prepared by third-party consultants. *See* Request Nos. 1-23, 2-7. Reports prepared by SCANA's Audit Service Department for SCE&G and SCANA contain highly sensitive, non-public data that informs strategic decisions by SCE&G management. Any reports or other materials prepared by third-party consultant, AECOM, are similarly confidential and non-public.

\* \* \* \* \*

We will supplement our responses, as noted above, as soon as possible. Please let me know if you have questions in the meantime.

Very truly yours,

K. Chad Burgess
On behalf of SCE&G

J. David Black
On behalf of Dominion Energy

KCB/kms
Enclosures

ELECTRONICALLY FILED - 2018 May 23 6:24 PM - SCPSC - Docket # 2017-370-E - Page 44 of 94

EXHIBIT "D"

**SOUTH CAROLINA ELECTRIC & GAS COMPANY**
**OFFICE OF REGULATORY STAFF'S CONTINUING**
**AUDIT INFORMATION REQUEST**
**DOCKET NO. 2017-207-E (2nd Continuing AIR)**
**DOCKET NO. 2017-305-E (1st Continuing AIR)**
**DOCKET NO. 2017-370-E (1st Continuing AIR)**

**REQUEST 1-22:**

Please provide a copy of the SCANA Minutes of the Board of Directors Meetings for each meeting held from January 1, 2015 through December 31, 2017.

**RESPONSE 1-22:**

The documents responsive to this request contain confidential and sensitive information. Therefore, SCE&G will make this information available for review and inspection by ORS Staff at the Company's corporate headquarters. Access may be coordinate by contacting Chad Burgess at 217-8141, during normal business hours.

**FIRST SUPPLEMENTAL RESPONSE 1-22:**

SCE&G objects to Request 1-22 on the basis that certain portions of the documents sought are protected by the attorney-client privilege. With respect to those portions of the documents that are non-privileged, that information is confidential and sensitive information. Due to the confidential and sensitive nature of the information requested, SCE&G will make the information responsive to this request available for review and inspection by ORS Staff at the Company's corporate headquarters after the execution of a confidentiality agreement.

Responsible persons: Chad Burgess (legal matters) and Gina Champion

ELECTRONICALLY FILED - 2018 May 23 6:24 PM - SCPSC - Docket # 2017-370-E - Page 45 of 94

EXHIBIT "D"

**SOUTH CAROLINA ELECTRIC & GAS COMPANY**
**OFFICE OF REGULATORY STAFF'S CONTINUING**
**AUDIT INFORMATION REQUEST**
**DOCKET NO. 2017-207-E (4th Continuing AIR)**
**DOCKET NO. 2017-305-E (3rd Continuing AIR)**
**DOCKET NO. 2017-370-E (3rd Continuing AIR)**

**REQUEST 3-8:**

Please provide an estimate of the type and amount of CAPEX projects planned by SCE&G for the years 2018, 2019, 2020 and 2021. Please identify how these CAPEX projects will be financed post-merger.

**RESPONSE 3-8:**

CAPEX projects will be funded in a manner as to optimize, in the most cost efficient manner, the capital structure for SCE&G. This would consist of some combination of short and long term debt and equity, including cash from operations.

**FIRST SUPPLEMENTAL RESPONSE 3-8:**

Below is an estimate of the type and amount of CAPEX projects planned by SCE&G for the years 2018, 2019, 2020 and 2021.

**Estimated Capital Expenditures**
**$(Millions)**

|  | 2018 | 2019 | 2020 | 2021 |
|---|---|---|---|---|
| **SCE&G:** |  |  |  |  |
| Generation | 124 | 145 | 340 | 223 |
| Transmission & Dist. | 229 | 203 | 226 | 233 |
| Other | 12 | 23 | 28 | 24 |
| Gas | 98 | 105 | 130 | 139 |
| Common&Non-Utility | 3 | 11 | 9 | 9 |
| **Total SCE&G** | **466** | **487** | **733** | **628** |

Responsible Persons: Christina Putnam (SCANA/SCE&G) and Sarah French (Dominion Energy)

EXHIBIT "D"

ELECTRONICALLY FILED - 2018 May 23 6:24 PM - SCPSC - Docket # 2017-370-E - Page 46 of 94

**SOUTH CAROLINA ELECTRIC & GAS COMPANY**
**OFFICE OF REGULATORY STAFF'S CONTINUING**
**AUDIT INFORMATION REQUEST**
**DOCKET NO. 2017-207-E (5th Continuing AIR)**
**DOCKET NO. 2017-305-E (4th Continuing AIR)**
**DOCKET NO. 2017-370-E (4th Continuing AIR)**

**REQUEST 4-25:**

Provide a copy of all studies, analyses, or presentations made to the Dominion Board of Directors in regards to the proposed merger.

**RESPONSE 4-25:**

Dominion Energy objects to Request 4-25 on the basis that certain portions of the documents sought are protected by the attorney-client privilege. With respect to those portions of the documents that are non-privileged, that information is confidential and sensitive information. Due to the confidential and sensitive nature of the information requested, Dominion Energy will make the information responsive to this request available to ORS for review and inspection at SCE&G's administrative offices after the execution of a confidentiality agreement.

Responsible Person: Lisa Booth (legal matters) and Karen Doggett

**FIRST SUPPLEMENTAL RESPONSE 4-25**

The presentations to the Dominion Board of Directors responsive to this request have been determined to not contain privileged information. Due to the confidential and sensitive nature of the information requested, Dominion Energy will make the information responsive to this request available to ORS for review and inspection at the law offices of Nexsen Pruet, LLC after the execution of a confidentiality agreement.

Responsible Person: Lisa Booth (legal matters) and Karen Doggett

EXHIBIT "D"

ELECTRONICALLY FILED - 2018 May 23 6:24 PM - SCPSC - Docket # 2017-370-E - Page 47 of 94

**SOUTH CAROLINA ELECTRIC & GAS COMPANY**
**OFFICE OF REGULATORY STAFF'S CONTINUING**
**AUDIT INFORMATION REQUEST**
**DOCKET NO. 2017-207-E (5th Continuing AIR)**
**DOCKET NO. 2017-305-E (4th Continuing AIR)**
**DOCKET NO. 2017-370-E (4th Continuing AIR)**

**REQUEST 4-27:**

Provide a copy of all studies, analyses, or presentations made to the SCE&G Board of Directors in regards to the proposed merger.

**RESPONSE 4-27:**

SCE&G objects to Request 4-26 on the basis that certain portions of the documents sought are protected by the attorney-client privilege. With respect to those portions of the documents that are non-privileged, that information is confidential and sensitive information. Due to the confidential and sensitive nature of the information requested, SCE&G will make the information responsive to this request available to ORS for review and inspection at SCE&G's administrative offices after the execution of a confidentiality agreement.

Responsible Persons: Chad Burgess (legal matters) and Gina Champion

**FIRST SUPPLEMENTAL RESPONSE 4-27:**

See Response 4-26. There are no studies, analyses, or presentations made to the SCE&G Board of Directors in regards to the proposed merger. Any studies, analyses, or presentations made available to members of the SCE&G Board are addressed in response to Request 4-26.

Responsible Persons: Chad Burgess (legal matters) and Gina Champion

EXHIBIT "D"

ELECTRONICALLY FILED - 2018 May 23 6:24 PM - SCPSC - Docket # 2017-370-E - Page 48 of 94

**SOUTH CAROLINA ELECTRIC & GAS COMPANY**
**OFFICE OF REGULATORY STAFF'S CONTINUING**
**AUDIT INFORMATION REQUEST**
**DOCKET NO. 2017-207-E (5th Continuing AIR)**
**DOCKET NO. 2017-305-E (4th Continuing AIR)**
**DOCKET NO. 2017-370-E (4th Continuing AIR)**

**REQUEST 4-69:**

Provide a copy of all analyses performed by or for SCE&G that assessed the monetization and/or the economics of the monetization of the Toshiba payment.

**RESPONSE 4-69:**

SCE&G objects to Request 4-69 on the basis that certain information responsive to this request is protected by the attorney-client privilege. With respect to the remaining information responsive to this request, that information is confidential and sensitive information. Due to the confidential and sensitive nature of the information requested, SCE&G will make the information responsive to this request available to ORS for review and inspection at SCE&G's administrative offices after the execution of a confidentiality agreement.

Responsible Person: Chad Burgess (legal matters) and Christina Putnam

**FIRST SUPPLEMENTAL RESPONSE 4-69:**

SCE&G objects to Request 4-69 on the basis that certain information responsive to this request is protected by the attorney-client privilege. With respect to the remaining information responsive to this request, please see attached.

Responsible Persons: Chad Burgess (legal matters) and Christina Putnam

ELECTRONICALLY FILED - 2018 May 23 6:24 PM - SCPSC - Docket # 2017-370-E - Page 49 of 94

EXHIBIT "D"

Attachment to First Supplemental Response 4-69
Page 1 of 7

September 27, 2017

# Project Rubicon

# Presentation to the Board of Directors



ReedSmith Ducera

ELECTRONICALLY FILED - 2018 May 23 6:24 PM - SCPSC - Docket # 2017-370-E - Page 50 of 94

EXHIBIT "D"

**ReedSmith Ducera**

# Executive Summary

- The V.C. Summer Project Owners ("Owners") launched a monetization process on Friday, September 15th to sell: (i) the monetary rights to receive payments under the $2.168 billion Toshiba Guaranty Settlement Claim ("Settlement Claim")[10], and (ii) claims against the Westinghouse ("WEC") bankruptcy estate (collectively, the "Interest")

- The Owners received thirteen initial bids on or near the bid deadline of Wednesday, September 20th

    – Six parties placed bids to acquire 100% of the Interest ("Whole Claim Bids") (with one party also submitting a partial bid), and seven parties submitted multiple bids to acquire a portion of the Interest ("Partial Bids")

    – The highest price of the initial Whole Claims Bids was 90.5% of the $2,018 million net notional claim ("Net Settlement Claim")

    – The clearing price of the initial Partial Bids was 88.75%

- The Owners and its advisors pursued discussions with a number of parties that presented actionable bids

    – Several parties submitted revised binding bids, of which Citibank's was the highest at 91.53%

- Based on a number of key factors, including price and legal documentation, the Owners concluded that Citibank is the winning bidder – on the evening of Monday, September 25th, the Owners counter-signed Citibank's binding commitment letter, subject to Board approval

- The Santee Cooper management team and its legal and financial advisors recommend Citibank's offer to purchase the Net Settlement Claim for approximately $1,847.1 million (an implied purchase price of 91.53%) – Santee Cooper's portion of the proceeds is approximately $831.2 million

Note:
10   The Owners will retain the first $150 million payment under the Settlement Agreement (the "First Installment"), which is expected to be received on October 2, 2017

2

ELECTRONICALLY FILED - 2018 May 23 6:24 PM - SCPSC - Docket # 2017-370-E - Page 51 of 94

EXHIBIT "D"

**ReedSmith Ducera**

## Process Overview

- The monetization process implemented by the Owners and its advisors was structured to be robust and designed to maximize market value

  – 105 accredited investors comprised of 15 broker-dealers and 90 investment management firms were contacted and asked to provide binding commitments to acquire a portion or all of the Interest

    • Broker-dealers were viewed as important participants as they could help streamline the process by building a partial or entire book of demand for the Interest

    • In regards to the investment management firms, the goal was to reach out to a broad but targeted universe of distressed credit investors that would likely be interested in participating

  – Furthermore, all information regarding the Settlement Claim has been public since the Settlement Agreement was announced in July 2017, reducing the time required to run a robust monetization process (i.e. NDAs were not required, and all bidders were asked to rely on public information)

- The monetization process was also designed with a focus on the Owners' dual objectives of maximizing both the value of the Interest and certainty for an expedited closing by the end of September

  – To maintain flexibility, the transaction structure put forth by the Owners accommodated multiple buyers, thus allowing for both Partial and Whole Claim Bids

  – To encourage price discovery, a modified Dutch Auction was used to determine the clearing price for selling all of the Interest

  – To expedite the process, potential investors were provided with transaction agreements including an Assignment and Purchase Agreement ("APA") in substantially final form in an effort to minimize legal discussions and documentation after bids were submitted

ELECTRONICALLY FILED - 2018 May 23 6:24 PM - SCPSC - Docket # 2017-370-E - Page 52 of 94

EXHIBIT "D"

**ReedSmith Ducera**

# Rationale For Sale at a Discount

- As outlined in this presentation, there are a number of benefits to Santee Cooper ("S.C.") of monetizing its portion of the Interest in exchange for upfront proceeds

- Citibank's offer to purchase the Interest at 91.53% of $2.018 billion implies a discount of approximately $77 million to Santee Cooper

- The ~8.5% discount on the portion of the Settlement Claim being sold appears to be justified when measured against several key financial benchmarks:

  1. **Lack of Interest Rate:** The payment stream provided for in the Settlement Agreement does not provide for any interest rate to compensate the Owners for the time value of money

  2. **Toshiba Credit Risk:** At the proposed sale price, the implied discount rate of the Net Settlement Claim payment stream would be materially lower than the current weighted averaged yield on Toshiba's unsecured debt. This implies that the cost to Santee Cooper of selling the Interest at a discount is lower than the Toshiba credit risk it would have to bear if it retained its portion of the Interest

  3. **Cost of Toshiba Credit Default Swap ("CDS"):** Santee Cooper eliminates the risk of non-payment by monetizing the Interest at a discount. If Santee Cooper were to keep its portion of the Interest, it could insure against non-payment by purchasing approximately $908 million of Toshiba CDS. The cost of acquiring CDS over the potential lifetime of the Settlement Claim is greater than the $ discount implied by the sale price

  4. **Payback Rate to Recoup Discount:** The discount can conceptually be amortized over the lifetime of the Settlement Claim payment stream. Assuming that the approximately $831 million of gross proceeds to Santee Cooper were invested, Santee Cooper would only need to generate low to mid-single digit returns to recoup the discount over a several year period



**Implied Discount to Santee Cooper from Sale**

| Sale Price (% of $2.018 bn) | Gross Proceeds to S.C. (48%) | S.C. Portion of $2.018 Net Claim | Implied Discount to S.C. | |
|---|---|---|---|---|
| | | | $ Discount (mm) | % Discount[1] |
| 91.53% | $831 | $908 | ($77) | (8.5%) |
| | **A** | **B** | **A — B** | |

**Note:**
[1] Absolute discount on the Settlement Claim is approximately 7.5% when Santee Cooper's portion of the First installment is included

4

EXHIBIT "D"

ELECTRONICALLY FILED - 2018 May 23 6:24 PM - SCPSC - Docket # 2017-370-E - Page 53 of 94

**ReedSmith Ducera**

# Summary Pros and Cons of Selling Interest

| | Pros | Cons |
|---|---|---|
| **Sell Interest** | ▪ Proceeds received at transaction close vs. over a multi-year period<br>▪ Allows for economic return on upfront payment<br>▪ Significantly mitigates Toshiba counterparty risk<br>▪ Significantly mitigates timing and process risk associated with WEC bankruptcy and sale process<br>▪ Reduces management distraction related to WEC bankruptcy and sale process<br>▪ May reduce overhang from ratings agencies | ▪ Total proceeds represent a 7.9% discount to the face value of the $2.168 billion Settlement Claim<br>▪ Representations, warranties, and indemnities that are required of the Owners as part of the transaction |

ELECTRONICALLY FILED - 2018 May 23 6:24 PM - SCPSC - Docket # 2017-370-E - Page 54 of 94

EXHIBIT "D"

ReedSmith Ducera

# Summary of APA

| APA | |
|---|---|
| **Owners** | ▪ South Carolina Electric & Gas Company<br>▪ The South Carolina Public Service Authority |
| **Buyer** | ▪ CitiBank, N.A., a national Banking Association; immediately after the Closing, Citibank, N.A. intends to assign all rights and obligations under the Purchase Agreement to Citigroup Financial Products Inc. |
| **Anticipated Closing Date** | ▪ September 27, 2017 |
| **Price** | ▪ 91.53% |
| **Aggregate Amount** | ▪ $1,847,075,400 |
| **Structure** | ▪ Direct Sale to Buyer |
| **Sale & Purchase of the Interest** | ▪ The Owners' rights to receive payment from Toshiba under the Settlement Agreement and enforcement rights to proofs of claim associated with the EPC Agreement |
| **Retained Rights** | ▪ Owners retained items including; certain excluded documents, the $150,000,000 First Installment, the EPC Agreement (other than enforcement rights assigned to the Buyer), the IAA, and the Summer Facility |
| **Buyer's Representations and Warranties** | ▪ Summary of the Representations and Warranties that have to be accurate as of the Closing:<br>  – Buyer has (i) conducted adequate due diligence, (ii) is making an informed decision with regard to entering into the transaction having completed its own analysis and independently made its own decisions regarding the Agreement, and (iii) is able to bear the economic risk associated with the transaction<br>  – Buyer acknowledges that the Interest is being sold "as-is," "where-is" and "with all faults," except as set forth in the Owner's Representations and Warranties and Covenants of the Agreement |

EXHIBIT "D"

ELECTRONICALLY FILED - 2018 May 23 6:24 PM - SCPSC - Docket # 2017-370-E - Page 55 of 94

Attachment to First Supplemental Response 4-69
Page 7 of 7

ReedSmith Ducera

## Disclaimer

The information herein has been prepared exclusively for the Recipient by Ducera Partners LLC ("Ducera"). The information contained herein is based on publicly available and private, non-public sources and Ducera has not assumed any responsibility for independently verifying such information. No representation or warranty, express or implied, is or will be made, and no responsibility or liability is or will be accepted, by Ducera or by any of its officers, directors or agents as to or in relation to the accuracy or completeness of any information contained herein. In furnishing this information, Ducera undertakes no obligation to provide the Recipient with access to additional information, to update any information contained herein, or to correct any inaccuracies herein. These materials and the information contained herein are confidential and may not be disclosed publicly or made available to third parties without the prior written consent of Ducera.

ELECTRONICALLY FILED - 2018 May 23 6:24 PM - SCPSC - Docket # 2017-370-E - Page 56 of 94

EXHIBIT "E"

## Message from Santee Cooper CEO

- Assessment is not ...(and has never been ... intended to position Owners for litigation ... but we are not going to give up our rights to anything.

- Wenick PO approach ... is to protect Consortium from the Southern project.

- We understand the Consortium's sensitivity regarding Southern ... and are fine with developing an Assessment Work Product protected by a privileged and non-discoverable attorney-directed vehicle.

- Our inability to put a simple agreement into place ... leaves the Consortium looking like it has something to hide ... relax!

- The purpose of the Assessment is to make the Owners / Consortium / and Project successful.

- Roderick & Asherman ... clearly understood the purpose of the Assessment and its goal ... and pledged their full support in face-to-face meetings with our CEOs on Jun 10 (Asherman) ... and Jun 17 (Roderick).

- The Owners are going to perform a 3rd Party Assessment of this project ... it will be led by Bechtel.

- We are asking the Consortium for its cooperation.

- For the Assessment to be successful ... the Consortium needs to be open and transparent about the project and its issues ... so that solutions can be designed to make us all successful.

- If the Consortium is not going to be open and cooperative with this plan ... unfortunately the Owners will be left with one path forward (litigation) ... and we do not want to go there.

Confidential Competition Sensitive
Proprietary Business Information

00171547

ELECTRONICALLY FILED - 2018 May 23 6:24 PM - SCPSC - Docket # 2017-370-E - Page 57 of 94

EXHIBIT "E"

## ATTORNEY CLIENT PRIVILEGED—CONFIDENTIAL

General Talking Points for Nuclear Construction Meeting—November 14, 2014

### 1.   OWNERS SHOULD NOT BE IN A RUSH TO TAKE ANY ACTION

The burden to resolve the current dispute is on the Consortium, as both parties within the Consortium are at fault in causing unexcused project delay. Owners have withheld $28,365,017 in overpaid progress payments and $2,056,360 in milestone escalation from invoices received through 10/01/14, by March of 2015 the aggregate withheld figure will be $75 million. CBI is under increasing financial pressure as a result. Every day construction work continues on site. A settlement now in effect rewards the Consortium for late work.  Other than having the matter settled, there is no immediate reason to force a resolution.

### 2.   A LEGAL REMEDY DOES NOT APPEAR VIABLE FOR OWNERS

The EPC agreement caps Owners' liquidated damages at $150 million.  At this juncture, we do not have proof of fraud or other business wrongdoing that would allow a Court to set aside those agreed damages under New York law.  We continue to research this point, but there is a substantial risk to the Owners that, in spite of the Consortium's continuing unexcused delays, our damages remedy will be insufficient to cover losses.

### 3.   THERE IS DISAGREEMENT AMONG OWNERS ON TERMS OF POTENTIAL SETTLEMENT

Santee Cooper cannot agree to the 11 points of settlement proposed by SCE&G, and specifically disputes an offer to reset liquidated damages at $300 million in event of global agreement.

### 4.   REQUIRE CONSORTIUM TO RESOLVE THIS DISAGREEMENT INTERNALLY

From the start of construction, the Westinghouse unfinished design has impeded the Contractor's ability to perform.  Over and above that, CB&I has been unable to fabricate submodules to NRC standards while maintaining a schedule.  Westinghouse/Toshiba has the burden and wherewithal to internally satisfy CB&I's claims.  A capitulation at this point by Owners only reinforces the problem and enables it to continue.  Westinghouse has chosen this contractor and hopes to sell the AP1000 worldwide.  If necessary, before any offer is made to the Consortium, Owners' senior management should go to Westinghouse senior management to point this out, and on to Toshiba if required.

### 5.   OWNERS SHOULD PURSUE ADDITIONAL CONSTRUCTION MANAGEMENT EXPERTISE

Going forward, heightened oversight of the project should be exercised by Owners, including the procurement of additional construction management expertise.

ELECTRONICALLY FILED - 2018 May 23 6:24 PM - SCPSC - Docket # 2017-370-E - Page 58 of 94

EXHIBIT "E"

**6.  OWNERS SHOULD PURSUE MORE AGGRESSIVE TARGET COST REDUCTIONS**

In addition to withholding payments for additional storage costs, we should consider reductions for other target costs (e.g., make adjustments for poor direct craft productivity factors, and excessive numbers of field-non-manual and indirect craft personnel).

**7.  OWNERS SHOULD PURSUE AN ARTICLE VII REMEDY NOW**

Article VII of the EPC entitled "Price Adjustment Provisions" allows Owners to pursue a reduction in construction costs when the inflation rate and "other cost changes" are favorable. These market conditions have occurred in Owners' favor. We should immediately notify the Consortium of our intent to pursue this contractual remedy.

Confidential Competition Sensitive
Proprietary Business Information
FOIA Exempt Response

_00178518

EXHIBIT "E"

Please do not hesitate to call me if you need anything – I'm sure we will be back in touch soon.


Have a Great Weekend,

Michael Crosby

---

**From:** Albert, Craig [mailto:cmalbert@Bechtel.com]
**Sent:** Thursday, February 05, 2015 6:00 PM
**To:** Carter, Lonnie; Crosby, Michael; Crosby, Michael; Carter, Lonnie
**Cc:** Adams, Mike A. (BGI); Troutman, Tyrone; Watson, Marty
**Subject:** DRAFT Proposal from Bechtel

Lonnie, Michael,

Attached is a draft of the proposal we committed to providing, and below is a draft of the text I would include in a letter transmitting the final/formal proposal. Please advise of any changes you would like us to make.

Look forward to hearing from you.

Craig


Dear Lonnie and Michael,


Thanks again for meeting with Mike Adams and me on January 24 to discuss the status of the V.C. Summer project. Successful delivery of this project is obviously essential for Santee Cooper, SCANA, and your contractors, but it is also vitally important to our industry and to Bechtel. We understand how important it is to you that the project be executed in the most prudent manner possible and that the new units be delivered at the earliest possible completion date.


Bechtel has supported a number of owners in performing independent assessments of complex EPC projects and we are committed to making a team of senior Bechtel personnel available to support such a review on V.C. Summer. We are very knowledgeable of the AP1000 design basis and our broad experience with world-wide supply chain management, grass-roots nuclear construction, and executing mega projects that leverage large

2

Confidential Competition Sensitive
Proprietary Business Information

_00079114

ELECTRONICALLY FILED - 2018 May 23 6:24 PM - SCPSC - Docket # 2017-370-E - Page 60 of 94

EXHIBIT "E"

scale modularization provides us with the insight needed to understand the complexities and challenges to deliver this project.

Given the importance and magnitude of this project, I handpicked Bechtel Senior Vice President Mike Lewis to lead our proposed assessment team. Mike is one of our very best project managers for complex, mega projects and is currently serving as our corporate Manager of Construction, the most senior construction manager in Bechtel. In addition, we have included other senior managers on the team who have very successful history working at V.C. Summer.

In terms of the assessment, we propose that our team focus on understanding the current status and forecasted path to completion through various aspects of the project including: design; supply chain management, with emphasis on module fabrication; construction; and startup. With WEC's support, we can focus on getting a clear picture of the status of the WEC design and licensing efforts and evaluate how those activities may impact the future path to completion. Our team will review project metrics and reports; interview select owner and contractor personnel; and visit the site and key fabrication facilities to evaluate the health of the project execution plan and the thoroughness of the current forecast – from both a schedule and cost performance perspective.

Note that our review will focus on the methods and tools being used to manage project execution, changes, and isks, but will not review the attribution of past impacts or validity of any pending or future claims. Beyond the numbers, we plan to assess the degree to which all parties are aligned in a positive project culture focused on the quality and efficiency of project delivery. We will also look for potential opportunities to tailor contractor oversight given the current project status and circumstances.

As part of our assessment, we will provide you with our initial conclusions and recommendations focusing on the most prudent path forward, and what that means in terms of cost and schedule to improve the trajectory of the project. We are confident, based on our experience in the industry and with assisting owners in completing complex projects that we can provide recommendations that will help you and your current contractors with delivery of your project.

The effort for an assessment of this magnitude will require approximately 10 senior managers, will last 8 weeks in total, and will cost $1 million. Attached is a **DRAFT** proposal that outlines and further defines the details for how the assessment will be executed, key members of the team, commercial considerations, documents and data that are needed from the project to support the assessment, and the proposed topics for the assessment report. Additional information on Bechtel's experience with the AP1000 technology and other relevant projects is also included.

We look forward to supporting you in this endeavor and are prepared to start at your request. I suggest we quickly set up a follow-on meeting with some of our key team leaders to further discuss this effort in detail and

Confidential Competition Sensitive
Proprietary Business Information

_00079115

EXHIBIT "E"

answer any of your questions.  We are prepared to formally issue this proposal if it meets your expectations and can obviously incorporate any changes you would like.  I would be happy to help finalize our proposal.  Ty Troutman, our General Manager for Nuclear Power, who is copied on this email and can be reached at <u>703-429-6284</u>, can also help coordinate this follow on discussion.  Please let me know of any questions.


Best regards,

Craig

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*
WARNING – This e-mail message originated outside of Santee Cooper.
Do not click on any links or open any attachments unless you are confident it is from a trusted source.
If you have questions, please call the IT Support Center at Ext. 7777.
\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

Confidential Competition Sensitive
Proprietary Business Information

_00079116

ELECTRONICALLY FILED - 2018 May 23 6:24 PM - SCPSC - Docket # 2017-370-E - Page 61 of 94

ELECTRONICALLY FILED - 2018 May 23 6:24 PM - SCPSC - Docket # 2017-370-E - Page 62 of 94

EXHIBIT "E"

**MARSH, KEVIN B**

| | |
|---|---|
| From: | Albert, Craig [cmalbert@Bechtel.com] |
| Sent: | Monday, July 13, 2015 2:49 PM |
| To: | Lonnie Carter; MARSH, KEVIN B |
| Cc: | Adams, Mike A. (BGI); Carl Rau; Troutman, Tyrone |
| Subject: | Fwd: Scana/Santee Cooper (SS) Bechtel (B) Meeting |

***This is an EXTERNAL email. Please do not click on a link or open any attachments unless you are confident it is from a trusted source.

Kevin, Lonnie,
We were exchanging emails internally about what we should discuss tonight. Decided just to forward to you unfiltered.  Of course you may have other items and are free to add/delete from our list.
"SS" is you and "B" is us.
See you in couple hours.
Craig

Begin forwarded message:

> **From:** "Albert, Craig" <cmalbert@Bechtel.com>
> **Date:** July 13, 2015 at 12:27:40 PM EDT
> **To:** "Rau, Carl" <cwrau@Bechtel.com>
> **Cc:** "Adams, Mike A. (BGI)" <maadams@bechtel.com>, "Troutman, Tyrone" <tptroutm@bechtel.com>
> **Subject: Re: Scana/Santee Cooper (SS) Bechtel (B) Meeting**

Looks like good flow. We certainly want to hit each item before end.

I reordered a bit below based on answering the question 'what is Bechtel's intent of mtg':
- 1) to understand SS sense of urgency (and to emphasize a high one). We are ready to go and prepared to go quickly. Need contract, then the info.
- 2) get a sense from SS of what we can expect from consortium regarding their disposition and support of our effort. And expectations for 7/28 consortium meeting.
- 3) high level alignment on what assessment is and isn't. (three paths of assessment: the work, the consortium, and SS oversight. Not claims consultancy)
- 4) discuss how we plan to approach assessment
- 5) to share some very initial observations (SS too hands-off, over-delegating, ...)
- 6) discuss level of ownership within SS of this assessment. And who is change agent.
- 7) anything else they can discuss of future events/changes/plans that would impact project.
- 8) frequency of CEO-level check-ins and level of detail in those meetings.
- 9) at risk of being presumptuous, discussion about 'beyond the assessment' (Watts Bar 500)

We can discuss status of PUC along the way.

See you at airport.

1

Confidential Competition Sensitive
Proprietary Business Information

_00024735

ELECTRONICALLY FILED - 2018 May 23 6:24 PM - SCPSC - Docket # 2017-370-E - Page 63 of 94

EXHIBIT "E"

*July 28, 2015*
*Kick-off MTG*



**Date:** July 9, 2015

**Subject:** Summary of Bechtel's V.C. Summer 2 &3 Management Assessment Scope and Approach

**Reference:** Bechtel's Assessment Proposal, dated February 10, 2015

## Overview

SCANA and Santee Cooper requested Bechtel to perform an overall assessment of the V.C. Summer Units 2 & 3 project (Project) with the objective to assist the Project owners in better understanding the current status and potential challenges as a first step in helping to ensure that the Project is on the most efficient trajectory to completion. The assessment is expected to take eight (8) weeks and will document the identified risks, observations, and recommendations by the Bechtel team in support of the above objective.

## Scope

a. Evaluate current status of forecasted completion plan for: Design; Licensing; Supply Chain; and Construction

b. Focus these evaluations on the issues that have caused impacts on the Project to date

c. Review and comment on the current project management tools and work processes being used to plan and execute the Project

d. Review and comment on the mitigation plans and/or recovery plans put into place and evaluate their effectiveness to date

e. Review and comment on the change management processes being used on the Project, through completion and turnover of the units

f. Develop a Final Report that will contain an overall Executive Summary along with a narrative describing the current status, identified risks, observations, and recommendations for the following Project functions:

- Project Management
- Project Controls
- Engineering
- Licensing
- Quality Assurance/Quality Control

**BECHTEL CONFIDENTIAL**
**Page 1 of 2**

Confidential Competition Sensitive
Proprietary Business Information

_00073656

ELECTRONICALLY FILED - 2018 May 23 6:24 PM - SCPSC - Docket # 2017-370-E - Page 64 of 94

EXHIBIT "E"



- Supply Chain Management
- Module Construction
- Construction
- Startup

**Approach**

- **Data Validation:** During this phase, the team will evaluate the current status of the Project including: Design; Licensing; Supply Chain; and Construction (e.g., scope control, schedule (plan verses actual), staffing (plan verses actual), budget (plan verses actual)). This Phase will take approximately one week after receipt of documents requested. Based on review of the documents received, a more detailed plan for the assessment may be necessary.

- **Interviews:** Bechtel team will interview the SCE&G/Santee Cooper leadership team members to get a good understanding of how the contractors are organized and managed and in gauging the current EPC culture and potential impacts to the execution approach on the Project. The list of the leadership team members in question will be provided at the conclusion of the data validation phase.

- **Functional breakout sessions:** During this period, the Bechtel team will break out by their assigned functional area and work directly with SCE&G/SCANA and Consortium team managers responsible for their respective functions. The Bechtel team will focus on a review of the various tools, documents, and reports and their ability to support the efficient and timely planning, management and completion of the Project.

**Confidential Competition Sensitive**
**Proprietary Business Information**
FOIA Exempt Response

_00073658

ELECTRONICALLY FILED - 2018 May 23 6:24 PM - SCPSC - Docket # 2017-370-E - Page 65 of 94

EXHIBIT "E"

## Crosby, Michael

| | |
|---|---|
| **From:** | Albert, Craig <cmalbert@Bechtel.com> |
| **Sent:** | Tuesday, August 25, 2015 8:05 AM |
| **To:** | Crosby, Michael |
| **Subject:** | Re: Item 4 |

Michael, I completely understand your advice.

I was trying to be as forward leaning and provocative as possible knowing that you would whittle us back to the right place at this time.

Our plan on the call will be to:

1) explain at high level why we have a concern;

2) update progress made thus far and describe obstacles encountered. We will point out what we have received and what we ARE able to do with it; what not able to do and why it matters;

3) Then we will make suggestions. We will gently follow flow of the long email I sent you and follow Kevin's lead and not push unnaturally hard. At minimum, we'd like to get Kevin to agree to continue weekly call and have him agree to advise Westinghouse and CBI executives to take this seriously and that Bechtel's input will be necessary/helpful to Owners to resolve issues with Consortium. Also would like kevin to support a meeting between Bechtel executives and consortium's to improve mutual understanding.

We will be flexible and careful on the call and follow your advice.

Sound about right?

Craig


> On Aug 24, 2015, at 9:43 PM, Crosby, Michael <michael.crosby@santeecooper.com> wrote:
>
> Craig,
>
> I believe the email approach is too aggressive at this point ... and may even place Bechtel credibility at risk. Let's talk tomorrow if we can ... before noon is best for me ... but I will take your call whenever.
>
> Unfortunately we need to invest a couple of weeks of laying an appropriate foundation with Kevin before launching ... at this point a couple more weeks is immaterial.
>
> We had a Board meeting today ... and received excellent support.  We will not be making any decisions regarding the Consortium or the project moving forward without a completed Bechtel Assessment  ... Roderick will be hearing that (again) soon ... information will flow to the extent the Consortium has any to offer.
>
> In fairness to Kevin we need to ease him into the pool.  This is going to be difficult for him to swallow, digest and then push down into his organization.  Lonnie will have to coach and support him as he works through it ... and it will likely require SCANA Board support to execute a big move.
>
> Carl (and you) have excellent rapport with Kevin (my observation).  If the call is truly just CEOs ... be bold and begin verbalizing your observations ... provide examples and lay the foundation.  Play off of Kevin's tone ... Lonnie will help you.
>

1

Confidential Competition Sensitive
Proprietary Business Information

_00079167

EXHIBIT "E"

> Let's talk tomorrow.
>
> Michael R. Crosby
> iPad
>
>
>> On Aug 24, 2015, at 6:30 PM, Albert, Craig <cmalbert@Bechtel.com> wrote:
>>
>> Michael,
>> Below is a draft note regarding a stronger intervention action (item 4). Let me know your thoughts and if you'd like to discuss.
>> Carl and I appear to have just scheduled a call tomorrow at 4 with CEOs. Too soon to launch this?  Perhaps you can advise your thoughts on this and how close we walk up to it in the call.
>> It's quite aggressive but does stimulate thoughts. Let me know.
>> Craig
>>
>>
>>
>> Lonnie, Kevin,
>>
>> Prior to our first CEO update meeting, we'd like to put a fairly bold action-oriented proposal on the table for discussion and consideration in our meeting.
>>
>> It is clear that we collectively are not making much progress with regard to the Bechtel assessment. We are now planning a third meeting -- simply to get aligned on the data that we need in order to perform a basic but thorough cost and schedule analysis of the project.  We are now being referred directly to Westinghouse, several levels down in their company. Based on this and a number of other observations, we are concerned this indicates some combination of the following:
>>
>> - Given newly apparent adverse circumstances of both the project and the viability of the consortium, there may be a lack of EPC competence and/or capacity of the owner team to prudently oversee the project going forward without assistance from strong mega nuclear EPC project company.
>>
>> - Resistance to the assessment itself for variety of possible reasons
>> (e.g. natural self-defense, fear of assessment conclusions, loss of
>> control, concern of Bechtel intentions, belief/hope that Bechtel
>> involvement will be fleeting/short term like previous 3rd party
>> assessments)
>>
>> Time is slipping and so we are suggesting an intervention now to help quickly ensure the project and the Owners' interests are front-and-center.  We believe an alternative approach regarding assistance from Bechtel may be in your best interest in order to help implement any project course correction. This may help make the assessment that we both envision possible and position all of us for strong and immediate changes if warranted.
>>
>> We have outlined this approach below:
>>
>> 1) Scana/SC should engage Bechtel as its owner engineer (OE) and let the consortium members know that our involvement is not short term or superficial. That we will be engaged to support the owners going forward.
>>
>> 2) Advise consortium executives that their cooperation and openness with Bechtel is in their best interest because any future contract changes and any future progress payments, must be supported by Bechtel analysis. (We believe that to the extent allowed by contract, you should have much more accurate information regarding engineering,

2

Confidential Competition Sensitive
Proprietary Business Information
FOIA Exempt Response

_00079168

EXHIBIT "E"

procurement, and construction schedule status as part of a process to resolve any contractual differences with the consortium; and you should ensure you have sufficient quantitative visibility and verification of work performed (e.g. EPC earned value) to justify making further payments.
>>
>> 3) Define scope/terms and reporting relationship of Bechtel to support this. At minimum, it should include a contingent of senior large project professionals contractually seconded to the "Owners" management team. We recommend this group be full time dedicated to the project, and report directly to the CEO (allow the current oversight team to support the OE as necessary).
>>
>> 4) Scana/SC should encourage and support a Bechtel executive discussion with W and potentially CBI to assure clarity in ongoing project status requirements.
>>
>> 5) Continue the effort to obtain the data needed to support the
>> assessment (we would have the 3rd meeting in Cranberry this week.)
>>
>> We look forward to our meeting to discuss our basis for this proposal.
>>
>> Regards,
>>
>> Craig
>>
>>
>>
>> ***************************************************************
>> ***************************************************
>> WARNING – this e-mail message originated outside of Santee Cooper.
>> Do not click on any links or open any attachments unless you are confident it is from a trusted source.
>> If you have questions, please call the IT Support Center at Ext. 7777.
>> ***************************************************************
>> ***************************************************
>
>
> Confidentiality Notice:
> This message is intended exclusively for the individual or entity to
> which it is addressed. This communication may contain information that
> is proprietary, privileged, confidential or otherwise legally exempt
> from disclosure. If you are not the named addressee, you are not
> authorized to read, print, retain, copy or disseminate this message or
> any part of it. If you have received this message in error, please
> notify the sender immediately either by phone or reply to this e-mail,
> and delete all copies of this message.

***************************************************************
***********************
WARNING – this e-mail message originated outside of Santee Cooper.
Do not click on any links or open any attachments unless you are confident it is from a trusted source.
If you have questions, please call the IT Support Center at Ext. 7777.
***************************************************************
***********************

Confidential Competition Sensitive
Proprietary Business Information
FOIA Exempt B

_00079169

ELECTRONICALLY FILED - 2018 May 23 6:24 PM - SCPSC - Docket # 2017-370-E - Page 67 of 94

ELECTRONICALLY FILED - 2018 May 23 6:24 PM - SCPSC - Docket # 2017-370-E - Page 68 of 94

EXHIBIT "F"



# Presentation to S. C. House Utility Ratepayer Protection Committee

September 15, 2017



EXHIBIT "F"

ELECTRONICALLY FILED - 2018 May 23 6:24 PM - SCPSC - Docket # 2017-370-E - Page 69 of 94

## Project Facts

- **Approved AP1000 Design**
  - The NRC certified the AP1000 Design before the project began.

- **Schedule**
  - A project schedule has existed throughout construction.

- **Project Assessment Report and Project Oversight**
  - Counsel commissioned this report in support of potential litigation; SCE&G addressed the recommendations.

ELECTRONICALLY FILED - 2018 May 23 6:24 PM - SCPSC - Docket # 2017-370-E - Page 70 of 94

EXHIBIT "F"

## Project Consortium Issues

- In 2015 significant commercial issues within the Consortium of Westinghouse and CB&I were impacting performance and productivity on the site.

- Outside legal counsel commissioned an independent assessment for use in potential litigation with the Consortium to validate challenges the Owners had identified.

- Report focused on completing the units as planned if Westinghouse had lived up to its commitments.

- SCE&G and Santee Cooper undertook steps to address material points made in the report.

SCE&G.

EXHIBIT "F"

ELECTRONICALLY FILED - 2018 May 23 6:24 PM - SCPSC - Docket # 2017-370-E - Page 71 of 94

## Summary

- **Every decision we've made has been in the best interests of customers.**

- **We've had an approved design and schedule since day one.**

- **The Bechtel Report was a tool for validating project challenges and to support potential litigation with Westinghouse.**

- **I believe we would be building these plants if Westinghouse had not declared bankruptcy.**

SCE&G.

ELECTRONICALLY FILED - 2018 May 23 6:24 PM - SCPSC - Docket # 2017-370-E - Page 72 of 94

EXHIBIT "G"

## Excerpts From House Utility Ratepayer Protection Committee

## Hearing

September 15, 2017

3:19:12

**Chairman McCoy: So you believe It was prudent to leave out material information when presenting in front of these commissions?**

Marsh: With respect to the report as I have said earlier, it was confidential; it was subject to attorney client privilege; it was prepared in anticipation of litigation, but I believe we shared and gave others open access to the site to understand what was going on with the construction process.

3:34:45

**Vice-Chairman Ott: Following up on that, why didn't you provide the report? Even if not asked for, why was the determination made to withhold the report from ORS, after you did receive it, since they had already made reference to it previously, what was the thought process behind not giving that information to them or the PSC when you went before them after you had received the report?**

Marsh: We believed it was privileged; it was prepared in anticipation of potential litigation against Westinghouse.

4:19:13

**Representative James Smith: You stated that the Bechtel report was prepared in anticipation of litigation that was your testimony correct?**

Marsh: Yes sir.

**Representative James Smith: And you stated it was in anticipation of litigation with Westinghouse, is that correct?**

Marsh: Yes sir.

5:51:06

**Representative Tommy Pope: What I am trying to distinguish for our peers, the Bechtel report was really done because you anticipated litigation, not to make this project better, but you anticipated litigation is what I hear as to why it was not disclosed is that correct?**

Byrne: Yeah, the reason that we commissioned the Bechtel report was in anticipation of litigation. Now, an entity like Bechtel is probably a little uncomfortable with that aspect of things because they are a nuclear construction company themselves. But, in this industry when we do assessment reports we get a lot of feedback so every assessment report we ever do including our operating unit, unit 1,  gives you a lot of opportunities to take action, so when we are presented with those opportunities to fix things we are going to take advantage of those. ...we did not ignore anything from the Bechtel report.

ELECTRONICALLY FILED - 2018 May 23 6:24 PM - SCPSC - Docket # 2017-370-E - Page 73 of 94

EXHIBIT "H"

1

1

2

3

4

5

6

7

8                    TRANSCRIBED VIDEO FILE

9

10

11

12

13                   South Carolina Senate

14      V. C. Summer Nuclear Project Review Committee

15                   September 18, 2017

16

17

18

19

20                   COMPUSCRIPTS, INC.

21           CLIENT FOCUSED.   DEADLINE DRIVEN.

22

23

24                      803.988.0086

25                      888.988.0086


www.compuscripts.com

ELECTRONICALLY FILED - 2018 May 23 6:24 PM - SCPSC - Docket # 2017-370-E - Page 74 of 94

EXHIBIT "H"

79

1    intellectual property while Westinghouse was

2    still solvent.

3                  CHAIRMAN MASSEY:   "To enable

4    owner to exercise its rights upon termination:

5    Each of Westinghouse and Stone and Webster has

6    granted owner an intellectual property license

7    on the date hereof," and it sets out the

8    different exhibits with the licenses on them.

9    And the exercise of your rights would be the

10   completion of the project.  I mean, that -- you,

11   you were able to terminate the contract if you

12   had grounds under -- for cause and still -- and

13   retain the intellectual property.

14                  The idea, and surely, surely the

15   lawyers that you had negotiating this thing in

16   the beginning -- I mean, everybody knew that the

17   plan was to complete the project, right?  I

18   mean, that's the plan, right?  I mean, you were

19   not going to negotiate something that if you had

20   to cancel because they were just screwing up

21   that you weren't going to be able to complete

22   the project.  And that's what this is -- set out

23   to do, isn't it?

24                  MR. BYRNE:  Yeah, and, you know,

25   we were always looking at whether or not it

1   would make sense to try to terminate the

2   contract, and we were prepping for the

3   possibility of a lawsuit with the consortium,

4   including Westinghouse, and that's why we

5   Commissioned the Bechtel Report.  But it --

6   cancellation would have been very difficult for

7   us to restart in a timely fashion, and just us

8   terminating for cause doesn't get us access to

9   the intellectual property.

10              So, you know, Westinghouse would

11   fight you on that.  There were further

12   provisions in the agreement that outlined what

13   it would take for an independent third party to

14   turn over the intellectual property to us.

15              CHAIRMAN MASSEY:  Right, and I

16   understand that.  I mean, it was, it was kept in

17   escrow, right, which is where it is now, right?

18              MR. BYRNE:  That's correct.

19              CHAIRMAN MASSEY:  Yeah.  Well,

20   all of those deficient performance reasons that

21   -- was that a -- that was a significant factor

22   leading to the renegotiation of the contract in

23   2015, wasn't it?

24              MR. BYRNE:  It was.

25              CHAIRMAN MASSEY:  Is that right?

EXHIBIT "H"

84

1              MR. BYRNE:  Right.

2              CHAIRMAN MASSEY:  The Bechtel

3    Report confirms them -- many of those things,

4    but you knew about those things.

5              MR. BYRNE:  That's right.

6              CHAIRMAN MASSEY:  Right.  So the

7    Bechtel Report was not a basis for the

8    renegotiated contract.

9              MR. BYRNE:  The report itself was

10   not a basis for the renegotiated contract.

11             CHAIRMAN MASSEY:  All right.  The

12   -- tell me again while y'all -- why did you

13   engage Bechtel in order to do that report?

14             MR. BYRNE:  Why did we engage

15   Bechtel?

16             CHAIRMAN MASSEY:  Yeah.

17             MR. BYRNE:  It was --

18             CHAIRMAN MASSEY:  Why get the --

19             MR. BYRNE:  -- it was in

20   anticipation of litigation with the consortium

21   partners.

22             CHAIRMAN MASSEY:  Litigation

23   about what?  What would the litigation have

24   been?

25             MR. BYRNE:  Well, it was really

EXHIBIT "H"

85

1    two things.  It was, could they have a claim

2    against us for these payments that we were

3    withholding, and could we have a defense for

4    that, and then if we wanted to pursue something

5    for them being deficient, then -- and certainly

6    if there was a termination, there were going to

7    be lawsuits.  So we wanted to make sure that our

8    positions were defensible.  So that, that was

9    the basis behind which we went with the Bechtel

10   Report.

11            CHAIRMAN MASSEY:  And the report,

12   the official -- the final version of the report,

13   the written report, was released, I think it was

14   in February of '16; is that right?

15            MR. BYRNE:  That sounds right.

16            CHAIRMAN MASSEY:  All right, and

17   so that report was not issued in anticipation of

18   litigation, was it?

19            MR. BYRNE:  The report was issued

20   for that purpose.

21            CHAIRMAN MASSEY:  Well, you

22   renegotiated the contract in October of '15.

23            MR. BYRNE:  Correct.

24            CHAIRMAN MASSEY:  Right?  One of

25   the interesting things about that contract is,

ELECTRONICALLY FILED - 2018 May 23 6:24 PM - SCPSC - Docket # 2017-370-E - Page 78 of 94

EXHIBIT "H"



you completely took litigation off the table.

MR. BYRNE: Until the project was over with.

CHAIRMAN MASSEY: Right. Yeah, but I mean, you, you were --

MR. BYRNE: You -- we could sue each other when the project ended. We only took litigation off the table for the period of construction.

CHAIRMAN MASSEY: If you pursued the dispute resolution procedures in the interim under that renegotiated contract, right?

MR. BYRNE: Now, the dispute resolution procedures were in place irregardless of lawsuits, intended to avoid lawsuits and protracted commercial disputes. But at the tail end of the project, we could sue each other. Now, presumably, it would have been an issue for -- under which we would have been at -- before the -- a dispute resolution panel or a board.

CHAIRMAN MASSEY: But that 2015 contract by its terms resolved every dispute that you had between -- with the consortium.

MR. BYRNE: It resolved the disputes that we had at the time. There were a

1    couple of change orders that we were in the

2    process of negotiating that were not tied up

3    with that negotiation, but it was a small

4    handful of things.

5            CHAIRMAN MASSEY:  Did disputes

6    arise between October 27, 2015, and February

7    2016 that would have led to litigation after the

8    completion of the project?

9            MR. BYRNE:  We did have a couple

10   of disputes.  Now, they didn't lead to

11   litigation at this point in time, but we hadn't

12   gotten to that point yet.  But the construction

13   milestone payment schedule was one issue we had

14   a dispute on.

15           CHAIRMAN MASSEY:  Right.  I mean,

16   the schedule was still a problem.

17           MR. BYRNE:  It wasn't necessarily

18   that the schedule was a problem.  It was how you

19   pay -- we wanted to make sure that we only paid

20   the contractor for actual progress on the

21   project.  Again, we're trying to incent them to

22   get the construction done in a timely fashion,

23   and so we wanted to make sure that if they

24   didn't hit milestones, they didn't get paid.

25           CHAIRMAN MASSEY:  Right, because

ELECTRONICALLY FILED - 2018 May 23 6:24 PM - SCPSC - Docket # 2017-370-E - Page 79 of 94

1     that renegotiated contract provides, and I think

2     there was some conversation earlier about a

3     liquidated damages provision if they didn't meet

4     certain -- if they didn't complete the project

5     by certain days, then they've got certain

6     penalties for each day, each week, each month,

7     whatever, that that didn't complete it, up to a

8     cap, like two year or something.  But it also

9     included incentives payments if they got -- I

10    mean, you were trying to encourage them to do

11    the project.

12              MR. BYRNE:  We were trying to

13    give both a carrot and a stick in order to get

14    the project finished and to qualify for

15    production tax credits.

16              CHAIRMAN MASSEY:  Were you aware

17    of Westinghouse's financial problems when you

18    renegotiated that contract in October of 2015?

19              MR. BYRNE:  No, and they are not

20    a publicly traded company, so we don't

21    necessarily have any insight into their

22    financials.

23              CHAIRMAN MASSEY:  Were you aware

24    of Toshiba's financial problems at that point?

25              MR. BYRNE:  We were not aware of

1    information released, but you did not.  So to

2    that narrative, did SCANA purposely withhold the

3    dire condition that this contract and this

4    project had from South Carolina ORS, PURC, PSC,

5    any and everybody?

6              MR. MARSH:  Well, the report was

7    prepared by outside cancel in anticipation of

8    litigation and is therefore confidential.  As

9    you've heard us report before, we believe the

10   problems that were identified in the report were

11   known to us.  Mr. Carter also testified earlier

12   today that the Bechtel Report was not news.  We

13   felt like we were on the verge of having

14   litigation with Westinghouse and still may be

15   engaged in Westinghouse litigation based on some

16   of the information we confirmed and validated in

17   the report.

18              I don't believe we misled or did

19   not share information with the Office of

20   Regulatory Staff or others.  We've actually gone

21   back and prepared a document that I'm happy to

22   leave with this group that identifies problems

23   that were identified in the Bechtel Report and

24   where we addressed those in testimony before the

25   Commission or in information provided in our 34

ELECTRONICALLY FILED - 2018 May 23 6:24 PM - SCPSC - Docket # 2017-370-E - Page 82 of 94

1    quarterly reports to the Public Service

2    Commission and Office of Regulatory Staff that

3    are required under the Base Load Review Act.

4                    So we believed the issues were

5    out there and were being discussed.  We didn't

6    see anything in that report that was material

7    that they were not aware of or had access to our

8    people in their interviews to talk to and

9    certainly didn't intend to hide behind the

10   report.  The report was prepared in preparation

11   for potential litigation, and that -- I don't

12   know what to say other than that was the

13   characterization of the report.  We still

14   believe it's a protected document.  Even though

15   a copy has been provided to you, and we're happy

16   to address the questions, we still believe it's

17   a confidential report prepared in anticipation

18   of litigation.

19                    The comment with respect to

20   Bechtel being limited to information in a

21   reading room -- and I'll ask some of my people

22   on-site to verify this if I'm not correct -- my

23   understanding is, there's certain information

24   that Westinghouse was reluctant to share with

25   Bechtel, their competitor.  I mean, I can

ELECTRONICALLY FILED - 2018 May 23 6:24 PM - SCPSC - Docket # 2017-370-E - Page 83 of 94

EXHIBIT "H"

212

1    it, and we would maintain the argument of

2    privilege on that.

3                SENATOR RANKIN:  All right --

4                MR. CARTER:  If I may, Senator,

5    may -- if I may, I -- we do not have the October

6    22nd because we -- because I know they've been

7    looking for -- make sure we've been thorough and

8    have all these documents, but I am told that we

9    did have a draft.  There was a draft in

10    somebody's file of an earlier report that we've

11    produced, so, again, I just -- I want to be

12    clear and (INDISTINCT).

13                SENATOR RANKIN:  All right, and

14    so, Mr. Marsh, and I'm going to come back to

15    Santee Cooper as well, your testimony is that

16    there has never been withholding of any

17    pertinent information, relevant information from

18    ORS, Public Service Commission, or any other

19    agency charged with oversight of you and this

20    project.

21                MR. MARSH:  That has certainly

22    been our intent, to be open and transparent,

23    although with respect to this report, we did

24    maintain that it was confidential due to its

25    being prepared in anticipation of litigation.

EXHIBIT "H"

221

1    true narrative, or is that a false narrative?

2                    MR. MARSH:  I believe that's a

3    false narrative because if I'd been asked

4    directly for the report by Dukes Scott or a

5    member of his staff, I would have responded,

6    It's a confidential document prepared in

7    anticipation of litigation, and we cannot share

8    it.

9                    SENATOR RANKIN:  So let me

10   interrupt you.  So the young lady who is charged

11   at ORS with this particular task, are you saying

12   that she never asked for these documents of your

13   employees, your finance team?

14                   MR. MARSH:  No, sir, that's not

15   what I said.  I said if Mr. Scott had asked me

16   -- if she asked the people on the finance team,

17   I doubt many of those were even aware the report

18   was out or the specific purpose of the report

19   because the work was done in a confidential

20   manner.

21                   SENATOR RANKIN:  So how would Mr.

22   Scott know it existed, but only you did, if his

23   staff member is asking the folks charged with

24   implementing the financing of this project knew

25   it existed and were apparently at meetings with

EXHIBIT "H"

222

1    your staff?  How -- I mean, how --

2              MR. MARSH:  I don't know the

3    exact words in that conversation, but I know

4    members of our team did not disavow that Bechtel

5    had been on-site, but I think they said, We have

6    not seen a report, or, There is no report.  I

7    can't speak for them.  I've got two of them here

8    who can tell you exactly what they said.  But I

9    don't believe, had we made that information

10   available, had it not been confidential and

11   prepared in anticipation of litigation and we

12   shared it, I don't believe it would change where

13   we are here today.

14             I mean, we have testified that

15   the information in that report was not a

16   surprise to us when it came out.  As I mentioned

17   earlier, I've gone back and our team has gone

18   back and documented issues in the report and

19   corresponding times when we disclosed it to the

20   Public Service Commission, either in testimony

21   or through our quarterly reports we filed with

22   respect to the project being undertaken.

23             I don't believe we -- well, I

24   know we didn't intentionally try to hide

25   information, in my opinion, from the Office of

ELECTRONICALLY FILED - 2018 May 23 6:24 PM - SCPSC - Docket # 2017-370-E - Page 86 of 94

EXHIBIT "H"

234

1    law firm working with us.  We didn't hire them

2    for this specific purpose.  They were already

3    advising us.  They were working with us on the

4    project, and then we felt like this would be the

5    best way to protect this information for

6    potential litigation.

7                    SENATOR RANKIN:  And that

8    litigation would include, would it not, your

9    potential prudency hearing before ORS, correct?

10                    MR. MARSH:  This was done in

11    anticipation of litigation against Westinghouse.

12                    SENATOR RANKIN:  Right, but would

13    -- but for this discovery and but for this

14    blowing up, would anybody from ORS, anybody from

15    any part of this state or this world, and you

16    guys are a public traded company, everybody with

17    access to what's going on now, would anybody

18    have ever known about this Bechtel Report?

19                    MR. MARSH:  I can't foresee how

20    that would have played out in the future.

21    Certainly, if we go forward with litigation and

22    it had not been aware at that time, it could

23    have become available at that time, but I go

24    back to what I said earlier.  There were not

25    significant surprises in the Bechtel Report.

ELECTRONICALLY FILED - 2018 May 23 6:24 PM - SCPSC - Docket # 2017-370-E - Page 87 of 94

EXHIBIT "H"

260

1    information we had.  Today we say that we have
2    more information, and it's now prudent to walk
3    away.
4                        And it's a two-part question.
5    The first one, to you, Mr. Marsh, is, ORS just
6    testified about, not a report, but a
7    presentation or a PowerPoint, and your response
8    was, We can't give them a report that they
9    didn't ask for.  And I understand the legal
10    reason for that answer.  One of the reasons for
11    the frustration across the State of South
12    Carolina is, the *duh* question in the room is,
13    How on earth did they know to ask for a report
14    if you never told them that there was a report?
15    How would they possibly know to say, Can you
16    give us the report that you didn't tell us
17    about?
18                        MR. MARSH:  Well, we've said from
19    the beginning, and I think we've been
20    consistent, that we consider the report
21    confidential.  It was prepared in anticipation
22    of litigation, and therefore, we didn't go out
23    and offer it to people.  The information in that
24    report was a validation of concerns we've got.
25    We believe that those concerns were already

ELECTRONICALLY FILED - 2018 May 23 6:24 PM - SCPSC - Docket # 2017-370-E - Page 88 of 94

1    adequate disclosed through the review process

2    and the hearing process at the Commission.

3                Again, I'll be glad to leave you

4    with this document where we've referenced the

5    concerns in a report to areas where we've

6    already shared that information publicly.  And

7    if they had asked me for the report, I still

8    would have told them it's confidential because

9    it was prepared in preparation for potential

10   litigation.

11               SENATOR FANNING:  And I do get

12   that.  I guess my question, unlike anybody else

13   here, I'm wondering how on earth they'd know to

14   ask you for the report so you could tell them

15   you couldn't give it to them.

16               MR. MARSH:  I think we've already

17   testified, and even their representatives have

18   testified, they saw Bechtel people on-site.

19   They required about the report.

20               SENATOR FANNING:  Mr. Marsh,

21   that's what worries us, is that if we have to

22   make decisions based on the hope that somebody

23   on a regulatory staff might have hopefully seen

24   somebody hanging out with executives at SCANA,

25   hoping and guessing that perhaps they're working

1    and then you trusted Westinghouse, and

2    Westinghouse abused your trust, and I do

3    understand that.  Question, Mr. Marsh, did you

4    ever go to Mr. Dukes Scott's office and have him

5    sign a nondisclosure agreement before you showed

6    him the Bechtel Report?

7              MR. MARSH:  No, I did not because

8    we believed that to be a confidential report

9    prepared in anticipation of litigation.

10             SENATOR FANNING:  So to your

11   knowledge, he has not signed a nondisclosure

12   agreement.

13             MR. MARSH:  Not with respect to

14   the Bechtel Report, no.

15             SENATOR FANNING:  Thank you.  Mr.

16   Carter, earlier, you were talking about the

17   selling of Santee Cooper, and you said you

18   didn't believe -- I appreciate your honest

19   answer -- that consumers would be better off

20   having it being sold to a private entity.

21   Today, we're kind of in a -- I guess "mess" is a

22   word we can use, and we had a public entity and

23   a private entity working together in this.  How

24   did Santee Cooper as a public entity any better

25   protect us from this mess than a private entity

ELECTRONICALLY FILED - 2018 May 23 6:24 PM - SCPSC - Docket # 2017-370-E - Page 90 of 94

EXHIBIT "H"

323

1    given on the one hand, and the Bechtel Report

2    that was not given on the other hand, whether or

3    not, when one looks at it, he is satisfied that

4    -- I hate to use the term "something sinister"

5    -- but that there was information that was, in

6    fact, that was hidden.  That's kind of where I'm

7    heading on that.  That was a rambling question,

8    but did you follow it?

9             MR. MARSH:  I think I did.  It

10   certainly has never been our intent to hide any

11   material information from the Office of

12   Regulatory Staff.  We have provided them with

13   space on-site.  We have provided them with

14   access to our teams.  We have set up a special

15   data room when they've requested information or

16   they want information available to review.

17   We've made that available to them.  They have

18   participated in many of our project review

19   meetings.  Their teams have been on-site with

20   their outside experts.

21             In addition to their normal

22   staff, he came on-site on a regular basis.  I

23   think it was quarterly.  He had full access to

24   our team.  He had full access to the meetings

25   that were taking place on-site with respect to

ELECTRONICALLY FILED - 2018 May 23 6:24 PM - SCPSC - Docket # 2017-370-E - Page 91 of 94

EXHIBIT "H"

324

1  project progress, and it was certainly our

2  intent to provide all the information we knew to

3  them.  We did not try to hide it, disclose it --

4  I mean, to keep in secret, to my knowledge.  The

5  Bechtel --

6              SENATOR SABB:  Well, clearly the

7  Bechtel Report was kept in secret.

8              MR. MARSH:  Well, I was just

9  getting ready to say, that was secret, or it was

10  confidential --

11             SENATOR SABB:  Yes, sir.

12             MR. MARSH:  -- because it was

13  prepared in anticipation of litigation.  But as

14  we've said before, we believe the significant

15  issues in that report, ORS was aware of those.

16  We had certainly communicated those in various

17  forms, whether it be verbal or in response to

18  their inquiries or participation in our

19  meetings.  I believe they were aware of those

20  issues.

21             SENATOR SABB:  All right, sir.

22  Last area of inquiry, real quick: the sale of

23  some of Santee Cooper's percentage.  I gleaned

24  two things to listening at the testimony.  One

25  was that your position was that nothing ought be

EXHIBIT "H"

361

1          today is that ORS affirmatively, actively sought

2          information from your organization that you

3          decided, by legal maneuver or otherwise, not to

4          produce, how in the world would ORS have any

5          sense of good faith from you?  How would we a

6          public have any sense of good faith dealing when

7          you're hiding behind a law firm and hiding

8          behind a privilege shield of a document that is

9          not complimentary of your management of this

10         project?

11                    And that's a loaded question, but

12         I'm real curious that you now want to involve

13         ORS, and, We're buddy-buddies, we're pals, yet

14         perhaps, not you, but the public is beating on

15         ORS for not doing its job, beating up on the

16         General Assembly for not doing its job, when

17         SCANA has purposely and willfully not produced a

18         document that is highly critical of your

19         project, of which you're the majority partner,

20         but now, Let's invite them back to the table.

21         That doesn't jive with me.  That does not speak

22         of good faith, and perhaps I'm way off base in

23         this.  I hope you can help me be proven wrong.

24                    MR. MARSH:  Well, as I said

25         before it was never our intention to hide behind

1    the attorney.  We didn't get an attorney to hide

2    information.  We got an attorney to validate

3    concerns we've had on the project that I believe

4    were well known to ORS and their staff, based on

5    communications we've had with them, their

6    interactions with people at the site, the

7    quarterly reports we have filed with the

8    Commission, and the direct testimony we have

9    given to the Commission.  It's never been our

10   intent to hide information from the Office of

11   Regulatory Staff.

12         SENATOR RANKIN:  But is it -- and

13   I hate to interrupt.  Never your intent, I

14   didn't mean to do it, but I did it.  Didn't you

15   not produce it?  You did it, right?  You're

16   sorry that you didn't do it, but, in fact,

17   you've had testimony today saying they asked,

18   proactively asked, yet you didn't do it.  How is

19   that anything other thing bad faith?

20         MR. MARSH:  Because the document

21   was prepared in anticipation of litigation, and

22   we believed it to be confidential.  We still

23   believe that today.  I know you've been provided

24   a copy of that document, and we've certainly

25   been doing our best to respond to questions

1       about the information contained in the report.

2       But we have not tried to deceive anyone.  We

3       have not tried to hide information.  We simply

4       believe the document was confidential because it

5       was prepared in anticipation of litigation.

6               With respect to our dealing to

7       Dukes Scott and the Office of Regulatory Staff,

8       I have dealt with them the majority of my

9       career, since the Office of Regulatory Staff was

10      formed.  We don't always agree.  Many times we

11      disagree, which is why we have to sit down and

12      find common ground with these settlements that

13      we reach.  I think it would be very awkward for

14      us to try to craft any type of settlement

15      without the Office of Regulatory Staff in the

16      room with their knowledge of the project and all

17      the accounting and financial issues and the

18      orders that could likely be issued by the

19      Commission regarding the abandonment decision.

20              SENATOR RANKIN:  That assumes,

21      and again, the Lord willing, there's peace and

22      harmony and resolution, and nobody has to pay

23      for the risk that SCANA undertook and that

24      Santee Cooper, as a minority party, or partner,

25      undertook.  But you're assuming a settlement,

ELECTRONICALLY FILED - 2018 May 23 6:24 PM - SCPSC - Docket # 2017-370-E - Page 94 of 94