# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF SOUTH CAROLINA

## COLUMBIA DIVISION

In re SCANA Corporation  )
Securities Litigation    )  C/A No. 3:17-2616-MBS
_____)

## ORDER AND OPINION

On March 30, 2018, Plaintiffs West Virginia Investment Management Board and Stichting Blue Sky Equity Active Low Volatility Fund and Stichting Blue Sky Active Large Cap Equity USA Fund, individually and on behalf of themselves and others similarly situated, filed a consolidated class action complaint against SCANA Corporation ("SCANA"), and Kevin B. Marsh, SCANA's former Chief Executive Officer ("CEO") and Chairman of SCANA's Board of Directors; Jimmy E. Addison, CEO and former Chief Financial Officer ("CFO") and Executive Vice President of SCANA; Stephen A. Byrne, SCANA's former Executive Vice President; and Harold C. Stowe, D. Maybank Hagood, and James W. Roquemore, members of the Board of Directors ("Individual Defendants" (collectively, "Defendants"). Plaintiffs seek certification of a class of all persons and entities who purchased, or otherwise acquired, SCANA'S publicly traded securities from October 27, 2015 through December 20, 2017, and were damaged as a result of Defendants' alleged misrepresentations and omissions with respect to the abandonment of a nuclear reactor construction project at the V.C. Summer nuclear generating station in Fairfield County, South Carolina. Plaintiffs allege the following causes of action: violation of Section 10(b) of the Securities Exchange Act of 1934 (the "Act") and Rule 10b-5 (against all Defendants) (Count One); and violation of Section 20(a) of the Act (against Individual Defendants) (Count Two).

On March 4, 2019, this matter came before the court for a hearing on the following motions

to dismiss:

- Motion to dismiss for failure to state a claim filed by Jimmy Addison on June 4, 2018. Plaintiffs filed an omnibus response on August 9, 2018. Addison filed a reply on September 18, 2018.

- Motion to dismiss for failure to state a claim filed by Stephen Byrne on June 4, 2018. Plaintiffs filed an omnibus response on August 9, 2018. Byrne filed a response on September 19, 2018.

- Motion to dismiss for failure to state a claim filed by Kevin Marsh on June 4, 2018. Plaintiffs filed an omnibus response on August 9, 2018. Marsh filed a reply on September 18, 2018.

- Motion to dismiss for failure to state a claim filed by Maybank Hagood, James Roquemore, SCANA Corporation, and Harold Stowe. Plaintiffs filed an omnibus response on August 9, 2018. These Defendants filed a reply on September 18, 2018.

For the reasons set forth below, Defendants Addison's, Byrne's and Marsh's motions to dismiss are denied. SCANA's motion to dismiss is denied in part and granted in part.

## I. FACTS

In May 2008, SCANA's subsidiary, South Carolina Electric and Gas Company ("SCE&G"), and the South Carolina Public Service Authority ("Santee Cooper") entered into an agreement to construct two nuclear reactors at an estimated cost of $9.8 billion (the "Project"). To finance the Project, SCANA expected to qualify for tax credits under the Energy Policy Act of 2005, 42 U.S.C. §§ 15801, et seq., which would provide tax credits worth approximately $2.2 billion if the Project were completed by January 1, 2021. In addition, SCANA relied on the Base Load Review Act, S.C. Code Ann. §§ 58-33-210, et seq. ("BLRA"), which allowed the South Carolina Public Service Commission ("PSC") to approve utility rate increases to cover construction costs of new nuclear reactors. Under the BLRA, SCANA was required to demonstrate to the PSC that costs were prudently incurred and decisions prudently made considering the information available to SCANA

at the time. <u>See</u> S.C. Code Ann. § 58-33-225. SCANA selected Westinghouse Electric Company ("Westinghouse") as its lead contractor and CBI Stone & Webster ("CB&I"), as supporting contractor.[1] Construction commenced in March 2013.

According to Plaintiffs, the Project was immediately beset by cost overruns and delays. In September 2015, the PSC approved a twenty-seven month extension of the construction schedule, as well as addition costs of $698 million. Plaintiffs allege that Defendants repeatedly assured the public, investors, and the PSC that SCANA was acting in a transparent and responsible manner, and that the initial risks and challenges of the construction had been overcome.

Plaintiffs contend SCANA purposely did not publicly disclose that, in early 2015, SCANA, through counsel, had retained Bechtel Corporation ("Bechtel"), an engineering, construction, and project management company, to assess the Project's viability. In October 2015, Bechtel submitted a preliminary report that provided the following summary and contained a number of recommendations:

- The objective of the assessment was to assist the Owners [SCE&G and Santee Cooper] to better understand the current status and potential challenges of the project and to help ensure the project is on the most cost efficient trajectory to completion.

- Based on our assessment, the current schedule is at risk. Significant issues include:

  To-go scope quantities, installation rates, productivity, and staffing levels all point to completion later than current forecast.

---

[1] CB&I Stone & Webster, Inc. provided the nuclear construction and integrated services businesses of CB&I. Westinghouse acquired CB&I Stone & Webster, Inc. in December 2015. <u>See</u> https://www.post-gazette.com/business/powersource/2017/06/27/westinghouse-bankruptcy-news -stone-webster-acquisition-chicago-bridge-iron-nuclear-power-plants-toshiba/stories/201706280068 (accessed March 20, 2019).

While EPC[2] plans and schedules are integrated; the plans and schedules are not reflective of actual project circumstances.

The Consortium lacks project management integration needed for EPC.

There is a lack of a shared vision, goals, and accountability between the Owners and the Consortium.

The WEC-CB&I [Westinghouse-CB&I] relationship is extremely poor, caused to a large extent by commercial issues.

The Contract does not appear to be serving the Owners or the Consortium particularly well. The issued design is often not constructible resulting in a significant number of changes.

• The oversight approach taken by the Owners does not allow for real-time, appropriate cost and schedule mitigation.

ECF No. 95-12, 4.

Bechtel's preliminary findings indicated that the commercial operation date for Unit 2 should be adjusted by eighteen to twenty-six months, or to December 2020 to August 2021 (as compared to the then-current commercial operation date of June 2019); and the commercial operation date for Unit 3 should be adjusted by twenty-four to thirty-six months, or to June 2022 to June 2023 (as compared to the then-current commercial operation date of June 2020).

Also in October 2015, SCE&G, Santee Cooper, Westinghouse, and CB&I entered into an agreement (the "EPC Amendment"). ECF No. 95-13. The EPC Amendment contained a provision permitting Westinghouse to contract with Fluor Corporation, an engineering and construction firm

---

[2] "EPC stands for Engineering, Procurement, Construction and is a prominent form of contracting agreement in the construction industry. The engineering and construction contractor will carry out the detailed engineering design of the project, procure all the equipment and materials necessary, and then construct to deliver a functioning facility or asset to their clients." https://www.epcengineer.com/definition/132/epc-engineering-procurement-construction (accessed March 28, 2019).

("Fluor"), for additional construction support. The EPC Amendment contained new Guaranteed Substantial Completion Dates ("GSCDs") of August 31, 2019 for Unit 2 and August 31, 2020 for Unit 3. The EPC Amendment provided for bonuses for on-time completion as well as liquidated damages for delay of construction for each unit in the amounts for $200,000/day for the first thirty days; $300,000/day for the next thirty-one to ninety days; $400,000/day for the next ninety-one to one hundred fifty days; $500,000/day for the next one hundred fifty-one to seven hundred thirty days; and $0/day for each seven hundred thirty-one days or beyond. Id. at 4-5. The parties further agreed to allow SCE&G and Santee Cooper the option to convert the EPC Amendment to a fixed price contract no later than November 1, 2016. If exercised, the contract price would be adjusted to $6.082 billion and payments made to complete the Project after June 30, 2015 would be credited against the $6.082 billion amount. ECF No. 95-13, 23.

On October 27, 2015, SCANA filed a Form 8-K with the Securities and Exchange Commission (SEC). ECF No. 95-14. The Form 8-K summarized the EPC Amendment, including that the GSCDs had been extended to August 31, 2019 and August 31, 2020, and reported that substantially all outstanding disputes with Westinghouse had been resolved. A press release attached to the Form 8-K stated that the fixed option price would increase to approximately $7.601 billion. SCANA also completed a Form 10-Q on November 6, 2015, which informed investors that the nuclear reactors would be operational by the end of 2020 and the Project would qualify for the Energy Policy Act tax credits. ECF No. 95-17.

On November 9, 2015, Bechtel provided a formal assessment (the "First Bechtel Report"). ECF Nos. 105-4, 105-5. Among other things, Bechtel noted that the Project had been achieving a 0.5% progress per month rather than the anticipated 1% per month. Bechtel indicated that future

needs were 2.5% to 3% per month. Bechtel reiterated its assessment that the anticipated commercial operation date for Unit 2 was December 2020 to August 2021, and for Unit 3 was June 2022 to June 2023. On February 5, 2016, Bechtel submitted a revised report (the "Second Bechtel Report") at the request of SCANA's outside counsel. The Second Bechtel Report removed information regarding the delays in commercial operation dates for the Project. ECF Nos. 105-7, 105-8. The First Bechtel Report and the Second Bechtel Report were denominated privileged work product prepared in anticipation of litigation.

Plaintiffs assert that Bechtel reviewed the EPC Amendment, which was signed five days after the Bechtel preliminary assessment. According to Plaintiffs, Bechtel concluded that the EPC Amendment would further delay the schedule. Plaintiffs also dispute that Defendants addressed most of Bechtel's concerns in the EPC Amendment, including the existing engineering design and the deficient oversight approach. Plaintiffs contend that Bechtel found there was no credible path for SCANA to complete the Project by the end of 2020; thus, the schedule was not simply "at risk," it was impossible to achieve. Plaintiffs allege that Santee Cooper urged SCANA to implement Bechtel's recommendations, including the need for new project management and leadership. Plaintiffs contend that the Project continued to show "dismal progress and schedule slippage" as SCANA resisted implementing the recommendations, as demonstrated by internal memoranda, minutes of various meetings, and emails.

Throughout 2016, Defendants continued to assure the PSC, investors, and the public that the Project would be completed before the tax credits deadline, that they had been straightforward and honest about challenges on the Project, and that most of the issues had been resolved. On May 26, 2016, SCANA notified the PSC and public through a press release that it had determined to exercise

the fixed price option. According to the press release, the fixed price option would provide substantial value to customers, investors, and SCANA by limiting the risk of future cost increases. According to Plaintiffs, the election of the fixed price option created the expectation that Westinghouse would be able to absorb costs that exceeded the $7.6 billion fixed price. Plaintiffs allege that Defendants were aware that costs would exceed the $7.6 billion fixed price, and that Westinghouse and its parent company and guarantor, Toshiba Corporation ("Toshiba"), would be unable to fund the costs. Plaintiffs allege that Santee Cooper estimated each month of delay cost SCANA approximately $42.5 million. Defendants nevertheless informed investors that SCANA could finish the Project on its own, if necessary.

On February 14, 2017, Toshiba announced a $6.3 billion write-down in connection with the Project. In March 2017, Westinghouse filed for protection under Chapter 11 of the Bankruptcy Code. On July 31, 2017, SCANA issued a press release announcing that it would abandon the Project. Plaintiffs allege that Defendants' public justifications for abandonment consisted of facts previously known to them, i.e., that the Project could not be completed for many years and greater costs would be incurred; the Project would no longer be eligible for the Energy Policy Act tax credits; and that Westinghouse would declare bankruptcy rather than pay costs in excess of the fixed price option.

On August 1, 2017, SCANA petitioned the PSC for rate increases to cover costs beginning on June 30, 2016 and through abandonment, as allowed under the BLRA. Members of the South Carolina Legislature expressed disapproval over the costs of the Project being shifted to South Carolina taxpayers, and opined that SCANA stockholders should be responsible. On or about August 9, 2017, the South Carolina Office of Regulatory Staff moved to dismiss SCANA's abandonment

petition. SCANA withdrew its abandonment petition on August 15, 2017. The South Carolina Senate convened a V.C. Summer Nuclear Project Review Committee, and on August 22, 2017, Santee Cooper revealed the existence of the Bechtel Reports. On September 4, 2017, upon demand from South Carolina Governor Henry D. McMaster, Santee Cooper submitted a copy of the Second Bechtel report to the Governor's office and requested that the Governor keep the report confidential. The Governor reviewed the document, found no basis for attorney-client privilege or confidentiality, and ordered that the information be released to the public.

The dates in the Second Bechtel report caused legislators to inquire about the existence of another Bechtel Report, which was denied by Defendant Marsh. Plaintiffs allege that on September 27, 2017, The State newspaper reported obtaining a timeline referencing a prior Bechtel assessment. Two months later, Defendants disclosed the First Bechtel Report. Plaintiffs allege that these and related events during the period between the abandonment and the release of the First Bechtel Report, such as the commencement of state and federal criminal investigations, had a direct impact on the value of their stock.

In total, PSC approved nine rate hikes at a cost of $37 million per month, or $500 million per year to customers' electricity bills. According to Plaintiffs, the revelation of Defendants' allegedly fraudulent activities resulted in a 50% decline in the value of SCANA's common stock, from a high closing price of $76.12 per share on July 6, 2016, to a closing price of $37.39 per share on December 21, 2017.

Plaintiffs assert that Defendants knew, on the basis of the Bechtel Reports, as well as internal communications, such as Westinghouse's monthly construction progress reports, that the information promulgated to the SEC and investors was false and misleading.

## II. APPLICABLE LAW

### A. Sections 10(b) and 20(a)

Section 10(b) makes it unlawful "to use or employ, in connection with the purchase or sale of any security registered on a national securities exchange . . . any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors." 15 U.S.C. § 78j(b); see also 17 C.F.R. § 240.10b-5 ("It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange, (a) [t]o employ any device, scheme, or artifice to defraud, (b) [t]o make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or (c) [t]o engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security."). To establish liability under Section 10(b) of the Exchange Act and under Rule 10b–5, a plaintiff must demonstrate: "'(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation.'" In re Novan, Inc., Sec. Litig., 1:17CV999, 2018 WL 6732990, *4 (M.D.N.C. Nov. 30, 2018) (quoting Stoneridge Inv. Partners, LLC v. Scientific-Atlanta, 552 U.S. 148, 157 (2008)). To establish the first element, a plaintiff "must point to a factual statement or omission—that is, one that is demonstrable as being true or false." Longman v. Food Lion, Inc., 197 F.3d 675, 682 (4th Cir. 1999)). The statement must be false, or the omission must render public statements misleading. Id. (citing 17

C.F.R. § 240.10b-5). Further, the statement or omission of fact must be material, that is, "there is a substantial likelihood that a reasonable purchaser or seller of a security (1) would consider the fact important in deciding whether to buy or sell the security or (2) would have viewed the total mix of information made available to be significantly altered by disclosure of the fact." Id. (citing cases). "Because these claims necessarily involve allegations of fraud, a plaintiff must also meet the requirements of Rule 9(b) of the Federal Rules of Civil Procedure, which requires 'a party [to] state with particularly the circumstances constituting fraud.'" In re Genworth Fin. Inc. Sec. Litig., 103 F. Supp. 3d 759, 770 (E.D. Va. 2015) (quoting Fed. R. Civ. P. 9(b)).

Section 20(a) imposes liability on any person who "directly or indirectly, controls any person liable" for violations of Section 10(b), "unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action." In re Novan, Inc., 2018 WL 6732990 at *15 (quoting 15 U.S.C. § 78t(a)). Accordingly, § 20(a) "liability is derivative of § 10(b)." Knurr v. Orbital ATK Inc., 272 F. Supp. 3d 784, 813 (E.D. Va. 2017) (citing Yates v. Municipal Mortg. & Equity, LLC, 744 F.3d 874, 894 n.8 (4th Cir. 2014)).

B.    Motions to Dismiss Generally

Defendants' motions to dismiss are brought under Fed. R. Civ. P. 8, 9(b), 10(c), and 12(b)(6). To sufficiently plead a claim, Rule 8 requires that "'[a] pleading that states a claim for relief must contain . . . a short and plain statement of the claim showing that the pleader is entitled to relief[.]'" Paradise Wire & Cable Defined Benefit Pension Plan v. Well, No. 18-1483, 2019 WL 1105179, *3 (4th Cir. March 11, 2019) (quoting Fed. R. Civ. P. 8(a)(2)). As the Court stated in Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009):

[T]he pleading standard Rule 8 announces does not require "detailed factual

allegations," but it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation. A pleading that offers "labels and conclusions" or "a formulaic recitation of the elements of a cause of action will not do." Nor does a complaint suffice if it tenders "naked assertion[s]" devoid of "further factual enhancement."

To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to "state a claim to relief that is plausible on its face." A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. The plausibility standard is not akin to a "probability requirement," but it asks for more than a sheer possibility that a defendant has acted unlawfully. Where a complaint pleads facts that are "merely consistent with" a defendant's liability, it "stops short of the line between possibility and plausibility of 'entitlement to relief.'"

(internal citations to  Bell Atlantic Corp. v. Twombly, 550 U.S. 544 (2007), omitted).

Further, Rule 8(a)(2) prohibits "shotgun pleading," defined as a complaint that "'fails to articulate claims with sufficient clarity to allow the defendant to frame a responsive pleading' . . . or if 'it is virtually impossible to know which allegations of fact are intended to support which claim(s) for relief.'"  SunTrust Mortg., Inc. v. First Residential Mortg. Servs. Corp., Civil Action No. 3:12CV162, 2012  WL 7062086, *7 (E.D. Va. 2012) (citing cases).

Rule 9(b) requires that "[i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting the fraud or mistake.  Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally."  The "circumstances" required to be pleaded with particularity under Rule 9(b) are "'the time, place, and contents of the false representations, as well as the identity of the person making the misrepresentation and what he obtained thereby.'"  Harrison v. Westinghouse Savannah River Co., 176 F.3d 776, 784 (4th Cir. 1999) (quoting 5 Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure: Civil § 1297, at 590 (2d ed. 1990)). Mere allegations of "fraud by hindsight" will not satisfy the requirements of Rule 9(b).  Id. (citing

Hillson Partners Ltd. Partnership v. Adage, Inc., 42 F.3d 204, 209 (4th Cir.1994)). The second sentence of Rule 9(b) allows conclusory allegations of the defendants' knowledge as to the true facts and of the defendants' intent to deceive. Id. (citing 5 Wright and Miller § 1297, at 612).

Federal Rule of Civil Procedure 10(b) requires that parties state claims or defenses "in numbered paragraphs, each limited as far as practicable to a single set of circumstances." Rules 8 and 10 serve the purposes of (1) giving the opposing party fair notice of what the claims are and the grounds upon which they rests, and (2) framing the issues and providing the basis for informed pretrial proceedings. JTH Tax, Inc. v. Hines, Action No. 2:15cv558, 2017 WL 9480172, *2 (E.D. Va. July 19, 2017) (citing cases).

A Rule 12(b)(6) motion to dismiss tests the legal sufficiency of the complaint. Teamsters Local 210 Affiliated Pension Trust Fund v. Neustar, Inc., Civil Action No. 1-17-cv-1145 (AJT/JFA), 2019 WL 693276, *3 (E.D. Va. Feb. 19, 2019) (citing Randall v. United States, 30 F.3d 518, 522 (4th Cir. 1994); Republican Party of N.C. v. Martin, 980 F.2d 943, 952 (4th Cir. 1994)). A claim should be dismissed "'if, after accepting all well-pleaded allegations in the plaintiff's complaint as true . . . it appears certain that the plaintiff cannot prove any set of facts in support of his claim entitling him to relief.'" Id. (quoting Edwards v. City of Goldsboro, 178 F.3d 231, 244 (4th Cir. 1999)). In considering a motion to dismiss, "'the material allegations of the complaint are taken as admitted,'" Jenkins v. McKeithen, 395 U.S. 411, 421 (1969) (citations omitted), and the court may consider exhibits attached to the complaint, Fayetteville Investors v. Commercial Builders, Inc., 936 F.2d 1462, 1465 (4th Cir. 1991)." Id.

C.     Motions to Dismiss Under the Private Securities Litigation Reform Act of 1995 ("PSLRA")

The PSLRA imposes heightened pleading standards for pleading falsity and the required

scienter for Section 10(b) claims. In re Novan, Inc., 2018 WL 6732990 at *4 (citing Zak v. Chelsea Therapeutics Int'l Ltd., 780 F.3d 597, 606 (4th Cir. 2015)). "The PSLRA codifies Rule 9(b) and further requires that '[t]he complaint must "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed."'" In re Genworth, 103 F. Supp. 3d at 770 (quoting PEC Solutions, Inc. Sec. Litig., 418 F.3d 379, 387 (4th Cir. 2005)). "'In order to meet this requirement, the complaint must contain the time, place, speaker, and contents of the allegedly false statement.'" Id. (quoting Iron Workers Local 16 Pension Fund v. Hilb Rogal & Hobbs Co., 432 F. Supp. 2d 571, 578 (E.D. Va. 2006)).

In addition, the PSLRA requires the complaint to "'state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind[,]'" known as "scienter." In re Genworth, 103 F. Supp. 3d at 782 (citing 15 U.S.C. § 78u–4(b)(2)). To prove scienter, "a plaintiff must show that defendants possess the 'intent to deceive, manipulate, or defraud.'" Id. (quoting Ernst & Ernst v. Hochfelder, 425 U.S. 185, 194 & n.12 (1976)). A plaintiff must show "either 'intentional misconduct' or such 'severe recklessness' that the danger of misleading investors was 'either known to the defendant or so obvious that the defendant must have been aware of it.'" Id. (quoting Cozzarelli v. Inspire Pharm. Inc., 549 F.3d 618, 623 (4th Cir. 2008)). A strong inference" of scienter must be more than merely "'reasonable' or 'permissible' —it must be cogent . . . and at least as compelling as any opposing inference [] one could draw from the facts alleged.'" Id. at 782-83 (quoting Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308, 324 (2007)). The Fourth Circuit has stated that "'[r]eckless conduct sufficient to establish a strong inference of

scienter' must be 'severe,' Ottmann v. Hanger Orthopedic Grp., Inc., 353 F.3d 338, 344 (4th Cir. 2003), or 'so highly unreasonable and such an extreme departure from the standard of ordinary care as to present a danger of misleading the plaintiff to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it.' Matrix Capital Mgmt. Fund, LP v. BearingPoint, Inc., 576 F.3d 172, 181 (4th Cir. 2009)." Lerner v. Northwest Biotherapeutics, 273 F. Supp. 3d 573, 594 (D. Md. 2017).

"'In determining if the complaint satisfies the pleading standards of the PSLRA, the court will assess the complaint as a whole. As such, the court will evaluate the number and level of detail of the facts, the plausibility and coherency of the facts, the sources of the facts and the reliability of those sources, and any other criteria that can be used to inform how well the facts support Plaintiffs' allegations.'" In Re Novan, 2018 WL 6732990 at *4 (quoting Plymouth Cnty. Ret. Ass'n v. Primo Water Corp., 966 F. Supp. 2d 525, 539 (M.D.N.C. 2013)).

### III. DISCUSSION

The court attaches hereto and incorporates by reference Plaintiffs' Exhibits A and B from their response in opposition to Defendants' motions. Exhibit A denominates the allegations of false and misleading statements and omissions made by various Defendants. Exhibit B sets forth the allegations demonstrating scienter. The court has grouped Defendants' various arguments and addressed them below.

### A.    Forward-Looking Statements.

Defendants assert that most of the statements identified by Plaintiffs were forward-looking regarding the future construction schedule and cost projections and related to plans and objectives of management for future operations, and thus protected by the safe harbor provision of the PSLRA.

Defendants also assert the forward-looking statements were not material, because any reasonable investor would know that the statements were not to be relied upon. Defendants argue Plaintiffs fail to adequately plead that Defendants had actual knowledge that any forward-looking statements were false when made, given the commitments made by Westinghouse in the EPC Amendment, the financial incentives for Westinghouse to deliver the Project on time, and the arrival of Fluor as the new construction manager.

A defendant shall not be liable for an oral or written forward-looking statement if the statement is (1) identified as forward-looking and (2) accompanied by "'meaningful cautionary statements identifying important factors that could cause actual results to differ materially.'" Ollila v. Babcock & Wilson Enters., Inc., Docket No. 3:17-cv-109, 2018 WL 792069, * 4 (W.D.N.C. Feb. 8, 2018) (quoting 15 U.S.C. § 78u-5(c)(1)(A)(i)). However, the safe harbor "'does not protect representations of current or historical fact.'" Id. (quoting In Re Ambac Fin. Grp., Inc. Sec. Litig., 693 F. Supp. 2d 241, 272, n.36 (S.D.N.Y. 2010)). If a statement is a mix of both forward-looking and present or past facts, it is taken out of the safe harbor with respect to the parts of the statement that are not forward-looking. Id. at *5 (citing In re Genworth, 103 F. Supp. 3d at 789). Statements that might arguably have some forward-looking aspect are unprotected by the PSLRA safe harbor provision to the extent that they are premised on representations of present fact. Id. (citing In re Regeneron Pharms., Inc. Sec. Litig., No. 03 Civ. 3111 RWS, 2005 WL 225288, *13 (S.D.N.Y. 2005)). Additionally, cautionary language is meaningless if it warns only of risks that have already materialized, or if the defendants knew their statements were false or misleading when made. Id. (citing Epstein v. World Acceptance Corp., Civil Action No. 6:14-cv-01606-MGL, 2015 WL 2365701, * 6 (D.S.C. May 18, 2015)).

Plaintiffs make a plausible claim that Defendants misrepresented SCANA's ability to complete the Project by the end of 2020. Plaintiffs allege Defendants misleadingly represented that the GSCDs for Unit 2 and Unit 3 reflected the actual completion dates, such that SCANA would qualify for Energy Policy Act tax credits. See, e.g., ECF No. 72, ¶¶ 202, 339, 341, 343, 346-347, 350. These statements allegedly were contradicted by Bechtel's investigation, Westinghouse's monthly progress reports that detailed recurring problems in construction, management, and scheduling, and Westinghouse's own documented failure to make timely progress in construction of the Project.

The court further finds Plaintiffs make plausible claims that Defendants falsely assured investors of transparency regarding the Project, misrepresented their involvement in and oversight of the Project, recklessly refused to implement Bechtel's and Santee Cooper's recommendations, and then misrepresented the state of those affairs to investors. Plaintiffs plausibly allege statements of current or historical facts or omissions of existing facts. For example, Individual Defendants' assertions that they had been straightforward and honest about challenges related to the Project plausibly were misleading, given the public response after SCANA abandoned the Project and the Bechtel Reports came to light. See, e.g., ECF No. 72, ¶¶ 198, 201, 344, 345, 362, 365, 366, 371, 382.

In the alternative, Plaintiffs argue that any cautionary language used by Defendants in conjunction with forward-looking statements was not meaningful because the language was not substantive or tailored to specific future projections, estimates, or opinions. SCANA provided the following example of cautionary language utilized in some of its documents:

> Statements included in these press releases which are not statements of historical fact are intended to be, and are hereby identified as, "forward-looking statements" for purposes of . . . the Securities Exchange Act . . . . Forward-looking statements

include, but are not limited to, statements concerning . . . estimated construction and other expenditures. In some cases, forward-looking statements can be identified by terminology such as "may," "will," "could," "should," "expects," "forecasts," "plans," "anticipates," "believes," "estimates," "projects," "predicts," "potential," or "continue" or the negative of these terms or other similar terminology. Readers are cautioned that any such forward-looking statements are not guarantees of future performance and involve a number of risks and uncertainties, and that actual results could differ materially from those indicated by such forward-looking statements. Important factors that could cause actual results to differ materially from those indicated by such forward-looking statements include, but are not limited to, the following: (1) the information is of a preliminary nature and may be subject to further and/or continuing review and adjustment; (2) legislative and regulatory action, particularly changes in rate regulation, regulations governing electric grid reliability and pipeline integrity, environmental regulations, and actions affecting the construction of new nuclear units: (3) current and future litigation; (4) changes in the economy, especially in areas served by subsidiaries of SCANA; (5) the impact of competition from other energy suppliers, including competition from alternate fuels in industrial markets; (6) the impact of conservation and demand side management efforts and/or technological advances on customer usage; (7) the loss of sales to distributed generation, such as solar photovoltaic systems; (8) growth opportunities for SCANA's regulated and diversified subsidiaries; (9) the results of short- and long-term financing efforts, including prospects for obtaining access to capita markets and other sources of liquidity; (10) the effects of weather, especially in areas where the generation and transmission facilities of SCANA and its subsidiaries are located and in areas served by SCANA's subsidiaries; (11) changes in SCANA's or its subsidiaries' (the Company) accounting rules and accounting policies; (12) payment and performance by counterparties and customers as contracted and when due; (13) the results of efforts to license, site, construct and finance facilities for electric generation and transmission, including nuclear generating facilities and results of efforts to operate its electric and gas systems and assets in accordance with acceptable performance standards; (14) maintaining creditworthy joint owners for SCE&G's new nuclear generation project; (15) the ability of suppliers, both domestic and international, to timely provide the labor, secure processes, components, parts, tools, equipment and other supplies needed, at agreed upon quality and prices, for our construction program, operations and maintenance; (16) the results of efforts to ensure the physical and cyber security of key assets and processes; (17) the availability of fuels such as coal, natural gas and enriched uranium used to produce electricity; the availability of purchased power and natural gas for distribution; the level and volatility of future market prices for such fuels and purchased power; and the ability to recover the costs for such fuels and purchased power; (18) the availability of skilled and experienced human resources to properly manage operate, and grow the Company's businesses; (19) labor disputes; (20) performance of SCANA's pension plan assets; (21) changes in taxes and tax credits, including production tax credits for the new

nuclear units; (22) inflation or deflation; (23) compliance with regulations; (24) natural disasters and man-made mishaps that directly affect our operations or the regulations governing them; and (25) the other risks and uncertainties described from time to time in the reports filed by SCANA or SCE&G with the United States Securities and Exchange Commission. The Company disclaims any obligation to update any forward-looking statements.

ECF No. 95-8, 3-4.

Defendants also contend that appropriate cautionary language accompanied oral statements, as well. Plaintiffs plausibly allege cautionary language relied on by SCANA fails to convey any substantive warning to investors regarding the specific deficiencies facing the Project, particularly when Defendants were sufficiently aware of the Project's deficiencies to contemplate hiring Bechtel to troubleshoot the Project in early 2015. Instead, Defendants allegedly continued to inform SCANA's investors, the PSC, and the public that great progress was being made on the Project. See, e.g., ECF No. 72, ¶¶ 205, 392-398.

B.      Statements of Opinion or Puffery.

Defendants contend that other statements relied on by Plaintiffs constitute inactionable opinion or puffery. Defendants assert that disclosure of the Bechtel Reports would not have altered the total mix of information provided to investors.

"'Indefinite statements of corporate optimism, also known as puffery, are generally non-actionable, as they do not demonstrate falsity.'" In re Under Armour Sec. Litig., 342 F. Supp. 3d 658, 676 (D. Md. 2018) (analyzing claim raised under Section 11 of the Securities Exchange Act, 15 U.S.C. § 77k(a))(quoting In re Neustar Sec. Litig., 83 F. Supp. 3d 671, 680 (E.D. Va. 2015)). "A reasonable person understands and 'recognizes the import of words like "I think' or "I believe," and grasps that they convey some lack of certainty as to the statement's content." Id. (quoting

Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund, 135 S. Ct. 1318, 1328 (2015)).

For such a statement to be properly alleged as misleading, it requires specific factual allegations that

the speaker did not in fact hold the stated belief, or the supporting facts supplied by the speaker were

untrue. Id. (citing Omnicare, 135 S. Ct. at 1332). Opinions, though sincerely held and otherwise true

as a matter of fact, may nonetheless be actionable if the speaker omits information whose omission

makes the statement misleading to a reasonable investor. Id. (citing Omnicare, 135 S. Ct. at 1332).

Plaintiffs plausibly allege that the identified misstatements expressed certainty rather than an

uncertain view of a fact, and thus cannot be described as opinions or puffery. For example, Plaintiffs

contend statements regarding the status of the Project, the scope and sequencing of the schedule, and

the reasonableness of the completion deadlines constituted objectively verifiable statements of fact.

Plaintiffs plausibly allege that any statements that could be construed as opinions are actionable

because (1) Defendants could not have sincerely believed these opinions, given the Bechtel reports,

monthly progress reports, and other internal correspondence that described deficiencies in the

progress of the Project; and (2) Defendants omitted material facts showing that they lacked the basis

for making those statements that a reasonable person would expect. Further, Plaintiffs plausibly

allege that Defendants omitted material facts that would have been viewed by the reasonable investor

as having significantly altered the total mix of information made available during the period prior to

abandonment of the Project. See, e.g., ECF No. 72, ¶¶ 405-408, 410, 418, 491.

C.      Violation of Item 303.

SCANA moves to dismiss Plaintiffs' claim under Item 303 of SEC Regulation S-K. Item 303

requires a filer, among other things, to

[d]escribe any known trends or uncertainties that have had or that the registrant

reasonably expects will have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations. If the registrant knows of events that will cause a material change in the relationship between costs and revenues (such as known future increases in costs of labor or materials or price increases or inventory adjustments), the change in the relationship shall be disclosed.

17 C.F.R. § 229.303(a)(3)(ii).

The question is whether the failure to comply with Item 303's disclosure requirements can give rise to liability under Rule 10b-5. Plaintiffs rely on Stratte-McClure v. Morgan Stanley, 776 F.3d 94 (2d Cir. 2015), wherein the Court of Appeals for the Second Circuit held that:

> [A] violation of Item 303's disclosure requirements can only sustain a claim under Section 10(b) and Rule 10b–5 if the allegedly omitted information satisfies [Basic Inc. v. Levinson, 485 U.S. 224 (1988)]'s test for materiality. That is, a plaintiff must first allege that the defendant failed to comply with Item 303 in a 10–Q or other filing. Such a showing establishes that the defendant had a duty to disclose. A plaintiff must then allege that the omitted information was material under Basic's probability/magnitude test, because 10b–5 only makes unlawful an omission of "material information" that is "necessary to make . . . statements made," in this case the Form 10–Qs, "not misleading." Matrixx Initiatives, Inc. v. Siracusano, [563 U.S. 27], (2011) (quoting 17 C.F.R. § 240.10b–5(b)) (internal quotation marks omitted). Of course, as with any Section 10(b) claim, a plaintiff must also sufficiently plead scienter, a "connection between the . . . omission and the purchase or sale of a security," reliance on the omission, and an economic loss caused by that reliance. Levitt v. J.P. Morgan Sec., Inc., 710 F.3d 454, 465 (2d Cir. 2013).

Id. at 103.

Conversely, SCANA cites to In re Nvidia Corp. Sec. Litig., 768 F.3d 1046 (9th Cir. 2014). In that case, the Court of the Appeals for the Ninth Circuit determined that:

> [N]either Section 10(b) nor Rule 10b–5 "create[s] an affirmative duty to disclose any and all material information. Disclosure is required under these provisions only when necessary 'to make . . . statements made, in the light of the circumstances under which they were made, not misleading.'" [Matrixx Initiatives, Inc. v. Siracusano, 563 U.S. 27, 45 (2011) (quoting 17 C.F.R. § 240.10b–5). In Basic Inc. v. Levinson, the Supreme Court noted that "[s]ilence, absent a duty to disclose, is not misleading under Rule 10b–5." 485 U.S. 224, 239, n.17 [] (1988). The Court did not explain what would give rise to a duty to disclose, but it is this language in Basic that

Plaintiffs cite in support of their argument. They assert that Item 303 creates "a duty to disclose," and failure to disclose it is therefore misleading for purposes of Section 10(b) and Rule 10b–5.

Id. at 1054.

Relying on Oran v. Stafford, 226 F.3d 275, 287-88 (3d Cir. 2000), the Ninth Circuit noted that "management's duty to disclose under Item 303 is much broader than what is required under the standard pronounced in Basic." In re Nvidia Corp., 768 F.3d at 1055. Rather, "[b]ecause the materiality standards for Rule [10b-5] and [Item 303] differ significantly, the 'demonstration of a violation of the disclosure requirements of Item 303 does not lead inevitably to the conclusion that such disclosure would be required under Rule 10b–5. Such a duty to disclose must be separately shown.'" Id. (quoting Oran, 226 F.3d at 288) (internal quotations omitted).

In this Circuit, the Eastern District of North Carolina found persuasive Nvidia's interpretation of Oran. Ash v. PowerSecure Int'l Inc., No. 4:14-CV-92-D, 2015 WL 5444741 (E.D.N.C. Sept. 15, 2015). In Ash, the plaintiffs' argument "relie[d] on the implicit claim that a violation of Item 303 amounts to a per se violation of section 10(b) and Rule 10b-5." Id. at *10. The Ash court found that, under Oran, "[a] plaintiff cannot seek to bring an action under Rule 10b–5 in the guise of an Item 303 violation when the same underlying alleged omissions are not sufficient to state a Rule 10b–5 violation." Id. Additionally, in In re Maximus, Inc. Sec. Litig., Civil Action No. 1:17-cv-0884 (AJT/IDD) (E.D. Va. Aug. 27, 2018), the Eastern District of Virginia determined that a failure to comply with Item 303 does not give rise to liability under Section 10(b) or Rule 10b-5, although the court alternatively found that the plaintiffs had failed to adequately allege scienter or materiality for any purported omissions in the defendant's Form 10-Qs, as required under Stratte-McClure. Id. at *15-16.

The court will adhere to the views of its sister courts.  The court concludes that failure to comply with Item 303 does not give rise to liability under Section 10(b) or Rule 10b-5.  SCANA's motion to dismiss is granted as to this claim.

D.    Scienter

The court finds the amended complaint plausibly demonstrates that Individual Defendants acted at least recklessly and possibly deliberately.  Plaintiffs' amended complaint catalogs allegations of contemporaneous presentations, reports, analyses, and correspondence that individually and collectively informed Defendants that their public statements concerning the status of the Project were materially false and misleading when made.  Plaintiffs allege that the failure to disclose the Bechtel Reports and other information regarding the viability of the Project are strong evidence of scienter. Plaintiffs also allege that Defendants fabricated a claim of privilege over Bechtel's work, asserting that the reports were created in anticipation of litigation with Westinghouse, despite the fact that (1) Westinghouse was a party to the retention of Bechtel; (2) Bechtel rejected the use of its work product as any type of "claims consultancy" or litigation work product; (3) Bechtel talked freely with the Officer Defendants, outside of the presence of counsel; (4) the First Bechtel Report bears no privilege designation, and (5) SCANA and Santee Cooper had resolved all outstanding litigation with Westinghouse and CB&I through the EPC Amendment.

Plaintiffs plausibly allege Defendants knew that the monthly progress rate at the Project never tipped 0.8%, which means that there was no material improvement in progress throughout the class period.   Plaintiffs assert that Defendants' concealment is even more incriminating when viewed in the context that the Project was the single most important component of SCANA's business and had the direct attention of Individual Defendants.  Plaintiffs further allege that Defendants were motivated to keep the Project running so that SCANA could reap the benefits of the nine rate hikes permitted under the BLRA and approved by the PSC.  Plaintiffs point out that, by the end of the class period, SCANA received nearly $500 million in extra revenue per year from SCE&G customers as an advance

on project costs.  See, e.g., ECF No. 72, ¶¶ 114-118, 122-128, 139-141, 157-160, 178-179, 183-194.

Reviewing the amended complaint as a whole, Defendants' assertions that Westinghouse was in the best position to assess the deficiencies of the Project and that they were justified in relying on the commitments set forth in the EPC Amendment strain credulity.  Defendants retained Bechtel because Westinghouse was failing to perform adequately, and, according to Plaintiffs, contemplated the consequences of a potential bankruptcy should the fixed price option in the EPC Amendment be triggered.  The court cannot say that the facts as a whole more plausibly suggest that Defendants acted innocently or negligently, rather than with intent or severe recklessness.  See Cozzarelli, 549 F.3d at 624.

E.     Loss Causation

To establish loss causation, a plaintiff must plead "(1) the 'exposure' of the defendant's misrepresentation or omission, i.e., the revelation of 'new facts suggesting [that the defendant] perpetrated a fraud on the market; and (2) that such exposure 'resulted in the decline of [the defendant's share price.'"  Singer v. Reali, 883 F.3d 425, 445 (4th Cir. 2018) (quoting Katyle v. Penn Nat'l Gaming, Inc., 637 F.3d 462, 473 (4th Cir. 2011)).  In Singer, the Fourth Circuit noted:

As we have recognized, exposure for purposes of the loss causation element can be alleged pursuant to the corrective disclosure theory and the materialization of a concealed risk theory.  On the one hand, under the corrective disclosure theory, a complaint may allege that the defendant company itself made a disclosure that "publicly revealed for the first time" that the company perpetrated a fraud on the market by way of a material misrepresentation or omission.  See Katyle, 637 F.3d at 473.  On the other hand, utilizing the materialization of a concealed risk theory, a complaint may allege that news from another source revealed the company's fraud.  Id. at 477 n.10 (explaining that, "[i]n such a case, the plaintiffs would not need to identify a public disclosure that corrected the previous, misleading disclosure because the news of the materialized risk would itself be the revelation of . . . fraud that

caused plaintiffs' loss" [Id.] (quoting Teachers' Ret. Sys. of La. v. Hunter, 477 F.3d 162, 187 n.3 (4th Cir. 2007)). The materialization of a concealed risk theory has been generally accepted as a means of proving loss causation because, inter alia, a company "accused of securities fraud should not escape liability by simply avoiding a corrective disclosure." See Ohio Pub. Emps. Ret. Sys. v. Fed. Home Loan Mortg. Corp., 830 F.3d 376, 384-85 (6th Cir. 2016).

Importantly, the ultimate loss causation inquiry under either the corrective disclosure theory or the materialization of a concealed risk theory is the same: whether a "misstatement or omission concealed something from the market that, when disclosed, negatively affected the value of the security." See In re Vivendi, S.A. Sec. Litig., 838 F.3d 223, 261-62 (2d Cir. 2016) (emphasis omitted). That is, pursuant to each theory, the plaintiff must show "that the loss caused by the alleged fraud results from the 'relevant truth ... leak[ing] out.'" Id. at 261 (quoting Dura Pharm., Inc. v. Broudo, 544 U.S. 336, 342 [] (2005)).

Plaintiffs contend Defendants false statements constituted an "amalgam" of corrective disclosures and materializations of previously concealed risks known to Defendants. Plaintiffs note that SCANA's stock prices decreased upon each revelation. The court finds that in paragraphs 227-319 and 429-33 of the amended complaint Plaintiffs plausibly allege specific public disclosures and subsequent reductions in the value of SCANA's stock as the result of "the relevant truth . . . leak[ing] out."

F.   Section 20(a) Claims

Because, with the exception of Plaintiffs' Item 303 claim, the Section 10(b) and Rule 10b allegations are adequately pleaded, Plaintiffs' Section 20(a) claims also survive.

## IV. CONCLUSION

Defendant Addison's motion to dismiss (ECF No. 92) is **denied**. Defendant Byrne's motion to dismiss (ECF No. 93) is **denied**. Defendant Marsh's motion to dismiss (ECF No. 94) is **denied**. SCANA's motion to dismiss (ECF No. 95) is **denied in part and granted in part as to Item 303**

**only**.

       **IT IS SO ORDERED**.

                                 /s/ Margaret B. Seymour
                                 Senior United States District Judge

Columbia, South Carolina

March 29, 2019