# Exhibit A

**Alleged False and Misleading Statements and Omissions**

| # | Date and Source | Speaker(s) | Complaint Cite | False and Misleading Statement(s) and Omissions[1] |
|---|---|---|---|---|
| | **Statements Regarding SCANA's Ability to Complete the Project by the End of 2020 (Schedule/Costs/Nuclear Tax Credits)** | | | |
| 1. | October 27, 2015 8-K<br><br>"SCE&G Announces an Amendment to the Engineering, Procurement, and Construction Agreement for AP1000 Plants at VC Summer Station" | SCANA, Marsh | Compl. ¶ 339<br><br>Appx. A at 1 | The October 27, 2015 EPC Amendment "***revises the Guaranteed Substantial Completion Dates (GSCDs) for Units 2 and 3 to August 31, 2019 and 2020, respectively.***" |
| 2. | October 27, 2015 8-K<br><br>"SCE&G Announces an Amendment to the Engineering, Procurement, and Construction Agreement for AP1000 Plants at VC Summer Station" | SCANA, Marsh | Compl. ¶ 339<br><br>Appx. A at 1–2 | "[T]he ***total gross construction cost of the [Nuclear] Project [was raised to] approximately $7.113 billion [$5.5 billion in 2007 dollars].***" Moreover, the October 27, 2015 8-K announced SCE&G's "exclusive and irrevocable option to, at any time prior to November 1, 2016, further amend the EPC Agreement" and exercise a "fixed price option [that] would result in SCE&G's total Project costs to increase by approximately $774 million over the $6.827 billion" approved by the PSC in September 2015. If exercised, this fixed price option "***would bring the total gross construction cost of the Project to approximately $7.601 billion***" for SCANA. |
| 3. | October 27, 2015 8-K<br><br>"SCE&G Announces an Amendment to the Engineering, Procurement, and" | SCANA, Marsh | Compl. ¶ 340<br><br>Appx. A at 1 | Defendant Marsh touted the EPC Amendment in the October 27, 2015 8-K, and was quoted as stating how he and the other Defendants were "excited about the changes in . . .the amendment to the EPC contract for the new nuclear plants and ***see these changes as very positive,***" |

[1] The statements made by Defendants that are ***bolded and italicized*** emphasize those portions of the statements alleged to be false and misleading.

**Alleged False and Misleading Statements and Omissions**

| # | Date and Source | Speaker(s) | Complaint Cite | False and Misleading Statement(s) and Omissions[1] |
|---|---|---|---|---|
| | Construction Agreement for AP1000 Plants at VC Summer Station" | | | |
| 4. | October 27, 2015 8-K<br><br>"SCE&G Announces an Amendment to the Engineering, Procurement, and Construction Agreement for AP1000 Plants at VC Summer Station" | SCANA, Marsh | Compl. ¶ 340<br><br>Appx. A at 1 | Marsh: "***We believe these changes provide better protection against future cost increases for our customers and the company.***" |
| 5. | October 27, 2015 8-K | SCANA, Marsh | Appx. A at 1 | "Among other things, upon effectiveness, the October 2015 Amendment would . . . (ii) revise ***the guaranteed substantial completion dates of Units 2 and 3 to August 31, 2019 and 2020, respectively.***" |
| 6. | October 29, 2015 Call | Addison | Compl. ¶ 343<br><br>Appx. A at 3 | Following opening statements during the October 29, 2015 Call, an analyst from Mizuho Securities asked Defendants about the risks facing the Nuclear Project after the EPC Amendment: "[W]hat sort of risk would you say that you still retain and the risk that the construction consortium retains?"<br><br>In response, Defendant Addison did not include completing the Nuclear Project by the end of 2020 as a retained risk, responding that "***our risk profile is certainly reduced from where it was before we signed the amendment,***" and adding that "***our only risk***" would be "***changes in law or change orders that might be associated with the project.***" |

**Alleged False and Misleading Statements and Omissions**

| # | Date and Source | Speaker(s) | Complaint Cite | False and Misleading Statement(s) and Omissions[1] |
|---|---|---|---|---|
| 7. | October 29, 2015 Call | Marsh | Appx. A at 2 | "Under this amendment, SCE&G has agreed to pay Westinghouse incremental capital costs of cost of approximately $245 million over the $5.247 billion approved in the Public Service Commission's recent order number 2015-661. ***This, along with estimated escalation and AFUDC, would bring the total gross construction cost of the project to approximately $7.113 billion. The amendment also revises the guaranteed substantial completion dates of units 2 and 3 to August 31, 2019 and 2020 respectively***."  "Westinghouse also has the opportunity to earn, from SCE&G, completion bonuses of approximately $303 million or $151.5 million for each unit, depending on the timing of the plants been placed into service. In addition, this amendment provides SCE&G for itself and its agent for Santee Cooper, an exclusive and irrevocable option until November 1, 2016, to further amend the EPC agreement to fix the total amount remaining to be paid for the entire scope of work on the project after June 30, 2015, at approximately $3.345 billion, which is SCE&G's 55% portion of $6.082 billion. This fixed price option result in SCE&G paying Westinghouse incremental project costs of approximately $774 million over the previous escalated amount approved by the PSC of $6.826 billion. ***Combined with estimated escalation and AFUDC, this would bring the total gross construction cost of the project to approximately $7.601 billion.***" |
| 8. | October 29, 2015 Call | Addison | Appx. A at 2 | "***The total fixed price option would be $7.601 billion*** as we've laid out on slide 26, the third or fourth line down. That would be the total expected project cost. Of that, the capital cost portion or the construction contract, EPC contract, would be $6.757 billion. So the additional amount would be escalation to date on the existing work that's been done and then some additional dollars, the additional $20 million associated with the schedule moving out two months for owners costs. But the bulk of that is fixed in the fixed price contract and that would be based on the guaranteed substantial completion dates. So, unit 2 August 2019 and |

**Alleged False and Misleading Statements and Omissions**

| # | Date and Source | Speaker(s) | Complaint Cite | False and Misleading Statement(s) and Omissions[1] |
|---|---|---|---|---|
| | | | | unit 3 August 2020 and the liquidated damages are keyed off each of those dates for specific units." |
| 9. | November 6, 2015 10-Q | SCANA, Marsh and Addison[2] | Compl. ¶ 341<br><br>Appx. A at 4–5 | In the Company's November 6, 2015 Form 10-Q for the third quarter of 2015, signed and certified as accurate pursuant to the Sarbanes-Oxley Act of 2002 ("SOX") by Defendants Marsh and Addison (the "November 6, 2015 10-Q"), the Company stated that "[b]ased on the guaranteed substantial completion dates provided above, ***both New Units are expected to be operational and to qualify for the nuclear production tax credits***; however, ***further delays in the schedule*** or changes in tax law ***could*** impact such conclusions.*" |
| 10. | November 6, 2015 10-Q | SCANA, Marsh and Addison | Appx. A at 3-5 | "Among other things, upon effectiveness, the October 2015 Amendment would . . . ***revise the guaranteed substantial completion dates of Units 2 and 3 to August 31, 2019 and 2020, respectively . . . .***"<br><br>"***Under the October 2015 Amendment, SCE&G's total estimated project costs will increase by approximately $286 million over the $6.8 billion approved by the SCPSC in September 2015, and will bring its total estimated gross construction cost of the project (including escalation and AFC) to approximately $7.1 billion.***"<br><br>"Finally, upon effectiveness, the October 2015 Amendment would provide SCE&G and Santee Cooper an irrevocable option, until November 1, 2016 and subject to regulatory approvals, to further amend the EPC Contract to fix the total amount to be paid to the Consortium for its entire scope of work on the project (excluding a limited amount of work within the time and materials component of the contract price) after June 30, 2015 at $6.082 billion (SCE&G's 55% portion being approximately $3.345 billion ). This total amount to be paid would be subject to adjustment for amounts paid since June 30, 2015. Were this fixed price |

---

[2] The statements contained in such SEC filings are attributed to the persons who signed them.

**Alleged False and Misleading Statements and Omissions**

| # | Date and Source | Speaker(s) | Complaint Cite | False and Misleading Statement(s) and Omissions[1] |
|---|---|---|---|---|
| | | | | option to be exercised, the aggregate delay-related liquidated damages amount referred to in (iii) above would be capped at $338 million per unit (SCE&G's 55% portion being approximately $186 million per unit), and the completion bonus amounts referred to in (iv) above would be $150 million per New Unit (SCE&G's 55% portion being approximately $83 million per New Unit). ***The exercise of this fixed price option would result in SCE&G's total estimated project costs increasing by approximately $774 million over the $6.8 billion approved by the SCPSC in September 2015, and would bring its total estimated gross construction cost (including escalation and AFC) of the project to approximately $7.6 billion.***" <br><br> "The IRS has notified SCE&G that, subject to a national megawatt capacity limitation, the electricity to be produced by each of the New Units (advanced nuclear units, as defined) ***would qualify for nuclear production tax credits*** under Section 45J of the Internal Revenue Code ***to the extent that such New Unit is operational before January 1, 2021*** and other eligibility requirements are met. These nuclear production tax credits (related to SCE&G's 55% share of both New Units) ***could total as much as approximately $1.4 billion.***" |
| **11.** | November 19, 2015 PSC Direct Testimony | Marsh | Compl. ¶ 341 <br><br> Appx. A at 5 | Defendant Marsh also discussed the availability of the Nuclear Tax Credits based on the completion of both Units in 2020 during his testimony during a November 19, 2015 ex parte briefing before the PSC "regarding recent activity concerning the new nuclear units at V.C. Summer Nuclear Station" (the "November 2015 PSC Briefing"): <br><br> We wanted to focus Westinghouse very keenly on meeting the deadlines for the production tax credits. As you know, ***those tax credits expire at the end of 2020. We have to have our plants on line at the end of 2020 to qualify for those. The first plant is certainly more than a year ahead of that; the second plant is a little bit less than six months ahead of that***, so we wanted to |

**Alleged False and Misleading Statements and Omissions**

| # | Date and Source | Speaker(s) | Complaint Cite | False and Misleading Statement(s) and Omissions[1] |
|---|---|---|---|---|
| | | | | make sure we kept them focused on trying to reach those goals so we could secure those benefits for customers that amount to about $2.3 billion on a pretax basis. **** So, on line one, the ***guaranteed substantial completion dates***, those have moved from June of [20]19 and June of 2020 for Units 2 and 3—under the "EPC" and the "Fixed-Price Option" those have both ***moved to August of [20]19 and August of 2020. A couple of months' move there, but still we believe in time to finish the units for the production tax credit qualification***. |
| 12. | November 19, 2015 PSC Briefing | Marsh | Appx. A at 5 | "The line that is really apples-to-apples is on line four, a "Total Expected Project Cost" which takes the estimated cost plus inflation. The current Order, we projected the $6.827 billion, and that's consistent with the numbers you approved in our recent Order in September. ***Under the "Amended EPC" it would go up $286 million to $7.113 billion.  Then if we were to elect the fixed-price option, it would go up another $188 million, to bring it to $7.601 billion.***" |
| 13. | November 19, 2015 PSC Briefing | Byrne | Appx. A at 6 | "To talk a little bit about the two options, as Kevin pointed out, ***we have an amended EPC and then we have an option to fix the price, but under either of those options we have reset the guaranteed substantial completion dates to August 31, 2019, for the first new unit, Unit 2; and August 31, 2020, for the second new unit, or Unit 3.***" |
| 14. | February 18, 2016 Call | Addison | Appx. A at 6 | Analyst: "Okay. Do you happen to know, or can I find somewhere in the BLRA filings what the cumulative costs for Unit 2 would be through 2019, as you currently stand today?" <br><br> Addison: "***Well, on the amended contract, it's about -- the total price of the units is about $7.1 billion***, so you can roughly estimate 50% of that." |

**Alleged False and Misleading Statements and Omissions**

| # | Date and Source | Speaker(s) | Complaint Cite | False and Misleading Statement(s) and Omissions[1] |
|---|---|---|---|---|
| 15. | February 18, 2016 Call Investor Presentation | SCANA, Addison, Byrne | Appx. A at 6 | PowerPoint slide deck titled "Fourth Quarter & Full Year 2015," used during the February 18, 2016 Call, listed the "***Guaranteed Substantial Completion Dates***" for the Nuclear Project as "***Unit 2 — August 2019***" and "***Unit 3 — August 2020***," and represented the "***Total Expected Project Cost***" as "***$7.113 billion***" under the Amended EPC Contract and "***$7.601 billion***" under the Fixed Price Option, if elected. |
| 16. | February 26, 2016 2015 10-K | SCANA, Marsh, Addison and the Director Defendants | Appx. A at 6-8 | "***Guaranteed Substantial Completion Dates***" listed as "***August 2019***" and "***August 2020***" for Units 2 and 3, respectively.<br><br>"Total Expected Project Cost (SCE&G's 55% share)" listed as "***$7.113 billion***" under "***October 2015 Amendment***" and "***$7.601 billion***" under "***Fixed Price Option Under the October 2015 Amendment***"<br><br>"***Among other things, the October 2015 Amendment: . . . revised the guaranteed substantial completion dates of Units 2 and 3 to August 31, 2019 and 2020, respectively….***"<br><br>"Under the October 2015 Amendment, ***SCE&G's total estimated project costs increased by approximately $286 million over the $6.8 billion approved by the SCPSC in September 2015, bringing its total estimated gross construction cost of the project (including escalation and AFC) to approximately $7.1 billion.***"<br><br>"Finally, the October 2015 Amendment provides SCE&G and Santee Cooper an irrevocable option, until November 1, 2016 and subject to regulatory approvals, to further amend the EPC Contract to fix the total amount to be paid to the |

**Alleged False and Misleading Statements and Omissions**

| # | Date and Source | Speaker(s) | Complaint Cite | False and Misleading Statement(s) and Omissions[1] |
|---|---|---|---|---|
| | | | | Consortium for its entire scope of work on the project (excluding a limited amount of work within the time and materials component of the contract price) after June 30, 2015 at $6.082 billion (SCE&G's 55% portion being approximately $3.345 billion ). This total amount to be paid would be subject to adjustment for amounts paid since June 30, 2015. Were this fixed price option to be exercised, the aggregate delay-related liquidated damages referred to in (iii) above would be capped at $338 million per unit (SCE&G's 55% portion being approximately $186 million per unit), and the completion bonus referred to in (iv) above would be $150 million per New Unit (SCE&G's 55% portion being approximately $83 million per New Unit). ***The exercise of this feed*** *price **option would** result in **SCE&G's total estimated project costs increasing by approximately $774 million over the $6.8 billion approved by the SCPSC in September 2015, and would bring its total estimated gross construction cost (including escalation and AFC) of the project to approximately $7.6 billion.***" <br><br> "The IRS has notified SCE&G that, subject to a national megawatt capacity limitation, the electricity to be produced by each of the New Units (advanced nuclear units, as defined) would qualify for nuclear production tax credits under Section 45J of the Internal Revenue Code to the extent that such New Unit is operational before January 1, 2021 and other eligibility requirements are met. These nuclear production tax credits (related to SCE&G's 55% share of both New Units) could total as much as approximately $1.4 billion. Such credits would be earned over the first eight years of each New Unit's operations and would be realized by SCE&G over those years or during allowable carry-forward periods. ***Based on the guaranteed substantial completion dates provided above, both New Units are expected to be operational and to qualify for the nuclear production tax credits, however, further delays in the schedule or changes in tax law impact such conclusions.***" |

**Alleged False and Misleading Statements and Omissions**

| # | Date and Source | Speaker(s) | Complaint Cite | False and Misleading Statement(s) and Omissions[1] |
|---|---|---|---|---|
| 17. | March 2, 2016 SCANA Investor Presentation – UBS & Morgan Stanley Utilities Conference | SCANA | Appx. A at 8 | PowerPoint presentation lists the "*Guaranteed Substantial Completion Dates*" for Units 2 and 3 as "*August 2019*" and "*August 2020,*" respectively, with the revised "*Total Expected Project Cost*" at "*$7.113 billion*" under the Amended EPC and "*$7.601 billion*" under the Fixed Price Option. |
| 18. | April 28, 2016 Call Investor Presentation | SCANA, Addison, Byrne | Appx. A at 8 | PowerPoint slide deck titled "First Quarter 2016," used during the April 28, 2016 Call, listed the "*Guaranteed Substantial Completion Dates*" for the Nuclear Project as "*Unit 2 – August 2019*" and "*Unit 3 – August 2020,*" and represented the "Total Expected Project Cost" as "*$7.113 billion*" under the Amended EPC Contract and "*$7.601 billion*" under the Fixed Price Option, if elected. |
| 19. | May 6, 2016 10-Q | SCANA, Marsh and Addison | Appx. A at 8-10 | "Among other things, the October 2015 Amendment: . . . revised the *guaranteed substantial completion dates of Units 2 and 3 to August 31, 2019 and 2020, respectively.*"<br><br>"Under the October 2015 Amendment, SCE&G's total estimated project costs increased by approximately $286 million over the $6.8 billion approved by the SCPSC in September 2015. In addition, SCE&G has updated project costs for estimated change orders related to certain outstanding disputes not resolved by the October 2015 Amendment. As of April 30, 2016, these estimated change orders total approximately $53 million. *The estimated* **gross** *construction cost of the project (including the effects of these change orders, escalation and AFC) as of March 31, 2016 totals approximately $7.2 billion.*"<br><br>"Finally, the October 2015 Amendment provides SCE&G and Santee Cooper an irrevocable option, until November 1, 2016 and subject to regulatory approvals, to further amend the EPC Contract to fix the total amount to be paid to the Consortium for its entire scope of work on the project (excluding a limited amount of work within the time and materials component of the contract price) after June 30, 2015 at $6.082 billion (SCE&G's 55% portion being |

| # | Date and Source | Speaker(s) | Complaint Cite | False and Misleading Statement(s) and Omissions[1] |
|---|---|---|---|---|
| | | | | approximately $3.345 billion). This total amount to be paid would be subject to adjustment for amounts paid since June 30, 2015. Were this fixed price option to be exercised, the aggregate delay-related liquidated damages referred to in (iii) above would be capped at $338 million per unit (SCE&G's 55% portion being approximately $186 million per unit), and the completion bonus referred to in (iv) above would be $150 million per New Unit (SCE&G's 55% portion being approximately $83 million per New Unit). The exercise of this fixed price option would result in SCE&G's total estimated project costs increasing by approximately $774 million over the $6.8 billion approved by the SCPSC in September 2015. This increase does not include the estimated change orders described previously totaling approximately $53 million and additional sales tax that would be due under this fixed price option of approximately $10 million. ***The estimated gross construction cost of the project (including the effects of these change orders and additional sales tax, escalation and AFC) under this feed price option would total approximately $7.7 billion.***"<br><br>"The IRS has notified SCE&G that, subject to a national megawatt capacity limitation, the electricity to be produced by each of the New Units (advanced nuclear units, as defined) would qualify for nuclear production tax credits under Section 45J of the Internal Revenue Code to the extent that such New Unit is operational before January 1, 2021 and other eligibility requirements are met. These nuclear production tax credits (related to SCE&G's 55% share of both New Units) could total as much as approximately $1.4 billion. Such credits would be earned over the first eight years of each New Unit's operations and would be realized by SCE&G over those years or during allowable carry-forward periods. ***Based on the guaranteed substantial completion dates provided above, both New Units are expected to be operational and to qualify for the nuclear production tax credits,*** however, ***further delays in the schedule*** or changes in tax law **could** ***impact such conclusions.***" |

**Alleged False and Misleading Statements and Omissions**

| # | Date and Source | Speaker(s) | Complaint Cite | False and Misleading Statement(s) and Omissions[1] |
|---|---|---|---|---|
| 20. | May 26, 2016 Press Release | SCANA, Marsh | Appx. A at 10 | "*The construction schedule reflected in the petition indicates a guaranteed substantial completion date for Unit 2 of August 2019 and a guaranteed substantial completion date for Unit 3 of August 2020.* These dates were established by Westinghouse in the October 2015 Amended EPC Contract. Subsequent to the signing of this Amended EPC Contract, Westinghouse hired Fluor as the subcontracted construction manager for the project. This petition reflects an increase in SCE&G's total Project costs of approximately $852 million (a reconciliation of these additional costs can be found below) over the $6.827 billion approved by the SCPSC in Order No. 2015-661. This increase includes approximately $505 million that is directly related to the fixed price option. *The total project cost is now estimated at approximately $7.679 billion including owner's cost, transmission, escalation and allowance for funds used during construction.*" |
| 21. | May 26, 2016 8-K | SCANA | Appx. A at 10 | "*The estimated gross construction cost of the New Units under the fixed price option would total approximately $7.7 billion.*"<br><br>The construction schedule reflected in the Petition indicates a *guaranteed substantial completion date for Unit 2 of August 2019 and a guaranteed substantial completion date for Unit 3 of August 2020.* |
| 22. | June 8, 2016 8-K | SCANA | Appx. A at 10-11 | Among other things, the October 2015 Amendment provides for the development of a revised construction milestone payment schedule and establishes a dispute resolution board (the "DRB") process for certain commercial claims and disputes, including any dispute that might arise with respect to the development of the revised construction milestone payment schedule. We and Santee Cooper have been negotiating with the Consortium regarding the development of such schedule. To date, while negotiations are ongoing, the parties have been unable to agree to the timing and amounts of various payments. As a result of the lack of agreement, we anticipate that the matter may be referred to the DRB in the near |

**Alleged False and Misleading Statements and Omissions**

| # | Date and Source | Speaker(s) | Complaint Cite | False and Misleading Statement(s) and Omissions[1] |
|---|---|---|---|---|
| | | | | future. ***Total estimated project costs and the guaranteed substantial completion dates are not at issue.*** |
| 23. | July 1, 2016 PSC Direct Testimony | Addison | Compl. ¶ 344<br><br>Appx. A at 11 | "Without approval of the cost and construction schedules proposed here, the Company's ability to finance the completion of the Units on reasonable financial terms may be placed in great jeopardy. . . . ***The current schedules reflect the best information available about the anticipated costs and construction timetables for completing the project. The anticipated capital costs presented here are not speculative. As Mr. Byrne testifies, they are based on a careful review of construction plans and the expected costs of the tasks required to complete them. No speculative or un-itemized costs are included in this cost schedule. It is appropriate that this cost schedule be approved under the BLRA as the updated schedule for the project***." |
| 24. | July 1, 2016 PSC Direct Testimony | Byrne | Compl. ¶ 198<br><br>Compl. ¶ 345<br><br>Appx. A at 11-13 | "***The Guaranteed Substantial Completion Dates ("GSCDs") of the Units are now August 31, 2019 for Unit 2 and August 31, 2020 for Unit 3.*** These dates are each approximately two months later than the projected completion dates approved in the last BLRA order."<br><br>"**Q: ARE THESE SUBSTANTIAL COMPLETION DATES AND THE CONSTRUCTION SCHEDULES THAT SUPPORT THEM REASONABLE?**<br><br>**[Byrne]:** *Yes*. The substantial completion dates and the construction schedules . . . are based on extensive construction data that Westinghouse has provided to SCE&G. That data includes a construction schedule which identifies and sequences the tens of thousands of specific construction activities that must be accomplished to complete the project. ***SCE&G's construction experts have reviewed this schedule and found that its scope and sequencing is logical and*** |

**Alleged False and Misleading Statements and Omissions**

| # | Date and Source | Speaker(s) | Complaint Cite | False and Misleading Statement(s) and Omissions[1] |
|---|---|---|---|---|
| | | | | *appropriate*. . . . Consistent with its responsibilities as Owner, *SCE&G has carefully reviewed and evaluated all information that is available related to the project and schedule and finds it to be reasonable.*<br><br>*It is my opinion that Westinghouse and Fluor have a reasonable construction plan in place to achieve the GSCDs.* That plan is reflected in the milestone construction schedule . . . . *It is my considered opinion that [the milestone construction schedule] represents a reasonable and prudent schedule for completing the project as envisioned by the BLRA and should be adopted . . . .*"<br><br>"As a result of the Amendment, we now have in place:<br>1. A fully restructured Consortium,<br>2. A new and highly-skilled mega-projects construction manager,<br>3. An Amendment that eliminates practically all the major commercial issues between the parties at this time,<br>4. An EPC Contract that has been reformulated to limit future disputes, and<br>5. Revised liquidated damages, completion incentives and other EPC terms that put Westinghouse at risk for approximately $1.0 billion on a 100% basis due to delay.<br><br>*All these factors support the conclusion that the construction schedule . . . . is [a] reasonable and prudent schedule for completing the Units.*"<br><br><br>"**Guaranteed Substantial Completion Dates:** *The GSCDs of the Units have been revised to August 31, 2019 for Unit 2 and August 31, 2020 for Unit 3.*"<br><br>"Apart from the safety and quality of construction, one of SCE&G's principal objectives was the completion of the Units in time to qualify for all available federal production tax credits. *The projected benefit of those credits is worth approximately $2.2 billion and will be passed on directly to our customers*." |

**Alleged False and Misleading Statements and Omissions**

| # | Date and Source | Speaker(s) | Complaint Cite | False and Misleading Statement(s) and Omissions[1] |
|---|---|---|---|---|
| | | | | **"Q. DO YOU HAVE AN OPINION CONCERNING THE REASONABLENESS AND PRUDENCE OF THESE ADJUSTMENTS TO OWNER'S COST?"** |
| | | | | **[Byrne]**: "It is my firm opinion that these costs reflect a necessary and valuable investment that the Company is making to protect the interest of its customers in these long-lived assets, as well as those of our partner Santee Cooper. ***They are prudent in every respect***." |
| | | | | **"Q. ARE THE UPDATES REQUESTED IN THIS PROCEEDING REASONABLE AND PRUDENT?** |
| | | | | **[Byrne:]** ***Yes. The updates presented in this proceeding are reasonable and prudent.*** As President for Generation and Transmission, I am involved on an on-going basis with all major aspects of the construction project and was directly involved in the negotiations of both the EPC Contract Amendment and the decision to exercise the fixed-price option. The adjustments requested in this proceeding include adjustments to the construction schedule as well as to EPC costs and Owner's cost. ***They are adjustments that I know to represent reasonable and prudent changes in the cost and construction schedules for the Units.*** Making these adjustments is necessary to create the anticipated cost and construction schedules for the Units as required by the BLRA. ***Based on my knowledge of the project, and in my professional opinion, the adjustments are in no way the result of any lack of responsible and prudent management of the project by the Company or of imprudence by the Company in any respect.*** I ask the Commission to approve the updated capital cost and construction schedules as presented here . . . ." |
| 25. | July 1, 2016 PSC Direct | Marsh | Appx. A at 14 | Reiterates "***Gross Construction***" cost of "***$7.674 [billion]***" |

**Alleged False and Misleading Statements and Omissions**

| # | Date and Source | Speaker(s) | Complaint Cite | False and Misleading Statement(s) and Omissions[1] |
|---|---|---|---|---|
| | Testimony | | | "***The federal tax credits that are available to the project are worth a total of $2.2 billion to customers. Both of our plants must produce power before the end of 2020 to qualify for the full amount of these credits. The GSCD for Unit 2 is now 16 months ahead of that deadline and the GSCD for Unit 3 is four months ahead of it.*** These are tight windows, so we wanted to focus Westinghouse very keenly on meeting these deadlines." |
| 26. | July 28, 2016 Call | Byrne | Appx. A at 14<br><br>Compl. ¶ 202<br><br>Compl. ¶ 346 | "***The guaranteed [substantial] completion dates remain at August of 2019 for Unit 2 and August 2020 for Unit 3. We don't see anything to change those.***" Fluor's review of the schedule is really something that should conclude somewhere in the third quarter and then they will be giving that to Westinghouse.<br><br>And remember that on the project now we're just dealing with Westinghouse, Fluor is a subcontractor to Westinghouse. ***I don't expect anything necessarily to change from that [Fluor] review,*** save for perhaps the number of hours it might take and shifts that they would have to put on, that kind of thing. So the goal of that schedule review was to hold the dates constant and see what it would take to accomplish those dates. ***So I don't expect anything dramatic to come from that.***" |
| 27. | August 5, 2016 10-Q | SCANA, Marsh and Addison | Appx. A at 14-16 | "[T]he October 2015 Amendment . . . revised the ***guaranteed substantial completion dates of Units 2 and 3 to August 31, 2019 and 2020, respectively.***"<br><br>"Under the October 2015 Amendment, SCE&G's total estimated project costs increased over the $6.8 billion approved by the SCPSC in September 2015. In addition, SCE&G has updated project costs for estimated change orders related to certain outstanding disputes not resolved by the October 2015 Amendment. As a result, ***the estimated gross construction cost of the project (including the effects of these change orders, escalation and AFC) totals approximately $7.2*** |

**Alleged False and Misleading Statements and Omissions**

| # | Date and Source | Speaker(s) | Complaint Cite | False and Misleading Statement(s) and Omissions[1] |
|---|---|---|---|---|
| | | | | *billion.*" |
| | | | | "On May 26, 2016, SCE&G petitioned the SCPSC seeking approval to update the capital cost schedule and construction milestone schedule for the New Units consistent with the October 2015 Amendment. Within this petition, SCE&G also informed the SCPSC that it had notified WEC of its intent to elect the fixed price option, subject to concurrence by Santee Cooper and approval by the SCPSC. The petition reflects an increase in total project costs of approximately $852 million over the cost approved by the SCPSC in September 2015, of which approximately $505 million is directly attributable to the fixed price option. ***The project's estimated gross construction cost is now estimated to be approximately $7.7 billion, including owner's costs, transmission, escalation and AFC.*** On June 30, 2016, Santee Cooper's board of directors approved a resolution authorizing the execution of a limited agency agreement pursuant to which SCE&G, for itself and on behalf of Santee Cooper, would elect the fixed price option on its behalf. SCE&G then executed the fixed price option on July 1, 2016, subject to SCPSC approval. A public hearing on this matter is scheduled to begin on October 4, 2016, and the SCPSC is expected to issue its order in November 2016." |
| | | | | "The IRS has notified SCE&G that, subject to a national megawatt capacity limitation, the electricity to be produced by each of the New Units (advanced nuclear units, as defined) would qualify for nuclear production tax credits under Section 45J of the Internal Revenue Code to the extent that such New Unit is operational before January 1, 2021 and other eligibility requirements are met. ***These nuclear production tax credits (related to SCE&G's 55% share of both New Units) could total as much as approximately $1.4 billion.*** Such credits would be earned over the first eight years of each New Unit's operations and would be realized by SCE&G over those years or during allowable carryforward periods. ***Based on the guaranteed substantial completion dates provided above, both New Units are expected to be operational and to qualify for the nuclear*** |

**Alleged False and Misleading Statements and Omissions**

| # | Date and Source | Speaker(s) | Complaint Cite | False and Misleading Statement(s) and Omissions[1] |
|---|---|---|---|---|
| | | | | *production tax credits*; however, *further delays in the schedule* or changes in tax law *could impact such conclusions*." |
| 28. | September 1, 2016 Press Release | SCANA | Appx. A at 16 | "This settlement agreement signifies that no contested issues exist among the settling parties and supports approval of the updated construction schedule*, which indicates guaranteed substantial completion dates of August 2019 and August 2020 for Units 2 and 3, respectively, and inclusion of an additional $831 million in the capital cost schedule.*" |
| 29. | October 7, 2016 Media Day 2016 Video | Byrne | Appx. A at 16 | Presentation states: "*We have established considerable cost certainty.*" <br><br> Byrne says: "*We have established significant cost certainty. . . . We negotiated a fixed price option.*" |
| 30. | November 4, 2016 10-Q | SCANA, Marsh and Addison | Appx. A at 16-18 | "On September 1, 2016, SCE&G, ORS and certain other parties entered into a settlement agreement related to SCE&G's May 26, 2016 petition to update construction and capital cost schedules, including SCE&G's election of the fixed price option included in the October 2015 Amendment. Under the terms of the settlement agreement, the settling parties agree to support SCPSC approval of the updated construction schedule, *which indicates substantial completion dates of August 2019 and August 2020 for the New Units*, and SCE&G's election of the fixed price option." <br><br> "[T]he October 2015 Amendment. . . revised the *guaranteed substantial completion dates of Units 2 and 3 to August 31, 2019 and 2020, respectively . . . .*" <br><br> "Under the October 2015 Amendment, SCE&G's total estimated project costs increased over the $6.8 billion approved by the SCPSC in September 2015. In |

**Alleged False and Misleading Statements and Omissions**

| # | Date and Source | Speaker(s) | Complaint Cite | False and Misleading Statement(s) and Omissions[1] |
|---|---|---|---|---|
| | | | | addition, SCE&G has updated project costs for estimated change orders related to certain outstanding disputes not resolved by the October 2015 Amendment. ***As a result, SCE&G's estimated gross construction cost for the project (including the effects of these change orders, escalation and AFC but excluding the fixed price option described below) totaled approximately $7.2 billion.***" |
| | | | | "On May 26, 2016, SCE&G petitioned the SCPSC seeking approval to update the capital cost schedule and construction milestone schedule for the New Units consistent with the October 2015 Amendment. Within this petition, SCE&G also informed the SCPSC that it had notified WEC of its intent to elect the fixed price option, subject to concurrence by Santee Cooper and approval by the SCPSC. The petition reflected an increase in total project costs of approximately $852 million over the cost approved by the SCPSC in September 2015, of which approximately $505 million is directly attributable to the fixed price option. ***SCE&G's estimated gross construction cost for the project is now estimated to be approximately $7.7 billion, including owner's costs, transmission, escalation and AFC.*** After receiving Santee Cooper's concurrence in June 2016, SCE&G executed the fixed price option on July 1, 2016, subject to SCPSC approval." |
| | | | | "The settlement agreement supports approval of the fixed price option and the revised construction and capital cost schedules, ***including the guaranteed substantial completion dates of August 2019 and August 2020 for Units 2 and 3, respectively*** . . . ." |
| | | | | "The IRS has notified SCE&G that, subject to a national megawatt capacity limitation, the electricity to be produced by each of the New Units (advanced nuclear units, as defined) would qualify for nuclear production tax credits under Section 45J of the IRC to the extent that such New Unit is operational before January 1, 2021 and other eligibility requirements are met. These nuclear production tax credits (related to SCE&G's 55% share of both New Units) could total as much as approximately $1.4 billion . Such credits would be earned over |

**Alleged False and Misleading Statements and Omissions**

| # | Date and Source | Speaker(s) | Complaint Cite | False and Misleading Statement(s) and Omissions[1] |
|---|---|---|---|---|
| | | | | the first eight years of each New Unit's operations and would be realized by SCE&G over those years or during allowable carry-forward periods. ***Based on the guaranteed substantial completion dates provided above, both New Units are expected to be operational and to qualify for the nuclear production tax credits***; however, ***further delays in the schedule*** or changes in tax law ***could*** ***impact such conclusions***." |
| 31. | November 9, 2016 Press Release | SCANA | Appx. A at 18 | "***The approved construction schedule designates guaranteed substantial completion dates of August 2019 and August 2020 for Units 2 and 3, respectively. The approved capital cost schedule includes incremental capital costs that total $831 million (SCE&G's 55% portion in 2007 dollars). The total project capital cost is now estimated at approximately $6.8 billion (SCE&G's 55% portion in 2007 dollars) or $7.7 billion including escalation and allowance for funds used during construction (SCE&G's 55% portion in future dollars).***" |
| 32. | February 14, 2017 8-K "SCANA Receives Reaffirmation from Westinghouse Regarding Completion of VC Summer New Nuclear Project" | SCANA | Compl. ¶ 347<br><br>Appx. A at 18 | The February 14, 2017 Press Release announced that "***[i]n addition to [Toshiba's] reaffirmation, [Westinghouse] provided SCE&G with revised in-service dates of April 2020 and December 2020 for Units 2 and 3, respectively***," compared to the then-current August 2019 and August 2020 dates— representing a delay of eight months for Unit 2 and four months for Unit 3, respectively. |
| 33. | February 14, 2017 8-K "SCANA Receives Reaffirmation from Westinghouse Regarding Completion | SCANA | Compl. ¶ 348<br><br>Appx. A at 18 | The February 14, 2017 Press Release thus attempted to minimize the impact of this new schedule delay, assuring that the "***completion dates provided in the new schedule*** are within the 18 month contingency period provided under the construction provisions of the [BLRA] . . . and ***would enable both units to qualify, under current law, for the federal production tax credits.***" |

**Alleged False and Misleading Statements and Omissions**

| # | Date and Source | Speaker(s) | Complaint Cite | False and Misleading Statement(s) and Omissions[1] |
|---|---|---|---|---|
| | of VC Summer New Nuclear Project" | | | |
| 34. | February 16, 2017 Call | Byrne | Compl. ¶ 349<br><br>Appx. A at 18 | On February 16, 2017, during the February 16, 2017 Earnings Call, when confronted by an analyst that it was "conceivable that unit [Unit 3] wouldn't qualify for PTCs," Defendant Byrne similarly downplayed this "possibility" as follows:<br><br>That possibility exists. There are a couple things that are yet undefined or untested relative to qualification production tax credits. One is, what is the definition of in service. ***Because certainly we'll be making some power from those units prior to declaring it in service. So if making power qualifies, then we'll be ahead of those dates.*** That just gives us a little bit more room, probably on the order of two months. |
| 35. | February 16, 2017 Call | Byrne | Appx. A at 19 | **Analyst:** "So I wanted to follow-up a little bit, I imagine a lot of questions here around it. But first a little bit of an update on worker productivity to the extent to which you have a sense. ***Given the new timelines released, obviously recently, what's your level of confidence against these timelines, particularly given some of the risks around further delay on the second unit?*** Do you have any sense on that?"<br><br>**Byrne:** "Julien, this is Steve. When you say the second unit, you talking about the second new unit or talking about Unit 2, which is the first new unit?"<br><br>**Analyst:** "Sorry, yes, ***the second new unit and the 2020 deadline***."<br><br>**Byrne:** "What we've seen so far is that the efficiency factors have increased significantly on Unit 3, our second new unit. In some cases, it's a matter of hours |

**Alleged False and Misleading Statements and Omissions**

| # | Date and Source | Speaker(s) | Complaint Cite | False and Misleading Statement(s) and Omissions[1] |
|---|---|---|---|---|
| | | | | and in other cases, it's double or triple the efficiency factor for the second unit. So we're learning the lessons from the first unit and applying them to the second unit and ***it's going much, much more smoothly***. ***So I have a reasonable confidence in the efficiency gains for the second new unit***." |
| 36. | February 24, 2017 2016 10-K | SCANA, Marsh, Addison, Hagood, and Roquemore | Appx. A at 19-21<br><br>Compl. ¶ 350 | "In addition to the project risks highlighted in Toshiba's disclosures surrounding the large losses described above, additional risks and uncertainties regarding the project schedule are evident. In February 2017, WEC notified the Company and Consolidated SCE&G that the contractual guaranteed substantial completion dates of August 2019 and 2020 for Unit 2 and Unit 3, respectively, which were reflected in the October 2015 Amendment, are not likely to be met. ***Instead, revised substantial completion dates of April 2020 and December 2020 are reflected within WEC's revised project schedule.*** While these later dates remain within the SCPSC-approved 18-month contingency periods provided for under the BLRA, and achievement of such dates would also allow the output of both units to qualify, under current law, for federal production tax credits, there remains substantial uncertainty as to WEC's ability to meet these dates given its historical inability to meet forecasted productivity and work force efficiency levels."<br><br>"***The approved construction schedule designates contractual guaranteed substantial completion dates of August 31, 2019 and August 31, 2020 for Units 2 and 3, respectively, although recent communications from WEC indicate substantial completion dates of April 2020 and December 2020 for Units 2 and 3, respectively.*** These later dates remain within SCPSC-approved 18-month contingency periods provided for under the BLRA, and achievement of such dates would also allow the output of both units to qualify, under current law, for federal production tax credits*.*"<br><br>"The approved capital cost schedule includes incremental capital costs. |

**Alleged False and Misleading Statements and Omissions**

| # | Date and Source | Speaker(s) | Complaint Cite | False and Misleading Statement(s) and Omissions[1] |
|---|---|---|---|---|
| | | | | *SCE&G's total project capital cost is now estimated at approximately $6.8 billion including owner's costs and transmission, or $7.7 billion with escalation and AFC*." |
| | | | | "*The approved construction schedule designates contractual guaranteed substantial completion dates of August 31, 2019 and August 31, 2020 for Units 2 and 3, respectively.* The approved capital cost schedule includes incremental capital costs that total $831 million . *SCE&G's total project capital cost is now estimated at approximately $6.8 billion including owner's costs and transmission, or $7.7 billion with escalation and AFC.*" |
| | | | | "The October 2015 Amendment: . . . revised the *contractual guaranteed substantial completion dates of Units 2 and 3 to August 31, 2019 and 2020, respectively* . . . ." |
| | | | | "The IRS has notified SCE&G that, subject to a national megawatt capacity limitation, the electricity to be produced by each of the New Units (advanced nuclear units, as defined) would qualify for nuclear production tax credits under Section 45J of the IRC to the extent that such New Unit is operational before January 1, 2021 and other eligibility requirements are met. These nuclear production tax credits (related to SCE&G's 55% share of both New Units) could total as much as approximately $1.4 billion . Such credits would be earned over the first eight years of each New Unit's operations and would be realized by SCE&G over those years or during allowable carry-forward periods. *Based on current tax law and the contractual guaranteed substantial completion dates (and the recently revised forecasted dates of completion) provided above, both New Units would be operational and would qualify for the nuclear production tax credits*; however, *further delays in the schedule* or changes in tax law *could impact such conclusions*." |

**Alleged False and Misleading Statements and Omissions**

| # | Date and Source | Speaker(s) | Complaint Cite | False and Misleading Statement(s) and Omissions[1] |
|---|---|---|---|---|
| 37. | May 5, 2017 10-Q | SCANA, Marsh and Addison | Compl. ¶ 351 | In February 2017, WEC notified the Company and Consolidated SCE&G that the contractual guaranteed substantial completion dates of August 2019 and 2020 for Unit 2 and Unit 3, respectively, which were reflected in the October 2015 Amendment, are not likely to be met. ***Instead, WEC provided further revised estimated substantial completion dates of April 2020 and December 2020.*** These later dates remain within the SCPSC-approved 18-month contingency periods provided for under the BLRA, ***and achievement of such dates would also allow the output of both units to qualify, under current law, for federal production tax credits***. there remains substantial uncertainty as to WEC's ability to meet these dates given its historical inability to meet forecasted productivity and work force efficiency levels. |
| | | | **Statements Regarding Defendants' Transparency About the Nuclear Project** | |
| 38. | November 6, 2015 10-Q | SCANA, Marsh and Addison | Compl. ¶ 363 | Item No. 26 to the EPC Amendment, which was attached as an exhibit to the November 6, 2015 10-Q, provided that: While the Parties acknowledge the existence of various confidentiality agreements between themselves, ***they also recognize that certain disclosures must be made to satisfy various securities laws and for regulatory purposes. Each Party is free to make such disclosures as it deems prudent***, but the disclosing Party must provide a copy of any intended written disclosure to the other Parties before such disclosure is made. |
| 39. | November 19, 2015 PSC Direct Testimony | Addison | Compl. ¶ 362 | Among one of the new provisions in the EPC Amendment was a clause that freed SCANA of any obligation it previously had to clear public statements concerning the Nuclear Project with Westinghouse. Defendant Addison described this provision during the November 19 PSC Briefing as enhancing Defendants' "***ability to disclose to our regulators and our investors all the details of anything that we think is critical that you know***:" |

**Alleged False and Misleading Statements and Omissions**

| # | Date and Source | Speaker(s) | Complaint Cite | False and Misleading Statement(s) and Omissions[1] |
|---|---|---|---|---|
| | | | | One of the provisions in the agreement — one very late night we were going through things that were very important to us, we said, "***We really need the ability to disclose to our regulators and our investors all the details of anything that we think is critical that you know***," and they [Westinghouse] acquiesced to that right off the bat. So there's a provision in that agreement, Item No. 26, that says ***we can share with you anything that we think is important that you see, as well as the investors, those that buy our bonds or those that buy stock to provide the funds to build the plants.*** |
| 40. | September 23, 2016 The Post and Courier "Electric Bill 'Look at Whole Picture,' SCANA Chief Says of Nuclear Project Costs," | Marsh | Compl. ¶ 365 | Defendant Marsh, in a September 23, 2016 article published in The Post and Courier titled, "Electric Bill 'Look at Whole Picture,' SCANA Chief Says of Nuclear Project Costs," asserted that "***[w]e've been straightforward and honest about the challenges we've had on this project as we've presented those to the commission***, and we'll do everything we can to limit the cost of that fixed price." |
| 41. | March 29, 2017 Call | Marsh | Compl. ¶ 366 | Later, once the market began to understand through various partial disclosures that the Nuclear Project was in serious jeopardy, Defendant Marsh tried to assure investors that SCANA had been and would continue to be "open" and "transparent." For example, during the March 29, 2017 Call, Marsh represented that "***[w]e've been transparent on this project since day 1, and we're not going to change that.***" |
| 42. | August 3, 2017 Call | Marsh | Compl. ¶ 367 | Months later, after SCANA had announced its abandonment of the Nuclear Project, Defendant Marsh spoke during the August 3, 2017 earnings call (the "August 3, 2017 Call") about SCANA's commitment to openness with the PSC, stating "***[o]ur process at the commission is very open.***" |
| 43. | September 18, 2017 | Marsh | Compl. ¶ 367 | Marsh reiterated this description on September 18, 2017 during testimony |

**Alleged False and Misleading Statements and Omissions**

| # | Date and Source | Speaker(s) | Complaint Cite | False and Misleading Statement(s) and Omissions[1] |
|---|---|---|---|---|
| | South Carolina Senate Testimony | | | before the South Carolina Senate, when he stated that, despite the recent revelation of the existence of the February 2016 Final Bechtel Report, SCANA had "***discussed openly the challenges that we had.***" |
| 44. | September 18, 2017 PSC Testimony | Marsh | Compl. ¶ 371 | In response to a direct question from a PSC Commissioner about the existence of an earlier Bechtel report, Marsh replied: "***I'm not aware of a second report.***" |
| | **Statements Regarding SCANA's "Prudent" Oversight of the Nuclear Project (Including "Quality" Statements)** | | | |
| 45. | October 29, 2015 Call | Addison | Compl. ¶ 374 | For example, during the October 29, 2015 Call, Defendant Addison, in response to an analyst question about whether Fluor and Westinghouse had "looked at the quality [of the] work that has been done by CB&I," responded:<br>    But Westinghouse has had an opportunity to assess quality as have<br>    our folks, and so ***we don't just rely on the quality from the vendor,***<br>    in this case CB&I. ***We have our own quality group, our own quality inspectors***, and we send our folks not just at the site but we<br>    will send them to facilities that are manufacturing components,<br>    whether it be CB&I or somebody else, and we send them whether<br>    it is domestically or internationally, our QA QC inspectors have a<br>    lot of stamps on their passports. ***We will be able to assure Fluor of***<br>    ***the quality of the construction so far.*** |
| 46. | October 29, 2015 Call | Addison | Compl. ¶ 375 | The same analyst followed up and asked: "So you're happy with the quality, so there's going to be no ah ha moment, is what you are saying?" Defendant Addison responded in the affirmative: "***We don't anticipate any ah ha moments.***" |

**Alleged False and Misleading Statements and Omissions**

| # | Date and Source | Speaker(s) | Complaint Cite | False and Misleading Statement(s) and Omissions[1] |
|---|---|---|---|---|
| 47. | November 6, 2015 10-Q | SCANA, Marsh and Addison | Compl. ¶ 380 | For example, SCANA represented in the November 6, 2015 10-Q, which was signed by Defendants Marsh and Addison, that:<br>Under the BLRA, the SCPSC has approved, among other things, a milestone schedule and a capital costs estimates schedule for the New Units. This approval constitutes a final and binding determination that the New Units are used and useful for utility purposes, and ***that the capital costs associated with the New Units*** ***are prudent utility costs and expenses and are properly included in rates so long as the New Units are constructed or are being constructed within the parameters of the approved milestone schedule, including specified schedule contingencies, and the approved capital costs estimates schedule.*** |
| 48. | November 19, 2015 PSC Testimony | Byrne | Compl. ¶ 376 | Defendant Byrne also misrepresented SCANA's control over the quality of the Nuclear Project construction during the November 19 PSC Briefing, responding to a question about whether he had "any concern about having a fixed-price option, about the quality of the project at the end," in the negative, stating "***even with the delays, we don't have an issue with quality.***" |
| 49. | February 26, 2016 2015 10-K | SCANA, Marsh, Addison and Director Defendants | Compl. ¶ 381 | Under the BLRA, the SCPSC has approved, among other things, a milestone schedule and a capital costs estimates schedule for the New Units. This approval constitutes a final and binding determination that the New Units are used and useful for utility purposes, and ***that the capital costs associated with the New Units*** ***are prudent utility costs and expenses and are properly included in rates so long as the New Units are constructed or are being constructed within the parameters of the approved milestone schedule, including specified schedule contingencies, and the*** |

**Alleged False and Misleading Statements and Omissions**

| # | Date and Source | Speaker(s) | Complaint Cite | False and Misleading Statement(s) and Omissions[1] |
|---|---|---|---|---|
| | | | | *approved capital costs estimates schedule.* |
| **50.** | March 29, 2016 Proxy Statement filed with the SEC, containing a "Chairman's Letter and 2015 Highlights" | Marsh | Compl. ¶ 381 | Under the BLRA, the SCPSC has approved, among other things, a milestone schedule and a capital costs estimates schedule for the New Units. This approval constitutes a final and binding determination that the New Units are used and useful for utility purposes, and *that the capital costs associated with the New Units are prudent utility costs and expenses and are properly included in rates so long as the New Units are constructed or are being constructed within the parameters of the approved milestone schedule, including specified schedule contingencies, and the approved capital costs estimates schedule.* |
| **51.** | May 6, 2016 10-Q | SCANA, Marsh and Addison | Compl. ¶ 381 | Under the BLRA, the SCPSC has approved, among other things, a milestone schedule and a capital costs estimates schedule for the New Units. This approval constitutes a final and binding determination that the New Units are used and useful for utility purposes, and *that the capital costs associated with the New Units are prudent utility costs and expenses and are properly included in rates so long as the New Units are constructed or are being constructed within the parameters of the approved milestone schedule, including* specified *schedule contingencies, and the approved capital costs estimates schedule.* |
| **52.** | August 5, 2016 10-Q | SCANA, Marsh and Addison | Compl. ¶ 381 | Under the BLRA, the SCPSC has approved, among other things, a milestone schedule and a capital costs estimates schedule for the New Units. This approval constitutes a final and binding determination that the New Units are used and useful for utility purposes, and *that the capital costs associated with the New* |

**Alleged False and Misleading Statements and Omissions**

| # | Date and Source | Speaker(s) | Complaint Cite | False and Misleading Statement(s) and Omissions[1] |
|---|---|---|---|---|
| | | | | *Units* *are prudent utility costs and expenses and are properly included in rates so long as the New Units are constructed or are being constructed within the parameters of the approved milestone schedule, including specified schedule contingencies, and the approved capital costs estimates schedule.* |
| 53. | November 4, 2016 10-Q | SCANA, Marsh and Addison | Compl. ¶ 381 | Under the BLRA, the SCPSC has approved, among other things, a milestone schedule and a capital costs estimates schedule for the New Units. This approval constitutes a final and binding determination that the New Units are used and useful for utility purposes, and *that the capital costs associated with the New Units* *are prudent utility costs and expenses and are properly included in rates so long as the New Units are constructed or are being constructed within the parameters of the approved milestone schedule, including specified schedule contingencies, and the approved capital costs estimates schedule.* |
| 54. | February 24, 2017 2016 10-K | SCANA, Marsh, Addison, Hagood and Roquefort | Compl. ¶ 381 | Under the BLRA, the SCPSC has approved, among other things, a milestone schedule and a capital costs estimates schedule for the New Units. This approval constitutes a final and binding determination that the New Units are used and useful for utility purposes, and *that the capital costs associated with the New Units* *are prudent utility costs and expenses and are properly included in rates so long as the New Units are constructed or are being constructed within the parameters of the approved milestone schedule, including specified schedule contingencies, and the approved capital costs estimates schedule.* |

**Alleged False and Misleading Statements and Omissions**

| # | Date and Source | Speaker(s) | Complaint Cite | False and Misleading Statement(s) and Omissions[1] |
|---|---|---|---|---|
| 55. | May 5, 2017 10-Q | SCANA, Marsh and Addison | Compl. ¶ 381 | Under the BLRA, the SCPSC has approved, among other things, a milestone schedule and a capital costs estimates schedule for the New Units. This approval constitutes a final and binding determination that the New Units are used and useful for utility purposes, and ***that the capital costs associated with the New Units are prudent utility costs and expenses and are properly included in rates so long as the New Units are constructed or are being constructed within the parameters of the approved milestone schedule, including specified schedule contingencies, and the approved capital costs estimates schedule.*** |
| 56. | August 4, 2017 10-Q | SCANA, Marsh and Addison | Compl. ¶ 381 | Under the BLRA, the SCPSC has approved, among other things, a milestone schedule and a capital costs estimates schedule for the New Units. This approval constitutes a final and binding determination that the New Units are used and useful for utility purposes, and ***that the capital costs associated with the New Units are prudent utility costs and expenses and are properly included in rates so long as the New Units are constructed or are being constructed within the parameters of the approved milestone schedule, including specified schedule contingencies, and the approved capital costs estimates schedule.*** |
| 57. | July 1, 2016 PSC Direct Testimony | Marsh | Compl. ¶ 382<br><br>Compl. ¶ 200 | In their PSC testimony, Defendants Marsh and Byrne made direct statements attesting to their knowledge of and "prudent" oversight of the Nuclear Project. For example, Defendant Marsh stated that "***I can affirmatively testify, as I have testified in prior proceedings, that SCE&G is performing its role as project owner in a reasonable, prudent, and cost-effective manner***." |
| 58. | July 1, 2016 PSC Direct | Marsh | Compl. ¶ 382 | Defendant Marsh also minimized the risks facing the Nuclear Project and assured |

**Alleged False and Misleading Statements and Omissions**

| # | Date and Source | Speaker(s) | Complaint Cite | False and Misleading Statement(s) and Omissions[1] |
|---|---|---|---|---|
| | Testimony | | Compl. ¶ 201 | investors that, based on his "direct[] . . . management and oversight of the project," many of the construction issues were now largely behind SCANA: My senior management team and I are directly involved in the management and oversight of the project and in interacting with Westinghouse and Fluor and their senior leadership teams. ***We are dealing with the issues aggressively and at the highest levels. The challenges we are facing are consistent with the risk we identified in our filings in 2008***. The important point is that these challenges do not in any way outweigh the long-term benefits of adding this new nuclear capacity to our system. … We are now nine years into a thirteen year construction project. ***The project team has overcome many of the first-of-a-kind challenges presented by this project***. |
| 59. | July 1, 2016 PSC Direct Testimony | Byrne | Compl. ¶ 383 | Defendant Byrne answered the following question in his Direct Testimony in the affirmative: "Are the updates requested in this proceeding [are] reasonable and prudent?," Defendant Byrne responded that "[t]he ***updates presented in this proceeding are reasonable and prudent,"*** and are "***adjustments that I know to represent reasonable and prudent changes in the cost and construction schedules for the Units.***" Byrne explained that, "***[b]ased on my knowledge of the project, and in my professional opinion, the adjustments are in no way the result of any lack of responsible and prudent management of the project by the Company or of imprudence by the Company in any respect.***" |
| 60. | February 16, 2017 Call | Marsh | Compl. ¶ 384 | One analyst asked whether, "if the issues with the budget and the cost overruns are really driven by . . . more ordinary course scheduling issues . . . and also the fact that Toshiba may not be able to meet its financial obligations, is that under the abandonment provision? Is that a cause for being able to get recovery for the |

**Alleged False and Misleading Statements and Omissions**

| # | Date and Source | Speaker(s) | Complaint Cite | False and Misleading Statement(s) and Omissions[1] |
|---|---|---|---|---|
| | | | | money spent to date?" In response, Marsh explained that "[t]here was not an effort to make a listing of the types of items that would qualify [under the abandonment provision]," but that "***generally prudency is the rule that the Commission banks on at the end of the day.***" He thus implied that SCANA would be able to recover its additional costs on the Nuclear Project under the BLRA because the Company had acted prudently in managing it. |
| 61. | March 29, 2017 Call | Marsh | Compl. ¶ 385 | In response to analysts' concern over SCANA's ability to recover costs in the event of abandonment, Defendant Marsh stated that "***it's pretty clear that if it is deemed it's not prudent to continue the project, that the prudently incurred cost to date can be recovered through the abandonment clause. I don't expect that to be changed.***" |
| 62. | September 18, 2017 SC Senate Committee Hearing | Marsh | Compl. ¶ 386 | Similarly, on September 18, 2017, during the SC Senate Committee Hearing, Defendant Marsh once again touted that all prior decisions during construction were prudent: "[T]he costs that were the basis for the increases in the revised rates while we were building the project were based on dollars that ***were prudently spent as the project was being constructed.***" He continued: "***So it's my opinion that those rate increases were prudent at the time they were put into place.***" |
| 63. | September 18, 2017 SC Senate Committee Hearing | Marsh | Compl. ¶ 387 | During this hearing, Marsh further assured that SCANA had made "prudent decisions" throughout the course of the Nuclear Project: "We knew and told the Commission back in 2008 when we had it approved that we anticipated there would be challenges on a megaproject of this size, and we did our best to address those, ***making prudent decisions along the way.***" |
| 64. | October 26, 2017 Call | Addison | Compl. ¶ 388 | As late as October 26, 2017, during the October 26, 2017 earnings for the third quarter of 2017 (the "October 26, 2017 Call"), after the Nuclear Project was abandoned and several investigations into the Officer |

**Alleged False and Misleading Statements and Omissions**

| # | Date and Source | Speaker(s) | Complaint Cite | False and Misleading Statement(s) and Omissions[1] |
|---|---|---|---|---|
| | | | | Defendants' actions had commenced, Defendant Addison still asserted that SCANA had been prudent in its management of the Nuclear Project from the start: "As we have said in various legislative hearings, *we believe our actions related to the nuclear project have been prudent* and were in the best interest of our customers." |
| **Statements Regarding Progress at the Nuclear Project** | | | | |
| 65. | January 15, 2016, SCANA's YouTube channel "SCE&G Release Video Highlighting a Year of Progress for V.C. Summer Units 2 and 3" | SCANA public affairs spokeswoman | Compl. ¶ 392 | On January 15, 2016, in a video titled "Year of Progress" that was published on SCANA's YouTube channel, SCANA's public affairs spokeswoman discussed SCANA's purported "progress with V.C. Summer Units 2 and 3 over the past year," stating, for example, that "*significant progress has taken place on the V.C. Summer Nuclear construction site.*" |
| 66. | January 15, 2016, SCANA's YouTube channel "SCE&G Release Video Highlighting a Year of Progress for V.C. Summer Units 2 and 3" | Marsh | Compl. ¶ 392  Compl. ¶¶ 25, 195 | Defendant Marsh then touted the progress and success of the Nuclear Project: "*I have just as much faith today in building new nuclear [i.e., the Nuclear Project] as I did in 2008. And [the Nuclear Project] positions us well for the long term.*" |
| 67. | March 29, 2016 Proxy Statement | Marsh | Compl. ¶ 393  Compl. ¶ 195 | In SCANA's March 29, 2016 Proxy Statement, Defendant Marsh again told investors that "[d]uring a very challenging 2015, *we continued to move forward and make substantial progress on initiatives important to our company such as our new nuclear construction project* and our recent initiative to offer renewable energy to our customers." |

**Alleged False and Misleading Statements and Omissions**

| # | Date and Source | Speaker(s) | Complaint Cite | False and Misleading Statement(s) and Omissions[1] |
|---|---|---|---|---|
| 68. | April 28, 2016 Call | Byrne | Compl. ¶ 394 | On the April 28, 2016 Earnings Call, Defendant Byrne discussed with analysts the continued viability of the Nuclear Project in the event that Westinghouse was no longer solvent and was no longer part of the Nuclear Project. Byrne stated that, should Westinghouse leave the Project, SCANA itself could act as the general contractor, "which we would be more comfortable doing now than when we originally signed up for the project *since we've made so much progress.*" |
| 69. | May 26, 2016 8-K | Marsh | Compl. ¶ 395 | One month later, in the May 26, 2016 Press Release announcing SCE&G's petition seeking approval to update the capital cost and the construction milestone schedule for the Nuclear Project, Defendant Marsh represented that *"[c]onstruction of the two new nuclear units continues to progress.*" |
| 70. | September 21, 2016, SCE&G's YouTube Channel Media Day 2016 – Byrne Video | Byrne | Compl. ¶ 396<br><br>Compl. ¶ 205 | On October 7, 2016, SCE&G's YouTube channel, scegnews, published two videos, originally recorded on September 21, 2016, where SCANA gave local, regional, and national media outlets an update on the construction progress of the Nuclear Project's Units 2 and 3. In the Media Day 2016 - Byrne Video, Defendant Byrne began by assuring the public that "*[t]he pace of this project is quickening.* [Though] we have run into some issues and roadblocks in the past, *most of those issues and roadblocks are behind us.*" Byrne further stated in a PowerPoint presentation that "[w]e have the right team in place *and are making tremendous progress toward completion*" and that "*a lot of progress is taking place.*" |
| 71. | September 21, 2016, SCE&G's YouTube Channel Media Day 2016 – Marsh Video | Marsh | Compl. ¶ 396<br><br>Compl. ¶ 205 | Similarly, in the same video, Defendant Marsh assured the public that SCANA has been making "*great progress*" at the Nuclear Project. |

**Alleged False and Misleading Statements and Omissions**

| # | Date and Source | Speaker(s) | Complaint Cite | False and Misleading Statement(s) and Omissions[1] |
|---|---|---|---|---|
| 72. | September 21, 2016, SCE&G's YouTube Channel Media Day 2016 – Marsh Video | Marsh | Compl. ¶ 396 | Later, in the Media Day 2016 - Marsh again reassured investors that progress had continued at the project, as SCANA had addressed prior challenges: <br> In projects of this nature, you're going to have some challenges and issues. We've had challenges and issues; some of those have been on the cost side, the cost of the whole project for Santee [Cooper] and SCE&G is going from 11.4 billion to 13.8 billion or about a 21% increase because of adjustments we had to make in the price, some of it driven by regulations, some of it driven by engineering challenges from our providers, some of it delivered by late delivery of parts that weren't on time at the time we needed them, ***but we've been able to meet those challenges, make adjustments to the contract and continue progress on the project.*** |
| 73. | October 27, 2016 Call | Byrne | Compl. ¶ 397 | On the October 27, 2016 Earnings Call, Defendant Byrne similarly reiterated to investors "***the significant progress that has been made so far on the project.***" |
| 74. | February 16, 2017 Call | Byrne | Compl. ¶ 397 | Again, on February 16, 2017, during the fourth quarter and year-end 2016 Earnings Call Defendant Byrne further assured investors that "***we've made significant progress in just under 14 months.***" |
| 75. | February 16, 2017 Call | Marsh | Compl. ¶ 397 | During that same February 16, 2017 Call, Defendant Marsh similarly assured investors of continued "substantial progress" on the Nuclear Project: "As you can see from [Byrne's] update, ***we are making substantial progress on these new plants and remain focused on continued progress toward their completion.***" |
| 76. | August 1, 2017 PSC Briefing | Byrne | Compl. ¶ 398 | For example, at the August 1, 2017 PSC Briefing, Defendant Byrne assured that before the abandonment decision, "***[t]he construction work at the site has been progressing well.***" |

**Alleged False and Misleading Statements and Omissions**

| # | Date and Source | Speaker(s) | Complaint Cite | False and Misleading Statement(s) and Omissions[1] |
|---|---|---|---|---|
| 77. | August 3, 2017 Call | Marsh | Compl. ¶ 398 | Likewise, at the August 3, 2017 Earnings Call, Defendant Marsh stated that before the announcement of Westinghouse's bankruptcy in March 2017, the Nuclear Project "was moving forward, *we were making progress and looking forward to hitting the targets.*" |
| | **Statements Regarding the Impact of a Westinghouse/Toshiba Bankruptcy on the Nuclear Project's Continued Viability** | | | |
| 78. | February 18, 2016 Call | Byrne | Compl. ¶ 403 <br><br> Compl. ¶ 219 | In response, Defendant Byrne downplayed the likelihood and impact of a bankruptcy by Toshiba, and Westinghouse, assuring investors that "we do have in the contract some provisions to escrow intellectual properties*, such that if there were to be a cessation of operations by the contractor, that we could finish the plant on our own.*" |
| 79. | April 28, 2016 Call | Byrne | Compl. ¶ 403 <br><br> Compl. ¶ 220 | Then, on the April 28, 2016 Earnings Call, Defendant Byrne again minimized the negative impact of a potential bankruptcy by Toshiba or Westinghouse on the Nuclear Project's continued viability. Specifically, Byrne reassured investors that, in the event of a potential Westinghouse bankruptcy, SCANA could finish the project on its own: "*So, the important part, to me, is that I have the information that I need to be able to finish the plant on my own . . .*" |
| 80. | February 12, 2017 Article *The Post and Courier* | Byrne | Compl. ¶ 404 | SCANA and Santee Cooper elected to exercise the fixed price option in mid-2016, and it was approved by the PSC in late 2016, just one month before Toshiba announced an estimated impairment of billions of dollars connected to Nuclear Project at the end of December. In a February 12, 2017 article in *The Post and Courier*, in response to inquiries regarding the impact that the potential bankruptcy of Toshiba would have on the continued viability of the Nuclear Project, Defendant Byrne again reassured investors that "*we do have some contingency plans in place to complete the plant on our own should something like that happen.*" He further explained: "We would then act as the general contractor, and we're escrowing the proprietary information . . . we would need in order to do that now. . . . From that perspective *we think we can complete the* |

**Alleged False and Misleading Statements and Omissions**

| # | Date and Source | Speaker(s) | Complaint Cite | False and Misleading Statement(s) and Omissions[1] |
|---|---|---|---|---|
| | | | | *plants on our own.*" |
| 81. | February 14, 2017 Press Release | SCANA | Compl. ¶ 405 Compl. ¶ 232 | A few days later, the February 14, 2017 Press Release further reassured investors that SCANA and Santee Cooper "have received information from [Westinghouse] officials that indicates *[Westinghouse] and its parent guarantor, Toshiba Corporation (Toshiba), are committed to completing the two new Westinghouse AP1000 nuclear units.*" |
| 82. | February 16, 2017 Call | Marsh | Compl. ¶ 406 | On February 16, 2017, during the fourth quarter Earnings Call, Defendant Marsh again told investors that Toshiba's financial difficulties would not derail the completion of the Nuclear Project: "We continue to monitor Toshiba's financial situation and their proposed recovery plans. Although ideally Toshiba would be without these stresses, *we still anticipate completing our two new nuclear units* which will enable us to provide our customers with safe, reliable energy for decades to come." Moreover, later on the same call, Defendant Marsh similarly reassured that SCANA would complete the Nuclear Project without Westinghouse, if necessary. For instance, he explained that "If for any reason, Westinghouse exits the project: *Under this scenario, we could evaluate options of serving as the general contractor, entering into a new EPC contract for the remainder of the construction, or entering into a procurement and construction contract and supply the engineering support ourselves or through a third-party engineering firm.* As of the end of 2016, all major equipment has been procured, received on site, or is in fabrication. |
| 83. | February 16, 2017 Call | Marsh | Compl. ¶ 407 | During the same fourth quarter Earnings Call, in response to an analyst question about a "worst-case scenario on the nuclear side," Defendant Marsh stated that SCANA would "consider all" of the options to continue construction, downplaying the possibility that SCANA would abandon the Nuclear Project: So we would certainly consider all of those [options], look at the |

**Alleged False and Misleading Statements and Omissions**

| # | Date and Source | Speaker(s) | Complaint Cite | False and Misleading Statement(s) and Omissions[1] |
|---|---|---|---|---|
| | | | | last case option, **the abandonment [provisions] under the BLRA. That's not something high on our list.** We would certainly like to finish these projects, they are critical to us over the long term and meeting customers['] needs and the growth we expect to see in the State of South Carolina over the long term. . . . **So we're sticking with our strategy[,] and these plants are critical to do that.** |
| 84. | February 16, 2017 Call | Marsh | Compl. ¶ 408 | Several analysts asked specifically about the BLRA abandonment provision, including whether SCANA could recover BLRA funds in the event of abandonment. For example, in response to a question about whether Marsh "f[elt] confident that given this type of situation that's happened, [the BLRA abandonment clause] would still be valid," Marsh sidestepped the question, reiterating that "**Westinghouse and Toshiba have reaffirmed their commitment to finish the project**." |
| 85. | March 29, 2017 Call | Marsh | Compl. ¶ 409<br><br>Compl. ¶ 248 | March 29, 2017, during the March 2017 Conference Call, Defendant Marsh again downplayed the possibility of SCANA abandoning the Nuclear Project, reassuring investors that "**[a]t this time, we expect that the resources available from Westinghouse and Toshiba, including its parental guarantee, are adequate to compensate us for the Westinghouse estimate of additional costs.**" |
| 86. | April 27, 2017 Call | Byrne | Compl. ¶ 410 | On April 27, 2017, during the Q1 FY 2017 Earnings Call, Defendant Byrne continued to minimize the impact of Westinghouse's bankruptcy and reassure investors that SCANA would complete the Nuclear Project despite any cost overruns because Toshiba would honor the fixed price option and pay for any additional costs above the fixed price amount. Specifically, Byrne stated that "**[Westinghouse's] estimate to us of what it would cost to complete above what our current fixed price contract amount is would be within the amount that is the parental guarantee from Toshiba.**" |

**Alleged False and Misleading Statements and Omissions**

| # | Date and Source | Speaker(s) | Complaint Cite | False and Misleading Statement(s) and Omissions[1] |
|---|---|---|---|---|
| 87. | July 31, 2017 8-K Abandonment Press Release | SCANA<br><br><br><br>Marsh (7/31/2017) | Compl. ¶ 415<br><br>Compl. ¶ 261 | On July 31, 2017, Defendants issued the July 31, 2017 Abandonment Press Release that misled investors into believing Westinghouse's bankruptcy was the primary reason SCANA chose to abandon the Nuclear Project, and continued to conceal Bechtel's earlier negative findings. Specifically, the press release quoted Defendant Marsh as follows: "We arrived at this very difficult but necessary decision following months of evaluating the project from all perspectives to determine the most prudent path forward. ***Many factors outside our control have changed since inception of this project. Chief among them, the bankruptcy of our primary construction contractor, Westinghouse . . .***" Similarly, that same day during the July 31, 2017 Abandonment Conference Call, Defendant Marsh affirmed that SCANA's actions met the test for prudency, and placed the blame for the Nuclear Project's demise on "***the failure of Westinghouse to deliver on its fixed price contract.***" Furthermore, Marsh explained that the "***Westinghouse bankruptcy removed the benefits and protection of the [F]ixed [P]rice [O]ption,***" which caused "SCANA and our project co-owner, Santee Cooper, to reevaluate the entire new nuclear project from all perspectives." |
| 88. | August 1, 2017 PSC Briefing | Byrne (8/1/2017)<br><br><br>Marsh (8/3/2017) | Compl. ¶ 416<br><br>Compl. ¶ 264<br><br>Compl. ¶ 268 | On August 1, 2017, during the August 2017 PSC Briefing, Defendant Byrne testified that Defendants "***thought – in October [2015], when we negotiated our [F]ixed [P]rice [O]ption, that we had largely resolved the issues with costs,***" and that Toshiba's December 2016 announcement of its financial troubles was "the first time that they indicated that Toshiba had a huge financial liability issue on finishing the cost of our project." On August 3, 2017, during the Q2 FY 2017 Earnings Call, Defendant Marsh continued to assure investors that construction had been going well, that SCANA had acted prudently throughout the project's course, and that SCANA had no prior knowledge of any substantial problems that could jeopardize its viability before Toshiba's and Westinghouse's |

**Alleged False and Misleading Statements and Omissions**

| # | Date and Source | Speaker(s) | Complaint Cite | False and Misleading Statement(s) and Omissions[1] |
|---|---|---|---|---|
| | | | | financial problems. For example, with respect to any prior knowledge of Toshiba's and Westinghouse's financial difficulties, Defendant Marsh stated that "*[i]t was shortly [after the 2016 approval of the Fixed Price Option on November 9, 2016] that we learned of the news of the Toshiba financial distress, followed by the Westinghouse bankruptcy in March of 2017*." |
| 89. | September 15, 2017 House Utility Ratepayer Protection Committee Hearing | Marsh | Compl. ¶ 417 | On September 15, 2017, during the September 2017 House Utility Ratepayer Protection Committee Hearing, Defendant Marsh testified to the committee that Defendants abandoned the Nuclear Project only because of Westinghouse's bankruptcy: <br><br> Westinghouse filed for bankruptcy on March 29, 2017, and told SCE&G that they would not honor our fixed price contract. Immediately upon learning that - and we had hints that that was coming based on our discussions with them and with Toshiba – we'd already put a team in place to begin the transition and evaluation period to determine the most prudent path forward for the project. We honestly didn't know the answer to that question when we started. *We wanted to complete the project. We had parental guarantees that Westinghouse had told us were sufficient to cover what they believed the additional cost would be, and if that had been the case, we might still be building today.* <br><br> But we had to evaluate that and we had to make our own determination. We had access to information to do that evaluation that we had never had access to before because of the fixed price arrangement and the EPC contract that was in place that was originally signed in 2008. We evaluated completing both units. We evaluated completing one unit, one with delaying construction on the second; the other one with abandoning the second unit, and |

**Alleged False and Misleading Statements and Omissions**

| # | Date and Source | Speaker(s) | Complaint Cite | False and Misleading Statement(s) and Omissions[1] |
|---|---|---|---|---|
| | | | | then we looked at abandoning both units. |
| 90. | September 15, 2017 House Utility Ratepayer Protection Committee Hearing | Marsh and Byrne | Compl. ¶ 418 | During the September 15, 2017 House Utility Ratepayer Protection Committee Hearing, Defendants once again passed the blame onto Westinghouse, stating in SCANA's PowerPoint presentation: "*I believe we would be building these plants if Westinghouse had not declared bankruptcy.*" In addition to this PowerPoint slide, Defendant Marsh expressed this same point during his testimony: "*If Westinghouse hadn't declared bankruptcy and lived up to its commitments and Santee Cooper were still in the project, yes, I do think we'd be moving and I think we would have completed the project.*" Similarly, Defendant Byrne reiterated: "I think, as Mr. Marsh has said, you know, we're sorry that we're here *but if we were not in a position where Westinghouse is in bankruptcy and rejected the contract, we would still be building these plants and I believe we would be building both plants with our partner, Santee Cooper.*" |
| 91. | September 18, 2017 SC Senate Committee Hearing | Marsh | Compl. ¶ 419 | On September 18, 2017, during the September 2017 SC Senate Committee Hearing, Defendant Marsh again blamed Westinghouse for the Nuclear Project's collapse. For instance, he stated that "*if Westinghouse had lived up to its fixed-price contract and the obligations they signed with us, we would still be building these projects, I believe.*" |
| 92. | September 28, 2017 8-K | SCANA (quoting Marsh) | Compl. ¶ 420 | The September 28, 2017 Press Release—issued that day—again passed all blame onto Westinghouse for Defendants' own failures. Specifically, it quoted Defendant Marsh as follows: "*The primary reason the project was cancelled is Westinghouse filed for bankruptcy and informed us that they would not honor the Fixed Price Contract under the provisions of federal bankruptcy laws.*" |

**Alleged False and Misleading Statements and Omissions**

| # | Date and Source | Speaker(s) | Complaint Cite | False and Misleading Statement(s) and Omissions[1] |
|---|---|---|---|---|
| **Item 303 Omissions** | | | | |
| 93. | November 6, 2015 10-Q | SCANA, Marsh, and Addison | Compl. ¶¶ 423, 428 | Defendants failed to disclose (i) existence of known trends or uncertainties within the Company regarding the Nuclear Project, namely that SCANA was not going to be able to complete construction of the Nuclear Project Units by the end of 2020; was not going to be eligible to receive $1.4 billion in Nuclear Tax Credits; and the fact that (ii) the failure to complete the Nuclear Project Units by the end of 2020 would have a "material…unfavorable impact on…revenues." |
| 94. | 2015 Form 10-K, issued on February 26, 2016 | SCANA, Marsh, Addison and the Director Defendants | Compl. ¶¶ 423, 428 | Defendants failed to disclose (i) existence of known trends or uncertainties within the Company regarding the Nuclear Project, namely that SCANA was not going to be able to complete construction of the Nuclear Project Units by the end of 2020; was not going to be eligible to receive $1.4 billion in Nuclear Tax Credits; and the fact that (ii) the failure to complete the Nuclear Project Units by the end of 2020 would have a "material…unfavorable impact on…revenues." |
| 95. | May 6, 2016 10-Q | SCANA, Marsh, and Addison | Compl. ¶¶ 423, 428 | Defendants failed to disclose (i) existence of known trends or uncertainties within the Company regarding the Nuclear Project, namely that SCANA was not going to be able to complete construction of the Nuclear Project Units by the end of 2020; was not going to be eligible to receive $1.4 billion in Nuclear Tax Credits; and the fact that (ii) the failure to complete the Nuclear Project Units by the end of 2020 would have a "material…unfavorable impact on…revenues." |
| 96. | August 5, 2016 10-Q | SCANA, Marsh, and Addison | Compl. ¶¶ 423, 428 | Defendants failed to disclose (i) existence of known trends or uncertainties within the Company regarding the Nuclear Project, namely that SCANA was not going to be able to complete construction of the Nuclear Project Units by the end of 2020; was not going to be eligible to receive $1.4 billion in Nuclear Tax Credits; and the fact that (ii) the failure to complete the Nuclear Project Units by the end of 2020 would |

**Alleged False and Misleading Statements and Omissions**

| # | Date and Source | Speaker(s) | Complaint Cite | False and Misleading Statement(s) and Omissions[1] |
|---|---|---|---|---|
| | | | | have a "material…unfavorable impact on…revenues." |
| 97. | November 4, 2016 10-Q | SCANA, Marsh, and Addison | Compl. ¶¶ 423, 428 | Defendants failed to disclose (i) existence of known trends or uncertainties within the Company regarding the Nuclear Project, namely that SCANA was not going to be able to complete construction of the Nuclear Project Units by the end of 2020; was not going to be eligible to receive $1.4 billion in Nuclear Tax Credits; and the fact that (ii) the failure to complete the Nuclear Project Units by the end of 2020 would have a "material…unfavorable impact on…revenues." |
| 98. | 2016 Form 10-K, issued on February 24, 2017 | SCANA, Marsh, Addison, Hagood, and Roquemore | Compl. ¶¶ 423, 428 | Defendants failed to disclose (i) existence of known trends or uncertainties within the Company regarding the Nuclear Project, namely that SCANA was not going to be able to complete construction of the Nuclear Project Units by the end of 2020; was not going to be eligible to receive $1.4 billion in Nuclear Tax Credits; and the fact that (ii) the failure to complete the Nuclear Project Units by the end of 2020 would have a "material…unfavorable impact on…revenues." |
| 99. | May 5, 2017 10-Q | SCANA, Marsh, and Addison | Compl. ¶¶ 423, 428 | Defendants failed to disclose (i) existence of known trends or uncertainties within the Company regarding the Nuclear Project, namely that SCANA was not going to be able to complete construction of the Nuclear Project Units by the end of 2020; was not going to be eligible to receive $1.4 billion in Nuclear Tax Credits; and the fact that (ii) the failure to complete the Nuclear Project Units by the end of 2020 would have a "material…unfavorable impact on…revenues." |