# UNITED STATES DISTRICT COURT
## DISTRICT OF SOUTH CAROLINA
### (COLUMBIA DIVISION)

| | |
|---|---|
| *In re SCANA Corporation Securities Litigation* | Civil Action No. 3:17-CV-2616-MBS |

## MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF LEAD PLAINTIFFS' MOTION FOR CLASS CERTIFICATION AND APPOINTMENT OF CLASS REPRESENTATIVES AND CLASS COUNSEL

Marlon E. Kimpson (D.S.C. Bar No. 7487)
William S. Norton (D.S.C. Bar No. 11343)
Joshua C. Littlejohn (D.S.C. Bar No. 10426)
**MOTLEY RICE LLC**
28 Bridgeside Blvd.
Mt. Pleasant, South Carolina 29464
Telephone: (843) 216-9000
Facsimile: (843) 216-9450

*Liaison Counsel for Lead Plaintiffs West Virginia IMB and Blue Sky*

James W. Johnson *(admitted pro hac vice)*
Michael H. Rogers *(admitted pro hac vice)*
Irina Vasilchenko *(admitted pro hac vice)*
James Christie *(admitted pro hac vice)*
Philip J. Leggio *(admitted pro hac vice)*
**LABATON SUCHAROW LLP**
140 Broadway
New York, New York 10005
Telephone: (212) 907-0700
Facsimile: (212) 818-0477

John C. Browne *(admitted pro hac vice)*
Jeroen Van Kwawegen *(admitted pro hac vice)*
Lauren Ormsbee *(admitted pro hac vice)*
Michael M. Mathai *(admitted pro hac vice)*
Kate W. Aufses *(admitted pro hac vice)*
**BERNSTEIN LITOWITZ BERGER
  & GROSSMANN LLP**
1251 Avenue of the Americas
New York, New York 10020
Telephone: (212) 554-1400
Facsimile: (212) 554-1444

*Co-Lead Counsel for Lead Plaintiffs West Virginia IMB and Blue Sky
and Proposed Lead Counsel for the Class*

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................................... iii

TABLE OF EXHIBITS ........................................................................................ vi

I.      INTRODUCTION ........................................................................................1

II.     FACTUAL BACKGROUND.......................................................................6

        A.    Background of the Fraud ...............................................................6

        B.    Defendants' False and Misleading Statements and Omissions During
              the Class Period.............................................................................11

        C.    The Truth Gradually Emerges ......................................................12

III.    THE PROPOSED CLASS SATISFIES THE STANDARDS FOR CLASS
        CERTIFICATION UNDER RULE 23 ......................................................17

        A.    The Proposed Class Meets the Numerosity Requirement............18

        B.    The Proposed Class Meets the Commonality Requirement .......20

        C.    The Proposed Class Meets the Typicality Requirement..............21

        D.    The Proposed Class Meets the Adequacy Requirement .............22

        E.    The Requirements of Rule 23(b)(3) Are Satisfied......................24

              1.    Questions Common to Class Members Predominate Over Any
                    Questions Affecting Only Individual Members......................24

                    (a)    Lead Plaintiffs Are Entitled to a Presumption of Reliance
                           Under *Basic*'s Fraud-on-the-Market Theory ...............25

                           (i)    *Basic*'s Publicity and Market Timing Prerequisites Are Met ...... 26

                           (ii)    SCANA Common Stock Traded in an Efficient Market ............. 26

                                   a)    SCANA Stock Had High Weekly Trading
                                         Volume................................................ 27

                                   b)    A Sufficient Number of Financial Analysts
                                         Followed SCANA During the Class Period........................ 28

c)      SCANA Stock Traded on the NYSE .................................... 29

d)      SCANA Was Eligible to File Form S-3s During the Class Period ........................................ 30

e)      The Price of SCANA's Stock Reacted to New, Company-Specific Information During the Class Period ........................................................ 30

(b)     Lead Plaintiffs Are Also Entitled to a Presumption of Reliance Under *Affiliated Ute* .................................................. 32

(c)     Damages Will Be Calculated Using a Common Methodology ................................................................ 33

2.     A Class Action Is Superior to Other Available Methods .................................... 34

F.    The Court Should Appoint Lead Counsel Under Rule 23(g) ...................................... 35

IV.   CONCLUSION ................................................................................................. 35

## **TABLE OF AUTHORITIES**

**Page**

**Cases**

*Affiliated Ute Citizens of Utah v. United States,*
 406 U.S. 128 (1972)............................................................5, 25, 32, 33

*Amchem Prods., Inc. v. Windsor,*
 521 U.S. 591 (1997)......................................................................24, 34

*Amgen Inc. v. Conn. Ret. Plans & Tr. Funds,*
 568 U.S. 455 (2013)...................................................................4, 18, 25

*In re Barrick Gold Sec. Litig.,*
 314 F.R.D. 91 (S.D.N.Y. 2016) ........................................................30, 31

*Basic Inc. v. Levinson,*
 485 U.S. 224 (1988)...................................................................5, 25, 30, 32

*In re BearingPoint, Inc. Sec. Litig.,*
 232 F.R.D. 534 (E.D. Va. 2006) ..................................18, 21, 24, 28, 34

*Cammer v. Bloom,*
 711 F. Supp. 1264 (D.N.J. 1989) .................................................. *passim*

*Carpenters Pension Tr. Fund of St. Louis v, Barclays PLC,*
 310 F.R.D. 69 (S.D.N.Y. 2015) ............................................................29

*Central Wesleyan Coll. v. W.R. Grace & Co.,*
 143 F.R.D. 628 (D.S.C. 1992) (Blatt, J.),
 *aff'd,* 6 F.3d 177 (4th Cir. 1993).........................................................20

*City of Ann Arbor Emps.' Ret. Sys. v. Sonoco Prods. Co.,*
 270 F.R.D. 247 (D.S.C. 2010) (Wooten, J.) .................................. *passim*

*City of Cape Coral Mun. Firefighters' Ret. Plan*
 *v. Emergent Biosolutions, Inc. HQ,*
 322 F. Supp. 3d 676 (D. Md. 2018)......................................................27

*In re Computer Scis. Corp. Sec. Litig.,*
 288 F.R.D. 112 (E.D. Va. 2012) ..........................................................27

*Erica P. John Fund, Inc. v. Halliburton Co. ("Halliburton I"),*
 563 U.S. 804 (2011).........................................................................4, 25

*In re Facebook, Inc., IPO Sec. & Derivative Litig.,*
 986 F. Supp. 2d 428 (S.D.N.Y. 2013)....................................................32

*Gariety v. Grant Thornton, LLP*,
   368 F.3d 356 (4th Cir. 2004) ...........................................................................17, 26

*Halliburton Co. v. Erica P. John Fund, Inc. ("Halliburton II")*,
   573 U.S. 258 (2014)................................................................................................25

*KBC Asset Mgmt. NV v. 3D Sys. Corp.*,
   2017 WL 4297450 (D.S.C. Sept. 28, 2017) (Lewis, J.)................................. *passim*

*Krogman v. Sterritt*,
   202 F.R.D. 467 (N.D. Tex. 2001) .........................................................................27

*Local 703, I.B. of T Grocery & Food Emps. Welfare Fund v. Regions Fin. Corp.*,
   762 F.3d 1248 (11th Cir. 2014) .......................................................................29, 30

*Lumen v. Anderson*,
   280 F.R.D. 451 (W.D. Mo. 2012) ..........................................................................29

*In re Mills Corp. Sec. Litig.*,
   257 F.R.D. 101 (E.D. Va. 2009) ...............................................................19, 20, 34

*In re NeuStar, Inc. Sec. Litig.*,
   2015 WL 5674798 (E.D. Va. Sept. 23, 2015)...........................................20, 21, 24

*In re NII Holdings, Inc. Sec. Litig.*,
   311 F.R.D. 401 (E.D. Va. 2015) ................................................................... *passim*

*Phillips Petroleum Co. v. Shutts*,
   472 U.S. 797 (1985)................................................................................................34

*In re Red Hat, Inc. Sec. Litig.*,
   261 F.R.D. 83 (E.D.N.C. 2009) .............................................................................18

*In re SCANA Corp. Sec. Litig.*,
   2019 WL 1427443 (D.S.C. Mar. 29, 2019) ................................................6, 11, 33

*Scott v. Clarke*,
   61 F. Supp. 3d 569 (W.D. Va. 2014) ................................................................18, 19

*Simpson v. Specialty Retail Concepts*,
   823 F. Supp. 353 (M.D.N.C. 1993) ..................................................................26, 28

*Simpson v. Specialty Retail Concepts*,
   149 F.R.D. 94 (M.D.N.C. 1993) .......................................................................19, 20

*In re Smith Barney Transfer Agent Litig.*,
   290 F.R.D. 42 (S.D.N.Y. 2013) ........................................................................32, 33

*South Carolina Nat'l Bank v. Stone,*
   139 F.R.D. 325 (D.S.C. 1991) (Anderson, J.) ........................................................... 32

*Thomas v. FTS USA, LLC,*
   312 F.R.D. 407 (E.D. Va. 2016) ................................................................................. 20

**Statutes and Rules**

17 C.F.R. § 239.13 ........................................................................................................ 30

17 C.F.R. § 240.15c3-1(c)(8) ....................................................................................... 29

Fed. R. Civ. P. 23(a) ............................................................................................ *passim*

Fed. R. Civ. P. 23(b)(3) ................................................................................ 1, 3, 4, 24, 35

Fed. R. Civ. P. 23(g) ..................................................................................................... 35

**TABLE OF EXHIBITS**

| Exhibit | Description |
|---------|-------------|
| A | Expert Report of Chad Coffman, CFA dated June 28, 2019 |
| B | Morgan Stanley, *High Risk of Disallowance; Lowering PT to $45 and Remaining UW*, October 4, 2017 |
| C | Declaration of Craig Slaughter in Support of Lead Plaintiffs' Motion for Class Certification and Appointment of Class Representatives and Class Counsel, dated June 24, 2019 |
| D | Declaration of Harmen Nieuwenhuis in Support of Lead Plaintiffs' Motion for Class Certification and Appointment of Class Representatives and Class Counsel, dated June 27, 2019 |
| E | Firm Résumé of Labaton Sucharow LLP |
| F | Firm Résumé of Bernstein Litowitz Berger & Grossmann LLP |
| G | Firm Résumé of Motley Rice LLC |
| H | Compendium of Unpublished Decisions |

Lead Plaintiffs the West Virginia Investment Management Board ("West Virginia IMB") and Stichting Blue Sky Global Equity Active Low Volatility Fund and Stichting Blue Sky Active Large Cap Equity USA Fund ("Blue Sky") (collectively, "Lead Plaintiffs") respectfully submit this memorandum of law in support of their motion for class certification pursuant to Federal Rules of Civil Procedure 23(a) and 23(b)(3), seeking (i) certification of a class of investors in the publicly traded common stock of SCANA Corporation ("SCANA" or the "Company"), as defined below; (ii) the appointment of Lead Plaintiffs as Class Representatives; and (iii) the appointment of Labaton Sucharow LLP ("Labaton Sucharow") and Bernstein Litowitz Berger & Grossmann LLP ("Bernstein Litowitz") (together, "Co-Lead Counsel") as Class Counsel.[1]

## I.     INTRODUCTION

This securities fraud class action (the "Action") asserts claims under the Exchange Act arising from one of the most high-profile fiascos in modern South Carolina history—SCANA's failed, $9 billion decade-long effort to build two nuclear reactors in South Carolina in partnership with state-owned utility South Carolina Public Service Authority ("Santee Cooper") (the "Project"). During the Class Period (October 27, 2015 through December 20, 2017), Defendants misrepresented the status and their oversight of the Project. They repeatedly assured investors that the Project was on schedule and on budget, and that they were making "tremendous progress" towards completion in time to qualify for critical federal nuclear tax credits worth $1.4 billion to SCANA (the "Nuclear Tax Credits").

Defendants also told investors that they were managing the Project "prudently"—a requirement under South Carolina's "Base Load Review Act" (the "BLRA") for SCANA to raise

---

[1] All "¶__" citations are to the Consolidated Class Action Complaint for Violations of the Federal Securities Laws (the "Complaint") (ECF No. 72). All capitalized terms are defined in the Complaint unless otherwise stated. Unless otherwise indicated, all emphases herein are added and internal brackets, citations, or quotes omitted.

its customers' electricity rates to help defray the massive construction costs of the Project. Time and time again, Defendants assured investors that they were fully "transparent" and had "disclose[d] to investors all the details of anything we think is critical that you know," as well as making numerous other positive statements detailed in the Complaint.

Defendants' statements were false and misleading. In reality, SCANA and the Individual Defendants knew from the start of the Class Period that the Project was irreparably off-course, due in large part to SCANA's failed management and oversight. Indeed, just days prior to the start of the Class Period, SCANA's own independent expert Bechtel Corporation ("Bechtel"), a leading engineering and construction firm that SCANA hired to assess the Project, reported the truth to Defendants following an in-depth, three-month assessment of the Project. In its October 22, 2015 presentation and two lengthy subsequent reports, Bechtel laid out a litany of "fundamental" construction, design, and oversight failures at the Project that rendered it not only over-budget but so far behind schedule that it was virtually impossible for it to be finished in time to qualify for the critical Nuclear Tax Credits. Rather than disclose these truths to investors, Defendants concealed and suppressed the Bechtel reports and a litany of additional internal reports and findings by high-level executives, all of which confirmed Bechtel's conclusions.

The falsity of Defendants' Class Period statements and omissions about the Project was disclosed gradually through a series of partial disclosures beginning in December 2016, which revealed, *inter alia*, Defendants' prior knowledge and cover-up of severe problems with the Project years earlier, including the existence of the Bechtel reports.  The revelation of Defendants' misconduct caused more than a 50% drop in SCANA's stock price during the Class Period. The fallout from Defendants' fraud has included multiple ongoing government investigations, including a criminal probe by the South Carolina Attorney General's Office, the

F.B.I., the U.S. Attorney's Office, and a civil inquiry by the U.S. Securities and Exchange Commission ("SEC").

Lead Plaintiffs now request certification of this Action as a class action pursuant to Rule 23(b)(3) on behalf of a class (the "Class") consisting of:

> All persons and entities who purchased, or otherwise acquired, the publicly traded common stock of SCANA Corporation from October 27, 2015 through December 20, 2017, inclusive (the "Class Period"), and were damaged thereby.[2]

This is a paradigmatic example of the type of case that is appropriately certified as a class action. Certification under Rule 23 is appropriate if: "(1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) representative parties will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a). Additionally, "common" issues of law or fact must "predominate over any questions affecting only individual members," and a class action must be "superior" to other methods of adjudication. Fed. R. Civ. P. 23(b)(3). The proposed Class easily satisfies these requirements.

*First*, with 142.9 million shares of stock outstanding throughout the Class Period, during which over a million shares traded weekly, there are thousands of Class members, satisfying the numerosity requirement.

*Second*, this Action involves many common issues of law and fact. Defendants are alleged to have made materially false and misleading statements and omissions that were

---

[2] Excluded from the Class are: Defendants; members of the immediate family of any Defendant who is an individual; the officers and directors of SCANA during the Class Period; any firm, trust, corporation, or other entity in which any Defendant has or had a controlling interest; and the legal representatives, affiliates, heirs, successors-in-interest, or assigns of any such excluded person or entity.

publicly disseminated in, *inter alia*, SCANA's SEC filings, press releases, conference calls with analysts and investors, and public testimony submitted to, and public hearings held before, various South Carolina government agencies. As the Complaint details, questions of law and fact common to the Class include whether: (1) Defendants' public statements during the Class Period misrepresented or omitted material facts; (2) Defendants knew or recklessly disregarded that their statements were false or misleading; (3) the price of SCANA's common stock was inflated as a result of the alleged misstatements and omissions; and (4) the Class suffered damages.

*Third*, both adequacy and typicality are satisfied because Lead Plaintiffs and the Class assert virtually identical claims arising from the same misstatements and course of events. Lead Plaintiffs have no conflicts with the Class, have been actively monitoring and supervising this Action, and have retained experienced counsel with proven track records in securities actions.

*Fourth*, this Action also satisfies the predominance requirement of Rule 23(b)(3). Numerous common issues of fact and law (e.g., falsity, materiality, and scienter) are subject to common proof and predominate over any individual issues. For example, the question of whether Defendants made materially false and misleading statements or omissions is a quintessentially common one. *See Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*, 568 U.S. 455, 475 (2013) ("[T]his Court has held that . . . the falsity or misleading nature of the defendant's alleged statements or omissions are common questions . . . ."). The Supreme Court has also held that materiality and loss causation are common issues that should be adjudicated on a class-wide basis. *See Erica P. John Fund, Inc. v. Halliburton Co. ("Halliburton I")*, 563 U.S. 804, 813 (2011) (no requirement to "show loss causation as a condition of obtaining class certification"); *Amgen,* 568 U.S. at 470 ("the question of materiality is common to the class"); *see also City of*

*Ann Arbor Emps.' Ret. Sys. v. Sonoco Prods. Co.*, 270 F.R.D. 247, 256 (D.S.C. 2010) (Wooten, J.) ("[P]roof of loss causation is not required at class certification.").

Moreover, common issues predominate with respect to the element of reliance in connection with Lead Plaintiffs' Exchange Act claims. There can be no question that SCANA's stock traded in an efficient market during the Class Period as it traded in high volume on the New York Stock Exchange ("NYSE"), the Company regularly filed reports with the SEC, and the Company was followed closely by securities analysts. The accompanying Expert Report of Chad Coffman, CFA ("Coffman Report," attached hereto as Ex. A) further establishes that SCANA's common stock traded in an efficient market during the Class Period. Accordingly, a presumption of reliance applies. *See Basic Inc. v. Levinson*, 485 U.S. 224, 245-246 (1988); *see also Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128, 153–54 (1972) (presumption of reliance applies to material omissions). Mr. Coffman also concludes that damages may be reliably assessed on a Class-wide basis through a common and widely accepted event study methodology that will quantify the artificial inflation per share in SCANA's common stock during the Class Period.

***Finally***, proceeding as a class action is superior to other available methods for fairly and efficiently adjudicating Class members' claims because: (1) potentially thousands of investors suffered damages as a result of Defendants' misconduct; (2) it is unlikely that investors who lost relatively small amounts of money would file individual actions due to litigation costs; (3) it is desirable to hear all such claims in one court; and (4) there is no difficulty in maintaining this Action as a class action. Thus, Lead Plaintiffs request certification of the Class defined above, the appointment of Lead Plaintiffs as Class Representatives, and the appointment of Labaton Sucharow and Bernstein Litowitz as Class Counsel.

## II.    FACTUAL BACKGROUND

On March 29, 2019, the Court issued an opinion and order largely denying Defendants'

motions to dismiss the Complaint. *See In re SCANA Corp. Sec. Litig.*, 2019 WL 1427443 (D.S.C.

Mar. 29, 2019) ("MTD Opinion"). On May 31, 2019, Lead Plaintiffs and Defendants (the

"Parties") filed with the Court a Joint Federal Rule of Civil Procedure 26(f) Proposed Discovery

Plan (ECF No. 148) and Joint Stipulation for Scheduling Order (ECF No. 149).  On June 6,

2019, the Court issued the Scheduling Order (ECF No. 151), permitting discovery to commence.

Accordingly, the Parties are currently engaged in fact discovery.  The brief summary of the facts

set forth below is taken from the Complaint, as well as certain documents that Lead Plaintiffs

obtained in their investigation via FOIA requests or other publicly available sources.

### A.    Background of the Fraud

SCANA is an energy-based holding company that, through its subsidiaries, principally

South Carolina Electric & Gas ("SCE&G"), affiliates, and the other named Defendants (together,

"SCANA," the "Company," or "Defendants"), engaged in electric and natural gas utility

operations and other energy-related businesses. ¶37.[3]

In late 2007, SCANA announced its plans to build two new nuclear power plants. ¶70.

This endeavor was a "bet[] the family farm" project, as SCANA's estimated share of the cost of

the plants was $5.4 billion—$1.5 billion more than its market capitalization. ¶60. To finance the

Project, SCANA relied upon two new laws: (1) the federal Energy Policy Act of 2005, which

---

[3] The Individual Defendants are (1) Kevin B. Marsh, SCANA's former Chief Executive Officer
("CEO") and Chairman of SCANA's Board of Directors (¶38); (2) Jimmy E. Addison,
SCANA's former Chief Financial Officer ("CFO") and Executive Vice President (¶39);
(3) Stephen A. Byrne, SCANA's former Executive Vice President and SCE&G's former chief
operating officer ("COO") (¶40); (4) Harold C. Stowe, the Lead Director on SCANA's Board
until on or about April 27, 2016 (¶42); (5) D. Maybank Hagood, a director on SCANA's Board,
including as its Lead Director since on or about April 27, 2016, as well as a member of the
Board's Nuclear Oversight Committee (¶43); and (6) James W. Roquemore, a director on
SCANA's Board and the Chairman of its Nuclear Oversight Committee (¶44).

entitled SCANA to $1.4 billion in Nuclear Tax Credits if the Project was fully completed by January 1, 2021, and (2) the 2007 state-level BLRA, which allowed SCANA to preemptively raise customers' energy rates to finance the Project as long as Defendants were managing the Project "prudently." ¶¶61–69.

In May 2008, SCANA signed an Engineering, Procurement, and Construction Contract (the "EPC Contract") with its chief contractor, Westinghouse Electric Company ("Westinghouse"), and sub-contractor, CB&I Stone & Webster ("CB&I") (collectively, the "Consortium"), to build the Project. ¶72. SCANA then submitted to the South Carolina Public Service Commission ("PSC") its petition for approval of the Project and sought an increase in its customers' electric rates to fund the Project. ¶74. The PSC approved the petition based on completion of the Project by January 1, 2019—two years in advance of the deadline for SCANA to collect the Nuclear Tax Credits. ¶77.

Construction of the Project began in March 2013, but it faced setbacks almost immediately. ¶84. SCANA and Santee Cooper internally expressed concern about Westinghouse's work—specifically, delays and design failures that, according to internal documents only recently made public, "place[d] the project's future in danger," "plac[ed] the project schedule in jeopardy," and "put[] unrecoverable stress on the milestone schedule" approved by the PSC. ¶¶85–86. These problems went unresolved and, in 2014, SCANA petitioned the PSC for an extension to the construction schedule that set "Guaranteed Substantial Completion Dates" ("GSCDs") of June 19, 2019 for Unit 2 and June 16, 2020 for Unit 3, and sought further rate hikes to account for an additional $700 million of costs. ¶¶88, 90. Crediting Defendant Byrne's testimony before the PSC at the time, in which he confidently told the PSC that "many of the initial risks and challenges of the new nuclear construction have been

overcome," the PSC granted the petition, noting specifically that the schedule still allowed for SCANA to benefit from the Nuclear Tax Credits. ¶92.

Unbeknownst to investors, these risks and challenges were far from resolved. Indeed, in the face of these challenges, at the start of 2015, SCANA retained Bechtel, one of the world's most respected engineering, construction, and project management companies in the nuclear field, to evaluate the Project. ¶94. Over the course of three months, the Bechtel team conducted a comprehensive assessment. ¶107. On October 22, 2015, Bechtel presented to Defendants its highly critical findings, explaining, *inter alia*, that "the current schedule [was] at risk," and the completion dates for the Project had to be extended to June 2022–June 2023—ensuring that SCANA would not be entitled to receive the $1.4 billion in Nuclear Tax Credits. ¶¶113-115. Another Bechtel memorandum to SCANA and Santee Cooper from October 2015 confirms that Bechtel was "***highly confident*** that the current schedule and cost forecast will not be achieved" and "further delays and cost increases ***are inevitable***." ECF No. 105-3, at 2–3.

Rather than disclose these truths to investors and the public, Defendants concealed and suppressed Bechtel's analysis. Indeed, just five days after the Bechtel presentation, SCE&G, Santee Cooper, Westinghouse, and CB&I entered into an agreement (the "EPC Amendment") which included revised GSCDs—August 31, 2019 for Unit 2 and August 31, 2020 for Unit 3—despite the fact that these dates were years earlier than the dates that Bechtel said were realistic. ¶131. While the EPC Amendment granted SCE&G and Santee Cooper the option to convert the EPC Amendment to a fixed price contract no later than November 1, 2016, Defendants knew that, based on Bechtel's assessment, the Project would be grossly over-budget and Westinghouse would be unlikely to carry those costs. ¶¶131, 206–221.

On October 27, 2015, the first day of the Class Period, SCANA filed a Form 8-K announcing the EPC Amendment and the revised completion dates. ¶339. In the Form 8-K and on a conference call two days later, Defendants made several false statements about the Project and never mentioned Bechtel's directly contradictory assessment. ¶¶340–341.

Less than two weeks later, on November 9, 2015, Bechtel provided an additional, lengthy assessment of the Project, referred to as the First Bechtel Report. ¶113. Notably, in addition to the conclusions already presented to Defendants, Bechtel reviewed the EPC Amendment and concluded that the terms of the EPC Amendment would, in fact, *"further delay[]"* rather than improve the schedule. ¶124. In response to Bechtel's supplemented conclusion that there was no credible path for SCANA to complete the Project by the end of 2020, Defendants engaged in a cover-up.

Their first step was to pressure Bechtel to change its conclusions, ultimately succeeding in getting it to issue a watered-down version of the report—the February 5, 2016 Second Bechtel Report—which removed certain sections of the First Bechtel Report but, notably, did not retract or contradict those earlier conclusions. ¶¶119–124. Newly-obtained documents confirm that both Defendants Marsh and Byrne personally directed this effort to sanitize and whitewash the First Bechtel Report. *See, e.g.*, ECF No. 105-11. Afterwards, realizing that even the watered-down Second Bechtel Report would be explosive if it were released to the public, Defendants decided to bury both reports by ginning up a baseless, *post hoc* claim of privilege over the Bechtel engagement. ¶¶138–148, 278–282.

Throughout 2016, Defendants continued to assure investors, the PSC, and the public that the Project would be completed before the Nuclear Tax Credit deadline, making the astonishing assertion on multiple occasions that they had been transparent about the challenges the Project

faced, and that the Project's construction was making "substantial progress." ¶¶195–205. In reality, however, Defendants were deliberately ignoring recommendations both from Bechtel and Santee Cooper that were critical if the Project had any chance to be completed on time. ¶¶149–176. For example, in March 2016, Santee Cooper sent Defendant Marsh a memo outlining steps it believed SCANA should take to address the Second Bechtel Report, including hiring additional independent engineers and managers to oversee the Project (¶151), and echoing Bechtel's finding that the Project's progress rate needed to improve dramatically. ¶153.

SCANA refused to take the necessary steps to resolve the Project's problems, and the Project's progress continued to slip further behind schedule. ¶¶160–176. For example, in a July 13, 2016 email to Marsh (which was forwarded to Byrne), Santee Cooper's CEO confirmed that monthly construction progress continued to average only 0.5% per month in 2016—far below the 3% rate that Bechtel found was necessary to get the Project back on track. ¶165. The email specifically noted that "*[t]his rate of progress will never meet the current completion schedule, impacting production tax credits.*" *Id.* Similarly, Westinghouse monthly progress reports that were sent to Marsh and Byrne also revealed the continuing dismal monthly progress rates in 2016 and 2017 (0.6-0.8%), confirming that construction progress never improved significantly and was nowhere near the rate necessary to finish the Project on schedule. ¶¶187–188. All the while, Defendants repeatedly told investors and the public that "substantial progress" was being made on the Project, "*current schedules reflect the best information available* about the anticipated costs and construction timetables for completing the project," and the 2019 and 2020 substantial completion dates remained "*reasonable.*" ¶¶195–199.

On May 26, 2016, SCANA notified the PSC and the public that it intended to exercise the fixed price option, which, it stated, would provide value by limiting the risk of future cost

10

increases—though it would do nothing to assure that the Project was completed on time. ¶206. In reality, moreover, election of the fixed price option created the unrealistic expectation that Westinghouse could absorb any costs of the Project that exceeded the $7.6 billion fixed price. At this point, Defendants knew or should have known that costs would significantly exceed $7.6 billion, and Westinghouse—and its parent company and guarantor, Toshiba Corporation ("Toshiba")—would not be able to absorb these costs. ¶209.

Recognizing that this was a serious issue, SCANA reassured investors that it could finish the Project on its own if necessary. ¶219. The PSC approved SCANA's petition on November 9, 2016. ¶208. In total, the PSC approved nine rate hikes based on Defendants' representations, at a cost of $37 million per month, or nearly $500 million per year to customers' electricity bills. ¶81.

**B.    Defendants' False and Misleading Statements and Omissions During the Class Period**

Throughout the Class Period, Defendants made the following five categories of misstatements and omissions regarding the Project, all of which have been upheld by the Court: (1) SCANA's ability to complete the Project by the end of 2020, including statements about its schedule, costs, and SCANA's eligibility for the Nuclear Tax Credits (¶¶338-361 & Complaint Appendix); (2) Defendants' purported "transparency" about the Project (¶¶362-372); (3) their supposed "prudent" oversight of the Project (¶¶373-391); (4) the Project's continued, supposedly positive "progress" (¶¶392-401); and (5) the likelihood and impact of a potential Westinghouse or Toshiba bankruptcy on the Project's continued viability (¶¶402-422). *See also* ECF No. 143-1 (Lead Plaintiffs' chart of alleged misstatements and omissions, which the Court attached and incorporated by reference to its MTD Opinion).

C.    **The Truth Gradually Emerges**

The truth about the Project emerged through a series of partial disclosures beginning in late December 2016. ¶227.  On December 26, 2016 (a non-trading day), just six weeks after the PSC approved SCANA's revised schedule and a fixed price of $7.7 billion, Toshiba announced an estimated impairment of "several billion US dollars" related to Westinghouse's nuclear construction business. ¶228. Analysts and market commentators attributed Toshiba's financial distress to "cost overruns and missed deadlines on nuclear reactor projects," including specifically the Project. *Id.* As a result, SCANA's stock price fell over 2% on December 28, 2016. ¶229. On February 14, 2017, Toshiba quantified its impairment, reporting that it would take a $6.3 billion write-down related to its U.S. nuclear program, and that it might sell Westinghouse—specifically calling into question the viability of the Project. ¶230. That same day, SCANA's stock price fell 4.5%. ¶231.

SCANA, however, continued to mislead investors, providing false reassurances in response to these disclosures. ¶¶228, 232–239. For example, while SCANA told investors on February 14, 2017 that it had received information from Westinghouse and Toshiba affirming their "commit[ment] to completing" the nuclear units (¶232), an internal document acquired through FOIA requests revealed that Toshiba's CEO sent Marsh a letter ten days later disagreeing with that assertion and stating that "no specific commitment has been agreed by Toshiba so far." ECF No. 105-20.  On February 16, 2017, SCANA held a conference call and discussed Toshiba's write-down and its possible impact on SCANA and the Project, leading to a further stock price decline on February 17, 2017. ¶¶236–237, 240.

On March 22, 2017, a Morgan Stanley report stated that "further cost overruns and delays will emerge," which the report estimated could be $5.2 billion greater than SCANA's latest estimate. ¶¶241–242. Later that same day, a Reuters article reported that Westinghouse had

secured bankruptcy counsel, suggesting the bankruptcy was imminent. ¶243. As a result, SCANA's stock price dropped nearly 0.8% on March 22, 2017 and 1.5% on March 23, 2017. ¶244.

After days of speculation about Westinghouse's financial viability, Westinghouse filed for Chapter 11 bankruptcy protection on March 29, 2017. ¶¶241–245. In response, Defendants continued to falsely claim that their oversight of the Project had been prudent and that they had been fully transparent about the Project's issues. For example, Marsh stated on March 29, 2017 that the "prudently incurred cost to date can be recovered through the abandonment clause. I don't expect that to be changed" (¶246) and assured investors that "[we]'ve been transparent on this project since day 1, and we're not going to change that" (¶248).

On July 27, 2017, SCANA stated that given the "significant challenges" in completing the Project (challenges that Defendants had concealed), the Project's costs would "materially exceed" prior estimates and it would not be completed in time to qualify for the critical Nuclear Tax Credits. ¶255. In response, SCANA's stock price plummeted 6.6% the next day. ¶257. But, at this point, investors were still in the dark about the existence of and Defendants' prior knowledge and cover-up of the Bechtel reports and other adverse information about the Project. ¶298.

In fact, Defendants continued to deny any wrongdoing and to intentionally conceal the full truth. Defendants' actions caused the market at this time to continue to be optimistic that SCANA would recover the Project's costs under the BLRA, because the market believed that Defendants had been "prudent" in their oversight. *See, e.g.*, ¶258 (July 28, 2017 Well Fargo report: "In the event of complete abandonment of the [] [P]roject, we believe relative downside is limited given . . . the protections afforded [SCANA] under the BLRA."). Defendants actively

13

encouraged this view, refusing to acknowledge their role in the Project's failure and largely blaming Westinghouse. *See, e.g.*, ¶¶261, 264, 268, 415-416.

On July 31, 2017, SCANA formally abandoned the Project. ¶259. The next day, Defendants petitioned the PSC to increase electricity rates to cover costs incurred on the Project. ¶263. The market's relief that SCANA would not take on the enormous costs of construction, however, was short-lived. On August 2, 2017, the media reported that lawmakers formed the South Carolina Energy Caucus to hold SCANA "accountable" and to make "the shareholders of SCANA Corp. . . . eat any remaining costs tied to the high-profile cancellation of [the Project];" in response, SCANA's stock price fell nearly 3% on August 3, 2017. ¶¶266, 272. Defendants reacted by once again making false statements to the market. On August 3, 2017, SCANA held a conference call where Marsh falsely reassured investors that SCANA's "process at the [PSC] is very open" (¶367), and that prior to Westinghouse's bankruptcy, the Project "was moving forward, *we were making progress* and looking forward to hitting the targets." ¶398. In short, Defendants refused to acknowledge their role in the Project's failure.

On August 4, 2017, the South Carolina Attorney General announced an investigation into SCANA "to ensure that all laws were complied with and all applicable procedures were followed," and the media reported that legislators planned to investigate SCANA's abandonment, leading to a 2.4% stock drop. ¶¶270–272. On August 9, 2017, the South Carolina Office of Regulatory Staff ("ORS"), SCANA's utility watchdog, moved to dismiss SCANA's abandonment petition, and Speaker of the South Carolina House filed a petition to intervene to support the ORS, causing SCANA's stock price to fall over 1% the next day. ¶¶274, 276.

Throughout this period Defendants continued to conceal and suppress the Bechtel Reports. The existence of the Second Bechtel Report—but not its actual findings—was first

disclosed on August 22, 2017, at a hearing before a South Carolina Senate committee wherein Defendant Byrne testified, claiming he could not discuss Bechtel's report because it was privileged work product. ¶278.  In early September 2017, the Second Bechtel Report was disclosed to the public after Santee Cooper provided it in response to a demand by South Carolina Governor Henry D. McMaster.  ¶281. On September 6 and 7, 2017 the media reported on the Second Bechtel Report's adverse findings about the Project and other newly released internal SCANA documents showing Defendants' longstanding knowledge of the substantial risks facing the Project and the likelihood of a Toshiba and Westinghouse bankruptcy.  These disclosures caused SCANA's stock price to fall 0.75% on September 7, 2017. ¶¶283–286, 431.

Defendants responded by continuing to deceive the public, preventing the full truth about the Project from reaching the market. For example, at a September 18, 2017 South Carolina Senate hearing, Marsh stated that SCANA had "discussed openly the challenges that we had" on the Project and flatly denied the existence of the First Bechtel Report: "I'm not aware of a second report." ¶¶367, 371. He also insisted that the costs of the Project were "prudently spent" and that Defendants had "ma[de] prudent decisions along the way." ¶¶386-387.

The truth about the extent of Defendants' fraud and its ramifications on SCANA continued to be revealed over the next few months as further disclosures revealed the falsity of Defendants' statements regarding their purportedly "prudent" and "transparent" management of the Project.  For example, on September 21, 2017, SCANA and the press disclosed a subpoena by the U.S. Attorney's Office to SCANA and a federal grand jury investigation regarding the Project, including potential securities fraud charges as to "whether SCANA misled investors," resulting in a 3.4% stock drop the next day. ¶¶292–295.  On September 26, 2017, the ORS filed a motion before the PSC calling for the suspension of $37 billion per month in rate hikes and the

return of $1.7 billion that SCANA's customers had already been charged under the BLRA to finance the costs of the Project, citing allegations that SCANA failed to disclose information that would have provided a basis for challenging the rate increases. ¶¶297. Additionally, on September 27, 2017, an article in *The State* for the first time revealed the existence of the First Bechtel Report, including that this "***damning report . . . was originally much worse***," and that SCANA had actively tried to water down Bechtel's original findings. ¶298. On this news, SCANA's stock price dropped 7.8%. ¶299.

Indeed, after the First Bechtel Report was finally made public in late November 2017, a South Carolina representative stated: "***This is a cover up. This is deception at its core. The bottom line is they lied to everyone, and they did it intentionally.***" ¶314. *See also* Ex. B (October 4, 2017 Morgan Stanley report discussing the "key news" of the recently disclosed Bechtel report, which "concluded that aspects of [SCANA]'s management of the project was deficient . . . , and that [SCANA] did not disclose to its regulators . . . makes it much more likely . . . that the costs incurred after that time are deemed imprudent and are disallowed").

On September 29, 2017, the media reported on a "previously undisclosed" May 2014 letter regarding the Project from Defendant Marsh, which was "more proof, concrete proof, that these guys knew the project was in bad shape." ¶¶300–302. That same day, Fitch and Standard & Poor's downgraded SCANA's credit rating due to the fallout from the Project, causing a nearly 5% stock price drop. *Id.* On October 19, 2017, among other things, Governor McMaster requested that SCANA "immediately cease collecting approximately $37 million per month from ratepayers," and use the Toshiba settlement to repay ratepayers rather than fund the costs of the Project. ¶¶303–304. As a result, SCANA's stock price dropped almost 1%. ¶305. On October 27, 2017, in response to a highly critical analyst report from Morgan Stanley, which indicated, *inter*

*alia*, that SCANA management was aware of significant issues with the Project "at the same time that management was allegedly not fully disclosing such issues to key constituents," SCANA's stock price declined 2.8%. ¶¶308–309.

On October 31, 2017, investors also learned of the resignations of Defendants Marsh and Byrne amidst criminal investigations into the Project, and that a South Carolina House committee "examining the nuclear project fiasco" proposed legislation to block SCANA from charging ratepayers for the Project. ¶¶311–313. These disclosures caused SCANA's stock price to decline an additional 6%. ¶313. Finally, on December 20, 2017, the PSC denied SCANA's request to dismiss rate relief suits, and analysts weighed in with unfavorable opinions. ¶¶317–318. As a result, SCANA's stock price fell 9.5% on December 21, 2017. ¶319.[4] In total, the revelation of Defendants' fraud about the Project resulted in a ***50%*** decline in the value of SCANA's common stock (from a Class Period high closing price of $76.12 per share on July 6, 2016, to a closing price of $37.39 per share on December 21, 2017), causing a loss of approximately $2.77 billion in market capitalization. ¶30.

## III.    THE PROPOSED CLASS SATISFIES THE STANDARDS FOR CLASS CERTIFICATION UNDER RULE 23

Class certification is warranted when a putative class satisfies the four requirements of Rule 23(a)—numerosity, commonality, typicality, and adequacy—and also meets the requirements of at least one of Rule 23(b)'s subsections. *Gariety v. Grant Thornton, LLP*, 368 F.3d 356, 362 (4th Cir. 2004). District courts are accorded "broad discretion" to certify a class. *Sonoco*, 270 F.R.D. at 250; *see also KBC Asset Mgmt. NV v. 3D Sys. Corp.*, 2017 WL 4297450, at *3 (D.S.C. Sept. 28, 2017) (Lewis, J.) ("Issues of class action manageability are properly

---

[4] *See also* ¶431 (chart identifying each corrective disclosure and/or materialization of the risk event, the price declines in SCANA common stock resulting from the event, and, for purposes of comparison, the percentage change in the S&P 500 Index on each event date).

committed to the district court's discretion, because that court generally has a greater familiarity and expertise with the practical . . . and primarily . . . factual problems of administering a lawsuit than does a court of appeals."). In exercising that discretion, "[t]he Fourth Circuit has counseled the district courts to construe Rule 23 liberally." *Id.* (citing *Gunnells v. Healthplan Servs., Inc.*, 348 F.3d 417, 424 (4th Cir. 2003)). This is particularly true in securities fraud class actions. *See In re BearingPoint, Inc. Sec. Litig.*, 232 F.R.D. 534, 538 (E.D. Va. 2006) ("in light of the importance of the class action device in securities fraud suits, the requirements of Rule 23 are to be construed liberally"). Indeed, courts in this Circuit (and throughout the country) recognize that "[s]ecurities litigation is particularly well suited to class action treatment." *In re Red Hat, Inc. Sec. Litig.*, 261 F.R.D. 83, 86 (E.D.N.C. 2009).

Determining whether a class should be certified requires courts to consider whether Rule 23's requirements have been met—not whether plaintiffs will ultimately prevail on the merits. *KBC*, 2017 WL 4297450, at *2 ("[L]ikelihood of the plaintiffs' success on the merits . . . is [ir]relevant to the issue of whether certification is proper."); *Sonoco*, 270 F.R.D. at 250 ("[A] Rule 23 certification analysis should not include consideration of whether the proposed class is likely to prevail ultimately on the merits."). The Supreme Court has recently confirmed that merits questions may be considered only to the extent that they are relevant to determining whether the Rule 23 prerequisites for class certification are satisfied. *See Amgen*, 568 U.S. at 465–66. As shown below, Lead Plaintiffs easily satisfy the requirements of Rule 23, and the proposed Class should be certified.

### A. The Proposed Class Meets the Numerosity Requirement

Under the numerosity requirement, the proposed Class must be "so numerous that joinder of all members is impracticable." Fed. R. Civ. P. 23(a)(1). "'Impracticable,' for the purposes of Rule 23, does not mean 'impossible'; rather, [p]laintiffs must show that the number of allegedly

18

affected individuals is sufficiently large that [i]t would be extremely difficult or inconvenient to join all the members of the class." *Scott v. Clarke*, 61 F. Supp. 3d 569, 584 (W.D. Va. 2014). Courts within the Fourth Circuit presume that classes that exceed 25 members satisfy this element. *See, e.g.*, *In re NII Holdings, Inc. Sec. Litig.*, 311 F.R.D. 401, 406 (E.D. Va. 2015) ("Although neither the Federal Rules nor the federal courts have identified a particular threshold, classes as small as 'twenty-five or more' have been certified."). Further, "[t]he numerosity requirement is seldom disputed in securities fraud cases given the large quantity of shareholders who purchase stock in reliance upon a company's public statements." *In re Mills Corp. Sec. Litig.*, 257 F.R.D. 101, 104-05 (E.D. Va. 2009); *see also NII Holdings*, 311 F.R.D. at 406 (same). "In securities fraud actions brought against publicly owned and nationally listed corporations, the numerosity requirement has been met by a showing that a large number of shares were outstanding and traded during the relevant period." *Simpson v. Specialty Retail Concepts*, 149 F.R.D. 94, 98 (M.D.N.C. 1993).

Here, the numerosity requirement is easily met. SCANA had approximately 142.9 million shares outstanding during the Class Period. Coffman Report ¶76. *See Mills*, 257 F.R.D. at 104-05 (holding that numerosity requirement had been met where "millions of shares [were] outstanding during the [c]lass [p]eriod"). Further, during the Class Period, SCANA stock was traded nationally on the NYSE, an open and efficient market (*see* Part III.E.1(a)(ii), *infra*), with weekly and daily trading volumes averaging approximately 5.6 million and 1.1 million shares, respectively. *See* Coffman Report ¶¶31, 34. Based on the frequency of stock transactions in which investors buy and sell shares, one can infer that there are many thousands of Class members who purchased stock at various times during the Class Period. Thus, the Class is likely comprised of multiple thousands of geographically dispersed persons or entities, making joinder

highly problematic and inefficient. *See Sonoco*, 270 F.R.D. at 251 ("Given the number and likely geographical dispersion of potential class members, joinder would be impracticable.").

### B.    The Proposed Class Meets the Commonality Requirement

The commonality element is met when there are "questions of law or fact common to the class." *Id.* However, commonality does not require that "the class must have 'identical factual and legal claims in all respects.'" *Mills*, 257 F.R.D. at 105 (quoting *Broussard v. Meineke Discount Muffler Shops, Inc.*, 155 F.3d 331, 337 (4th Cir. 1998)); *Central Wesleyan Coll. v. W.R. Grace & Co.*, 143 F.R.D. 628, 636 (D.S.C. 1992) (Blatt, J.) (commonality "does not require that all, or even most, issues be common, nor that common issues predominate, but only that common issues exist"), *aff'd* 6 F.3d 177 (4th Cir. 1993). Rather, "there need be only a single issue common to the class." *Thomas v. FTS USA, LLC*, 312 F.R.D. 407, 417 (E.D. Va. 2016). "This is not a heavy burden in securities fraud class actions." *In re NeuStar, Inc. Sec. Litig.*, 2015 WL 5674798, at *3 (E.D. Va. Sept. 23, 2015); *see also Simpson*, 149 F.R.D. at 98 ("The commonality requirement . . . has been applied permissively . . . in the context of securities fraud litigation.").

The Complaint here describes a common course of conduct, the hallmark of open-market securities fraud actions certified as class actions under Rule 23. Virtually all of the questions of law or fact are common to Lead Plaintiffs and the absent Class members, including:

- Whether Defendants' acts and omissions violated the Exchange Act;

- Whether the statements disseminated to the Class by Defendants during the Class Period misrepresented: (1) SCANA's ability to complete the Project by the end of 2020, including statements about its schedule, costs, and the Nuclear Tax Credits; (2) Defendants' purported "transparency" about the Project; (3) their supposedly "prudent" oversight of the Project; (4) the Project's continued, supposedly positive "progress"; and (5) the likelihood and impact of a potential Westinghouse or Toshiba bankruptcy on the Project's continued viability;

20

- Whether Defendants omitted material facts necessary to make their statements, in light of the circumstances under which they were made, not misleading;

- Whether investors suffered damages when artificial inflation in SCANA's stock price, created or maintained by Defendants' false statements, was eliminated; and

- Whether Defendants acted knowingly or recklessly in misrepresenting material facts.

In similar circumstances, courts have found the commonality element satisfied. *See, e.g.*, *Sonoco*, 270 F.R.D. at 251 (where "plaintiff alleges that the same misrepresentations or omissions were made to all members of the proposed class through press releases, conference calls, and filings with the SEC . . . the commonality requirement has been satisfied"); *NeuStar, Inc.*, 2015 WL 5674798, at *6 ("[T]he questions of whether [d]efendants' statements or omissions were material, whether they were made in connection with the purchase or sale of securities, and whether they were made with scienter, are necessarily common to each class member given that [d]efendants' conduct alone is relevant to their proof."); *BearingPoint, Inc.*, 232 F.R.D. at 539 ("Members of a proposed class in a securities case are especially likely to share common claims and defenses."); *NII Holdings*, 311 F.R.D. at 406 (same).

## C.     The Proposed Class Meets the Typicality Requirement

Rule 23(a)(3) requires that the representative parties' claims be "typical" of the claims of the prospective class. This typicality element is satisfied when "each class member's claim arises from the same course of events, and each class member makes similar legal arguments to prove the defendant's liability." *NII Holdings*, 311 F.R.D. at 406; *see also KBC*, 2017 WL 4297450, at *5 (typicality requirement satisfied where "it is undisputed KBC's claims and those of the Class arise out of the same course of conduct and are premised upon the same legal theory").  "Put simply, a [l]ead [p]laintiff must demonstrate that it has claims that are of the same sort as other members of the proposed class." *NII Holdings*, 311 F.R.D. at 407. In other words, so long as

Lead Plaintiffs "seek to recover damages for losses caused by the same allegedly materially false and misleading statements and omissions," the typicality requirement is met. *Id.*

Here, the claims asserted by Lead Plaintiffs are typical of the claims of absent Class members. Lead Plaintiffs allege that Defendants violated §§ 10(b) and 20(a) of the Exchange Act, as well as Rule 10b-5 promulgated thereunder, by issuing public statements that misrepresented or omitted material facts to all investors. ¶¶338–422. Lead Plaintiffs also allege that, like the other members of the Class, their shares of SCANA common stock were purchased at artificially inflated prices as a result of Defendants' material misrepresentations and omissions. When Defendants' misrepresentations and fraudulent conduct were disclosed and became apparent to the market, Class members were damaged as artificial inflation came out of the stock price. ¶¶227–319, 429–433. Accordingly, the typicality requirement is satisfied.

### D.    The Proposed Class Meets the Adequacy Requirement

The adequacy requirement of Rule 23(a)(4) demands that "the representative parties will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). This requirement is satisfied where: (1) the proposed class representative's interests are to vigorously pursue the claims of the class and are not antagonistic to the interests of other class members; and (2) the proposed class counsel are qualified, experienced and able to conduct the litigation. *See Sonoco*, 270 F.R.D. at 252. The inquiry focuses on "uncover[ing] conflicts of interest between named parties and the class they seek to represent." *KBC*, 2017 WL 4297450, at *5.

Here, Lead Plaintiffs and their selection of counsel readily satisfy both prongs of the adequacy test. Co-Lead Plaintiff West Virginia IMB is a public body corporate created to serve as the principal long-term investment management organization for the State of West Virginia, and Co-Lead Plaintiffs Blue Sky are investment funds administered by the Blue Sky Group. Ex. C (Declaration of Craig Slaughter in Support of Lead Plaintiff West Virginia IMB's Motion for

Class Certification) ¶3; Ex. D (Declaration of Harmen Nieuwenhuis in Support of Lead Plaintiff Blue Sky's Motion for Class Certification) ¶3. Co-Lead Plaintiff West Virginia IMB purchased 100,100 shares of SCANA stock during the Class Period. Ex. C ¶5; *see also* ECF No. 72-1 (West Virginia IMB Certification and Loss Analysis). Co-Lead Plaintiffs Blue Sky purchased 154,996 shares of SCANA stock during the Class Period. Ex. D ¶¶5-6; *see also* ECF No. 72-2 (Blue Sky Certification and Loss Analysis). Lead Plaintiffs have actively supervised and monitored the progress of this litigation to date and will continue to actively participate in its prosecution and take all necessary steps to ensure that they fulfill their fiduciary obligations as Lead Plaintiffs and Class Representatives. Ex C ¶¶7-9; Ex. D ¶¶8-10.

Since the Court appointed Lead Plaintiffs on January 23, 2018 (*see* ECF No. 49), Lead Plaintiffs have understood their role and obligations as class representatives and have protected and continue to protect absent class members' interests. Ex C ¶¶7-9; Ex. D ¶¶8-10. Through their experienced counsel, Lead Plaintiffs have, *inter alia*, investigated and filed the Complaint, successfully opposed Defendants' motions to dismiss, negotiated an aggressive case schedule, propounded discovery requests on Defendants, and obtained (prior to the start of discovery) over 1.5 million pages of internal documents and numerous deposition and hearing transcripts from related actions against SCANA via FOIA requests and other publicly available sources. Lead Plaintiffs will continue to actively participate and supervise in the litigation through trial. *Id.* Lead Plaintiffs' interests and actions clearly fulfill the adequacy requirement under Rule 23(a)(4).

Finally, Lead Plaintiffs have protected the interests of the Class by retaining Co-Lead Counsel that are "are highly-experienced in litigating these types of actions and have a proven track record in prosecuting complex securities actions" and "have already undertaken substantial

work in identifying, investigating, and initiating this action, which further suggests their adequacy." *NII Holdings*, 311 F.R.D. at 408. Here, Co-Lead Counsel possess extensive experience litigating securities class actions and have successfully prosecuted numerous securities class actions on behalf of injured investors. *See* Ex. E (Firm Résumé of Labaton Sucharow); Ex. F (Firm Résumé of Bernstein Litowitz). Likewise, Motley Rice LLC ("Motley Rice") is a highly respected law firm with extensive experience in complex, class action litigation, and has experience litigating within the District of South Carolina. *See* Ex. G (Firm Résumé of Motley Rice). Each firm is undoubtedly qualified, experienced and capable of prosecuting this litigation on behalf of the Class. *NeuStar*, 2015 WL 5674798, at *5 (counsel was "competent, dedicated, qualified, and experienced enough to conduct the litigation" and assure a "vigorous prosecution"). This further supports that adequacy is met as such experience "indicates counsel's ability to properly leverage the value of this case into a fair settlement." *Id.*

**E.    The Requirements of Rule 23(b)(3) Are Satisfied**

The proposed class satisfies Rule 23(b)(3)'s requirement that (1) common questions of law or fact predominate over individual questions and (2) a class action is the superior method to adjudicate this dispute. *See Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 615 (1997).

**1.    Questions Common to Class Members Predominate Over Any Questions Affecting Only Individual Members**

"Predominance is a test readily met in certain cases alleging securities fraud . . . ." *Amchem Prods.,* 521 U.S. at 625; *see also BearingPoint*, 232 F.R.D. at 542 ("Securities fraud cases are particularly appropriate candidates for treatment under Rule 23(b)(3) since the elements of the cause of action generally relate to the acts or omissions of the defendants and because individual damages might be too paltry to justify bringing individual cases."). The predominance

inquiry "focuses on the issue of liability, and if the liability issue is common to the class, common questions are held to predominate over individual ones." *Sonoco*, 270 F.R.D. at 254.

Because the Supreme Court has found, and recently reiterated, that falsity, materiality, and loss causation are issues common to a class, *Amgen*, 568 U.S. at 475, whether common questions of law or fact predominate in a securities fraud action often turns on the element of reliance. *Halliburton I*, 563 U.S. at 810. Reliance here is established through the presumption of class-wide reliance established in *Basic* and reaffirmed in *Halliburton Co. v. Erica P. John Fund, Inc.* ("*Halliburton II*"), which provides that a proposed class representative may:

> [S]atisfy the reliance element of the Rule 10b-5 cause of action by invoking a presumption that a public, material misrepresentation will distort the price of stock traded in an efficient market, and that anyone who purchases the stock at market price may be considered to have done so in reliance on the misrepresentation.

573 U.S. 258, 283-84 (2014). Alternatively, reliance here may also be established under another independent legal doctrine, which is based on a defendant's "failure to disclose" material information. *See Affiliated Ute*, 406 U.S. at 153–54. As set forth below, both presumptions of reliance apply here.

### (a)    Lead Plaintiffs Are Entitled to a Presumption of Reliance Under *Basic*'s Fraud-on-the-Market Theory

To invoke the *Basic* presumption of reliance, Lead Plaintiffs must establish that (1) the alleged misrepresentations were public, (2) the relevant transaction took place between the time the misrepresentations were made and the time the truth was revealed, and (3) the stock traded in an efficient market. *Halliburton I,* 563 U.S. at 811.  Here, Lead Plaintiffs are entitled to a presumption of reliance under *Basic's* "fraud-on-the-market" theory because each of these three prerequisites is satisfied.

        **(i)**   ***Basic*'s Publicity and Market Timing Prerequisites Are Met**

First, Lead Plaintiffs allege that Defendants made material misrepresentations and omissions in their public statements to investors that artificially inflated or maintained the market price of SCANA's stock. *See, e.g.*, ¶¶227–319, 338–422, 429–433. Thus, the alleged misstatements were public.

Second, on market timing, Lead Plaintiffs allege that they bought SCANA stock during the Class Period in reliance on the integrity of the stock price, and suffered losses when the artificial inflation came out of the stock price when the truth was revealed. ¶¶437-438.

        **(ii)**   **SCANA Common Stock Traded in an Efficient Market**

The Fourth Circuit and courts across the country generally consider the following non-exhaustive list of factors, set forth in *Cammer v. Bloom*, 711 F. Supp. 1264, 1285–87 (D.N.J. 1989), when evaluating whether a security traded in an efficient market:

> (1) average trading volume, (2) number of securities analysts following the stock, (3) number of market makers, (4) whether the company was entitled to file an S-3 Registration Statement, if relevant, and (5) evidence of a cause and effect relationship between unexpected news and stock-price changes.

*Gariety*, 368 F.3d at 368.[5]

Each of these factors shows that SCANA stock traded in an efficient market during the Class Period. Indeed, as discussed below, most of these factors are not even reasonably the subject of dispute, as SCANA stock traded on a major exchange (the NYSE), had high average trading volume, and the Company was followed by a number of securities analysts and regularly

---

[5] "It is not necessary that a stock satisfy all five factors in order for the market in that stock to be efficient" because the *Cammer* factors are meant to be "instructive, [and] are by no means exhaustive," as "[p]laintiff[s] may wish to present other evidence of market efficiency at trial." *Simpson v. Specialty Retail Concepts*, 823 F. Supp. 353, 355 (M.D.N.C. 1993); *NII Holdings*, 311 F.R.D. at 409 (*Cammer* factors "are merely instructive" and "no one factor is more important than another when a court undertakes the holistic and fact-intensive inquiry of determining whether a market is efficient").

filed reports with the SEC.  In further support of their motion, Lead Plaintiffs submit the expert report of Chad Coffman, CFA. *See* Ex. A. Mr. Coffman is a recognized expert in the application of economics, finance, statistics, and valuation principles to questions that arise in litigation and other contexts, and has issued opinions on behalf of both plaintiffs and defendants in dozens of cases involving securities fraud. Coffman Report ¶¶3-5. Here, Mr. Coffman analyzed each of the *Cammer* factors (as well as several other factors relied upon by experts and courts)[6] and concluded that the market for SCANA's stock was efficient during the Class Period. *Id.* ¶¶26-74.

### a)    SCANA Stock Had High Weekly Trading Volume

The first *Cammer* factor, high average weekly trading volume, is indicative of market efficiency because "many investors are executing trades on the basis of newly available or disseminated corporate information." 711 F. Supp. at 1286. SCANA's common stock had a sufficiently high weekly trading volume to justify a finding of market efficiency. There is a "substantial presumption" of efficiency where weekly trading volume exceeds 1% of total shares outstanding and a "strong presumption" at 2%. *Cammer*, 711 F. Supp. at 1286; *see also NII Holdings*, 311 F.R.D. at 410 (finding "average weekly turnover percentages surpass the benchmark set down by *Cammer* of 2% for a 'strong presumption' that the market was efficient"); *In re Computer Scis. Corp. Sec. Litig.*, 288 F.R.D. 112, 119 (E.D. Va. 2012) (same, and finding market efficiency where the weekly trading volume percentage of defendant company's stock was twice the 2% benchmark). Here, SCANA stock's average weekly trading

---

[6] District courts within the Fourth Circuit consider additional factors when determining whether a company's stock traded efficiently: "(1) the capitalization of the company; (2) the bid-ask spread of the stock; and (3) the percentage of stock not held by insiders (the 'float')." *City of Cape Coral Mun. Firefighters' Ret. Plan v. Emergent Biosolutions, Inc. HQ*, 322 F. Supp. 3d 676, 687 (D. Md. 2018) (quoting *Krogman v. Sterritt*, 202 F.R.D. 467, 474 (N.D. Tex. 2001)). In addition, Mr. Coffman looked at the level of institutional ownership, the degree of "autocorrelation," i.e., the extent to which a stock's price is pegged to previous price movements, and amount of options trading. *See* Coffman Report ¶¶75-85. All of these additional factors, including the *Krogman* factors, further favor a finding of market efficiency here. *Id.*

volume of 3.95% of outstanding shares exceeds the 2% benchmark for market efficiency. Coffman Report ¶¶31, 34. SCANA stock's trading volume also compares favorably to the market at large. By comparison, the NASDAQ's and NYSE's average weekly trading volume is just 1.97%. *Id*. ¶34. In addition, when expressed in dollars, SCANA's annualized turnover velocity of 197% was larger than the average firm listed on the NYSE and NASDAQ of 103%. *Id*. ¶36. Thus, the sufficiently large volume of trading in SCANA's common stock supports a finding that it traded in an efficient market during the Class Period.

> **b)** **A Sufficient Number of Financial Analysts Followed SCANA During the Class Period**

The second *Cammer* factor, coverage by securities analysts, also indicates market efficiency, as the price of a company's security is often affected by analysts' information learned through analysts' own investigation. 711 F. Supp. at 1286. Mr. Coffman notes what is a matter of public record: that at least nineteen major firms, including Morgan Stanley, Wells Fargo Securities, Barclays, Morningstar, and UBS Research, covered SCANA stock during the Class Period. Coffman Report ¶40. Those firms issued approximately 241 reports on SCANA during that time. *Id.* In addition, there were approximately 4,126 unique news articles written about SCANA during the Class Period. *Id.* ¶42 & n.30. Courts throughout the country agree that a significant number of analysts and reports covering a company indicates a greater likelihood that investors relied on information provided about the company and, therefore, supports a finding that the market for the company's shares was efficient. *See, e.g.*, *Simpson*, 823 F. Supp. at 355 (market efficient where three analysts followed security); *Sonoco*, 270 F.R.D. at 256 (same for six analysts); *BearingPoint*, 232 F.R.D. at 540 (same for 15 analysts); *NII Holdings*, 311 F.R.D. at 410 (same for 18 analysts); *see also* Coffman Report at ¶¶38-43.

### c)    SCANA Stock Traded on the NYSE

Third, *Cammer* held that the number of market makers is relevant in considering the market efficiency of securities trading in an over-the-counter market with no volume reporting. 711 F. Supp. at 1293. Market makers are entities that agree to purchase or sell securities on demand, to support a liquid market for the shares. *Local 703, I.B. of T Grocery & Food Emps. Welfare Fund v. Regions Fin. Corp.*, 762 F.3d 1248, 1255 (11th Cir. 2014); *see also* 17 C.F.R. § 240.15c3-1(c)(8). They "ensure that the market react[s] swiftly to company news and reported financial results." *Sonoco*, 270 F.R.D. at 256. During the Class Period, SCANA common stock traded on the NYSE, which obviates the need for market makers by facilitating trades through a computerized system that automatically matches orders and provides quotes. Coffman Report ¶¶46-47; *see also NII Holdings*, 311 F.R.D. at 410–11. The NYSE is one of the largest and most liquid exchanges in the world, with billions of shares traded each day, and virtually guarantees a liquid market for the securities listed on its trading platform. Coffman Report ¶47.

The fact that SCANA traded on the NYSE is strong evidence that SCANA common stock traded in an efficient market throughout the Class Period. *Id.*; *see also Sonoco*, 270 F.R.D. at 255-56 (finding company's trading on the NYSE at all times during the class period as supportive of an efficient market); *NII Holdings*, 311 F.R.D. at 410 ("[M]ost courts agree that [a] listing [on the NYSE or NASDAQ] is a good indicator of efficiency.").[7]

---

[7] *Lumen v. Anderson*, 280 F.R.D. 451, 459–60 (W.D. Mo. 2012) (noting that cases "too numerous to cite [] establish [that] the NYSE . . . [is] at least entitled to a presumption of efficiency – making it incumbent upon [d]efendants to rebut the presumption."); *Carpenters Pension Trust Fund of St. Louis v, Barclays PLC*, 310 F.R.D. 69, 83 (S.D.N.Y. 2015) ("In most cases, evidence that a stock trades at high volumes on a large national market, such as the NYSE . . . , and is followed by a large number of analysts will be sufficient to satisfy the Basic presumption . . . ."). Nevertheless, throughout the Class Period, there were 122 market makers for SCANA common stock. Coffman Report ¶48.

### d)    SCANA Was Eligible to File Form S-3s During the Class Period

Fourth, *Cammer* held that eligibility for S-3 registration is indicative of market efficiency because a company is entitled to S-3 registration when, among other things, it has filed Exchange Act reports for a specified length of time and has an outstanding "float" of shares above a certain sizable value. *Cammer*, 711 F. Supp. at 1271 n.5, 1287. Today, the SEC has loosened the public float requirement, and now requires only a market capitalization of more than $75 million for S-3 eligibility. 17 C.F.R. § 239.13. As Mr. Coffman notes, SCANA meets all of the S-3 eligibility requirements, and thus, the fourth *Cammer* factor is satisfied. Coffman Report ¶51. Accordingly, this *Cammer* factor also weighs in favor of market efficiency. *NII Holdings*, 311 F.R.D. at 411.

### e)    The Price of SCANA's Stock Reacted to New, Company-Specific Information During the Class Period

The fifth and final *Cammer* factor asks whether Lead Plaintiffs can make a *prima facie* showing that, during the Class Period, SCANA's stock price quickly responded to the release of new Company-specific "unexpected" news events. 711 F. Supp. at 1287.[8] As detailed in his expert report, Mr. Coffman has shown through a statistical, empirical analysis known as an event study that SCANA's stock price reacted in an efficient manner when new information was released about the Company. *See* Coffman Report ¶¶52-74.[9] Using a well-established methodology, Mr. Coffman first created a regression model to control for market and industry-

---

[8] *Cf. Regions*, 762 F.3d at 1256 ("Confirmatory misrepresentations 'confirm' existing information about a stock, rather than release new and different information that might bring about a negative change in the stock's price. . . . When a company releases expected information, truthful or otherwise, the efficient market hypothesis underlying *Basic* predicts that the disclosure will cause no significant change in the price.").

[9] Mr. Coffman's methodology has been accepted by numerous courts under the current state of the law. *See, e.g.*, *KBC*, 2017 WL 4297450, at *7 (accepting Mr. Coffman's similar methodology for market efficiency); *NII Holdings*, 311 F.R.D. at 412 (accepting Mr. Coffman's event study using the same methodology he employed here as objective and unbiased); *In re Barrick Gold Sec. Litig.*, 314 F.R.D. 91, 104-06 (S.D.N.Y. 2016) (certifying securities fraud class and accepting Mr. Coffman's similar event study as evidence of market efficiency).

wide factors that influenced the price of SCANA stock. *Id.* ¶¶56-57. This model allowed him to isolate the change in SCANA stock price that can be attributed to Company-specific news by finding the difference between the actual price movement on a given day and the movement predicted by the regression model, which accounts for market and industry factors. *Id.* ¶58.

With this data in hand, Mr. Coffman then examined the price change in SCANA stock on two sets of days: (1) days on which SCANA announced earnings, and (2) days on which there was no Company-specific news. *Id.* ¶¶59-74. Because it is far more likely that material, new information about the Company would be released to the market on earnings announcements than on non-news days, in an efficient market one would expect to find a greater percentage of days in the former group with a statistically significant movement in price that could not be accounted for by random chance alone. *Id.* ¶70.

Indeed, Mr. Coffman found a statistically significant difference in the percentage of days with significant price movements when comparing the two sets. On days with earnings announcements, SCANA stock had a statistically significant price change 44.44% of the time, approximately 20 times greater than the days with the least amount of SCANA-related news, which exhibited a significant change only 2.33% of the time.[10] *Id.* ¶¶66-69 & Appendix C. In addition, both the magnitude of the average change in SCANA stock price and the daily trading volume were statistically significantly higher for earnings announcements as compared to days with the least amount of SCANA-related news. *Id.* ¶¶70-73. Based on this analysis, Mr. Coffman concluded that there was a causal connection between new material information and appropriate movements in SCANA stock price during the Class Period. *Id.* ¶74.

---

[10] Mr. Coffman considered a price change at the 95% confidence level, i.e., a price change of approximately two or more standard deviations from the average change, to be statistically significant. *Id.* ¶¶61-62. In other words, on days Mr. Coffman considered the price movement to be statistically significant, there was less than a 5% chance that the price movement could be attributed to random fluctuations alone. *Id.*

In sum, Mr. Coffman found that each of the *Cammer* factors, as well as the additional factors he analyzed, support a finding of market efficiency. Thus, Lead Plaintiffs and the Class may rely on the "fraud-on-the-market" presumption to establish reliance.

> **(b)    Lead Plaintiffs Are Also Entitled to a Presumption of Reliance Under *Affiliated Ute***

As noted above, Lead Plaintiffs are also entitled to a presumption of reliance under an additional and independent theory apart from *Basic*. Because the claims stated (and upheld) in this case include Defendants' material omissions of information regarding the Project—notably, the Bechtel Reports—which, if revealed, would have significantly altered the total mix of information available to investors at the time the information was concealed, Lead Plaintiffs are also entitled to a presumption of reliance under *Affiliated Ute*. In a case of both affirmative misstatements and omissions, such as this case, a presumption of reliance pursuant to *Affiliated Ute*, 406 U.S. at 153–54, is applicable to cases that allege omissions. *S.C. Nat'l Bank v. Stone*, 139 F.R.D. 325, 333 (D.S.C. 1991) (Anderson, J.) (plaintiffs entitled to the *Affiliated Ute* presumption because "a substantial portion of the plaintiffs' claims [were] premised upon what the defendants failed to disclose, rather than on what was affirmatively misrepresented").

In a case such as this, "involving primarily a failure to disclose, positive proof of reliance is not a prerequisite to recovery. All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in the making of this decision." *Affiliated Ute*, 406 U.S. at 153–54. The *Affiliated Ute* doctrine arises out of the reality that "as a practical matter [reliance on an omission] is impossible to prove." *In re Facebook, Inc., IPO Sec. & Derivative Litig.*, 986 F. Supp. 2d 428, 469 (S.D.N.Y. 2013). This is because, "[w]hen a defendant's fraud consists primarily of omissions, requiring a plaintiff to show a speculative set of facts, i.e., how he would have behaved if omitted material information had

been disclosed, [it] places an unrealistic evidentiary burden on the 10(b) plaintiff." *In re Smith Barney Transfer Agent Litig.*, 290 F.R.D. 42, 47 (S.D.N.Y. 2013).

Here, the *Affiliated Ute* presumption is appropriate because Lead Plaintiffs' claims include numerous omissions of material fact. *See, e.g.*, ¶¶20, 27, 196, 198–199, 268, 314, 361, 368–369, 372, 377, 391, 401, 422, 448, 451. This Court upheld such alleged omissions at the motion to dismiss stage, finding that Lead Plaintiffs had plausibly alleged that "***Defendants omitted material facts*** that would have been viewed by the reasonable investor as having significantly altered the total mix of information." MTD Opinion, at *9.

Class certification should be granted here because a reasonable person deciding whether to purchase SCANA stock "could not know—and therefore could not rely on" the fact that, *inter alia*, the Project was experiencing substantial delays and cost overruns, was not on track to be eligible for the Nuclear Tax Credits, and was not being managed prudently. *Smith Barney*, 290 F.R.D. at 48. Lead Plaintiffs are therefore entitled to the *Affiliated Ute* presumption of reliance.

### (c)    Damages Will Be Calculated Using a Common Methodology

Courts routinely find that damages issues in securities cases are common to all class members because they can be calculated on a class-wide basis using an event study that measures the price impact of company-specific information alleged to be a corrective disclosure. *See KBC*, 2017 WL 4297450, at *7. This case is no different. Mr. Coffman explains that class-wide damages can be calculated using standard tools of valuation to measure the difference between the amount of price inflation when Class members purchased shares of SCANA stock and the amount of inflation at the time of sale (unless the shares were retained, in which case they would be subject to the PSLRA's "90-day lookback" provision). Coffman Report ¶87. The Coffman Report also explains that damages arising from Lead Plaintiffs' Exchange Act claims can be measured on a common, class-wide basis by performing an event study. *Id*. ¶88.

## 2.    A Class Action Is Superior to Other Available Methods

The class action device is superior to other available methods for the fair and efficient resolution of large-scale securities class actions comprised of thousands of separate individual cases. The Supreme Court has recognized that "[c]lass actions . . . permit the plaintiffs to pool claims which would be uneconomical to litigate individually. . . . [M]ost of the plaintiffs would have no realistic day in court if a class action were not available." *Phillips Petroleum Co. v. Shutts*, 472 U.S. 797, 809 (1985); *see also Amchem*, 521 U.S. at 617.

In this case, the Class members' interests in individually controlling the prosecution of separate actions are minimal—Lead Plaintiffs are not aware of any related individual actions that have been filed since this Action was consolidated on January 23, 2018. *See* ECF No. 49; *see also NII Holdings*, 311 F.R.D. at 414. Further, "class members have a limited interest in asserting individual claims because they are geographically dispersed and their damages claims have a negative value insofar as they would be uneconomical to assert individually." *NII Holdings*, 311 F.R.D. at 414; *see also Sonoco*, 270 F.R.D. at 257; *Mills*, 257 F.R.D. at 109. Additionally, the maintenance of a consolidated class action in this District ensures an efficient expenditure of resources and prevents "courts [from] be[ing] significantly burdened from adjudicating this case as separate actions instead of as a class." *Sonoco*, 270 F.R.D. at 257.

Because individual Class members are most likely located in geographically dispersed areas, and because SCANA maintains a place of business in this District, the securities at issue were traded on the NYSE, and much of the alleged conduct occurred in substantial part in this District, the District of South Carolina is a desirable forum for this class action. Finally, Lead Plaintiffs do not foresee any management difficulties. *See BearingPoint*, 232 F.R.D. at 544–45 ("management of the class litigation should not prove especially difficult as securities cases allow for the easy identification of the class members"). Indeed, the certification of this Action

as a class action appears to be the ***sole method*** for fairly and efficiently litigating the claims of all members of the proposed Class.

### F.    The Court Should Appoint Lead Counsel Under Rule 23(g)

Federal Rule 23(g)(1) provides that "[u]nless a statute provides otherwise, a court that certifies a class must appoint class counsel." Fed. R. Civ. P. 23(g)(1). As the Court is aware, Lead Counsel has already done substantial work in investigating and prosecuting the claims in this Action, and is otherwise experienced in litigating complex claims—especially the type asserted in this Action. These facts all support appointing Labaton Sucharow and Bernstein Litowitz as Class Counsel. *See* Fed. R. Civ. P. 23(g).

## IV.    CONCLUSION

For the foregoing reasons, Lead Plaintiffs respectfully request the Court to: (a) certify this Action as a class action pursuant to Fed. R. Civ. P. 23(a) and 23(b)(3); (b) certify Lead Plaintiffs as the representatives of the proposed Class; and (c) appoint the law firms of Labaton Sucharow and Bernstein Litowitz as Class Counsel.

DATED: June 28, 2019

*/s/ Marlon E. Kimpson*
Marlon E. Kimpson (D.S.C. Bar No. 7487)
William S. Norton (D.S.C. Bar No. 11343)
Joshua C. Littlejohn (D.S.C. Bar No. 10426)
**MOTLEY RICE LLC**
28 Bridgeside Blvd.
Mt. Pleasant, South Carolina 29464
Telephone: (843) 216-9000
Facsimile: (843) 216-9450
mkimpson@motleyrice.com
bnorton@motleyrice.com
jlittlejohn@motleyrice.com

*Liaison Counsel for Lead Plaintiffs West Virginia IMB and Blue Sky*

James W. Johnson *(admitted pro hac vice)*
Michael H. Rogers *(admitted pro hac vice)*
Irina Vasilchenko *(admitted pro hac vice)*

James Christie *(admitted pro hac vice)*
Philip J. Leggio *(admitted pro hac vice)*
**LABATON SUCHAROW LLP**
140 Broadway
New York, New York 10005
Telephone: (212) 907-0700
Facsimile: (212) 818-0477
jjohnson@labaton.com
mrogers@labaton.com
ivasilchenko@labaton.com
jchristie@labaton.com
pleggio@labaton.com

*Co-Lead Counsel for Lead Plaintiffs West Virginia IMB and Blue Sky and Proposed Lead Counsel for the Class*

John C. Browne *(admitted pro hac vice)*
Jeroen Van Kwawegen (*admitted pro hac vice*)
Lauren Ormsbee *(admitted pro hac vice)*
Michael M. Mathai *(admitted pro hac vice)*
Kate W. Aufses *(admitted pro hac vice)*
**BERNSTEIN LITOWITZ BERGER**
   **& GROSSMANN LLP**
1251 Avenue of the Americas
New York, New York 10020
Telephone: (212) 554-1400
Facsimile: (212) 554-1444
johnb@blbglaw.com
jeroen@blbglaw.com
lauren@blbglaw.com
michael.mathai@blbglaw.com
kate.aufses@blbglaw.com

*Co-Lead Counsel for Lead Plaintiffs West Virginia IMB and Blue Sky and Proposed Lead Counsel for the Class*

## **CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on June 28, 2019, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will send a Notice of Electronic Filing to all counsel of record.

*/s/ Marlon E. Kimpson*
MARLON E. KIMPSON (D.S.C. Bar No. 7487)