**UNITED STATES DISTRICT COURT**
**DISTRICT OF SOUTH CAROLINA**
**(COLUMBIA DIVISION)**

| | |
|---|---|
| *In re SCANA Corporation Securities Litigation* | Civil Action No. 3:17-CV-2616-MBS |

**DEFENDANTS' RESPONSE IN OPPOSITION**
**TO LEAD PLAINTIFFS' MOTION FOR CLASS CERTIFICATION AND**
**APPOINTMENT OF CLASS REPRESENTATIVES AND CLASS COUNSEL**

# <u>TABLE OF CONTENTS</u>

**Page**

INTRODUCTION ....................................................................................................1

STANDARD FOR CLASS CERTIFICATION ..............................................................3

ARGUMENT ..........................................................................................................4

I.     The Court should deny class certification because Plaintiffs' claims are not typical of the putative class..........................................................................4

     A.     Because of their investment managers' unique trading strategies, Plaintiffs did not rely on the integrity of the market price.......................5

         1.     Reliance is an essential element of a Section 10(b) securities claim...................................................................5

         2.     Plaintiff West Virginia Investment Management Board (IMB) did not rely on the integrity of the market price. ..................................................................................7

         3.     The Blue Sky Plaintiffs did not rely on the integrity of the market price...................................................10

     B.     Plaintiffs cannot represent a class over the entire putative class period because they knew of the alleged fraud before the end of that period and continued to hold or even purchase SCANA stock. ....................14

II.     The Court should end the putative class period by July 31, 2017. .......................16

     A.     The length of the class period must be considered on a motion for class certification. .................................................................................17

     B.     The Court should end the class period by July 31, 2017, because the market had already learned all relevant, material information when the Nuclear Project was abandoned. ............................................19

         1.     The July 31 announcement cured the alleged misstatements about the status of the nuclear project..............................20

         2.     The July 31 announcement cured the alleged misstatements about the nuclear project's viability. ................................20

         3.     The July 31 announcement cured the alleged misstatements about SCANA's oversight and transparency with respect to the Nuclear Project. ....................................21

     C.     Alternatively, the Court should end the putative class period by September 27, 2017, when the market had confirmation of the risks disclosed in the abandonment announcement. ......................................25

D.      None of the events alleged in the complaint after July 31, 2017,
        qualifies as corrective disclosures that could extend the class
        period. ...............................................................................................................27

E.      Any class period extending beyond July 31, 2017, would be
        plagued by intra-class conflicts of interest. ...........................................................33

CONCLUSION...................................................................................................................................35

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Affiliated Ute Citizens of Utah v. United States,*
    406 U.S. 128 (1972)...................................................................................................6

*In re Am. Int'l Grp., Inc. Sec. Litig.,*
    689 F.3d 229 (2d Cir. 2012)....................................................................................6

*In re Am. Italian Pasta Co. Sec. Litig.,*
    2007 WL 927745 (W.D. Mo. Mar. 26, 2007)................................................28, 31

*Amchem Prods., Inc. v. Windsor,*
    521 U.S. 591 (1997)................................................................................................4

*Amgen Inc. v. Connecticut Ret. Plans & Tr. Funds,*
    568 U.S. 455 (2013)................................................................................................6

*In re Barclays Liquidity Cross & High Frequency Trading Litig.,*
    126 F. Supp. 3d 342 (S.D.N.Y. 2015)....................................................................6

*Basic Inc. v. Levinson,*
    485 U.S. 224 (1988)......................................................................................6, 9, 10

*Berger v. Compaq Computer Corp.,*
    257 F.3d 475 (5th Cir. 2001) ................................................................................33

*Berwecky v. Bear, Stearns & Co.,*
    197 F.R.D. 65 (S.D.N.Y. 2000) ...................................................................... 14-15

*In re BofI Holding, Inc. Sec. Litig.,*
    302 F. Supp. 3d 1128 (S.D. Cal. 2018)...........................................................29, 31

*Christian v. BT Grp. PLC,*
    2017 WL 3705804 (D.N.J. Aug. 28, 2017) .........................................................27

*City of Ann Arbor Employees' Ret. Sys. v. Sonoco Prod. Co.,*
    270 F.R.D. 247 (D.S.C. 2010) .............................................................................32

*Comcast Corp. v. Behrend,*
    569 U.S. 27 (2013)............................................................................................. 3-4

*Cox v. Collins,*
    7 F.3d 394 (4th Cir. 1993) ......................................................................................6

*Deiter v. Microsoft Corp.,*
    436 F.3d 461 (4th Cir. 2006) ..................................................................................4

*In re DVI, Inc. Sec. Litig.*,
  2010 WL 3522090 (E.D. Pa. Sept. 3, 2010) ........................................................29

*Ealy v. Pinkerton Gov't Servs., Inc.*,
  514 F. App'x 299 (4th Cir. 2013) .........................................................................4

*Erica P. John Fund, Inc. v. Halliburton Co.*,
  563 U.S. 804 (2011)......................................................................................... 5-6

*Fila v. Pingtan Marine Enter. Ltd.*,
  195 F. Supp. 3d 489 (S.D.N.Y. 2016)..................................................................19

*FindWhat Inv'r Grp. v. FindWhat.com*,
  658 F.3d 1282 (11th Cir. 2011) ..........................................................................30

*GAMCO Inv'rs, Inc. v. Vivendi, S.A.*,
  927 F. Supp. 2d 88 (S.D.N.Y. 2013).............................................................5, 7, 14

*Gary Plastic Packaging Corp. v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*,
  903 F.2d 176 (2d Cir. 1990)..................................................................................4

*George v. China Auto. Sys., Inc.*,
  2013 WL 3357170 (S.D.N.Y. July 3, 2013) .........................................................14

*Good v. Am. Water Works Co.*,
  310 F.R.D. 274 (S.D. W. Va. 2015)........................................................................4

*Grae v. Corr. Corp. of Am.*,
  330 F.R.D. 481 (M.D. Tenn. 2019) ............................................................18, 24, 33

*Halliburton Co. v. Erica P. John Fund, Inc.*,
  573 U.S. 258 (2014).............................................................................................7

*In re FNMA.*, *In re Fed. Nat. Mortg. Ass'n*,
  247 F.R.D. 32 (D.D.C. 2008).....................................................................21, 22, 25

*In re InterClous Sys., Inc. Sec. Litig.*,
  2014 WL 12774917 (D.N.J. Nov. 5, 2014) .........................................................7, 9

*KBC Asset Mgmt. NV v. 3D Sys. Corp.*,
  2017 WL 4297450 (D.S.C. Sept. 28, 2017).................................................... 32-33

*Kline v. Wolf*,
  88 F.R.D. 696 (S.D.N.Y. 1981) ...........................................................................16

*Local 703, I.B. of T. Grocery & Food Employees Welfare Fund v. Regions Fin. Corp.*,
  282 F.R.D. 607 (N.D. Ala. 2012)...........................................................................9

*Loos v. Immersion Corp.*,
  762 F.3d 880 (9th Cir. 2014) ............................................................................29

*Meyer v. Concordia Int'l Corp.*,
  2018 WL 3104624 (S.D.N.Y. May 23, 2018) ....................................................15

*Meyer v. Greene*,
  710 F.3d 1189 (11th Cir. 2013) .........................................................................28

*Monroe Cty. Employees' Ret. Sys. v. YPF Sociedad Anonima*,
  15 F. Supp. 3d 336 (S.D.N.Y. 2014)..................................................................19

*In re Omnicom Grp., Inc. Sec. Litig.*,
  597 F.3d 501 (2d Cir. 2010)................................................................28, 29, 31

*Pearce v. UBS PaineWebber, Inc.*,
  2004 WL 5282962 (D.S.C. Aug. 13, 2004) .........................................................1

*Ravens v. Iftikar*,
  174 F.R.D. 651 (N.D. Cal. 1997) ................................................................. 34-35

*Redman v. RadioShack Corp.*,
  768 F.3d 622 (7th Cir. 2014) .............................................................................33

*In re Ribozyme Pharm., Inc. Sec. Litig.*,
  192 F.R.D. 656 (D. Colo. 2000) ........................................................................14

*In re Safeguard Scis.*,
  216 F.R.D. 577 (E.D. Pa. 2003).....................................................................7, 11

*Shiring v. Tier Techs., Inc.*,
  244 F.R.D. 307 (E.D. Va. 2007) ......................................................................5, 9

*Simpson v. Specialty Retail Concepts*,
  823 F. Supp. 353 (M.D.N.C. 1993) .....................................................................6

*Singer v. Reali*,
  883 F.3d 425 (4th Cir. 2018) ...................................................................... 17-18

*State of Alaska v. Suburban Propane Gas Corp.*,
  123 F.3d 1317 (9th Cir. 1997) ...........................................................................16

*Stoneridge Inv. Partners, LLC v. Sci.-Atlanta*,
  552 U.S. 148 (2008)........................................................................................1, 5

*Strigliabotti v. Franklin Res., Inc.*,
  2006 WL 2792417 (N.D. Cal. Sept. 27, 2006) ..................................................35

*In re SunEdison, Inc. Sec. Litig.*,
　　329 F.R.D. 124 (S.D.N.Y. 2019) ..............................................................17

*In re Vivendi Universal, S.A. Sec. Litig.*,
　　123 F. Supp. 3d 424 (S.D.N.Y. 2015)........................................................9

*W. Virginia Pipe Trades Health & Welfare Fund v. Medtronic, Inc.*,
　　325 F.R.D. 280 (D. Minn. 2018)....................................................... *passim*

*Wal-Mart Stores, Inc. v. Dukes*,
　　564 U.S. 338 (2011)...............................................................................1, 4

*In re Williams Sec. litigation-WCG Subclass*,
　　558 F.3d 1130 (10th Cir. 2009) ...............................................................30

*Zhong Zheng v. Pingtan Marine Enter. Ltd.*,
　　379 F. Supp. 3d 164 (E.D.N.Y. 2019) .....................................................19

**Statutes**

S.C. Code § 58-33-275(E) ................................................................................21

**Other Authorities**

Fed. R. Civ. P. 23 ....................................................................... 1, 3-4, 17, 33

McLaughlin on Class Actions § 4:3 (15th ed.)...............................................17

INTRODUCTION

Plaintiffs' Motion to certify a class of SCANA Corporation stockholders fails because instead of providing the "rigorous analysis" required for class certification, it treats class certification as a *fait accompli*. *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350–51 (2011). Plaintiffs improperly claim, with no cognizable legal support, that a shareholder securities class should be certified as a matter of course whenever a stock trades in an efficient market and the price declines. But as Judge Anderson correctly recognized—and the Supreme Court has reiterated: "Not all securities fraud claims will proceed as class actions." *Pearce v. UBS PaineWebber, Inc.*, 2004 WL 5282962, at *13 (D.S.C. Aug. 13, 2004). The dispositive issues that Plaintiffs carefully avoid in their Motion make this one of those shareholder securities cases that cannot proceed as a class action, and certainly not throughout the overreaching putative class period.

First, Plaintiffs cannot serve as class representatives because their idiosyncratic investment philosophies prevent them from proving *reliance*, which "is an essential element of the § 10(b) private cause of action." *Stoneridge Inv. Partners, LLC v. Sci.-Atlanta*, 552 U.S. 148, 159 (2008); *see also* Fed. R. Civ. P. 23(a)(3) ("the claims or defenses of the representative parties" must be "typical of the claims or defenses of the class"). Plaintiffs try to skirt their atypical reliance problem by presuming that they—like *some* investors—rely on the integrity of the market price to accurately reflect a stock's value. But the evidence shows that Plaintiffs do not *in fact* rely on the integrity of the market price. And for that reason, the so-called "fraud-on-the-market" presumption has been rebutted. So even if any other investors had viable claims here, those claims would go down with Plaintiffs' sinking ship.

1

Plaintiffs cannot prove reliance because the investment managers that traded in SCANA stock on their behalf are quantitative managers that would have traded in SCANA stock *even if they had known about the fraud alleged here.* As one representative investment manager testified, its trading algorithm "doesn't depend on whether a stock price truly reflects the *intrinsic value* of a company." And as another admitted, "the algorithm *didn't care about alleged fraud.*" Because those investment managers would not have changed their trading decisions *even if they knew about the alleged fraud*, Plaintiffs have a unique reliance problem and cannot represent the proposed class of SCANA stockholders. And because both lead Plaintiffs employed investment managers to make *all* trades on their behalf, Plaintiffs' suitability as putative representatives rises and falls with their managers' admissions.

Second, Plaintiffs are atypical and inappropriate class representatives because their managing principals personally knew of the alleged fraud well before the putative class period ended and yet continued to hold *or even buy more* SCANA stock—*even after they sought to be appointed lead Plaintiffs by the Court in this action.* Their behavior demonstrates that the alleged misrepresentations were irrelevant to their decision to trade in SCANA stock. Investors to whom such alleged misrepresentations are irrelevant do not rely on them in any sense of the word. Because Plaintiffs are subject to these unique reliance defenses, they cannot represent this putative class, and their Motion should be denied.

Even if some class could be certified, Plaintiffs offer not one word in defense of prolonging the class period all the way through December 2017. That class period is indefensible because "[i]n a securities class action, the class period ends when curative information is publicly announced or otherwise effectively disseminated to the market." *W. Virginia Pipe Trades Health*

*& Welfare Fund v. Medtronic, Inc.*, 325 F.R.D. 280, 291 (D. Minn. 2018). Any curative information had flooded the market long before December 2017.

Indeed, the market was well aware of any curative information no later than July 31, 2017, when SCANA announced the abandonment of the V.C. Summer Nuclear Project. The alleged misrepresentations to be cured here concern the Nuclear Project's status, its future viability, and SCANA's prudency and transparency in managing it. But when SCANA announced on July 31, 2017 that it was abandoning the Nuclear Project, that announcement unmistakably informed the market that the project was not economically viable and that SCANA would not complete it. And while the prudency and transparency of SCANA's management could affect SCANA's ability to recover the costs of construction under South Carolina law, the market recognized just after the abandonment that cost recovery was already at risk. The market needed no additional prompting to recognize that risk of non-recovery, and so had all the curative information it needed as of the end of July. All of Plaintiffs' additional alleged corrective disclosures dates involve confirmation of what the market already knew or third-party reactions to what the market already knew. As a matter of law, none of those subsequent events justifies extending the class period.

For these reasons, the Court should deny Plaintiffs' Motion for class certification under Rule 23(a)(3) for lack of any acceptable class representative. In the alternative, the Court should not certify a class beyond the period ending July 31, 2017.[1]

### STANDARD FOR CLASS CERTIFICATION

"The class action is an exception to the usual rule that litigation is conducted by and on behalf of the individual named parties only." *Comcast Corp. v. Behrend*, 569 U.S. 27, 33 (2013).

---

[1] This brief in opposition to the Plaintiffs' Motion for Class Certification is being filed on behalf of all Defendants to this litigation, including SCANA Corporation, Kevin B. Marsh, Jimmy E. Addison, Stephen A. Byrne, Harold C. Stowe, D. Maybank Hagood, and James W. Roquemore.

3

To certify a class, the Plaintiff must "prove . . . *in fact*" that it has met the Rule 23(a) criteria: (1) numerosity, (2) commonality, (3) typicality, and (4) adequacy. *Id*. (emphasis added). "In addition to satisfying Rule 23(a)'s prerequisites, parties seeking class certification must show that the action is maintainable under Rule 23(b)." *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 614 (1997). Under Rule 23(b)(3), which the Plaintiffs invoke here, they must show that (1) "questions of law or fact common to class members predominate over any questions affecting only individual members," and that (2) "a class action is superior to other available methods for fairly and efficiently adjudicating the controversy."

District courts must conduct a "rigorous analysis" of a request for class certification. *Wal-Mart Stores*, 564 U.S. at 350–51. "Frequently that 'rigorous analysis' will entail some overlap with the merits of the plaintiff's underlying claim." *Id*. at 351. A district court commits legal error "by failing to [conduct] a rigorous analysis." *Ealy v. Pinkerton Gov't Servs., Inc.*, 514 F. App'x 299, 306 (4th Cir. 2013).

**ARGUMENT**

## I.     The Court should deny class certification because Plaintiffs' claims are not typical of the putative class.

To obtain certification, Plaintiffs must show that "the claims or defenses of the representative parties are typical of the claims or defenses of the class." Fed. R. Civ. P. 23(a)(3). "The essence of the typicality requirement is captured by the notion that 'as goes the claim of the named plaintiff, so go the claims of the class.'" *Good v. Am. Water Works Co.*, 310 F.R.D. 274, 295 (S.D. W. Va. 2015) (quoting *Deiter v. Microsoft Corp.*, 436 F.3d 461, 466 (4th Cir. 2006)). So "class certification is inappropriate where a putative class representative is subject to unique defenses which threaten to become the focus of the litigation." *Gary Plastic Packaging Corp. v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 903 F.2d 176, 180 (2d Cir. 1990). "[T]o defeat class

4

certification[,] it is not necessary that the unique defense asserted against the putative class representative ultimately succeed.  Instead, the presence of even *an arguable defense* peculiar to the named plaintiff may destroy the required typicality" by diverting attention from any common issues.  *Shiring v. Tier Techs., Inc.*, 244 F.R.D. 307, 313 (E.D. Va. 2007) (emphasis added).

These Plaintiffs are atypical for two reasons.  First, Plaintiffs' investment managers used algorithmic trading models that did not rely on the integrity of the market price because they would have purchased SCANA *even if they had known of the alleged fraud*.  Second, all three Plaintiffs learned of the alleged fraud long before the putative class period ended in December 2017.  Despite Plaintiffs' personal knowledge of the alleged fraud, they continued to hold or even *continued to purchase* SCANA stock, which destroys their claim that they relied on Defendants' alleged misrepresentations.[2]

### A. Because of their investment managers' unique trading strategies, Plaintiffs did not rely on the integrity of the market price.

#### 1. Reliance is an essential element of a Section 10(b) securities claim.

"Reliance by the plaintiff upon the defendant's deceptive acts is an essential element of the § 10(b) private cause of action."  *Stoneridge Inv. Partners, LLC*, 552 U.S. at 159.  "To prove reliance, the plaintiff must show that but for the claimed misrepresentations or omissions, [she] would not have entered into the detrimental securities transaction."  *GAMCO Inv'rs, Inc. v. Vivendi, S.A.*, 927 F. Supp. 2d 88, 101 (S.D.N.Y. 2013).  "The traditional (and most direct) way a plaintiff can demonstrate reliance is by showing that he was aware of a company's statement and engaged in a relevant transaction—*e.g.*, purchasing common stock—based on that specific

---

[2] Pursuant to Defendants' concurrently filed Motion to Seal, Defendants' public brief redacts certain testimony below that has been designated confidential under the Confidentiality Order in this proceeding.

misrepresentation." *Erica P. John Fund, Inc. v. Halliburton Co.*, 563 U.S. 804, 810 (2011) (*Halliburton I*).  But courts can also presume—subject to rebuttal—"that investors trading in efficient markets indirectly rely on public, material misrepresentations through their reliance on the integrity of the price set by the market." *Amgen Inc. v. Connecticut Ret. Plans & Tr. Funds*, 568 U.S. 455, 462 (2013); *see also Basic Inc. v. Levinson*, 485 U.S. 224, 246 (1988).  Plaintiffs rely on that so-called "*Basic* presumption" here.  (Plaintiffs' Motion for Class Certification (ECF 166) at 26–31.)

Defendants are always entitled to rebut the *Basic* presumption "by appropriate evidence." *Halliburton I*, 563 U.S. at 811.  As *Basic* explained, "[a]ny showing that severs the link between the alleged misrepresentation and either the price received (or paid) by the plaintiff, or his decision to trade at a fair market price, will be sufficient to rebut the presumption of reliance." 485 U.S. at 248.  For example, if the defendants can show that the plaintiff "w[as] privy to the truth" of the alleged misrepresentation, then "the causal connection" between the alleged fraud and plaintiff's purchase "could be broken." *Id.*  Likewise, if the plaintiff did not "rely on the market price of securities as an accurate measure of their intrinsic value," then it cannot take advantage of the *Basic* presumption. *In re Am. Int'l Grp., Inc. Sec. Litig.*, 689 F.3d 229, 234 n.3 (2d Cir. 2012).[3]

_____

[3] Plaintiffs also rely on a similar presumption under *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), but that presumption is rebutted here for the same reasons as the *Basic* presumption. *See Simpson v. Specialty Retail Concepts*, 823 F. Supp. 353, 355 (M.D.N.C. 1993) (noting that defendants can rebut *Affiliated Ute* presumption).  And *Affiliated Ute* does not apply here in any event because it only creates a rebuttable presumption of reliance on material *omissions*, not the affirmative misstatements Plaintiffs allege here. *See In re Barclays Liquidity Cross & High Frequency Trading Litig.*, 126 F. Supp. 3d 342, 366 (S.D.N.Y. 2015) ("If a misrepresentation claim could be reframed as an omission claim merely by alleging that a defendant did nothing to dispel its own misrepresentation, then the limitation of the *Affiliated Ute* presumption to omissions alone would be meaningless.").  Even if their claims turned in part on omissions, the Fourth Circuit has rejected the *Affiliated Ute* presumption "in a Rule 10b–5 case when the plaintiff alleges *both* nondisclosure and positive misrepresentation instead of only nondisclosure." *Cox v. Collins*, 7 F.3d 394, 395–96 (4th Cir. 1993) (emphasis added).

Courts also decline to certify putative classes if the named plaintiff would have purchased the defendant's stock *even if* it had known of the alleged fraud. *See Halliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S. 258, 268 (2014) (*Halliburton II*) (if "a plaintiff would have bought or sold the stock even had he been aware that the stock's price was tainted by fraud, then the presumption of reliance would not apply").

In *GAMCO*, for example, the plaintiffs could not "show that but for the claimed misrepresentations or omissions, she would not have entered into the detrimental securities transaction." 927 F. Supp. 2d at 101. The plaintiffs alleged that the defendant misrepresented its liquidity. But the court found no reliance because the plaintiffs' investment philosophy "is completely independent of liquidity concerns and market price." *Id*. There was no evidence that the plaintiffs "would have viewed Vivendi as a less attractive investment if Vivendi had fully disclosed its liquidity condition at all relevant times." *Id*. at 101–02. *GAMCO* thus makes plain that the plaintiffs must show that they would not have invested in the defendant's stock had they known of the alleged fraud. *See also In re InterClous Sys., Inc. Sec. Litig.*, 2014 WL 12774917, at *1 (D.N.J. Nov. 5, 2014) (denying lead plaintiff status because a "seemingly unique trading strategy, which incorporates, among other things, an algorithmic trading approach, complex mathematical formulae, and other mechanisms and methodologies" enabled unique defenses); *In re Safeguard Scis.*, 216 F.R.D. 577, 582 (E.D. Pa. 2003) (finding atypical a lead plaintiff that "focuse[d] on technical price movements rather than price").

### 2. Plaintiff West Virginia Investment Management Board (IMB) did not rely on the integrity of the market price.

IMB employed only one investment manager during the putative class period to buy and sell stocks on its behalf. (Ex. 1 at 25.) That investment manager, INTECH, testified at its

deposition that it did not rely on the integrity of the market price because it would have purchased SCANA stock *even if it knew of the alleged fraud*.

INTECH relies on a computer running an algorithm to make trading decisions. (Ex. 2 at 44:2–5.) In making such a decision, its algorithm evaluates only two things: stock price volatility and stock price correlation. (*Id.* at 86:17–19.) Volatility measures a stock price's up or down movement. (*Id.* at 86:20–23.) Correlation concerns whether a stock price moves up or down compared to the price of another stock or a benchmark. (*Id.* at 87:9–13.) INTECH's algorithm does not know whether a company has made a false or misleading statement and it does not care. (*Id.* at 89:24–90:22, 92:10–15.) INTECH does not consider news articles, SEC filings, company press releases, or any other similar information as part of its trading process. (*Id.* at 83:19–86:7.) Other than applying a client-provided exclusion list of companies in which INTECH cannot trade, INTECH employees are not at all involved in the stock selection or stock trading process; simply put, "[e]verything is based on algorithms." (*Id.* at 79:19–80:12.) INTECH even admitted that its algorithm "doesn't depend on whether a stock price truly reflects the intrinsic value of a company." (*Id*. at 68:11–16.) The algorithm explicitly ignores market price and focuses instead only on "volatility and correlation." (*Id*. at 86:17–19.) INTECH admitted that it "doesn't matter to INTECH" whether a company's press release or SEC filings are false. (*Id*. at 84:8–20.)

INTECH admitted that nothing would have changed had it known of Defendants' allegedly fraudulent statements. INTECH explained that if it had "material, nonpublic information" about potential fraud or other insider information, INTECH's models would have performed the same. (*Id*. at 88:6–89:10.) Indeed, INTECH confirmed that it would still invest in a company even if "INTECH knows that company A has made *a false or misleading statement*." (*Id*. at 90:4–22 (emphasis added).) When asked whether INTECH would have "sold the [SCANA] shares earlier"

if it "had known that there was alleged fraud," INTECH answered "No." (*Id*. at 143:5–18.) And when Plaintiff IMB's own counsel asked INTECH whether "stock price was one of the factors that INTECH considered in making investment decisions," INTECH resisted by highlighting that its model is "truly a function around volatility and correlations," not price. (*Id*. at 148:9–17.)

INTECH's admissions make plain that it employed a unique trading model that did not rely on the integrity of the market price. *See In re Vivendi Universal, S.A. Sec. Litig.*, 123 F. Supp. 3d 424, 436 (S.D.N.Y. 2015) (holding that plaintiff did not rely on integrity of market price because "[t]he market price of Vivendi's [securities] was not important to [plaintiff's] calculation of their intrinsic value," and plaintiff would have made the same purchases even if it knew of the fraud); *In re InterClous Sys., Inc. Sec. Litig.*, 2014 WL 12774917, at *1 (plaintiff subject to unique defenses because of its "seemingly unique trading strategy, which incorporates, among other things, an algorithmic trading approach [and] complex mathematical formulae"). Because INTECH was the only investment manager for IMB during the putative class period, Defendants have shown "an *arguable* defense peculiar to [IMB]" that "destroy[s] the required typicality." *Shiring*, 244 F.R.D. at 313.

INTECH's admissions here readily distinguish other cases involving INTECH and that lacked a clear record rebutting the *Basic* presumption. In *Local 703, I.B. of T. Grocery & Food Employees Welfare Fund v. Regions Fin. Corp.*, 282 F.R.D. 607, 615 n.7 (N.D. Ala. 2012), the Court concluded that the *Basic* presumption applied because INTECH did not testify that "had [it] known those numbers were manipulated, it would not have considered that to be relevant information." *Id*. But that is *exactly* what INTECH stated here: When asked whether INTECH would have "sold the [SCANA] shares earlier" if it "had known that there was alleged fraud," INTECH answered "No." (Ex. 2 at 143:5–18.) Likewise, in *In re Par Pharmaceutical Securities*

9

*Litig.*, No. 06-cv-3226, Dkt. No. 286 (D.N.J. July 23, 2012), the defendants failed to develop any evidence that INTECH's trading patterns defeated the *Basic* presumption. The court explained that the defendants "have not suggested that INTECH" had non-public information or that "INTECH did not rely upon the information in the market as an indicator of Par's value." *Id.* at 12. But again, INTECH explicitly confirmed here that it would have made exactly the same purchasing decisions *even if* it had known of the alleged fraud. The record here provides precisely the link missing in those cases.

        **3.**      **The Blue Sky Plaintiffs did not rely on the integrity of the market price.**

Like IMB, the Blue Sky Plaintiffs did not rely on the integrity of the market price because they employed investment managers during the proposed class period to makes trades on their behalf that would have purchased SCANA stock even if they knew of the alleged fraud.

The Blue Sky Large Cap Fund employed INTECH as its sole investment manager during the proposed class period. (Ex. 1 at 25.) Thus, for the same reasons that IMB did not rely on the integrity of the market price because of INTECH's trading algorithm, the Blue Sky Large Cap Fund likewise did not rely on the integrity of the market price. *See supra* Argument § I.A.2.

The Blue Sky Low Volatility Fund had three investment managers that traded in SCANA stock during the putative class period: TOBAM Core Investments, LSV Asset Management, and Analytic Investors. (Ex. 1 at 25.) TOBAM, LSV, and Analytic trade substantially the same way INTECH does, so none of them satisfy *Basic*'s criteria for invoking the presumption of reliance.



**TOBAM.** ████████████████████████████████████

██████████████████████████ (Ex. 3 at 48:25–49:11.) ███████████████

████████████████████████████████████████████

██████████████████████████ (*Id.* at 54:24–55:12, 64:15–65:2.) ███



(*Id.*)

(*Id.* at 59:14–18.)

(*Id.* at 96:8–18.)

(*Id.* at 71:9–12.)  When faced with such testimony, courts have concluded that the plaintiff did not rely on the integrity of the market price.  *See In re Safeguard Scis.*, 216 F.R.D. at 582 (finding lead plaintiff atypical because his trading strategy "focuse[d] on technical price movements rather than price").

(Ex. 3 at 59:1–24.)

(*Id.* at 67:10–69:23.)

(*Id.* at 58:9–13, 60:8–12.)

(*Id.* at 113:16–114:4.)

TOBAM also explained that it still would have purchased SCANA stock even if it had known of the alleged fraud.

(*Id.* at 72:8–18.)

(*Id.* at 72:23–73:3.)

(*Id.* at 92:19–24.)

11



**LSV.** ████████████████████████████████ (Ex. 4 at 48:20–23.) ████████████████████████████████

████████████████████████████ (*Id.* at 57:21–59:17.) ████████████████████████████

████ (*Id.* at 15:16–17.) ████████████████████

████████████ (*Id.* at 72:2–13.) ████████████

████████████████████ (*Id.* at 59:8–17.) ██

████████████████████████████

████████ (*Id.* at 39:9–14.)

████████████████████████

████████████████████████ (*Id.* at 56:22–57:2.) ████████████████

████████████ (*See id.*) ████████████████████

████████████████████ (*Id.* at 72:2–13.) ████████████████

████████████ (*Id.* at 74:7–12 (emphasis added).) ████████████

████████████████████████

████████ (*Id.* at 101:22–102:19.)

**Analytic.** Analytic's Global Low Volatility Equity Strategy also begins with an investment "universe" based on the benchmark MSCI World Index (Ex. 29 at 53:25–54:4), then uses computer-driven quantitative techniques to identify a portfolio meant to achieve the same returns as that index with less risk. (*Id.* at 54:17–55:5.) ████████████

████████████████████████████



(Ex. 5 at 60:9–23; Ex. 27 (WFAI_SCANA_114)), and

(Ex. 5 at 60:4–8, 72:10–19.)

(*Id.* at 72:22–73:7.)

(*Id.* at 63:11–23, 73:8–23.)

(Ex. 29 at 41:13–21, Ex. 5 at 63:19–23.)

(Ex. 5 at 99:16–24).

(*see id.* at 44:5–11)),

(*id.* at 97:25–98:19),

(*Id.* at 98:15–19.)  For SCANA, the analyst community was certainly aware of the fraud alleged here by the time Analytic *made its first purchase in **October 2017***, *see infra* Argument § I.B, so the alleged fraud would have made no difference to Analytic's purchasing decisions here.

Each of those investment managers would have made the same purchases *even if it had known* about the alleged fraud, so those trades could not have relied on the integrity of the market price.  Because neither the IMB nor the Blue Sky Plaintiffs purchased SCANA stock with that reliance, they are at least arguably subject to unique defenses that doom their ability to represent this putative class.

**B.    Plaintiffs cannot represent a class over the entire putative class period because they knew of the alleged fraud before the end of that period and continued to hold or even purchase SCANA stock.**

Plaintiffs also cannot represent a class throughout their overreaching requested class period because they were already convinced of the alleged fraud well before the end of that period, so they could not have relied on the alleged fraud during the entire period.   And despite their principals' personal knowledge of the alleged misconduct, Plaintiffs *continued to hold or even purchase* SCANA stock.  Plaintiffs' activity after they learned of the alleged fraud rebuts any claim that they relied on Defendants' alleged misstatements.

"A named plaintiff who has engaged in a post-disclosure purchase is subject to the defense that the alleged misstatements or omissions were really not a factor in the [original] purchasing decision."  *George v. China Auto. Sys., Inc.*, 2013 WL 3357170, at *6 (S.D.N.Y. July 3, 2013).  Those plaintiffs are subject to unique defenses because their continued purchasing or holding of the defendant's stock shows that "the disclosure of the fraud was *irrelevant* to the named plaintiffs."   *Id*. (emphasis added).   In other words, a plaintiff's post-disclosure activity is "*probative* of whether [the plaintiff's] investment strategy took market price into account," because if it did, then the plaintiff would have sold the stock or stopped buying it once the plaintiff learned of the alleged fraud.  *GAMCO*, 927 F. Supp. 2d at 262 (emphasis added).  That the plaintiffs did not sell the defendant's stock after learning of the alleged fraud reinforces that they originally bought it based on *other* considerations.  *See In re Ribozyme Pharm., Inc. Sec. Litig.*, 192 F.R.D. 656, 662 (D. Colo. 2000) (holding certain lead plaintiffs atypical because they "have not yet sold [the defendant's] stock" after learning of the corrective disclosure); *Berwecky v. Bear, Stearns &*

14

*Co.*, 197 F.R.D. 65, 69 (S.D.N.Y. 2000) (finding proposed plaintiffs atypical because they purchased stock "after the allegations of fraud[] . . . became public knowledge").[4]

The Blue Sky Plaintiffs learned of the alleged fraud more than two months before the putative class period ended, yet held and even purchased *more* SCANA stock. ████████████ ████████████████████████████████████████████████████████████████████ (Ex. 6 at 75:5–21, 163:11–18.) ██████████████████████████████████ ██████████████ (*Id.* at 12:4–13:7.)  Despite its early knowledge of the alleged fraud, the Blue Sky Large Cap Fund continued to hold thousands of shares of SCANA stock through December 2017, and the Blue Sky Low Volatility Fund continued to *purchase* SCANA stock.  (*See* Ex. B to Am. Compl. (ECF 72-2) (cataloguing transactional history).) ████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████ (*Id.* at 4; Ex. 6 at 178:2– 21.) ████████████████████████████████████████████████████████ ████████████████████████ (Ex. 6 at 163:19–164:2.) ████████████████ ████████████████████████████████████████████████████████ (*Id.* at 165:25– 166:10 (emphasis added).)  Thus, both Blue Sky funds continued to hold or purchase SCANA stock after their principals personally learned of the alleged fraud.  Such behavior destroys any claim that the Blue Sky Plaintiffs relied on the absence of fraud when purchasing SCANA stock.

---

[4] Some courts have held that a plaintiff's post-disclosure purchases do not defeat typicality if the plaintiff was "averaging down."  *See Meyer v. Concordia Int'l Corp.*, 2018 WL 3104624, at *3 (S.D.N.Y. May 23, 2018) ("[I]t is a common investment strategy for entities to engage in subsequent purchases [i.e., to purchase additional stock after the price of the stock decreases,] in order to decrease the average cost of their investment.").  Yet given the staggering volume of post-disclosure purchases by Blue Sky, it did not merely purchase a small fraction of additional shares to decrease the average cost of its investment.  (*See* Ex. B to Am. Compl. (ECF 72-2) (cataloguing transactional history).)

Plaintiff IMB likewise admitted that it learned of the alleged fraud more than a month *before* the end of the putative class period and yet continued to hold SCANA stock. (Ex. 7 at 116:17–22 (testimony by IMB that it was "convinced that SCANA had committed a fraud" as of November 15, 2017).) IMB testified that on November 15, 2017, it met with its counsel to discuss the alleged fraud in this very lawsuit. (*Id*. at 114:7–115:7.) Then on November 22, 2017, IMB met with the Blue Sky Plaintiffs to discuss "our future strategy *for prosecuting this case* and the claims against SCANA." (*Id*. at 115:8–16 (emphasis added).) During these strategic negotiations, IMB continued to hold *more than 40,000 shares of SCANA stock* despite its principals' personal knowledge of the alleged fraud. (Ex. A to Am. Compl. (ECF 72-1) (cataloguing IMB transactions).) IMB's decision to continue holding SCANA stock after it knew of the alleged fraud destroys its claim of reliance.

It is beyond the pale for these Plaintiffs and their law firms to have demanded appointment as lead Plaintiffs on November 27, 2017, while being fully aware that they continued to hold SCANA stock, and even claim damages for losses incurred *after* the fact. That attempt to boost their damages dooms their ability to represent the class. Without a viable class representative, the Court must deny class certification. *See State of Alaska v. Suburban Propane Gas Corp.*, 123 F.3d 1317, 1321 (9th Cir. 1997) ("[W]hen named plaintiffs are subject to unique defenses which could skew the focus of the litigation, district courts properly exercise their discretion in denying class certification."); *Kline v. Wolf*, 88 F.R.D. 696, 700 (S.D.N.Y. 1981) (denying class certification because of "the unique defenses to which *each plaintiff* is subject" (emphasis added)).

## II.    The Court should end the putative class period by July 31, 2017.

Plaintiffs seek an overbroad class period all the way through December 20, 2017. But that period includes many months *after* the investing public learned of the alleged misrepresentations,

when (under Plaintiffs' theory) it was no longer possible to rely on the absence of the alleged fraud. That is why courts consistently hold that the proposed class must end once corrective disclosures have cured the alleged fraud. Because the July 31, 2017, abandonment announcement conveyed all allegedly material information to the public about the Nuclear Project, the Court should end the putative class on that date.

### A. The length of the class period must be considered on a motion for class certification.

"In a securities class action, the class period ends when curative information is publicly announced or otherwise effectively disseminated to the market." *Medtronic*, 325 F.R.D. at 291. "The ability to rebut an alleged corrective disclosure becomes particularly important in cases— like this one—where the parties dispute what event serves as the corrective disclosure." *Id*.

District courts routinely end class periods in securities cases once the market has learned of the defendant's alleged misrepresentations. A leading treatise explains that "[i]f a plaintiff's allegations are sufficient to satisfy Rule 23 but insufficient to sustain the class period or class definition as pled, it is then appropriate for a court to limit the class period." MCLAUGHLIN ON CLASS ACTIONS § 4:3 (15th ed.). "Attempts to limit the class period frequently occur in the *securities law context*, where courts have *consistently held* that liability for misrepresentations or omissions under the securities laws terminates when curative information is publicly announced or otherwise effectively disseminated." *Id*. (emphases added). Courts thus often "modif[y] the class period." *Medtronic, Inc.*, 325 F.R.D. at 293 n.4 (citing cases); *see also In re SunEdison, Inc. Sec. Litig.*, 329 F.R.D. 124, 134–35 (S.D.N.Y. 2019).

District courts shorten class periods in securities cases because the plaintiffs must show that the alleged misstatements *caused* the alleged losses. One way the plaintiffs may show causation is through a "'corrective disclosure' of the alleged fraud," in which plaintiff identifies

"a corrective disclosure that reveals to the market *the falsity of the prior statements*." *Singer v. Reali*, 883 F.3d 425, 455 (4th Cir. 2018) (emphasis added). For a statement to qualify as a corrective disclosure, it thus must correct a specific statement that SCANA made. Plaintiffs may also show causation by identifying a "materialization of the concealed risk," in which they "show that the loss was foreseeable and caused by the materialization of the risk *concealed* by the fraudulent statement." *Id.* (emphasis added). The event that materialized thus must reveal some information that SCANA consciously withheld from the public. Both theories "drive at the same point: did the misstatement or omission *conceal something from the market* that, when disclosed, negatively affected the value of the security." *Id.* at 456 (emphasis added). Under each theory, the central inquiry remains the same: whether the disclosure or materialized event revealed some information that the market (i) did not already know and that (ii) SCANA withheld from the public. (*See also* Ex. 26 at 91:12–92:6 (Plaintiffs' expert agreeing that a disclosure "has to provide *new* information" that has been "obscured from the market") (emphasis added).)

Those avenues for proving loss causation highlight two types of information that do *not* correct prior statements. First, the materialization of a *known or previously disclosed* risk does not reveal new information to the public that can correct prior statements. "In an efficient market, the stock price impact of a previously undisclosed risk occurs when the risk is first disclosed to the market." (Ex. 8 ¶ 30.) "[T]he materialization of a risk can only be evidence of the price impact of an earlier false statement concealing the risk if the risk wa*s not disclosed at some point between the statement and the materialization*." *Grae v. Corr. Corp. of Am.*, 330 F.R.D. 481, 496 (M.D. Tenn. 2019) (emphasis added). If the risk materializes *after* the public already knew about it, "[t]he price of the stock might still go down . . . but[] because the risk was no longer concealed, that price decrease *would not be attributable to the fraud*." *Id.* at 496–97 (emphasis added). Thus,

18

once the Defendants' statements alert the public to a risk, the later materialization of that risk cannot extend the length of the putative class period.  *See Monroe Cty. Employees' Ret. Sys. v. YPF Sociedad Anonima*, 15 F. Supp. 3d 336, 358 (S.D.N.Y. 2014) (holding that plaintiff did not prove loss causation because the price drop "likely represented the materialization of a *known* risk, rather than the disclosure of a *concealed* one" (emphasis added)).

Second, the negative characterization of already-public information cannot serve as a corrective event.  "If a third party (*e.g.* a journalist, investor, or politician) makes a critical statement about a company whose stock trades in an efficient market and that statement is based solely on publicly available information, then the only new facts disclosed to the market [are] the opinion of the individual who made that critical statement."  (Ex. 8 ¶ 33.)  Courts thus hold that "third-party articles and reports expressing negative opinions based on information that was already publicly available are not corrective."  *Zhong Zheng v. Pingtan Marine Enter. Ltd.*, 379 F. Supp. 3d 164, 177 (E.D.N.Y. 2019).  As a result, "[p]laintiffs cannot use [news] article[s]" to show loss causation when the articles are "based solely on public information."  *Fila v. Pingtan Marine Enter. Ltd.*, 195 F. Supp. 3d 489, 496 (S.D.N.Y. 2016).

B.    **The Court should end the class period by July 31, 2017, because the market had already learned all relevant, material information when the Nuclear Project was abandoned.**

SCANA announced on July 31 that it had abandoned the project.  That news cured the alleged misstatements, which include: statements about (i) the status of the Nuclear Project, (ii) the viability of the Nuclear Project, and (iii) SCANA's oversight and transparency for the project.  (Am. Compl. ¶¶ 336–428.)  By July 31, the verdict on the status and viability of the project was in, and the market was well aware of the risks over the eventual assessment of SCANA's oversight.

19

1.    **The July 31 announcement cured the alleged misstatements about the status of the Nuclear Project.**

The Amended Complaint alleges that SCANA represented that it would complete the Nuclear Project by 2020, in time to obtain the federal nuclear tax credits (*id.* ¶¶ 338–42), and downplayed the risk that it might not complete the Nuclear Project in time to obtain the tax credits, (*id.* ¶¶ 343–59, 392–400.)    The July 31 abandonment announcement cured those alleged misstatements about the Nuclear Project's status.  That announcement unmistakably conveyed that the Owners would not complete the Nuclear Project in time to obtain the nuclear tax credits.  (Ex. 9.)  Indeed, the announcement highlighted that the Owners would *never* complete the Nuclear Project.  Likewise, the July 31 announcement recited that the Owners permanently abandoned the Nuclear Project because of cost overruns and schedule delays, which underscored that the on-site contractors could not overcome lagging labor productivity and other construction hurdles.  (*Id.*)  Neither the Amended Complaint nor Plaintiffs' Motion for Class Certification identifies any statements about the Nuclear Project's status that remained uncured after the July 31 announcement.    Thus, even if SCANA had misrepresented the project's status, the July 31 abandonment announcement cured any misstatement by making plain that the Owners would never complete the Nuclear Project.

2.    **The July 31 announcement cured the alleged misstatements about the Nuclear Project's viability.**

The Amended Complaint also alleges that SCANA misrepresented the Nuclear Project's viability, by telling the public it could complete the project on its own even if Westinghouse filed for bankruptcy.  (*Id.* ¶¶ 402–21.)  But the July 31 abandonment announcement plainly conveyed that the Nuclear Project would not be completed.  That announcement highlighted that the Owners had to abandon the project largely because of Westinghouse's bankruptcy.  (Ex. 9.)  Without the

Nuclear Project's primary contractor, the Owners could not complete the project in time to obtain the federal tax credits. (*See id*.) So regardless of any alleged misstatements, the investing public knew as of July 31 that the Nuclear Project was no longer economically viable. Neither the Amended Complaint nor Plaintiffs' Motion for Class Certification identifies *any* statements about the project's viability that remained uncured after the July 31 abandonment announcement.

> **3.    The July 31 announcement cured the alleged misstatements about SCANA's oversight and transparency with respect to the Nuclear Project.**

The Amended Complaint alleges that SCANA misrepresented its oversight and transparency over the Nuclear Project, which allegedly jeopardized SCANA's ability to recover previously approved construction costs from ratepayers if the South Carolina Public Service Commission (PSC) later found those costs to be "imprudent." (*See* Am. Compl. ¶¶ 65–67, 362-71, 374–89; S.C. Code § 58-33-275(E).) SCANA's July 31 abandonment announcement effectively cured the alleged misstatements about prudency and transparency. Given the magnitude of the project and the outstanding costs for which SCANA would seek recovery, the July 31 announcement put investors on notice of the substantial risk that the PSC would forbid SCANA from recovering some of the Nuclear Project costs.

SCANA's abandonment announcement put investors on notice of the potential disallowance of cost recovery even if the degree of the risk was still uncertain, much like in *In re FNMA*. There, the court held that the defendant's original announcement to the market about a potential earnings restatement "put investors on *notice* that Fannie Mae's financial future was, at best, *uncertain*." *In re Fed. Nat. Mortg. Ass'n*, 247 F.R.D. 32, 40 (D.D.C. 2008) (emphases added). That notice of future uncertainty "severed the link" between the alleged misstatement and the supposed loss. *Id*. at 39. "While additional information did enter the market after [that original

21

announcement], those additional disclosures did not render the [original] statement either misleading or *any less corrective*." *Id.* at 40 (emphasis added). The upshot is that even if investors did not know exactly how much SCANA's statements about oversight and transparency would affect cost recovery under the BLRA, the risk of disallowance under the BLRA could not have been concealed after July 31.

News articles and analyst reports following the July 31 announcement repeatedly highlighted the risk of disallowance under the BLRA. On August 1, 2017, an analyst report from Fitch warned that while the PSC "has been supportive of the nuclear project since its inception, Fitch is concerned that the magnitude of the stranded costs could result in *an adverse regulatory order*." (Ex. 10, emphasis added.) The report continued that "[t]he *possibility of disallowance* of uncertified construction costs of about $1.5 billion . . . are of particular concern to Fitch." (*Id.*, emphasis added.) Other August 1, 2017, analyst reports sang the same tune. An August 1 Morgan Stanley report covering SCANA stock warned that "Risks Remain High in Abandonment" and that "there is some degree of risk relating to the $1.5b in investment that has not received prudence review." (Ex. 11.) An August 1 report from Moody's cautioned that SCANA was "proceed[ing] down unchartered waters in seeking recovery of the abandonment costs," and Moody's thought it "likely" that the PSC would "*disallow or modify* portions of [SCANA's] cost recovery request." (Ex. 12, emphasis added.) And an August 1 analyst report from Mizuho Securities bluntly stated that "[w]e believe there is a *risk for disallowance* of some or all of these costs." (Ex. 13, emphasis added.)

Analyst reports continued to flag the risk of BLRA disallowance in the days following SCANA's July 31 abandonment announcement.

22

- An August 3, 2017, article from S&P Global Platts warned that "South Carolina regulators might not allow [SCANA] to recover all $4.9 billion the company has spent . . . on the soon-to-be abandoned Summer nuclear plant expansion project." (Ex. 14.)

- An August 4, 2017, report from Mizuho Securities stated that the abandonment announcement was a "major shock" in South Carolina, and that there "is a potential for unrest adding to SCANA's regulatory risk." (Ex. 15.)

- An August 7, 2017, article from SNL Financial highlighted analyst fears that the abandonment petition "raised material regulatory risks, as it will be the first application under the abandonment clause of [the BLRA]." (Ex. 16.)

- An August 7, 2017, Morgan Stanley report highlighted "[t]he political pushback in South Carolina regarding SCANA's decision to abandon construction of the VC Summer new nuclear plant," and opined that "*cost disallowances and lower allowed returns are likely*." (Ex. 17, emphasis added.)

- An August 16, 2017, report from Fitch explained that "[i]n the case of abandonment, the onus is on the utility to prove that the incurred costs were prudent and minimized. Fitch is concerned that a portion of the construction costs *could be disallowed*." (Ex. 18, emphasis added.)

The analyst reports and news articles immediately after SCANA's July 31 abandonment announcement make plain that the public well knew the risk of disallowance under the BLRA due to a potential finding of imprudency.

The class period should end as of July 31 here because investors were "on notice," just as in *Medtronic*. There, the plaintiffs alleged that the defendant misrepresented the clinical success of its product. 325 F.R.D. at 284–85. The defendant allegedly did so by paying doctors for favorable clinical studies. *Id*. The court explained that "[t]he date of the corrective disclosure in this case is the date on which Medtronic's payments to the authors of the journal articles fully became public information for the first time," and that "[t]he parties propose three possible dates of corrective disclosure: June 28, 2011; July 5, 2011; and August 3, 2011." *Id*. at 294–95. The court ended the proposed class on June 28 because an announcement on that date put investors *on notice* of the allegedly misleading conduct. "The payments to physicians are the crux of Plaintiffs'

scheme-liability claims and were disclosed to the public in *The Spine Journal* issue released on June 28, 2011. As a result, as of June 28, a *reasonable investor would have known* not to rely on the assumption that these studies were conducted without significant financial incentives." *Id*. at 295 (emphasis added). As in *Medtronic*, once SCANA told the public that it was better to abandon the Nuclear Project rather than continue construction, "a reasonable investor would have known not to rely on the assumption" that SCANA would be able to recover all of its previously approved costs. *Id*. at 295.

The September 27 article about the Bechtel report did not contradict the market's knowledge that, as of July 31, 2017, SCANA would not complete the Nuclear Project and may not recover costs under the BLRA. As explained, "the materialization of a risk can only be evidence of the price impact of an earlier false statement concealing the risk if the risk wa*s not disclosed* at some point between the statement and the materialization." *Grae*, 330 F.R.D. at 496 (emphasis added). After the July 31 abandonment announcement, copious analyst reports explicitly recognized the risk that SCANA would not recover costs under the BLRA. *See supra* at 22–24. That outlook did not change after the September 27 article in *The State* on the Bechtel report. That article speculated about the existence of an earlier version of the Bechtel report, and how it might affect cost recovery under the BLRA. (*See* Ex. 19.) But the article did not reveal any new risks that had been *concealed* from the market. Indeed, several analyst reports right after September 27 did not acknowledge the article or adjust their assessment of SCANA stock to account for the report. (*See* Exs. 22, 23.) Other analyst reports continued to note the uncertainty over cost recovery under the BLRA, but did not adjust their outlook based on a prior version of the Bechtel report. (*See* Exs. 24, 25.) Instead, those analyst reports continued to highlight the regulatory and political risks that might affect cost recovery, like ongoing PSC proceedings or the Attorney

General's opinion on the BLRA's constitutionality. (*Id.*) Thus, no disclosure after July 31, 2017 revealed any new risks to the market over the status of the Nuclear Project or SCANA's ability to recover costs under the BLRA.

**C.    Alternatively, the Court should end the putative class period by September 27, 2017, when the market had confirmation of the risks disclosed in the abandonment announcement.**

Even if the class period could extend beyond July 31, 2017—when the market knew SCANA would not complete the Nuclear Project and may not recover costs under the BLRA—the class period would have to end on September 27, 2017. By then, the market had yet more confirmation that SCANA's recovery of construction costs was at risk.

The July 31 announcement conveyed to the investing public that the Nuclear Project was not viable and that the Owners would not complete it in time to qualify for the federal tax credits. The public also learned on September 27 that Bechtel had opined in its first report that the Nuclear Project would not be finished on time. (*See* Ex. 19.) That information was inherent in the abandonment announcement, which conveyed to the public that the difficulties the project faced were serious enough to warrant abandoning the project altogether. The September 27 article reinforced that message by highlighting that the "original, undiluted report" may have included other information about the project's management. (*Id.*) A reasonable investor was thus "on notice" of other opinions about the project's difficulties, which were not previously known to the public.[5] *In re FNMA*, 247 F.R.D. at 40. The consequence of that nondisclosure was that SCANA may have been at risk of disallowance under the BLRA, as the market knew even after the abandonment in July. *See supra* at 22–24.

---

[5] As set forth in Defendants' Motions to Dismiss and as the evidence will show, there was no duty to disclose those opinions.

A September 29 report from Goldman Sachs underscored that the public knew by September 27 that SCANA may not have disclosed all the project's difficulties, and thus may not recover costs under the BLRA.  The Goldman Sachs report recognized that "*sizable uncertainty exists* regarding SCG's VC nuclear project since they announced plans to abandon the project." (Ex. 20, emphasis added.)   The report also cautioned investors that "uncertainty has risen" following the project's abandonment, including "*the potential for cost recovery* on this project." (*Id*., emphasis added.)  The report closed by advising investors that a "[k]ey risk" facing SCANA stock was "*cost recovery and financing*" related to the Nuclear Project.  (*Id*. at 2 (emphasis added).)

The October 4 Morgan Stanley report that Plaintiffs attached to their Motion for Class Certification is more evidence that the Court should end the putative class period no later than September 27.  (Ex. B to Motion for Class Certification (ECF 166-2).)  The Morgan Stanley report analyzed the mix of public information to conclude that SCANA "faces significant risk that investments made in its nuclear plant will be partially disallowed."  (*Id*. at 2.)  The report revealed no new information, but offered only the analyst's opinion that SCANA faced legal and regulatory risks (as SCANA had previously warned).

Other lawsuits against SCANA raising identical claims to those here underscore that the proposed class period should end no later than September 27.  The first securities-fraud case against SCANA was filed on September 27, 2017, and several copycat lawsuits followed soon after.  *See In re SCANA Corp. Securities Litig*., No. 3:17-cv-2616, Dkt No. 1, (D.S.C. Sept. 27, 2017); *Evans v. SCANA Corp.*, No. 3:17-cv-2683, Dkt. No. 1 (D.S.C. Oct. 5, 2017); *Fox v. SCANA Corp.*, No. 3:17-cv-3063, Dkt. No. 1 (D.S.C. Nov. 10, 2017).  All these cases turned on the same basic alleged misrepresentations.  (*See id*.)  The flurry of lawsuits that began in late September

2017 highlights that the market had all it needed to know.  Because there was nothing left to reveal after September 27, 2017, there is no basis to extend the putative class beyond that date.

**D.      None of the events alleged in the complaint after July 31, 2017, qualifies as corrective disclosures that could extend the class period.**

The Amended Complaint identifies several purported corrective events after July 31.  (Am. Compl. ¶ 431.)  Yet none of the developments after July 31 revealed information *that SCANA could have disclosed*, because those other developments each represent the materialization of a *known risk* or a third party's negative reaction to *already-public* information.[6]  *See supra* Argument § II.A.

**December 20, 2017**: The Amended Complaint alleges that the PSC on this date denied a request to dismiss a rate relief suit.  (*See* Ex. 21.)  The PSC's order simply denied a motion to dismiss because *assuming the facts that the ORS had pled months ago on September 26*, Am. Compl. ¶ 297, the PSC could not conclude that the petitioners "cannot obtain relief on any theory." (*Id.*)  The PSC did not correct a prior statement by SCANA or reveal any information to the public that SCANA withheld.  The PSC's ruling based on previously alleged facts is, therefore, not a corrective disclosure because it "did not reveal any new *hidden* information to the public." *Medtronic*, 325 F.R.D. at 295 (emphasis added).

The Amended Complaint also alleges that Morgan Stanley issued a report on this date that opined SCANA's stock would drop if the petitioners prevailed in pending PSC cases.  That third-party analysis is not a corrective disclosure because it did not correct a SCANA misstatement or

---

[6] Plaintiffs may not attempt to correct this fundamental defect by identifying new alleged corrective disclosures for the first time in their reply brief.  *See, e.g.*, *Christian v. BT Grp. PLC*, 2017 WL 3705804, at *7 (D.N.J. Aug. 28, 2017) ("In determining what is a partial disclosure for loss causation purposes, the case law instructs courts to *hew closely to the allegations of the complaint*." (emphasis added)).  Thus, Plaintiffs are limited to the 18 alleged corrective disclosures in the Amended Complaint.  (*See* Am. Compl. ¶ 431.)

reveal information that SCANA knowingly withheld.  When an analyst report comments on known information, "the only thing actually disclosed to the market when the opinion is released *is the opinion itself*, and such an opinion, standing alone, cannot reveal to the market the falsity of a company's prior factual representations."  *Meyer v. Greene*, 710 F.3d 1189, 1199 (11th Cir. 2013). Indeed, as Defendants' expert witness Professor Chris James explains, *none* of the information released on December 20 revealed new information that SCANA withheld.  (Ex. 8 ¶¶ 49–53.)

**October 31, 2017**: The Amended Complaint alleges that Defendants Marsh and Byrne resigned on this date.  These events did not correct prior alleged misstatements or reveal information that SCANA consciously withheld.  And courts have repeatedly held that news of resignations do not qualify as corrective disclosures. *See In re Omnicom Grp., Inc. Sec. Litig.*, 597 F.3d 501, 511–12 (2d Cir. 2010) (holding that an article discussing an officer's resignation was not a corrective disclosure because it did not "reveal some then-undisclosed fact with regard to the specific misrepresentations alleged in the complaint"); *In re Am. Italian Pasta Co. Sec. Litig.*, 2007 WL 927745, at *4 (W.D. Mo. Mar. 26, 2007) (termination of a board chairman was not a corrective disclosure); *see also* (Ex. 8 ¶¶  55–57.)

**October 26-27, 2017**: The Amended Complaint alleges that SCANA released earnings statements on these dates that commented on the public reaction to the abandonment announcement.  The earnings statements did not cure any prior alleged misrepresentations or reveal any information that SCANA withheld from the public.  Nor did SCANA's commentary on the public response qualify as a corrective disclosure because SCANA simply offered its assessment on information that *the public already knew* (the reactions to SCANA's July 31 announcement).  As Professor James explains in analyzing the events on October 26 and 27,

"[a]nalyst commentary was mixed and all based on information *already known to the market*." (Ex. 8 ¶¶ 59–60.)

**October 19, 2017**: The Amended Complaint alleges that the Governor on this date asked SCANA to stop charging customers for the Nuclear Project.  SCANA had no obligation to predict and disclose the Governor's "distant" reaction to the July 31 abandonment announcement.  *In re Omnicom Grp., Inc. Sec. Litig.*, 597 F.3d at 514.  Nor did the Governor's request correct a previous disclosure by SCANA, or reveal information to the public that SCANA knowingly withheld.  Thus, these statements are not curative because they "did not reveal any new *hidden* information to the public."  *Medtronic*, 325 F.R.D. at 295 (emphasis added); (Ex. 8 ¶ 62.)

**September 29, 2017**:  The Amended Complaint alleges that credit rating agencies downgraded SCANA's credit.  These developments were not curative because they did not correct a prior SCANA statement or reveal hidden information.  Indeed, "[b]oth the ratings downgrade and *The Post and Courier* article [on this date] were based on publicly available information." (Ex. 8 ¶ 64.)  Courts have also held that credit downgrades do not qualify as corrective disclosures.  *See In re DVI, Inc. Sec. Litig.*, 2010 WL 3522090, at *24 (E.D. Pa. Sept. 3, 2010) ("This Court finds that the S & P announcement is not a corrective disclosure as a matter of law. . . . [T]he S & P announcement did not reveal any new information to the market.").

**September 21, 2017**: The Amended Complaint alleges that the U.S. Attorney subpoenaed documents from SCANA and convened a grand jury to investigate the Nuclear Project.  The initiation of an investigation does not cure alleged prior statements: "While the disclosure of an investigation is certainly an ominous event, it simply puts investors on notice of a *potential* future disclosure of fraudulent conduct."  *Loos v. Immersion Corp.*, 762 F.3d 880, 890 (9th Cir. 2014); *see also In re BofI Holding, Inc. Sec. Litig.*, 302 F. Supp. 3d 1128, 1139 (S.D. Cal. 2018) (initiation

of government investigation is not a corrective disclosure). Likewise, the Amended Complaint alleges that lawmakers commented on the U.S. Attorney's alleged investigation, but these statements also did not reveal new, hidden information. (*See also* Ex. 8 ¶¶ 69–72.)

The Amended Complaint separately alleges that a September 22 article detailed alleged insider trading at SCANA. The allegations of insider trading have little to do with the subject matter of the alleged misrepresentations here, which focus on the status and viability of the Nuclear Project, and whether SCANA prudently incurred expenses. Speculation about insider trading thus cannot be curative because "[i]n order to qualify as corrective, the disclosure must share the same subject matter as the prior misstatement; only then can the disclosure be said to have a *corrective* effect, rather than merely a *negative* effect." *FindWhat Inv'r Grp. v. FindWhat.com*, 658 F.3d 1282, 1312 n.28 (11th Cir. 2011); *see also In re Williams Sec. litigation-WCG Subclass*, 558 F.3d 1130, 1140 (10th Cir. 2009) (same).

**September 7, 2017**: The Amended Complaint alleges that several articles on this date published information about SCANA's knowledge of the Nuclear Project's viability. But SCANA's July 31 abandonment announcement plainly conveyed to the public that the project was not viable and that the Owners would not complete it. *See supra* Argument § II.B. The Amended Complaint also alleges that articles on this date reported that SCANA knew Westinghouse would likely file for bankruptcy. Yet the market already learned in March 2017 that Westinghouse actually *did* file for bankruptcy. (Am. Compl. ¶ 245.) Indeed, "[t]he market was well aware" of "the financial issues with Westinghouse and Toshiba" even before "SCANA announced it will abandon the Nuclear Project." (Ex. 8 ¶¶ 74–75.) These alleged statements were not curative because they "did not reveal any new *hidden* information to the public." *Medtronic*, 325 F.R.D. at 295 (emphasis added).

**August 10, 2017**: The Amended Complaint alleges that Defendant Marsh made some statements about the project's cost overruns and production delays, and that lawmakers threatened SCANA to stop charging customers for the project. Neither of these events corrected any prior SCANA statements or revealed new information. SCANA's July 31 abandonment announcement highlighted that the Owners would not finish the project, and the lawmakers' response amounts to little more than a "distant," "idiosyncratic reaction[]" that SCANA need not predict. *In re Omnicom Grp., Inc. Sec. Litig.*, 597 F.3d at 514. These statements were not curative because they "did not reveal any new *hidden* information to the public." *Medtronic*, 325 F.R.D. at 295 (emphasis added). (*See also* Ex. 8 ¶¶ 77.)

**August 9, 2017**: The Amended Complaint alleges that a South Carolina agency moved to dismiss SCANA's abandonment petition. The agency's announcement neither corrected a prior SCANA statement nor revealed information that SCANA hid from the public. Indeed, "[t]he ORS motion to dismiss is an action taken by a third party based on publicly available information, and did not reveal any new information to the market that corrected a prior misrepresentation." (Ex. 8 ¶ 79.) It was, therefore, not curative because it "did not provide any new information to the market or investors." *In re Am. Italian Pasta Co. Sec. Litig.*, 2007 WL 927745, at *4.

**August 4, 2017**: The Amended Complaint alleges that the South Carolina Attorney General announced an investigation into SCANA. But the "announcement of internal or regulatory investigations into misconduct [] have been held insufficient, on their own, to serve as corrective disclosures." *In re BofI Holding, Inc. Sec. Litig.*, 302 F. Supp. 3d at 1139 (citing cases); (*see also* Ex. 8 ¶¶ 81–82.)

**August 2, 2017**: The Amended Complaint alleges that several lawmakers made public statements on this date in response to SCANA's abandonment announcement. These statements

31

cannot be curative because they did not correct prior statements by SCANA or reveal information that SCANA hid from public review. All the statements revealed were the *lawmakers' opinions* on events that the public already knew about. (*See also* Ex. 8 ¶¶ 84–85.)

As a matter of law, the class period cannot extend past July 31, 2017. While courts have been unable to shorten proposed class periods when there were factual questions over the effect of the alleged corrective events, those cases are readily distinguishable. In *City of Ann Arbor Employees' Ret. Sys. v. Sonoco Prod. Co.*, 270 F.R.D. 247, 257 (D.S.C. 2010), the plaintiffs claimed that the class should extend to September 18, 2007, because the defendant released negative financial information on that date that contradicted the defendant's prior statements. *Id*. While the defendant told the public of certain price concessions on July 18, it also announced on that date "that it would maintain its previously established" financial projections for the year. *Id*. But on September 18, "Sonoco *lowered its base earnings guidance* for the third quarter of 2007 and for the full year of 2007," which directly contradicted its prior statement on July 18. *Id*. at 257–58 (emphasis added). Unlike in *Sonoco*, nothing after the July 31 abandonment announcement *contradicted* the market's knowledge that, as of July 31, 2017, SCANA would not complete the Nuclear Project and may not recover costs under the BLRA. *See supra* at 22–24.

*KBC Asset Mgmt. NV v. 3D Sys. Corp.*, 2017 WL 4297450 (D.S.C. Sept. 28, 2017), is also distinguishable because the defendants revealed new information after their proposed class period end date that contradicted their prior statements to the market. For example, on April 24, the defendants stated that they "did not 'expect to report organic growth for the quarter' but that they *had not 'given up'* on reporting organic growth for the year." *Id*. at *8 (emphasis added). Yet on May 6, the defendants' disclosure stated that "organic revenue growth had *declined* by seven percent," and the defendants "*withdrew the previously issued annual guidance* for 2015 in the May

6, 2015, disclosure." *Id*. (emphasis added).  Unlike the defendants in *3D Systems*, SCANA did not withdraw prior statements or reveal new contradictory information after the July 31 abandonment announcement.  The market was well aware as of July 31 that cost recovery under the BLRA was at risk.  Even subsequent information that makes the risk more likely cannot extend the putative class period because "the materialization of a risk can only be evidence of the price impact of an earlier false statement concealing the risk if the risk wa*s not disclosed* at some point between the statement and the materialization."  *Grae*, 330 F.R.D. at 496 (emphasis added).

### E.    Any class period extending beyond July 31, 2017, would be plagued by intra-class conflicts of interest.

The Court also should not extend the putative class period beyond July 31 because that would create fundamental intra-class conflicts of interest that Plaintiffs have not recognized, let alone proposed to remedy.  Class certification makes the named plaintiffs "fiduciaries" for absent class members, *Redman v. RadioShack Corp.*, 768 F.3d 622, 638 (7th Cir. 2014), and Rule 23(a)(4) thus requires the representatives to "fairly and adequately protect the interests of the class."  Plaintiffs have not met their burden of showing how they can fairly and adequately protect a class riven by conflicts of interest.  *See Berger v. Compaq Computer Corp.*, 257 F.3d 475, 480-81 (5th Cir. 2001) (reversing certification where the district court did not require proof of adequacy).

The conflict arises from the existence of "two distinct sets of misrepresentations alleged by Plaintiffs."  (Ex. 8 ¶ 92.)  The first set of alleged misrepresentations relate to the completion and viability of the Nuclear Project.  (*See id*. ¶ 93); *see also supra* Argument § II.B.  The second set pertains to SCANA's ability to recover costs under the BLRA based on its prudency and transparency with respect to the Nuclear Project.  (Ex. 8 ¶ 94); *see also supra* Argument § II.B.  Those distinct sets of alleged misrepresentations create a conflict between putative class members

33

who purchased before and after July 31, and Plaintiffs' cursory assumption that classwide damages can be easily calculated offers no way to cure that conflict.

If the Court certifies a class beyond July 31, 2017, then the two sets of misrepresentations will create irreconcilable intra-class conflicts. For an investor who sold shares on August 1, 2017, that investor will calculate its harm by taking the inflation at purchase and subtracting the inflation at sale. (Ex. 8 ¶ 95.) The investor wants to maximize the difference between the inflation at purchase and the inflation at sale to increase any damages award. So that investor would argue that "inflation at sale is zero" because "all inflation was removed from the stock price" after the abandonment of the project. (*Id*.) But investors who purchased SCANA stock *after* August 1, 2017, have the "exact opposite incentive." (*Id*.) Those investors would argue that "the stock price after abandonment became more inflated" because of misrepresentations about prudency and transparency. (*Id*.) Those investors must make that argument because if inflation were zero in August 2017, then purchasers in or after August 2017 had no economic harm.

Courts recognize that intra-class conflicts can easily arise when the putative class members purchased stocks at different times. In *Ravens v. Iftikar,* 174 F.R.D. 651 (N.D. Cal. 1997), the court explained that a purchaser "maximizes recovery by maximizing the price inflation at the time of the purchase *and minimizing it at the time of sale*." *Id.* at 672 (emphasis added). By minimizing inflation at the time of sale, the plaintiff tries to recoup the largest damages award possible. *Id*. A plaintiff will have "an incentive *to overstate the inflation* caused by [a] fraudulent statement immediately preceding their stock purchases and to magnify the effect of any subsequent corrective disclosures." *Id*. (emphasis added). But that incentive does not apply to *all* class members. "[A]nother class member purchasing at or after a subsequent corrective statement has an incentive *to downplay [the] importance*" of the prior corrective disclosure to preserve their

ability to recover damages. *Id.* (emphasis added). Thus, courts refuse certification if the proposed class definition would create "a structural incentive to favor one group over the other." *Strigliabotti v. Franklin Res., Inc.*, 2006 WL 2792417, at *4 (N.D. Cal. Sept. 27, 2006). To avoid that structural problem, the putative class period must end by July 31, 2017. Otherwise, the putative class will be plagued with incompatible incentives that will deeply disrupt the litigation.

**CONCLUSION**

The Court should deny Plaintiffs' Motion for Class Certification because their unique trading strategies and knowledge of the alleged fraud make them atypical class representatives who would yoke the class as a whole to their idiosyncratic deficiencies. In the alternative, the Court should end the putative class period on July 31, 2017, because the alleged misrepresentations had been corrected by then, and because any later class period would create deeply problematic conflicts of interest. At a minimum, the putative class period should end by September 27, 2017, when the market had additional confirmation of any remaining undisclosed risk to investor.

Dated: September 25, 2019                    Respectfully submitted,

                                             *s/ Steven J. Pugh*
                                             Steven J. Pugh (Fed. ID No. 7033)
                                             Benjamin P. Carlton (Fed. ID No. 11797)
                                             RICHARDSON PLOWDEN & ROBINSON, PA
                                             1900 Barnwell Street (29201)
                                             Post Office Drawer 7788
                                             Columbia, South Carolina 29202
                                             (803) 771-4400
                                             spugh@richardsonplowden.com
                                             bcarlton@richardsonplowden.com

_s/ William A. Coates_

William A. Coates, Federal ID: 183
ROE CASSIDY COATES & PRICE P.A.
1052 North Church Street
Post Office Box 10529
Greenville, SC 29603
Tel: 864-349-2600
Fax: 864-349-0303
wac@roecassidy.com

and

Anne M. Tompkins (admitted _pro hac vice_)
Jonathan M. Watkins (admitted _pro hac vice_)
Aaron C. Lang (admitted _pro hac vice_)
CADWALADER, WICKERSHAM & TAFT LLP
282 West Trade Street
Charlotte, NC 28202
Telephone: (704) 348 1400
Facsimile: (704) 348 5200
anne.tompkins@cwt.com
jonathan.watkins@cwt.com
aaron.lang@cwt.com

_Counsel for Defendant Kevin B. Marsh_

and

I.S. Leevy Johnson (Fed. ID No. 2194)
George Craig Johnson (Fed. ID No. 6538)
JOHNSON TOAL & BATTISTE, PA
Post Office Box 1431
Columbia, South Carolina 29202
(803) 252-9700
islj@jtbpa.com
george@jtbpa.com

and

Brian E. Pumphrey (admitted pro hac vice)
Brian D. Schmalzbach (admitted pro hac vice)
MCGUIREWOODS LLP
800 East Canal Street
Richmond, Virginia 23219
(804) 775-7745
bpumphrey@mcguirewoods.com
bschmalzbach@mcguirewoods.com

_Counsel for Defendants SCANA Corporation, Harold C. Stowe, D. Maybank Hagood, and James W. Roquemore_

*s/ James M. Griffin*
James M. Griffin
Margaret Nicole Fox
GRIFFIN DAVIS LAW
4408 Forest Drive, Suite 300
PO Box 999
Columbia, SC 29202
Tel: (803) 744-0800
jgriffin@griffindavislaw.com
mfox@griffindavislaw.com

and

Matthew T. Martens (*pro hac vice*)
Benjamin W. Chapin (*pro hac vice*)
WILMER CUTLER PICKERING
    HALE AND DORR LLP
1875 Pennsylvania Ave., NW
Washington, DC 20006
Tel: 202-663-6000
matthew.martens@wilmerhale.com
benjamin.chapin@wilmerhale.com

and

Timothy J. Perla (*pro hac vice*)
WILMER CUTLER PICKERING
    HALE AND DORR LLP
60 State Street
Boston, MA 02109
Tel: 617-526-6000
timothy.perla@wilmerhale.com

and

James F. Wyatt, III (*pro hac vice*)
Robert A. Blake, Jr. (*pro hac vice*)
WYATT & BLAKE, LLP
435 East Morehead Street
Charlotte, NC 28202
Tel: 704-331-0767
jwyatt@wyattlaw.net
rblake@wyattlaw.net

*Counsel for Defendant Stephen A. Byrne*

*s/ William A. Coates*
William A. Coates
ROE CASSIDY COATES & PRICE, P.A.
1052 North Church Street (29601)
P.O. Box 10529
Greenville, South Carolina 29603
Tel: (864) 349-2600
Fax: (864) 349-0303
wac@roecassidy.com

and

John A. Jordak, Jr.
john.jordak@alston.com
Meredith J. Kingsley
meredith.kingsley@alston.com
ALSTON & BIRD
1201 West Peachtree Street
Atlanta, GA  30309-3424
Tel:  404-881-7000
Fax:  404-881-7777

*Counsel for Defendant Jimmy Addison*

## **CERTIFICATE OF SERVICE**

I certify that on this 25th day of September, 2019, I caused a true and correct version of the foregoing document to be filed with the Clerk of the Court using the CM/ECF system, which will automatically send a notification of such filing to all counsel of record.

*s/ Steven J. Pugh*
Steven J. Pugh (Fed. ID No. 7033)
RICHARDSON PLOWDEN & ROBINSON, PA
1900 Barnwell Street (29201)
Post Office Drawer 7788
Columbia, South Carolina 29202
(803) 771-4400
spugh@richardsonplowden.com