### UNITED STATES DISTRICT COURT
### DISTRICT OF SOUTH CAROLINA
### (COLUMBIA DIVISION)

| | |
|---|---|
| *In re SCANA Corporation Securities Litigation* | Civil Action No. 3:17-CV-2616-MBS |

### MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF LEAD PLAINTIFFS' MOTION FOR FINAL APPROVAL OF <u>CLASS ACTION SETTLEMENT AND PLAN OF ALLOCATION</u>

Marlon E. Kimpson (D.S.C. Bar No. 7487)
William S. Norton (D.S.C. Bar No. 11343)
Joshua C. Littlejohn (D.S.C. Bar No. 10426)
**MOTLEY RICE LLC**
28 Bridgeside Blvd.
Mt. Pleasant, South Carolina 29464
Telephone: (843) 216-9000
Facsimile: (843) 216-9450

*Liaison Counsel for Lead Plaintiffs West Virginia IMB and Blue Sky*

James W. Johnson *(admitted pro hac vice)*
Michael H. Rogers *(admitted pro hac vice)*
Irina Vasilchenko *(admitted pro hac vice)*
James Christie *(admitted pro hac vice)*
Philip J. Leggio *(admitted pro hac vice)*
**LABATON SUCHAROW LLP**
140 Broadway
New York, New York 10005
Telephone: (212) 907-0700
Facsimile: (212) 818-0477

John C. Browne *(admitted pro hac vice)*
Jeroen Van Kwawegen *(admitted pro hac vice)*
Lauren Ormsbee *(admitted pro hac vice)*
Michael M. Mathai *(admitted pro hac vice)*
Kate W. Aufses *(admitted pro hac vice)*
**BERNSTEIN LITOWITZ BERGER & GROSSMANN LLP**
1251 Avenue of the Americas
New York, New York 10020
Telephone: (212) 554-1400
Facsimile: (212) 554-1444

*Co-Lead Counsel for Lead Plaintiffs West Virginia IMB and Blue Sky and Proposed Lead Counsel for the Class*

# **TABLE OF CONTENTS**

PRELIMINARY STATEMENT ....................................................................................................1

ARGUMENT ..............................................................................................................................4

I. THE PROPOSED SETTLEMENT WARRANTS FINAL APPROVAL ..........................4

 A. Lead Plaintiffs and Lead Counsel Have Adequately Represented the
  Settlement Class................................................................................................6

 B. The Settlement Was Reached Following Substantial Discovery and
  Arm's-Length Negotiations with an Experienced Mediator....................................8

 C. The Relief that the Settlement Provides for the Settlement Class is
  Adequate In Light of the Costs and Risks of Further Litigation...........................10

  1. The Risks of Establishing Liability and Damages Support
   Approval of the Settlement .........................................................................11

  2. The Settlement Represents a Substantial Percentage of Maximum
   Recoverable Damages................................................................................17

  3. The Costs and Delays of Continued Litigation Support Approval of
   the Settlement............................................................................................18

  4. All Other Factors Set Forth in Rule 23(e)(2)(C)  Support Approval
   of the Settlement .......................................................................................19

 D. The Settlement Treats Settlement Class Members Equitably Relative to
  Each Other .....................................................................................................21

 E. Reaction of the Settlement Class to the Settlement ...............................................21

II. THE PLAN OF ALLOCATION IS FAIR AND REASONABLE...................................21

III. THE SETTLEMENT CLASS SHOULD BE CERTIFIED...............................................23

IV. NOTICE SATISFIED RULE 23 AND DUE PROCESS .................................................24

CONCLUSION...........................................................................................................................25

# TABLE OF AUTHORITIES

CASES                                                                          Page(s)

*In re Bear Stearns Cos., Sec. Derivative & ERISA Litig.*,
   909 F. Supp. 2d 259 (S.D.N.Y. 2012).....................................................................10

*In re Biolase, Inc. Sec. Litig.*,
   No. 13-1300, 2015 WL 12720318 (C.D. Cal. Oct. 13, 2015)...................................17

*In re Checking Account Overdraft Litig.*,
   830 F. Supp. 2d 1330 (S.D. Fla. 2011) ...................................................................17

*Dura Pharms., Inc. v. Broudo*,
   544 U.S. 336 (2005).................................................................................................15

*Hefler v. Wells Fargo & Co.*,
   No. 16-05479, 2018 WL 6619983 (N.D. Cal. Dec. 18, 2018).................................21

*In re LandAmerica §1031 Exch. Servs., Inc. IRS §1031 Tax Deferred Exch. Litig.*,
   No. 2054, 2012 WL 13124593 (D.S.C. July 12, 2012) ...........................................5

*In re Jiffy Lube Sec. Litig.*,
   927 F.2d 155 (4th Cir. 1991) .................................................................................5, 9

*Kirven v. Cent. States Health & Life Co. of Omaha*,
   No. CA 3:11-2149-MBS, 2015 WL 1314086 (D.S.C. Mar. 23, 2015).......................... *passim*

*In re MicroStrategy, Inc. Sec. Litig.*,
   148 F. Supp. 2d 654 (E.D. Va. 2001) ...............................................................18, 22

*In re NeuStar Inc. Sec. Litig.*,
   No. 14CV885, 2015 WL 5674798 (E.D. Va. Sept. 23, 2015) .................................7

*Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*,
   135 S. Ct. 1318 (2015).............................................................................................12

*In re Polaroid ERISA Litig.*,
   240 F.R.D. 65 (S.D.N.Y. 2006) ................................................................................7

*Reed v. Big Water Resort, LLC*,
   No. 2:14-cv-01583-DCN, 2016 WL 374816 (D.S.C. Feb. 1, 2016)........................4

*Ret. Sys. v. Sonoco Prods. Co.*,
   270 F.R.D. 247 (D.S.C. 2010) ..................................................................................6

*S.C. Nat'l Bank v. Stone*,
   749 F. Supp. 1419 (D.S.C. 1990).............................................................................5

*Temp. Servs., Inc. v. Am. Int'l Grp., Inc.*,
No. 3:08-cv-00271-JFA, 2012 WL 4061537 (D.S.C. Sept. 14, 2012) ...................................10

*In re The Mills Corp. Sec. Litig.*,
265 F.R.D. 246 (E.D. Va. 2009) ..............................................................................7, 9, 18, 22

*Thorpe v. Walter Inv. Mgmt. Corp.*,
No. 1:14-cv-20880-UU, 2016 WL 10518902 (S.D. Fla. Oct. 17, 2016) ...............................17

*Wal-Mart Stores, Inc. v. Visa U.S.A.*,
396 F.3d 96 (2d Cir. 2005)....................................................................................................24

## Statutes & Rules

15 U.S.C. § 78u-4(a)(7) ...............................................................................................................24

15 U.S.C. § 78u-4(e) ...................................................................................................................23

Fed. R. Civ. P. 23(c)(2)(B) ...................................................................................................24, 25

Fed. R. Civ. P. 23(e) ...............................................................................................................4, 5

Fed. R. Civ. P. 23(e)(2)(A) .........................................................................................................6

Fed. R. Civ. P. 23(e)(2)(B) .........................................................................................................8

Fed. R. Civ. P. 23(e)(2)(C) ...........................................................................................10, 19, 20

Pursuant to Rule 23(e) of the Federal Rules of Civil Procedure, Lead Plaintiffs West Virginia Investment Management Board ("West Virginia IMB") and Stichting Blue Sky Global Equity Active Low Volatility Fund and Stichting Blue Sky Active Large Cap Equity USA Fund ("Blue Sky") (collectively, "Lead Plaintiffs"), on behalf of themselves and the proposed Settlement Class, respectfully submit this memorandum of law in support of their motion for final approval of: (i) the proposed settlement reached with Defendants in the Action (the "Settlement"), and (ii) the proposed plan of allocation of the proceeds of the Settlement (the "Plan of Allocation" or "Plan").[1]

## PRELIMINARY STATEMENT

Subject to Court approval, Lead Plaintiffs have agreed to settle all claims in the Action, and related claims, in exchange for a payment of $192,500,000—with $160,000,000 paid in cash and $32,500,000 paid in freely-tradable Dominion Energy, Inc. ("Dominion Energy")[2] common stock, or cash at the option of SCANA. Lead Plaintiffs respectfully submit that the proposed Settlement is an excellent result for the Settlement Class and easily satisfies the standards for final approval under Rule 23(e)(2) of the Federal Rules of Civil Procedure.

The proposed Settlement ranks as the largest securities class action recovery ever obtained in the District of South Carolina, the fifth largest securities class action recovery in the

---

[1] Unless otherwise defined herein, all capitalized terms have the meanings set forth in the Stipulation and Agreement of Settlement, dated December 20, 2019, previously filed with the Court (ECF No. 214-2) (the "Stipulation") or in the Joint Declaration of John C. Browne and James W. Johnson in Support of (I) Lead Plaintiffs' Motion for Final Approval of Class Action Settlement and Plan of Allocation; and (II) Lead Counsel's Motion for an Award of Attorneys' Fees and Payment of Litigation Expenses (the "Joint Declaration"), filed herewith. Citations to "¶ __" refer to paragraphs in the Joint Declaration and citations to "Ex. __" refer to exhibits to the Joint Declaration.

[2] Dominion Energy merged with Defendant SCANA Corporation ("SCANA" or the "Company") effective January 2, 2019, upon which SCANA common stock was converted into Dominion Energy common stock.

history of the Fourth Circuit, and among the top 100 securities class action recoveries nationwide. Moreover, as detailed in the accompanying Joint Declaration[3] and as set forth herein, the Settlement represents a very favorable recovery for the Settlement Class given the risks attendant to the continued prosecution of the Action.

At the time the agreement to settle was reached, Lead Plaintiffs and Lead Counsel had a well-developed understanding of the strengths and weaknesses of the Action. Before the Settlement was agreed to, Lead Counsel had: (i) conducted an extensive investigation into the alleged fraud, which included a thorough review of the voluminous public record and documents obtained pursuant to the South Carolina Freedom of Information Act ("FOIA"), as well as interviews with 69 former employees of SCANA, its lead contractors on the Nuclear Project, and others with relevant knowledge; (ii) drafted and filed a detailed, 183-page amended complaint based on Lead Counsel's investigation; (iii) engaged in extensive briefing and conducted oral argument before the Court in successfully defeating the bulk of Defendants' motions to dismiss the amended complaint; (iv) engaged in substantial informal and formal discovery, which included obtaining and reviewing voluminous additional documents pursuant to FOIA and other informal requests, and, in connection with formal discovery, obtaining and reviewing 565,507 documents (totaling 5,215,238 pages) produced by Defendants; (v) moved for class certification, which included preparation of an expert report from Lead Plaintiffs' economic expert, defending the depositions of each of the Lead Plaintiffs, Lead Plaintiffs' economic expert, and cross-examining representatives from each of the Lead Plaintiffs' four relevant non-party investment

---

[3] The Joint Declaration is an integral part of this submission and, for the sake of brevity in this memorandum, the Court is respectfully referred to it for a detailed description of, *inter alia*: the nature of the claims asserted (¶¶ 15-19); the history of the Action (¶¶ 20-72); the negotiations leading to the Settlement (¶¶ 73-77); the risks and uncertainties of continued litigation (¶¶ 78-105); and the terms of the proposed Plan of Allocation (¶¶ 112-119).

managers; and (vi) engaged in extensive arm's-length settlement negotiations, including two formal mediation sessions before retired United States District Court Judge Layn R. Phillips. ¶¶ 8-9; 20-33; 42-77.

While Lead Plaintiffs and Lead Counsel continue to believe that the claims asserted against Defendants are meritorious, they recognize that the Action presented a number of substantial risks to establishing the liability of Defendants, including challenges in establishing the falsity of Defendants' statements and whether they were made with intent to deceive investors and commit securities fraud. Defendants would have argued that the public was well aware that the Nuclear Project was an extremely risky endeavor and there were no guarantees it would be successful. Defendants would have also pointed to numerous risk disclosures regarding the uncertainty of the Nuclear Project and completion deadlines, and would have argued that they justifiably relied on purported assurances by Westinghouse—the lead contractor on the project and one of the largest construction conglomerates in the world—that the Nuclear Project would be completed on time.

Even if Lead Plaintiffs established liability, they would have faced significant hurdles in proving loss causation and damages with respect to at least some of the alleged corrective disclosures. Defendants argued that the Court should end the Class Period on July 31, 2017, when Defendants announced their abandonment of the Nuclear Project—nearly five months before the end of the alleged Class Period—because by that date (if not earlier), the risks related to the completion of the Nuclear Project were fully disclosed. Defendants also argued, in the alternative, that the Class Period should end no later than September 27, 2017, when the market learned of the existence of Bechtel's original report and its adverse findings, thereby eliminating numerous other subsequent corrective disclosures. If Defendants prevailed on their loss

causation arguments, recoverable damages would have declined substantially or been eliminated altogether. Indeed, if the Class Period concluded on July 31, 2017 and earlier corrective disclosures contested by Defendants were also dismissed, maximum recoverable damages could have been as low as $200 million. Given those risks, a recovery of $192.5 million represents a significant recovery for the Settlement Class, and avoids the risks and delays associated with pursuing the Action through class certification, summary judgment, trial, and appeals, a process that could take several years.

In light of these considerations, Lead Plaintiffs and Lead Counsel respectfully submit that the Settlement is fair, reasonable, and adequate and warrants final approval by the Court. Additionally, Lead Plaintiffs request that the Court approve the Plan of Allocation, which was set forth in the Notice mailed to potential Settlement Class Members. The Plan of Allocation, which was developed by Lead Plaintiffs' damages expert in consultation with Lead Counsel, provides a reasonable method for allocating the Net Settlement Fund among Settlement Class Members who submit valid claims based on damages they suffered that were attributable to the alleged fraud.

## ARGUMENT

### I. THE PROPOSED SETTLEMENT WARRANTS FINAL APPROVAL

Federal Rule of Civil Procedure 23(e) requires judicial approval for any compromise or settlement of class action claims. *See* Fed. R. Civ. P. 23(e). A class action settlement should be approved if the court finds it "fair, reasonable, and adequate." Fed. R. Civ. P. 23(e)(2).

In determining whether to approve the Settlement, the Court should be guided by the principle that "[t]here is a strong judicial policy in favor of settlements, particularly in the class action context." *Reed v. Big Water Resort, LLC*, No. 2:14-cv-01583-DCN, 2016 WL 374816, at *3 (D.S.C. Feb. 1, 2016) (citation omitted). "'The voluntary resolution of litigation through

settlement is strongly favored by the courts' and is 'particularly appropriate' in class actions." *In re LandAmerica §1031 Exch. Servs., Inc. IRS §1031 Tax Deferred Exch. Litig.*, MDL No. 2054, 2012 WL 13124593, at *4 (D.S.C. July 12, 2012) (*quoting S.C. Nat'l Bank v. Stone*, 749 F. Supp. 1419, 1423 (D.S.C. 1990)).

Rule 23(e)(2), as amended on December 1, 2018, provides that the Court should determine whether a proposed settlement is "fair, reasonable, and adequate" after considering whether:

> (A) the class representatives and class counsel have adequately represented the class; (B) the proposal was negotiated at arm's length; (C) the relief provided for the class is adequate, taking into account: (i) the costs, risks, and delay of trial and appeal; (ii) the effectiveness of any proposed method of distributing relief to the class, including the method of processing class-member claims; (iii) the terms of any proposed award of attorney's fees, including timing of payment; and (iv) any agreement required to be identified under Rule 23(e)(3); and (D) the proposal treats class members equitably relative to each other.

Fed. R. Civ. P. 23(e)(2). District courts should also consider the following Fourth Circuit approval factors when evaluating a proposed settlement:

> (1) the extent of discovery that has taken place and the stage of the proceedings; (2) bad faith or collusion and circumstances surrounding the negotiation; (3) the experience of counsel; (4) objections from class members; (5) the relative strength of the plaintiffs' case on the merits; (6) the existence of any difficulties of proof or strong defenses the plaintiffs are likely to encounter if the case goes to trial; (7) the anticipated duration and expense of additional litigation; and (8) the solvency of the defendants and the likelihood of recovery on a litigated judgment.

*Kirven v. Cent. States Health & Life Co. of Omaha*, No. CA 3:11-2149-MBS, 2015 WL 1314086, at *4 (D.S.C. Mar. 23, 2015) (Seymour, J.) ("*Kirven II*").[4]

---

[4] *See also In re Jiffy Lube Sec. Litig.,* 927 F.2d 155, 159 (4th Cir. 1991) (identifying four factors for determining a settlement's fairness: "(1) the posture of the case at the time settlement was proposed; (2) the extent of discovery that had been conducted; (3) the circumstances surrounding the negotiations; and (4) the experience of counsel in the area of [the] class action litigation," and five factors for assessing its adequacy: "(1) the relative strength of the plaintiffs' case on the merits; (2) the existence of any difficulties of proof or strong defenses the plaintiffs are likely to

The Advisory Committee Notes to the 2018 amendments to the Federal Rules of Civil Procedure indicate that the factors set forth in Rule 23(e)(2) are not intended to "displace" any factor previously adopted by the Court of Appeals, but "rather to focus the court and the lawyers on the core concerns of procedure and substance that should guide the decision whether to approve the proposal." Advisory Committee Notes to 2018 Amendments. Accordingly, Lead Plaintiffs will discuss the fairness, reasonableness, and adequacy of the Settlement principally in relation to the four factors set forth in Rule 23(e)(2), but will also discuss the application of relevant, non-duplicative factors traditionally considered by the Fourth Circuit.

All of the applicable factors strongly support approval of the Settlement.

**A.     Lead Plaintiffs and Lead Counsel Have Adequately Represented the Settlement Class**

In determining whether to approve a class action settlement, the Court should consider whether "the class representatives and class counsel have adequately represented the class." Fed. R. Civ. P. 23(e)(2)(A). Courts consider whether: (1) the proposed class representative's interests are to vigorously pursue the claims of the class and are not antagonistic to the interests of other class members; and (2) the proposed class counsel are qualified, experienced, and able to conduct the litigation. *See City of Ann Arbor Emps.' Ret. Sys. v. Sonoco Prods. Co.*, 270 F.R.D. 247, 252 (D.S.C. 2010); *see also Kirven II*, 2015 WL 1314086, at *5 ("The inquiry into the adequacy of legal counsel focuses on whether counsel is competent, dedicated, qualified, and experienced enough to conduct the litigation and whether there is an assurance of vigorous prosecution.") (citation omitted).

---

encounter if the case goes to trial; (3) the anticipated duration and expense of additional litigation; (4) the solvency of the defendant[ ] and the likelihood of recovery on a litigated judgment; and (5) the degree of opposition to the settlement").

Here, Lead Plaintiffs and Lead Counsel have adequately represented the Settlement Class in both their prosecution of the Action and in the negotiation and achievement of the Settlement. Lead Plaintiffs' claims are typical of and coextensive with those of other Settlement Class Members, and they lack any interests that are antagonistic to the interest of other members of the Settlement Class. Therefore, Lead Plaintiffs—like all other Settlement Class Members—have an interest in obtaining the largest possible recovery from Defendants. *See In re Polaroid ERISA Litig.*, 240 F.R.D. 65, 77 (S.D.N.Y. 2006) ("Where plaintiffs and class members share the common goal of maximizing recovery, there is no conflict of interest between the class representatives and other class members.") (citation omitted). The institutional investor Lead Plaintiffs have also diligently supervised and participated in the litigation on behalf of the Settlement Class. *See* Declaration of Harmen Nieuwenhuis on Behalf of Blue Sky ¶¶ 4-6, Ex. 1; Declaration of Craig Slaughter on Behalf of West Virginia IMB, ¶¶ 4-6, Ex. 2.

Moreover, Lead Plaintiffs have retained counsel who are highly experienced in securities litigation and have successfully prosecuted many complex class actions throughout the United States. *See* BLB&G and Labaton Firm Resumes, Ex. 5-C and 6-C, respectively.[5] Lead Counsel have vigorously pursued the claims on behalf of SCANA investors and aggressively negotiated an outstanding recovery for the Settlement Class through mediation.

Accordingly, Lead Plaintiffs and Lead Counsel have adequately represented the Settlement Class.

---

[5] *See also In re The Mills Corp. Sec. Litig.,* 265 F.R.D. 246, 256 (E.D. Va. 2009)) ("[W]hen Class Counsel [including Bernstein Litowitz] are nationally recognized members of the securities litigation bar, it is entirely warranted for this Court to pay heed to their judgment in approving, negotiating, and entering into a putative settlement."); *In re NeuStar Inc. Sec. Litig.,* No. 14CV885, 2015 WL 5674798, at *11 (E.D. Va. Sept. 23, 2015) ("Counsel in this case [including Labaton Sucharow] are affiliated with national law firms recognized for their experience in securities litigation and class representation.").

**B.     The Settlement Was Reached Following Substantial Discovery and Arm's-Length Negotiations with an Experienced Mediator**

In weighing approval of a class action settlement, the Court must consider whether the settlement "was negotiated at arm's length."  Fed. R. Civ. P. 23(e)(2)(B).  Courts in the Fourth Circuit have traditionally considered the following related circumstances in determining the "procedural" fairness of a settlement: (1) the extent of discovery that has taken place and the stage of the proceedings; and (2) bad faith or collusion and circumstances surrounding the negotiation.[6]  An analysis of these factors strongly supports approval of the Settlement here.

At the time the Parties reached the Settlement, the knowledge of Lead Plaintiffs and Lead Counsel, and the proceedings themselves, had reached a stage where the Parties could make a well-founded evaluation of the claims and propriety of settlement.  As discussed above and in the Joint Declaration, Lead Counsel conducted a detailed, substantive investigation by, among other things, reviewing the voluminous public record (including relevant SEC filings, analyst reports, news articles, and transcripts of investor calls), as well as: documents obtained from a South Carolina regulatory agency, the Office of Regulatory Staff ("ORS"), Santee Cooper, SCANA's state-owned junior partner on the Nuclear Project, and a South Carolina newspaper, among others, pursuant to FOIA or other informal requests, and interviews with 69 former employees of SCANA, its lead contractors on the Nuclear Project, and others with relevant knowledge.  ¶¶ 23-24.  Pursuant to their informal discovery efforts, Lead Plaintiffs obtained and reviewed over 1.8 million pages of documents, as well as numerous deposition and hearing transcripts from other proceedings against SCANA, before the Settlement was reached.  ¶ 124.  Further, before the Settlement, Lead Plaintiffs obtained and had begun reviewing over 5.2 million pages of documents produced by Defendants in formal discovery.  *Id.*  Lead Counsel also performed

---

[6] *Kirven II*, 2015 WL 1314086, at *5 (first and second factors).

extensive legal research in preparing the Complaint, the briefing in opposition to Defendants' motions to dismiss the Complaint, and Lead Plaintiffs' motion for class certification.  ¶¶ 23; 31-33; 68.  The class certification motion also involved the preparation of an expert report from Lead Plaintiffs' economic expert, defending the depositions of each of the Lead Plaintiffs and Lead Plaintiffs' economic expert, and cross-examining representatives from each of the Lead Plaintiffs' four relevant non-party investment managers.  ¶¶ 68-70.  Thus, the advanced stage of the proceedings and the substantial amount of discovery conducted in the Action supports approval of the Settlement.  *See Kirven II*, 2015 WL 1314086, at *5 (granting final approval where "discovery was adequate to develop the record and ascertain the merits of the case"); *see also Mills,* 265 F.R.D. at 254 ("in cases in which discovery has been substantial and several briefs have been filed and argued, courts should be inclined to favor the legitimacy of a settlement") (citation omitted).

Moreover, the Parties reached the Settlement only after protracted, arm's-length negotiations between experienced and informed counsel and with the assistance of Judge Phillips, an experienced mediator of securities class actions and other complex litigation.  ¶¶ 73-75; *see also* Declaration of Layn R. Phillips, dated April 19, 2020, submitted herewith as Ex. 4.  The mediation process included the exchange of two rounds of detailed mediation statements on liability and damages, and two separate full-day mediation sessions under the auspices of Judge Phillips.  *Id*.  At the end of the second mediation session, the Parties reached an agreement in principle to settle the Action for $192.5 million, with $160 million paid in cash and $32.5 million paid in freely-tradable Dominion Energy common stock (or cash at the option of SCANA). These facts clearly support a finding that the Settlement is fair and devoid of bad faith or collusion.  *See In re Jiffy Lube Sec. Litig.*, 927 F.2d 155, 159 (4th Cir. 1991) (a court should

consider if a settlement "was reached as a result of good-faith bargaining at arm's length, without collusion"); *Temp. Servs., Inc. v. Am. Int'l Grp., Inc.*, No. 3:08-cv-00271-JFA, 2012 WL 4061537, at *12 (D.S.C. Sept. 14, 2012) ("supervision by a mediator lends an air of fairness to agreements that are ultimately reached") (citation omitted); *In re Bear Stearns Cos., Sec. Derivative & ERISA Litig.*, 909 F. Supp. 2d 259, 265 (S.D.N.Y. 2012) (finding a settlement fair where the parties engaged in "arm's length negotiations," including mediation before "retired federal judge Layn R. Phillips, an experienced and well-regarded mediator of complex securities cases").

### C.    The Relief that the Settlement Provides for the Settlement Class is Adequate In Light of the Costs and Risks of Further Litigation

In determining whether a settlement is "fair, reasonable, and adequate," the Court must consider whether "the relief provided for the class is adequate, taking into account . . . the costs, risks, and delay of trial and appeal" as well as other relevant factors.  Fed. R. Civ. P. 23(e)(2)(C). This factor under Rule 23(e)(2)(C) encompasses four of the factors traditionally considered by the Fourth Circuit when evaluating a proposed class action settlement: (1) the relative strength of the plaintiffs' case on the merits; (2) the existence of any difficulties of proof or strong defenses the plaintiffs are likely to encounter if the case goes to trial; and (3) the anticipated duration and expense of additional litigation.[7]  Each of these factors supports approval of the Settlement under Rule 23(e)(2)(C).

As discussed in detail in the Joint Declaration and below, continued litigation of the Action presented a number of risks that Lead Plaintiffs would be unable to establish liability and damages.   In addition, continuing the litigation through trial and appeals would impose substantial additional costs on the Settlement Class and would result in extended delays before

---

[7] *Kirven II*, 2015 WL 1314086, at *5 (fifth, sixth, and seventh factors).

any recovery could be achieved.  The Settlement, which provides a $192.5 million recovery for the Settlement Class, avoids those further costs and delays.  Moreover, the Settlement represents a substantial percentage of the maximum damages that could be established at trial, and thus represents a very favorable outcome in light of the litigation risks.  All of these factors strongly support approval of the Settlement.

### 1.    The Risks of Establishing Liability and Damages Support Approval of the Settlement

While Lead Plaintiffs and Lead Counsel believe that the claims asserted against Defendants in the Action are meritorious, they recognize that this Action presented several substantial risks to establishing both liability and damages.

### (a)    Risks to Proving Liability

Lead Plaintiffs would have faced substantial challenges in proving that Defendants' statements were materially false and misleading when made and that the statements were made with intent to defraud investors.

**Falsity, Materiality, and Actionability.**  Lead Plaintiffs would have faced significant hurdles in establishing that Defendants' statements were actionable under the federal securities laws.  ¶¶ 81-85.  For example, many of Defendants' statements, including those regarding projected completion dates, costs, and eligibility for federal nuclear production tax credits for the Nuclear Project, were arguably forward-looking statements protected by the safe harbor provisions of the PSLRA.  Indeed, there was a significant risk that many of the alleged statements would be found to be forward-looking because they inherently dealt with SCANA's future projections, including when the Nuclear Project was going to be completed, whether the completion of the Nuclear Project would occur in time for SCANA to qualify for critical nuclear tax credits, and how much the total cost of completion of the Nuclear Project would be at that

time.  ¶ 82.  Defendants would have continued to argue that these statements were accompanied by meaningful cautionary language regarding the Nuclear Project's risks (including risk warnings concerning the Nuclear Project's schedule and costs) that rendered non-actionable Defendants' failure to disclose the independent adverse assessment of the Nuclear Project by Bechtel Corporation ("Bechtel"), which is at the heart of the alleged fraud.  Further, Defendants would have continued to argue that such forward-looking statements were protected by the PSLRA safe harbor because they were not made with actual knowledge of their falsity.  *Id.*

Defendants would have also continued to argue that other allegedly false statements, *e.g.,* those regarding the Nuclear Project's positive progress and Defendants' purported "transparency" and "prudent" oversight, were equally non-actionable puffery or statements of opinion.  ¶ 83.  According to Defendants, in order to establish that an opinion is actionable, Lead Plaintiffs must demonstrate that the Individual Defendant offering the opinion did not actually believe that the statement was false at the time the statement was made.  *See Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*, 135 S. Ct. 1318 (2015).  However, Defendants would likely have continued to argue that Lead Plaintiffs would not be able to establish that the Individual Defendants did not actually believe that their opinion statements were false or that Defendants lacked any reasonable basis for opining that, *inter alia*, progress was being made on the Nuclear Project for numerous reasons, including because Defendants reasonably relied on the assurances of substantial progress on the project and the schedules and costs estimates provided by Westinghouse, the lead contractor on the Nuclear Project.  Accordingly, Lead Plaintiffs would have faced significant challenges in proving that Defendants did not actually believe, or lacked any reasonable basis, for opining that progress was being

made on the Nuclear Project and that they were prudently managing the construction of the Nuclear Project.

Defendants would have also continued to argue that the omissions of Bechtel's adverse findings were non-actionable because, *inter alia*, Defendants had no duty to disclose what the Company understood at that time to be the preliminary, speculative opinions of a third party that had limited information and data about the Nuclear Project. ¶ 85. Moreover, Defendants would have continued to argue that they had no duty to disclose Bechtel's adverse findings because they were contradicted by the information provided to Defendants by Westinghouse, which had assumed the risk of cost overruns on the Nuclear Project by entering into a contractual amendment with SCANA (the "EPC Amendment") at the start of the Class Period. *Id.* Indeed, Defendants would have argued that the EPC Amendment had addressed many of the management and other issues that Bechtel had identified in its assessment, including by bringing a new contractor onto the project (Fluor), thereby rendering Bechtel's adverse findings obsolete. Furthermore, Defendants would have continued to highlight that Bechtel's conclusions were unreliable because Bechtel was motivated in part by its own agenda to secure a position as a contractor on the Nuclear Project. *Id.* Finally, Defendants would have maintained that they had no duty to disclose the Bechtel reports because they were attorney-client privileged work product, based on their position that Bechtel was retained by the Company's outside counsel to assess the Nuclear Project for litigation purposes against Westinghouse and the other contractors. *Id.* Accordingly, Lead Plaintiffs faced substantial risks in establishing the falsity and actionability of Defendants' statements and omissions.

**Scienter.** Even if Lead Plaintiffs succeeded in proving that Defendants' statements were materially false, Lead Plaintiffs would have faced significant hurdles in proving that Defendants

made the statements with the intent to mislead investors or were severely reckless in making the statements.  ¶ 86.  For example, as discussed above, Defendants contend that the Individual Defendants reasonably relied on the schedule and cost estimates provided to SCANA by Westinghouse, its lead contractor on the Project, and further believed in good faith that the EPC Amendment entered into between SCANA and Westinghouse, just days before the start of the Class Period, fixed many of the problems with the Nuclear Project identified by Bechtel in its report to SCANA.  Thus, in order to prove scienter, Defendants contend that Lead Plaintiffs would have to establish, *inter alia*, that Defendants knew that Westinghouse did not reasonably believe that it could complete the Nuclear Project on schedule and on budget, contrary to its continued representations to SCANA.

In addition, Defendants have challenged the accounts of two former Westinghouse employees which Lead Plaintiffs relied on in the Complaint to establish Defendants' knowledge of the schedule delays and cost overruns at the Nuclear Project.  ¶ 87.  Defendants would have continued to maintain that the statements of those Westinghouse employees were mere opinions and the employees had their own agendas with respect to the Nuclear Project and, therefore, cannot be relied on to support the Defendants' scienter.  Similarly, Defendants would likely attempt to discredit the testimony of a key SCANA whistleblower relied on in the Complaint to support Defendants' knowledge of the Nuclear Project's failures and intent to defraud investors, by arguing that this whistleblower was unreliable and motivated by her own personal issues.  *Id.* Accordingly, establishing Defendants' scienter would have posed a significant risk if the litigation were to proceed.

**(b)    Risks to Proving Damages and Loss Causation**

Even assuming that Lead Plaintiffs overcame the above risks and successfully established liability, Lead Plaintiffs would have confronted considerable additional challenges in

14

establishing loss causation and damages. *See Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 345-46 (2005) (plaintiffs bear the burden of proving "that the defendant's misrepresentations 'caused the loss for which the plaintiff seeks to recover'") (citation omitted). Lead Plaintiffs attempted to meet their burden of proving loss causation and damages through their allegations that the alleged fraud was gradually revealed to the investing public through 18 partial corrective disclosures that resulted in maximum class-wide damages of approximately $1.5 billion as estimated by Lead Plaintiffs' damages expert. ¶ 88.

In response, however, Defendants would have continued to argue that the alleged corrective disclosures did not correct the alleged misstatements and omissions for a variety of reasons, including because many of the allegedly concealed risks about the Nuclear Project were previously disclosed and known to the market.   ¶ 89.   For example, Defendants would have maintained their primary loss causation argument that the Class Period should end no later than July 31, 2017, when SCANA announced its abandonment of the Nuclear Project—nearly five months before the end of the alleged Class Period.   Specifically, on July 31, 2017, SCANA announced that it "expected that the cost of completing the Nuclear Project would 'materially exceed' prior estimates by Westinghouse," that "the reactors would not be complete in time to receive the planned tax credits," and there were "significant challenges" to completing the Nuclear Project.   Accordingly, Defendants had a very strong argument that the July 31, 2017 disclosure effectively severed the causal link between Defendants' misstatements and omissions and Lead Plaintiffs' alleged injuries because it fully disclosed all of the relevant concealed information regarding the progress, schedule, and costs of the Nuclear Project and Defendants' poor oversight and lack of transparency regarding the project.   ¶ 90.

In the alternative, Defendants would have continued to argue that, at a minimum, the Class Period should end no later than September 27, 2017. ¶ 91. On this date, the market learned of the existence of Bechtel's original report and its adverse findings, as well as Defendants' attempts not to expose the report, which, according to Defendants, fully disclosed the alleged fraud to investors. If this argument were successful, it would eliminate numerous other subsequent corrective disclosures that Lead Plaintiffs had alleged.

If Defendants prevailed on these arguments at class certification, summary judgment, or trial, maximum recoverable damages would have been significantly reduced. Indeed, according to Defendants, if the Class Period concluded on July 31, 2017, and certain earlier corrective disclosures contested by Defendants for various other reasons were also dismissed, maximum recoverable damages could have been as low as $200 million. ¶ 92.

Moreover, Lead Plaintiffs would have also encountered significant challenges overcoming Defendants' arguments regarding the purported lack of significant stock price reaction when the allegedly undisclosed risks related to the Nuclear Project were first revealed to the public. ¶ 93. Specifically, with respect to the first alleged corrective disclosure in December 2017, Defendants would have continued to argue that SCANA's price did not react in a statistically significant way after Toshiba (Westinghouse's parent company) disclosed a multi-billion dollar impairment related to its nuclear construction business on December 27, 2016. According to Defendants, while news outlets such as *Bloomberg* and the *Wall Street Journal* connected the anticipated write-down directly to the allegedly undisclosed risks facing the Nuclear Project and SCANA's recent schedule revision and cost increases, SCANA's stock price did not react to the disclosure of this information in a statistically significantly way on December 28, 2016. Accordingly, although Lead Plaintiffs had credible responses to these and other loss

causation arguments advanced by Defendants, Lead Plaintiffs faced a significant risk that they would not be able to establish loss causation.

**2.    The Settlement Represents a Substantial Percentage of Maximum Recoverable Damages**

Lead Plaintiffs submit that the $192.5 million Settlement is also a very favorable result when considered in relation to the maximum damages that could be established at trial. As noted above, assuming that Lead Plaintiffs prevailed on all liability issues at trial (which was far from certain) and established loss causation with respect to all 18 alleged corrective disclosures, the maximum damages that Lead Plaintiffs would be able to prove at trial is approximately $1.5 billion, resulting in a recovery for the Settlement Class under the Settlement of approximately 13% of maximum recoverable damages. However, as also noted above, if Defendants succeeded with respect to certain of their loss causation and damages arguments, damages would be reduced to as low as approximately $200 million (and could be further reduced to zero if certain other arguments were accepted). And, even if Lead Plaintiffs were successful at trial, Defendants could have challenged the damages of each large class member in post-trial proceedings, substantially reducing any aggregate recovery.

The recovery provided by the Settlement, even at the 13% level when compared to absolute maximum damages, is well above the average level of recovery in comparable actions. *See, e.g.*, *In re Checking Account Overdraft Litig.*, 830 F. Supp. 2d 1330, 1344-45 (S.D. Fla. 2011) (finding that settlement providing 9% of class' potential recovery was reasonable); *Thorpe v. Walter Inv. Mgmt. Corp.*, No. 1:14-cv-20880-UU, 2016 WL 10518902 at *3 (S.D. Fla. Oct. 17, 2016) (approving settlement representing 5.5% of the maximum damages and noting that the settlement is "an excellent recovery, returning more than triple the average settlement in cases of this size"); *In re Biolase, Inc. Sec. Litig.*, No. 13-1300, 2015 WL 12720318, at *4 (C.D. Cal. Oct.

17

13, 2015) (settlement recovery of 8% of estimated damages "equals or surpasses the recovery in many other securities class actions").  The outcome is particularly favorable here because loss causation issues could have substantially reduced the maximum damages achievable at trial.

### 3.    The Costs and Delays of Continued Litigation Support Approval of the Settlement

The substantial costs and delays required before any recovery could be obtained through litigation also strongly support approval of the Settlement.  *See Mills,* 265 F.R.D. at 256 ("This factor is based on a sound policy of conserving the resources of the Court and the certainty that 'unnecessary and unwarranted expenditure of resources and time benefit[s] all parties.'") (citation omitted).

While this case settled after substantial document discovery had occurred, achieving a litigated verdict in the Action would have required substantial additional time and expense.  In the absence of the Settlement, achieving a recovery for the Settlement Class would have required: (i) the conclusion of fact discovery (including taking numerous depositions); (ii) obtaining a class certification order from the Court and briefing Defendants' likely interlocutory appeal of that order to the Fourth Circuit under Rule 23(f); (iii) conducting complex and expensive expert discovery; (iv) briefing a motion for summary judgment; (v) a trial involving substantial fact and expert testimony; and (vi) post-trial motions.  Finally, whatever the outcome at trial, it is virtually certain that appeals would be taken from any verdict.  The foregoing would pose substantial expense for the Settlement Class and delay the Settlement Class's ability to recover—assuming, of course, that Lead Plaintiffs and the Settlement Class were ultimately successful on their claims.  *See In re MicroStrategy, Inc. Sec. Litig.*, 148 F. Supp. 2d 654, 667 (E.D. Va. 2001) ("additional litigation of plaintiffs' claims ... would likely have been protracted and costly ... [n]or is it likely that this litigation would have ended with a

jury verdict; there is little doubt that a jury verdict for either side would only have ushered in a new round of litigation in the Fourth Circuit and beyond ...").

In contrast to costly, lengthy, and uncertain continued litigation, the Settlement provides an immediate, significant, and certain recovery for the Settlement Class valued at $192.5 million.

<h4 align="center">4.    All Other Factors Set Forth in Rule 23(e)(2)(C)<br>Support Approval of the Settlement</h4>

Rule 23(e)(2)(C) also instructs courts to consider whether the relief provided for the class is adequate in light of "the effectiveness of any proposed method of distributing relief to the class, including the method of processing class-member claims;" "the terms of any proposed award of attorney's fees, including timing of payment;" and "any agreement required to be identified under Rule 23(e)(3)." Fed. R. Civ. P. 23(e)(2)(C)(ii)-(iv). Each of these factors also supports approval of the Settlement or is neutral and does not suggest any basis for inadequacy of the Settlement.

First, the procedures for processing Settlement Class Members' claims and distributing the proceeds of the Settlement to eligible claimants are well-established, effective methods that have been widely used in securities class action litigation. Here, the proceeds of the Settlement will be distributed to Settlement Class Members who submit eligible Claim Forms with required documentation to the Court-authorized Claims Administrator, Epiq Class Action & Claims Solutions, Inc. ("Epiq"). Epiq, an independent company with extensive experience handling the administration of securities class actions, will review and process the claims under the supervision of Lead Counsel, will provide claimants with an opportunity to cure any deficiencies in their claims or request review of the denial of their claim by the Court, and will then mail or wire claimants their *pro rata* share of the Net Settlement Fund (as calculated under the Plan of

Allocation) upon approval of the Court.[8]  This type of claims processing is standard in securities class actions and has long been found to be effective.

Second, the relief provided for the Settlement Class in the Settlement is also adequate when the terms of the proposed award of attorney's fees are taken into account.  As discussed in the accompanying Fee Memorandum, the proposed attorneys' fees of 14% of the Settlement Fund, to be paid upon approval by the Court, are reasonable in light of the efforts of Lead Counsel and the risks in the litigation.  Most importantly with respect to the Court's consideration the fairness of the Settlement, is the fact that approval of attorneys' fees are entirely separate from approval of the Settlement, and neither Lead Plaintiffs nor Lead Counsel may cancel or terminate the Settlement based on this Court's or any appellate court's ruling with respect to attorneys' fees and/or Litigation Expenses.  *See* Stipulation ¶ 21.

Lastly, Rule 23 asks the court to consider the fairness of the proposed settlement in light of any agreements required to be identified under Rule 23(e)(3).  *See* Fed. R. Civ. P. 23(e)(2)(C)(iv).  Here, the only agreement entered into by the Parties, other than the Stipulation and the Term Sheet (which has been superseded by the Stipulation), is the confidential Supplemental Agreement, which sets forth the conditions under which SCANA would be able to terminate the Settlement in the event that requests for exclusion from the Settlement Class exceed a certain amount.  A copy of the Supplemental Agreement was provided to the Court *in camera* in connection with Lead Plaintiffs' motion for preliminary approval of the Settlement.  This type of agreement is a standard provision in securities class actions and has no negative

---

[8] The Settlement is not a claims-made settlement.  If the Settlement is approved, Defendants will have no right to the return of any portion of Settlement based on the number or value of Claims submitted.  *See* Stipulation ¶ 15.

impact on the fairness of the Settlement. *See Hefler v. Wells Fargo & Co.*, No. 16-05479, 2018 WL 6619983, at \*7 (N.D. Cal. Dec. 18, 2018).

### D.     The Settlement Treats Settlement Class Members Equitably Relative to Each Other

The proposed Settlement also treats members of the Settlement Class equitably relative to one another. As discussed below in Part II, pursuant to the Plan of Allocation set forth in the Notice, eligible claimants approved for payment by the Court will receive their *pro rata* share of the recovery based on their transactions in publicly traded SCANA common stock. Lead Plaintiffs will receive the same level of *pro rata* recovery (based on their Recognized Claims as calculated under the Plan of Allocation) as all other Settlement Class Members.

### E.     Reaction of the Settlement Class to the Settlement

One factor not included in Rule 23(e)(2) that should be considered in assessing the proposed Settlement's fairness and adequacy is the Settlement Class's reaction to the proposed Settlement. *See Kirven II*, 2015 WL 1314086, at \*5. While the deadline set by the Court for Settlement Class Members to exclude themselves or object to the Settlement has not yet passed, to date no objections to the Settlement or the Plan of Allocation have been received and no requests for exclusion have been received. ¶¶ 111; 119.[9]

In sum, all of factors to be considered under Rule 23(e)(2) support a finding that the Settlement is fair, reasonable, and adequate.

## II.     THE PLAN OF ALLOCATION IS FAIR AND REASONABLE

In addition to seeking final approval of the Settlement, Lead Plaintiffs seek approval of the proposed Plan of Allocation for the Settlement proceeds.

---

[9] The deadline for submitting objections and requesting exclusion from the Class is May 27, 2020. As provided in the Court's Preliminary Approval Order (ECF No. 219), Lead Plaintiffs will file reply papers no later than June 10, 2020 addressing any requests for exclusion and objections that may be received.

Approval of a plan of allocation of settlement proceeds is governed by the same standards of fairness and reasonableness applicable to the settlement as a whole. *See, e.g., MicroStrategy,* 148 F. Supp. 2d at 668 ("To warrant approval, the plan of allocation must also meet the standards by which the . . . settlement was scrutinized – namely, it must be fair and adequate."). "The proposed allocation need not meet standards of scientific precision, and given that qualified counsel endorses the proposed allocation, the allocation need only have a reasonable and rational basis." *Mills,* 265 F.R.D. at 258.

The proposed Plan of Allocation for the proceeds of the Settlement is set forth in ¶¶ 55-77 of the Notice (Ex. 3-A). The proposed Plan of Allocation was developed by Lead Counsel in consultation with Lead Plaintiffs' damages expert. The Plan provides for the distribution of the Net Settlement Fund to Settlement Class Members who submit Claim Forms that are approved for payment by the Court on a *pro rata* basis based on the extent of their injuries attributable to the alleged fraud.

In developing the Plan of Allocation, Lead Plaintiffs' damages expert calculated the estimated amount of artificial inflation in the per share closing price of publicly traded SCANA common stock that allegedly was proximately caused by Defendants' alleged false and misleading statements and omissions. Notice ¶ 57; In calculating the estimated artificial inflation, Lead Plaintiffs' damages expert considered price changes in publicly traded SCANA common stock in reaction to certain public announcements allegedly revealing the truth concerning Defendants' alleged misrepresentations and omissions, adjusting for price changes that were attributable to market or industry forces. *Id.*

The Plan of Allocation calculates a "Recognized Loss Amount" or "Recognized Gain Amount" for each purchase or acquisition of publicly traded SCANA common stock during the

Class Period that is listed in the Claim Form and for which adequate documentation is provided by the claimant. Notice ¶ 61. The calculation of Recognized Loss Amounts under the Plan will depend on when the claimant purchased and/or sold the shares, whether the claimant held the shares through the statutory 90-day look-back period, *see* 15 U.S.C. § 78u-4(e), and the value of the shares when the claimant purchased, sold, or held them. Claimants who purchased publicly traded SCANA common stock during the Class Period but did not hold the securities through at least one of the dates where artificial inflation was allegedly removed from the price of the securities will have no Recognized Loss Amount as to those transactions because any loss they suffered would not have been caused by the disclosure of the alleged fraud. Notice ¶ 59.

Under the Plan of Allocation, claimants' Recognized Loss Amounts will be netted against their Recognized Gain Amounts, if any, to determine the claimants' "Recognized Claims," and the Net Settlement Fund will be allocated *pro rata* to Authorized Claimants based on the relative size of their Recognized Claims. Notice ¶¶ 63, 72-73.

Lead Counsel believe that the Plan of Allocation provides a fair and reasonable method to equitably allocate the Net Settlement Fund among Settlement Class Members who suffered losses as result of the alleged misconduct. ¶¶ 112-119. To date, no objections to the proposed Plan of Allocation have been received. ¶ 119.

## III.    THE SETTLEMENT CLASS SHOULD BE CERTIFIED

In connection with the Settlement, the Parties have stipulated to the certification of the Settlement Class for purposes of the Settlement. As set forth in detail in Lead Plaintiffs' memorandum of law in support of their motion for preliminary approval of the Settlement, the Settlement Class satisfies all the requirements of Rules 23(a) and (b)(3) of the Federal Rules of Civil Procedure. *See* ECF No. 214-1 at 20-25; *see also* Preliminary Approval Order (ECF No. 219) at ¶¶ 2-3 (finding that the Court will likely be able to certify the Settlement Class at final

approval).  None of the facts regarding certification of the Settlement Class have changed since Lead Plaintiffs submitted their motion for preliminary approval, and there has been no objection to certification.  Accordingly, Lead Plaintiffs respectfully request that the Court certify the Settlement Class under Rules 23(a) and (b)(3) for the reasons set forth in their earlier memorandum.  *See* ECF No. 214-1 at 20-25.

## IV.    NOTICE SATISFIED RULE 23 AND DUE PROCESS

The Notice to the Settlement Class satisfied the requirements of Rule 23, which requires "the best notice that is practicable under the circumstances, including individual notice to all members who can be identified through reasonable effort."  Fed. R. Civ. P. 23(c)(2)(B).  The Notice also satisfied Rule 23(e)(1), which requires that notice of a settlement be "reasonable"— *i.e.*, it must "fairly apprise the prospective members of the class of the terms of the proposed settlement and of the options that are open to them in connection with the proceedings."  *Wal-Mart Stores, Inc. v. Visa U.S.A.*, 396 F.3d 96, 114 (2d Cir. 2005).

Both the substance of the Notice and the method of its dissemination to potential members of the Settlement Class satisfied these standards.  The Notice includes all the information required by Federal Rule of Civil Procedure 23(c)(2)(B) and the PSLRA, 15 U.S.C. § 78u-4(a)(7).  In accordance with the Preliminary Approval Order, and the Court's related order concerning the Notice Date (ECF No. 225), Epiq began mailing copies of the Notice and Claim Form to potential Settlement Class Members on March 25, 2020.  *See* Villanova Decl. ¶¶ 2-9. As of April 21, 2020, Epiq has disseminated 25,215 copies of the Notice Packet to potential Settlement Class Members and nominees.  *See id.* ¶ 9.  In addition, Epiq caused the Summary Notice to be published in the *Wall Street Journal* and transmitted over the *PR Newswire* on April 8, 2020.  *See id.* ¶ 10.  This combination of individual mail to all Settlement Class Members who could be identified with reasonable effort, supplemented by notice in an appropriate, widely-

24

circulated publication, and transmitted over a newswire, was "the best notice . . . practicable under the circumstances." Fed. R. Civ. P. 23(c)(2)(B).

## CONCLUSION

Lead Plaintiffs respectfully request that the Court approve the proposed Settlement and Plan of Allocation as fair, reasonable, and adequate.

DATED: April 22, 2020

*/s/ Marlon E. Kimpson*
Marlon E. Kimpson (D.S.C. Bar No. 7487)
William S. Norton (D.S.C. Bar No. 11343)
Joshua C. Littlejohn (D.S.C. Bar No. 10426)
**MOTLEY RICE LLC**
28 Bridgeside Blvd.
Mt. Pleasant, South Carolina 29464
Telephone: (843) 216-9000
Facsimile: (843) 216-9450
mkimpson@motleyrice.com
bnorton@motleyrice.com
jlittlejohn@motleyrice.com

*Liaison Counsel for Lead Plaintiffs West Virginia IMB and Blue Sky*

John C. Browne *(admitted pro hac vice)*
Jeroen Van Kwawegen (*admitted pro hac vice*)
Lauren Ormsbee *(admitted pro hac vice)*
Michael M. Mathai *(admitted pro hac vice)*
Kate W. Aufses *(admitted pro hac vice)*
**BERNSTEIN LITOWITZ BERGER
   & GROSSMANN LLP**
1251 Avenue of the Americas
New York, New York 10020
Telephone: (212) 554-1400
Facsimile: (212) 554-1444
johnb@blbglaw.com
jeroen@blbglaw.com
lauren@blbglaw.com
michael.mathai@blbglaw.com
kate.aufses@blbglaw.com

*Co-Lead Counsel for Lead Plaintiffs West Virginia IMB and Blue Sky and Proposed Lead Counsel for the Class*

25

James W. Johnson *(admitted pro hac vice)*
Michael H. Rogers *(admitted pro hac vice)*
Irina Vasilchenko *(admitted pro hac vice)*
James Christie *(admitted pro hac vice)*
Philip J. Leggio *(admitted pro hac vice)*
**LABATON SUCHAROW LLP**
140 Broadway
New York, New York 10005
Telephone: (212) 907-0700
Facsimile: (212) 818-0477
jjohnson@labaton.com
mrogers@labaton.com
ivasilchenko@labaton.com
jchristie@labaton.com
pleggio@labaton.com

*Co-Lead Counsel for Lead Plaintiffs West Virginia IMB
and Blue Sky and Proposed Lead Counsel for the Class*

**<u>CERTIFICATE OF SERVICE</u>**

I HEREBY CERTIFY that on April 22, 2020, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will send a Notice of Electronic Filing to all counsel of record.

*/s/ Marlon E. Kimpson*
MARLON E. KIMPSON (D.S.C. Bar No. 7487)
