## UNITED STATES DISTRICT COURT
## DISTRICT OF SOUTH CAROLINA
## (COLUMBIA DIVISION)

| | |
|---|---|
| *In re SCANA Corporation Securities Litigation* | Civil Action No. 3:17-CV-2616-MBS |

**JOINT DECLARATION OF JOHN C. BROWNE AND JAMES W. JOHNSON IN SUPPORT OF (I) LEAD PLAINTIFFS' MOTION FOR FINAL APPROVAL OF CLASS ACTION SETTLEMENT AND PLAN OF ALLOCATION; AND (II) LEAD COUNSEL'S MOTION FOR AN AWARD OF ATTORNEYS' FEES AND <u>PAYMENT OF LITIGATION EXPENSES</u>**

## TABLE OF CONTENTS

**Page**

TABLE OF EXHIBITS TO DECLARATION.............................................................................. iii

I.      INTRODUCTION ................................................................................................... 1

II.     PROSECUTION OF THE ACTION ...................................................................... 6

        A.      Factual Background of the Claims.............................................................. 6

        B.      Filing of the Initial Complaint and Appointment of Lead Plaintiffs and
                Lead Counsel ............................................................................................. 8

        C.      Lead Counsel's Investigation and the Consolidated Class Action
                Complaint.................................................................................................... 9

        D.      Continued Informal Discovery Following Filing of Complaint .......................... 11

        E.      Defendants' Motions to Dismiss the Complaint......................................... 11

        F.      The Court Denies Defendants' Motion to Dismiss.................................... 13

        G.      Discovery ................................................................................................. 15

                1.      Formal Document Discovery.......................................................... 17

                2.      Document Review......................................................................... 21

        H.      Lead Plaintiffs' Motion for Class Certification and Class Certification
                Discovery ................................................................................................. 24

        I.      The Parties Agree to Settle the Action...................................................... 25

III.    RISKS OF CONTINUED LITIGATION ............................................................. 27

        A.      Lead Plaintiffs Faced Substantial Risks in Proving Defendants' Liability.......... 27

                1.      Falsity, Materiality, and Actionability.......................................... 28

                2.      Scienter ........................................................................................ 30

                3.      Loss Causation ............................................................................ 31

        B.      Risks of Prevailing at Class Certification ................................................. 34

        C.      Risk of Appeal .......................................................................................... 34

D.    General Risks in Prosecuting Securities Actions on a Contingent Basis.............. 35

IV.    LEAD PLAINTIFFS' COMPLIANCE WITH THE COURT'S ORDERS REQUIRING ISSUANCE OF SETTLEMENT NOTICE ............................................... 37

V.    ALLOCATION OF THE PROCEEDS OF THE SETTLEMENT................................... 39

VI.    THE FEE AND EXPENSE APPLICATION ................................................... 42

    A.    The Fee Application.............................................................................. 42

        1.    Lead Plaintiffs Have Authorized and Support the Fee and Expense Application................................................................................. 43

        2.    The Significant Time and Labor Devoted to the Action by Plaintiffs' Counsel ..................................................................... 43

        3.    The Quality of Plaintiffs' Counsel's Representation ................................ 45

        4.    Standing and Caliber of Defendants' Counsel.......................................... 46

        5.    The Risks of Litigation and the Need to Ensure the Availability of Competent Counsel in High-Risk Contingent Cases ............................... 46

        6.    The Reaction of the Settlement Class to the Fee Application .................. 47

    B.    The Litigation Expense Application ..................................................................... 48

VII.    MISCELLANEOUS EXHIBITS ...................................................................... 50

VIII.    CONCLUSION............................................................................................... 51

## TABLE OF EXHIBITS TO DECLARATION

| EXHIBIT | DOCUMENT |
|---|---|
| 1 | Declaration of Harmen Nieuwenhuis on Behalf of Blue Sky, dated April 21, 2020 |
| 2 | Declaration of Craig Slaughter on Behalf of West Virginia IMB, dated April 15, 2020 |
| 3 | Declaration of Alexander P. Villanova Regarding: (A) Mailing of the Notice and Claim Form; (B) Publication of the Summary Notice; and (C) Report on Requests for Exclusion, dated April 21, 2020 |
| 4 | Declaration of Layn R. Phillips, dated April 19, 2020 |
| 5 | Declaration on Behalf of Bernstein Litowitz Berger & Grossmann LLP, dated April 22, 2020 |
| 6 | Declaration on Behalf of Labaton Sucharow LLP, dated April 22, 2020 |
| 7 | Declaration on Behalf of Motley Rice LLC, dated April 22, 2020 |
| 8 | Summary Table of Lodestars and Expenses |
| 9 | Summary Table of Plaintiffs' Counsel's Expenses |
| 10 | Unreported Order |

JAMES W. JOHNSON and JOHN C. BROWNE jointly declare as follows:

## I.     INTRODUCTION

1.     John C. Browne is a partner in the law firm of Bernstein Litowitz Berger & Grossmann LLP ("BLB&G") and James W. Johnson is a partner in the law firm of Labaton Sucharow LLP ("Labaton Sucharow"). BLB&G and Labaton are each Court-appointed Lead Counsel for Lead Plaintiffs West Virginia Investment Management Board ("West Virginia IMB") and Stichting Blue Sky Global Equity Active Low Volatility Fund and Stichting Blue Sky Active Large Cap Equity USA Fund ("Blue Sky") (collectively, "Lead Plaintiffs" or "Plaintiffs") and the proposed Settlement Class in the above-captioned action (the "Action").[1] We have personal knowledge of the matters set forth herein based on our active participation in the prosecution and settlement of the Action.

2.     We respectfully submit this Joint Declaration in support of: (a) Lead Plaintiffs' Motion for Final Approval of Class Action Settlement and Plan of Allocation (the "Final Approval Motion"); and (b) Lead Counsel's Motion for an Award of Attorneys' Fees and Payment of Litigation Expenses. In support of these motions, Lead Plaintiffs and Lead Counsel are also submitting the exhibits attached hereto, the Memorandum of Law in Support of Lead Plaintiffs' Motion for Final Approval of Class Action Settlement and Plan of Allocation (the "Settlement Memorandum") and the Memorandum of Law in Support of Lead Counsel's Motion for Attorneys' Fees and Litigation Expenses (the "Fee Memorandum").

3.     The proposed Settlement before the Court provides for the resolution of all claims in the Action in exchange for a payment of $192,500,000—with $160,000,000 paid in cash and

---

[1]     Unless otherwise defined herein, all capitalized terms have the meanings set forth in the Stipulation and Agreement of Settlement, dated December 20, 2019 (the "Stipulation"), previously filed with the Court. *See* ECF No. 214-2.

$32,500,000 paid in freely-tradable Dominion Energy, Inc. ("Dominion Energy")[2] common stock, or cash at the option of SCANA. As detailed herein, the Settlement represents a very favorable result and is in the best interests of the Settlement Class. This Settlement would be the largest securities class action recovery in the history of the District of South Carolina, the fifth largest securities class action recovery ever achieved in the Fourth Circuit, and among the top 100 securities class action recoveries nationwide.

4.      Had litigation continued, Lead Plaintiffs would have faced significant risks in establishing Defendants' liability and proving damages in the Action. Defendants would have vigorously opposed class certification, moved for summary judgment, and put forth substantial defenses to liability, including challenges to falsity, scienter, materiality, and loss causation.

5.      While Lead Plaintiffs would advance strong counterarguments of their own, Lead Counsel recognize that there is a substantial risk that at class certification or summary judgment, Defendants could have been successful in eliminating a portion—or even *all*—of the Settlement Class's potential recoverable damages. Even if Defendants' motion for summary judgment was unsuccessful, Defendants would have continued to vehemently pursue this argument in *Daubert* motion practice, at trial, and through appeals.

6.      Defendants would also have contested the alleged falsity of their statements and whether they were made with an intent to deceive investors and commit securities fraud. They would have argued on summary judgment, and to any jury, that the public was well aware that building a nuclear power plant was an extremely risky endeavor and there were no guarantees it would be successful—indeed, it has not been accomplished in America since the 1970s.

---

[2]      Dominion Energy merged with Defendant SCANA Corporation ("SCANA" or the "Company") effective January 2, 2019, upon which SCANA common stock was converted into Dominion Energy common stock.

Defendants would have pointed to copious risk disclosures they made regarding the uncertainty of the construction project and completion deadlines, and would have argued that they justifiably relied on purported assurances by Westinghouse—one of the largest construction conglomerates in the world—that the project would be completed on time. Even if Lead Plaintiffs were successful in proving their claims to a jury, Defendants would have appealed any verdict in Lead Plaintiffs' favor and, at a minimum, any recovery to class members would be delayed by several years.

7.     The Settlement eliminates these risks while providing a guaranteed recovery to the Settlement Class in a timely manner. When viewed in this context, and relative to other securities class action recoveries, the recovery achieved in this case is very favorable. The Settlement has the full support of Lead Plaintiffs. *See* Declaration of Harmen Nieuwenhuis on Behalf of Blue Sky, dated April 21, 2020, submitted herewith as Ex. 1, at ¶ 8; Declaration of Craig Slaughter on Behalf of West Virginia IMB, dated April 15, 2020, submitted herewith as Ex. 2, at ¶ 7.

8.     As discussed in detail below, the Settlement was achieved in considerable part due to the substantial litigation efforts of Lead Counsel. Prior to filing the detailed amended complaint, Lead Counsel conducted an extensive investigation into the alleged fraud, including a thorough review of the voluminous public record (including relevant SEC filings, analyst reports, news articles, and transcripts of investor calls), as well as: documents obtained from a South Carolina regulatory agency, the Office of Regulatory Staff ("ORS"); Santee Cooper, SCANA's state-owned junior partner on the Nuclear Project; and a South Carolina newspaper, among others, pursuant to the South Carolina Freedom of Information Act ("FOIA"), and interviews

with 69 former employees of SCANA, its lead contractors on the Nuclear Project, and others with relevant knowledge.

9. After Lead Plaintiffs filed the 183 page amended complaint: (i) Lead Counsel engaged in extensive briefing and conducted oral argument before the Court in successfully defeating the bulk of Defendants' motions to dismiss the amended complaint; (ii) undertook substantial informal and formal discovery efforts, which included obtaining and reviewing voluminous additional documents pursuant to FOIA, and, in connection with formal discovery, Lead Plaintiffs' production of 2,120 documents (totaling 146,963 pages), Defendants' production of 565,507 documents (totaling 5,215,238 pages), and the production of an additional 677 documents (totaling 11,260 pages) by Lead Plaintiffs' four relevant non-party investment managers; (iii) moved for class certification, which included preparation of an expert report from Lead Plaintiffs' economic expert, defending the depositions of each of the Lead Plaintiffs, Lead Plaintiffs' economic expert, and cross-examining representatives from each of the Lead Plaintiffs' four relevant non-party investment managers; and (iv) engaged in extensive arm's-length negotiations to achieve the Settlement, including two formal mediation sessions before retired District Court Judge Layn R. Phillips.

10. As a result of these and other substantial efforts detailed below, Lead Plaintiffs and Lead Counsel are well-informed of the strengths and weaknesses of the claims and defenses in the Action, and they have concluded that the Settlement is in the best interests of the Settlement Class.

11. In addition to seeking final approval of the Settlement, Lead Plaintiffs seek approval of the proposed Plan of Allocation for the proceeds of the Settlement. Lead Plaintiffs prepared the Plan of Allocation in consultation with their expert in the fields of damages and

economics. Pursuant to the Plan of Allocation, the Settlement Fund, less Court-approved attorneys' fees and expenses, Notice and Administration Costs, and Taxes (the "Net Settlement Fund"), will be distributed on a *pro rata* basis to Settlement Class Members who submit Claim Forms that are approved for payment by the Court.

12.    Lead Counsel worked hard, and with skill and diligence, to achieve a very beneficial Settlement for the Class. At all times, Lead Counsel took pains to conduct the litigation as efficiently as possible, and minimize duplicative work through careful coordination and meaningful divisions of labor. Plaintiffs' Counsel's efforts have been entirely on a contingency fee basis, and they have not received any payment of fees or expenses.

13.    For their efforts and success in prosecuting the case and negotiating the Settlement, Lead Counsel are applying for an award of attorneys' fees and payment of Litigation Expenses.  Specifically, Lead Counsel are applying for: (i) attorneys' fees in the amount of 14% of the Settlement Fund; (ii) payment of expenses reasonably incurred by Plaintiffs' Counsel in the amount of $729,303.12; and (iii) an aggregate award pursuant to the Private Securities Litigation Reform Act, 15 U.S.C. § 78u-4 ("PSLRA"), in the amount of $41,832.21, to the Lead Plaintiffs in connection with their representation of the Settlement Class. The 14% requested fee, which is based on the decision of Blue Sky and West Virginia IMB, is well within the range of percentage awards granted by this Court, other courts in this Circuit, and across the country in securities class actions. Lead Counsel respectfully submit that the fee request is fair and reasonable in light of the result achieved in the Action, the efforts of Plaintiffs' Counsel, and the risks and complexity of the litigation.

14.    For all of the reasons set forth herein, including the very favorable result obtained and the obstacles to a greater recovery, we respectfully submit that the Settlement and Plan of

Allocation are "fair, reasonable, and adequate" in all respects, and that the Court should approve them pursuant to Federal Rule of Civil Procedure Rule 23(e). For similar reasons, and for the additional reasons set forth below, we respectfully submit that Lead Counsel's request for attorneys' fees and payment of Litigation Expenses, which includes the requested PSLRA awards to Lead Plaintiffs, are also fair and reasonable, and should be approved.

## II.    PROSECUTION OF THE ACTION

### A.    Factual Background of the Claims

15.    This securities class action asserts claims arising under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act") on behalf of investors who purchased or otherwise acquired SCANA common stock from October 27, 2015 through December 20, 2017, inclusive (the "Class Period").

16.    SCANA is an electric and gas utility company which, in 2008, began constructing two nuclear reactors at the V.C. Summer nuclear generating station near Jenkinsville, South Carolina (the "Nuclear Project"). Lead Plaintiffs allege that SCANA and the Individual Defendants made a series of alleged misstatements and omissions during the Class Period regarding the progress and oversight of the Nuclear Project. For example, Lead Plaintiffs allege that Defendants repeatedly assured investors that, *inter alia*, the Nuclear Project was on budget and on schedule (including to qualify for $1.4 billion in federal nuclear tax credits that were crucial to defray the massive costs of the project), SCANA was making significant progress towards completion, and the Nuclear Project was being managed prudently and transparently by Defendants.

17.    Contrary to these statements, however, Lead Plaintiffs allege that Defendants knew by the start of the Class Period that the Nuclear Project suffered from a host of fundamental problems, which made it impossible for the Nuclear Project to be completed by the

end of 2020, as planned, due in large part to Defendants' deficient oversight. In particular, Lead Plaintiffs allege that, in October 2015, Defendants were presented with the adverse findings of SCANA's own independent expert, Bechtel Corporation ("Bechtel"), whom the Company had retained to assess the Nuclear Project. At that time, Bechtel allegedly told Defendants that the Project was years behind schedule—and thus would not be finished until long after the deadline to qualify for the $1.4 billion in tax credits—and was significantly over-budget, due to many "fundamental" engineering, construction, and management failures. According to the Complaint, Bechtel later detailed these findings in a 130-page formal report, which it sent to SCANA in November 2015.

18.     Lead Plaintiffs further allege that, rather than truthfully disclose or attempt to address Bechtel's findings, Defendants pressured Bechtel to issue a second, watered-down report in February 2016. Nonetheless, according to the Complaint, Defendants concealed both Bechtel reports from the public for almost two years. At the same time, Lead Plaintiffs allege that the Nuclear Project continued to deteriorate, as evidenced by many internal documents that Defendants likewise concealed, while Defendants publicly continued to tout the project's purported substantial progress and reaffirm that it was on track to be completed by the prior deadlines.

19.     Lead Plaintiffs allege that, as the truth regarding the Nuclear Project's problems and Defendants' fraud began to slowly emerge in late 2016 and early 2017, Defendants were forced to ultimately abandon it in July 2017, prompting numerous civil and criminal investigations into Defendants' culpability and the public release of the Bechtel reports. According to the Complaint, these and other disclosures in the summer and fall of 2017 further

revealed the true extent of Defendants' fraud, causing significant declines in SCANA's stock price and substantial damages to its investors.

### B. Filing of the Initial Complaint and Appointment of Lead Plaintiffs and Lead Counsel

20. Beginning in September 2017, certain related class actions (*Norman v. SCANA Corp., et al.*, No. 3:17-CV2616-MBS; *Evans v. SCANA Corp. et al.*, No. 3:17-cv-02683-MBS; *Fox v. SCANA Corp., et al.*, No. 3:17-cv-03063-MBS, and *West Palm Beach Firefighters' Pension Fund v. SCANA Corp., et al.*, No. 3:17-cv-03141-MBS) were filed in the United States District Court for the District of South Carolina (the "Court") alleging violations of the federal securities.

21. On November 27 2017, West Virginia IMB and Blue Sky filed a joint motion seeking consolidation of these related actions, appointment as co-lead plaintiffs, and approval of their selection of lead counsel. ECF No. 9. The same day, two other movants also filed competing lead plaintiff motions: (i) the Puerto Rico Retirement Systems (ECF No. 8); and (ii) a group of three individual investors, Marshall Mullins, Dominic Veneto, and Kenneth Evans (collectively known as the "SCANA Investor Group") (ECF No. 8).[3] On December 8, 2017, the Puerto Rico Retirement Systems withdrew their motion. ECF No. 12. The Court held a hearing on the remaining competing lead plaintiff motions on January 18, 2018.

22. By Order dated January 23, 2018, the Court: (i) consolidated the related actions into this lead Action, to be captioned "*In re SCANA Corporation Securities Litigation*" and maintained under File No. 3:17-CV-2616-MBS; (ii) appointed West Virginia IMB and Blue Sky

---

[3] The ECF references herein are to the docket in the first-filed action, *Norman v. SCANA Corp., et al.*, No. 3:17-CV2616-MBS. The SCANA Investor Group filed their lead plaintiff motion for consolidation, appointment of lead plaintiff and approval of selection of lead counsel only on the *Fox v. SCANA Corp., et al.*, No. 3:17-cv-03063-MBS docket. All references to SCANA Investor Group filings are to the *Fox* docket.

as Lead Plaintiffs; and (iii) approved BLB&G and Labaton Sucharow as Lead Counsel. ECF No. 49.

**C.    Lead Counsel's Investigation and the Consolidated Class Action Complaint**

23.    After the Court appointed Lead Plaintiffs and Lead Counsel, Lead Counsel accelerated their already ongoing investigation into potential claims and began drafting a consolidated amended complaint. This effort required that Lead Counsel thoroughly research relevant case law applicable to the claims asserted and Defendants' potential defenses thereto, while simultaneously conducting an exhaustive review of countless materials authored, issued, or presented by SCANA and the other Defendants, including SCANA's financial reports, hundreds of SEC filings, conference call transcripts, press releases, investor presentations, and other communications issued publicly during the Class Period and beyond.

24.    Also as part of their investigation, Lead Counsel engaged in extensive informal discovery efforts to support the Complaint's allegations, including issuing FOIA requests to: (i) The ORS, a South Carolina public utility watchdog that initiated a regulatory proceeding against SCANA before the South Carolina Public Service Commission ("PSC"), SCANA's utility regulator; and (ii) Santee Cooper, South Carolina's state-owned electric and water utility that was SCANA's junior partner on the Nuclear Project.  Lead Counsel also requested documents from *The Post and Courier,* a South Carolina newspaper that had obtained internal documents from their own FOIA requests to the ORS. As a result, Lead Plaintiffs received and reviewed 1,513 documents (totaling 16,560 pages) prior to filing the Complaint on March 30, 2018, and used information from these documents in support of the allegations in the Complaint.

25.    Lead Counsel also contacted 200 former employees of SCANA and its lead contractors on the Nuclear Project, including Westinghouse, and conducted 69 interviews with potential witnesses. These interviews provided valuable insight and background that aided Lead

Counsel in their investigation and formulating the theory of the case. Indeed, Lead Plaintiffs relied on the accounts of two such former Westinghouse employees who worked on the Nuclear Project in supporting the allegations of the Complaint.

26.     Lead Counsel also retained a preeminent economic consulting firm, Global Economics Group, to provide expert analysis relating to market efficiency, loss causation, and damages. The work performed by Global Economics Group provided considerable aid to Lead Counsel in drafting the Complaint.

27.     On March 30, 2018, Lead Plaintiffs filed the Consolidated Class Action Complaint for Violations of the Federal Securities Laws (the "Complaint") asserting claims against all Defendants under Section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder, and against the Individual Defendants under Section 20(a) of the Exchange Act. ECF No. 72. The Complaint, totaling 183 pages plus an 88 page appendix of alleged misstatements, alleged that Defendants misrepresented the status and their oversight of the Nuclear Project, including by assuring investors that the Nuclear Project was on schedule and on budget, making significant progress towards completion, and was being managed prudently and transparently by Defendants.

28.     According to the Complaint, these statements were false and misleading because Defendants allegedly knew from the start of the Class Period that the Nuclear Project was not realistically going to be completed by 2020, as planned, allegedly due in large part to Defendants' deficient oversight. The Complaint further alleged that the price of SCANA common stock was artificially inflated as a result of Defendants' allegedly false and misleading statements and omissions and declined when the truth was revealed through a series of partial corrective disclosures on December 27, 2017, February 14, 2017, February 16, 2017, March 22,

2017, March 23, 2017, July 27, 2017, August 2, 2017, August 4, 2017, August 9, 2017, August 10, 2017, September 7, 2017, September 21, 2017, September 26, 2017, September 29, 2017, October 19, 2017, October 26-27, 2017, October 31, 2017 and December 20, 2017.[4]

### D.  Continued Informal Discovery Following Filing of Complaint

29.  Lead Plaintiffs continued their investigation, obtaining and reviewing voluminous additional documents through the aforementioned FOIA requests after the filing of the Complaint and before the Court's March 29, 2019 Order and Opinion sustaining the Complaint. To secure these documents, Lead Counsel had multiple meet and confer negotiations with the ORS and Santee Cooper.  In total, including the documents discussed above, Lead Plaintiffs received and reviewed 244,233 documents (totaling 1,836,743 pages) prior to the start of formal discovery. Notably, Lead Plaintiffs used many of these newly obtained documents to further support their arguments in opposition to Defendants' subsequent motions to dismiss.

### E.  Defendants' Motions to Dismiss the Complaint

30.  On June 4, 2018, Defendants SCANA, together with Harold Stowe, Maybank Hagood, and James Roquemore, and Defendants Marsh, Addison, and Byrne, all filed four separate motions to dismiss the Complaint. *See* ECF Nos. 92-95. Defendants argued, in large part, that the majority of the statements were forward-looking statements about the expected schedule and cost projections of the Nuclear Project, protected by the PSLRA safe-harbor; the challenged statements were inactionable statements of opinion or immaterial puffery; Defendants had no duty to disclose Bechtel's purported opinions that there were risks and uncertainties with

---

[4]     The alleged corrective disclosures and resultant declines in SCANA stock price were subsequently refined by Lead Plaintiffs' economic expert, upon further analysis as the case proceeded, as reflected in the proposed Plan of Allocation for the proceeds of the Settlement, set forth in the Notice. *See* Declaration of Alexander P. Villanova Regarding: (A) Mailing of the Notice and Claim Form; (B) Publication of the Summary Notice; and (C) Report on Requests for Exclusion, dated April 21, 2020 ("Villanova Decl."), Ex. 3 - A, submitted herewith.

the Nuclear Project; Lead Plaintiffs failed to plead scienter with the heightened particularity required by Rule 9(b) and the PSLRA; and the Complaint failed to plead loss causation because none of the alleged disclosures corrected Defendants' alleged misstatements.

31.    On August 9, 2018, Lead Plaintiffs filed their omnibus opposition to Defendants' four separate motions to dismiss. ECF No. 105. Lead Counsel made every effort to coordinate and streamline their drafting of Lead Plaintiffs' motion to dismiss opposition brief. For example, because BLB&G took the lead in drafting the majority of the amended complaint, BLB&G was primarily responsible for drafting the facts, scienter, and loss causation sections of Lead Plaintiffs' opposition brief, while Labaton Sucharow was primarily responsible for researching and drafting the sections addressing Defendants' various falsity, materiality, safe harbor, and other actionability legal arguments, which accounted for the majority of the opposition brief. Lead Counsel took a similarly coordinated and collaborative approach to briefing throughout their litigation of this case.

32.    In their opposition, Lead Plaintiffs argued, *inter alia*, that: the Complaint sufficiently pled the falsity of Defendants' statements and omissions related to the Nuclear Project, including that Defendants had a duty to disclose Bechtel's adverse findings and other negative internal information known to Defendants; Defendants' statements were not inactionable opinions, but instead misrepresentations of existing facts concerning the status and their oversight of the Nuclear Project; even if certain statements were opinions, they were actionable in that they lacked a reasonable basis when made and misleadingly omitted contradictory, material facts, including Bechtel's findings; Defendants' omissions of such facts were material; Defendants' statements touting the Nuclear Project's progress and Defendants' purported "prudent" and "transparent" oversight and omissions were material, rather than mere

puffery; Defendants' statements, particularly those concerning the projected completion dates, costs, and eligibility for federal nuclear production tax credits of the Nuclear Project, were not forward-looking, and even if any were forward-looking, they were not protected by the PSLRA safe harbor because Defendants' risk warnings did not provide meaningful cautionary language; Defendants did not adequately disclose the risks and problems associated with the Nuclear Project under the truth-on-the-market or bespeaks caution defenses; Defendants' statements were made with the requisite level of scienter, contrary to Defendants' non-culpable explanations that, for example, they reasonably relied on their lead contractors' schedule and budget estimates; and Lead Plaintiffs adequately pled loss causation because each of the alleged corrective disclosures revealed new information about Defendants' fraud.

33.    On September 18-19, 2018, Defendants filed their reply memoranda of law in further support of their motions to dismiss. ECF Nos. 121-24. Lead Plaintiffs carefully reviewed these submissions and evaluated whether a sur-reply was necessary before concluding that the arguments could be addressed at oral argument.

**F.    The Court Denies Defendants' Motion to Dismiss**

34.    On March 4, 2019, Lead Counsel participated in oral argument before the Court on Defendants' motions to dismiss. ECF No. 141. On March 29, 2019, the Court issued an Order and Opinion denying Defendants' motions to dismiss, except that the Court granted the motions to the narrow extent they sought dismissal based on claims for violation of Item 303. *See In re SCANA Corp. Sec. Litig.*, No. 3:17-2616-MBS, 2019 WL 1427443 (D.S.C. Mar. 29, 2019). Regarding falsity, among other things, the Court agreed with Lead Plaintiffs that the Complaint adequately alleged that Defendants misrepresented SCANA's ability to complete the Nuclear Project by the end of 2020, stating that the "statements were contradicted by Bechtel's investigation, Westinghouse's monthly progress reports that detailed recurring problems . . . as

13

well as Westinghouse's own documented failure to make timely progress in construction of the Project." *Id*. at \*7. The Court also found that the Complaint adequately alleged that "Defendants falsely assured investors of transparency regarding the Project, misrepresented their involvement in and oversight of the Project, recklessly refused to implement Bechtel's and Santee Cooper's recommendations, and then misrepresented the state of those affairs to investors." *Id*. at \*8.

35.     Additionally, in rejecting Defendants' arguments that certain statements are inactionable opinion or puffery as a matter of law, the Court found that in the Complaint, Lead Plaintiffs "plausibly allege that the identified misstatements expressed certainty rather than an uncertain view of a fact, and thus cannot be described as opinions or puffery." *Id*. at \*9.

36.     On scienter, the Court sustained Lead Plaintiffs' scienter allegations, finding that the Complaint "plausibly demonstrates that Individual Defendants acted at least recklessly and possibly deliberately." *Id*. at \*11. Among other things, the Court found that "the failure to disclose the Bechtel Reports and other information regarding the viability of the Project are strong evidence of scienter" and that Lead Plaintiffs' "plausibly allege Defendants knew that the monthly progress rate at the Project never tipped 0.8%, which means that there was no material improvement in progress throughout the class period." *Id*. The Court also ruled that "the court cannot say that the facts as a whole more plausibly suggest that Defendants acted innocently or negligently, rather than with intent or sever recklessness." *Id.*

37.     The Court also found that the allegations adequately pled loss causation, dismissing Defendants' argument that the alleged corrective disclosures failed to reveal the truth about any alleged misrepresentations. In particular, the Court held that "Plaintiffs plausibly allege specific public disclosures and subsequent reductions in the value of SCANA's stock as the result of 'the relevant truth . . . leak[ing] out.'" *Id*. at \*12.

38.     The Court sustained the Complaint's Section 20(a) control person liability claims against the Individual Defendants. *Id*.

39.     However, the Court granted Defendants' motions to dismiss in part with respect to Lead Plaintiffs' claim under Item 303 of SEC Regulation S-K that SCANA failed to disclose a materially adverse trend or uncertainty regarding the Nuclear Project. Specifically, the Court held that, based on other authorities within the Fourth Circuit, "failure to comply with Item 303 does not give rise to liability under Section 10(b) or Rule 10b-5," thereby dismissing this claim on legal grounds. *Id*. at *11.

40.     The Court's comprehensive analysis focused on the key issues in the Action and provided the Parties with valuable insight into the issues that allowed them to continue to assess honestly the merits of their respective cases.

41.     Defendants answered the Complaint on June 14, 2019. ECF Nos. 153-156.  The Parties then proceeded into formal discovery.  Defendants expressed their position that the Court's order on Defendants' motions to dismiss had to take all the allegations in the Complaint as true.  Defendants contended that the evidence revealed through the discovery process would absolve them from liability here.

**G.     Discovery**

42.     Following the Court's Order and Opinion on Defendants' motions to dismiss, on May 21, 2019 the Parties met and conferred concerning a proposed plan of discovery. On May 31, 2019, the Parties filed their Joint Rule 26(f) Proposed Discovery Plan and Additional Information Required by Local Civil Rule 26.03. ECF No. 148. The Parties also submitted a Joint Stipulation and Scheduling Order on May 31, 2019. ECF No. 149. On June 6, 2019, the Court issued a "Scheduling Order" (ECF No. 151), that set forth deadlines related to fact and merits discovery, class certification, among others. The Scheduling Order was later amended,

upon motion of the Parties, by a "First Amended Scheduling Order", on August 13, 2019. ECF No. 181.

43.    As described further below, Lead Counsel conducted extensive discovery in litigating this Action, including: the review of documents; defending, and/or otherwise participating in seven depositions in connection with class certification; drafting and responding to interrogatories and discovery requests; extensive meet and confer negotiations between the Parties with respect to Lead Plaintiffs' document requests to Defendants and consulting with Lead Counsel's expert in the preparation of expert reports.

44.    As discussed above, Lead Plaintiffs received and reviewed over 1,500 documents (totaling over 16,500 pages) through FOIA and other informal investigatory requests prior to filing their Complaint. After filing the Complaint, Lead Plaintiffs received and reviewed an additional 230,778 documents (totaling nearly 1.7 million pages) through FOIA requests in 2019. In total, Lead Plaintiffs received and reviewed 244,233 documents (totaling 1,836,743 pages) through FOIA and other informal requests prior to the start of formal discovery. Further, as part of its investigation, Lead Plaintiffs also obtained and reviewed numerous deposition and hearing transcripts of testimony from current and former employees and third-party witnesses in related proceedings against SCANA, including from the regulatory action brought by the ORS and other entities before the PSC.

45.    Once formal discovery began in June 2019, Lead Plaintiffs served on Defendants initial disclosures pursuant to Rule 26(a)(1) of the Federal Rules of Civil Procedure and numerous document requests. Lead Plaintiffs subsequently engaged in multiple meet and confers with Defendants related to these document requests. Simultaneously, Lead Counsel responded to Defendants' document requests and interrogatories, including by making document productions

on Lead Plaintiffs' behalves, and participated in meet and confers regarding Defendants'
discovery requests. In connection with class certification, Lead Counsel defended two separate
30(b)(6) depositions of representatives from each of the co-lead Plaintiffs, West Virginia IMB
and Blue Sky, and also defended the deposition of Lead Plaintiffs' class certification expert,
Chad Coffman. In addition, Lead Counsel participated in four depositions of representatives
from Lead Plaintiffs' investment managers.

### 1.    Formal Document Discovery

46.    Developing the substantial body of evidence needed to prove the alleged
violations of the federal securities laws required Lead Plaintiffs to undertake robust document
discovery efforts. Lead Counsel ultimately obtained and analyzed approximately 565,507
documents, totaling 5,215,238 pages, in connection with formal discovery.

### (a)    Lead Plaintiffs' Document Discovery Directed to Defendants

47.    Pursuant to the Court's Scheduling Order, formal discovery began on June 9,
2019. Shortly thereafter, on June 14, 2019, Lead Plaintiffs served their first request for the
production of documents on all Defendants ("Lead Plaintiffs' First RFP"), which consisted of 58
document requests.

48.    On July 15, 2019, each of the Defendants served their objections and responses to
Lead Plaintiffs' First RFP. Throughout July and August 2019, the Parties negotiated the scope of
Defendants' document production in response to Lead Plaintiffs' First RFP through multiple
telephonic meet and confer sessions and email communications. For example, during a
telephonic meet and confer on July 2, 2019, Defendants informed Lead Plaintiffs that Defendants
had made extensive prior document productions in multiple related criminal, regulatory, and civil
proceedings against SCANA that purportedly overlapped substantially with Lead Plaintiffs'
document requests. Defendants then raised the possibility of re-producing these prior document

productions to Lead Plaintiffs to satisfy a majority of the requests in Lead Plaintiffs' First RFP. On July 22, 2019, in response to Lead Plaintiffs' request, Defendants provided Lead Plaintiffs with extensive additional information regarding Defendants' prior document productions, including, notably, to the SEC and to the U.S. Attorney's Office for the District of South Carolina ("USAO") in response to document subpoenas served in the Department of Justice's ("DOJ") criminal investigation, which Lead Plaintiffs subsequently analyzed.

49.     On August 1, 2019, the Parties met and conferred again regarding Defendants' document production efforts, including SCANA's and Defendant Addison's responses and objections to Lead Plaintiffs' First RFP. During the call, the Parties also continued their discussions regarding Defendants' proposal to respond to a majority of the requests in Lead Plaintiffs' First RFP by re-producing its most inclusive prior document productions in related actions against SCANA. Lead Plaintiffs requested certain additional information regarding these prior document productions and agreed in principle to Defendants' proposal, subject to these follow-up requests. On August 5, 2019, the Parties additionally met and conferred regarding Defendant Byrne's and Marsh's responses and objections to Lead Plaintiffs' First RFP, including their prior productions in related government proceedings.

50.     Following these meet and confers, in August 2019, the Parties continued their discussions regarding the scope of Defendants' document productions in response to Lead Plaintiffs' First RFP. For example, on August 22, 2019, in response to Lead Plaintiffs' follow-up requests on the meet and confers, Defendants provided by email additional information regarding SCANA's prior document productions and other issues related to certain requests in Lead Plaintiffs' First RFP. Shortly thereafter, on August 29, 2019, the Parties reached agreement on Defendants' proposal that they could respond to most of Lead Plaintiffs' document requests by

producing those documents that Defendants produced to the DOJ in its related criminal investigation, subject to Lead Plaintiffs' reservation of rights to make additional requests after receiving and reviewing this initial production.

51.    On September 9, 2019, Defendants made their initial document production, consisting of 565,507 documents, totaling 5,215,238 pages, which were previously produced to the USAO as part of the DOJ's criminal investigation into SCANA. Lead Counsel and their staff attorneys subsequently worked to review and synthesize these documents in preparation for later briefing and depositions. These documents, consisted of, *inter alia*: internal communications between SCANA employees, including Defendants, regarding the Nuclear Project, the Bechtel reports, and Westinghouse's bankruptcy; communications with Santee Cooper, Westinghouse, and other contractors and sub-contractors working on the Nuclear Project concerning the Nuclear Project's progress, schedule, budget, and related issues; documents and communications regarding SCANA's submissions concerning the Nuclear Project to the ORS and PSC; Nuclear Project meeting minutes and related presentations and reports; internal reports and analyses by SCANA, Santee Cooper, and the lead contractors, notably Westinghouse, related to completion of the Nuclear Project; and personnel files and similar documents related to the Nuclear Project, including employee surveys and feedback related to the Nuclear Project.

### (b)    Lead Plaintiffs' Review of Documents and Transcripts in Related Actions

52.    Lead Counsel obtained and reviewed numerous hearing transcripts and deposition transcripts of current and former SCANA employees and officers and third-party witnesses taken in related proceedings against SCANA.

53.    In November 2018, Lead Counsel observed the live broadcast of the three-week hearing before the PSC and prepared daily summaries of the proceedings and testimony.

Approximately 38 witnesses testified in this proceeding, including Defendants Stephen Byrne and Jimmy Addison.

54.    Lead Counsel also revised the daily hearing transcripts of the PSC hearing and created digests of the testimony of relevant witnesses. Lead Counsel also reviewed the 180 exhibits used throughout the PSC hearing, including all documents and testimony referenced in filings with the PSC during the hearing.

55.    Further, Lead Counsel reviewed numerous deposition transcripts (and related document exhibits) of Defendants Jimmy Addison, Stephen Byrne, and Kevin Marsh, as well as other relevant SCANA employees, which were taken in the ORS proceeding and other, related ratepayer actions.

56.    Finally, Lead Counsel analyzed numerous additional transcripts of testimony by SCANA employees before the PSC taken during 2015 to 2018 regarding SCE&G's rate increase requests and created digests of relevant testimony.

(c)    <b>Defendants' Document Discovery</b>

57.    Concurrent with Lead Plaintiffs' efforts to obtain and review documents relevant to their case, on June 25, 2019, Defendants served on Lead Plaintiffs their first request for production of documents, consisting of 27 document requests concerning, *inter alia*, Lead Plaintiffs' investment practices, investment managers, trading history, and knowledge of SCANA and SCANA securities. Defendants served a second set of document requests on Lead Plaintiffs on July 3, 2019. Lead Counsel thereafter drafted their responses and objections to Defendants' document requests, and engaged in a meet and confer process that included numerous telephonic meet and confers and calls (including on July 30, 2019 and August 2, 2019), emails, and letters, as well as substantial attorney time. Ultimately—while simultaneously continuing to negotiate with Defendants concerning the scope of their document production and

20

then beginning to review that initial document production so as to maintain the aggressive discovery schedule—Lead Plaintiffs produced over 2,120 documents, totaling 146,963 pages, each of which required Lead Counsel's review for relevance and privilege.

58.     Defendants also served Lead Plaintiffs with two sets of interrogatory requests, one on June 25, 2019 and another on August 27, 2019. Lead Plaintiffs served responses and objections to Defendants' interrogatories on July 25, 2019 (which Lead Plaintiffs subsequently amended on August 12, 2019) and September 26, 2019, respectively.

### 2.     Document Review

59.     As Lead Counsel received documents in response to Lead Plaintiffs' informal discovery (*e.g.*, FOIA) requests from the ORS, Santee Cooper and other sources, and document requests to Defendants, they needed to review and analyze those documents. In doing so, Lead Counsel looked for ways to keep costs to a minimum, as well as to streamline their review and analysis. In that regard, BLB&G electronically hosted the document productions, and Lead Counsel employed an analytics technology called Relativity Active Learning ("RAL"). Using RAL, attorney coding decisions (for instance, whether the documents are "relevant" or "not relevant") are applied to certain documents, ingested by the active learning model, and then applied by the system in order to identify and prioritize more relevant documents to the reviewers as the review progresses. When reviewing the documents identified by RAL as the more relevant documents, the attorneys were tasked with making several analytical determinations as to the documents' importance and relevance. Specifically, they applied coding to thousands of documents covering a variety of important case-related topics and determined whether the documents were "hot," "highly relevant," "relevant," "not useful," "irrelevant," and "adverse."

60.     In addition to identifying and coding relevant documents, Lead Counsel used the documents to construct organizational charts that categorized SCANA personnel in order to determine who would possess information relevant to Lead Plaintiffs' claims and to prioritize witnesses for eventual depositions. Lead Counsel also constructed timelines and linked documents to Defendants' Class Period representations and the alleged corrective disclosures.

61.     In addition to reviewing the relevant documents identified by RAL, attorneys ran targeted searches using key individuals' names or other keywords related to important case issues to identify and review additional relevant documents.

62.     Lead Counsel also drafted chronologies and prepared compilations of key documents related to the Nuclear Project for purposes of, *inter alia*, drafting the Complaint, opposing Defendants' motions to dismiss, developing its discovery and litigation strategy, and preparing for the two mediations, including locating and compiling: all monthly project review meeting minutes during the Class Period, as well as related communications, correspondence, and attachments; important documents related to Bechtel's assessment of the Nuclear Project; and important documents and communications related to SCANA's internal analysis of the Nuclear Project's schedule and costs performed by the Company's estimate at completion team.

63.     In Lead Counsel's judgment, maintaining an aggressive discovery schedule was important to the successful prosecution of the Action. However, particularly given the volume of documents, Lead Counsel's ability to do so required the assistance of staff attorneys to review documents and help prepare for depositions and mediation. These attorneys were valued and integral members of the team, crucial in identifying key documents for purposes of drafting the Complaint, opposing Defendants' motions to dismiss, drafting mediation statements, and developing the litigation strategy and theories. Among other things, these attorneys also assisted

with the review of deposition transcripts of Individual Defendants and other key witnesses in related actions against SCANA, conducted critical analyses of the documents (including drafting chronologies and memoranda regarding key issues in the case, as discussed above), identified possible deposition witnesses, and prepared deposition kits. They prepared chronologies, compendiums of key players, master exhibit lists and other such compilations of key documents, and analyses of hot documents, which they continually updated and refined as the team's knowledge of issues expanded.

64.     Lead Counsel often asked for follow-up research into particular topics of interest that staff attorneys presented throughout their review. Through regular meetings and discussions, Lead Counsel ensured that these attorneys understood the developing nature of the evidence and focused their review on the key issues and events in the case.

65.     Throughout their review, the attorneys also analyzed the documents for several other issues related to the adequacy and scope of the document productions, including the documents obtained by Lead Counsel through their informal discovery efforts (in particular, their FOIA requests to the ORS and Santee Cooper). For example, the attorneys also reviewed the productions to determine whether they substantively tracked what had been agreed to be produced in response to document and FOIA requests.

66.     Finally, the attorney review team prepared meaningful work product, including chronologies, compendiums of key players, master exhibit lists and other such compilations of key documents, and analyses of hot documents, which they continually updated and refined as the team's knowledge of issues expanded. At all the times, the staff attorneys were under the direct supervision of the attorneys at Lead Counsel who had principal oversight and day-to-day management of the Action.

67.     The attorneys who undertook discovery in this Action have significant credentials and experience and have engaged in substantive work at Lead Counsel for years. In this case and others they have served as valuable members of Lead Counsel's litigation teams, and several have worked with us on multiple cases.

**H.     Lead Plaintiffs' Motion for Class Certification and Class Certification Discovery**

68.     On June 28, 2019, Lead Plaintiffs filed their motion to certify the class, appoint class representatives, and appoint class counsel, along with an expert report in support of their motion from Chad Coffman, addressing market efficiency and common damages methodologies. ECF Nos. 165-66. Following Lead Plaintiffs' motion for class certification, Defendants noticed and took the depositions of seven individuals, including representatives of each of the Lead Plaintiffs pursuant to Rule 30(b)(6), four representatives from Lead Plaintiffs' relevant investment managers, and Lead Plaintiffs' expert, Mr. Coffman.

69.     On August 18, 2019, Defendants deposed Lead Plaintiffs' representative Craig Slaughter, Executive Director and Chief Investment Officer of West Virginia IMB. Defendants focused on topics specifically concerning West Virginia IMB's investment management practices, its investments in SCANA securities, and its knowledge of the present Action, and attempted to establish that Lead Plaintiff was an inadequate class representative.

70.     On September 13, 2019, Defendants took the deposition of Harmen Nieuwenhuis, Lead Plaintiffs' representative from Blue Sky, and focused on issues similar to those explored with Mr. Slaughter.

71.     On September 25, 2019, Defendants filed their memorandum of law in opposition to Lead Plaintiffs' motion for class certification, along with an expert report from Christopher James, Ph.D. ECF Nos. 195. Defendants raised several arguments in opposition to class

certification, including that: (i) Lead Plaintiffs' investment managers, who used algorithmic trading models to make their investment decisions, allegedly did not rely on the integrity of the market price because they would have purchased SCANA securities even if they had known of the fraud; (ii) Lead Plaintiffs could not represent the class because they allegedly learned of the fraud before the Class Period ended in December 2017, but still continued to purchase SCANA stock; and (iii) the Class Period was too long and should end on (a) July 31, 2017, when SCANA announced its abandonment of the Nuclear Project, which Defendants argued completely cured the alleged misrepresentations, or (b) alternatively, on September 27, 2017, when, *inter alia*, news articles disclosed the existence of, and Defendants' failure to disclose, the first Bechtel report.

72.    Defendants' opposition brief relied heavily on Dr. James' expert report for Defendants' central argument—that the proposed Class Period was too long. ECF No. 195-9. Dr. James argued, *inter alia*, that the Class Period defined by Lead Plaintiffs was: (i) inconsistent with an efficient market; and (ii) gave rise to inevitable conflicts of interest between purchasers who bought SCANA stock before the abandonment of the Nuclear Project and those who purchased afterwards.

## I.    The Parties Agree to Settle the Action

73.    Lead Plaintiffs achieved the Settlement through fair, honest, and vigorous negotiations, and with the guidance and input of experienced and informed counsel and the Mediator. *See generally* Declaration of Layn R. Phillips, dated April 19, 2020, submitted herewith as Ex. 4

74.    In the Spring of 2019, the Parties agreed to participate in a settlement mediation and to retain retired U.S. District Court Judge Layn Phillips as the Mediator. The Parties participated in a full-day mediation on May 17, 2019. In advance of the mediation, the Parties

exchanged and submitted to the Mediator detailed mediation opening and reply statements. No agreement was reached at that time.

75.    The Parties eventually agreed to a second mediation, which was held on October 2, 2019. Two rounds of mediation statements were again exchanged and submitted to Judge Phillips in advance of the second mediation. A resolution was ultimately reached at the end of the second mediation. The Parties finalized and executed a Term Sheet on October 3, 2019.

76.    On December 20, 2019, following extensive, arm's-length negotiations, the Parties executed the Stipulation, which embodies the final terms and conditions of the Parties' agreement to settle all claims asserted in the Action, and related claims, in exchange for payment of $192,500,000, subject to the approval of the Court.  On January 7, 2020, Lead Plaintiffs filed a motion for preliminary approval of the Settlement, which included the Stipulation and Agreement of Settlement as an exhibit. *See* ECF Nos. 214, 214-2.

77.    On February 11, 2020, the Court issued an order preliminarily approving the Settlement and providing for notice of the Settlement to the Settlement Class (the "Preliminary Approval Order"). ECF No. 219. Among other things, the Preliminary Approval Order: (i) preliminarily approved the Settlement, as embodied in the Stipulation, subject to further consideration at the Settlement Hearing; (ii) directed that notice of the Settlement be mailed to Settlement Class Members and be published in the *Wall Street Journal* and disseminated using *PR Newswire*; (iii) scheduled the Settlement Hearing for June 17, 2019 at 2:00 p.m.; and (iv) established the procedures and deadlines for Settlement Class Members to submit claims, request exclusion, and file objections to the Settlement, Plan of Allocation, or Lead Counsel's fee and expense application. *Id*. at ¶¶ 4, 5, 7, 14-20.

## III.    RISKS OF CONTINUED LITIGATION

78.    As summarized below, Lead Counsel respectfully submit that there was significant risk in prosecuting, and continuing to prosecute, this Action.  From the time that Lead Counsel agreed to take on the case, settlement was by no means inevitable and certainly not at the high level ultimately achieved. While Lead Plaintiffs prevailed on Defendants' motions to dismiss, the benefits of the Settlement must be weighed against the risks presented by continued litigation of the Action, including, as discussed below, the serious risks of establishing Defendants' liability and damages.

### A.    Lead Plaintiffs Faced Substantial Risks in Proving Defendants' Liability

79.    Here, Defendants would have vigorously contested their liability with respect to every element of Lead Plaintiffs' claims. Even though Lead Plaintiffs prevailed with respect to the motions to dismiss, a substantial risk existed that the Court would find that Lead Plaintiffs failed to establish liability or damages as a matter of law at summary judgment, that Defendants would succeed in a *Daubert* challenge to Lead Plaintiffs' expert's analysis, or—if the Court were to permit the claims to proceed to trial—that a jury (or appeals court) would rule against Lead Plaintiffs.

80.    While Lead Plaintiffs and Lead Counsel believe they advanced strong claims on the merits, they nonetheless acknowledge that Defendants' arguments posed very credible threats to Lead Plaintiffs' ability to ultimately succeed. Defendants would hold Lead Plaintiffs to their burden of proof on all elements of securities fraud, and establishing the Settlement Class's claims would require the jury to make complicated assessments of credibility on several complex and hotly contested factual disagreements. For instance, proving securities fraud required that Lead Plaintiffs demonstrate that Defendants had an intent to deceive or otherwise acted with severe recklessness nearing such intent. While Lead Counsel believe they could marshal

considerable evidence in support of this requirement, there is no way to know how the Court on summary judgment, or a jury at trial, would decide.

### 1.    Falsity, Materiality, and Actionability

81.    Lead Plaintiffs would have faced substantial challenges in proving that Defendants' statements were materially false and misleading when made. Indeed, there were significant risks associated with proving the actionability of many of Defendants' statements. In particular, many of Defendants' statements, including those concerning the projected completion dates, costs, and eligibility for federal nuclear production tax credits of the Nuclear Project, were arguably forward-looking statements of the type that are immune under the PSLRA safe harbor. Many of the alleged misstatements were at risk of being found to be forward-looking because they inherently dealt with SCANA's future projections, including when the Nuclear Project was going to be completed, whether this would be in time for SCANA to qualify for the critical nuclear tax credits, and how much the total cost of completion would be at that time.

82.    Moreover, Defendants would have also vigorously argued that these forward-looking statements were accompanied by meaningful cautionary language regarding the Nuclear Project's risks, including specific risk warnings concerning the Nuclear Project's schedule and costs that repeatedly appeared in the Company's press releases, quarterly and annual SEC filings, and in the Company's regulatory submissions. According to Defendants, such extensive risk disclosures rendered non-actionable Defendants' failure to disclose Bechtel's independent adverse assessment of the Nuclear Project, which is at the heart of the Complaint's allegations. Further, Defendants would have continued to argue that such forward-looking statements were also protected by the PSLRA safe harbor because they were not made with actual knowledge of their falsity, for the reasons set forth in the scienter section below.

83.     Defendants would have also continued to argue that other allegedly false statements, such as those regarding the Nuclear Project's positive progress and Defendants' purported "transparency" and "prudent" oversight of the Nuclear Project, were equally non-actionable statements of opinion or non-actionable puffery. In order to establish that an opinion is actionable, Defendants argued that Lead Plaintiffs would have had to establish that the Individual Defendant offering the opinion did not actually believe that that the statement was false at the time the statement was made. *See Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*, 135 S. Ct. 1318 (2015).

84.     Defendants would likely have continued to argue that Lead Plaintiffs would not be able to establish that the Individual Defendants did not actually believe that their opinion statements were false or that Defendants lacked any reasonable basis for opining that, *inter alia*, progress was being made on the Nuclear Project for numerous reasons, including because Defendants reasonably relied on the assurances of substantial progress on the project and the schedules and costs estimates provided by Westinghouse, the lead contractor on the Nuclear Project. Accordingly, Lead Plaintiffs would have to overcome significant hurdles in proving that Defendants did not actually believe, or lacked any reasonable basis, for opining that progress was being made on the Nuclear Project and that they were prudently managing the Nuclear Project's construction.

85.     Moreover, Defendants would have continued to advance their arguments that the omissions of Bechtel's adverse findings were non-actionable because, *inter alia*, Defendants had no duty to disclose what SCANA understood at that time to be the preliminary, speculative opinions of a third party who had limited information and data about the Nuclear Project. Further, Defendants would have continued to contend that they had no duty to disclose Bechtel's

adverse findings because they were contradicted by the information provided to Defendants by Westinghouse, which had assumed the risk of cost overruns on the Nuclear Project by entering into a contractual amendment with SCANA (the "EPC Amendment") at the start of the Class Period. In particular, Defendants also would have continued to argue that this EPC Amendment had addressed many of the management and other issues that Bechtel had identified in its assessment, including by bringing a new contractor onto the project (Fluor), thereby rendering Bechtel's adverse findings obsolete. Defendants also would have continued to highlight that Bechtel's conclusions were unreliable because it was motivated in part by its own agenda to secure a place as a contractor on the Nuclear Project. Finally, Defendants also would have continued to maintain that they had no duty to disclose the Bechtel reports because they were attorney-client privileged work product, given that Bechtel was retained by SCANA's outside counsel to assess the Nuclear Project for litigation purposes against Westinghouse and the other contractors. Accordingly, Lead Counsel faced substantial risks in establishing the falsity and actionability of Defendants' statements and omissions.

## 2.    Scienter

86.    Lead Plaintiffs would also have also faced significant challenges in proving that Defendants made the alleged false statements with the intent to mislead investors or were severely reckless in disregarding their statements' falsity. For example, as discussed above, Defendants have contended that the Individual Defendants reasonably relied on the schedule, cost estimates, and other positive information about the Nuclear Project's progress provided to SCANA by Westinghouse, its lead contractor on the Nuclear Project. Further, Defendants also have and would have continued to argue that they believed in good faith that the EPC Amendment entered into between SCANA and Westinghouse, just days before the start of the Class Period, fixed many of the problems with the Nuclear Project identified to SCANA by

Bechtel in its assessment. Thus, in order to prove scienter, Lead Plaintiffs would have to establish, *inter alia*, that Defendants knew that Westinghouse did not reasonably believe that it could complete the Nuclear Project on schedule and on budget, contrary to its continued representations to SCANA.

87.     Moreover, Defendants would also have continued to challenge the accounts of two former Westinghouse employees relied on in the Complaint as support for Defendants' knowledge of the schedule delays and cost overruns at the Nuclear Project. Specifically, Defendants would have continued to maintain that these statements were mere opinions of Westinghouse employees, who had their own agendas with respect to the Nuclear Project, and thus cannot be relied on to support the Defendants' scienter. Likewise, Defendants would likely attempt to discredit the testimony of a key SCANA whistleblower relied on in the Complaint to support Defendants' knowledge of the Nuclear Project's failures and intent to defraud investors, as unreliable and motivated by her own personal issues. Accordingly, for all these reasons, proving scienter would have posed a significant risk if the litigation were to proceed.

### 3.     Loss Causation

88.     Lead Counsel expect that Defendants would have vigorously persisted in arguing that much (if not all) of the declines in SCANA's stock prices were not attributable to risks allegedly concealed by Defendants' false and misleading statements and omissions. In order to prove damages from those statements, a class representative bears the burden of establishing "loss causation"—that defendants' false and misleading statements caused their alleged loss. *See Dura Pharm., Inc. v. Broudo*, 544 U.S. 336, 345-46 (2005) (plaintiffs bear the burden of proving "that the defendant's misrepresentations 'caused the loss for which the plaintiff seeks to recover'" (quoting 15 U.S.C. § 78u-4(b)(4))). Lead Plaintiffs attempted to meet this burden through their allegations that Defendants' fraud was gradually revealed to the investing public

through a series of partial corrective events that materialized risks concealed by Defendants' alleged fraud. Lead Plaintiffs' damages expert estimated maximum class-wide aggregate damages of approximately $1.5 billion based on 18 alleged corrective events.

89.     In response, however, Defendants would have continued to argue that the alleged corrective disclosures did not correct the alleged misstatements and omissions for a variety of reasons, including because many of the allegedly concealed risks about the Nuclear Project were previously disclosed and known to the market. Notably, Defendants would have maintained their primary loss causation argument, that the Court should end the Class Period no later than July 31, 2017, when SCANA announced its abandonment of the Nuclear Project—nearly five months before the end of the alleged Class Period. Defendants would continue to contend that by that date (if not earlier), the risks related to the completion of the Nuclear Project were fully disclosed by the abandonment announcement and, thus, any misstatements related to the project's status and oversight were completely corrected.

90.     Specifically, on July 31, 2017, SCANA announced that it "expected that the cost of completing the Nuclear Project would 'materially exceed' prior estimates by Westinghouse," that "the reactors would not be complete in time to receive the planned tax credits," and there were "significant challenges" to completing the Nuclear Project. Therefore, Defendants would have a compelling argument that this disclosure effectively severed the causal link between Defendants' misstatements and omissions and Lead Plaintiffs' alleged injuries because it fully disclosed all of the relevant concealed information regarding the Nuclear Project's progress, schedule, and costs and Defendants' poor oversight and lack of transparency.

91.     In the alternative, Defendants argued, and would have continued to do so, that at a minimum, the Class Period should end no later than September 27, 2017, when the market

learned of the existence of Bechtel's original report and its adverse findings, as well as Defendants' attempts to cover up this report. According to Defendants, such information fully disclosed to investors the alleged fraud, which centers on Defendants' failure to disclose Bechtel's adverse findings that contradicted Defendants' public statements. If this argument were successful, it would eliminate numerous other subsequent corrective disclosures that Lead Plaintiffs had alleged.

92.     If Defendants prevailed on these arguments at class certification, summary judgment, or trial, maximum recoverable damages would have been significantly reduced. Indeed, according to Defendants, if the Class Period concluded on July 31, 2017 and certain earlier corrective disclosures contested by Defendants for various other reasons were also dismissed, maximum recoverable damages could have been as low as $200 million.

93.     Lead Plaintiffs would also face significant challenges in establishing loss causation due to Defendants' arguments regarding the purported lack of significant stock price reaction when the allegedly undisclosed risks related to the Nuclear Project were first revealed to the public. Specifically, with respect to the first alleged corrective disclosure in December 2017, Defendants would continue to advance the argument that SCANA's price did not react in a statistically significant way after Toshiba (Westinghouse's parent company) disclosed a multi-billion dollar impairment related to its nuclear construction business on December 27, 2016.

94.     Defendants had contended that news outlets such as Bloomberg and the *Wall Street Journal* connected the anticipated write-down directly to the allegedly undisclosed risks facing the Nuclear Project and SCANA's recent schedule revision and cost increases. Yet, according to Defendants, SCANA's stock price did not react to the disclosure of this information in a statistically significantly way on December 28, 2016. Accordingly, although Lead Plaintiffs

had credible responses to these and other loss causation arguments advanced by Defendants, Lead Plaintiffs faced a significant risk that it would not be able to establish loss causation.

**B.     Risks of Prevailing at Class Certification**

95.     While Lead Counsel believed that Defendants' substantive arguments in opposition to class certification did not pose a serious issue, there was substantial risk that the Court (or the 4th Circuit on a Rule 23(f) interlocutory appeal) would narrow the Class Period. As previously noted, Defendants argued that the Class Period should end on July 31, 2017 – almost five months earlier than Lead Plaintiffs sought – when SCANA announced the abandonment of the Nuclear Project, or, in the alternative, no later than September 27, 2017, when the market learned of the existence of the original Bechtel report and Defendants' failure to disclose it.

96.     Had the Court accepted Defendants' arguments that the Class Period should end on July 31, 2017 and earlier alleged corrective disclosures be dismissed, damages in the case would have been reduced by more than 86%, which would have substantially reduced the value of the case. If the Court accepted Defendants' alternative argument that the Class Period should end on September 27, 2017—which was compelling given that the disclosure revealed new information about Defendants' knowledge and concealment of Bechtel's original adverse findings, which were at the heart of Lead Plaintiffs' claims—that also would have eliminated numerous subsequent corrective disclosures and thus greatly reduced recoverable damages in the case.

**C.     Risk of Appeal**

97.     Finally, even if Lead Plaintiffs prevailed at summary judgment and at trial, Defendants would likely have appealed the judgment—leading to many additional months, if not years, of further litigation. On appeal, Defendants would have renewed their numerous

arguments as to why Lead Plaintiffs had failed to establish liability and damages, thereby exposing Lead Plaintiffs to the risk of having any favorable judgment reversed or reduced below the Settlement Amount.

98.     Based on all the factors summarized above, Lead Plaintiffs and Lead Counsel respectfully submit that it was in the best interest of the Settlement Class to accept the certain and substantial benefit conferred by the Settlement, instead of incurring the significant risk that the Settlement Class could recover a lesser amount, or nothing at all, after several additional years of arduous litigation.

### D.     General Risks in Prosecuting Securities Actions on a Contingent Basis

99.     Securities class actions are increasingly dismissed at the class certification stage, in connection with *Daubert* motions, or at summary judgment. For example, class certification has been denied in several recent securities class actions. *See, e.g.*, *Ohio Pub. Emps. Ret. Sys. v. Fed. Home Loan Mortg. Corp.*, No. 4:08CV0160, 2018 WL 3861840, at *20 (N.D. Ohio Aug. 14, 2018); *In re Finisar Corp. Sec. Litig.*, No. 5:11-CV-01252-EJD, 2017 WL 6026244, at *9 (N.D. Cal. Dec. 5, 2017); *Gordon v. Sonar Cap. Mgmt. LLC*, No. 11-9665, 2015 WL 1283636 (S.D.N.Y. Mar. 19, 2015); *Sicav v. James Jun Wang*, No. 12-6682, 2015 WL 268855 (S.D.N.Y. Jan. 21, 2015).

100.     Even when class certification has been granted, courts have shortened the class period based on similar arguments offered by Defendants here. *See, e.g.*, *W. Va. Pipe Trades Health & Welfare v. Medtronic, Inc.*, 325 F.R.D. 280, 291-95 (D. Minn. 2018). As noted above, if the Class Period were shortened, damages would be significantly reduced.

101.     Courts also frequently dismiss securities class actions at the summary judgment stage. *See, e.g,* *In re Barclays Bank PLC Sec. Litig.*, No. 09-1989, 2017 WL 4082305, at *25 (S.D.N.Y. Sept. 13, 2017) (summary judgment granted on September 13, 2017 after eight years

of litigation); *Omnicom Grp., Inc. Sec. Litig.*, 541 F. Supp. 2d 546, 554-55 (S.D.N.Y. 2008), *aff'd* 597 F.3d 501 (2d Cir. 2010) (summary judgment granted after six years of litigation and millions of dollars spent by plaintiffs' counsel); *see also In re Xerox Corp. Sec. Litig.*, 935 F. Supp. 2d 448, 496 (D. Conn. 2013), *aff'd* 766 F.3d 172 (2d Cir. 2014). And even cases that have survived summary judgment have been dismissed prior to trial in connection with *Daubert* motions. *See Bricklayers and Trowel Trades Int'l Pension Fund v. Credit Suisse First Boston*, 853 F. Supp. 2d 181 (D. Mass. 2012), *aff'd* 752 F.3d 82 (1st Cir. 2014) (granting summary judgment *sua sponte* in favor of defendants after finding that plaintiffs' expert was unreliable).

102.    Even when securities class action plaintiffs are successful in having a class certified, have prevailed at summary judgment, have overcome *Daubert* motions and have gone to trial, there are still very real risks that there will be no recovery or substantially less of a recovery for class members. For example, in *In re BankAtlantic Bancorp, Inc.*, No. 07-61542, 2011 WL 1585605 (S.D. Fl. Apr. 25, 2011), a jury rendered a verdict in plaintiffs' favor on liability in 2010 but, the following year, the district court granted defendants' motion for judgment as a matter of law and entered judgment in favor of the defendants on all claims. In 2012, the Eleventh Circuit affirmed the district court's ruling, finding that there was insufficient evidence to support a finding of loss causation. 688 F.3d 713 (11th Cir. 2012).

103.    There is also the increasing risk that an intervening change in the law can result in the dismissal of a case after significant effort has been expended. The Supreme Court has heard several securities cases in recent years, often announcing holdings that dramatically changed the law in the midst of long-running cases. *See Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*, 135 S. Ct. 1318 (2015); *Halliburton Co. v. Erica P. John Fund, Inc.*, 134 S. Ct. 2398 (2014); *Comcast Corp. v Behrand*, 133 S. Ct. 1426 (2013); *Morrison v. Nat'l Austl.*

*Bank Ltd.*, 561 U.S. 247 (2010). As a result, many cases have been lost after the plaintiffs have invested thousands of hours in briefing and discovery. For example, in *In re Vivendi Univ., S.A. Sec. Litig.*, 765 F. Supp. 2d 512, 524, 533 (S.D.N.Y. 2011), after a verdict for class plaintiffs finding Vivendi acted recklessly with respect to 57 statements, the district court granted judgment for defendants following a change in the law announced in *Morrison*.

104. Likewise, likely appeals of any judgment lead to many additional months, if not years, of further litigation, exposing plaintiffs to risks of having any favorable judgment reversed or reduced. This risk is very real in securities fraud class actions, as there are numerous instances across the country where jury verdicts for plaintiffs in securities class actions were overturned after appeal. *See, e.g.*, *Glickenhaus & Co. v. Household Int'l, Inc.*, 787 F.3d 408 (7th Cir. 2015) (reversing and remanding jury verdict of $2.46 billion after 13 years of litigation); *Robbins v. Koger Props., Inc.*, 116 F.3d 1441 (11th Cir. 1997) (reversing $81 million jury verdict after 19-day trial and dismissing case with prejudice); *Anixter v. Home-Stake Prod. Co.*, 77 F.3d 1215 (10th Cir. 1996) (overturning plaintiffs' verdict obtained after two decades of litigation); *In re Apple Comp. Sec. Litig.*, No. 84-20148, 1991 WL 238298 (N.D. Cal. Sept. 6, 1991) ($100 million jury verdict vacated on post-trial motions).

105. In sum, Lead Counsel respectfully submit that securities class actions face serious risks of dismissal and non-recovery at all stages of litigation, and this Action is no different.

## IV. LEAD PLAINTIFFS' COMPLIANCE WITH THE COURT'S ORDERS REQUIRING ISSUANCE OF SETTLEMENT NOTICE

106. The Preliminary Approval Order directed that the Notice of (I) Pendency of Class Action and Proposed Settlement; (II) Settlement Fairness Hearing; and (III) Motion for an Award of Attorneys' Fees and Payment of Litigation Expenses (the "Notice") be disseminated to the Settlement Class; set May 27, 2020 as the deadline for Settlement Class Members to submit

objections to the Settlement, the Plan of Allocation, and/or the Fee and Expense Application; set May 27, 2020 as the deadline for Settlement Class Members to request exclusion from the Settlement Class, and scheduled the final approval hearing for June 17, 2020. ECF No. 219.

107.    The Preliminary Approval Order authorized Lead Counsel to retain Epiq Systems ("Epiq") as the Claims Administrator for the Settlement. *Id*. at ¶ 7. In accordance with the Preliminary Approval Order, and the Court's related order concerning the Notice Date (ECF No. 225) Epiq has: (i) mailed the Court-approved Notice and Claim Form (together, the "Notice Packet") to potential Settlement Class Members who have been identified through reasonable effort; (ii) posted the Notice and Claim Form on the website developed for this Settlement, www.SCANASecuritiesLitigation.com; and (iii) published the Summary Notice in the *Wall Street Journal* and transmitted it over the *PR Newswire*.[5]

108.    The Notice sets forth a description of the terms of the Settlement and the proposed Plan of Allocation and provides potential Settlement Class Members with, among other things, an explanation of their right to object to any aspect of the Settlement, the Plan of Allocation, and/or Lead Counsel's request for an award of attorneys' fees and payment of Litigation Expenses, the manner for submitting a Claim Form in order to be eligible to receive a payment from the Settlement, and their right to request exclusion from the Settlement Class. *See generally* Ex. 3 - A. The Notice also informs Settlement Class Members of Lead Counsel's intention to apply for an award of attorneys' fees in an amount not to exceed 14% of the Settlement Fund, and for payment of Litigation Expenses incurred in connection with the institution, prosecution and resolution of the Action, as well as Lead Plaintiffs' PSLRA award, in an amount not to exceed $1,200,000.

---

[5]    Epiq's efforts are detailed in the Villanova Declaration, attached as Exhibit 3 hereto.

109.    As set forth in the Villanova Declaration, Epiq disseminated 21,771 copies of the Notice Packet to potential Settlement Class Members and nominees by first-class mail by March 25, 2020. Villanova Decl. at ¶¶ 2-6.  As of April 21, 2020, a total of 25,215 Notice Packets have been mailed to potential Settlement Class Members and nominees. *Id.* at ¶ 9. Epiq also caused, in accordance with the Court's Orders, the Summary Notice to be published in *Wall Street Journal* and to be transmitted via *PR Newswire* on April 8, 2020. *Id.* at ¶ 10.

110.    Contemporaneously with the mailing of the Notice Packet, Epiq also created a case website to provide Settlement Class Members and other interested parties with information concerning the Settlement and the important dates and deadlines in connection therewith, as well as access to downloadable copies of the Notice, Claim Form, Stipulation, and Preliminary Approval Order. *See id.* at ¶ 14.  The Notice Packet has also been posted on Lead Counsel's firm websites.

111.    As noted above, the Court-ordered deadline for Settlement Class Members to request exclusion or file objections to the Settlement, the Plan of Allocation and/or the Fee and Expense Application is May 27, 2020. To date, no objections to the Settlement, Plan of Allocation or Fee and Expense Application have been received, and no requests for exclusion have been received. Lead Plaintiffs and Lead Counsel will address any objections in their reply papers to be filed with the Court on June 10, 2020.

## V.    ALLOCATION OF THE PROCEEDS OF THE SETTLEMENT

112.    Pursuant to the Preliminary Approval Order, and as set forth in the Notice, all Settlement Class Members who want to participate in the distribution of the Net Settlement Fund (*i.e.*, the Settlement Fund less any (a) Taxes, (b) Notice and Administration Costs, (c) Litigation Expenses awarded by the Court, (d) attorneys' fees awarded by the Court; and (e) other costs or fees approved by the Court) are to submit a Claim Form by mail or online, using the case

website, by no later than July 25, 2020. As set forth in the Notice, the Net Settlement Fund will be distributed among Settlement Class Members who submit eligible claims according to the plan of allocation approved by the Court.

113.    Lead Counsel developed the proposed plan of allocation for the Net Settlement Fund (the "Plan of Allocation") in consultation with Lead Plaintiffs' economic and damages expert. Lead Counsel believe that the Plan of Allocation provides a fair and reasonable method to equitably allocate the Net Settlement Fund among Settlement Class Members who suffered losses as result of the conduct alleged in the Complaint.

114.    The Plan of Allocation is set forth in the Notice. *See* Villanova Decl., Ex. A at ¶¶ 55-77.  As described in the Notice, calculations under the Plan of Allocation are not intended to be estimates of, nor indicative of, the amounts that Settlement Class Members might have been able to recover at trial or estimates of the amounts that will be paid to Authorized Claimants pursuant to the Settlement. *Id*. at ¶ 55. Instead, the calculations under the plan are a method to weigh the claims of Settlement Class Members against one another for the purposes of making *pro rata* allocations of the Net Settlement Fund.

115.    In developing the Plan of Allocation, Lead Plaintiffs' expert calculated the estimated amount of artificial inflation in the per share closing price of publicly traded SCANA common stock that allegedly was proximately caused by Defendants' alleged false and misleading statements and omissions. Notice ¶ 57. In calculating the estimated artificial inflation, Lead Plaintiffs' expert considered price changes in publicly traded SCANA common stock in reaction to certain public announcements allegedly revealing the truth concerning Defendants' alleged misrepresentations and omissions, adjusting for price changes that were attributable to market or industry forces. *Id*.

116.    The Plan of Allocation calculates a "Recognized Loss Amount" or "Recognized Gain Amount" for each purchase or acquisition of publicly traded SCANA common stock during the Class Period that is listed in the Claim Form and for which adequate documentation is provided by the claimant. Notice ¶ 61. The calculation of Recognized Loss Amounts under the Plan will depend on when the claimant purchased and/or sold the shares, whether the claimant held the shares through the statutory 90-day look-back period, *see* 15 U.S.C. § 78u-4(e), and the value of the shares when the claimant purchased, sold, or held them. Claimants who purchased publicly traded SCANA common stock during the Class Period but did not hold the securities through at least one of the dates where artificial inflation was allegedly removed from the price of the securities by a corrective disclosure will have no Recognized Loss Amount as to those transactions because any loss they suffered would not have been caused by the disclosure of the alleged fraud.  Notice ¶ 59.

117.    Under the Plan of Allocation, claimants' Recognized Loss Amounts will be netted against their Recognized Gain Amounts, if any, to determine the claimants' "Recognized Claims," and the Net Settlement Fund will be allocated *pro rata* to Authorized Claimants based on the relative size of their Recognized Claims. Notice ¶¶ 63, 72-73.

118.    In sum, the Plan of Allocation was designed to fairly and rationally allocate the proceeds of the Net Settlement Fund among Settlement Class Members based on the losses they suffered on transactions in SCANA common stock that were attributable to the conduct alleged in the Complaint. Accordingly, Lead Counsel respectfully submit that the Plan of Allocation is fair and reasonable and should be approved by the Court.

119.    As noted above, as of April 21, 2020 more than 25,000 copies of the Notice, which contains the Plan of Allocation and advises Settlement Class Members of their right to

object to the proposed Plan of Allocation, have been sent to potential Settlement Class Members and nominees. *See* Villanova Decl. at ¶ 9. To date, no objections to the proposed Plan of Allocation have been received.

## VI.    THE FEE AND EXPENSE APPLICATION

120.    In addition to seeking final approval of the Settlement and Plan of Allocation, Lead Counsel are applying to the Court, on behalf of Plaintiffs' Counsel, for an award of attorneys' fees of 14% of the Settlement Fund (the "Fee Application"). Lead Counsel also request payment of Litigation Expenses incurred in connection with the prosecution of the Action from the Settlement Fund in the amount of $729,303.12. Lead Counsel further request an award to Lead Plaintiffs in the total amount of $41,832.21, directly related to their representation of the Settlement Class, in accordance with the PSLRA, 15 U.S.C. § 78u-4(a)(4). The legal authorities supporting the requested fee and expenses are discussed in Lead Counsel's Fee Memorandum. The primary factual bases for the requested fee and expenses are summarized below.

### A.    The Fee Application

121.    For Plaintiffs' Counsel's efforts on behalf of the Settlement Class, Lead Counsel are applying for a fee award to be paid from the Settlement Fund on a percentage basis. Only Lead Counsel, BLB&G and Labaton Sucharow, and Liaison Counsel, Motley Rice LLC, will be paid from the fee award. Based on the quality of the result achieved, the extent and quality of the work performed, the significant risks of the litigation, and the fully contingent nature of the representation, Lead Counsel respectfully submit that the requested fee award is reasonable and should be approved. As discussed in the Fee Memorandum, a 14% fee award is fair and reasonable for attorneys' fees in common fund cases such as this and is within the range of percentages awarded in securities class actions in this Circuit with comparable settlements.

### 1. Lead Plaintiffs Have Authorized and Support the Fee and Expense Application

122.    Lead Plaintiff West Virginia IMB is a sophisticated institutional investor that closely supervised and monitored the prosecution and settlement of the Action. *See* Declaration of Craig Slaughter, Ex. 2, at ¶¶ 2-6. West Virginia IMB has evaluated the Fee and Expense Application and fully supports the requests. *Id*. at ¶ 8. Accordingly, Lead Plaintiff West Virginia IMB's endorsement of Lead Counsel's fee and expense request demonstrates its reasonableness and should be given weight in the Court's consideration of the fee award.

123.    Lead Plaintiff Big Sky is a sophisticated institutional investor that closely supervised and monitored the prosecution and settlement of the Action. *See* Declaration of Harmen Nieuwenhuis, Ex. 1, at ¶¶ 2-7. Blue Sky has evaluated the Fee and Expense Application and fully supports the requests. *Id*. at ¶ 9. Accordingly, Lead Plaintiff Blue Sky's endorsement of Lead Counsel's fee and expense request demonstrates its reasonableness and should be given weight in the Court's consideration of the fee award.

### 2. The Significant Time and Labor Devoted to the Action by Plaintiffs' Counsel

124.    The work undertaken by Plaintiffs' Counsel in investigating and prosecuting this case and arriving at the Settlement in the face of substantial risks has been time-consuming and challenging. As set forth above, the Action settled only after counsel overcame multiple legal and factual challenges, extensive informal and formal fact discovery that was ongoing at the time of settlement, including the analysis of more than 1.8 million pages of documents obtained through informal discovery efforts, as well as over 5.2 million of pages of documents obtained from Defendants through formal discovery, which Lead Counsel had begun to analyze at the time of settlement, and defended or otherwise participated in seven depositions in connection with class certification.

125.    Throughout this case, Lead Counsel devoted substantial time to its prosecution. While we personally devoted significant time to the case, other experienced attorneys at our firms were also involved, with more junior attorneys and paralegals working on matters appropriate to their skill and experience level. Throughout the litigation, Lead Counsel maintained an appropriate level of staffing that avoided unnecessary duplication of effort and ensured the efficient prosecution of this litigation. At all times throughout the pendency of the Action, Lead Counsel's efforts were driven and focused on advancing the litigation to bring about the most successful outcome for the Settlement Class, whether through settlement or trial.

126.    The time and labor expended by Plaintiffs' Counsel in pursuing this Action and achieving the Settlement strongly demonstrate the reasonableness of the requested fee. Attached hereto as Exhibits 5 to 7 are declarations from Plaintiffs' Counsel in support of the Fee and Expense Application (the "Fee and Expense Declarations"). Each of the Fee and Expense Declarations includes a schedule summarizing the lodestar of the firm and the litigation expenses it incurred, delineated by category. The Fee and Expense Declarations indicate the amount of time spent on the Action by the attorneys and professional support staff of each firm from the inception of the Action through March 31, 2020, and the lodestar calculations based on their current hourly rates. For attorneys or professional support staff who are no longer employed by a firm, the lodestar calculations are based upon the hourly rates for such person in his or her final year of employment. The hourly rates of Plaintiffs' Counsel range from $775 to $1,300 for partners, $725 to $775 for of-counsel, $450 to $700 for associates, $335 to $410 for staff attorneys, $225 to $375 for paralegals/managing clerk, and $175 to $600 for investigators/litigation support staff. These declarations were prepared from daily time records

44

regularly maintained and prepared by the respective firms, which are available at the request of the Court.

127.    As set forth in Exhibit 8, Plaintiffs' Counsel expended a total of 41,189.6 hours in the investigation, prosecution, and resolution of the Action through March 31, 2020. The resulting total lodestar for this time is $19,859,952.00; however, additional time will necessarily be dedicated to seeking approval of the Settlement and its administration.

128.    The requested 14% fee equals $26.95 million, before accrued interest, and therefore, under the lodestar approach, is approximately 1.36 times the value of Plaintiffs' Counsel's lodestar. As discussed in the Fee Memorandum, this requested multiplier is within, and indeed at the lower end of,  the range of multipliers typically awarded by Courts in this Circuit in cases involving significant contingency fee risk and settlements of similar magnitude. *See* Fee Memorandum at §III.A.

### 3.    The Quality of Plaintiffs' Counsel's Representation

129.    Lead Counsel believe that the best test of the quality of the representation provided is the quality of the results achieved for the class members whom counsel were appointed to represent. Here, for the reasons previously detailed above, Lead Counsel respectfully submit that the Settlement is a very favorable result for the Settlement Class. Reached after years of dedicated effort, the Settlement is the result of Plaintiffs' Counsel's hard work, persistence and skill in a case that presented significant litigation risks.

130.    Moreover, as demonstrated by the firm resumes included as Exhibits 6 - C and 7 - C hereto, Lead Counsel are among the most experienced and skilled law firms in the securities litigation field, and each firm has a long and successful track record representing investors in such cases. We believe Lead Counsel's experience and ability added valuable leverage in the settlement negotiations.

### 4.    Standing and Caliber of Defendants' Counsel

131.    The quality of the work performed by Plaintiffs' Counsel in attaining the Settlement should be evaluated in light of the quality of their opposition. Defendants were represented by vigorous and extremely able counsel from many prestigious defense law firms, including McGuireWoods LLP, counsel for Dominion Energy and Defendants SCANA, Stowe, Hagood, and Roquemore; Cadwalader, Wickersham & Taft LLP, counsel for Defendant Marsh; Alston & Bird, counsel for Defendant Addison; and Wilmer Cutler Pickering Hale and Dorr, LLP, counsel for Defendant Byrne. In the face of this skillful and well-financed opposition, Lead Counsel were nonetheless able to develop a case that was sufficiently strong to persuade Defendants and their counsel to settle the case on terms that will benefit the Settlement Class.

### 5.    The Risks of Litigation and the Need to Ensure the Availability of Competent Counsel in High-Risk Contingent Cases

132.    The prosecution of these claims was undertaken entirely on a contingent-fee basis, and the considerable risks assumed by Lead Counsel in bringing this Action to a successful conclusion are described above. Those risks are relevant to the Court's evaluation of an award of attorneys' fees. Here, the risks assumed by Counsel, and the time and expenses incurred by Plaintiffs' Counsel without any payment, were extensive.

133.    From the outset, Lead Counsel understood that they were embarking on a complex, expensive, lengthy, and hard-fought litigation with no guarantee of ever being compensated for the substantial investment of time and the outlay of money that vigorous prosecution of the case would require. In undertaking that responsibility, Lead Counsel were obligated to ensure that sufficient resources (in terms of attorney and support staff time) were dedicated to the litigation, and that Lead Counsel would further advance all of the costs necessary to pursue the case vigorously on a fully contingent basis, including funds to

compensate vendors and consultants and to cover the considerable out-of-pocket costs that a case such as this typically demands. Because complex shareholder litigation generally proceeds for several years before reaching a conclusion, the financial burden on contingent-fee counsel is far greater than on a firm that is paid on an ongoing basis. Indeed, Lead Counsel have received no compensation during the course of this Action, yet they have incurred $729,303.12 in expenses in prosecuting this Action for the benefit of SCANA investors.

134.    Plaintiffs' Counsel's persistent efforts in the face of significant risks and uncertainties have resulted in a significant and certain recovery for the Settlement Class. In light of this recovery and Plaintiffs' Counsel's investment of time and resources over the course of the litigation, Lead Counsel believe the requested attorneys' fee is fair and reasonable and should be approved.

### 6.    The Reaction of the Settlement Class to the Fee Application

135.    As noted above, as of April 21, 2020, 25,215 Notice Packets have been mailed to potential Settlement Class Members and nominees advising them that Lead Counsel would apply for attorneys' fees in an amount not to exceed 14% of the Settlement Fund. *See* Villanova Decl. at ¶ 9 and Ex. A (Notice at ¶¶ 5, 78). In addition, the Court-approved Summary Notice has been published in the *Wall Street Journal* and transmitted over the *PR Newswire*. *Id*. ¶ 10. To date, no objections to the request for attorneys' fees have been received.

136.    In sum, Lead Counsel accepted this case on a contingency basis, committed significant resources to it, and prosecuted it without any compensation or guarantee of success. Based on the favorable result obtained, the quality of the work performed, the risks of the Action, and the contingent nature of the representation, Lead Counsel respectfully submit that the requested fee is fair and reasonable.

**B.      The Litigation Expense Application**

137.    Lead Counsel also seek payment of $729,303.12 in Litigation Expenses that were reasonably incurred in connection with the prosecution of the Action (the "Expense Application").

138.    From the outset of the Action, Lead Counsel have been cognizant of the fact that they might not recover any of their expenses and, further, that if there were to be payment of expenses, it would not occur until the Action was successfully resolved, often a period lasting several years. Lead Counsel also understood that, even assuming that the case was ultimately successful, payment of expenses would not necessarily compensate them for the lost use of funds advanced by them to prosecute the Action. Consequently, counsel were motivated to take steps to minimize expenses whenever practicable without jeopardizing the vigorous and efficient prosecution of the case.

139.    Plaintiffs' Counsel have incurred a total of $729,303.12 in litigation expenses in connection with the prosecution of the Action. The expenses are summarized in Exhibit 9, which was prepared based on the Fee and Expense Declarations submitted by each firm and identifies each category of expense, *e.g.*, expert fees, on-line legal and factual research, travel costs, telephone and duplicating expenses, and the amount incurred for each category. As attested to in each firm's Fee and Expense Declaration (Exhibits 5 to 7 hereto), these expenses are reflected on the books and records maintained by each Plaintiffs' Counsel firm. These books and records are prepared from expense vouchers, check records, and other source materials and are an accurate record of the expenses incurred. Importantly, these expenses were recorded separately by Plaintiffs' Counsel and are not duplicated among the respective firms' hourly rates.

140.    Of the total amount of expenses, $296,351.08, or approximately 41%, was expended for the retention of consulting experts. As noted above, Lead Counsel worked

extensively with their expert on issues related to market efficiency, loss causation, and damages. This work was instrumental in Lead Counsel's appraisal of the claims, moving for class certification, and ultimately bringing about the favorable result achieved.

141.    Another significant category of expenses was for document management and litigation support, which total $140,053.40, or approximately 19% of the total amount of expenses.

142.    The costs of mediation totaled $50,697.50, or approximately 7% of the total expenses.

143.    The combined costs of on-line legal and factual research were $68,569.26, or approximately 9% of the total expenses. The costs of court reporting totaled $34,784.26, or approximately 5% of total expenses.

144.    Plaintiffs' Counsel also incurred $56,015.50 in out-of-town travel costs, or approximately 8% of the total expenses, for travel in connection with court appearances and depositions in the Action. As detailed in the Fee and Expense Declarations, Lead Counsel have capped these travel costs in various ways, including limiting airfare to coach rates and capping expenses for meals and hotels.

145.    The other expenses for which Plaintiffs' Counsel seek payment are the types of expenses that are necessarily incurred in litigation and regularly charged to clients. These expenses include, among others, filing fees, copying/printing costs (in-house and through outside vendors), long distance telephone charges, and postage and delivery expenses.

146.    Additionally, pursuant to the PSLRA, 15 U.S.C. § 78u-4(a)(4), Lead Plaintiffs are seeking reimbursement related directly to their representation of the Settlement Class, based on the time that employees of West Virginia IMB and Blue Sky dedicated to the Action, including

being deposed and participating in settlement negotiations, and out-of-pocket travel expenses incurred. Such payments are expressly authorized and anticipated by the PSLRA, as discussed in the Fee Memorandum, §V.

147.    As set forth in the Slaughter Declaration, attached hereto as Exhibit 2, West Virginia IMB seeks an award of $34,048.82, as reimbursement for the time it dedicated to the Action ($27,650.70 in connection with 201.2 hours) and $6,398.12 in out-of-pocket expenses related to its attendance at both mediations.  As set forth in the Nieuwenhuis Declaration attached hereto as Exhibit 1, Blue Sky seeks a total of $7,783.39 in reimbursement for its time, which is based on 147 hours.

148.    The Notice informed potential Settlement Class Members that Lead Counsel would be seeking payment of expenses in an amount not to exceed $1,200,000, including reimbursement to the Lead Plaintiffs directly related to their representation of the Settlement Class, as authorized by the PSLRA. *See* Ex. 3 - A at ¶¶ 5, 78. The aggregate amount requested, $771,135.33, which includes $729,303.12 for litigation expenses incurred by Plaintiffs' Counsel and $41,832.21 in PSLRA reimbursement to the Lead Plaintiffs, is well below the $1.2 million cap.

149.    The expenses incurred by Plaintiffs' Counsel and Lead Plaintiffs were reasonable and necessary to represent the Settlement Class and achieve the Settlement. Accordingly, Lead Counsel respectfully submit that the expenses should be paid in full from the Settlement Fund.

## VII.    MISCELLANEOUS EXHIBITS

150.    Attached hereto as Exhibit 10 is a true and correct copy of the unreported Order Awarding Lead Counsel's Attorneys' Fees and Expenses, *City of Ann Arbor Emps.' Ret. Sys. v. Sonoco Prods. Co.*, No. 4:08-cv-02348-TLW-KDW (D.S.C. Sept. 7, 2012), ECF No. 225 (Wooten, J.).

## VIII.   CONCLUSION

151.    For all the reasons stated above, Lead Plaintiffs and Lead Counsel respectfully submit that the Settlement and the Plan of Allocation should be approved as fair, reasonable, and adequate. Lead Counsel further submit that the requested fee of 14% of the Settlement Fund should be approved as fair and reasonable, the request for payment of Plaintiffs' Counsel's litigation expenses in the amount of $729,303.12 should be approved; and Lead Plaintiffs' request for $41,832.21 should be approved.

We declare, under penalty of perjury, that the foregoing is true and correct. Executed this 22nd day of April, 2020.

_____                          _____
James W. Johnson                                           John C. Browne

## VIII.  CONCLUSION

151.    For all the reasons stated above, Lead Plaintiffs and Lead Counsel respectfully submit that the Settlement and the Plan of Allocation should be approved as fair, reasonable, and adequate. Lead Counsel further submit that the requested fee of 14% of the Settlement Fund should be approved as fair and reasonable, the request for payment of Plaintiffs' Counsel's litigation expenses in the amount of $729,303.12 should be approved; and Lead Plaintiffs' request for $41,832.21 should be approved.

We declare, under penalty of perjury, that the foregoing is true and correct. Executed this 22nd day of April, 2020.

_____                                _____

James W. Johnson                                                    John C. Browne

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that on April 22, 2020, I electronically filed the foregoing with the

Clerk of Court using the CM/ECF system, which will send a Notice of Electronic Filing to all

counsel of record.

*/s/ Marlon E. Kimpson*
MARLON E. KIMPSON (D.S.C. Bar No. 7487)
